ORIGINAL

EARL ANZAI
Acting Attorney General
JACK ROSENZWEIG
Deputy Attorney General
State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Telephone:    (808) 586-1301
Facsimile:    (808) 586-1205

SPENCER HOSIE    (Admitted *Pro Hac Vice*)
GEORGE FROST    (Admitted *Pro Hac Vice*)
Hosie Frost & Large
One Post Street
25th Floor
San Francisco, California  94104
Telephone:    (415) 296-9801
Facsimile:    (415) 296-9802

Of Counsel:
GALIHER DeROBERTIS NAKAMURA ONO TAKITANI
Law Corporations
GARY O. GALIHER
L. RICHARD DeROBERTIS
JEFFREY T. ONO
610 Ward Avenue, Suite 200
Honolulu, Hawaii  96814-3308
Telephone:    (808) 597-1400
Facsimile:    (808) 591-2608

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARGERY S. BRONSTER, ATTORNEY GENERAL FOR THE STATE OF HAWAII, As *Parens Patriae* for the Natural persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies, | ) ) ) ) ) ) | CIVIL NO. 98-00792-SPK<br><br>SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF UNDER THE SHERMAN ACT AND PENDENT STATE CLAIM; EXHIBITS "A"-"H"; DEMAND FOR TRIAL BY JURY; SUMMONS IN A CIVIL CASE |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |

# EXHIBIT "A"

CHEVRON CORPORATION; CHEVRON    )
U.S.A. INC.; TESORO HAWAII    )
CORPORATION, as successor-in-interest to    )
BHP PETROLEUM AMERICAS    )
REFINING, INC.; BHP HAWAII INC.;    )
SHELL OIL COMPANY; SHELL OIL    )
PRODUCTS COMPANY; TEXACO INC.;    )
TEXACO REFINING AND MARKETING    )
INC.; TESORO PETROLEUM    )
CORPORATION; TESORO HAWAII    )
CORPORATION; TOSCO    )
CORPORATION; UNION OIL    )
COMPANY OF CALIFORNIA; and    )
UNOCAL CORPORATION,    )
                                        )
                        Defendants.    )
                                        )
                                        )

D:\03840T01\PLEADING\BLS11COM.DOC

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE
## AND OTHER RELIEF UNDER THE
## SHERMAN ACT AND PENDENT STATE CLAIM

COMES NOW the Attorney General for the State of Hawaii, and complains and alleges as follows:

## I.

## INTRODUCTION

1.    Defendants are gasoline refiners and wholesalers in Hawaii. Through a series of illegal agreements, these Defendants have allocated retail gasoline market shares and fixed retail gasoline prices at uncompetitive levels. Plaintiff, the Attorney General of the State of Hawaii, brings this action on behalf of the people of the State to recover damages for past price fixing and for an injunction prohibiting future price fixing.

## II.

## JURISDICTION AND VENUE

2.    Plaintiff is the Attorney General for the State of Hawaii. Plaintiff brings this action both as *parens patriae* for the natural persons residing in the State of Hawaii and on behalf of the State of Hawaii, its political subdivisions and governmental agencies.

3.    This action is brought pursuant to 15 U.S.C. § 15(c) and HRS § 480-14, which govern federal and state claims by state attorneys general for violation of Sherman Act §§ 1-7 (15 U.S.C. §§ 1-7) and Chapter 480 of the Hawaii Revised Statutes.

4.    Defendants' sales of petroleum products are in interstate trade and commerce; they also affect interstate trade and commerce.

5.    The United States District Courts have subject matter jurisdiction of this action pursuant to 15 U.S.C. § 15(c), which permits state attorneys general to sue in any United States District Court having jurisdiction of the Defendants for violations of Sherman Act §§ 1-7 (15 U.S.C. §§ 1-7). The Attorney General's federal antitrust claims against the Defendants are for violation of Sherman Act § 1, as Defendants have fixed prices for gasoline and allocated market shares pursuant to an agreement in restraint of trade and commerce.

6.    The United States District Courts also have subject matter jurisdiction over the Attorney General's state statutory claims pursuant to 28 U.S.C. § 1367(a), as the state statutory claims are so related to the Sherman Act § 1 claims that they form part of the same case and controversy under Article III of the United States Constitution.

7.    A substantial part of the events and omissions giving rise to the Attorney General's claims occurred in the District of Hawaii. Further, the Defendants reside, are found,

and/or transact business in the District of Hawaii. The United States District Court for the District of Hawaii has personal jurisdiction over all Defendants. Venue is proper in the District of Hawaii pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22.

**III.**

**IDENTIFICATION OF THE DEFENDANTS**

8.      Defendant CHEVRON CORPORATION, a Delaware corporation, is parent to Defendant CHEVRON U.S.A. INC., a Pennsylvania corporation, which is registered with the State of Hawaii, Department of Commerce and Consumers Affairs, Business Registration Division as a corporation managing the business and assets relating to refining, marketing, supply, and distribution of products derived from petroleum, and also as a corporation engaged in all phases of the petroleum industry. Defendants CHEVRON CORPORATION AND CHEVRON U.S.A. INC. are referred to herein as "CHEVRON."

9.      Defendant BHP PETROLEUM AMERICAS REFINING INC., a Hawaii corporation (now known as Tesoro Hawaii Corporation), was registered with the State of Hawaii, Department of Commerce and Consumers Affairs, Business Registration Division as a petroleum refinery, and also as a corporation involved in the retail sale of petroleum products. Defendant BHP HAWAII INC. is a Hawaii corporation registered as a holding company. On February 8, 1993, Pacific Resources, Inc. changed its name to BHP Petroleum Americas (Hawaii) Inc. On June 28, 1994, BHP Petroleum Americas (Hawaii) Inc. changed its name to BHP Hawaii Inc. Defendants BHP PETROLEUM AMERICAS REFINING INC. and BHP HAWAII INC. are referred to herein as "BHP." On May 29, 1998, BHP Petroleum Americas Refining, Inc. changed its name to Tesoro Hawaii Corporation.

4

10. Defendants SHELL OIL COMPANY and SHELL OIL PRODUCTS Company are both Delaware corporations registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division. Defendant SHELL OIL COMPANY is the parent company of Defendant SHELL OIL PRODUCTS COMPANY. Defendants SHELL OIL COMPANY and SHELL OIL PRODUCTS COMPANY are referred to herein as "SHELL."

11. Both Defendants TEXACO INC. and TEXACO REFINING AND MARKETING INC. are Delaware corporations. Defendant TEXACO INC., the parent of Defendant TEXACO REFINING AND MARKETING INC., is registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as a corporation engaged in marketing; Texaco Refining and Marketing Inc. is registered as a corporation engaged in the manufacturing, transportation, and marketing of petroleum products. Defendants TEXACO INC. and TEXACO REFINING AND MARKETING INC. are referred to herein as "TEXACO."

12. Defendant TESORO PETROLEUM CORPORATION, a Delaware corporation, is parent to Defendant TESORO HAWAII CORPORATION. Defendant TESORO HAWAII CORPORATION is the successor-in-interest to BHP Petroleum Americas Refining, Inc., Defendants TESORO PETROLEUM CORPORATION and TESORO HAWAII CORPORATION are referred to herein as "TESORO."

13. Defendants TESORO PETROLEUM CORPORATION and TESORO HAWAII CORPORATION are alleged to be liable both as successors-in-interest of BHP Petroleum Americas Refining, Inc., and as active participants in the common scheme and

conspiracy alleged herein. Specifically, prior to acquiring the BHP Hawaii assets, Tesoro conducted a due diligence review, and understood what Hawaii margins were and why they were what they were. After closing the transaction, Tesoro continued the business practices of its predecessor in Hawaii, elected to join the ongoing conspiracy, and profited therefrom.

14. Defendant TOSCO CORPORATION is a Nevada corporation registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as a corporation engaged in the marketing of wholesale petroleum products. Defendant TOSCO CORPORATION is referred to herein as "TOSCO."

15. Defendant TOSCO CORPORATION is alleged to be liable both as the successor-in-interest of Defendants UNION OIL COMPANY OF CALIFORNIA and UNOCAL CORPORATION (referred hereinafter as "UNOCAL"), from which TOSCO purchased its Hawaii petroleum business in November 1996, and thereafter as an active participant in the common scheme and conspiracy alleged herein. Specifically, prior to acquiring the Unocal business, Tosco undertook a due diligence review and understood what Hawaii margins were and why they were what they were. After closing the transaction, Tosco continued the business practices of its predecessor in Hawaii, elected to join the ongoing conspiracy, and profited therefrom.

16. Defendant UNION OIL COMPANY OF CALIFORNIA is a California corporation registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as a corporation engaged in the marketing of petroleum products. Defendant UNOCAL CORPORATION, a Wyoming corporation, is currently

registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as inactive.

## IV.

## DEFENDANTS' HAWAII OPERATIONS

### A.    Refining And Marketing

17.    Defendants are of two types: (1) current and former owners and operators of the two in-state petroleum refineries; and, (2) current and former in-state wholesalers of motor gasoline and diesel fuel (hereinafter "motor fuel"). The current and former owners and operators of the two in-state petroleum refineries are CHEVRON, BHP, and TESORO; while CHEVRON has owned and operated its Hawaiian refinery throughout the period here relevant, BHP sold its Hawaiian refinery (and service stations) to TESORO in May 1998.

18.    The Defendant wholesalers of motor fuel are the refiners CHEVRON and BHP/TESORO, who also act as wholesalers, and SHELL, TEXACO, UNOCAL, and TOSCO. CHEVRON, SHELL, and TEXACO have acted as wholesalers throughout the relevant period. UNOCAL sold its Hawaii business to TOSCO in November 1996. BHP sold its Hawaii business to TESORO in May 1998.

19.    As used herein, "BHP/TESORO" refers to BHP in and before May 1998 and TESORO in and after May 1998. "UNOCAL/TOSCO" refers to UNOCAL in and before November 1996 and TOSCO in and after November 1996.

20.    CHEVRON owns and operates a refinery at Barber's Point on Oahu which has the capacity to refine 54,000 barrels of oil per day. This facility refines approximately 60% of the gasoline consumed in the State of Hawaii. As a vertically-integrated company,

CHEVRON generally retains one-half of the motor fuel it refines to either: (a) sell directly to consumers through its company-owned and operated retail stations, or (b) sell to its franchisee-operated retail stations that, in turn, resell to consumers. Motor fuel sold by CHEVRON's company-owned and operated retail stations and motor fuel sold by CHEVRON's franchisee-operated retail stations is marketed under the name "CHEVRON."

21. With few exceptions, the remaining one-half of the motor fuel refined by CHEVRON is sold to in-state motor fuel wholesalers, such as Defendants SHELL, TEXACO, and TOSCO (formerly UNOCAL). These wholesalers -- who are also vertically integrated companies -- resell motor fuel purchased from CHEVRON either directly to consumers through their company-owned and operated retail stations, or to their respective franchisees. Both avenues of resale result in sales to consumers in retail stations bearing the wholesaler's trade name (*e.g.*, SHELL. TEXACO, or UNOCAL).

22. Until May 1998, BHP was the owner and operator of Hawaii's second refinery, which has the capacity to process 95,000 barrels of oil per day; TESORO purchased this refinery from BHP in May 1998 and currently owns and operates the refinery. While the BHP/TESORO refinery runs more barrels of oil per day than does the CHEVRON refinery, it produces less gasoline.

23. As with CHEVRON, BHP/TESORO retains a portion of the motor fuel refined to sell directly to consumers through company-owned and operated retail stations, or to franchisees for resale to consumers at the franchisees' retail stations. Motor fuel sold by BHP/TESORO, either directly to consumers or through franchisees, is marketed under the brand name "Gas Express."

24.    Also as with CHEVRON, BHP/TESORO sells a portion of the motor fuel it refines to its competitors in the wholesale business: Defendants SHELL, TEXACO, and UNOCAL/TOSCO. As previously mentioned, these wholesalers resell motor fuel either directly to consumers through their company-owned and operated retail stations, or to their respective franchisees, who sell to consumers under the wholesaler's trade name (*e.g.*, SHELL, TEXACO, or UNOCAL).

25.    Together, the two refiners have sufficient refining capacity to produce all of the gasoline demanded in Hawaii; there is no refining shortfall that requires the import of gasoline from refining centers ex-Hawaii.

26.    As publicly reported, Defendants' approximate shares of the retail market for gasoline are reflected in the chart below:

|              | 1993 | 1998 |
|--------------|------|------|
| Chevron      | 30%  | 32%  |
| Shell        | 16%  | 13%  |
| Texaco       | 11%  | 12%  |
| Tosco/Unocal | 15%  | 12%  |
| BHP/Tesoro   | 20%  | 14%  |

B.    **The Retail Level: Defendants Control Their Hawaiian Franchisees**

27.    Each Defendant has both company-owned and company leased (or "franchised") stations. As to company-owned stations, the Defendant owns the service station premises, hires the employees, establishes the hours of operation, specifies the work rules, and sets the retail prices for each grade of gasoline.

28.    Defendants' franchisees typically do not own the retail service stations they operate, but lease the premises from Defendants under Service Station Lease Agreements. The Defendants, through their Service Station Lease Agreements (and other agreements), dictate such matters as the hours of operation, the hours the franchisee must personally devote to the service station, the types of motor vehicle repairs that may be performed on site, the personal appearance of those staffing the service station, the language(s) service station employees must speak, what, if any, additional merchandise the franchisee can market, and whether and where automatic teller machines and pay phones may be located, among other things.

29.    As a practical matter, Defendants' franchisees are not free to buy petroleum products from the seller offering the best price, but must buy only from a single Defendant at a non-negotiable price set by that Defendant under the terms of a Motor Fuel Supply Agreement.    Defendants, through their Motor Fuel Supply Agreements (and other agreements with their respective franchisees), have assured that one level of buyers in the chain of distribution for gasoline (franchisees) must buy from Defendants.

30.    Defendants set both the price at which their franchisees must buy motor fuel, and, effectively and within a narrow range, the price at which they resell motor fuel to consumers.  When a Defendant sells motor fuel through a company-owned and operated retail service station, it directly sets the price to the consumer; this price sets the general retail price level.  The Defendant also sells motor fuel to its franchisees -- who compete with company-owned and operated stations -- at the retail price less an amount sufficient to cover the franchisee's costs and provide a small return.  Franchisees cannot consistently resell the motor fuel to consumers at a price in excess of the price charged by the company-owned stations

without losing sales to those stations. The franchisees cannot resell the motor fuel to consumers at a price significantly less than the full retail price and still recover costs and a profit.

31.    Because the Defendants control their franchisees, consumers of motor fuel are direct purchasers from Defendants both through company-owned and operated retail stations and franchisee-operated retail stations.

C.    **Motor Fuel Prices in Hawaii.**

32.    Excluding taxes, Hawaii's gasoline retail prices averaged $0.30+/gallon above the average mainland price from 1995 through the first half of 1998. *See* Exhibit "A".

33.    A "wholesale margin," as that term is used here, is the difference between the price a wholesaler pays for gasoline and the price it charges upon resale of that gasoline to a retail service station operator.

34.    A "retail margin" is the difference between the price a retail service station operator pays to acquire gasoline and the price it charges upon resale of that gasoline (before taxes) to consumers at the pump.

35.    Over the past four years, Hawaiian retail margins slightly exceeded the national average. The national average retail margin on all grades of gasoline was $0.06/gallon; Hawaii's: $0.09/gallon. *See* Exhibit "B".

36.    It is extraordinary wholesale margins which account for Hawaii's high retail gasoline and diesel fuel prices. The 1995-1998 national average wholesale margin on all grades of gasoline was $0.16/gallon; the comparable figure for Hawaii is $0.36/gallon, $0.20/gallon higher (*i.e.*, 125% higher). Similarly, the 1995-1998 wholesale margin in California and Washington (the two West Coast states where refineries are located) was

$0.13/gallon; the $0.36 wholesale margin in Hawaii was a full $0.23/gallon (*i.e.* more than 175%) higher than wholesale margins on the West Coast. *See* Exhibit "C".

37.    Over the period at issue, the retail gasoline price and diesel fuel price in Hawaii significantly exceeded the cost of gasoline purchased elsewhere and shipped to Hawaii (excluding all taxes). For example, over the last four years, Hawaii retail prices exceeded the cost of buying gasoline in California and transporting it to Hawaii (the "California equivalent price") by more than $0.20 per gallon. *See* Exhibit "D" (unleaded regular, excluding all taxes).

38.    It is only the average citizen who bears the brunt of this disparity in motor gasoline and diesel prices in Hawaii. This price relationship is not seen for jet fuel, a petroleum product for which there is an active Hawaii market. In the period 1987 to the present, jet fuel prices in Hawaii generally paralleled the West Coast equivalent price, *i.e.*, the cost of buying jet fuel in California and transporting it to Hawaii. *See* Exhibit "E". Fuel oil prices and bunker fuel prices also approximated the West Coast equivalent price. Markedly higher prices are seen for only two products: motor gasoline and diesel fuel.

39.    Nor do Chevron's **national** diesel fuel customers pay supra-competitive prices in Hawaii. Chevron made what it called "Major Business Unit" sales to national companies buying diesel fuel in both Hawaii and elsewhere, *e.g.*, Ryder Truck. These companies paid a competitive price for diesel fuel purchased in Hawaii, *i.e.*, a price several cents higher than the California price. Other commercial buyers in Hawaii, however, who purchased diesel fuel in bulk commercial qualities in Hawaii alone, did not get the "Major Business Unit" sales price, but instead paid a much higher price. For example, on average in the 1994 calendar year, Hawaii only bulk, commercial diesel purchasers paid, after tax, more than $.20 a gallon more for diesel

fuel than did Chevron customers who bought both in Hawaii and on the mainland. That is, the local commercial buyer paid a materially higher price than did its national counterpart for the same product at the same place at the same time. This was part of a Chevron strategy to "desensitize" the local markets by selling to select large and sophisticated customers on a West Coast price basis.

### D.    The Cost Of Refining In Hawaii.

40.    Hawaii's high motor fuel prices are not caused by high Hawaii refining costs.

41.    The cost of manufacturing petroleum products, including motor fuel, turns on several factors. First, the cost of crude purchased accounts for approximately 87% of cost, as illustrated below:



**Medium Conversion Refinery Costs & Revenues**
**1991 - 1995 Average**
**(Dollars Per Barrel)**

Product Revenue = $22.08
Profit = $1.10
Operating Costs = $2.78 — 13% of Costs
Crude Costs = $18.20 — 87% of Costs

Source: Oil & Gas Journal, Refining Statistics Sourcebook.

Crude is used as the source material for petroleum products and often used to fuel the refinery.

42.    Hawaii, Los Angeles, San Francisco and the Puget Sound area of Washington are the principal refining centers on the West Coast. Alaska North Slope Crude ("ANS") is a primary crude oil feedstock for each of those West Coast refining centers. While crude oil costs have fluctuated over time, historically, the delivered cost of ANS crude oil has been the same to each refining area.

43.    A second factor influencing refining cost is the percentage of gasoline made relative to throughput volume; more expensive hardware and more fuel is needed to produce a higher percentage of gasoline. California's refineries produce, on average, 52 barrels

14

of gasoline from every 100 barrels of oil refined, and as many as 85 barrels. In contrast, CHEVRON's Hawaii refinery produces approximately 28 barrels of gasoline from 100 barrels of crude and the BHP/TESORO refinery produces approximately 11 barrels from 100. These lower gasoline production ratios enable the Hawaii refiners to operate in less expensive operating modes.

44. A third cost factor is the type of gasoline made. Less polluting gasolines are more expensive to manufacture. In this regard, refining gasoline in California is more expensive than refining gasoline in Hawaii, as California law requires use of less-polluting, more expensive "CARB" gasoline.

45. Other operating costs that go into refining gasoline, such as labor, constitute a relatively small percentage of total costs. Relatively high operating costs will not add more than a penny or two to the cost of refining gasoline. In fact, however, refinery operating costs in Hawaii are no higher than comparable costs on the West Coast of the mainland.

46. With Hawaii wholesale (to Defendants) sales prices approximating the national average, and retail margins approximating the national average, extraordinarily large wholesale margins translate directly into abnormally high retail motor fuel costs. For example, the following contrasts the cost components of gasoline prices in California and Hawaii:



V.

## THE PRICE FIXING CONSPIRACY

47.   Defendants agreed among themselves to allocate market shares and fix, control, stabilize, and maintain the price of motor fuel (both gasoline and diesel) sold to retail service stations and to consumers, thus assuring Defendants supra-competitive profits at the expense of all purchasers of motor fuel in Hawaii.

48.    CHEVRON and BHP/TESORO sold motor fuel to their competitors, other major oil and gas companies who did not and do not refine in Hawaii.  CHEVRON and BHP/TESORO sold motor fuel to these competitors at a price generally less than the West Coast equivalent price, that is, the price at which the competitors could purchase motor fuel in California and ship it to Hawaii.  These sales were typically made through exchange agreements, wherein the Hawaii refiners would deliver motor fuel to their competitors in Hawaii and receive back motor fuel on the mainland.

49.    This lower price was available only to the wholesaler Defendants here; no other wholesaler or retailer could buy motor fuel from CHEVRON or BHP/TESORO on similar terms.  Rather, other buyers generally paid a price equal to the CHEVRON retail price less a retailer's margin.

50.    This created a three-tier market structure as follows:



51.    On information and belief, the refiners and their competitors, Defendants here, agreed that they would not compete for additional market share by lowering prices to the retailers. That is, CHEVRON and BHP/TESORO, the price leaders, agreed not to lower prices to their retail outlets, and the competitors agreed not to charge less than the refiners' price. The competitors also agreed not to import additional and competitive gasoline volumes. Through these agreements, the Defendants maintained supra-competitive wholesale margins and a stable market with allocated market shares for motor fuel. The exchange agreements alleged above in paragraph 48 were used, along with other mechanisms, as a means of policing and enforcing the market share allocation.

52.    The Defendants met and discussed motor fuel prices. On information and belief, CHEVRON would hold meetings where CHEVRON executives discussed with CHEVRON competitors what CHEVRON called "price discipline," that is, the agreement that no competitor would price compete with CHEVRON. At these meetings, CHEVRON also discussed the retaliatory actions it would take should one of the competitors begin to price compete.

53.    As a consequence of these agreements, the Defendants' reported retail gasoline prices moved in concert. For example, in 102 reported instances between July 1, 1996 and July 1, 1998, the CHEVRON and SHELL prices were identical 93 times. On the remaining nine occasions, SHELL's price differed from CHEVRON's by just $0.01 or $0.02 a gallon, and most frequently the price difference reflected a momentary lag in SHELL following CHEVRON's price up or down.

54.    Defendants' agreement to allocate market shares and fix motor fuel prices kept Hawaii prices exceedingly high even in the face of substantial declines in the cost of crude oil, the largest single cost of manufacturing gasoline. For example, between 1996 and June of 1998, crude oil prices dropped 37 percent, while mainland gasoline prices dropped 15 percent. Hawaii jet fuel prices also dropped along with crude oil prices. Yet Hawaii gasoline prices remained essentially unchanged over the same period. *See* Exhibits "D" and "E".

55.    The only purpose of making public the price at which Defendants sold gasoline to their franchisees was to advise each other of that price.

56.    Defendants' sharing of motor fuel price information was intended to facilitate their agreement to fix prices and allocate market shares.

57.     Defendants also have communicated with one another, directly or indirectly, by phone, facsimile, letter, publication, press release, personal meeting, or by other means to facilitate their agreement to fix prices and allocate market shares.

## VI.

## PRIOR FALSE AND INCONSISTENT EXPLANATIONS

58.     Since 1989, the State of Hawaii, by and through the Office of the Attorney General, has been investigating the following issues related to gasoline pricing in Hawaii: (1) whether the Hawaii gasoline market was not competitive; (2) whether the companies selling gasoline in Hawaii worked together to ensure a lack of competition; (3) whether the companies used various mechanisms, *e.g.* product supply agreements, to create, produce, and police the uncompetitive market; and (4) as a result of the lack of competition, whether the companies refining and/or marketing gasoline in Hawaii were making excessive, supra-competitive profits and/or return on capital employed.

59.     In an effort to determine answers to these questions, the State, by and through the Office of the Attorney General, initiated series of confidential investigative demand ("CID") proceedings ("State investigation"). Through the State investigation, the State asked for information and data that would allow it to answer the questions outlined in ¶ 58 above. Had the State determined that the market in Hawaii was uncompetitive, and uncompetitive by reason of collective conduct, or that the companies doing business in Hawaii were making excessive, supra-competitive profits in Hawaii, the State would have addressed the problem promptly, either by way of legislation, regulation, or litigation.

60.     Over the past decade, and in an ongoing effort to thwart the State's investigation, the Defendants, individually and collectively, directly and through their agents, have misrepresented basic facts about Hawaii's motor fuel business.  Acting together, the Defendants propagated, through numerous public statements, two key untruths about Hawaii's motor fuel market: that it was extremely competitive, and that Hawaii motor fuel profits were no greater than mainland motor fuel profits.

61.     Each Defendant is jointly and severally liable for actions of other conspirators, including false and misleading statements made by other Defendants

62.     The Defendants' public statements were inconsistent with what they knew to be true.  By category, the following paragraphs contrast what the Defendants said with what their internal documents reflect they in fact believed.

A.     **Competition.**

63.     Since at least 1990, the Defendants represented that the Hawaii market was "highly" or "extremely" competitive, with each of the Defendants price competing for additional market share, *i.e.*, dropping motor fuel prices in an effort to capture additional market share.  In fact, the Defendants understood that there was little or no motor fuel price competition in Hawaii, and that Hawaii was a "unique market" in large part precisely given the absence of such competition.  For example, and without purporting to be comprehensive:

| **What They Said** | **What They Knew** |
|---|---|
| • "The gasoline market is very competitive… [p]rice competition is strong with each company trying to increase its market share… [i]n addition to price competition, there is a tremendous amount of non-price competition in the market."<br><br>        Chevron comments | • Hawaii has an "historical lack of serious competition for on-island business despite under-utilization of refineries."<br><br>        Chevron April 1987<br>        Document<br><br>• Hawaii has very "limited competition" as a |

21

| | |
|---|---|
| On 1990 A.G. report<br>August 6, 1990 | "unique marketing/refining characteristic."<br>Chevron 1987<br>Document |

- "Michael Neeley [Chevron Pricing Manager]… says the market is highly competitive with constant price changes."
  Business Week Online, October 6, 1998

- "Price competition is strong with each company trying to increase its market share."
  Chevron Senate Testimony October 1990

- In disputing that the Hawaii market was not competitive: "the findings state that the markets for oil and oil products in Hawaii are highly concentrated markets in which market prices above competitive levels tend to persist "such a finding is simply not valid."
  Public Affairs Consultants – Hawaii statement to the Legislature, March 5, 1991

- "[C]ompetition in Hawaii is so great, that it has allowed the industry to improve the efficiency of their operations."
  Statement to the Legislature of Public Affairs Consultants, Retained by Shell, Texaco, Chevron and Unocal, February 10, 1995

- Michael Neeley recently testified that Chevron would **not** price compete for additional market share in Hawaii.
  Michael Neeley Deposition testimony at pp. 212-216

**B.    Higher Costs of Doing Business in Hawaii: the "Price of Paradise".**

64.    The Defendants have long defended higher motor fuel prices in Hawaii as a function of higher Hawaii operating costs.  It costs more, they said, to buy crude oil, operate

refineries, and sell motor fuel in Hawaii than on the West Coast. The Defendants represented that these higher costs **caused** the higher motor fuel prices, and that the Defendants were, in essence, simply passing on to the Hawaii consumer the higher costs actually incurred.

65.    These representations were false. Overall, it costs less to refine, distribute, and sell gasoline in Hawaii than on the West Coast. Crude oil costs less to buy in Hawaii than on the West Coast (for the same type of oil), and refinery operating costs, on balance, were also lower in Hawaii than on the mainland. To illustrate:

| **What They Said** | **What They Knew** |
| --- | --- |
| • "There are many reasons why gasoline can be more expensive in Hawaii than at many mainland locations. These include higher gasoline taxes, the distance of Hawaii from crude sources and the resulting high freight costs, higher costs for land, labor, construction and distribution."<br><br>Senate testimony of Robert Reed, PRI CEO, August 29, 1990 | • "It costs less to produce petroleum products in Hawaii than it does to produce them elsewhere in the world and ship them to Hawaii."<br><br>Undated Chevron Document |
| • "Richard Parry, Vice-President for operations at BHP Hawaii said gasoline costs more in Hawaii than on the West Coast for a number of reasons, including the relative size of the market, the economies of scale, the capital costs, stringent environmental restrictions, and high land and transportation costs."<br><br>Star Bulletin March 22, 1994 | • "Crude prices lower [in Hawaii] than U.S.W.C. [West Coast]."<br><br>Chevron internal study, April 16, 1987 |
| • "The remainder of the [after tax price] difference is largely attributable to the higher operating costs in Hawaii – particularly higher real property expenses."<br><br>Chevron comments on the Attorney General's 1989 Interim Report on Gasoline | • "January ROCE [return on capital employed] for the Hawaii region is the highest in the West and will probably continue due to their low employed capital," i.e. lower capital cost.<br><br>Chevron "Net Margin By Region" document |
| | • Michael Neeley, Chevron's Hawaii pricing manager, recently testified that it would be "misleading" to say that high operating costs caused high Hawaii prices. |

Prices, August 6, 1990

- "Chee [Chevron spokesman] attributes the price differential [gas prices in California against Hawaii] to the cost of doing business in Hawaii. From milk prices to real estate, consumer goods are typically more expensive in Hawaii than in the rest of the nation. Gasoline is no exception, he says."

> A. Chee quoted in San
> Antonio Business Journal,
> May 10, 1999

### C.    No Abnormal Hawaii Profits.

66.    The Defendants made the representations concerning high costs to make the further point that **high Hawaii motor fuel prices** did not mean **high Hawaii motor fuel profits**. That is, that higher costs meant that higher motor fuel prices did not translate into higher Hawaii net profits. In fact, the Defendants' motor fuel Hawaii profits were many times greater than their motor fuel West Coast profits, or mainland profits generally, as observed internally. To illustrate:

| What They Said | What They Knew |
|---|---|
| • In responding to the Attorney General's 1989 Interim Report concern that Hawaii margins might be much greater than margins elsewhere, Chevron disagreed, and countered that: "Chevron's average refining and marketing profit per gallon on all gallons of refined products sold in the United States in 1988 was 3.1¢ per gallon. In 1989 (the year of the Valdez spill), it was 1.2¢ per gallon, and for the first six months of 1990, it was 3.8¢ per gallon." There is no suggestion that Hawaii margins differed from those West Coast and company averages.<br><br>Chevron's August 6, 1990 | • In fact, in 1988, for franchise stations, Chevron's "net margin" for the West Coast was 1.8¢, and 2.4¢ for the USA as a whole. This contrasts with a Hawaii net margin for the same class of trade of **14¢**. Hawaii net margins therefore were 5 (overall) to 7 plus (West Coast) times greater than Chevron's margins elsewhere, a fact concealed by Chevron.<br><br>• "Our [Hawaii refinery profit] on a barrel of crude equals four times Chevron USA average."<br><br>Chevron document, May 4, 1987 |

24

Comments on December 1989 Interim Attorney General's Report on Hawaii gasoline Prices

- The Defendants used the mistaken conclusion of the 1994 Interim Report, that Hawaii profits were not supra-competitive, in an effort to block further inquiry, even though they knew the conclusion to be wrong: "In addition, the 1994 Attorney General's Interim Report on the Investigation of Gasoline Prices stated that the Department hired a professional economist who specialized in petroleum markets who determined that, 'the facts tend to indicate that through 1992, refineries in Hawaii have not been earning more than a competitive return on investment.'"

Public Affairs Consultants Hawaii (on behalf of Shell, Unocal, Texaco and Chevron) February 10, 1995

- The Hawaii refinery runs "about 3 percent of the total crude run by Chevron USA," but produces "14 percent" of Chevron's national profit.
Id.

- "We are [Hawaii refining] obviously very important to CUSA [Chevron USA] profitability, and [Hawaii] should stay a good place to run crude oil!!" Id. [emphasis in original]

### D.    Hawaii: A Separate Market With No Connection To The West Coast.

67.    For years, the Defendants represented that Hawaii constituted a separate petroleum product market, and that Hawaii was not governed by West Coast supply and demand factors. Specifically, the Defendants represented that petroleum product prices in Hawaii were set by supply and demand forces in Hawaii, and Hawaii prices were not tied to or a function of California prices. For this reason, the Defendants said it would be a mistake to compare Hawaii to West Coast prices, and that West Coast prices were lower signified nothing.

68.    These representations were misrepresentations.    In fact, absent the artificial barriers to entry which the Defendants created, Hawaii is part of a larger West Coast petroleum products market, and the Defendants knew this to be true. In addition, Hawaii motor

fuel prices between and amongst the Defendants were tied, penny for penny, to California prices, and moved in lock-step with those California prices. To illustrate:

| **What They Said** | **What They Knew** |
|---|---|
| • "Hawaii gasoline prices should not be compared to mainland markets."<br><br>PRI letter to former Attorney General Warren Price III, July 27, 1990 | • The Defendants knew that Hawaii was part of a larger West Coast petroleum products market. The proof is in their conduct, for they:<br><br>- Bought and sold motor fuel between and amongst themselves at prices explicitly tied, penny for penny, with West Coast prices, so that as West Coast prices increased or decreased, Hawaii prices changed identically. |
| • BHP said "Hawaii is a unique market and it's going to be subject to its own market forces."<br><br>Star Bulletin October 7, 1994 | - Sold motor fuel to large, sophisticated buyers on a West Coast price basis, so that the Hawaii prices were tied, penny for penny, with West Coast Prices. |
| • BHP "also noted that Hawaii and the mainland are two separate markets, making comparisons of pricing tends inaccurate."<br><br>Star Bulletin February 11, 1998 | • Chevron's internal transfer price for motor fuels "sold" by its Hawaii refiner to its Hawaii marketing organization was tied, penny for penny, with West Coast prices. The Hawaii internal transfer price moved mechanically with West Coast prices. |

E.    **"Desensitize" Local Buyers.**

69.    In a further effort to hide excessive Hawaii profits and the lack of competition, Chevron adopted a strategy of selling petroleum products to sophisticated national customers also buying products in Hawaii at West Coast prices. As Chevron put it: "we desensitize competitive pricing locally by pricing large accounts on a West Coast basis." *See* Chevron document attached as Exhibit "F." That is, a customer sophisticated enough to know a competitive price and big enough to insist on one, got one; local consumers paid the much higher supra-competitive price.

### F.    Disguising Gasoline Exports.

70.    In a further effort to obscure the truth, Chevron crafted a strategy to disguise gas exports.    Chevron viewed exports as "politically sensitive" because it feared questions as to why it was exporting gasoline from Hawaii (high price) to California (low price), instead of just price competing to place more gasoline in Hawaii. *See* Chevron document, attached as Exhibit "G."  (Hawaii's "mogas [motor gasoline] retail price continues to exceed West Coast plus freight **making exporting finished mogas to the West politically sensitive.**") To forestall such questions, Chevron decided to export gasoline in a slightly different form, as light catcracked gasoline component ("LCC") a product one step removed from gasoline.  At considerable additional expense and difficulty (relative to exporting gasoline), Chevron put the strategy in place, and so addressed its "concern about establishing a track record of moving finished mogas from Hawaii to the U.S. West Coast."  *See* Chevron document, attached as Exhibit "H."  That is, Chevron did indirectly what it did not want to be seen doing directly.

### G.    Public Relations "Message".

71.    To assist Defendants in implementing these public deceptions, the Defendants employed outside public relations consultants and other professionals and consultants to broadcast the proper "message." Chevron, for example, retained Hill & Knowlton, and Chevron, Texaco, Unocal and Shell, retained Public Affairs Consultants - Hawaii.  These consultants were instrumental in perpetrating the fiction that Hawaii prices were caused by

higher costs, that there were no excessive Hawaii profits, and that Hawaii was an extremely competitive market for motor fuel.

### H. Responding To State Inquiries: The Interim Attorney General Reports.

72. On information and belief, in a further effort to obscure the truth, Chevron adopted a strategy to respond to inquiries and production requests initiated by the Hawaii Attorney General's Office by producing voluminous, inconsistent and confusing documents, so as to make it difficult for the State to determine the true facts, and further obscure those facts. In addition, numerous highly relevant documents, fairly requested, were not produced

73. State counsel were also told that Chevron's internal margin reports, known as TAFI or PSS reports, were unreliable, "inherently suspect" and "misleading" because they employed Chevron's internal transfer price, and that that price was "an arbitrary number with no real meaning in reality." This was false; the TAFI reports were reliable, were relied upon by Chevron, and the internal transfer price was designed to reflect the price that Chevron would pay if it purchased product in the open market all as recently testified to by recent Chevron witnesses. Far from being an "arbitrary number with no real meaning in reality," the price was designed to track market prices as closely as possible, and it was Chevron's "philosophy" that it do so.

### I. Success Of The Deception.

74. These deceptions were successful. For example, Dr. Fereidun Fesharaki, a petroleum economist at the East/West Center in Honolulu, has been frequently quoted as echoing the Defendants' "price of paradise" and "no excessive profits" arguments, thereby lending those points and the Defendants additional credibility. To illustrate, Dr. Fesharaki stated publicly that:

- "Fesharaki blames the high price of gasoline in Hawaii on costly transportation and land costs and high gasoline taxes." *Star Bulletin*, March 12, 1994.

- "Hawaii customers are paying the price of paradise." *Star Bulletin*, March 16, 1998.

- There have been "lousy profits and margins" for years in Hawaii. *Id.*

- "Hawaii historically has had some of the lowest profit margins in the country for gas and diesel sales." *Star Bulletin*, March 16, 1998.

- "Local gas prices are fair, given the extra cost pressure that [Hawaii] refineries face." *Star Bulletin*, March 17, 1998.

75.    Despite being duly diligent, the State of Hawaii did not discover until 1998 that the Hawaii motor fuels business was uncompetitive by reason of collusive conduct, and that, as a consequence, Hawaii motor fuels profits (including return on capital employed) were many times greater than mainland margins.

## VII.

### FRAUDULENT CONCEALMENT
(applies to all state and federal claims)

76.    Defendants concealed from Plaintiff the existence of the conspiracy and the facts giving rise to all of Plaintiff's claims, as alleged herein, and particularly alleged in ¶¶ 58-75. Defendants' concealment was designed and planned, to the extent possible, to prevent inquiry, escape investigation, and mislead and hinder the collection by Plaintiff of information that would have disclosed Plaintiff's causes of action. But for this concealment, the existence of the conspiracy and all of Plaintiff's claims would have been known to Plaintiff prior to the statute of limitations period.

77. Because of Defendants' fraudulent concealment, the conspiracy and causes of action were not discovered by Plaintiff until 1998, within four years before the commencement of this suit.

78. Defendants fraudulently concealed the existence of the conspiracy and Plaintiff's causes of action through Defendants' numerous affirmative acts calculated to mislead Plaintiff. These affirmative actions have included, but are not limited to, (a) knowing misrepresentations to the Senate, Legislature, public and Hawaii Attorney General's Office regarding the profitability, margins, and costs associated with the refining of petroleum products in Hawaii, (b) knowing misrepresentations to the Hawaii Attorney General's Office regarding the existence of a "competitive" petroleum products market in Hawaii, (c) knowing misrepresentations that the Hawaii petroleum products market was a separate market with no connection to the West Coast petroleum products market, (d) adopting a strategy to conceal evidence and mislead in response to the Hawaii Attorney General's Office's inquiries and requests for production, (e) disguising gasoline exports, and (f) all other acts in furtherance of the conspiracy giving rise to this suit, which acts also had the effect of concealing the existence of the conspiracy and Plaintiff's claims.

79. Due to Defendants' fraudulent concealment, Plaintiff did not discover the facts necessary to bring suit prior to late 1998. Until that time, Plaintiff did not have actual or constructive knowledge of the necessary facts giving rise to its claims, nor did Plaintiff have actual or constructive knowledge of facts sufficient to infer that a conspiracy existed and bring suit in good faith. Had Defendants not fraudulently concealed the conspiracy through their

affirmative acts of deception, Plaintiff would have discovered facts sufficient to give rise to its claims well before the statute of limitations period.

80.    Plaintiff exercised due diligence in attempting to discover the facts giving rise to Plaintiff's claims. This due diligence, in the State Investigations by the Attorney General's Office, has been ongoing since 1989. But for Defendants' fraudulent concealment, Plaintiff's due diligence would have resulted in discovery of the necessary facts giving rise to Plaintiff's claims.

81.    Given the Defendants' fraudulent concealment, the statute of limitations should be tolled through the time when Plaintiff had adduced the necessary facts giving rise to its claims. That time was calendar 1998, less than four years before commencement of this action.

82.    Each Defendant is jointly and severally liable for all damages, inasmuch as each Defendant is jointly and severally liable for all actions of the other co-conspirator Defendants, including public statements, in furtherance of the conspiracy (or concealment of the wrong) and all damages resulting therefrom.

### Count I: Price Fixing and Market Allocation
(federal claim)

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

83.    Defendants have conspired to allocate market shares and fix, control, stabilize, and maintain prices for motor fuel, in violation of Sherman Act § 1.

84.    Natural persons residing in the State of Hawaii, as well as the State of Hawaii, its political subdivisions, and governmental agencies, have been damaged in an amount exceeding $450 million by Defendants' conspiracy.

85.    Defendants are liable to Plaintiff for compensatory damages in an amount exceeding $450 million under 15 U.S.C. § 15(c)(2).

## Count II: Price Fixing and Market Allocation
### (state claim)

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

86.    Defendants have conspired to allocate market shares and fix, control, stabilize, and maintain prices for motor fuel, in violation of HRS § 480-4.

87.    Natural persons residing in the State of Hawaii, as well as the State of Hawaii, its political subdivisions, and governmental agencies, have been damaged in an amount exceeding $450 million by the Defendants' conspiracy.

88.    Defendants are liable to Plaintiff for compensatory damages under HRS § 480-14 in an amount exceeding $450 million.  Defendants have engaged in continuing violation of § 480-4, and thus are liable for damages from at least 1987 pursuant to HRS § 480-24(a).

## Count III: Unfair Trade Practices --
## Refusal to Deal and Price Discrimination

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

89.    Defendant-refiners CHEVRON and BHP/TESORO have sold motor fuel wholesale to Defendants SHELL, TEXACO, and UNOCAL/TOSCO throughout the damages period.

90.    At the time of their wholesale purchases, Defendants SHELL, TEXACO, and UNOCAL/TOSCO each held from 11%-16% of the retail market for motor fuel.

91.    At all times during the damages period Defendant-refiners CHEVRON and BHP/TESORO refused to sell to other purchasers at prices and on terms comparable to those offered SHELL, TEXACO, and UNOCAL/TOSCO.

92.    Defendant-refiners' refusal to deal and/or discriminatory pricing are unfair methods of competition and unfair acts and practices in the conduct of trade and commerce; as such, they are unlawful under HRS § 480-2.

93.    Further, Defendant-refiners' refusal to deal on similar prices and terms was for the purpose of fixing, controlling, and maintaining the price of motor fuel, all in violation of HRS § 480-4(b)(4) and Sherman Act § 1.

94.    Defendant-refiners' refusal to deal and/or discriminatory pricing, together with the other acts complained of herein, have damaged Plaintiff, as *parens patriae*, and the State of Hawaii, its political subdivisions, and governmental agencies in an amount in excess of $450 million.  Defendant-refiners have engaged in a continuing violation of HRS § 480-02 and § 480-4(b)(4), and thus are liable for damages from at least 1987 pursuant to HRS § 480-24(a).

### Count IV: Deceptive Trade Practices --
### HRS § 480-2

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

95.    Motor fuel are commodities essential to natural persons residing in Hawaii; they are necessary for Hawaii residents to travel to work, to return to their places of shelter, to obtain food and clothing, and to transport the sick and injured to doctors and hospitals.

96.    Deceptive trade practices are those acts that have the capacity or tendency to mislead and are unlawful pursuant to HRS § 480-2.

97.     Defendants collectively have engaged in deceptive trade practices, as alleged herein, and particularly as alleged in ¶¶ 47 through 82 above.

98.     Defendants are liable to Plaintiff, as *parens patriae*, for damages in excess of $450 million for their deceptive trade practices as to motor fuel.  Defendants have engaged in a continuing violation of HRS § 480-2, and thus are liable for damages from at least 1987 pursuant to § 480-24(a).

### Count V:  Unfair Trade Practices

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

99.     Any antitrust violation is, *per se*, an unfair method of competition or an unfair trade practice.

100.    Defendants' violations of 15 U.S.C. § 1 and HRS § 480-4 are antitrust violations, and hence unfair methods of competition or unfair trade practices.

101.    Even actions that fall short of an antitrust violation may be unfair methods of competition or unfair trade practices.

102.    Defendants, by reason of the actions complained of in this Complaint, have engaged in unfair methods of competition or unfair trade practices.

103.    Defendants are liable to Plaintiff, as *parens patriae*, and to the State of Hawaii, its political subdivisions, and governmental agencies for damages in excess of $450 million by reason of their unfair methods of competition or unfair trade practices, which violate HRS § 480-2.  Defendants have engaged in a continuing violation of HRS § 480-2, and thus are liable for damages from at least 1987, pursuant to HRS § 480-24(a).

### Prayer for Relief

Plaintiff, both as *parens patriae* for the natural persons residing in the State of Hawaii and on behalf of the State of Hawaii, its political subdivisions, and governmental agencies, prays for relief as follows:

a.      For compensatory damages in an amount in excess of $450 million;

b.      For treble damages in an amount in excess of $1.3 billion (when aggregated with compensatory damages under each and every count set forth above);

c.      For additional civil penalties in excess of $200 million given that for each day that any Defendant has violated HRS § 480-2 (as alleged in the preceding counts), that Defendant is liable to Plaintiff for a civil penalty of not less than $500 nor more than $10,000 pursuant to HRS § 480-3.1;

d.      For the award of an amount commensurate with expenses reasonably expected to be expended in distributing damages to natural persons residing in Hawaii, as provided for by HRS § 480-14(d);

e.      For costs of suit together with reasonable attorneys' fees;

f.      For pre-judgment and post-judgment interest in the maximum amount permitted by law;

g.      For a ruling that all statute of limitations are tolled;

h.      For a permanent injunction enjoining Defendants from future acts that violate HRS Chapter 480 and imposing penalties in the event of a subsequent violation pursuant to HRS § 480-15.1; and

i.     For such other and further relief as is just and equitable.

DATED:  Honolulu, Hawaii         July 23, 1999

SPENCER HOSIE
GARY O. GALIHER
L. RICHARD DeROBERTIS
JEFFREY T. ONO
GEORGE FROST

Attorneys for Plaintiff

# Exhibit A

## Average Retail Outlet Prices
## January 1995 - June 1998
## Unleaded Regular

| Geographic Area | 1995 | 1996 | 1997 | 1998 | Average 1995-1998 |
|---|---|---|---|---|---|
| | Dollars per Gallon Excluding Taxes | | | | |
| Hawaii | $1.010 | $1.103 | $1.103 | $1.089 | $1.074 |
| California* | $0.733 | $0.871 | $0.865 | $0.706 | $0.806 |
| California* - Washington Avg.** | 0.764 | 0.882 | 0.868 | 0.705 | 0.815 |
| U.S. Average | 0.718 | 0.803 | 0.787 | 0.639 | 0.751 |

Source:   Petroleum Marketing Annual, Tables 32, 34, & 43.

\*   The California data for 1996-1998 is for sales of reformulated gasoline, which is more expensive to manufacture than the conventional gasoline sold in Hawaii.

\*\*   Weighted average based on sales volumes in each state.

# Exhibit A

# Exhibit B

## Average Retailers' Margins
## January 1995 - June 1998
## All Grades

| Geographic Area | 1995 | 1996 | 1997 | 1998 | Average 1995-1998 |
|---|---|---|---|---|---|
| | | Dollars per Gallon Excluding Taxes | | | |
| Hawaii | $0.080 | $0.089 | $0.095 | $0.120 | $0.093 |
| California | $0.066 | $0.085 | $0.067 | $0.067 | $0.072 |
| California - Washington Avg.** | 0.071 | 0.090 | 0.071 | 0.067 | 0.076 |
| U.S. Average | 0.064 | 0.064 | 0.059 | 0.062 | 0.062 |

Source:    Petroleum Marketing Annual, Tables 31& 43.

Note:    Retailers' Margin = (Retail Outlet Price - Dealer Tank Wagon Price).
    ** Weighted average based on sales volumes in each state.

# Exhibit B

# Exhibit C

## Average Wholesalers' Margins
## January 1995 - June 1998
## All Grades

| Geographic Area | 1995 | 1996 | 1997 | 1998 | Average 1995-1998 |
|---|---|---|---|---|---|
| | | Dollars per Gallon Excluding Taxes | | | |
| Hawaii | $0.381 | $0.330 | $0.333 | $0.422 | $0.358 |
| California | $0.146 | $0.110 | $0.146 | $0.105 | $0.130 |
| California - Washington Avg.** | 0.153 | 0.117 | 0.145 | 0.103 | 0.133 |
| U.S. Average | 0.163 | 0.158 | 0.155 | 0.136 | 0.155 |

Source:    Petroleum Marketing Annual, Table 31 & 43.

Note:    Wholesalers' Margin = (Dealer Tank Wagon Price - Bulk Price).
Hawaii Bulk Price = (Volume-weighted California - Washington Average) +.03.

** Weighted average based on sales volumes in each state.

# Exhibit C



Retail Gasoline Prices in Hawaii and California
Unleaded Regular
1985-1998*

Exhibit D

* 1998 average is January through June.
Source: Petroleum Marketing Annual.

Exhibit D

# Retail Prices in Hawaii and California
## Jet Fuel
## 1989-1998*

**Exhibit E**

* 1998 average is January through June.
Source: Petroleum Marketing Annual.

Exhibit E

[TO BE FILED UNDER SEAL]


EXHIBIT "F"

**[TO BE FILED UNDER SEAL]**

**EXHIBIT "G"**

**[TO BE FILED UNDER SEAL]**

**EXHIBIT "H"**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARGERY S. BRONSTER, ATTORNEY GENERAL FOR THE STATE OF HAWAII, As *Parens Patriae* for the Natural persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies, | ) ) ) ) ) ) ) | CIVIL NO. 98-00792-SPK<br><br>DEMAND FOR TRIAL BY JURY |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| CHEVRON CORPORATION; CHEVRON U.S.A. INC.; TESORO HAWAII COR-PORATION, as successor-in-interest to BHP PETROLEUM AMERICAS REFIN-ING, INC.; BHP HAWAII INC.; SHELL OIL COMPANY; SHELL OIL PRO-DUCTS COMPANY; TEXACO INC.; TEXACO REFINING AND MARKETING INC.; TESORO PETROLEUM COR-PORATION; TESORO HAWAII COR-PORATION; TOSCO CORPORATION; UNION OIL COMPANY OF CALIFOR-NIA; and UNOCAL CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury on all issues so triable.

DATED:  Honolulu, Hawaii _____ July 23, 1999 _____

_____

SPENCER HOSIE
GARY O. GALIHER
L. RICHARD DeROBERTIS

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARGERY S. BRONSTER, ATTORNEY GENERAL FOR THE STATE OF HAWAII, As *Parens Patriae* for the Natural persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies,<br><br>Plaintiff,<br><br>vs.<br><br>CHEVRON CORPORATION; CHEVRON U.S.A. INC.; TESORO HAWAII CORPORATION, as successor-in-interest to BHP PETROLEUM AMERICAS REFINING, INC.; BHP HAWAII INC.; SHELL OIL COMPANY; SHELL OIL PRODUCTS COMPANY; TEXACO INC.; TEXACO REFINING AND MARKETING INC.; TESORO PETROLEUM CORPORATION; TESORO HAWAII CORPORATION; TOSCO CORPORATION; UNION OIL COMPANY OF CALIFORNIA; and UNOCAL CORPORATION,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 98-00792-SPK<br><br>SUMMONS IN A CIVIL CASE |

SUMMONS IN A CIVIL CASE

STATE OF HAWAII

To the above-named Defendants:

You are hereby summoned and required to serve upon Plaintiff's attorneys:

EARL ANZAI
Acting Attorney General
JACK ROSENZWEIG
Deputy Attorney General
State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Telephone:    (808) 586-1301
Facsimile:    (808) 586-1205
    -and-
SPENCER HOSIE    (Admitted *Pro Hac Vice*)
GEORGE FROST    (Admitted *Pro Hac Vice*)
Hosie Frost & Large
One Post Street, 25th Floor
San Francisco, California  94104
Telephone:    (415) 296-9801
Facsimile:    (415) 296-9802
    -and-
GARY O. GALIHER
L. RICHARD DeROBERTIS
JEFFREY T. ONO
Galiher DeRobertis Nakamura Ono Takitani
610 Ward Avenue, Suite 200
Honolulu, Hawaii  96814-3308
Telephone:    (808) 597-1400
Facsimile:    (808) 591-2608

an answer to the Second Amended Complaint For Injunctive And Other Relief Under The

Sherman Act And Pendent State Claim, which is herewith served upon you, within twenty (20)

days after service of this summons upon you, exclusive of the day of service.  If you fail to do so,

judgment by default will be taken against you for the relief demanded in the Second Amended

Complaint.  You must also file your answer with the Clerk of this Court within a reasonable

period of time after service.

*Margery S. Bronster, et al. v. Chevron Corporation, et al.*
Civil No. 98-00792-SPK -- U.S.D.C. (D.Haw.)
'SUMMONS IN A CIVIL CASE"

2

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.

A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

WALTER A. Y. H. CHINN                                                3  1999

_____          _____
CLERK                                     DATE


_____
(BY) DEPUTY CLERK




*Margery S. Bronster, et al. v. Chevron Corporation, et al.*
Civil No. 98-00792-SPK -- U.S.D.C. (D.Haw.)
'SUMMONS IN A CIVIL CASE"

3