## CERTIFICATE OF SERVICE

I certify that on March 2, 2026, I am causing the attached Notice of Motion and Motion to Enforce Settlement Agreement and accompanying attachments Exhibits A-F and Certificate of Service to be served on the attached list of Agents for Service of Process at the below stated addresses via certified mail by placing them in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth in the attached Service List.

Executed on March 2, 2026 at San Francisco, California.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/Maggie Lopez*
Maggie Lopez

# EXHIBIT 1

1

## Service List for Anzai Mailing

| Entity | Address for Registered Agent |
|---|---|
| Unocal Corporation | 1505 Corporation<br>CSC-Lawyers Incorporating Service<br>Attn: Koy Saechao, Rebecca Vang, Alex Jenkins, Wendy Harris, Skylar Leih, Melissa Dekoven, Maddie Bright, Josh Swindell, Aaron Caneles<br>2710 Gateway Oak Drive, Suite 150N<br>Sacramento, CA 95833-3502 |
| Union Oil of California | 1505 Corporation<br>CSC-Lawyers Incorporating Service<br>Attn: Koy Saechao, Rebecca Vang, Alex Jenkins, Wendy Harris, Skylar Leih, Melissa Dekoven, Maddie Bright, Josh Swindell, Aaron Caneles<br>2710 Gateway Oak Drive, Suite 150N<br>Sacramento, CA 95833-3502 |
| Texaco Inc. | 1505 Corporation<br>CSC-Lawyers Incorporating Service<br>Attn: Koy Saechao, Rebecca Vang, Alex Jenkins, Wendy Harris, Skylar Leih, Melissa Dekoven, Maddie Bright, Josh Swindell, Aaron Caneles<br>2710 Gateway Oak Drive, Suite 150N<br>Sacramento, CA 95833-3502 |
| Texaco Refining and Marketing, Inc. (Shell Oil Company sub) | Texaco Refining and Marketing Inc.<br>910 Louisiana<br>Houston, Texas 77002 |
| Equilon Enterprises LLC (Shell Oil Company sub) | C T Corporation System<br>900 Fort Street Mall, Suite 1680<br>Honolulu, Hawaii 96813 |
| Tosco Corporation | 1505 Corporation<br>CSC-Lawyers Incorporating Service<br>Attn: Koy Saechao, Rebecca Vang, Alex Jenkins, Wendy Harris, Skylar Leih, Melissa Dekoven, Maddie Bright, Josh Swindell, Aaron Caneles<br>2710 Gateway Oak Drive, Suite 150N<br>Sacramento, CA 95833-3502 |
| Tesoro Hawaii Corporation | Corporation Service Company<br>1003 Bishop Street<br>Suite 1600 Pauahi Tower<br>Honolulu, Hawaii 96813 |
| Tesoro Petroleum Corporation | Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company<br>211 E. 7th Street, Suite 620<br>Austin, TX 78701-3218 |

NAI-5010968448v1

2

IMANAKA ASATO, LLLC
Steven K. S. Chung          1751
Anthony F. T. Suetsugu      9404
745 Fort Street Mall, 17th Floor
Honolulu, HI 96813
Telephone:  (808) 521-9500
Facsimile:  (808) 541-9050
Email:  schung@imanaka-asato.com
        asuetsugu@imanaka-asato.com


Attorneys for Defendants
CHEVRON CORPORATION and
CHEVRON U.S.A., INC.
(*Additional Counsel Listed After Caption*)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| EARL I. ANZAI, ATTORNEY GENERAL FOR THE STATE OF HAWAII, as *Parens Patriae* for the Natural Persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies,<br><br>     Plaintiff,<br><br>  v.<br><br>CHEVRON CORPORATION; CHEVRON U.S.A., INC.; TESORO HAWAII CORPORATION, as Successor-In-Interest to BHP PETROLEUM AMERICAS REFINING INC.; BHP HAWAII INC; SHELL OIL COMPANY; SHELL OIL PRODUCTS COMPANY; TEXACO, INC.; TEXACO | ) Civil No. 1:98-cv-00792-MWJS-WRP<br>)<br>) **DEFENDANTS CHEVRON**<br>) **CORPORATION AND CHEVRON U.S.A.**<br>) **INC.'S MOTION TO ENFORCE THE**<br>) **JUDGMENT; MEMORANDUM IN**<br>) **SUPPORT OF MOTION; EXHIBITS "A"-**<br>) **"F"; CERTIFICATE OF SERVICE**<br>)<br>) Hearing Date:<br>) Hearing Time:<br>) Judge: Honorable Micah W. J. Smith<br>) Trial Date: None<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) *(Caption continued on next page)* |

REFINING AND MARKETING, INC.;    )
TESORO PETROLEUM              )
CORPORATION; TESORO HAWAII    )
CORPORATION; TOSCO           )
CORPORATION; UNION OIL       )
COMPANY OF CALIFORNIA; and   )
UNOCAL CORPORATION,          )
                             )
_____Defendants._____)

## ADDITIONAL COUNSEL

Anthony J. Dick*
Christopher S. Dinkel*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone: (202) 879-3939
Email:   ajdick@jonesday.com
         cdinkel@jonesday.com

Caroline N. Mitchell*
Jerry C. Ling (8260)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Email:   cnmitchell@jonesday.com
         jling@jonesday.com

David Phillips*
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200
Email:  davidphillips@jonesday.com

Theodore J. Boutrous Jr.*
William E. Thomson*
GIBSON DUNN
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Email:  tboutrous@gibsondunn.com
        wthomson@gibsondunn.com

Andrea E. Smith*
GIBSON DUNN
811 Main Street, Suite 3000
Houston, TX 77002-6117
Telephone: (346) 718-6600
Email:  aesmith@gibsondunn.com

Joshua D. Dick*
GIBSON DUNN
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: (415) 393-8200
Email:  jdick@gibsondunn.com

Attorneys for Defendants
CHEVRON CORPORATION and CHEVRON U.S.A. INC.
*pro hac vice applications pending

## DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A. INC.'S MOTION TO ENFORCE THE JUDGMENT

Defendants Chevron Corporation and Chevron U.S.A. Inc. (collectively "Chevron") move for an order to enforce this Court's Judgment and the incorporated Settlement Agreement (ECF 1188) and to enjoin the claims asserted by Hawai'i and its political subdivisions in state court ("the State Court Claims") in the pending cases of *County of Maui v. Sunoco LP*, 2CCV-20-283 (Haw. Cir. Ct., Island of Maui); *City and County of Honolulu v. Sunoco LP*, 1CCV-20-380 (Haw. Cir. Ct., Island of Oahu); and *State of Hawai'i v. BP P.L.C.*, 1CCV-25-717 (Haw. Cir. Ct., Island of Oahu). Chevron respectfully submits that the State Court Claims violate the Settlement Agreement and this Court's Final Judgment, and requests an injunction barring the State Court Claims under the All Writs Act, 28 U.S.C. § 1651. In particular, Chevron moves that the Court:

- Enjoin the State Court Plaintiffs to dismiss the current State Court Complaints against Chevron, which rely substantially on allegations of deceptive speech and conduct that occurred on or before April 30, 2002;

- Enjoin the State Court Plaintiffs from filing any amended complaint or pursuing any claim against Chevron that relies on allegations of deceptive speech or conduct regarding the sale, marketing, or promotion of petroleum products that occurred on or before April 30, 2002;

- Enjoin the State Court Plaintiffs from pursuing claims based on the theory that Chevron engaged in denial of anthropogenic global warming, which they allege ended in the late 1990s.

1

Pursuant to Local Rule 7.8, Chevron respectfully requests a hearing, which Chevron believes would assist the Court in resolving this motion.

This motion is made following the conference of counsel pursuant to Local Rule 7.8, which took place on January 15, 2026.

DATED: January 30, 2026
Honolulu, Hawai'i

Respectfully submitted,

/s/ *Steven K. S. Chung*
Steven K. S. Chung
Anthony F. T. Suetsugu
IMANAKA ASATO, LLLC
745 Fort Street Mall, 17th Floor
Honolulu, HI 96813
Telephone: (808) 521-9500
Facsimile: (808) 541-9050
Email: schung@imanaka-asato.com
       asuetsugu@imanaka-asato.com

## <u>ADDITIONAL COUNSEL</u>

Anthony J. Dick*
Christopher S. Dinkel*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone: (202) 879-3939
Email:   ajdick@jonesday.com
          cdinkel@jonesday.com

Caroline N. Mitchell*
Jerry C. Ling (8260)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Email:   cnmitchell@jonesday.com
          jling@jonesday.com

David Phillips*
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200
Email:  davidphillips@jonesday.com

Theodore J. Boutrous Jr.*
William E. Thomson*
GIBSON DUNN
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Email:  tboutrous@gibsondunn.com
          wthomson@gibsondunn.com

Andrea E. Smith*
GIBSON DUNN
811 Main Street, Suite 3000
Houston, TX 77002-6117
Telephone: (346) 718-6600
Email:  aesmith@gibsondunn.com

Joshua D. Dick*
GIBSON DUNN
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: (415) 393-8200
Email:  jdick@gibsondunn.com

Attorneys for Defendants
CHEVRON CORPORATION and CHEVRON U.S.A. INC.
*pro hac vice applications pending

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

EARL I. ANZAI, ATTORNEY
GENERAL FOR THE STATE OF
HAWAII, as *Parens Patriae* for the
Natural Persons Residing in Hawaii,
and on behalf of the State of Hawaii,
its Political Subdivisions and
Governmental Agencies,

      Plaintiff,

  v.

CHEVRON CORPORATION;
CHEVRON U.S.A., INC.; TESORO
HAWAII CORPORATION, as
Successor-In-Interest to BHP
PETROLEUM AMERICAS REFINING
INC.; BHP HAWAII INC; SHELL OIL
COMPANY; SHELL OIL PRODUCTS
COMPANY; TEXACO, INC.; TEXACO
REFINING AND MARKETING, INC.;
TESORO PETROLEUM
CORPORATION; TESORO HAWAII
CORPORATION; TOSCO
CORPORATION; UNION OIL
COMPANY OF CALIFORNIA; and
UNOCAL CORPORATION,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 1:98-cv-00792-MWJS-WRP

**DEFENDANTS' MEMORANDUM IN
SUPPORT OF MOTION; EXHIBITS A–F**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| INTRODUCTION | 1 |
| BACKGROUND | 2 |
|     A. The *Anzai* Litigation and Settlement Broadly Released Liability. | 2 |
|     B. The New State Court Cases Seek to Impose Liability on Chevron for Alleged Conduct Stretching Back Decades. | 5 |
| LEGAL STANDARD | 8 |
| ARGUMENT | 8 |
| I. The Settlement and Judgment Bar the State Court Claims. | 8 |
|     A. The Settlement and Judgment Apply to All State Court Plaintiffs. | 9 |
|     B. The Settlement and Judgment Apply to All the State Court Claims. | 10 |
|     C. The Settlement's Exclusion of "Environmental Claims" Does Not Apply. | 14 |
|     D. The Settlement and Judgment Bar the State Court Claims Because They Arise From Alleged Pre-Settlement Conduct. | 18 |
| II. This Court Should Issue Injunctive Relief to Enforce the Judgment. | 19 |
|     A. This Court Retains Jurisdiction to Enforce the Judgment. | 20 |
|     B. The All Writs Act Authorizes an Injunction Consistent With the Anti-Injunction Act. | 20 |
|         1. An injunction is needed to effectuate this Court's Judgment. | 21 |
|         2. An injunction is necessary and appropriate in aid of jurisdiction. | 23 |
| CONCLUSION | 24 |

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anzai v. Chevron Corp.*,
No. 1:98-cv-792 (D. Haw. July 23, 1999) ................................................*passim*

*Battle v. Liberty Nat'l Life Ins. Co.*,
877 F.2d 877 (11th Cir. 1989) ...................................................................24

*Bennett v. Medtronic, Inc.*,
285 F.3d 801 (9th Cir. 2002) .....................................................................24

*City & County of Honolulu v. Sunoco LP*,
39 F.4th 1101 (9th Cir. 2022) ....................................................................15

*City & County of Honolulu v. Sunoco LP*,
537 P.3d 1173 (Hawai'i 2023)...................................................................16

*Convention Center Authority v. Anzai*,
890 P.2d 1197 (Haw. 1995) .........................................................................9

*Flanagan v. Arnaiz*,
143 F.3d 540 (9th Cir. 1998) .................................................................*passim*

*Golden v. Pacific Maritime Ass'n*,
786 F.2d 1425 (9th Cir. 1986) ...................................................................21

*In re Diet Drugs*,
369 F.3d 293 (3d Cir. 2004) .......................................................................20

*Kokkonen v. Guardian Life Ins. Co. of America*,
511 U.S. 375 (1994)...............................................................................8, 20

*Mendoza v. Hyundai Motor Company, Ltd*,
No. 15-CV-01685-BLF, 2024 WL 37206 (N.D. Cal. Jan. 2, 2024)...................23

ii

*Norfolk S. Corp. v. Chevron U.S.A. Inc.*,
   371 F.3d 1285 (11th Cir. 2004) ........................................................22

*Reppun v. Board of Water Supply*,
   656 P.2d 57 (Haw. 1982) ..................................................................10

*U.S. ex rel. Barajas v. Northrop Corp.*,
   147 F.3d 905 (9th Cir. 1998) ............................................................22

*Wojciechowski v. Kohlberg Ventures, LLC*,
   923 F.3d 685 (9th Cir. 2019) ...............................................8, 21, 22

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

Hawaiʻi Const. Article VIII, § 1.............................................................9

28 U.S.C. § 1651 ..............................................................................8, 20

28 U.S.C. § 2283 .........................................................................8, 20, 21

Honolulu Charter § 7-105 ....................................................................10

HRS § 54-11.........................................................................................10

HRS § 54-16.........................................................................................10

HRS § 54-27.........................................................................................10

HRS § 54-31.........................................................................................10

HRS § 261-1...........................................................................................9

HRS § 480-2...................................................................................3, 6, 11

## INTRODUCTION

Chevron respectfully moves this Court to enforce the settlement agreement that the State of Hawai'i signed decades ago to resolve claims alleging the deceptive manufacture, marketing, and sale of petroleum products. This Court expressly incorporated into its Final Judgment the terms of that settlement agreement and retained jurisdiction to enforce it. Now, contrary to that Judgment, Hawai'i has filed suit in state court seeking to hold Chevron (and others) liable for what it claims is the deceptive manufacture, marketing, and sale of petroleum products, all of which fall squarely within the terms of the settlement release. Accordingly, this Court should protect and effectuate its Judgment by enjoining the State's new state-court lawsuit as impermissibly arising out of pre-settlement conduct. Such relief is provided both by federal law and the State's express agreement in the settlement.

In addition, the City and County of Honolulu, the Honolulu Board of Water Supply, and the County of Maui have filed state-court lawsuits against Chevron (and others) that are functionally identical to the State's new complaint. While those political subdivisions and agencies were not named parties to the settled case before this Court, the State brought that now-settled action expressly on behalf of the State's political subdivisions and agencies. As a result, the City and County of Honolulu, the Honolulu Board of Water Supply, and the County of Maui are bound by this Court's Judgment, and their claims in state court should be similarly barred.

1

In sum, the State of Hawaiʻi, the City and County of Honolulu, the Honolulu Board of Water Supply, and the County of Maui are in violation of this Court's Final Judgment, having filed lawsuits in state court arising out of alleged acts and speech pre-dating the 2002 release executed in this action. As a result, those state-court complaints should be enjoined. This Court should order the Plaintiffs in those cases to dismiss their present complaints as against Chevron and file amended Complaints (if they so choose) that do not contain any allegations regarding pre-settlement conduct or speech. At minimum, the Court should grant injunctive relief barring the State Court Plaintiffs from pursuing claims based on allegations pre-dating the 2002 Settlement.

## BACKGROUND

### A.  The *Anzai* Litigation and Settlement Broadly Released Liability.

In the late 1980s, the Hawaiʻi Attorney General's office began to investigate whether oil companies were engaged in anticompetitive and deceptive trade practices. Ex. A, Second Amended Complaint, ¶¶ 58-62, *Anzai v. Chevron Corp.*, No. 1:98-cv-792 (D. Haw. July 23, 1999) (ECF 166) (hereinafter "*Anzai* Complaint"). In 1998, Hawaiʻi's Attorney General sued Chevron (and others) on behalf of Hawaiʻi's residents, the State itself, and the State's political subdivisions and agencies. ¶ 2. According to the Complaint, Chevron deceived consumers by justifying higher "fuel prices in Hawaii as a function of higher Hawaii operating

2

costs." ¶¶ 64-69. The Complaint thus asserted price-fixing claims under state and federal antitrust statutes, as well as claims for unfair and deceptive trade practices under HRS § 480-2. ¶¶ 83-103.

After four years of aggressive litigation, the parties settled and moved for court approval of the Settlement Agreement. *See* Motion for Approval of Settlement Agreement, *Anzai v. Chevron Corp.*, No. 1:98-cv-792 (D. Haw. March 8, 2002) (ECF 1176). The Court held a fairness hearing and approved the Settlement, which involved substantial monetary payments and other concessions from Chevron and the other defendants. Ex. B, Final Judgment, *Anzai v. Chevron Corp.*, No. 1:98-cv-792 (D. Haw. April 30, 2002) (ECF 1188).

The Settlement releases "Settled Claims" on behalf of a wide category of releasors: "the State of Hawaii and its departments, agencies, divisions and other entities," the "legal representatives, predecessors, successors, and assigns of Plaintiffs," and "all others on whose behalf" the Attorney General brought the lawsuit "as identified in" the complaint. Ex. C, Settlement Agreement, ¶ 1.12, *Anzai v. Chevron Corp.*, No. 1:98-cv-792 (D. Haw. April 30, 2002) (ECF 1188). The Attorney General brought the lawsuit "both as *parens patriae* for the natural persons residing in the State of Hawaii and on behalf of the State of Hawaii, its political subdivisions and governmental agencies." Ex. A, *Anzai* Complaint ¶ 2.

The scope of the "Settled Claims" released on behalf of these parties is both clear and broad. It applies to "all claims, causes of action and liabilities of whatever nature or origin, known and unknown, that have been, could have been, or could be asserted against" Chevron "that arise from any act or acts occurring prior to the date of the Settlement Agreement" (April 30, 2002, *see* Ex. C, Settlement Agreement ¶¶ 1.15, 3.7), as long as they "relate to," among other things, "the pricing, sale, purchase, manufacture, exchange, marketing, delivery, and/or offering of gasoline, diesel, jet fuel and/or any other petroleum product or products." Ex. B, Final Judgment at 3-4; Ex. C, Settlement Agreement ¶ 1.15. The only limit on the breadth of the release is that the category of "'Settled Claims' does not include claims substantially unrelated to . . . deceptive trade practices," among other things. Ex. B, Final Judgment at 3-4; Ex. C, Settlement Agreement ¶ 1.15.

The parties agreed that this Court should retain jurisdiction "to order injunctive relief for the purposes of enforcing, implementing, administering, construing and interpreting" the Settlement Agreement. ¶ 3.6. The Judgment this Court entered "dismissed with prejudice" all Released Defendant Parties, including Chevron, and provided that "all claims in this lawsuit are dismissed with prejudice as to the Released Defendant Parties." Ex. B, Final Judgment ¶ 8; *see also* Ex. C, Settlement Agreement ¶ 3.5. The Judgment also expressly provided that "[t]his Court shall retain continuing jurisdiction over the Settlement Amount, the Settling

4

Parties and the Settlement Claimants for the purposes of enforcing, implementing, administering, construing and interpreting the Settlement Agreement." Ex. B, Final Judgment ¶ 11; Ex. C, Settlement Agreement ¶ 3.6.

**B.     The New State Court Cases Seek to Impose Liability on Chevron for Alleged Conduct Stretching Back Decades.**

In 2020, Maui and Honolulu sued a group of energy companies—including Chevron—alleging a "multi-front effort to conceal and deny" the link between fossil fuels and climate change. *See* Ex. D, Complaint, *County of Maui v. Sunoco LP*, 2CCV-20-283 (Oct. 12, 2020) (ECF 1) ("Maui Complaint"); Complaint, *City and County of Honolulu v. Sunoco LP*, 1CCV-20-380 (March 9, 2020) (ECF 1). The Honolulu Board of Water Supply later joined the Honolulu suit. *See* Ex. E, First Amended Complaint, *City and County of Honolulu v. Sunoco LP*, 1CCV-20-380 (March 22, 2021) ("Honolulu Complaint") (ECF 45). In 2025, the State of Hawaiʻi filed a materially identical lawsuit. *See* Ex. F, Complaint, *State of Hawaiʻi v. BP P.L.C.*, 1CCV-25-717 (May 1, 2025) (ECF 1) ("Hawaiʻi Complaint").

The State of Hawaiʻi, County of Maui, and the Honolulu entities (collectively the "State Court Plaintiffs") allege that the Defendants obscured the climatic effects of petroleum products through deceptive practices dating back to the 1960s. *See, e.g.*, Ex. E, Honolulu Complaint ¶¶ 12, 136 (alleging Defendants engaged in a "coordinated campaign of disinformation and deception" designed to "obscure the connection between their products and global warming"); Ex. D, Maui Complaint

5

¶¶ 12, 149 (same); Ex. F, Hawai'i Complaint ¶¶ 16, 156 (same). The State Court Plaintiffs seek damages for various common-law torts arising from what the State calls "a decades-long campaign of deception" relating to the sale and marketing of petroleum products. *See* Ex. F, Hawai'i Complaint ¶ 1. And Hawai'i seeks damages under the same deceptive-trade-practices statute, HRS § 480-2, that the Attorney General asserted in the *Anzai* litigation. *Id.* ¶¶ 407-420.

The State Court Plaintiffs assert claims based on two basic types of allegedly deceptive conduct (the "State Court Claims"). *First*, they allege that Chevron and others "affirmatively deceiv[ed] consumers and the public about the climatic dangers of fossil fuels" from the late 1980s until the late 1990s by denying the link between climate change and fossil fuels. Ex. F, Hawai'i Complaint ¶¶ 104-128; *see also* Ex. E, Honolulu Complaint ¶¶ 90-105; Ex. D, Maui Complaint ¶¶ 99-115. *Second*, the Plaintiffs allege that since the late 1990s Chevron and others have abandoned efforts to deny the climatic effects of fossil fuels and have instead engaged in "greenwashing"—that is, "promoting themselves as sustainable energy companies" while continuing "to ramp up fossil fuel production" and "to invest in new fossil fuel development." Ex. E, Honolulu Complaint ¶¶ 140-47; Ex. D, Maui Complaint ¶¶ 152-59; Ex. F, Hawai'i Complaint ¶¶ 160-73.

On February 2, 2024, the Defendants in the *Honolulu* action filed a motion for summary judgment based on the statute of limitations before discovery started in

6

earnest. *See* Def. Mot. for Summ. J., *City and County of Honolulu v. Sunoco LP*, 1CCV-20-380 (Feb. 11, 2025) (ECF 1536). That motion asserted both that the statute of limitations barred the bulk of Honolulu's claims and that Honolulu could have (but failed to) raise its claims earlier. *Id.* at 1. In particular, the motion highlighted that Plaintiffs' complaint "came almost two decades after [Honolulu's] then-Mayor Harris claimed ***in 2001*** that 'the paid propaganda and phony science of the . . . energy industr[y]' had led President Bush to deny 'the causal link between CO2 pollution and global warming,' which (according to Honolulu's Mayor) had already begun and would have a 'catastrophic impact' on Hawai'i." *Id.* at 1 (emphasis added).

On January 2, 2026, the *Honolulu* Circuit Court denied summary judgment, solely on the basis that "the Court cannot conclude continued discovery efforts would be futile." Order Denying Mot. for Summary Judgment, 2, *City and County of Honolulu v. Sunoco LP*, 1CCV-20-380 (Jan. 2, 2026) (ECF 2279). The court did not rule on "any of the other arguments raised in the briefs." *Id.* Accordingly, discovery into several decades' worth of alleged conduct and statements is now poised to begin for the first time.

7

## LEGAL STANDARD

A federal district court has inherent authority to issue orders necessary "to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380 (1994). That authority includes "ancillary jurisdiction" to enforce the terms of its judgment if the court has retained jurisdiction. *Id.* at 381. When a court's judgment incorporates the terms of a settlement, those terms become enforceable as part of the judgment. *See Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 690 (9th Cir. 2019). The All Writs Act—subject to the limitations of the Anti-Injunction Act—authorizes federal courts to enjoin state-court proceedings if "necessary in aid of [the federal court's] jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283; 28 U.S.C. § 1651; *see also Flanagan v. Arnaiz*, 143 F.3d 540, 545 (9th Cir. 1998).

## ARGUMENT

### I.     The Settlement and Judgment Bar the State Court Claims.

By its plain terms, the *Anzai* Settlement (incorporated into the Final Judgment) bars the State Court Claims that relate to alleged pre-settlement conduct. All of the State Court Plaintiffs fall within the definition of parties whose claims were released in *Anzai*, because the release applies to the State and all of its political subdivisions. And the Settlement's definition of released claims covers all of the State Court Claims because they all relate to alleged deceptive practices involving petroleum products and all arise from conduct before the Settlement's effective date.

8

## A.      The Settlement and Judgment Apply to All State Court Plaintiffs.

As an initial matter, the Settlement squarely applies to all the State Court Plaintiffs. Anzai sued on behalf of the people of Hawai'i, the State itself, and the State's "political subdivisions and governmental agencies." Ex. A, *Anzai* Complaint ¶ 2. And the Settlement Agreement releases claims on behalf of "Plaintiffs," defined in relevant part as "the State of Hawaii and its departments, agencies, divisions and other entities," the "legal representatives, predecessors, successors, and assigns of Plaintiffs," as well as "all others on whose behalf" the Attorney General brought the lawsuit "as identified in" the complaints. Ex. B, Final Judgment at 3; Ex. C, Settlement Agreement ¶¶ 1.12, 3.7.

The State of Hawai'i is clearly a Plaintiff whose claims were released under the Settlement Agreement. And because Hawai'i law treats counties and municipalities as political subdivisions of the State, the City and County of Honolulu and the County of Maui are also "Plaintiffs" whose claims were released. *See* Hawai'i Const. Art. VIII, § 1; HRS § 261-1; *Convention Center Authority v. Anzai*, 890 P.2d 1197, 1199 (Haw. 1995). The Honolulu Board of Water Supply is likewise a covered political subdivision because it is "a duly authorized department of the City and County of Honolulu." *Reppun v. Board of Water Supply*, 656 P.2d 57, 60 n.1 (Haw. 1982); *see* HRS §§ 54-11 to 54-34.[1]

---

[1] In addition, the Board falls within the category of entities whose claims were

9

**B.      The Settlement and Judgment Apply to All the State Court Claims.**

All of the State Court Claims fall squarely within the definition of released claims. The *Anzai* Settlement released Chevron from liability for "all claims" "of whatever nature or origin, known and unknown, that have been, could have been, or could be asserted" against the company "that arise from any act or acts occurring prior to the date of the Settlement Agreement and that relate to" (among other things) the "sale," "manufacture," and "marketing" of "gasoline, diesel, jet fuel and/or any other petroleum product or products," as long as the claims are not "substantially unrelated to" . . . "deceptive trade practices." Ex. B, Final Judgment at 3-4; Ex. C, Settlement Agreement ¶ 1.15.

The released claims were not limited to the antitrust theories that animated the *Anzai* litigation. On the contrary, the *Anzai* Settlement provided both sides a release of all claims "of whatever nature or origin, known and unknown" at the time of the settlement. *Id.* Although the Settlement Agreement carves out certain "substantially

---

released under the Settlement Agreement because the Board is one of the "legal representatives . . . and assigns of" Honolulu County. Ex. B, Final Judgment at 3; Ex. C, Settlement Agreement ¶ 3.7. The Board acts as Honolulu County's assigned agent and legal representative regarding water affairs—including suing and being sued in that capacity, HRS § 54-31, and exercising the county's power to "acquire and take" property "in the name of the county," HRS § 54-27; *see also* Honolulu Charter § 7-105 (giving the Board "the authority to acquire [real property] by eminent domain, purchase, lease or otherwise, in the name of the city"); HRS § 54-16 (providing that by default Honolulu County Attorney represents Board in litigation).

unrelated" claims, that carve-out is narrow: it covers only claims that are "substantially unrelated to," among other things, "deceptive trade practices." *Id.*

All of the State Court Claims are substantially related to alleged "deceptive trade practices." They all depend on the overarching theory that Defendants "mounted a decades-long campaign of deception to discredit the scientific consensus on climate change," thereby "sustaining the market for fossil fuels," which in turn supposedly "accelerated global warming" by increasing worldwide carbon emissions and thereby "brought about devastating climate change impacts to Hawaiʻi." Ex. F, Hawaiʻi Complaint ¶¶ 1-2; *see also* Ex. E, Honolulu Complaint ¶¶ 1-3; Ex. D, Maui Complaint ¶¶ 1-4.

Hawaiʻi packages that overarching theory into claims for (1) negligence, (2) public nuisance, (3) private nuisance, (4) trespass, (5) harm to public trust resources, (6) civil aiding and abetting (against co-defendant API only), (7) unfair or deceptive acts or practices under HRS § 480-2, and (8) strict liability for failure to warn. Ex. F, Hawaiʻi Complaint ¶¶ 327-448. Although these causes of action have differing elements under state law, they all share the same common overarching theory: that Chevron's sale and marketing of fossil fuels was a deceptive trade practice causing climate change.

As to negligence, Hawaiʻi claims that the Defendants breached their "duty of care when they advertised, promoted, and/or sold fossil fuel products" without

11

"warnin[g] of the risk of harm associated with fossil fuel products" and "by waging a years-long deceptive marketing and public relations campaign to discredit climate science." ¶¶ 334-35. Similarly, Hawai'i bases its claims for nuisance, trespass, and harm to public trust resources on the Defendants' alleged "campaign of deception," which allegedly "created, caused, contributed to, and assisted in creating" "Climate-Related Harms." ¶¶ 343 (public nuisance), 357 (private nuisance), 372 (trespass), 389 (public trust). Hawai'i's claim for deceptive trade practices rests on allegations of Defendants' deceptive "marketing, advertising, and promotion of fossil fuel products." ¶ 410. And Hawai'i bases its failure-to-warn claim on allegations that "fossil fuel products" Defendants "advertised, promoted, and/or sold . . . were not reasonably safe . . . because they lacked adequate warnings and instructions" due to a "decades-long campaign of intentional deception." ¶¶ 435, 448.

The *Honolulu* and *Maui* complaints, which are nearly identical to each other, assert claims for (1) public nuisance, (2) private nuisance, (3) strict liability for failure to warn, (4) negligent failure to warn, and (5) trespass. Ex. D, Maui Complaint ¶¶ 204-55; Ex. E, Honolulu Complaint ¶¶ 155-207. Like the causes of action asserted in Hawai'i's complaint, the plaintiffs insist that these causes of action also share the same common overarching theory that Chevron deceived the public in selling and marketing fossil fuels.

12

The nuisance claim alleges Defendants "created, contributed to, and/or assisted, and/or were a substantial contributing factor in the creation of [a] public nuisance by . . . promoting the sale and use of fossil fuel products," "misrepresenting and casting doubt on the integrity of scientific information related to climate change," and campaigning "against the regulation of their fossil fuel products." Ex. D, Maui Complaint ¶¶ 207, 216; Ex. E, Honolulu Complaint ¶¶ 158, 167.

The failure-to-warn claims (strict liability and negligence) allege Defendants deceived the public through "marketing" and "public relations materials" that denied risks allegedly associated with fossil fuels and by "introducing fossil fuel products into the stream of commerce"—that is, by manufacturing, marketing, and selling fossil fuel products—without adequate warnings. Ex. D, Maui Complaint ¶¶ 228-29, 240-41; Ex. E, Honolulu Complaint ¶¶ 180-81, 192-93.

Finally, Maui and Honolulu ground their trespass claims on allegations that the Defendants "caused flood waters, extreme precipitation, saltwater, and other materials" to enter the Plaintiffs' property "by distributing, analyzing, recommending, merchandising, advertising, promoting, marketing, and/or selling fossil fuel products" without warning consumers about the risk. Ex. D, Maui Complaint ¶ 249; Ex. E, Honolulu Complaint ¶ 201.

*　　*　　*

In sum, the allegations in all three complaints make clear that Plaintiffs maintain that all of the State Court Claims against Chevron are substantially related to allegedly "deceptive trade practices" involving "the pricing, sale, purchase, manufacture, exchange, marketing, delivery, and/or offering of gasoline, diesel, jet fuel and/or any other petroleum product or products." Ex. C, Settlement Agreement ¶ 1.15. Accordingly, the *Anzai* Settlement squarely precludes these claims. *See* Ex. B, Final Judgment at 5-7.

### C. The Settlement's Exclusion of "Environmental Claims" Does Not Apply.

To be sure, the preclusive effect of the *Anzai* Settlement is not boundless. As noted above, the Settlement Agreement does not preclude claims that are "substantially unrelated" to "deceptive trade practices." Ex. C, Settlement Agreement § 1.15. As an "example" of unrelated claims that are beyond the scope of the settlement release, the Agreement lists "environmental claims brought by the Plaintiffs." *Id.* But the State Court Claims at issue here do not fall within that exclusion because—as the State Court Plaintiffs have insisted—they involve allegations of deceptive trade practices related to the marketing, manufacture, and sale of fossil fuels. Accordingly, the exclusion of "environmental claims" does not apply to the State Court Claims.

The *Anzai* Settlement lists "environmental claims" as an "example" of claims "substantially unrelated" to "deceptive trade practices." Ex. C, Settlement

Agreement ¶ 1.15. Thus, to fall within the exclusion, any claim—environmental or not—must be substantially unrelated to deceptive trade practices. Here, *all* of the State Court Claims are—by Plaintiffs' own admissions—substantially related to alleged deceptive trade practices.

The State Court Plaintiffs have themselves argued repeatedly and consistently that their claims are based on alleged "deceptive trade practices." After Chevron removed the State Court lawsuits to federal court based on federal preemption, Plaintiffs successfully obtained a remand to state court by telling the federal courts that the lawsuits do "not seek to limit extraction of fossil fuels or otherwise regulate greenhouse gas emissions" but to recover damages related to Defendants' alleged "tortious campaign to mislead and conceal the dangers of their fossil-fuel products." Maui's Mot. to Remand, 6, *County of Maui v. Sunoco LP*, 1:20-cv-470 (Nov. 25, 2020) (ECF 74); Honolulu's Mot. to Remand, 7, *City & County of Honolulu v. Sunoco LP*, 1:20-cv-163 (Sep. 11, 2020) (ECF 116). The federal courts granted Plaintiffs' motions to remand on that basis, holding that these cases are not about regulating pollution, but rather are "about whether oil and gas companies misled the public about dangers from fossil fuels." *City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1113 (9th Cir. 2022).

After remand, Chevron renewed its federal-law preclusion and preemption arguments in state court in Chevron's motions to dismiss. Here again, Plaintiffs

15

opposed dismissal by telling the state courts that their lawsuits are about purportedly deceptive conduct. For example, Honolulu opposed Chevron's motion to dismiss by arguing that "the specific conduct that triggers Defendants' liability is their use of deception to promote the unrestrained consumption of their fossil fuel products . . . . As pleaded then, this lawsuit does not—and cannot possibly—regulate pollution of any kind." Honolulu's Opp'n to Mot. to Dismiss, 9, *City & County of Honolulu v. Sunoco LP*, 1CCV-20-380 (March 22, 2021) (ECF 375); Maui's Opp'n to Mot. to Dismiss, 39, *County of Maui v. Sunoco LP*, 2CCV-20-283 (June 24, 2022) (ECF 456) (same).

On appeal from the trial court's order denying the motion to dismiss, Plaintiffs told the Hawai'i Supreme Court that "the only problem this lawsuit seeks to address is the use of deception to promote fossil fuel products," and that Plaintiffs seek to hold Defendants "liable under Hawai'i common law for misleading consumers and the public for decades about the climate impacts of fossil fuels." Honolulu's Answering Brief, 1, 26, *City & County of Honolulu v. Sunoco LP*, CAAP-22-429 (Jan. 18, 2023) (ECF 65); Transfer Order, SCAP-22-429 (ECF 7) (transferring case as briefed to Hawai'i Supreme Court). And here again those arguments have been successful so far, persuading the state courts not to dismiss—at the pleadings stage— Plaintiffs' lawsuits based on federal preemption. *City & County of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1196 (Hawai'i 2023) (characterizing Plaintiffs' claims

16

as challenging "the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign" (internal quotation marks omitted)); Order Denying Mot. to Dismiss, 7, *City & County of Honolulu v. Sunoco LP*, 1CCV-20-380 (March 29, 2022) (ECF 618) (denying preemption argument for lack of "concrete showing that a damages award in this case would somehow regulate emissions").

And most recently, in successfully opposing Chevron's early, pre-discovery motion for summary judgement on the ground that the claims are barred by the statute of limitations, Plaintiffs argued that they are "suing Defendants to 'challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign.'" Honolulu's Opp'n to Mot. for Summ. J., 1, *City & County of Honolulu v. Sunoco LP*, 1CCV-20-380 (May 9, 2025) (ECF 1724). And, again quoting the Hawai'i Supreme Court, Plaintiffs argue that "this is a traditional tort case alleging Defendants misled consumers and should have warned them about the dangers of using their products." *Id*. at 3.

In short, the State Court Plaintiffs have continuously argued their claims are about deceptive trade practices. The State Court Plaintiffs should not now be heard to argue that their claims are "substantially unrelated" to "deceptive trade practices."

17

**D.      The Settlement and Judgment Bar the State Court Claims Because They Arise From Alleged Pre-Settlement Conduct.**

By releasing claims based on alleged deception that occurred before April 2002, the *Anzai* Settlement and Judgment eviscerate the State Court Claims. All of the State Court Claims rest, in substantial and essential part, on alleged deception that supposedly occurred before April 2002. In all of the State Court Complaints, the theory of the case is that Chevron engaged in decades of deceptive practices starting before 2002 that caused *cumulative* global warming. For example, the State of Hawai'i alleges a "decades-long campaign of deception" that "had, and continues to have, the purpose and effect of inflating and sustaining the market for fossil fuels, which drove up [greenhouse gas] emissions, accelerated global warming, and brought about devastating climate change impacts to Hawai'i." Ex. F, Hawai'i Complaint ¶¶ 1-2. As a result, it would be impossible for the State Court Complaints in their current form to proceed in a manner consistent with the Anzai Settlement's pre-2002 release.

Most notably, the State Court Plaintiffs' theory of climate-change denial relies entirely on alleged conduct from the 1980s and 1990s. *See, e.g.,* Ex. F, Hawai'i Complaint ¶¶ 104-128; Ex. E, Honolulu Complaint ¶¶ 90-105; Ex. D, Maui Complaint ¶¶ 99-115. The State alleges a "pivot . . . to affirmatively deceiving consumers and the public" in the period "between 1988 and 1992," citing alleged statements and conduct by the defendants in the early 1990s. *Id*. ¶ 104. And the State

18

admits Defendants "shifted away from denying anthropogenic warming" in the late 1990s. *Id*. ¶ 128. The Settlement Agreement thus precludes all of the State Court Claims to the extent they are based on the theory that Chevron affirmatively denied anthropogenic climate change.

As to Chevron specifically, the State Court Complaints rely almost entirely on pre-settlement allegations, invoking advertising by Chevron "[o]ver the last several decades" and a patent Chevron obtained in 1974. Ex. F, Hawaiʻi Complaint ¶¶ 36, 141; *see also* Ex. E, Honolulu Complaint ¶¶ 23, 120; Ex. D, Maui Complaint ¶¶ 22, 133. And Hawaiʻi highlights Chevron's alleged participation in organizations engaged in purportedly deceptive conduct beginning in the 1980s, Ex. F, Hawaiʻi Complaint ¶¶ 119, 123, and advertisements by Chevron in 1970 and 1996, *id.* ¶¶ 202, 237. . Without this alleged conduct stretching back decades and pre-dating the 2002 settlement, the few allegations as to Chevron's more recent speech and conduct do not state coherent or actionable claims.

## II.     This Court Should Issue Injunctive Relief to Enforce the Judgment.

To enforce the Judgment, this Court should order the State Court Plaintiffs to dismiss their present Complaints as against Chevron and file amended Complaints (if they so choose) that do not contain allegations regarding pre-settlement conduct or speech. The State Court Plaintiffs should be specifically enjoined from pursuing their "climate deception" theory that rests entirely on alleged conduct that ended in

the 1990s. And at a minimum, the Court should enjoin the State Court Plaintiffs from pursuing claims based on allegations pre-dating the 2002 Settlement.

### A.    This Court Retains Jurisdiction to Enforce the Judgment.

A federal court has authority to enforce a settlement agreement if it (1) incorporated the agreement into its dismissal order or (2) expressly retained jurisdiction to enforce it. *Kokkonen*, 511 U.S. at 381. Here, the Court did both: It expressly incorporated the terms of the Settlement Agreement into its final judgment and appended the Agreement as an exhibit, and it also "retain[ed] continuing jurisdiction over the Settlement Amount, the Settling Parties and the Settlement Claimants for the purposes of enforcing, implementing, administering, construing and interpreting the Settlement Agreement." Ex. B, Final Judgment at 2-5, 7.

### B.    The All Writs Act Authorizes an Injunction Consistent With the Anti-Injunction Act.

The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). That authority is limited by the Anti-Injunction Act, which prohibits federal courts from enjoining state-court proceedings except where "expressly authorized by Act of Congress, or where necessary in aid of [the federal court's] jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "[I]f an injunction falls within one of the Anti-Injunction Act's three exceptions, the All-Writs Act provides the positive authority

for federal courts to issue injunctions of state court proceedings." *In re Diet Drugs,* 369 F.3d 293, 305 (3d Cir. 2004); *see also Flanagan*, 143 F.3d at 545.

### 1.     An injunction is needed to effectuate this Court's Judgment.

The Anti-Injunction Act allows this Court to issue injunctive relief against state proceedings to "effectuate its judgments." 28 U.S.C. § 2283. That includes the authority to enjoin state-court proceedings that violate the settlement terms this Court incorporated into its final judgment. And that is exactly what Chevron is requesting here: This Court approved the *Anzai* Settlement and incorporated its terms into a final judgment. Thus, because the State Court Plaintiffs are seeking to press claims in state court that violate the Settlement Agreement, this Court should enjoin them to effectuate its final judgment.

There is no question this Court has the power to issue injunctive relief to enforce a settlement agreement when it "has expressly retained jurisdiction to construe and enforce [that] agreement." *Flanagan*, 143 F.3d at 546. The Anti-Injunction Act "allows federal courts to enjoin state court proceedings to protect the res judicata effect of their judgments." *Golden v. Pacific Maritime Ass'n*, 786 F.2d 1425, 1427 (9th Cir. 1986). And "when a court dismisses an action because of a settlement, the settlement and release of claims . . . become a final judgment and not simply a contract entered into by private parties." *Wojciechowski*, 923 F.3d at 690.

The terms of the agreement—not "general principles of claim preclusion"—thus define the judgment's preclusive effect. *Id*. at 689.

The Ninth Circuit has made clear that "the best evidence of [the parties'] intent is . . . the settlement agreement itself . . . as interpreted according to traditional principles of contract law." *Id.* at 690 (quoting *Norfolk S. Corp. v. Chevron U.S.A. Inc.*, 371 F.3d 1285, 1289 (11th Cir. 2004)). Parties can thus limit the preclusive effect of a judgment by reserving claims. *See U.S. ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 911 (9th Cir. 1998). Or they can settle and ask the court to approve a broad release of related claims. *See Flanagan*, 143 F.3d at 542. Either way, when a federal court makes the settlement terms a part of the court's judgment, it will enforce the terms as part of the judgment. *See Wojciechowski*, 923 F.3d at 691.

Here, the terms of the Settlement—and thus the Judgment that incorporated it—are broad. The Settlement released Chevron from liability for all claims arising from pre-settlement conduct related to (among other things) "deceptive trade practices" involving the "sale" or "marketing" of petroleum products. Ex. B, Final Judgment at 3-4; Ex. C, Settlement Agreement ¶ 1.15. As discussed above, all of the State Court Claims fall squarely within that definition. The All Writs Act and the Anti-Injunction Act thus authorize this Court to enforce the judgment by enjoining the State Court Plaintiffs from continuing to assert claims released by the *Anzai* Settlement. *See, e.g.*, *Flanagan*, 143 F.3d at 546. Accordingly, the Court should

22

enjoin the State Court Plaintiffs to dismiss their current Complaints against Chevron because they seek to establish liability based on pre-settlement allegations, and bar them from pursuing claims based on pre-settlement conduct or speech.

### 2. An injunction is necessary and appropriate in aid of jurisdiction.

The "necessary in aid of jurisdiction" exception to the Anti-Injunction Act independently allows a federal court to issue an injunction when a pending state case would impair the court's continuing authority to interpret and enforce its prior judgments. *See Flanagan*, 143 F.3d at 545. That is precisely the situation here.

When this Court approved the *Anzai* Settlement and incorporated its terms into its final judgment, it expressly stated that it retained jurisdiction to enforce the agreement. Ex. B, Final Judgment at 7. When a district court retains jurisdiction to enforce a settlement, that jurisdiction is presumptively "exclusive." *Flanagan*, 143 F.3d at 545; *see also Mendoza v. Hyundai Motor Company, Ltd*, No. 15-CV-01685-BLF, 2024 WL 37206, at *5 (N.D. Cal. Jan. 2, 2024). Here, the Court gave no indication that its retention of jurisdiction was anything other than exclusive. Accordingly, this Court is the only proper forum to resolve whether the *Anzai* judgment precludes the State Court Claims. Having "a state court construing what the federal court meant in the judgment" would "frustrate the federal district court's purpose" in retaining jurisdiction. *Flanagan*, 143 F.3d at 545.

Allowing the State Court Claims to proceed would require Chevron to assert the *Anzai* Settlement as a defense in state court, and the state court would then have to interpret the agreement to determine whether it bars the State Court Claims. That would undermine this Court's exclusive jurisdiction to interpret the Settlement. That is especially true because the state court's interpretation could have preclusive effect, which would not only intrude on this Court's exclusive jurisdiction but could leave this Court powerless to interpret the Agreement and to vindicate its own judgment—precisely the harm the "in aid of jurisdiction" exception is intended to prevent. *See Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 882 (11th Cir. 1989). It would render this Court's exclusive authority to enforce its prior judgment effectively "nugatory." *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 806 (9th Cir. 2002).

## CONCLUSION

Chevron respectfully requests that the Court grant injunctive relief to enforce the Settlement and Final Judgment. In particular, the Court should:

- Enjoin the State Court Plaintiffs to dismiss the current State Court Complaints against Chevron, which rely substantially on allegations of deceptive speech and conduct that occurred on or before April 30, 2002;

- Enjoin the State Court Plaintiffs from filing any amended complaint or pursuing any claim against Chevron that relies on allegations of deceptive speech or conduct regarding the sale, marketing, or promotion of petroleum products that occurred on or before April 30, 2002;

- Enjoin the State Court Plaintiffs from pursuing claims based on the theory that Chevron engaged in denial of anthropogenic global warming, which they allege ended in the late 1990s.

24

DATED:  January 30, 2026
Honolulu, Hawai'i

Respectfully submitted,

/s/ *Steven K. S. Chung*

Steven K. S. Chung
Anthony F. T. Suetsugu
IMANAKA ASATO, LLLC
745 Fort Street Mall, 17th Floor
Honolulu, HI 96813
Telephone:  (808) 521-9500
Facsimile:   (808) 541-9050
Email: schung@imanaka-asato.com
        asuetsugu@imanaka-asato.com

Anthony J. Dick*
Christopher S. Dinkel*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone: (202) 879-3939

Caroline N. Mitchell*
Jerry C. Ling (8260)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939

David Phillips*
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200

Theodore J. Boutrous Jr.*
William E. Thomson*
GIBSON DUNN
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  (213) 229-7000

Andrea E. Smith*
GIBSON DUNN
811 Main Street, Suite 3000
Houston, TX 77002-6117
Telephone:  (346) 718-6600

Joshua D. Dick*
GIBSON DUNN
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:  (415) 393-8200

Attorneys for Defendants
CHEVRON CORPORATION and CHEVRON U.S.A. INC.
*pro hac vice pending*

25

ORIGINAL

EARL ANZAI
Acting Attorney General
JACK ROSENZWEIG
Deputy Attorney General
State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Telephone:    (808) 586-1301
Facsimile:    (808) 586-1205

SPENCER HOSIE    (Admitted *Pro Hac Vice*)
GEORGE FROST     (Admitted *Pro Hac Vice*)
Hosie Frost & Large
One Post Street
25th Floor
San Francisco, California  94104
Telephone:    (415) 296-9801
Facsimile:    (415) 296-9802

Of Counsel:
GALIHER DeROBERTIS NAKAMURA ONO TAKITANI
Law Corporations
GARY O. GALIHER
L. RICHARD DeROBERTIS
JEFFREY T. ONO
610 Ward Avenue, Suite 200
Honolulu, Hawaii  96814-3308
Telephone:    (808) 597-1400
Facsimile:    (808) 591-2608

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARGERY S. BRONSTER, ATTORNEY GENERAL FOR THE STATE OF HAWAII, As *Parens Patriae* for the Natural persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies,<br><br>Plaintiff,<br><br>vs. | CIVIL NO. 98-00792-SPK<br><br>SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF UNDER THE SHERMAN ACT AND PENDENT STATE CLAIM; EXHIBITS "A"-"H"; DEMAND FOR TRIAL BY JURY; SUMMONS IN A CIVIL CASE |

# EXHIBIT "A"

CHEVRON CORPORATION; CHEVRON )
U.S.A. INC.; TESORO HAWAII )
CORPORATION, as successor-in-interest to )
BHP PETROLEUM AMERICAS )
REFINING, INC.; BHP HAWAII INC.; )
SHELL OIL COMPANY; SHELL OIL )
PRODUCTS COMPANY; TEXACO INC.; )
TEXACO REFINING AND MARKETING )
INC.; TESORO PETROLEUM )
CORPORATION; TESORO HAWAII )
CORPORATION; TOSCO )
CORPORATION; UNION OIL )
COMPANY OF CALIFORNIA; and )
UNOCAL CORPORATION, )
)
              Defendants. )
)
)

D:\03840T01\PLEADING\BLS11COM.DOC

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF UNDER THE SHERMAN ACT AND PENDENT STATE CLAIM

COMES NOW the Attorney General for the State of Hawaii, and complains and alleges as follows:

## I.

## INTRODUCTION

1. Defendants are gasoline refiners and wholesalers in Hawaii. Through a series of illegal agreements, these Defendants have allocated retail gasoline market shares and fixed retail gasoline prices at uncompetitive levels. Plaintiff, the Attorney General of the State of Hawaii, brings this action on behalf of the people of the State to recover damages for past price fixing and for an injunction prohibiting future price fixing.

## II.

## JURISDICTION AND VENUE

2.    Plaintiff is the Attorney General for the State of Hawaii.  Plaintiff brings this action both as *parens patriae* for the natural persons residing in the State of Hawaii and on behalf of the State of Hawaii, its political subdivisions and governmental agencies.

3.    This action is brought pursuant to 15 U.S.C. § 15(c) and HRS § 480-14, which govern federal and state claims by state attorneys general for violation of Sherman Act §§ 1-7 (15 U.S.C. §§ 1-7) and Chapter 480 of the Hawaii Revised Statutes.

4.    Defendants' sales of petroleum products are in interstate trade and commerce; they also affect interstate trade and commerce.

5.    The United States District Courts have subject matter jurisdiction of this action pursuant to 15 U.S.C. § 15(c), which permits state attorneys general to sue in any United States District Court having jurisdiction of the Defendants for violations of Sherman Act §§ 1-7 (15 U.S.C. §§ 1-7).  The Attorney General's federal antitrust claims against the Defendants are for violation of Sherman Act § 1, as Defendants have fixed prices for gasoline and allocated market shares pursuant to an agreement in restraint of trade and commerce.

6.    The United States District Courts also have subject matter jurisdiction over the Attorney General's state statutory claims pursuant to 28 U.S.C. § 1367(a), as the state statutory claims are so related to the Sherman Act § 1 claims that they form part of the same case and controversy under Article III of the United States Constitution.

7.    A substantial part of the events and omissions giving rise to the Attorney General's claims occurred in the District of Hawaii.  Further, the Defendants reside, are found,

and/or transact business in the District of Hawaii. The United States District Court for the District of Hawaii has personal jurisdiction over all Defendants. Venue is proper in the District of Hawaii pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22.

## III.

## IDENTIFICATION OF THE DEFENDANTS

8.     Defendant CHEVRON CORPORATION, a Delaware corporation, is parent to Defendant CHEVRON U.S.A. INC., a Pennsylvania corporation, which is registered with the State of Hawaii, Department of Commerce and Consumers Affairs, Business Registration Division as a corporation managing the business and assets relating to refining, marketing, supply, and distribution of products derived from petroleum, and also as a corporation engaged in all phases of the petroleum industry.  Defendants CHEVRON CORPORATION AND CHEVRON U.S.A. INC. are referred to herein as "CHEVRON."

9.     Defendant BHP PETROLEUM AMERICAS REFINING INC., a Hawaii corporation (now known as Tesoro Hawaii Corporation), was registered with the State of Hawaii, Department of Commerce and Consumers Affairs, Business Registration Division as a petroleum refinery, and also as a corporation involved in the retail sale of petroleum products.  Defendant BHP HAWAII INC. is a Hawaii corporation registered as a holding company.  On February 8, 1993, Pacific Resources, Inc. changed its name to BHP Petroleum Americas (Hawaii) Inc.  On June 28, 1994, BHP Petroleum Americas (Hawaii) Inc. changed its name to BHP Hawaii Inc.  Defendants BHP PETROLEUM AMERICAS REFINING INC. and BHP HAWAII INC. are referred to herein as "BHP."  On May 29, 1998, BHP Petroleum Americas Refining, Inc. changed its name to Tesoro Hawaii Corporation.

4

10. Defendants SHELL OIL COMPANY and SHELL OIL PRODUCTS Company are both Delaware corporations registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division. Defendant SHELL OIL COMPANY is the parent company of Defendant SHELL OIL PRODUCTS COMPANY. Defendants SHELL OIL COMPANY and SHELL OIL PRODUCTS COMPANY are referred to herein as "SHELL."

11. Both Defendants TEXACO INC. and TEXACO REFINING AND MARKETING INC. are Delaware corporations. Defendant TEXACO INC., the parent of Defendant TEXACO REFINING AND MARKETING INC., is registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as a corporation engaged in marketing; Texaco Refining and Marketing Inc. is registered as a corporation engaged in the manufacturing, transportation, and marketing of petroleum products. Defendants TEXACO INC. and TEXACO REFINING AND MARKETING INC. are referred to herein as "TEXACO."

12. Defendant TESORO PETROLEUM CORPORATION, a Delaware corporation, is parent to Defendant TESORO HAWAII CORPORATION. Defendant TESORO HAWAII CORPORATION is the successor-in-interest to BHP Petroleum Americas Refining, Inc., Defendants TESORO PETROLEUM CORPORATION and TESORO HAWAII CORPORATION are referred to herein as "TESORO."

13. Defendants TESORO PETROLEUM CORPORATION and TESORO HAWAII CORPORATION are alleged to be liable both as successors-in-interest of BHP Petroleum Americas Refining, Inc., and as active participants in the common scheme and

conspiracy alleged herein. Specifically, prior to acquiring the BHP Hawaii assets, Tesoro conducted a due diligence review, and understood what Hawaii margins were and why they were what they were. After closing the transaction, Tesoro continued the business practices of its predecessor in Hawaii, elected to join the ongoing conspiracy, and profited therefrom.

14. Defendant TOSCO CORPORATION is a Nevada corporation registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as a corporation engaged in the marketing of wholesale petroleum products. Defendant TOSCO CORPORATION is referred to herein as "TOSCO."

15. Defendant TOSCO CORPORATION is alleged to be liable both as the successor-in-interest of Defendants UNION OIL COMPANY OF CALIFORNIA and UNOCAL CORPORATION (referred hereinafter as "UNOCAL"), from which TOSCO purchased its Hawaii petroleum business in November 1996, and thereafter as an active participant in the common scheme and conspiracy alleged herein. Specifically, prior to acquiring the Unocal business, Tosco undertook a due diligence review and understood what Hawaii margins were and why they were what they were. After closing the transaction, Tosco continued the business practices of its predecessor in Hawaii, elected to join the ongoing conspiracy, and profited therefrom.

16. Defendant UNION OIL COMPANY OF CALIFORNIA is a California corporation registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as a corporation engaged in the marketing of petroleum products. Defendant UNOCAL CORPORATION, a Wyoming corporation, is currently

6

registered with the State of Hawaii, Department of Commerce and Consumer Affairs, Business Registration Division, as inactive.

## IV.

## DEFENDANTS' HAWAII OPERATIONS

### A.    Refining And Marketing

17.    Defendants are of two types: (1) current and former owners and operators of the two in-state petroleum refineries; and, (2) current and former in-state wholesalers of motor gasoline and diesel fuel (hereinafter "motor fuel"). The current and former owners and operators of the two in-state petroleum refineries are CHEVRON, BHP, and TESORO; while CHEVRON has owned and operated its Hawaiian refinery throughout the period here relevant, BHP sold its Hawaiian refinery (and service stations) to TESORO in May 1998.

18.    The Defendant wholesalers of motor fuel are the refiners CHEVRON and BHP/TESORO, who also act as wholesalers, and SHELL, TEXACO, UNOCAL, and TOSCO. CHEVRON, SHELL, and TEXACO have acted as wholesalers throughout the relevant period. UNOCAL sold its Hawaii business to TOSCO in November 1996. BHP sold its Hawaii business to TESORO in May 1998.

19.    As used herein, "BHP/TESORO" refers to BHP in and before May 1998 and TESORO in and after May 1998. "UNOCAL/TOSCO" refers to UNOCAL in and before November 1996 and TOSCO in and after November 1996.

20.    CHEVRON owns and operates a refinery at Barber's Point on Oahu which has the capacity to refine 54,000 barrels of oil per day. This facility refines approximately 60% of the gasoline consumed in the State of Hawaii. As a vertically-integrated company,

7

CHEVRON generally retains one-half of the motor fuel it refines to either: (a) sell directly to consumers through its company-owned and operated retail stations, or (b) sell to its franchisee-operated retail stations that, in turn, resell to consumers. Motor fuel sold by CHEVRON's company-owned and operated retail stations and motor fuel sold by CHEVRON's franchisee-operated retail stations is marketed under the name "CHEVRON."

21. With few exceptions, the remaining one-half of the motor fuel refined by CHEVRON is sold to in-state motor fuel wholesalers, such as Defendants SHELL, TEXACO, and TOSCO (formerly UNOCAL). These wholesalers -- who are also vertically integrated companies -- resell motor fuel purchased from CHEVRON either directly to consumers through their company-owned and operated retail stations, or to their respective franchisees. Both avenues of resale result in sales to consumers in retail stations bearing the wholesaler's trade name (e.g., SHELL, TEXACO, or UNOCAL).

22. Until May 1998, BHP was the owner and operator of Hawaii's second refinery, which has the capacity to process 95,000 barrels of oil per day; TESORO purchased this refinery from BHP in May 1998 and currently owns and operates the refinery. While the BHP/TESORO refinery runs more barrels of oil per day than does the CHEVRON refinery, it produces less gasoline.

23. As with CHEVRON, BHP/TESORO retains a portion of the motor fuel refined to sell directly to consumers through company-owned and operated retail stations, or to franchisees for resale to consumers at the franchisees' retail stations. Motor fuel sold by BHP/TESORO, either directly to consumers or through franchisees, is marketed under the brand name "Gas Express."

24.     Also as with CHEVRON, BHP/TESORO sells a portion of the motor fuel it refines to its competitors in the wholesale business: Defendants SHELL, TEXACO, and UNOCAL/TOSCO.  As previously mentioned, these wholesalers resell motor fuel either directly to consumers through their company-owned and operated retail stations, or to their respective franchisees, who sell to consumers under the wholesaler's trade name (*e.g.*, SHELL, TEXACO, or UNOCAL).

25.     Together, the two refiners have sufficient refining capacity to produce all of the gasoline demanded in Hawaii; there is no refining shortfall that requires the import of gasoline from refining centers ex-Hawaii.

26.     As publicly reported, Defendants' approximate shares of the retail market for gasoline are reflected in the chart below:

|                | 1993 | 1998 |
|----------------|------|------|
| Chevron        | 30%  | 32%  |
| Shell          | 16%  | 13%  |
| Texaco         | 11%  | 12%  |
| Tosco/Unocal   | 15%  | 12%  |
| BHP/Tesoro     | 20%  | 14%  |

**B.     The Retail Level: Defendants Control Their Hawaiian Franchisees**

27.     Each Defendant has both company-owned and company leased (or "franchised") stations.  As to company-owned stations, the Defendant owns the service station premises, hires the employees, establishes the hours of operation, specifies the work rules, and sets the retail prices for each grade of gasoline.

9

28. Defendants' franchisees typically do not own the retail service stations they operate, but lease the premises from Defendants under Service Station Lease Agreements. The Defendants, through their Service Station Lease Agreements (and other agreements), dictate such matters as the hours of operation, the hours the franchisee must personally devote to the service station, the types of motor vehicle repairs that may be performed on site, the personal appearance of those staffing the service station, the language(s) service station employees must speak, what, if any, additional merchandise the franchisee can market, and whether and where automatic teller machines and pay phones may be located, among other things.

29. As a practical matter, Defendants' franchisees are not free to buy petroleum products from the seller offering the best price, but must buy only from a single Defendant at a non-negotiable price set by that Defendant under the terms of a Motor Fuel Supply Agreement. Defendants, through their Motor Fuel Supply Agreements (and other agreements with their respective franchisees), have assured that one level of buyers in the chain of distribution for gasoline (franchisees) must buy from Defendants.

30. Defendants set both the price at which their franchisees must buy motor fuel, and, effectively and within a narrow range, the price at which they resell motor fuel to consumers. When a Defendant sells motor fuel through a company-owned and operated retail service station, it directly sets the price to the consumer; this price sets the general retail price level. The Defendant also sells motor fuel to its franchisees -- who compete with company-owned and operated stations -- at the retail price less an amount sufficient to cover the franchisee's costs and provide a small return. Franchisees cannot consistently resell the motor fuel to consumers at a price in excess of the price charged by the company-owned stations

10

without losing sales to those stations. The franchisees cannot resell the motor fuel to consumers at a price significantly less than the full retail price and still recover costs and a profit.

31.     Because the Defendants control their franchisees, consumers of motor fuel are direct purchasers from Defendants both through company-owned and operated retail stations and franchisee-operated retail stations.

**C.     Motor Fuel Prices in Hawaii.**

32.     Excluding taxes, Hawaii's gasoline retail prices averaged $0.30+/gallon above the average mainland price from 1995 through the first half of 1998. *See* Exhibit "A".

33.     A "wholesale margin," as that term is used here, is the difference between the price a wholesaler pays for gasoline and the price it charges upon resale of that gasoline to a retail service station operator.

34.     A "retail margin" is the difference between the price a retail service station operator pays to acquire gasoline and the price it charges upon resale of that gasoline (before taxes) to consumers at the pump.

35.     Over the past four years, Hawaiian retail margins slightly exceeded the national average. The national average retail margin on all grades of gasoline was $0.06/gallon; Hawaii's: $0.09/gallon. *See* Exhibit "B".

36.     It is extraordinary wholesale margins which account for Hawaii's high retail gasoline and diesel fuel prices. The 1995-1998 national average wholesale margin on all grades of gasoline was $0.16/gallon; the comparable figure for Hawaii is $0.36/gallon, $0.20/gallon higher (*i.e.*, 125% higher). Similarly, the 1995-1998 wholesale margin in California and Washington (the two West Coast states where refineries are located) was

$0.13/gallon; the $0.36 wholesale margin in Hawaii was a full $0.23/gallon (*i.e.* more than 175%) higher than wholesale margins on the West Coast. *See* Exhibit "C".

37. Over the period at issue, the retail gasoline price and diesel fuel price in Hawaii significantly exceeded the cost of gasoline purchased elsewhere and shipped to Hawaii (excluding all taxes). For example, over the last four years, Hawaii retail prices exceeded the cost of buying gasoline in California and transporting it to Hawaii (the "California equivalent price") by more than $0.20 per gallon. *See* Exhibit "D" (unleaded regular, excluding all taxes).

38. It is only the average citizen who bears the brunt of this disparity in motor gasoline and diesel prices in Hawaii. This price relationship is not seen for jet fuel, a petroleum product for which there is an active Hawaii market. In the period 1987 to the present, jet fuel prices in Hawaii generally paralleled the West Coast equivalent price, *i.e.*, the cost of buying jet fuel in California and transporting it to Hawaii. *See* Exhibit "E". Fuel oil prices and bunker fuel prices also approximated the West Coast equivalent price. Markedly higher prices are seen for only two products: motor gasoline and diesel fuel.

39. Nor do Chevron's **national** diesel fuel customers pay supra-competitive prices in Hawaii. Chevron made what it called "Major Business Unit" sales to national companies buying diesel fuel in both Hawaii and elsewhere, *e.g.*, Ryder Truck. These companies paid a competitive price for diesel fuel purchased in Hawaii, *i.e.*, a price several cents higher than the California price. Other commercial buyers in Hawaii, however, who purchased diesel fuel in bulk commercial qualities in Hawaii alone, did not get the "Major Business Unit" sales price, but instead paid a much higher price. For example, on average in the 1994 calendar year, Hawaii only bulk, commercial diesel purchasers paid, after tax, more than $.20 a gallon more for diesel

fuel than did Chevron customers who bought both in Hawaii and on the mainland. That is, the local commercial buyer paid a materially higher price than did its national counterpart for the same product at the same place at the same time. This was part of a Chevron strategy to "desensitize" the local markets by selling to select large and sophisticated customers on a West Coast price basis.

### D.    The Cost Of Refining In Hawaii.

40.    Hawaii's high motor fuel prices are not caused by high Hawaii refining costs.

41.    The cost of manufacturing petroleum products, including motor fuel, turns on several factors. First, the cost of crude purchased accounts for approximately 87% of cost, as illustrated below:



**Medium Conversion Refinery Costs & Revenues**
**1991 - 1995 Average**
**(Dollars Per Barrel)**

Product Revenue = $22.08
Profit = $1.10
Operating Costs = $2.78 — 13% of Costs
Crude Costs = $18.20 — 87% of Costs

Source: Oil & Gas Journal, Refining Statistics Sourcebook.

Crude is used as the source material for petroleum products and often used to fuel the refinery.

42. Hawaii, Los Angeles, San Francisco and the Puget Sound area of Washington are the principal refining centers on the West Coast. Alaska North Slope Crude ("ANS") is a primary crude oil feedstock for each of those West Coast refining centers. While crude oil costs have fluctuated over time, historically, the delivered cost of ANS crude oil has been the same to each refining area.

43. A second factor influencing refining cost is the percentage of gasoline made relative to throughput volume; more expensive hardware and more fuel is needed to produce a higher percentage of gasoline. California's refineries produce, on average, 52 barrels

14

of gasoline from every 100 barrels of oil refined, and as many as 85 barrels. In contrast, CHEVRON's Hawaii refinery produces approximately 28 barrels of gasoline from 100 barrels of crude and the BHP/TESORO refinery produces approximately 11 barrels from 100. These lower gasoline production ratios enable the Hawaii refiners to operate in less expensive operating modes.

44. A third cost factor is the type of gasoline made. Less polluting gasolines are more expensive to manufacture. In this regard, refining gasoline in California is more expensive than refining gasoline in Hawaii, as California law requires use of less-polluting, more expensive "CARB" gasoline.

45. Other operating costs that go into refining gasoline, such as labor, constitute a relatively small percentage of total costs. Relatively high operating costs will not add more than a penny or two to the cost of refining gasoline. In fact, however, refinery operating costs in Hawaii are no higher than comparable costs on the West Coast of the mainland.

46. With Hawaii wholesale (to Defendants) sales prices approximating the national average, and retail margins approximating the national average, extraordinarily large wholesale margins translate directly into abnormally high retail motor fuel costs. For example, the following contrasts the cost components of gasoline prices in California and Hawaii:

15



V.

## THE PRICE FIXING CONSPIRACY

47.     Defendants agreed among themselves to allocate market shares and fix, control, stabilize, and maintain the price of motor fuel (both gasoline and diesel) sold to retail service stations and to consumers, thus assuring Defendants supra-competitive profits at the expense of all purchasers of motor fuel in Hawaii.

16

48.     CHEVRON and BHP/TESORO sold motor fuel to their competitors, other major oil and gas companies who did not and do not refine in Hawaii.  CHEVRON and BHP/TESORO sold motor fuel to these competitors at a price generally less than the West Coast equivalent price, that is, the price at which the competitors could purchase motor fuel in California and ship it to Hawaii.  These sales were typically made through exchange agreements, wherein the Hawaii refiners would deliver motor fuel to their competitors in Hawaii and receive back motor fuel on the mainland.

49.     This lower price was available only to the wholesaler Defendants here; no other wholesaler or retailer could buy motor fuel from CHEVRON or BHP/TESORO on similar terms.  Rather, other buyers generally paid a price equal to the CHEVRON retail price less a retailer's margin.

50.     This created a three-tier market structure as follows:



51.     On information and belief, the refiners and their competitors, Defendants here, agreed that they would not compete for additional market share by lowering prices to the retailers.  That is, CHEVRON and BHP/TESORO, the price leaders, agreed not to lower prices to their retail outlets, and the competitors agreed not to charge less than the refiners' price.  The competitors also agreed not to import additional and competitive gasoline volumes.  Through these agreements, the Defendants maintained supra-competitive wholesale margins and a stable market with allocated market shares for motor fuel.  The exchange agreements alleged above in paragraph 48 were used, along with other mechanisms, as a means of policing and enforcing the market share allocation.

52. The Defendants met and discussed motor fuel prices. On information and belief, CHEVRON would hold meetings where CHEVRON executives discussed with CHEVRON competitors what CHEVRON called "price discipline," that is, the agreement that no competitor would price compete with CHEVRON. At these meetings, CHEVRON also discussed the retaliatory actions it would take should one of the competitors begin to price compete.

53. As a consequence of these agreements, the Defendants' reported retail gasoline prices moved in concert. For example, in 102 reported instances between July 1, 1996 and July 1, 1998, the CHEVRON and SHELL prices were identical 93 times. On the remaining nine occasions, SHELL's price differed from CHEVRON's by just $0.01 or $0.02 a gallon, and most frequently the price difference reflected a momentary lag in SHELL following CHEVRON's price up or down.

54. Defendants' agreement to allocate market shares and fix motor fuel prices kept Hawaii prices exceedingly high even in the face of substantial declines in the cost of crude oil, the largest single cost of manufacturing gasoline. For example, between 1996 and June of 1998, crude oil prices dropped 37 percent, while mainland gasoline prices dropped 15 percent. Hawaii jet fuel prices also dropped along with crude oil prices. Yet Hawaii gasoline prices remained essentially unchanged over the same period. *See* Exhibits "D" and "E".

55. The only purpose of making public the price at which Defendants sold gasoline to their franchisees was to advise each other of that price.

56. Defendants' sharing of motor fuel price information was intended to facilitate their agreement to fix prices and allocate market shares.

19

57. Defendants also have communicated with one another, directly or indirectly, by phone, facsimile, letter, publication, press release, personal meeting, or by other means to facilitate their agreement to fix prices and allocate market shares.

## VI.

## PRIOR FALSE AND INCONSISTENT EXPLANATIONS

58. Since 1989, the State of Hawaii, by and through the Office of the Attorney General, has been investigating the following issues related to gasoline pricing in Hawaii: (1) whether the Hawaii gasoline market was not competitive; (2) whether the companies selling gasoline in Hawaii worked together to ensure a lack of competition; (3) whether the companies used various mechanisms, *e.g.* product supply agreements, to create, produce, and police the uncompetitive market; and (4) as a result of the lack of competition, whether the companies refining and/or marketing gasoline in Hawaii were making excessive, supra-competitive profits and/or return on capital employed.

59. In an effort to determine answers to these questions, the State, by and through the Office of the Attorney General, initiated series of confidential investigative demand ("CID") proceedings ("State investigation"). Through the State investigation, the State asked for information and data that would allow it to answer the questions outlined in ¶ 58 above. Had the State determined that the market in Hawaii was uncompetitive, and uncompetitive by reason of collective conduct, or that the companies doing business in Hawaii were making excessive, supra-competitive profits in Hawaii, the State would have addressed the problem promptly, either by way of legislation, regulation, or litigation.

60. Over the past decade, and in an ongoing effort to thwart the State's investigation, the Defendants, individually and collectively, directly and through their agents, have misrepresented basic facts about Hawaii's motor fuel business. Acting together, the Defendants propagated, through numerous public statements, two key untruths about Hawaii's motor fuel market: that it was extremely competitive, and that Hawaii motor fuel profits were no greater than mainland motor fuel profits.

61. Each Defendant is jointly and severally liable for actions of other conspirators, including false and misleading statements made by other Defendants

62. The Defendants' public statements were inconsistent with what they knew to be true. By category, the following paragraphs contrast what the Defendants said with what their internal documents reflect they in fact believed.

### A. Competition.

63. Since at least 1990, the Defendants represented that the Hawaii market was "highly" or "extremely" competitive, with each of the Defendants price competing for additional market share, *i.e.*, dropping motor fuel prices in an effort to capture additional market share. In fact, the Defendants understood that there was little or no motor fuel price competition in Hawaii, and that Hawaii was a "unique market" in large part precisely given the absence of such competition. For example, and without purporting to be comprehensive:

| What They Said | What They Knew |
| --- | --- |
| • "The gasoline market is very competitive… [p]rice competition is strong with each company trying to increase its market share… [i]n addition to price competition, there is a tremendous amount of non-price competition in the market."<br>　　　　Chevron comments | • Hawaii has an "historical lack of serious competition for on-island business despite under-utilization of refineries."<br>　　　　Chevron April 1987<br>　　　　Document<br><br>• Hawaii has very "limited competition" as a |

21

On 1990 A.G. report
August 6, 1990

- "Michael Neeley [Chevron Pricing Manager]... says the market is highly competitive with constant price changes."
  Business Week
  Online, October 6,
  1998

- "Price competition is strong with each company trying to increase its market share."
  Chevron Senate Testimony
  October 1990

- In disputing that the Hawaii market was not competitive: "the findings state that the markets for oil and oil products in Hawaii are highly concentrated markets in which market prices above competitive levels tend to persist "such a finding is simply not valid."
  Public Affairs Consultants –
  Hawaii statement to the
  Legislature, March 5, 1991

- "[C]ompetition in Hawaii is so great, that it has allowed the industry to improve the efficiency of their operations."
  Statement to the Legislature of
  Public Affairs Consultants,
  Retained by Shell, Texaco,
  Chevron and Unocal,
  February 10, 1995

"unique marketing/refining characteristic."
Chevron 1987
Document

- Michael Neeley recently testified that Chevron would **not** price compete for additional market share in Hawaii.
  Michael Neeley
  Deposition testimony at
  pp. 212-216

**B.  Higher Costs of Doing Business in Hawaii: the "Price of Paradise".**

64.    The Defendants have long defended higher motor fuel prices in Hawaii as a function of higher Hawaii operating costs.  It costs more, they said, to buy crude oil, operate

refineries, and sell motor fuel in Hawaii than on the West Coast. The Defendants represented that these higher costs **caused** the higher motor fuel prices, and that the Defendants were, in essence, simply passing on to the Hawaii consumer the higher costs actually incurred.

65. These representations were false. Overall, it costs less to refine, distribute, and sell gasoline in Hawaii than on the West Coast. Crude oil costs less to buy in Hawaii than on the West Coast (for the same type of oil), and refinery operating costs, on balance, were also lower in Hawaii than on the mainland. To illustrate:

### What They Said

- "There are many reasons why gasoline can be more expensive in Hawaii than at many mainland locations. These include higher gasoline taxes, the distance of Hawaii from crude sources and the resulting high freight costs, higher costs for land, labor, construction and distribution."
  > Senate testimony of
  > Robert Reed, PRI
  > CEO, August 29, 1990

- "Richard Parry, Vice-President for operations at BHP Hawaii said gasoline costs more in Hawaii than on the West Coast for a number of reasons, including the relative size of the market, the economies of scale, the capital costs, stringent environmental restrictions, and high land and transportation costs."
  > Star Bulletin
  > March 22, 1994

- "The remainder of the [after tax price] difference is largely attributable to the higher operating costs in Hawaii – particularly higher real property expenses."
  > Chevron comments on the
  > Attorney General's 1989
  > Interim Report on Gasoline

### What They Knew

- "It costs less to produce petroleum products in Hawaii than it does to produce them elsewhere in the world and ship them to Hawaii."
  > Undated Chevron
  > Document

- "Crude prices lower [in Hawaii] than U.S.W.C. [West Coast]."
  > Chevron internal study,
  > April 16, 1987

- "January ROCE [return on capital employed] for the Hawaii region is the highest in the West and will probably continue due to their low employed capital," i.e. lower capital cost.
  > Chevron "Net Margin By
  > Region" document

- Michael Neeley, Chevron's Hawaii pricing manager, recently testified that it would be "misleading" to say that high operating costs caused high Hawaii prices.

Prices, August 6, 1990

- "Chee [Chevron spokesman] attributes the price differential [gas prices in California against Hawaii] to the cost of doing business in Hawaii. From milk prices to real estate, consumer goods are typically more expensive in Hawaii than in the rest of the nation. Gasoline is no exception, he says."

> A. Chee quoted in San Antonio Business Journal, May 10, 1999

## C. No Abnormal Hawaii Profits.

66. The Defendants made the representations concerning high costs to make the further point that **high Hawaii motor fuel prices** did not mean **high Hawaii motor fuel profits**. That is, that higher costs meant that higher motor fuel prices did not translate into higher Hawaii net profits. In fact, the Defendants' motor fuel Hawaii profits were many times greater than their motor fuel West Coast profits, or mainland profits generally, as observed internally. To illustrate:

| What They Said | What They Knew |
| --- | --- |
| • In responding to the Attorney General's 1989 Interim Report concern that Hawaii margins might be much greater than margins elsewhere, Chevron disagreed, and countered that: "Chevron's average refining and marketing profit per gallon on all gallons of refined products sold in the United States in 1988 was 3.1¢ per gallon. In 1989 (the year of the Valdez spill), it was 1.2¢ per gallon, and for the first six months of 1990, it was 3.8¢ per gallon." There is no suggestion that Hawaii margins differed from those West Coast and company averages.<br><br>Chevron's August 6, 1990 | • In fact, in 1988, for franchise stations, Chevron's "net margin" for the West Coast was 1.8¢, and 2.4¢ for the USA as a whole. This contrasts with a Hawaii net margin for the same class of trade of **14¢**. Hawaii net margins therefore were 5 (overall) to 7 plus (West Coast) times greater than Chevron's margins elsewhere, a fact concealed by Chevron.<br><br>• "Our [Hawaii refinery profit] on a barrel of crude equals four times Chevron USA average."<br><br>Chevron document, May 4, 1987 |

Comments on December 1989 Interim Attorney General's Report on Hawaii gasoline Prices

- The Defendants used the mistaken conclusion of the 1994 Interim Report, that Hawaii profits were not supra-competitive, in an effort to block further inquiry, even though they knew the conclusion to be wrong: "In addition, the 1994 Attorney General's Interim Report on the Investigation of Gasoline Prices stated that the Department hired a professional economist who specialized in petroleum markets who determined that, 'the facts tend to indicate that through 1992, refineries in Hawaii have not been earning more than a competitive return on investment.'"

  Public Affairs Consultants Hawaii (on behalf of Shell, Unocal, Texaco and Chevron) February 10, 1995

- The Hawaii refinery runs "about 3 percent of the total crude run by Chevron USA," but produces "14 percent" of Chevron's national profit.
  Id.

- "We are [Hawaii refining] obviously very important to CUSA [Chevron USA] profitability, and [Hawaii] should stay a good place to run crude oil!!" Id. [emphasis in original]

## D.   Hawaii: A Separate Market With No Connection To The West Coast.

67.    For years, the Defendants represented that Hawaii constituted a separate petroleum product market, and that Hawaii was not governed by West Coast supply and demand factors. Specifically, the Defendants represented that petroleum product prices in Hawaii were set by supply and demand forces in Hawaii, and Hawaii prices were not tied to or a function of California prices. For this reason, the Defendants said it would be a mistake to compare Hawaii to West Coast prices, and that West Coast prices were lower signified nothing.

68.    These representations were misrepresentations. In fact, absent the artificial barriers to entry which the Defendants created, Hawaii is part of a larger West Coast petroleum products market, and the Defendants knew this to be true. In addition, Hawaii motor

25

fuel prices between and amongst the Defendants were tied, penny for penny, to California prices, and moved in lock-step with those California prices. To illustrate:

| **What They Said** | **What They Knew** |
|---|---|
| • "Hawaii gasoline prices should not be compared to mainland markets."<br>PRI letter to former Attorney General Warren Price III, July 27, 1990 | • The Defendants knew that Hawaii was part of a larger West Coast petroleum products market. The proof is in their conduct, for they:<br><br>- Bought and sold motor fuel between and amongst themselves at prices explicitly tied, penny for penny, with West Coast prices, so that as West Coast prices increased or dcreased, Hawaii prices changed identically. |
| • BHP said "Hawaii is a unique market and it's going to be subject to its own market forces."<br>Star Bulletin October 7, 1994 | - Sold motor fuel to large, sophisticated buyers on a West Coast price basis, so that the Hawaii prices were tied, penny for penny, with West Coast Prices. |
| • BHP "also noted that Hawaii and the mainland are two separate markets, making comparisons of pricing tends inaccurate."<br>Star Bulletin February 11, 1998 | • Chevron's internal transfer price for motor fuels "sold" by its Hawaii refiner to its Hawaii marketing organization was tied, penny for penny, with West Coast prices. The Hawaii internal transfer price moved mechanically with West Coast prices. |

### E.    "Desensitize" Local Buyers.

69.    In a further effort to hide excessive Hawaii profits and the lack of competition, Chevron adopted a strategy of selling petroleum products to sophisticated national customers also buying products in Hawaii at West Coast prices. As Chevron put it: "we desensitize competitive pricing locally by pricing large accounts on a West Coast basis." *See* Chevron document attached as Exhibit "F." That is, a customer sophisticated enough to know a competitive price and big enough to insist on one, got one; local consumers paid the much higher supra-competitive price.

F.     **Disguising Gasoline Exports.**

70.     In a further effort to obscure the truth, Chevron crafted a strategy to disguise gas exports.   Chevron viewed exports as "politically sensitive" because it feared questions as to why it was exporting gasoline from Hawaii (high price) to California (low price), instead of just price competing to place more gasoline in Hawaii.  *See* Chevron document, attached as Exhibit "G."  (Hawaii's "mogas [motor gasoline] retail price continues to exceed West Coast plus freight **making exporting finished mogas to the West politically sensitive.**") To forestall such questions, Chevron decided to export gasoline in a slightly different form, as light catcracked gasoline component ("LCC") a product one step removed from gasoline.  At considerable additional expense and difficulty (relative to exporting gasoline), Chevron put the strategy in place, and so addressed its "concern about establishing a track record of moving finished mogas from Hawaii to the U.S. West Coast."  *See* Chevron document, attached as Exhibit "H."  That is, Chevron did indirectly what it did not want to be seen doing directly.

G.     **Public Relations "Message".**

71.     To assist Defendants in implementing these public deceptions, the Defendants employed outside public relations consultants and other professionals and consultants to broadcast the proper "message." Chevron, for example, retained Hill & Knowlton, and Chevron, Texaco, Unocal and Shell, retained Public Affairs Consultants - Hawaii.  These consultants were instrumental in perpetrating the fiction that Hawaii prices were caused by

higher costs, that there were no excessive Hawaii profits, and that Hawaii was an extremely competitive market for motor fuel.

### H.    Responding To State Inquiries:  The Interim Attorney General Reports.

72.    On information and belief, in a further effort to obscure the truth, Chevron adopted a strategy to respond to inquiries and production requests initiated by the Hawaii Attorney General's Office by producing voluminous, inconsistent and confusing documents, so as to make it difficult for the State to determine the true facts, and further obscure those facts.  In addition, numerous highly relevant documents, fairly requested, were not produced

73.    State counsel were also told that Chevron's internal margin reports, known as TAFI or PSS reports, were unreliable, "inherently suspect" and "misleading" because they employed Chevron's internal transfer price, and that that price was "an arbitrary number with no real meaning in reality."  This was false; the TAFI reports were reliable, were relied upon by Chevron, and the internal transfer price was designed to reflect the price that Chevron would pay if it purchased product in the open market all as recently testified to by recent Chevron witnesses. Far from being an "arbitrary number with no real meaning in reality," the price was designed to track market prices as closely as possible, and it was Chevron's "philosophy" that it do so.

### I.    Success Of The Deception.

74.    These deceptions were successful.  For example, Dr. Fereidun Fesharaki, a petroleum economist at the East/West Center in Honolulu, has been frequently quoted as echoing the Defendants' "price of paradise" and "no excessive profits" arguments, thereby lending those points and the Defendants additional credibility.  To illustrate, Dr. Fesharaki stated publicly that:

- "Fesharaki blames the high price of gasoline in Hawaii on costly transportation and land costs and high gasoline taxes." *Star Bulletin*, March 12, 1994.

- "Hawaii customers are paying the price of paradise." *Star Bulletin*, March 16, 1998.

- There have been "lousy profits and margins" for years in Hawaii. *Id.*

- "Hawaii historically has had some of the lowest profit margins in the country for gas and diesel sales." *Star Bulletin*, March 16, 1998.

- "Local gas prices are fair, given the extra cost pressure that [Hawaii] refineries face." *Star Bulletin*, March 17, 1998.

75. Despite being duly diligent, the State of Hawaii did not discover until 1998 that the Hawaii motor fuels business was uncompetitive by reason of collusive conduct, and that, as a consequence, Hawaii motor fuels profits (including return on capital employed) were many times greater than mainland margins.

## VII.

## **FRAUDULENT CONCEALMENT**
(applies to all state and federal claims)

76. Defendants concealed from Plaintiff the existence of the conspiracy and the facts giving rise to all of Plaintiff's claims, as alleged herein, and particularly alleged in ¶¶ 58-75. Defendants' concealment was designed and planned, to the extent possible, to prevent inquiry, escape investigation, and mislead and hinder the collection by Plaintiff of information that would have disclosed Plaintiff's causes of action. But for this concealment, the existence of the conspiracy and all of Plaintiff's claims would have been known to Plaintiff prior to the statute of limitations period.

77. Because of Defendants' fraudulent concealment, the conspiracy and causes of action were not discovered by Plaintiff until 1998, within four years before the commencement of this suit.

78. Defendants fraudulently concealed the existence of the conspiracy and Plaintiff's causes of action through Defendants' numerous affirmative acts calculated to mislead Plaintiff. These affirmative actions have included, but are not limited to, (a) knowing misrepresentations to the Senate, Legislature, public and Hawaii Attorney General's Office regarding the profitability, margins, and costs associated with the refining of petroleum products in Hawaii, (b) knowing misrepresentations to the Hawaii Attorney General's Office regarding the existence of a "competitive" petroleum products market in Hawaii, (c) knowing misrepresentations that the Hawaii petroleum products market was a separate market with no connection to the West Coast petroleum products market, (d) adopting a strategy to conceal evidence and mislead in response to the Hawaii Attorney General's Office's inquiries and requests for production, (e) disguising gasoline exports, and (f) all other acts in furtherance of the conspiracy giving rise to this suit, which acts also had the effect of concealing the existence of the conspiracy and Plaintiff's claims.

79. Due to Defendants' fraudulent concealment, Plaintiff did not discover the facts necessary to bring suit prior to late 1998. Until that time, Plaintiff did not have actual or constructive knowledge of the necessary facts giving rise to its claims, nor did Plaintiff have actual or constructive knowledge of facts sufficient to infer that a conspiracy existed and bring suit in good faith. Had Defendants not fraudulently concealed the conspiracy through their

affirmative acts of deception, Plaintiff would have discovered facts sufficient to give rise to its claims well before the statute of limitations period.

80.    Plaintiff exercised due diligence in attempting to discover the facts giving rise to Plaintiff's claims.  This due diligence, in the State Investigations by the Attorney General's Office, has been ongoing since 1989.  But for Defendants' fraudulent concealment, Plaintiff's due diligence would have resulted in discovery of the necessary facts giving rise to Plaintiff's claims.

81.    Given the Defendants' fraudulent concealment, the statute of limitations should be tolled through the time when Plaintiff had adduced the necessary facts giving rise to its claims.  That time was calendar 1998, less than four years before commencement of this action.

82.    Each Defendant is jointly and severally liable for all damages, inasmuch as each Defendant is jointly and severally liable for all actions of the other co-conspirator Defendants, including public statements, in furtherance of the conspiracy (or concealment of the wrong) and all damages resulting therefrom.

## Count I: Price Fixing and Market Allocation
(federal claim)

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

83.    Defendants have conspired to allocate market shares and fix, control, stabilize, and maintain prices for motor fuel, in violation of Sherman Act § 1.

84.    Natural persons residing in the State of Hawaii, as well as the State of Hawaii, its political subdivisions, and governmental agencies, have been damaged in an amount exceeding $450 million by Defendants' conspiracy.

85. Defendants are liable to Plaintiff for compensatory damages in an amount exceeding $450 million under 15 U.S.C. § 15(c)(2).

### Count II: Price Fixing and Market Allocation
(state claim)

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

86. Defendants have conspired to allocate market shares and fix, control, stabilize, and maintain prices for motor fuel, in violation of HRS § 480-4.

87. Natural persons residing in the State of Hawaii, as well as the State of Hawaii, its political subdivisions, and governmental agencies, have been damaged in an amount exceeding $450 million by the Defendants' conspiracy.

88. Defendants are liable to Plaintiff for compensatory damages under HRS § 480-14 in an amount exceeding $450 million. Defendants have engaged in continuing violation of § 480-4, and thus are liable for damages from at least 1987 pursuant to HRS § 480-24(a).

### Count III: Unfair Trade Practices --
### Refusal to Deal and Price Discrimination

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

89. Defendant-refiners CHEVRON and BHP/TESORO have sold motor fuel wholesale to Defendants SHELL, TEXACO, and UNOCAL/TOSCO throughout the damages period.

90. At the time of their wholesale purchases, Defendants SHELL, TEXACO, and UNOCAL/TOSCO each held from 11%-16% of the retail market for motor fuel.

91.     At all times during the damages period Defendant-refiners CHEVRON and BHP/TESORO refused to sell to other purchasers at prices and on terms comparable to those offered SHELL, TEXACO, and UNOCAL/TOSCO.

92.     Defendant-refiners' refusal to deal and/or discriminatory pricing are unfair methods of competition and unfair acts and practices in the conduct of trade and commerce; as such, they are unlawful under HRS § 480-2.

93.     Further, Defendant-refiners' refusal to deal on similar prices and terms was for the purpose of fixing, controlling, and maintaining the price of motor fuel, all in violation of HRS § 480-4(b)(4) and Sherman Act § 1.

94.     Defendant-refiners' refusal to deal and/or discriminatory pricing, together with the other acts complained of herein, have damaged Plaintiff, as *parens patriae*, and the State of Hawaii, its political subdivisions, and governmental agencies in an amount in excess of $450 million.  Defendant-refiners have engaged in a continuing violation of HRS § 480-02 and § 480-4(b)(4), and thus are liable for damages from at least 1987 pursuant to HRS § 480-24(a).

## Count IV: Deceptive Trade Practices --
## HRS § 480-2

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

95.     Motor fuel are commodities essential to natural persons residing in Hawaii; they are necessary for Hawaii residents to travel to work, to return to their places of shelter, to obtain food and clothing, and to transport the sick and injured to doctors and hospitals.

96.     Deceptive trade practices are those acts that have the capacity or tendency to mislead and are unlawful pursuant to HRS § 480-2.

97.     Defendants collectively have engaged in deceptive trade practices, as alleged herein, and particularly as alleged in ¶¶ 47 through 82 above.

98.     Defendants are liable to Plaintiff, as *parens patriae*, for damages in excess of $450 million for their deceptive trade practices as to motor fuel.  Defendants have engaged in a continuing violation of HRS § 480-2, and thus are liable for damages from at least 1987 pursuant to § 480-24(a).

### Count V:  Unfair Trade Practices

Plaintiff realleges the contents of the preceding paragraphs and further alleges:

99.     Any antitrust violation is, *per se*, an unfair method of competition or an unfair trade practice.

100.    Defendants' violations of 15 U.S.C. § 1 and HRS § 480-4 are antitrust violations, and hence unfair methods of competition or unfair trade practices.

101.    Even actions that fall short of an antitrust violation may be unfair methods of competition or unfair trade practices.

102.    Defendants, by reason of the actions complained of in this Complaint, have engaged in unfair methods of competition or unfair trade practices.

103.    Defendants are liable to Plaintiff, as *parens patriae*, and to the State of Hawaii, its political subdivisions, and governmental agencies for damages in excess of $450 million by reason of their unfair methods of competition or unfair trade practices, which violate HRS § 480-2.  Defendants have engaged in a continuing violation of HRS § 480-2, and thus are liable for damages from at least 1987, pursuant to HRS § 480-24(a).

## **Prayer for Relief**

Plaintiff, both as *parens patriae* for the natural persons residing in the State of Hawaii and on behalf of the State of Hawaii, its political subdivisions, and governmental agencies, prays for relief as follows:

a.    For compensatory damages in an amount in excess of $450 million;

b.    For treble damages in an amount in excess of $1.3 billion (when aggregated with compensatory damages under each and every count set forth above);

c.    For additional civil penalties in excess of $200 million given that for each day that any Defendant has violated HRS § 480-2 (as alleged in the preceding counts), that Defendant is liable to Plaintiff for a civil penalty of not less than $500 nor more than $10,000 pursuant to HRS § 480-3.1;

d.    For the award of an amount commensurate with expenses reasonably expected to be expended in distributing damages to natural persons residing in Hawaii, as provided for by HRS § 480-14(d);

e.    For costs of suit together with reasonable attorneys' fees;

f.    For pre-judgment and post-judgment interest in the maximum amount permitted by law;

g.    For a ruling that all statute of limitations are tolled;

h.    For a permanent injunction enjoining Defendants from future acts that violate HRS Chapter 480 and imposing penalties in the event of a subsequent violation pursuant to HRS § 480-15.1; and

i.    For such other and further relief as is just and equitable.

DATED:  Honolulu, Hawaii _____ July 23, 1999 _____

_____

SPENCER HOSIE
GARY O. GALIHER
L. RICHARD DeROBERTIS
JEFFREY T. ONO
GEORGE FROST

Attorneys for Plaintiff

36

# Exhibit A

## Average Retail Outlet Prices
## January 1995 - June 1998
## Unleaded Regular

| Geographic Area | 1995 | 1996 | 1997 | 1998 | Average 1995-1998 |
|---|---|---|---|---|---|
| | | Dollars per Gallon Excluding Taxes | | | |
| Hawaii | $1.010 | $1.103 | $1.103 | $1.089 | $1.074 |
| California* | $0.733 | $0.871 | $0.865 | $0.706 | $0.806 |
| California* - Washington Avg.** | 0.764 | 0.882 | 0.868 | 0.705 | 0.815 |
| U.S. Average | 0.718 | 0.803 | 0.787 | 0.639 | 0.751 |

Source:   Petroleum Marketing Annual, Tables 32, 34, & 43.

\*   The California data for 1996-1998 is for sales of reformulated gasoline, which is more expensive to manufacture than the conventional gasoline sold in Hawaii.

\*\*   Weighted average based on sales volumes in each state.

# Exhibit A

# Exhibit B

## Average Retailers' Margins
## January 1995 - June 1998
## All Grades

| Geographic Area | 1995 | 1996 | 1997 | 1998 | Average 1995-1998 |
|---|---|---|---|---|---|
| | Dollars per Gallon Excluding Taxes | | | | |
| Hawaii | $0.080 | $0.089 | $0.095 | $0.120 | $0.093 |
| California | $0.066 | $0.085 | $0.067 | $0.067 | $0.072 |
| California - Washington Avg.** | 0.071 | 0.090 | 0.071 | 0.067 | 0.076 |
| U.S. Average | 0.064 | 0.064 | 0.059 | 0.062 | 0.062 |

Source:    Petroleum Marketing Annual, Tables 31& 43.

Note:    Retailers' Margin = (Retail Outlet Price - Dealer Tank Wagon Price).
    **  Weighted average based on sales volumes in each state.

# Exhibit B

# Exhibit C

## Average Wholesalers' Margins
## January 1995 - June 1998
## All Grades

| Geographic Area | 1995 | 1996 | 1997 | 1998 | Average 1995-1998 |
|---|---|---|---|---|---|
| | | | Dollars per Gallon Excluding Taxes | | |
| *Hawaii* | $0.381 | $0.330 | $0.333 | $0.422 | $0.358 |
| California | $0.146 | $0.110 | $0.146 | $0.105 | $0.130 |
| California - Washington Avg.** | 0.153 | 0.117 | 0.145 | 0.103 | 0.133 |
| U.S. Average | 0.163 | 0.158 | 0.155 | 0.136 | 0.155 |

Source:   Petroleum Marketing Annual, Table 31 & 43.

Note:   Wholesalers' Margin = (Dealer Tank Wagon Price - Bulk Price).
Hawaii Bulk Price = (Volume-weighted California - Washington Average) +.03.
** Weighted average based on sales volumes in each state.

# Exhibit C







* 1998 average is January through June.
Source: Petroleum Marketing Annual.

Exhibit D

# Retail Prices in Hawaii and California
## Jet Fuel
## 1989-1998*

**Exhibit E**

* 1998 average is January through June.
Source: Petroleum Marketing Annual.

Exhibit E

[TO BE FILED UNDER SEAL]

EXHIBIT "F"

[TO BE FILED UNDER SEAL]


EXHIBIT "G"

[TO BE FILED UNDER SEAL]


EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARGERY S. BRONSTER, ATTORNEY GENERAL FOR THE STATE OF HAWAII, As *Parens Patriae* for the Natural persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Sub-divisions and Governmental Agencies, | ) CIVIL NO. 98-00792-SPK ) ) DEMAND FOR TRIAL BY JURY ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| CHEVRON CORPORATION; CHEVRON U.S.A. INC.; TESORO HAWAII COR-PORATION, as successor-in-interest to BHP PETROLEUM AMERICAS REFIN-ING, INC.; BHP HAWAII INC.; SHELL OIL COMPANY; SHELL OIL PRO-DUCTS COMPANY; TEXACO INC.; TEXACO REFINING AND MARKETING INC.; TESORO PETROLEUM COR-PORATION; TESORO HAWAII COR-PORATION; TOSCO CORPORATION; UNION OIL COMPANY OF CALIFOR-NIA; and UNOCAL CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury on all issues so triable.

DATED:  Honolulu, Hawaii _____ July 23, 1999 _____

SPENCER HOSIE
GARY O. GALIHER
L. RICHARD DeROBERTIS

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MARGERY S. BRONSTER, ATTORNEY ) CIVIL NO. 98-00792-SPK
GENERAL FOR THE STATE OF )
HAWAII, As *Parens Patriae* for the Natural ) SUMMONS IN A CIVIL CASE
persons Residing in Hawaii, and on behalf )
of the State of Hawaii, its Political )
Subdivisions and Governmental Agencies, )
)
Plaintiff, )
)
vs. )
)
CHEVRON CORPORATION; CHEVRON )
U.S.A. INC.; TESORO HAWAII )
CORPORATION, as successor-in-interest to )
BHP PETROLEUM AMERICAS )
REFINING, INC.; BHP HAWAII INC.; )
SHELL OIL COMPANY; SHELL OIL )
PRODUCTS COMPANY; TEXACO INC.; )
TEXACO REFINING AND MARKETING )
INC.; TESORO PETROLEUM )
CORPORATION; TESORO HAWAII )
CORPORATION; TOSCO )
CORPORATION; UNION OIL )
COMPANY OF CALIFORNIA; and )
UNOCAL CORPORATION, )
)
Defendants. )
)
_____ )

SUMMONS IN A CIVIL CASE

STATE OF HAWAII

To the above-named Defendants:

You are hereby summoned and required to serve upon Plaintiff's attorneys:

EARL ANZAI
Acting Attorney General
JACK ROSENZWEIG
Deputy Attorney General
State of Hawaii
425 Queen Street
Honolulu, Hawaii 96813
Telephone:    (808) 586-1301
Facsimile:    (808) 586-1205
    **-and-**
SPENCER HOSIE    (Admitted *Pro Hac Vice*)
GEORGE FROST    (Admitted *Pro Hac Vice*)
Hosie Frost & Large
One Post Street, 25th Floor
San Francisco, California 94104
Telephone:    (415) 296-9801
Facsimile:    (415) 296-9802
    **-and-**
GARY O. GALIHER
L. RICHARD DeROBERTIS
JEFFREY T. ONO
Galiher DeRobertis Nakamura Ono Takitani
610 Ward Avenue, Suite 200
Honolulu, Hawaii 96814-3308
Telephone:    (808) 597-1400
Facsimile:    (808) 591-2608

an answer to the Second Amended Complaint For Injunctive And Other Relief Under The

Sherman Act And Pendent State Claim, which is herewith served upon you, within twenty (20)

days after service of this summons upon you, exclusive of the day of service. If you fail to do so,

judgment by default will be taken against you for the relief demanded in the Second Amended

Complaint. You must also file your answer with the Clerk of this Court within a reasonable

period of time after service.

*Margery S. Bronster, et al. v. Chevron Corporation, et al.*
Civil No. 98-00792-SPK -- U.S.D.C. (D.Haw.)
'SUMMONS IN A CIVIL CASE"

2

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m.

on premises not open to the general public, unless a judge of the above-entitled court permits, in

writing on this summons, personal delivery during those hours.

A failure to obey this summons may result in an entry of default and default

judgment against the disobeying person or party.

WALTER A. Y. H. CHINN                                              3  199?

_____                    _____
CLERK                                        DATE


_____
(BY) DEPUTY CLERK


*Margery S. Bronster, et al. v. Chevron Corporation, et al.*
Civil No. 98-00792-SPK -- U.S.D.C. (D.Haw.)
'SUMMONS IN A CIVIL CASE"

3

LODGED

APR 3 0 2002

CLERK U. S. DISTRICT COURT
DISTRICT OF HAWAII

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

EARL I. ANZAI, ATTORNEY GENERAL FOR THE STATE OF HAWAII, as *Parens Patriae* for the Natural Persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies,

        Plaintiff,

vs.

CHEVRON CORPORATION; CHEVRON U.S.A., INC.; TESORO HAWAII CORPORATION, as Successor-In-Interest to BHP PETROLEUM AMERICAS REFINING INC.; BHP HAWAII INC.; SHELL OIL COMPANY; SHELL OIL PRODUCTS COMPANY; TEXACO, INC.; TEXACO REFINING AND MARKETING, INC.; TESORO PETROLEUM CORPORATION; TESORO HAWAII CORPORATION; TOSCO CORPORATION; UNION OIL COMPANY OF CALIFORNIA; and UNOCAL CORPORATION,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO. CV 98-00792-SPK

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 3 0 2002

at __ o'clock and __ min. __ M.
WALTER A. Y. H. CHINN, CLERK

## FINAL JUDGMENT

Before the Court is a motion for final approval of the terms of the Settlement Agreement and Mutual Release ("Settlement Agreement") between Chevron Corporation; Chevron U.S.A., Inc.; Shell Oil Company; Shell Oil Products Company; Texaco, Inc.; Texaco Refining and Marketing, Inc.; Tosco Corporation, a wholly owned subsidiary of Phillips Petroleum Company; Union Oil Company of California; and Unocal Corporation ("Defendants"), on the one hand, and Plaintiffs, on the other hand.

[794548.2]

# EXHIBIT "B"



Plaintiffs and Defendants executed the Settlement Agreement attached as Exhibit A on March 7, 2002. On March 8, 2002, this Court entered its Order of Preliminary Approval, scheduling a Settlement Hearing to consider whether the proposed settlement should be approved as fair, adequate and reasonable.

The Order of Preliminary Approval directed the Plaintiffs to give notice of the proposed settlement and the Settlement Hearing to the natural persons residing in the State of Hawaii at any time to the present. Affidavits of publication, filed with the Court, demonstrate that this Court's directions with respect to the Notice of Settlement have been complied with. The Court finds that this notice constituted the best notice practicable under the circumstances and the notice complied with due process and with 15 U.S.C. § 15c.

The Settlement Hearing was held before the Court on April 30, 2002, at which time all interested persons were given an opportunity to be heard.

## Definitions

1.1     Affiliates. "Affiliates" means those entities which were either (i) A Defendant's direct or indirect parent entity(ies), or (ii) entities in which that Defendant or its direct or indirect parent entities own, directly or indirectly, 50 percent or more of the ownership interest.

1.2     Defendants. "Defendants" means Chevron Corporation; Chevron U.S.A., Inc.; Shell Oil Company; Shell Oil Products Company; Texaco Inc.; Texaco Refining and Marketing, Inc.; Tosco Corporation, a wholly owned subsidiary of Phillips Petroleum Company; Union Oil Company of California; and Unocal Corporation.

1.3     Lawsuit. "Lawsuit" means Civil No. 98-00792-SPK, in the United States District Court for the District of Hawaii, styled *Earl I. Anzai, Attorney General for the State of Hawaii, as parens patriae for the natural persons residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies v. Chevron Corporation; Chevron*

- 2 -

[794548.2]

*U.S.A., Inc.; Tesoro Hawaii Corporation, as successor-in-interest to BHP Petroleum Americas Refining Inc.; BHP Hawaii Inc.; Shell Oil Company; Shell Oil Products Company; Texaco Inc.; Texaco Refining and Marketing, Inc.; Tesoro Petroleum Corporation; Tesoro Hawaii Corporation; Tosco Corporation; Union Oil Company of California; and Unocal Corporation.*

1.4     Notice Expenses.  "Notice Expenses" means the reasonable expenses incurred in providing reasonable notice to those natural persons residing or who have resided in the State of Hawaii pursuant to the Plan of Notice, including costs of publishing the Notice of Settlement.

1.5     Plaintiffs.  "Plaintiffs" means the Attorney General of the State of Hawaii as *parens patriae* for the natural persons residing in the State of Hawaii at any time to the present; the State of Hawaii and its departments, agencies, divisions and other entities; and all others on whose behalf the Attorney General of the State of Hawaii brought this lawsuit as identified in the Complaint, the First Amended Complaint, and the Second Amended Complaint; and the legal representatives, predecessors, successors, and assigns of Plaintiffs.

1.6     Released Parties.  (i) "Released Defendant Parties" means, severally and collectively, Defendants who have not withdrawn from the Settlement Agreement pursuant to paragraph 3.3(f) of the Agreement and Equilon Enterprises L.L.C. (subject to paragraph 3.3(f) of the Agreement), and all past and present agents, employees, officers, directors, representatives, attorneys, Affiliates, predecessors, successors, and assigns of each such Defendant and Equilon Enterprises L.L.C.; and (ii) "Released Plaintiff Parties" means the State of Hawaii and its past and present Attorneys General and the agents, employees, representatives and attorneys of the Attorney General's office.

1.7     Settled Claims.  "Settled Claims" means all claims, causes of action and liabilities of whatever nature or origin, known and unknown, that have been, could have been, or could be

- 3 -

[794548.2]

asserted against Released Defendant Parties or Released Plaintiff Parties (including, but not limited to, contract claims, tort claims, and claims arising under state or federal statute, regulation or antitrust law, including those arising under HRS §480-2) that arise from any act or acts occurring prior to the date of the Settlement Agreement and that relate to: (1) the pricing, sale, purchase, manufacture, exchange, marketing, delivery, and/or offering of gasoline, diesel, jet fuel and/or any other petroleum product or products; (2) the sale or purchase of assets located in the State of Hawaii and any government review process with respect to the sale and purchase of any assets; (3) the State's investigation of gasoline pricing and/or the conduct of the parties and their attorneys in the Lawsuit, including without limitation the Defendants' responses to Civil Investigative Demands or statements to the legislature or others; (4) any antitrust violation; (5) any allegation contained in the Lawsuit; or (6) any petroleum products, and that have been brought or could have been brought by or on behalf of Plaintiffs in the Lawsuit.

"Settled Claims" does not include claims substantially unrelated to either: (1) the antitrust laws or regulations, (2) deceptive trade practices, (3) unfair acts or practices raised in the Lawsuit, (4) trade regulation, or (5) claims in the Lawsuit. "Settled Claims" does not include, for example, environmental claims brought by the Plaintiffs and contractual claims of the Defendants for monies owed by the Plaintiffs for the purchase of petroleum products by the Plaintiffs from the Defendants. Without regard to the scope of the first paragraph of this section, the Release does not include the claims asserted by Chevron or the State in *Chevron U.S.A., Inc. v. Cayetano*, Civil No. 97-0093.

1.8    Settlement Amount. "Settlement Amount" means the sum of $20 million less the amount of approved Notice Expenses in paragraph 7 below. Of this amount, Chevron Corporation and Chevron U.S.A., Inc., will pay a combined total of $5 million; Shell Oil

- 4 -

Company and Shell Oil Products Company will pay a combined total of $5 million; Texaco, Inc., and Texaco Refining and Marketing, Inc. will pay a combined total of $5 million; Tosco Corporation, a wholly owned subsidiary of Phillips Petroleum Company, will pay $1.7 million; and Union Oil Company of California and Unocal Corporation will pay a combined total of $3.3 million. Upon such payment by the Defendants, their responsibility or liability, if any, for the use of the Settlement Amount is extinguished, and any liabilities relating to the use of the funds are the sole responsibility of the Plaintiffs. Plaintiffs shall have sole responsibility for payment of taxes, if any, on the Settlement Amount and/or its earnings thereon while in the District Court's control.

1.9 <u>Settling Parties</u>. "Settling Parties" means Plaintiffs and Defendants, severally and collectively.

The Court concludes that the Settlement Agreement is fair, adequate and reasonable, and that it should be approved. It is, therefore

ORDERED as follows:

1. This Court has original and supplemental jurisdiction to resolve by settlement and judgment all of the Settled Claims.

2. The Attorney General of the State of Hawaii and the Special Deputy Attorneys General fairly and adequately protect the interests of those persons residing in the State of Hawaii at any time to the present.

3. Those persons who have filed timely and valid requests for exclusion from the settlement ("Opt-Out Claimants") are identified in Exhibit B to this Final Judgment. The Opt-Out Claimants are not bound by this Final Judgment. The Opt-Out Claimants shall not receive any benefit under the settlement.

- 5 -

[794548.2]

4.  Those natural persons residing in the State of Hawaii at any time to the present who have not filed timely and valid requests for exclusion from the settlement ("Settlement Claimants") are bound by this Final Judgment and by the terms of the Settlement Agreement.

5.  The Settlement Agreement is fair, adequate and reasonable. It is hereby finally approved in all respects, and the Settling Parties are hereby directed to consummate and perform its terms.

6.  The approval of the Settlement Agreement and the entry of this Final Judgment (i) fully releases and discharges Released Defendant Parties with respect to Settled Claims belonging to Plaintiffs and Settlement Claimants, and (ii) releases Released Plaintiff Parties from liability, if any, to Defendants with respect to the Settled Claims.

7.  The application by Defendants for reimbursement of the expenses associated with publishing the Notice of Settlement is hereby granted. Defendants are awarded $ 12,804.99 as reimbursement of these expenses, deducted from the amount to be paid by Defendants.

8.  Released Defendant Parties are dismissed with prejudice, and all claims in this lawsuit are dismissed with prejudice as to the Released Defendant Parties.

9.  The Defendants' responsibility for the use or payment of any funds is extinguished once payment of the Settlement Amount is paid into the registry of the Court and any liabilities relating to the funds rest solely with the State of Hawaii after the payment into the registry of the Court of the Settlement Amount by the Defendants.

10. All state law claims in this lawsuit arise from the same nucleus of operative facts and form part of the same case or controversy as the federal claims alleged in this lawsuit.

- 6 -

[794548.2]

11.  This Court shall retain continuing jurisdiction over the Settlement Amount, the Settling Parties and the Settlement Claimants for the purposes of enforcing, implementing, administering, construing and interpreting the Settlement Agreement.

12.  The Plaintiffs and Settlement Claimants are denied all relief not expressly granted by this Final Judgment.

13.  This Court finds that, as Plaintiffs have acknowledged, the Settlement Amount to be paid under the terms of the Settlement Agreement by the Defendants is fair, adequate and reasonable in respect to the liability alleged.

14.  This Final Judgment does not address any application for attorneys' fees and expenses and does not address any applications for the use or allocation of the settlement funds. Any objection, dispute, controversy or appeal related to any application for attorneys' fees and expenses or to any application for the use or allocation of the settlement funds shall not affect the finality of this Judgment.

SIGNED this __30th__ day of __APRIL__, 2002.

_____
UNITED STATES DISTRICT JUDGE

- 7 -

[794548.2]

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

The Attorney General of the State of Hawaii; Chevron Corporation; Chevron U.S.A., Inc.; Shell Oil Company; Shell Oil Products Company; Texaco, Inc.; Texaco Refining and Marketing, Inc.; Tosco Corporation, a wholly owned subsidiary of Phillips Petroleum Company; Union Oil Company of California; and Unocal Corporation ("Defendants") enter into this Settlement Agreement and Mutual Release ("Settlement Agreement") settling the claims brought by Plaintiff against Defendants in the lawsuit Civil No. 98-00792-SPK, in the United States District Court for the District of Hawaii ("District Court"), styled *Earl I. Anzai, Attorney General for the State of Hawaii, as parens patriae for the natural persons residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies v. Chevron Corporation; Chevron U.S.A. Inc.; Tesoro Hawaii Corporation, as successor-in-interest to BHP Petroleum Americas Refining Inc.; BHP Hawaii Inc.; Shell Oil Company; Shell Oil Products Company; Texaco, Inc.; Texaco Refining and Marketing, Inc.; Tesoro Petroleum Corporation; Tesoro Hawaii Corporation; Tosco Corporation; Union Oil Company of California; and Unocal Corporation.*

This Settlement Agreement is made following arm's-length negotiations between and among the Settling Parties (as hereinafter defined). It takes into consideration the expense of further proceedings, the strengths and weaknesses of the claims against Defendants, the defenses thereto, the timing of the settlement, and such other factors as are appropriate in evaluating the matter.

In consideration of the mutual covenants set forth below, the Settling Parties agree that, subject to prior final approval by the District Court and the entry of Final Judgment, the Settled Claims shall be settled and the Defendants dismissed with prejudice, subject to the following terms and conditions.

Settlement Agreement And Mutual Release

# EXHIBIT "C"

## 1. DEFINITIONS

As used in this Settlement Agreement and the Exhibits hereto, the following terms have the meanings specified below.

1.1 Affiliates. "Affiliates" means those entities which were either (i) A Defendant's direct or indirect parent entity(ies), or (ii) entities in which that Defendant or its direct or indirect parent entities own, directly or indirectly, 50 percent or more of the ownership interest.

1.2 Defendants. "Defendants" means Chevron Corporation; Chevron U.S.A., Inc.; Shell Oil Company; Shell Oil Products Company; Texaco Inc.; Texaco Refining and Marketing, Inc.; Tosco Corporation, a wholly owned subsidiary of Phillips Petroleum Company; Union Oil Company of California; and Unocal Corporation.

1.3 Effective Date. "Effective Date" means the date on which the Judgment becomes the Final Judgment.

1.4 Final Judgment. If no direct appeal or mandamus from the Judgment has been filed, the Judgment becomes "Final" upon the expiration of the time under Fed. R. App. P. 4(a)(1) for filing a notice of direct appeal from the Judgment. If a timely direct appeal from the Judgment is filed and either the Judgment is affirmed or the appeal is dismissed, the Judgment becomes the Final Judgment when all appeals are completed or when the time for seeking all further appeals or review expires.

1.5 Judgment. "Judgment" means a final judgment to be rendered by the District Court substantially in the form of Exhibit C hereto.

1.6 Lawsuit. "Lawsuit" means Civil No. 98-00792-SPK, in the United States District Court for the District of Hawaii, styled *Earl I. Anzai, Attorney General for the State of Hawaii, as parens patriae for the natural persons residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies v. Chevron Corporation; Chevron U.S.A. Inc.; Tesoro Hawaii Corporation, as successor-in-interest to BHP Petroleum Americas*

Settlement Agreement And Mutual Release

2

*Refining Inc.; BHP Hawaii Inc.; Shell Oil Company; Shell Oil Products Company; Texaco, Inc.; Texaco Refining and Marketing, Inc.; Tesoro Petroleum Corporation; Tesoro Hawaii Corporation; Tosco Corporation; Union Oil Company of California; and Unocal Corporation.*

1.7 <u>Notice Expenses</u>. "Notice Expenses" means the reasonable expenses incurred in providing reasonable notice to those natural persons residing or who have resided in the State of Hawaii pursuant to the Plan of Notice, including costs of publishing the Notice of Settlement.

1.8 <u>Notice of Settlement</u>. "Notice of Settlement" means the notice of this Settlement Agreement and of the Settlement Hearing substantially in the form of Exhibit A hereto that is to be published pursuant to the Plan of Notice.

1.9 <u>Opt-Out Claimant</u>. "Opt-Out Claimant" means a natural person who has resided in the State of Hawaii at any time and who submits a timely and valid request for exclusion in accordance with the Order of Preliminary Approval and the Notice of Settlement, and who does not revoke that request for exclusion in writing prior to or at the Settlement Hearing.

1.10 <u>Opt-Out Claims</u>. "Opt-Out Claims" means Settled Claims that belong to Opt-Out Claimants. Opt-Out Claims are not settled by this Settlement Agreement.

1.11 <u>Order of Preliminary Approval</u>. "Order of Preliminary Approval" means an order of the District Court substantially in the form of Exhibit B hereto.

1.12 <u>Plaintiffs</u>. "Plaintiffs" means the Attorney General of the State of Hawaii as *parens patriae* for the natural persons residing in the State of Hawaii at any time to the present; the State of Hawaii and its departments, agencies, divisions and other entities; and all others on whose behalf the Attorney General of the State of Hawaii brought this lawsuit as identified in the Complaint, the First Amended Complaint, and the Second Amended Complaint; and the legal representatives, predecessors, successors, and assigns of Plaintiffs.

Settlement Agreement And Mutual Release

3

1.13    Plan of Notice. "Plan of Notice" means the plan to provide notice to the natural persons residing in the State of Hawaii at any time to the present as described in section 3.2(a) below.

1.14    Released Parties. (i) "Released Defendant Parties" means, severally and collectively, Defendants who have not withdrawn from this Agreement pursuant to paragraph 3.3(f) below, and Equilon Enterprises L.L.C. (subject to paragraph 3.3 (f) below), and all past and present agents, employees, officers, directors, representatives, attorneys, Affiliates, predecessors, successors and assigns of each such Defendant and Equilon Enterprises L.L.C.; and (ii) "Released Plaintiff Parties" means the State of Hawaii and its past and present Attorneys General and the agents, employees, representatives and attorneys of the Attorney General's office.

1.15    Settled Claims. "Settled Claims" means all claims, causes of action and liabilities of whatever nature or origin, known and unknown, that have been, could have been, or could be asserted against Released Defendant Parties or Released Plaintiff Parties (including, but not limited to, contract claims, tort claims, and claims arising under state or federal statute, regulation or antitrust law, including those arising under HRS §480-2) that arise from any act or acts occurring prior to the date of this Settlement Agreement and that relate to: (1) the pricing, sale, purchase, manufacture, exchange, marketing, delivery, and/or offering of gasoline, diesel, jet fuel and/or any other petroleum product or products; (2) the sale or purchase of assets located in the State of Hawaii and any government review process with respect to the sale and purchase of any assets; (3) the State's investigation of gasoline pricing and/or the conduct of the parties and their attorneys in the Lawsuit, including without limitation the Defendants' responses to Civil Investigative Demands or statements to the legislature or others; (4) any antitrust violation; (5) any allegation contained in the Lawsuit; or (6) any petroleum products, and that have been brought or could have been brought by or on behalf of Plaintiffs in the Lawsuit.

Settlement Agreement And Mutual Release

4

"Settled Claims" does not include claims substantially unrelated to either: (1) the antitrust laws or regulations, (2) deceptive trade practices, (3) unfair acts or practices raised in the Lawsuit, (4) trade regulation, or (5) claims in the Lawsuit. "Settled Claims" does not include, for example, environmental claims brought by the Plaintiffs and contractual claims of the Defendants for monies owed by the Plaintiffs for the purchase of petroleum products by the Plaintiffs from the Defendants. Without regard to the scope of the first paragraph of this section, the Release does not include the claims asserted by Chevron or the State in *Chevron U.S.A., Inc. v. Cayetano*, Civil No. 97-0093.

1.16    Settlement Amount. "Settlement Amount" means the sum of $20 million.

1.17    Settlement Hearing. "Settlement Hearing" means the hearing to be held before the District Court to determine (a) whether this Settlement Agreement, including Exhibits, should be approved; (b) whether the Judgment should be entered; and (c) whether the applications for reimbursement to Defendants of the Notice Expenses should be approved.

1.18    Settling Parties. "Settling Parties" means Plaintiffs and Defendants, severally and collectively.

## 2.    NO ADMISSION OF LIABILITY

Defendants deny any wrongdoing or liability, and this Settlement Agreement and any statement herein shall not be construed or interpreted as an admission or evidence of any liability by any Defendant. Defendants deny each of the claims alleged in the Lawsuit, and enter into this Settlement Agreement solely to avoid the further expenses and burden of protracted litigation. The settlement embodied in this Settlement Agreement and any Exhibits thereto is made to compromise and settle the Settled Claims without further litigation.

## 3.    RIGHTS AND DUTIES OF SETTLING PARTIES

3.1    Prompt implementation of this Settlement Agreement. It is the mutual intent of the Settling Parties to consummate this Settlement Agreement promptly. They agree to

Settlement Agreement And Mutual Release

5

cooperate and to exercise their best efforts to the extent necessary to effectuate and implement all of its terms and conditions, as quickly as possible.

(a)     The Settling Parties shall promptly and jointly submit this Settlement Agreement, including the Exhibits hereto, to the District Court for preliminary approval and shall file a motion that requests the District Court to enter an Order of Preliminary Approval substantially in the form of Exhibit B hereto.

(b)     In proceedings before the District Court and before any appellate courts, if necessary, Plaintiffs and Defendants shall affirmatively present their support for the Judgment approving this Settlement Agreement.

3.2     Publication of notice.  After the District Court grants preliminary approval of the Settlement Agreement (including the Plan of Notice) and after the District Court enters the Order of Preliminary Approval, Plaintiffs shall cause to be published the Notice of Settlement according to the Plan of Notice.  Subject to approval by the District Court, Notice Expenses shall be paid initially by Defendants, and then reimbursed to Defendants by means of a deduction from the Settlement Amount.

(a)     Plan of Notice.  The Notice of Settlement attached as Exhibit A shall be placed as an advertisement in "The Honolulu Advertiser," "The Honolulu Star-Bulletin," "The Hawaii Tribune Herald," "The Garden Island," "The West Hawaii Today," "The Maui News," and "USA Today."  The advertisements shall run in two consecutive weekday editions for the Hawaii newspapers and shall run in one weekday edition of the "USA Today."  The advertisements shall begin running within ten days after the entry of the Order of Preliminary Approval.  In addition, Plaintiffs will give notice on two consecutive Mondays as per the Hawaii State and County Public Notice Protocols at Plaintiffs' expense.  A website will also be created by Plaintiffs' counsel at the expense of such counsel for the purpose of providing access to this Settlement Agreement.

Settlement Agreement And Mutual Release

6

3.3     Requests for exclusion by Hawaii residents. Any natural person residing in the State of Hawaii at any time to the present may request not to participate in the settlement of the Lawsuit by submitting a timely request for exclusion in accordance with the Order of Preliminary Approval and the Notice of Settlement.

(a)     An Opt-Out Claimant waives any and all claims to any part of the Settlement Amount and any benefits under this Settlement Agreement.

(b)     A natural person who submits a timely request for exclusion, but who thereafter revokes that request for exclusion in writing prior to or at the Settlement Hearing, will not be an Opt-Out Claimant.

(c)     Neither the Settling Parties nor their respective counsel shall in any way encourage any person to become an Opt-Out Claimant or discourage any such person from participating in this settlement.

(d)     The Settling Parties waive any right to appeal or collaterally attack the Judgment entered pursuant to this Settlement Agreement.

(e)     When counsel for Plaintiffs receives a request for exclusion from the settlement, such counsel shall deliver a copy of it to counsel for each of the Defendants within one business day after receipt.

(f)     If more than 100 natural persons opt-out of this settlement and become Opt-Out Claimants, or if in the opinion of one or more Defendants the Opt-Out Claims that could reasonably be expected to be made by the Opt-Out Claimants exceed $ 1 million in the aggregate, any Defendant has the right to withdraw from this Agreement, with the Defendant being required to exercise that right within 10 days after the date by which natural persons must submit their notice of becoming an Opt-Out Claimant. In the event that one or more, but less than all, of the Defendants elect to withdraw from the Agreement pursuant to this paragraph, the Agreement shall remain valid and enforceable as between Plaintiffs and the other Defendants,

Settlement Agreement And Mutual Release

7

each of which shall pay the amount specified separately for it in paragraph 3.4. In that event, those Defendants that elect to withdraw from the Agreement expressly waive and release any and all rights to seek contribution or indemnity, or otherwise to seek reimbursement, from the other Released Defendant Parties for any liability, damages, penalties, costs, or expenses of any kind or nature incurred in connection with or as a result of the Lawsuit. Equilon Enterprises L.L.C. shall remain a Released Defendant Party unless all of Shell Oil Company and Shell Oil Products Company and Texaco, Inc. and Texaco Refining and Marketing, Inc. elect to withdraw from the Agreement pursuant to this paragraph.

     3.4    <u>Payment of Settlement-Amount</u>. As soon as practicable after the Effective Date, the Defendants shall pay the Settlement Amount, less any approved Notice Expenses, into the Registry of the District Court. No distribution of the funds placed in the Registry of the District Court shall occur without an order from the District Court, less any approved Notice Expenses. Of the $20 million included in the Settlement Amount, Chevron Corporation and Chevron U.S.A., Inc., will pay a combined total of $5 million; Shell Oil Company and Shell Oil Products Company will pay a combined total of $5 million; Texaco, Inc., and Texaco Refining and Marketing, Inc. will pay a combined total of $5 million; Tosco Corporation, a wholly owned subsidiary of Phillips Petroleum Company, will pay $1.7 million; and Union Oil Company of California and Unocal Corporation will pay a combined total of $3.3 million. Upon such payment by the Defendants, their responsibility or liability, if any, for the use of the Settlement Amount is extinguished, and any liabilities relating to the use of the funds are the sole responsibility of the Plaintiffs. Plaintiffs shall have sole responsibility for payment of taxes, if any, on the Settlement Amount and/or its earnings thereon while in the District Court's control.

     It is the Settling Parties' intent that the Settlement Amount pursuant to this Settlement Agreement be established as and meet all requirements of a Qualified Settlement Fund within the meaning of Treas. Reg. § 1.468B-1. The Settling Parties agree to take all

Settlement Agreement And Mutual Release

8

reasonable steps necessary to establish and obtain District Court approval, if necessary, for the establishment of a Qualified Settlement Fund.

3.5    Entry of judgment dismissing Plaintiffs' Claims. The Settling Parties agree to the entry of a judgment dismissing the Lawsuit with prejudice, contemporaneous with the District Court's final approval of this Settlement Agreement. The District Court shall be requested to consider at a hearing separate and apart from any hearing related to this Settlement Agreement any motions or applications concerning (i) attorneys' fees, costs, and expenses and (ii) the allocation of the Settlement Amount. Any objections, disputes, appeals or controversies relating to or arising from such matters shall not delay or impact the finality of the District Court's orders concerning the fairness and reasonableness of this Settlement Agreement and the releases herein. The Settling Parties agree to request a form of Judgment substantially in the form of Exhibit C. The Settling Parties agree that the Judgment must be a final judgment within the meaning of Fed. R. Civ. P. 54(b). The Judgment shall extinguish any liability of Defendants with respect to the claims made in the Lawsuit and with respect to Settled Claims.

3.6    Continuing jurisdiction. The Settling Parties agree that (i) the Judgment shall provide that, notwithstanding the entry of the Judgment, the District Court shall retain continuing jurisdiction over the Settlement Amount and the Settling Parties; (ii) the District Court's continuing jurisdiction shall include jurisdiction to order injunctive relief for the purposes of enforcing, implementing, administering, construing and interpreting this Settlement Agreement; and (iii) entry of Judgment substantially in the form attached as Exhibit C is a condition of this settlement.

3.7    Release of Settled Claims. As of the Effective Date, Plaintiffs, on behalf of themselves and their predecessors, successors, assigns and legal representatives, release Released Defendant Parties from liability with respect to the Settled Claims. Likewise, as of the Effective Date, Defendants, on behalf of themselves and their predecessors, successors, assigns, and legal

Settlement Agreement And Mutual Release

9

representatives, release Released Plaintiff Parties from liability with respect to the Settled Claims.

It is expressly understood that this settlement and the releases herein apply to all Settled Claims, whether known or unknown, and regardless of whether after-discovered facts, if known, would have altered the decision to enter into this agreement.

(a) All natural persons residing in the State of Hawaii at any time to the present who do not become Opt-Out Claimants shall be deemed to release Released Defendant Parties from liability with respect to all Settled Claims.

## 4. EFFECT OF DISAPPROVAL

4.1 In the event that (a) the District Court does not enter the Judgment in accord with this Settlement Agreement, or (b) such Judgment is reversed or vacated on appeal or on other review, or (c) the Effective Date does not occur for any reason, or (d) the District Court does not approve the "Notice of Settlement" or a notice substantially similar to the Notice of Settlement then

(i) this Settlement Agreement shall terminate,

(ii) any Judgment entered pursuant to this Settlement Agreement shall be vacated,

(iii) the Lawsuit against Defendants shall proceed as if this Settlement Agreement had never been executed, and

(iv) this Settlement Agreement may not be used in this Lawsuit or otherwise for any purpose, including but not limited to any evidentiary purpose.

## 5. ATTORNEYS' FEES AND EXPENSES

5.1 Plaintiffs may apply to the District Court for (i) an award of attorneys' fees and (ii) reimbursement of costs and those expenses incurred in prosecuting this Lawsuit. Subject to approval of the District Court, such award and reimbursement shall be paid out of the Settlement Amount. Any application by Plaintiffs for attorneys' fees, costs, and expenses, and any disputes

Settlement Agreement And Mutual Release

or controversies arising therefrom shall be considered separate and apart from the District Court's consideration of the fairness and reasonableness of this Settlement Agreement.

5.2     Defendants may apply to the District Court for reimbursement of the reasonable Notice Expenses advanced or incurred by Defendants.  Any such reimbursement shall be paid by means of a deduction from the Settlement Amount.

## 6.     OTHER PROVISIONS

6.1     Each of the Settling Parties has relied upon his or its own counsel's advice in entering into this Settlement Agreement and not upon the advice of any other party's counsel.

6.2     All of the Exhibits to this Settlement Agreement are material and integral parts hereof, and they are fully incorporated herein by reference.

6.3     This Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of the Settling Parties or their successors in interest.

6.4     This Settlement Agreement may be executed in multiple counterparts.

6.5     This Settlement Agreement and the Exhibits hereto constitute the entire agreement between Plaintiffs on the one hand and Defendants on the other hand and supersede any prior agreement or communication, whether oral or written, with respect to the subject matter hereof.

6.6     This Settlement Agreement (including the Exhibits hereto) and all documents relating hereto shall be construed and interpreted under federal law where applicable and, otherwise, under the internal laws of the State of Hawaii without regard to conflict of law principles.

6.7     Except as otherwise provided in this Settlement Agreement or as provided in any separate agreement between or among the Defendants, each Settling Party shall bear its own costs including taxable court costs.

Settlement Agreement And Mutual Release

6.8    Each Released Defendant Party hereby expressly waives and releases any and all rights to seek contribution or indemnity, or otherwise to seek reimbursement, from any other Released Defendant Party for any liability, damages, penalties, costs, or expenses of any kind or nature arising from or in connection with the Lawsuit.

6.9    Documents or information produced to the State of Hawaii, to Plaintiffs or to Plaintiffs' counsel shall continue to be governed by the Confidentiality Order in the Lawsuit and applicable Hawaii statutes.

6.10    The undersigned each represents that he or she is fully authorized to execute this Settlement Agreement on behalf of the Settling Party(ies) for which he or she signs.

_____    Date: _3/5/02_____
Earl Anzai, Attorney General for the State of Hawaii

_____    Date: _____
Spencer Hosie, Special Deputy Attorney
General for the State of Hawaii

Settlement Agreement and Mutual Release

12

[794674.3]

6.8     Each Released Defendant Party hereby expressly waives and releases any and all rights to seek contribution or indemnity, or otherwise to seek reimbursement, from any other Released Defendant Party for any liability, damages, penalties, costs, or expenses of any kind or nature arising from or in connection with the Lawsuit.

6.9     Documents or information produced to the State of Hawaii, to Plaintiffs or to Plaintiffs' counsel shall continue to be governed by the Confidentiality Order in the Lawsuit and applicable Hawaii statutes.

6.10    The undersigned each represents that he or she is fully authorized to execute this Settlement Agreement on behalf of the Settling Party(ies) for which he or she signs.


_____          Date:  _____
Earl Anzai, Attorney General for the State of Hawaii

_____          Date:  _3/8/02_____
Spencer Hosie, Special Deputy Attorney
General for the State of Hawaii


Settlement Agreement and Mutual Release

12

[794674.3]

_Walker C Taylor_    Date: _Mar. 6, 2002_

On Behalf of ChevronTexaco Corporation
formerly known as Chevron Corporation

Name:    WALKER C. TAYLOR

Title:    ASSISTANT SECRETARY

_____     Date: _____
On Behalf of Chevron Corporation

Name:        _____

Title:       _____


_____     Date:  3/5/02
On Behalf of Chevron U.S.A., Inc.

Name:  D.T. SHERMAN

Title: ASSISTANT SECRETARY


Settlement Agreement and Mutual Release

13

[794674.3]

03/05/02 15:21 FAX 713 241 __7 SHELL OIL LEGAL ☑002/002

A.Y. Noojin III

Date: _____

On Behalf of Shell Oil Company
by its agent, Shell Oil Products Company LLC

Name: A.Y. Noojin, III

Title: President & Chief Executive Officer

A.Y. Noojin III

Date: _____

On Behalf of Shell Oil Products Company

Name: A.Y. Noojin, III

Title: President & Chief Executive Officer

Settlement Agreement and Mutual Release

14

[794674.3]

Case 1:98-cv-00792-MWS-WRP   Document 1204-4   Filed 03/03/06   Page 116 of 287
PageID.958

_Walker C Taylor_
On Behalf of Texaco, Inc.                              Date: _Mar. 6, 2002_

Name:      WALKER C. TAYLOR

Title:      ASSISTANT SECRETARY


_____            Date: _____
On Behalf of Texaco Refining and Marketing, Inc.


Name:        _____

Title:        _____

10597552V1

03/07/02  14:32 FAX 713 241          /       SHELL OIL LEGAL                                 ☒003

_____          Date: _____

On Behalf of Texaco, Inc.

Name:

Title:

David E Kinnan
_____          Date: 3/7/02
On Behalf of Texaco Refining and Marketing, Inc.

Name: DAVID E. Kinnan

Title: General Counsel

Settlement Agreement and Mutual Release

15

[794674.3]

_W. Thomas Skok_ (signature)                      Date: __7 March 2002__

On Behalf of Tosco Corporation

Name:     W. THOMAS SKOK

Title:      Assistant Secretary

Settlement Agreement and Mutual Release

16

[794574.3]

FROM

_____   Date: _March 4, 2002_
On Behalf of Union Oil Company of California

Name: _Timothy R. Thomas_

Title: _Vice President, Law_

_____   Date: _March 4, 2002_
On Behalf of Unocal Corporation

Name: _Timothy R. Thomas_

Title: _Vice President, Law_

Settlement Agreement and Mutual Release

17

[794674 3]

DEPARTMENT OF THE
CORPORATION COUNSEL          205

MOANA M. LUTEY               6385
Corporation Counsel
RICHELLE M. THOMSON          8965
KEOLA R. WHITTAKER           11200
Deputies Corporation Counsel
County of Maui
200 South High Street, Third Floor
Wailuku, Hawaiʻi 96793
Telephone: (808) 270-7741
Facsimile: (808) 270-7152
E-mail: moana.lutey@co.maui.hi.us
E-mail: richelle.thomson@co.maui.hi.us
E-mail: keola.whittaker@co.maui.hi.us

SHER EDLING LLP
VICTOR M. SHER (*pro hac vice* forthcoming)
MATTHEW K. EDLING (*pro hac vice* forthcoming)
CORRIE J. YACKULIC (*pro hac vice* forthcoming)
TIMOTHY R. SLOANE (*pro hac vice* forthcoming)
100 Montgomery St. Ste. 1410
San Francisco, CA 94014
Telephone: (628) 231-2500
Facsimile: (628) 231-2929
E-mail: vic@sheredling.com
E-mail: matt@sheredling.com
E-mail: corrie@sheredling.com
E-mail: tim@sheredling.com

Attorneys for Plaintiff
COUNTY OF MAUI

Electronically Filed
SECOND CIRCUIT
2CCV-20-0000283
12-OCT-2020
08:59 AM
Dkt. 1 CMPS

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAIʻI

| COUNTY OF MAUI | CIVIL NO. _____ |
|---|---|
| Plaintiff, | (Other Non-Vehicle Tort) |
| vs. | COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |
| SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; EXXON | (Caption continued on next page) |

# EXHIBIT "D"

MOBIL CORPORATION; EXXONMOBIL
OIL CORPORATION; ROYAL DUTCH
SHELL plc; SHELL OIL COMPANY;
SHELL OIL PRODUCTS COMPANY LLC;
CHEVRON CORPORATION; CHEVRON
U.S.A. INC.; BHP GROUP LIMITED; BHP
GROUP PLC; BHP HAWAII INC.; BP p.l.c.;
BP AMERICA INC.; MARATHON
PETROLEUM CORPORATION;
CONOCOPHILLIPS; CONOCOPHILLIPS
COMPANY; PHILLIPS 66; PHILLIPS 66
COMPANY; AND DOES 1 through 100,
inclusive,

        Defendants.

## COMPLAINT

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................... 1

II.  PARTIES ...................................................................................................... 6

    A.  Plaintiff ............................................................................................... 6

    B.  Defendants .......................................................................................... 6

    C.  Relevant Non-Parties: Fossil Fuel Industry Associations ................... 35

III.  AGENCY ................................................................................................... 39

IV.  JURISDICTION AND VENUE ................................................................... 40

V.  FACTUAL BACKGROUND ........................................................................ 41

    A.  Climate Disruption—Cause and Effects ............................................. 41

    B.  Attribution ........................................................................................ 45

    C.  Defendants Went to Great Lengths to Understand, and Either Knew
    or Should Have Known About, the Dangers Associated with Their
    Fossil Fuel Products. ......................................................................... 46

    D.  Defendants Did Not Disclose Known Harms Associated with the Extraction,
    Promotion, and Consumption of Their Fossil Fuel Products, and Instead
    Affirmatively Acted to Obscure Those Harms and Engaged in a
    Campaign to Deceptively Protect and Expand the Use of Their
    Fossil Fuel Products. ......................................................................... 69

    E.  In Contrast to Their Public Statements, Defendants' Internal Actions
    Demonstrate Their Awareness of and Intent to Profit from the Unabated
    Use of Fossil Fuel Products. .............................................................. 87

    F.  Defendants' Actions Have Exacerbated the Costs of Adapting to
    and Mitigating the Adverse Impacts of the Climate Crisis. ................ 89

    G.  Defendants Continue to Mislead About the Impact of Their Fossil Fuel
    Products on Climate Change Through Greenwashing Campaigns
    and Other Misleading Advertisements in Hawai'i and Elsewhere. ...... 99

    H.  Defendants Caused the County's Injuries. ........................................ 102

VI.  CAUSES OF ACTION .............................................................................. 120

    FIRST CAUSE OF ACTION
    (Public Nuisance) ............................................................................ 120

    SECOND CAUSE OF ACTION
    (Private Nuisance) ........................................................................... 124

**THIRD CAUSE OF ACTION**
**Strict Liability Failure to Warn)** ...................................................................................... 127

**FOURTH CAUSE OF ACTION**
**(Negligent Failure to Warn)** .......................................................................................... 129

**FIFTH CAUSE OF ACTION**
**(Trespass)** ................................................................................................................. 132

VII.   **PRAYER FOR RELIEF** ................................................................................................. 134

**DEMAND FOR JURY TRIAL** ................................................................................................ 135

## I.    INTRODUCTION

1.      Defendants, major corporate members of the fossil fuel industry, have known for nearly half a century that unrestricted production and use of fossil fuel products create greenhouse gas pollution that warms the planet and changes our climate. They have known for decades that those impacts could be catastrophic and that only a narrow window existed to take action before the consequences would be irreversible. They have nevertheless engaged in a coordinated, multi-front effort to conceal and deny their own knowledge of those threats, discredit the growing body of publicly available scientific evidence, and persistently create doubt in the minds of customers, consumers, regulators, the media, journalists, teachers, and the public about the reality and consequences of the impacts of their fossil fuel pollution.

2.      At the same time, Defendants have promoted and profited from a massive increase in the extraction, production, and consumption of oil, coal, and natural gas, which has in turn caused an enormous, foreseeable, and avoidable increase in global greenhouse gas pollution and a concordant increase in the concentration of greenhouse gases,[1] particularly carbon dioxide ("$CO_2$") and methane, in the Earth's atmosphere. Those disruptions of the Earth's otherwise balanced carbon cycle have substantially contributed to a wide range of dire climate-related effects, including, but not limited to, global atmospheric and ocean warming, ocean acidification, melting polar ice caps and glaciers, more extreme and volatile weather, drought, and sea level rise.

---

[1] As used in this Complaint, the term "greenhouse gases" refers collectively to carbon dioxide, methane, and nitrous oxide. Where a cited source refers to a specific gas or gases, or when a process relates only to a specific gas or gases, this Complaint refers to each gas by name.

1

3.     Plaintiff, the County of Maui,[2] its departments and agencies, along with the County's residents, infrastructure, and natural resources, suffer the consequences of Defendants' campaign of deception.

4.     Defendants are extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and/or sellers of fossil fuel products, each of which contributed to deceiving the public about the role of their products in causing the global climate crisis. Decades of scientific research has shown that pollution from Defendants' fossil fuel products plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution and increased atmospheric $CO_2$ concentrations that have occurred since the mid-20[th] century. This dramatic increase in atmospheric $CO_2$ and other greenhouse gases is the main driver of the gravely dangerous changes occurring to the global climate and environment.

5.     Anthropogenic greenhouse gas pollution, primarily in the form of $CO_2$, is far and away the dominant cause of global warming,[3] resulting in severe impacts including, but not limited to, sea level rise, increasingly frequent and intense wildfires, disruption to the hydrologic cycle, more frequent and intense extreme precipitation events and associated flooding, more frequent and intense heatwaves, more frequent and intense droughts, and associated consequences of those physical and environmental changes. The consequences of Defendants' actions disproportionately impact people of color and those living in poverty. The primary cause of the climate crisis is the

---

[2] In this Complaint, the term "County" refers to Plaintiff the County of Maui, unless otherwise stated. The term "Maui" refers to the Island of Maui.

[3] *See* IPCC, *Climate Change 2014: Synthesis Report*, Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)], IPCC, Geneva, Switzerland (2014) 6, Figure SMP.3, https://www.ipcc.ch/report/ar5/syr.

combustion of coal, oil, and natural gas,[4] referred to collectively in this Complaint as "fossil fuel products."

6.      The rate at which Defendants have extracted and sold fossil fuel products has exploded since the Second World War, as have emissions from those products. The substantial majority of all greenhouse gas emissions in history have occurred since the 1950s, a period known as the "Great Acceleration."[5] About three quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s, and more than half have occurred since the late 1980s.[6] The annual rate of $CO_2$ emissions from extraction, production, and consumption of fossil fuels has increased substantially since 1990.[7]

7.      Defendants have known for more than 50 years that greenhouse gas pollution from their fossil fuel products would have significant adverse impacts on the Earth's climate and sea levels. Defendants' awareness of the negative implications of their actions corresponds almost exactly with the Great Acceleration and with skyrocketing greenhouse gas emissions. With that knowledge, Defendants took steps to protect their own assets from those threats through immense internal investment in research, infrastructure improvements, and plans to exploit new opportunities in a warming world.

8.      Instead of warning of those known consequences following from the intended and foreseeable use of their products and working to minimize the damage associated with the use and combustion of such products, Defendants concealed the dangers, promoted false and misleading

---

[4] *See* Pierre Friedlingstein et al., *Global Carbon Budget 2019*, 11 EARTH SYST. SCI. DATA 1783 (2019), https://www.earth-syst-sci-data.net/11/1783/2019.

[5] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 THE ANTHROPOCENE REVIEW 81, 81 (2015).

[6] R. J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 BIOGEOSCIENCES 1845, 1851 (2012).

[7] Friedlingstein et al., *supra* note 4, at 630.

3

information, sought to undermine public support for greenhouse gas regulation, and engaged in massive campaigns to promote the ever-increasing use of their products at ever-greater volumes. All Defendants' actions in concealing the dangers of, promoting false and misleading information about, and engaging in massive campaigns to promote increasing use of their fossil fuel products have contributed substantially to the buildup of $CO_2$ in the atmosphere that drives global warming and its physical, environmental, and socioeconomic consequences, including those affecting the County.

9. Defendants are directly responsible for the substantial increase in all $CO_2$ emissions between 1965 and the present. Defendants individually and collectively played leadership roles in denialist campaigns to misinform and confuse the public and obscure the role of Defendants' products in causing global warming and its associated impacts. But for such campaigns, climate crisis impacts in the County would have been substantially mitigated or eliminated altogether. Accordingly, Defendants are directly responsible for a substantial portion of the climate crisis-related impacts in and to the County.

10. As a direct and proximate consequence of Defendants' wrongful conduct described in this Complaint, the environment in and around the County is changing, with devastating adverse impacts on the County and its residents. For instance, average sea level has already risen and will continue to rise substantially along the County's coastlines, causing flooding, inundation, erosion, and beach loss; extreme weather, including hurricanes and tropical storms, "rain bomb" events, drought, heatwaves, wildfires, and other phenomena will become more frequent, longer-lasting, and more severe; ocean warming and acidification will injure or kill coral reefs that protect the island from increasingly intense storm surges; freshwater supplies will become increasingly scarce; endemic species will lose habitat, while invasive and disease carrying-pest species will

4

thrive; and the cascading social, economic, and other consequences of those and myriad other environmental changes—all due to anthropogenic global warming—will increase in the County.

11. As a direct result of those and other climate crisis-caused environmental changes, the County has suffered and will continue to suffer severe injuries, including, but not limited to: injury or destruction of County-owned or -operated facilities critical for operations, utility services, and risk management, as well as other assets essential to community health, safety, and well-being; increased planning and preparation costs for community adaptation and resiliency to the effects of the climate crisis; decreased tax revenue due to impacts on the County's tourism- and ocean-based economy and property tax base; and others.

12. Defendants' individual and collective conduct, including, but not limited to, their introduction of fossil fuel products into the stream of commerce while knowing but failing to warn of the threats those products posed to the world's climate; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products; their public deception campaigns designed to obscure the connection between their products and global warming and the environmental, physical, social, and economic consequences flowing from it; and their failure to pursue less hazardous alternatives, actually and proximately caused the County's injuries.

13. Accordingly, the County brings this action against Defendants for Public Nuisance, Private Nuisance, Strict Liability for Failure to Warn, Negligent Failure to Warn, and Trespass.

14. The County hereby disclaims injuries arising on federal property and those that arose from Defendants' provision of fossil fuel products to the federal government.

15. The County seeks to ensure that the parties who have profited from externalizing the consequences and costs of dealing with global warming and its physical, environmental, social,

5

and economic consequences, bear the costs of those impacts on the County, rather than the County, taxpayers, residents, or broader segments of the public.

## II.  PARTIES

### A.  Plaintiff

16.  Plaintiff, the County of Maui, brings this action as an exercise of its police power, which includes but is not limited to its power to prevent injuries to and pollution of the County's property and waters, to prevent and abate nuisances, and to prevent and abate hazards to public health, safety, welfare, and the environment.

17.  The County consists of several offices, departments, and divisions, each with purview over County operations, facilities, property, and/or programs that have been injured by Defendants' conduct as alleged herein and consequent global warming-related impacts. The County includes the islands of Maui, Lānaʻi, Kahoʻolawe, most of the island of Molokaʻi, and all other islands lying within three nautical miles off the shores thereof, including the islet of Molokini.

### B.  Defendants

18.  When reference in this Complaint is made to an act or omission of the Defendants, unless specifically attributed or otherwise stated, such references should be interpreted to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such an act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

19.  **Sunoco Entities**

a.  Sunoco LP is a fossil fuel product distributor, marketer, and promoter. Sunoco LP is registered in Delaware and has its headquarters in Dallas, Texas. Sunoco LP consists

6

of numerous divisions, subsidiaries and affiliates engaged in all aspects of the fossil fuel industry, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, distribution, and/or sales.

b.     Sunoco LP controls and has controlled companywide decisions about the quantity, nature, and extent of fossil fuel production, marketing, and sales, including those of its subsidiaries. Sunoco LP's managing partners determine whether and to what extent Sunoco subsidiary holdings around the globe—including in Hawai'i—market, produce, and/or distribute fossil fuel products.

c.     Sunoco LP controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment and communities from climate change from its fossil fuel products, including those of its subsidiaries.

d.     Each of Sunoco LP's subsidiaries functions as an alter ego of Sunoco LP, including by conducting fossil fuel-related business in Hawai'i that Sunoco LP would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both Sunoco LP and the subsidiary, and employing the same people.

e.     Each of Sunoco LP's subsidiaries functions as an agent of Sunoco LP, including by conducting activities in Hawai'i at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawai'i and increased sales to the parents.

7

f.       Aloha Petroleum LLC is a subsidiary of Sunoco LP. Aloha Petroleum LLC is registered in Delaware and has its principal place of business in Dallas, Texas. Aloha Petroleum LLC's principal line of business includes the marketing, terminalling, and distribution of gasoline, diesel, ethanol, lubricants, and other petroleum products in Hawai'i. Aloha Petroleum LLC purchased the assets of Shell Oil Company, Inc., in the State of Hawai'i in or about 2010.

g.       Aloha Petroleum, Ltd. is a subsidiary of Sunoco LP. Aloha Petroleum, Ltd. is incorporated in Hawai'i with its principal place of business in Honolulu. Aloha Petroleum, Ltd.'s principal line of business includes the marketing, terminalling, and distribution of gasoline, diesel, biodiesel, ethanol, lubricants, and other petroleum and fossil fuel products. Aloha Petroleum, Ltd. was formerly known as Associated Oil, a division of Tidewater Oil. At times relevant to this litigation, Associated Oil, was a subsidiary of Phillips 66, a predecessor-in-interest to ConocoPhillips.

h.       Defendants Sunoco LP, Aloha Petroleum LLC, Aloha Petroleum, Ltd., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "Sunoco."

i.       Sunoco has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to the County. Sunoco's statements in and outside of Hawai'i made in furtherance of its campaign of deception and denial, and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawai'i, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of Sunoco's products. That conduct was intended to reach and influence the County, as well as its

8

residents and residents of the State of Hawai'i, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawai'i, resulting in the County's injuries.

j.      Sunoco has advertised in print publications circulated widely to Hawai'i consumers, including but not limited to the *Wall Street Journal*, *New York Times*, *Time*, and *Sports Illustrated*. These advertisements contained no warning commensurate with the risks of Sunoco's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between Sunoco's fossil fuel products and climate change, and/or misrepresenting Sunoco's products or Sunoco itself as environmentally friendly

k.      A substantial portion of Sunoco's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Hawai'i, from which Sunoco derives and has derived substantial revenue. Sunoco is one of the largest fossil fuel product marketers and sellers in Hawai'i. Sunoco has a long history of marketing and selling fossil fuel products in Hawai'i, including operating numerous gas stations going back to at least the mid-20th century. Sunoco acquired Shell Hawaii's assets in 2010, which included 32 retail sites, five fuel distribution terminals, and associated assets on O'ahu, Maui, the Big Island, and Kaua'i. Sunoco was a member of the American Petroleum Institute's $CO_2$ Task Force during the 1970s and 1980s, which played a key role in hiding the industry's knowledge concerning climate change and disseminating misinformation. Sunoco retains the license for, and operates, Shell-branded gas stations across Hawai'i, in addition to its own Aloha-branded stations. Sunoco maintains an interactive website by which it directs prospective customers to Aloha-branded service stations in Hawai'i. Sunoco offers an Aloha-branded proprietary credit card known as the "Save-A-$ Club Card," which allows consumers in Hawai'i to pay for gasoline and other products

9

at Aloha-branded service stations, and which encourages consumers to use Aloha-branded gas stations by offering various rewards, including discounts on gasoline purchases.

20.     **Exxon Entities**

a.      Exxon Mobil Corporation is a multi-national, vertically integrated energy and chemicals company incorporated in the State of New Jersey with its headquarters and principal place of business in Irving, Texas. Exxon Mobil Corporation is among the largest publicly traded international oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., ExxonMobil Refining & Supply Corporation, Exxon Company, U.S.A., Exxon Corporation, and Mobil Corporation. Exxon Mobil Corporation is registered to do business in Hawai'i and has a registered agent for service of process in Honolulu, Hawai'i.

b.      Exxon Mobil Corporation controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Exxon Mobil Corporation's 2017 Form 10-K filed with the United States Securities and Exchange Commission represents that its success, including its "ability to mitigate risk and provide attractive returns to shareholders, depends on [its] ability to successfully manage [its] overall portfolio, including diversification among types and locations of [its] projects." Exxon Mobil Corporation determines whether and to what extent its holdings market, produce, and/or distribute fossil fuel products.

c.      Exxon Mobil Corporation controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link

between fossil fuel use and impacts on the environment and communities from climate change, including those of its subsidiaries. Exxon Mobil Corporation's Board holds the highest level of direct responsibility for climate change policy within the company. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management Committee are actively engaged in discussions relating to greenhouse gas emissions and the risks of climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries to provide an estimate of greenhouse gas-related emissions costs in their economic projections when seeking funding for capital investments.

d.      Each of Exxon Mobil Corporation's subsidiaries functions as an alter ego of Exxon Mobil Corporation, including by conducting fossil fuel-related business in Hawai'i that Exxon Mobil Corporation would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both Exxon Mobil Corporation and the subsidiary, and employing the same people.

e.      Each of Exxon Mobil Corporation's subsidiaries functions as an agent of Exxon Mobil Corporation, including by conducting activities in Hawai'i at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawai'i and increased sales to the parents.

f.      Exxonmobil Oil Corporation is a wholly owned subsidiary of Exxon Mobil Corporation that acts on Exxon Mobil Corporation's behalf and subject to Exxon Mobil Corporation's control. Exxonmobil Oil Corporation is incorporated in the State of New York with its principal place of business in Irving, Texas. Exxonmobil Oil Corporation is registered to do

11

business in Hawai'i and has a registered agent for service of process in Honolulu, Hawai'i. Exxonmobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Mobil Oil Corporation.

g. "Exxon" as used hereafter, means collectively Defendants Exxon Mobil Corporation and Exxonmobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions.

h. Exxon consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

i. Exxon has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to the County. Exxon's statements in and outside of Hawai'i made in furtherance of its campaign of deception and denial, and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawai'i, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of Exxon's products. That conduct was intended to reach and influence the County, as well as its residents and residents of the State of Hawai'i, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawai'i, resulting in the County's injuries.

j. Over the last twenty-five years, Exxon has spent substantially on radio, television, and/or outdoor advertisements in the Hawai'i market related to its fossil fuel products.

During that period, Exxon also advertised in print publications circulated widely to Hawai'i consumers, including but not limited to the *New York Times*, *Wall Street Journal*, *Time*, *Sports Illustrated*, *People*, *Fortune*, *The New Yorker*, *The Atlantic*, and *Ebony*. These advertisements contained no warning commensurate with the risks of Exxon's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between Exxon's fossil fuel products and climate change, and/or misrepresenting Exxon's products or Exxon itself as environmentally friendly.

k. A substantial portion of Exxon's fossil fuel products are or have been transported, traded, supplied, distributed, promoted, marketed, sold, and/or consumed in Hawai'i, from which Exxon derives and has derived substantial revenue. For example, Exxon directly and through its subsidiaries and/or predecessors-in-interest supplied substantial quantities of fossil fuel products, including, but not limited to, crude oil, to Hawai'i during the period relevant to this litigation.

21. **Shell Entities**

a. Royal Dutch Shell PLC is a vertically integrated, multinational energy and petrochemical company. Royal Dutch Shell is incorporated in England and Wales, with its headquarters and principal place of business in The Hague, Netherlands. Royal Dutch Shell PLC consists of numerous divisions, subsidiaries and affiliates engaged in all aspects of the fossil fuel industry, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

b. Royal Dutch Shell PLC controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Royal Dutch Shell PLC's Board of Directors determines whether and to what extent Shell

13

subsidiary holdings around the globe produce Shell-branded fossil fuel products. For instance, in 2015, a Royal Dutch Shell PLC subsidiary employee admitted in a deposition that Royal Dutch Shell PLC's Board of Directors made the decision about whether to drill a particular oil deposit off the coast of Alaska.

c. Royal Dutch Shell PLC controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment and communities from climate change, including those of its subsidiaries. Overall accountability for climate change within the Shell group of companies lies with Royal Dutch Shell PLC's Chief Executive Officer and Executive Committee. For instance, at least as early as 1988, Royal Dutch Shell PLC, through its subsidiaries, was researching companywide $CO_2$ emissions and concluded that the Shell group of companies accounted for "4% of the $CO_2$ emitted worldwide from combustion," and that climatic changes could compel the Shell group, as controlled by Royal Dutch Shell PLC, to "examine the possibilities of expanding and contracting [its] business accordingly." Royal Dutch Shell PLC's CEO has stated that Royal Dutch Shell PLC would reduce the carbon footprint of its products, including those of its subsidiaries "by reducing the net carbon footprint of the full range of Shell emissions, from our operations and from the consumption of our products." Additionally, in November 2017, Royal Dutch Shell PLC announced it would reduce the carbon footprint of "its energy products" by "around" half by 2050. Royal Dutch Shell PLC's effort is inclusive of all fossil fuel products produced under the Shell brand, including those of its subsidiaries.

d. Each of Royal Dutch Shell PLC's subsidiaries functions as an alter ego of Royal Dutch Shell PLC, including by conducting fossil fuel-related business in Hawai'i that Royal

Dutch Shell PLC would otherwise conduct if it were present in Hawaiʻi, sharing directors and officers with supervisory roles over both Royal Dutch Shell PLC and the subsidiary, and employing the same people.

e.      Each of Royal Dutch Shell PLC's subsidiaries functions as an agent of Royal Dutch Shell PLC, including by conducting activities in Hawaiʻi at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawaiʻi and increased sales to the parents.

f.      Shell Oil Company is a wholly owned subsidiary of Royal Dutch Shell PLC that acts on Royal Dutch Shell PLC's behalf and subject to Royal Dutch Shell PLC's control. Shell Oil Company is incorporated in the State of Delaware and with its principal place of business in Houston, Texas. Shell Oil Company is registered to do business in Hawaiʻi and has a registered agent for service of process in Honolulu, Hawaiʻi. Shell Oil Company was formerly known as, did or does business as, and/or is the successor in liability to Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Shell Trading (US) Company, Shell Energy Services, The Pennzoil Company, Shell Oil Products Company LLC, Shell Oil Products Company, Star Enterprise, LLC, and Pennzoil-Quaker State Company.

g.      Shell Oil Products Company LLC is a wholly owned subsidiary of Royal Dutch Shell PLC that acts on Royal Dutch Shell PLC's behalf and subject to Royal Dutch Shell PLC's control. Shell Oil Products Company LLC is incorporated in the State of Delaware and maintains its principal place of business in Houston, Texas. Shell Oil Products Company LLC is registered to do business in Hawaiʻi and has a registered agent for service of process in Honolulu,

15

Hawai'i. Shell Oil Products Company LLC is an energy and petrochemical company involved in refining, transporting, distributing, and marketing Shell fossil fuel products.

h. Defendants Royal Dutch Shell PLC, Shell Oil Company, Shell Oil Products Company LLC, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Shell."

i. Shell has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to the County. Shell's statements in and outside of Hawai'i made in furtherance of its campaign of deception and denial, and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawai'i, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of Shell's products. That conduct was intended to reach and influence the County, as well is its residents and residents of the State of Hawai'i, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawai'i, resulting in the County's injuries.

j. Over the last twenty-five years, Shell has spent substantially on radio, television, and/or outdoor advertisements in the Hawai'i market related to its fossil fuel products. During that period, Shell also advertised in print publications circulated widely to Hawai'i consumers, including but not limited to the *Wall Street Journal, Time*, *Sports Illustrated*, *People*, *The New Yorker*, *The Atlantic*, *Ebony*, and *Newsweek*. These advertisements contained no warning commensurate with the risks of Shell's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the

connection between Shell's fossil fuel products and climate change, and/or misrepresenting Shell's products or Shell itself as environmentally friendly.

k.      A substantial portion of Shell's fossil fuel products are or have been supplied, traded, distributed, promoted, marketed, sold, and/or consumed in Hawai'i, from which Shell derives and has derived substantial revenue. Among other endeavors, Shell conducts and/or controls, either directly or through franchise agreements, retail fossil fuel sales at over thirty-five Shell-branded petroleum service stations located in Hawai'i, at which it promotes, markets, and advertises its fossil fuel products under its Shell brand name. Shell markets and advertises its fossil fuel products in Hawai'i including by maintaining an interactive website available to prospective customers by which it directs Hawai'i residents to Shell's nearby retail service stations in Hawai'i. Shell offers a proprietary credit card known as the "Shell Fuel Rewards Card," which allows consumers in Hawai'i to pay for gasoline and other products at Shell-branded service stations, and which encourages consumers to use Shell-branded gas stations by offering various rewards, including discounts on gasoline purchases. Shell further maintains a smartphone application known as the "Shell US App" that offers Hawai'i consumers a cashless payment method for gasoline and other products at Shell-branded service stations. Hawai'i consumers utilize the payment method by providing their credit card information through the application. Hawai'i consumers can also receive rewards including discounts on gasoline purchases by registering their personal identifying information in the Shell US App and using the application to identify and activate gas pumps at Shell service stations during a purchase. Shell continues to license the Shell fossil fuel product brand name to petroleum sellers in Hawai'i. During the period relevant to this litigation, Shell owned and operated five fossil fuel distribution terminals and associated assets on O'ahu, Maui, the Big Island, and Kaua'i.

22.    **Chevron Entities**

a.    Chevron Corporation is a multinational, vertically integrated energy and chemicals company incorporated in the State of Delaware, with its global headquarters and principal place of business in San Ramon, California.

b.    Chevron Corporation operates through a web of United States and international subsidiaries at all levels of the fossil fuel supply chain. Chevron Corporation's and its subsidiaries' operations consist of: (1) exploring for, developing, and producing crude oil and natural gas; (2) processing, liquefaction, transportation, and regasification associated with liquefied natural gas; (3) transporting crude oil by major international oil export pipelines; (4) transporting, storing, and marketing natural gas; (5) refining crude oil into petroleum products; marketing of crude oil and refined products; (6) transporting crude oil and refined products by pipeline, marine vessel, motor equipment, and rail car; (7) basic and applied research in multiple scientific fields including chemistry, geology, and engineering; and (8) manufacturing and marketing of commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

c.    Chevron Corporation controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Chevron Corporation determines whether and to what extent its holdings market, produce, and/or distribute fossil fuel products.

d.    Chevron Corporation controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil

fuel use and impacts on the environment and communities from climate change, including those of its subsidiaries.

e. Each of Chevron Corporation's subsidiaries functions as an alter ego of Chevron Corporation, including by conducting fossil fuel-related business in Hawai'i that Chevron Corporation would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both Chevron Corporation and the subsidiary, and employing the same people.

f. Each of Chevron Corporation's subsidiaries functions as an agent of Chevron Corporation, including by conducting activities in Hawai'i at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawai'i and increased sales to the parents.

g. Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal place of business located in San Ramon, California. Chevron U.S.A. Inc. is registered to do business in and has a registered agent for service of process in Honolulu, Hawai'i. Chevron U.S.A. Inc. is a wholly-owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and subject to Chevron Corporation's control. Chevron U.S.A. Inc. was formerly known as, and did or does business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, and Chevron Chemical Company.

h. "Chevron" as used hereafter, means collectively, Defendants Chevron Corporation, and Chevron U.S.A. Inc., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions.

19

i.      Chevron has and continues to tortiously distribute, market, advertise, and promote its products in Hawaiʻi, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawaiʻi, including the County's injuries. Chevron's statements in and outside of Hawaiʻi made in furtherance of its campaign of deception and denial, and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawaiʻi, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of Chevron's products. That conduct was intended to reach and influence the County, as well as its residents and residents of the State of Hawaiʻi, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawaiʻi, resulting in the County's injuries.

j.      Over the last twenty-five years, Chevron has spent substantially on radio, television, and/or outdoor advertisements in the Hawaiʻi market related to its fossil fuel products. During that period, Chevron also advertised in print publications circulated widely to Hawaiʻi consumers, including but not limited to the *New York Times*, *Wall Street Journal*, *Time*, *Sports Illustrated*, *People*, *Fortune*, *The New Yorker*, *The Atlantic*, *Ebony*, and *Newsweek*. These advertisements contained no warning commensurate with the risks of Chevron's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between Chevron's fossil fuel products and climate change, and/or misrepresenting Chevron's products or Chevron itself as environmentally friendly.

k.      A substantial portion of Chevron's fossil fuel products are or have been refined, traded, distributed, promoted, marketed, sold, and/or consumed in Hawaiʻi, from which

20

Chevron derives and has derived substantial revenue. For instance, during the period relevant to this litigation, Chevron owned and operated a 58,000-barrel-per-day refinery on O'ahu. Chevron owns and operates four fossil fuel storage terminals on O'ahu, Maui, Kaua'i, and the Big Island. Chevron conducts and controls, and/or has conducted and controlled, either directly or through franchise agreements, retail fossil fuel sales at over eighty Chevron-branded petroleum services stations in Hawai'i, at which it promotes, markets, and advertises its fossil fuel products to consumers. Chevron offers a proprietary credit cards known as the "Chevron Techron Advantage Card," and "Texaco Techron Advantage Card," which allow consumers in Hawai'i to pay for gasoline and other products at Chevron- and/or Texaco-branded service stations, and which encourage consumers in Hawai'i to use Chevron- and/or Texaco-branded service stations by offering various rewards, including discounts on gasoline purchases at Chevron- and/or Texaco-branded service stations and cash rebates. Chevron maintains an interactive website available in Hawai'i by which it directs prospective customers to Chevon- and Texaco-branded service stations in Hawai'i. Chevron further maintains smartphone applications known as the "Chevron App" and "Texaco App" that offer Hawai'i consumers a cashless payment method for gasoline and other products at Chevron- and/or Texaco-branded service stations. Consumers in Hawai'i utilize the payment method by providing their credit card information through the application. Consumers in Hawai'i can also receive rewards including discounts on gasoline purchases by registering their personal identifying information into the Chevron App and Texaco App and using the application to identify and activate gas pumps at Chevron and/or Texaco service stations during a purchase.

23.    **<u>BHP Entities</u>**

      a.    BHP is a dual-listed company consisting of two parent companies: BHP Group Limited, which is registered in Australia and maintains its headquarters in Melbourne,

Victoria, Australia; and BHP Group plc, which is registered in England and Wales, and maintains its headquarters in London, England. Collectively, those entities are referred to herein as "BHP Group."

b. BHP Group operates as a multinational, vertically-integrated, petroleum, natural gas, and coal company, consisting of multiple affiliates, subsidiaries, and segments. BHP Group's fossil fuel products-related operations consist of exploration, evaluation, development, extraction, processing, transportation, marketing, and logistics.

c. BHP Group controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. BHP Group determines whether and to what extent its holdings market, produce, and/or distribute fossil fuel products.

d. BHP Group controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment and communities from climate change, including those of its subsidiaries.

e. Each of BHP Group's subsidiaries functions as an alter ego of BHP Group, including by conducting fossil fuel-related business in Hawai'i that BHP Group would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both BHP Group and the subsidiary, and employing the same people.

f. Each of BHP Group's subsidiaries functions as an agent of BHP Group, including by conducting activities in Hawai'i at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the

22

parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawai'i and increased sales to the parents.

g. BHP Group owns several subsidiaries that do fossil fuel products-related business in the United States, including in Hawai'i, including, but not limited to, BHP Hawaii Inc. BHP Hawaii Inc. is incorporated in Hawai'i.

h. "BHP," as used hereafter, refers to Defendants BHP Group Limited, BHP Group plc, and BHP Hawaii Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions.

i. BHP has tortiously distributed, marketed, advertised, and promoted its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including the County's injuries. BHP's statements in and outside of Hawai'i made in furtherance of its campaign of deception and denial, and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawai'i, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of BHP's products. That conduct was intended to reach and influence the County, as well as its residents and residents of the State of Hawai'i, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawai'i, resulting in the County's injuries.

j. BHP has advertised in print publications circulated widely to Hawai'i consumers, including but not limited to the *Wall Street Journal* and *Fortune*. These advertisements contained no warning commensurate with the risks of BHP's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material

23

omissions obfuscating the connection between BHP's fossil fuel products and climate change, and/or misrepresenting BHP's products or BHP itself as environmentally friendly.

k.      A substantial portion of BHP's fossil fuel products are or have been manufactured, refined, traded, distributed, promoted, marketed, sold, and/or consumed in Hawai'i, from which BHP derives and has derived substantial revenue. For example, BHP owned and operated a fossil fuel refinery in Kapolei on O'ahu during the time relevant to this litigation. BHP conducts and controls, and/or has conducted and controlled, either directly or through franchise agreements, retail fossil fuel sales at more than thirty BHP-branded retail petroleum service stations throughout Hawai'i, at which it is engaging or at times relevant to this complaint has engaged in the promotion, marketing, and advertisement of its fossil fuel products.

24.    **BP Entities**

a.      BP P.L.C. is a multinational, vertically integrated energy and petrochemical company, registered in England and Wales with its principal place of business in London, England. BP P.L.C. consists of three main operating segments: (1) exploration and production, (2) refining and marketing, and (3) gas power and renewables. BP P.L.C. is the ultimate parent company of numerous subsidiaries, referred to collectively as the "BP Group," which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as gasoline; and market and sell oil, fuel, other refined petroleum products, and natural gas worldwide. BP P.L.C.'s subsidiaries explore for oil and natural gas under a wide range of licensing, joint arrangement, and other contractual agreements.

b.      BP P.L.C. controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. BP P.L.C. is the ultimate decisionmaker on fundamental decisions about the BP Group's core business, *i.e.*,

24

the level of companywide fossil fuels to produce, including production among BP P.L.C.'s subsidiaries. For instance, BP P.L.C. reported that in 2016–17 it brought online thirteen major exploration and production projects. Those contributed to a 12-percent increase in the BP Group's overall fossil fuel product production. Those projects were carried out by BP P.L.C.'s subsidiaries. Based on those projects, BP P.L.C. expects the BP Group to deliver to customers 900,000 barrels of new product per day by 2021. BP P.L.C. further reported that in 2017 it sanctioned three new exploration projects in Trinidad, India, and the Gulf of Mexico.

c.      BP P.L.C. controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment and communities from climate change, including those of its subsidiaries. BP P.L.C. makes fossil fuel production decisions for the entire BP Group based on factors including climate change. BP P.L.C.'s Board is the highest decision-making body within the company, with direct responsibility for the BP Group's climate change policy. BP P.L.C.'s chief executive is responsible for maintaining the BP Group's system of internal control that governs the BP Group's business conduct. BP P.L.C.'s senior leadership directly oversees a carbon steering group, which manages climate-related matters and consists of two committees overseen directly by the board that focus on climate-related investments.

d.      Each of BP P.L.C.'s subsidiaries functions as an alter ego of BP P.L.C., including by conducting fossil fuel-related business in Hawai'i that BP P.L.C. would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both BP P.L.C. and the subsidiary, and employing the same people.

e.  Each of BP P.L.C.'s subsidiaries functions as an agent of BP P.L.C., including by conducting activities in Hawai'i at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawai'i and increased sales to the parents.

f.  BP America Inc. is a wholly owned subsidiary of BP P.L.C. that acts on BP P.L.C.'s behalf and subject to BP P.L.C.'s control. BP America Inc. is a vertically integrated energy and petrochemical company incorporated in the State of Delaware with its headquarters and principal place of business in Houston, Texas. BP America Inc., consists of numerous divisions and affiliates in all aspects of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP America Inc. is registered to do business in Hawai'i and has a registered agent for service of process in Honolulu, Hawai'i. BP America Inc. was formerly known as, did or does business as, and/or is the successor in liability to Amoco Corporation, Amoco Oil Company, ARCO Products Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Delaware Corporation), BP Exploration & Oil, Inc., BP Products North America Inc., BP Amoco Corporation, BP Amoco Plc, BP Oil, Inc., BP Oil Company, Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), The Atlantic Richfield Company (a Pennsylvania corporation) and its division, the Arco Chemical Company.

g.  Defendants BP P.L.C. and BP America, Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

26

h.      BP has and continues to tortiously distribute, market, advertise, and promote its products in Hawaiʻi, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawaiʻi, including to the County. BP's statements in and outside of Hawaiʻi made in furtherance of its campaign of deception and denial, and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawaiʻi, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of BP's products. That conduct was intended to reach and influence the County, as well as its residents and residents of the State of Hawaiʻi, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawaiʻi, resulting in the County's injuries.

i.      Over the last twenty-five years, BP has spent substantially on radio, television, and/or outdoor advertisements in the Hawaiʻi market related to its fossil fuel products. During that period, BP also advertised in print publications circulated widely to Hawaiʻi consumers, including but not limited to the *New York Times*, *Wall Street Journal*, *Time*, *Fortune*, *The New Yorker*, *The Atlantic*, and *Newsweek*. These advertisements contained no warning commensurate with the risks of BP's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between BP's fossil fuel products and climate change, and/or misrepresenting BP's products or BP itself as environmentally friendly.

j.      A substantial portion of BP's fossil fuel products are or have been supplied, transported, traded, distributed, promoted, marketed, sold, and/or consumed in Hawaiʻi, from which BP derives and has derived substantial revenue. For example, BP directly and through its subsidiaries and/or predecessors-in-interest supplied substantial quantities of fossil fuel products,

27

including, but not limited to, crude oil, to Hawai'i during the period relevant to this litigation. At times relevant to this complaint, BP engaged in the production of crude oil in Alaska, a substantial portion of which is shipped to, shipped through, and sold to refinery customers in Hawai'i. BP maintains an interactive website by which it directs prospective customers to retail locations in Hawai'i offering BP's fossil fuel products for sale, including, but not limited to, its Castrol brand of lubricants. BP offers a proprietary credit card known as the "BP Credit Card," which allows consumers in Hawai'i to pay for gasoline and other products. Consumers who use the BP Credit Card receive various rewards, including discounts on gasoline purchases.

25.     **Marathon Petroleum Corporation**

a.      Marathon Petroleum Corporation is a multinational energy company incorporated in the State of Delaware and with its principal place of business in Findlay, Ohio. Marathon Petroleum Corporation was spun off from the operations of Marathon Oil Corporation in 2011. It consists of multiple subsidiaries and affiliates involved in fossil fuel product refining, marketing, retail, and transport, including both petroleum and natural gas products. Marathon Petroleum Corporation merged in October 2018 with Andeavor Corporation, formerly known as Tesoro Corporation.

b.      Marathon Petroleum Corporation is a successor-in-interest to Tesoro Corporation and Tesoro Hawaii Corporation.

c.      Marathon Petroleum Corporation controls and has controlled companywide decisions about the quantity and extent of its fossil fuel production and sales, including those of its subsidiaries. Marathon Petroleum Corporation determines whether and to what extent its holdings market, produce, and/or distribute fossil fuel products.

28

d.      Marathon Petroleum Corporation controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment and communities from climate change, including those of its subsidiaries.

e.      Each of Marathon Petroleum Corporation's subsidiaries functions as an alter ego of Marathon Petroleum Corporation, including by conducting fossil fuel-related business in Hawai'i that Marathon Petroleum Corporation would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both Marathon Petroleum Corporation and the subsidiary, and employing the same people.

f.      Each of Marathon Petroleum Corporation's subsidiaries functions as an agent of Marathon Petroleum Corporation, including by conducting activities in Hawai'i at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawai'i and increased sales to the parents.

g.      Defendant Marathon Petroleum Corporation and its predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Marathon."

h.      Marathon has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including the County's injuries. Marathon's statements in and outside of Hawai'i made in furtherance of its campaign of deception and denial,

29

and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawai'i, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of Marathon's products. That conduct was intended to reach and influence the County, as well as its residents and residents of the State of Hawai'i, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawai'i, resulting in the County's injuries.

i.     Over the last twenty-five years, Marathon has spent substantially on radio, television, and/or outdoor advertisements in the Hawai'i market related to its fossil fuel products. During that period, Marathon also advertised in print publications circulated widely to Hawai'i consumers, including but not limited to the magasine *Time*. These advertisements contained no warning commensurate with the risks of Marathon's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between Marathon's fossil fuel products and climate change, and/or misrepresenting Marathon's products or Marathon itself as environmentally friendly.

j.     A substantial portion of Marathon's fossil fuel products are or have been refined, transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Hawai'i, from which Marathon derives and has derived substantial revenue. For example, Marathon marketed, promoted, and sold its gasoline and other fossil fuel products to consumers in Hawai'i, including through over thirty petroleum service stations it owned in Hawai'i and operated under the "Tesoro" name. Additionally, during the time relevant to this litigation, Marathon owned and operated the largest petroleum refinery in Hawai'i, which was capable of refining 94,000 barrels of fossil fuel per day.

26.    **ConocoPhillips Entities**

a.    ConocoPhillips is a multinational energy company incorporated in the State of Delaware and with its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that carry out ConocoPhillips's fundamental decisions related to all aspects of the fossil fuel industry, including exploration, extraction, production, manufacture, transport, and marketing.

b.    ConocoPhillips controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. ConocoPhillips determines whether and to what extent its holdings market, produce, and/or distribute fossil fuel products. ConocoPhillips's most recent annual report subsumes the operations of the entire ConocoPhillips group of subsidiaries under its name. Therein, ConocoPhillips represents that its value—for which ConocoPhillips maintains ultimate responsibility—is a function of its decisions to direct subsidiaries to explore for and produce fossil fuels: "Unless we successfully add to our existing proved reserves, our future crude oil, bitumen, natural gas and natural gas liquids production will decline, resulting in an adverse impact to our business." ConocoPhillips optimizes the ConocoPhillips group's oil and gas portfolio to fit ConocoPhillips's strategic plan. For example, in November 2016, ConocoPhillips announced a plan to generate $5 billion to $8 billion of proceeds over two years by optimizing its business portfolio, including its fossil fuel product business, to focus on low cost-of-supply fossil fuel production projects that strategically fit its development plans.

c.    ConocoPhillips controls and has controlled companywide decisions related to marketing, advertising, climate change and greenhouse gas emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil

fuel use and impacts on the environment and communities from climate change, including those of its subsidiaries. For instance, ConocoPhillips's board has the highest level of direct responsibility for climate change policy within the company. ConocoPhillips has developed and implements a corporate Climate Change Action Plan to govern climate change decision-making across all entities in the ConocoPhillips group.

d. Each of ConocoPhillips's subsidiaries functions as an alter ego of ConocoPhillips, including by conducting fossil fuel-related business in Hawaiʻi that ConocoPhillips would otherwise conduct if it were present in Hawaiʻi, sharing directors and officers with supervisory roles over both ConocoPhillips and the subsidiary, and employing the same people.

e. Each of ConocoPhillips's subsidiaries functions as an agent of ConocoPhillips, including by conducting activities in Hawaiʻi at the direction of their parent company or companies and for the parent company or companies' benefit. Specifically, the subsidiaries furthered the parents' campaign of deception and denial through misrepresentations, omissions, and failures to warn, which resulted in climate injuries in Hawaiʻi and increased sales to the parents.

f. ConocoPhillips Company is a wholly owned subsidiary of ConocoPhillips that acts on ConocoPhillips's behalf and subject to ConocoPhillips's control. ConocoPhillips Company is incorporated in the State of Delaware and has its principal office in Bartlesville, Oklahoma. ConocoPhillips Company is qualified to do business in Hawaiʻi and has a registered agent for service of process in Honolulu, Hawaiʻi.

g. Phillips 66 is a multinational energy and petrochemical company incorporated in the State of Delaware and with its principal place of business in Houston, Texas.

32

It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips.

> h.      Phillips 66 Company is a wholly owned subsidiary of Phillips 66 that acts on Phillips 66's behalf and subject to Phillips 66's control. Phillips 66 Company is incorporated in Delaware and has its principal office in Houston, Texas. Phillips 66 Company is qualified to do business in Hawai'i and has a registered agent for service of process in Honolulu, Hawai'i. Phillips 66 Company was formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, Tosco Refining Co., and Associated Oil (a predecessor-in-interest of defendant Aloha Petroleum, Ltd.).

> i.      Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "ConocoPhillips."

> j.      ConocoPhillips has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to the County. ConocoPhillips's statements in and outside of Hawai'i made in furtherance of its campaign of deception and denial, and its chronic failure to warn consumers of global warming-related hazards when it marketed, advertised, and sold its products both in and outside of Hawai'i, were intended to conceal and mislead the public, including the County and its residents, about the serious adverse consequences from continued use of ConocoPhillips's products. That conduct was intended to reach and influence the County, as well as its residents and residents of the State of Hawai'i, among others, to continue unabated use of Defendants' fossil fuel products in and outside Hawai'i, resulting in the County's injuries.

k.      Over the last twenty-five years, ConocoPhillips has spent substantially on radio, television, and/or outdoor advertisements in the Hawaiʻi market related to its fossil fuel products. During that period, ConocoPhillips also advertised in print publications circulated widely to Hawaiʻi consumers, including but not limited to the *New York Times*, *Wall Street Journal*, *Time*, *Sports Illustrated*, *People*, *Fortune*, and *The Atlantic*. These advertisements contained no warning commensurate with the risks of ConocoPhillips's products. Moreover, these advertisements also contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between ConocoPhillips's fossil fuel products and climate change, and/or misrepresenting ConocoPhillips's products or ConocoPhillips itself as environmentally friendly.

l.      A substantial portion of ConocoPhillips's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Hawaiʻi, from which ConocoPhillips derives and has derived substantial revenue. For instance, ConocoPhillips transports and delivers crude oil to purchasers, refiners, and/or distributors in Hawaiʻi, including through its subsidiaries. ConocoPhillips has owned and/or operated a bulk fossil fuel terminal near Honolulu, at which it received imported fossil fuels for distribution and sale throughout Hawaiʻi. ConocoPhillips conducts and controls, and/or has conducted and controlled, either directly or through franchise agreements, retail fossil fuel sales at its branded gas station locations throughout Hawaiʻi, at which it is engaging or at times relevant to this complaint has engaged in the promotion, marketing, and advertisement of its fossil fuel products under its various brand names, including ConocoPhillips, Phillips 66, and/or 76. ConocoPhillips maintains an interactive website available in Hawaiʻi by which it directs prospective customers to retail locations offering its fossil fuel products for sale, including but not limited to 76-branded gasoline

and service stations. ConocoPhillips also offers Hawai'i consumers multiple proprietary credit cards, including the "Drive Savvy Rewards Credit Card" and the "76 Fleet Card," which allow Hawai'i consumers and business customers to pay for gasoline and other products at Phillips 66-, Conoco-, and 76-branded service stations, and which incentivize use of ConocoPhillips's products by offering various rewards, including discounts on gasoline purchases. ConocoPhillips further maintains smartphone applications, including the "My 76 App" and the "My Phillips 66 App," which offer Hawai'i consumers a cashless payment method for gasoline and other products at its branded service stations. Hawai'i consumers utilize the payment method by providing their credit card information through the application. Hawai'i consumers can also receive rewards including discounts on gasoline purchases by registering their personal identifying information into the My 76 App and My Phillips 66 App and using the application to identify and activate gas pumps at service stations during a purchase.

## C. Relevant Non-Parties: Fossil Fuel Industry Associations

27. As set forth in greater detail below, each Defendant had actual knowledge that its fossil fuel products were hazardous. Defendants obtained knowledge of the hazards of their products independently and through their membership and involvement in trade associations.

28. Acting on behalf of and under the supervision and/or control of Defendants, numerous industry associations and industry-created front groups, including those listed below, conducted early climate research, distributed their findings to Defendants, and engaged in a long-term course of conduct to misrepresent, omit, and conceal the dangers of Defendants' fossil fuel products with the aim of protecting or enhancing Defendants' sales to consumers, including consumers in the County. Defendants actively supervised, facilitated, consented to, and/or directly

35

participated in the misleading messaging of these front groups, from which they profited significantly, including in the form of increased sales in the County—as was the intent.

29.    **The American Petroleum Institute ("API")** is a national trade association formed in 1919 and based in the District of Columbia and registered to conduct activity in Hawai'i. API's purpose is to advance its individual member's collective business interests, which includes increasing consumers' consumption of oil and gas to Defendants' financial benefit. Among other functions, API coordinates among members of the petroleum industry and gathers information of interest to the industry and disseminates that information to its members.

a.    Through membership, Executive Committee roles, and/or budgetary funding of API, Defendants have collectively steered the policies and trade practices of API. Defendants have also coordinated with API to craft and disseminate misleading messaging regarding climate change to advance their shared goal of increasing consumer demand for Defendants' fossil fuels. The following Defendants and/or their predecessors-in-interest are and/or have been core API members at times relevant to this litigation: Exxon, BP, Shell, Marathon, Chevron, BHP, ConocoPhillips, and Sunoco. Executives from some Defendants served on the API Executive Committee and/or as API Chairman, which is akin to serving as a corporate officer. For example, Exxon's CEO served on API's Executive Committee almost continuously for over 20 years (1991, 1996–97, 2001, and 2005–2016). BP's CEO served as API's Chairman in 1988, 1989, and 1998. Chevron's CEO served as API Chairman in 1994, 1995, 2003, and 2012. Shell's President served on API's Executive Committee from 2005–06. In 2020, API elected Phillips 66 Chairman and CEO Greg Garland to serve a two-year term as the President of its Board of Directors. Exxon President and CEO Darren Woods was Board President from 2018 to 2020, and ConocoPhillips Chairman and CEO Ryan Lance was Board President from 2016 to 2018.

36

Executive members of ConocoPhillips, and Marathon also served as members of API's Board of Directors at various times.

b. Relevant information was shared among API and Defendants and their predecessors-in-interest through (1) API distributing information it held to its members and (2) participation of officers and other personnel from Defendants and their predecessors-in-interest on API boards, committees, and task forces. Acting on behalf of and under the supervision and control of Defendants, API has participated in and led several coalitions, front groups, and organizations that have promoted disinformation about fossil fuel products to consumers, including the Global Climate Coalition, Partnership for a Better Energy Future, Coalition for American Jobs, Alliance for Energy and Economic Growth, and Alliance for Climate Strategies. These front groups were formed to provide climate disinformation and advocacy from a misleadingly objective source, when, in fact, they were financed and controlled by Defendants. Defendants have benefited from the spread of this disinformation, because, among other things, it has ensured a thriving consumer market for oil and gas, resulting in substantial profits for Defendants.

c. According to its website, API's stated mission includes "influenc[ing] public policy in support of a strong, viable U.S. oil and natural gas industry," which includes increasing consumers' consumption of oil and gas to Defendants' financial benefit. Through their Executive Committee roles, API board membership, and/or budgetary funding of API, Defendants collectively wielded control over the policies and trade practices of API. In addition, Defendants directly supervised and participated in API's misleading messaging regarding climate change. Defendants used their control over and involvement in API to further their goal of influencing consumer demand for their fossil fuel products through a long-term advertising and communications campaign centered on climate change denialism.

30.     **The Western States Petroleum Association ("WSPA")** is a trade association representing oil producers in Arizona, California, Nevada, Oregon, and Washington.[8] The following Defendants and/or their predecessors-in-interest are and/or have been WSPA members at times relevant to this litigation: Exxon, BP, Chevron, Shell, and ConocoPhillips.[9]

31.     **The American Fuel and Petrochemical Manufacturers ("AFPM")** is a national association of petroleum and petrochemical companies. AFPM has promoted disinformation about fossil fuel products to consumers through its membership in Partnership for a Better Energy Future. The following Defendants and/or their predecessors-in-interest are and/or have been AFPM members at times relevant to this litigation, and staff from these Defendants serve or have served on AFPM's board of directors: Exxon, BP, Marathon, Shell, Chevron, and ConocoPhillips.[10] AFPM has promoted disinformation about fossil fuel products to consumers, including those in the County, through its membership in Partnership for a Better Energy Future. Defendants have benefited from the spread of this disinformation, because among other things, it has ensured a thriving consumer market for oil and gas, resulting in substantial profits for Defendants.

32.     **U.S. Oil & Gas Association ("USOGA")** is a national trade association representing oil and gas producers, formerly known as the Mid-Continent Oil & Gas Association. The following Defendants and/or their predecessors-in-interest are and/or have been USOGA members at times relevant to this litigation: Exxon, BP, Chevron, Shell, BHP, Marathon and ConocoPhillips.[11]

---

[8] *About*, WESTERN STATES PETROLEUM ASS'N, https://www.wspa.org/about (last visited Oct. 7, 2020).

[9] *Id.*

[10] *Membership Directory*, AM. FUEL & PETROCHEMICAL MFRS., https://www.afpm.org/membership-directory (last visited Oct. 24, 2019).

[11] *See, e.g.*, *Member Companies*, LOUISIANA MID-CONTINENT OIL & GAS ASS'N, https://www.lmoga.com/membership/member-companies (last visited Oct. 7, 2020).

33. **Western Oil & Gas Association** was a California nonprofit trade association representing the oil and gas industries consisting of over 75 member companies. Its members included companies and individuals responsible for more than 65 percent of petroleum production and 90 percent of petroleum refining and marketing in the Western United States. The following Defendants and/or their predecessors-in-interest are and/or have been WOGA members at times relevant to this litigation: Exxon, Chevron, ConocoPhillips, and Shell.

34. **The Information Council for the Environment ("ICE")** was formed by coal companies and their allies, including the Western Fuels Association and the National Coal Association. Associated companies included Pittsburg and Midway Coal Mining (Chevron).

35. **The Global Climate Coalition ("GCC")** was an industry group formed to oppose greenhouse gas emission reduction initiatives. GCC was founded in 1989, shortly after the first meeting of the Intergovernmental Panel on Climate Change ("IPCC"), the United Nations body for assessing the science related to climate change. GCC disbanded in or around 2001. Founding members included API. Over the course of its existence, GCC corporate members included Amoco (BP), API, Chevron, Exxon, Ford, Shell Oil, Texaco (Chevron) and Phillips Petroleum (ConocoPhillips). Over its existence other members and funders included ARCO (BP), and the Western Fuels Association.

## III.   AGENCY

36. At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator, and/or joint venturer of each of the remaining Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and joint venture and rendered substantial

39

assistance and encouragement to the other Defendants, knowing that their conduct was wrongful and/or constituted a breach of duty.

37.      All Defendants, by and through non-party fossil fuel trade associations and industry groups, conspired to conceal and misrepresent the known dangers of fossil fuels, to knowingly withhold information regarding the effects of using fossil fuel products, to discredit climate change science and create the appearance such science is uncertain, and to engage in massive campaigns to promote heavy use of their fossil fuel products, which they knew would result in injuries to the County. Through their own actions and the actions of their agents, and through their membership and participation in fossil fuel industry trade associations, each Defendant was and is a member of that conspiracy. Defendants committed substantial acts to further the conspiracy in Hawaiʻi by making misrepresentations and omissions to Hawaiʻi consumers and failing to warn them about the disastrous effects of fossil fuel use. A substantial effect of the conspiracy has also and will also occur in Hawaiʻi, as the County has suffered and will suffer injuries from Defendants' wrongful conduct including, but not limited to, sea level rise, flooding, erosion, loss of wetlands and beaches, drought, wildfire, extreme precipitation events, and other social and economic consequences of these environmental changes. Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates, trade associations and industry groups, that their actions in Hawaiʻi and elsewhere would result in these injuries in and to Hawaiʻi and the County. Finally, the climate effects described herein are direct and foreseeable results of Defendants' conduct in furtherance of the conspiracy.

## IV.      JURISDICTION AND VENUE

38.      This Court has subject matter jurisdiction over this civil action under Hawaiʻi Revised Statutes section 603-21.5.

39.     This Court has personal jurisdiction over each Defendant either because they are domiciled in Hawaiʻi; were served with process in Hawaiʻi; are organized under the laws of Hawaiʻi; and/or maintain their principal place of business in Hawaiʻi; or because they transact business in Hawaiʻi; perform work in Hawaiʻi; contract to supply goods, manufacture products, or provide services in Hawaiʻi; advertise and promote their products in Hawaiʻi; caused tortious injury in Hawaiʻi; engage in persistent courses of conduct in Hawaiʻi; derive substantial revenue from manufactured goods, products, or services used or consumed in Hawaiʻi; and/or have interests in, use, or possess real property in Hawaiʻi.

40.     Venue in this Court is proper under Hawaiʻi Revised Statutes section 603-36(5) because the County's claims for relief arose in the County of Maui.

## V.      FACTUAL BACKGROUND

### A.      Climate Disruption—Cause and Effects

41.     Human-caused warming of the Earth is unequivocal. As a result, the atmosphere and oceans are warming, the sea level is rising, snow and ice cover is diminishing, oceans are acidifying, and hydrologic systems have been altered, among other environmental changes.

42.     The mechanism by which human activity causes global warming and climate disruption is well established: ocean and atmospheric warming is overwhelmingly caused by anthropogenic greenhouse gas emissions.

43.     Greenhouse gases are largely byproducts of humans combusting fossil fuels to produce energy and using fossil fuels to create petrochemical products.

44.     Prior to World War II, most anthropogenic $CO_2$ emissions were caused by land-use practices, such as forestry and agriculture, which altered the ability of the land and global biosphere to absorb $CO_2$ from the atmosphere; the impacts of such activities on Earth's climate were

41

relatively minor. Since that time, however, both the annual rate and total volume of anthropogenic $CO_2$ emissions have increased enormously following the advent of major uses of oil, gas, and coal.

45.     The graph below illustrates that fossil fuel emissions are the dominant source of increases in atmospheric $CO_2$ since the mid-twentieth century.



**Figure 1: Global Anthropogenic CO₂ Emissions**[12]

46.     The recent acceleration of fossil fuel emissions has led to a correspondingly sharp spike in atmospheric concentration of $CO_2$. Since 1960, the concentration of $CO_2$ in the atmosphere has gone from under 320 parts per million ("ppm") to approximately 415 ppm.[13] The rate of growth of atmospheric $CO_2$ is also accelerating. From 1960 to 1970, atmospheric $CO_2$ increased by an average of approximately 1 ppm per year; in the last five years, it has increased by more than 2.5 ppm per year.[14]

47.     The graph below indicates the tight nexus between the sharp increase in emissions from the combustion of fossil fuels and the steep rise of atmospheric concentrations of $CO_2$.

---

[12] *See* IPCC 2014 SYNTHESIS REPORT, *supra* note 3, at 3.

[13] Global Monitoring Laboratory, *Trends in Atmospheric Carbon Dioxide*, NOAA (last visited Oct. 8, 2020), https://www.esrl.noaa.gov/gmd/ccgg/trends.

[14] *Id.*



**Figure 2: Atmospheric CO₂ Concentration and Annual Emissions[15]**

48.     Because of the increased burning of fossil fuels, concentrations of greenhouse gases in the atmosphere are now at a level unprecedented in at least 3 million years.[16]

49.     As greenhouse gases accumulate in the atmosphere, the Earth radiates less energy back to space. This accumulation and associated disruption of the Earth's energy balance have myriad environmental and physical consequences, including, but not limited to, the following:

        a.      Warming of the Earth's average surface temperature both locally and globally, and increased frequency and intensity of heatwaves; to date, global average air

---

[15] Rebecca Lindsey, *Climate Change: Atmospheric Carbon Dioxide*, NOAA (Aug. 14, 2020), https://www.climate.gov/news-features/understanding-climate/climate-change-atmospheric-carbon-dioxide.

[16] *More CO₂ than ever before in 3 million years, shows unprecedented computer simulation*, SCIENCE DAILY (Apr. 3, 2019), https://www.sciencedaily.com/releases/2019/04/190403155436.htm; *see also* IPCC 2014 SYNTHESIS REPORT, *supra* note 3, at 4.

43

temperatures have risen approximately 1 degree C (1.8 degrees F) above preindustrial temperatures; temperatures in particular locations have risen more;

b. Sea level rise, due to the thermal expansion of warming ocean waters and runoff from melting glaciers and ice sheets;

c. Flooding and inundation of land and infrastructure, increased erosion, higher wave run-up and tides, increased frequency and severity of storm surges, saltwater intrusion, and other impacts of higher sea levels;

d. Changes to the global climate, and generally toward longer periods of drought interspersed with fewer and more severe periods of precipitation, and associated impacts on the quantity and quality of water resources available to both human and ecological systems;

e. Increased frequency, intensity, and destructive force of wildfires, due to shifts in the hydrologic cycle that result in increased fuel availability and changing wind patterns;

f. Ocean acidification, due to the increased uptake of atmospheric carbon dioxide by the oceans;

g. Increased frequency and intensity of extreme weather events due to the increase in the atmosphere's ability to hold moisture and increased evaporation;

h. Changes to terrestrial and marine ecosystems, and consequent impacts on the range of flora and fauna; and

i. Adverse impacts on human health associated with extreme weather, extreme heat, decreased air quality, and vector-borne illnesses.

50. As discussed in Part V.H, *infra*, these consequences of Defendants' conduct and its exacerbation of the climate crisis are already impacting the County and will continue to increase in severity in the County.

51.     Without Defendants' exacerbation of global warming caused by their conduct as alleged herein, the current and future physical and environmental changes caused by global warming would have been far less than those observed to date. Similarly, effects that will occur in the future would also be far less.[17]

**B.      Attribution**

52.     Defendants' efforts between 1965 and the present to deceive about the consequences of the normal use of their fossil fuel products; conceal the hazards of those products from consumers; promote their fossil fuel products despite knowing the dangers associated with those products; doggedly campaign against regulation of those products based on falsehoods, omissions, and deceptions; and failure to pursue less hazardous alternative products available to them; unduly inflated the market for fossil fuel products. Consequently, substantially more anthropogenic greenhouse gases have been emitted into the environment than would have been absent that conduct.

53.     By quantifying greenhouse gas pollution attributable to Defendants' products and conduct, climatic and environmental responses to those emissions are also calculable, and can be attributed to Defendants on an individual and aggregate basis.

54.     Defendants' conduct caused a substantial portion of global atmospheric greenhouse gas concentrations, and the attendant historical, projected, and committed disruptions to the environment—and consequent injuries to the County—associated therewith.

55.     Defendants, individually and together, have substantially and measurably contributed to the County's climate crisis-related injuries.

---

[17] *See, e.g.*, Peter U. Clark et al., *Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change*, 6 NATURE CLIMATE CHANGE 360, 365 (2016) ("Our modelling suggests that the human carbon footprint of about [470 billion tons] by 2000 . . . has already committed Earth to a [global mean sea level] rise of ~1.7m (range of 1.2 to 2.2 m).").

C.    **Defendants Went to Great Lengths to Understand, and Either Knew or Should Have Known About, the Dangers Associated with Their Fossil Fuel Products.**

56.    The fossil fuel industry has known about the potential warming effects of greenhouse gas emissions since as early as the 1950s. In 1954, geochemist Harrison Brown and his colleagues at the California Institute of Technology wrote to API, informing the trade association that preliminary measurements of natural archives of carbon in tree rings indicated that fossil fuels had caused atmospheric carbon dioxide levels to increase by about 5% since 1840.[18] API funded the scientists for various research projects, and measurements of carbon dioxide continued for at least one year and possibly longer, although the results were never published or otherwise made available to the public.[19]

57.    In 1957, H.R. Brannon of Humble Oil (predecessor-in-interest to ExxonMobil) measured an increase in atmospheric carbon dioxide similar to that measured by Harrison Brown. Brannon communicated this information to API. Brannon knew of Brown's measurements, compared them with his, and found they agreed. Brannon published his results in the scientific literature, which was available to Defendants and/or their predecessors-in-interest.[20]

58.    In 1959, API organized a centennial celebration of the American oil industry at Columbia University.[21] High-level representatives of Defendants were in attendance. One of the keynote speakers was the nuclear physicist Edward Teller. Teller warned the industry that "a temperature rise corresponding to a 10 per cent increase in carbon dioxide will be sufficient to melt the icecap and submerge . . . [a]ll the coastal cities." Teller added that since "a considerable

---

[18] *See* Benjamin Franta, *Early Oil Industry Knowledge of CO₂ and Global Warming*, 8 NATURE CLIMATE CHANGE 1024, 1024–25 (2018).

[19] *Id.*

[20] H.R. Brannon, Jr. et al., *Radiocarbon Evidence on the Dilution of Atmospheric and Oceanic Carbon by Carbon from Fossil Fuels*, 38 AMERICAN GEOPHYSICAL UNION TRANSACTIONS 643, 643–50 (1957).

[21] *See* ALLAN NEVINS & ROBERT G. DUNLOP, ENERGY AND MAN: A SYMPOSIUM (Appleton-Century-Crofts, New York 1960); *see also* Franta, *supra* note 18, at 1024–25.

46

percentage of the human race lives in coastal regions, I think that this chemical contamination is more serious than most people tend to believe."

59.    Following his speech, Teller was asked to "summarize briefly the danger from increased carbon dioxide content in the atmosphere in this century." He responded that "there is a possibility the icecaps will start melting and the level of the oceans will begin to rise."

60.    By 1965, concern over the potential for fossil fuel products to cause disastrous global warming reached the highest levels of the United States' scientific community. In that year, President Lyndon B. Johnson's Science Advisory Committee's Environmental Pollution Panel reported that a 25% increase in carbon dioxide concentrations could occur by the year 2000, that such an increase could cause significant global warming, that melting of the Antarctic ice cap and rapid sea level rise could result, and that fossil fuels were the clearest source of the pollution.[22]

61.    Three days after President Johnson's Science Advisory Committee report was published, the president of API, Frank Ikard, addressed leaders of the petroleum industry in Chicago at the trade association's annual meeting. Ikard relayed the findings of the report to industry leaders, saying,

> The substance of the report is that there is still time to save the world's peoples
> from the catastrophic consequence of pollution, but time is running out.[23]

Ikard also relayed that "by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts" and quoted the report's finding that "the pollution from internal combustion engines is so serious, and is growing so fast, that an alternative nonpolluting means of powering automobiles, buses, and trucks is likely to become a national necessity."

---

[22] PRESIDENT'S SCIENCE ADVISORY COMMITTEE, *Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel* 9, 119–24 (Nov. 1965), https://hdl.handle.net/2027/uc1.b4315678.

[23] *See* Franta, *supra* note 18, at 1024–25.

62. Thus, by 1965, Defendants and their predecessors-in-interest were aware that the scientific community had found that fossil fuel products, if used profligately, would cause global warming by the end of the century, and that such global warming would have wide-ranging and costly consequences.

63. In 1968, API received a report from the Stanford Research Institute, which it had hired to assess the state of research on environmental pollutants, including carbon dioxide.[24] The assessment endorsed the findings of President Johnson's Scientific Advisory Council from three years prior, stating, "Significant temperature changes are almost certain to occur by the year 2000, and . . . there seems to be no doubt that the potential damage to our environment could be severe." The scientists warned of "melting of the Antarctic ice cap" and informed API that [p]ast and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere." What was missing, the scientists said, was work on "air pollution technology and . . . systems in which $CO_2$ emissions would be brought under control."[25]

64. In 1969, the Stanford Research Institute delivered a supplemental report on air pollution to API, projecting with alarming particularity that atmospheric $CO_2$ concentrations would reach 370 ppm by 2000[26]—almost exactly what it turned out to be (369 ppm).[27] The report explicitly connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere."

---

[24] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants*, STANFORD RESEARCH INST. (Feb. 1968), https://www.smokeandfumes.org/documents/document16.

[25] *Id.*

[26] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants Supplement*, STANFORD RESEARCH INST. (June 1969).

[27] NASA GODDARD INST. FOR SPACE STUDIES, *Global Mean $CO_2$ Mixing Ratios (ppm): Observations*, https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt (last visited Oct. 8, 2020).

48

65.     By virtue of their memberships and participation in API at that time, Defendants received or should have received the Stanford Research Institute reports and were on notice of their conclusions.

66.     In 1972, API members, including Defendants, received a status report on all environmental research projects funded by API. The report summarized the 1968 SRI report describing the impact of fossil fuel products, including Defendants', on the environment, including global warming and attendant consequences. Defendants and/or their predecessors-in-interest that received this report include, but were not limited to: American Standard of Indiana (BP), Asiatic (Shell), Ashland (Marathon), Atlantic Richfield (BP), British Petroleum (BP), Chevron Standard of California (Chevron), Esso Research (ExxonMobil), Ethyl (formerly affiliated with Esso, which was subsumed by ExxonMobil), Getty (ExxonMobil), Gulf (Chevron, among others), Humble Standard of New Jersey (ExxonMobil/Chevron/BP), Marathon, Mobil (ExxonMobil), Pan American (BP), Shell, Standard of Ohio (BP), Texaco (Chevron), Union (Chevron), Skelly (ExxonMobil), Colonial Pipeline (ownership has included BP, ExxonMobil, and Chevron entities, among others), Continental (ConocoPhillips), Dupont (former owner of Conoco), Phillips (ConocoPhillips), and Caltex (Chevron).[28]

67.     In 1977, James Black of Exxon's Products Research Division presented to the Exxon Corporation Management Committee on the greenhouse effect. The next year, in 1978, Black presented to another internal Exxon group, PERCC. In a memo to the Vice President of Exxon Research and Engineering, Black summarized his presentations.[29] He reported that "current

---

[28] AM. PETROLEUM INST., *Environmental Research, A Status Report*, Committee for Air & Water Conservation (Jan. 1972), http://files.eric.ed.gov/fulltext/ED066339.pdf.

[29] Letter from J.F. Black, Exxon Research and Engineering Co., to F.G. Turpin, Exxon Research and Engineering Co., *The Greenhouse Effect*, CLIMATEFILES (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-on-greenhouse-effect-for-exxon-corporation-management-committee.

scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel consumption," and that doubling atmospheric carbon dioxide, according to the best climate model available, would "produce a mean temperature increase of about 2°C to 3°C over most of the earth," with two- to three-times as much warming at the poles. The figure below, reproduced from Black's memo, illustrates Exxon's understanding of the timescale and magnitude of global warming its products would cause.



**Figure 3: Future global warming predicted internally by Exxon in 1977**[30]

The impacts of such global warming, Black reported, would include "more rainfall," which would "benefit some areas and would harm others." "Some countries would benefit, but others could have their agricultural output reduced or destroyed." "Even those nations which are favored,

---

[30] *Id.* The company predicted global warming of 3°C by 2050, with 10°C of warming in polar regions. The difference between the dashed and solid curves prior to 1977 represents global warming that Exxon believed may already have been occurring.

however, would be damaged for a while since their agricultural and industrial patterns have been established on the basis of the present climate." Black reported that "It is currently estimated that mankind has a 5–10 yr. time window to obtain the necessary information" and "establish what must be done," at which time, "hard decisions regarding changes in energy strategies might become critical."

68. Also in 1977, Henry Shaw of the Exxon Research and Engineering Technology Feasibility Center attended a meeting of scientists and governmental officials in Atlanta, Georgia, on developing research programs to study carbon dioxide and global warming.[31] Shaw's internal memo to Exxon's John W. Harrison reported that "The climatic effects of carbon dioxide release may be the primary limiting factor on energy production from fossil fuels[.]"

69. In 1979, Exxon's W.L. Ferrall distributed an internal memorandum.[32] The memo reported that "The most widely held theory [about global warming] is that: The increase [in carbon dioxide] is due to fossil fuel combustion; [i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface; [and t]he present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050. [...] The potential problem is great and urgent." The memo stated that if limits were not placed on fossil fuel production:

> Noticeable temperature changes would occur around 2010 as the [carbon dioxide] concentration reaches 400 ppm [parts per million]. Significant climatic changes occur around 2035 when the concentration approaches 500 ppm. A doubling of the pre-industrial concentration [*i.e.*, 580 ppm] occurs around 2050. The doubling would bring about dramatic changes in the world's environment[.]

---

[31] Henry Shaw, *Environmental Effects of Carbon Dioxide*, CLIMATE INVESTIGATIONS CTR. (Oct. 31, 1977), https://www.industrydocuments.ucsf.edu/docs/tpwl0228.

[32] Letter from W.L. Ferrall, Exxon Research and Engineering Co., to Dr. R.L. Hirsch, *Controlling Atmospheric CO2*, CLIMATE INVESTIGATIONS CTR. (Oct. 16, 1979), https://www.industrydocuments.ucsf.edu/docs/mqwl0228.

Those projections proved remarkably accurate: annual average atmospheric $CO_2$ concentrations surpassed 400 parts per million in 2015 for the first time in millions of years.[33] Limiting the carbon dioxide concentration in the atmosphere to 440 ppm, or a 50% increase over preindustrial levels, which the memo said was "assumed to be a relatively safe level for the environment," would require fossil fuel emissions to peak in the 1990s and non-fossil energy systems to be rapidly deployed. Eighty percent of fossil fuel resources, the memo calculated, would have to be left in the ground to avoid doubling atmospheric carbon dioxide concentrations. Certain fossil fuels, such as shale oil, could not be substantially exploited at all.

70.    In November 1979, Exxon's Henry Shaw wrote to Exxon's Harold Weinberg urging "a very aggressive defensive program in […] atmospheric science and climate because there is a good probability that legislation affecting our business will be passed."[34] Shaw stated that an expanded research effort was necessary to "influence possible legislation on environmental controls" and "respond" to environmental groups, which had already opposed synthetic fuels programs based on carbon dioxide emissions. Shaw suggested the formation of a "small task force" to evaluate a potential program in carbon dioxide and climate, acid rain, carcinogenic particulates, and other pollution issues caused by fossil fuels.

71.    In 1979, API and its members, including Defendants, convened a Task Force to monitor and share cutting edge climate research among the oil industry. The group was initially called the $CO_2$ and Climate Task Force, but in 1980 changed its name to the Climate and Energy Task Force (hereinafter referred to as "API $CO_2$ Task Force"). Membership included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company,

---

[33] Nicola Jones, *How the World Passed a Carbon Threshold and Why It Matters*, YALE ENV'T 360 (Jan. 26, 2017), http://e360.yale.edu/features/how-the-world-passed-a-carbon-threshold-400ppm-and-why-it-matters.

[34] Memorandum from H. Shaw to H.N. Weinberg, *Research in Atmospheric Science*, CLIMATE INVESTIGATIONS CTR. (Nov. 19, 1979), https://www.industrydocuments.ucsf.edu/docs/yqwl0228.

including Exxon, Mobil (ExxonMobil), Amoco (BP), Phillips (ConocoPhillips), Texaco (Chevron), Shell, Sunoco, Sohio (BP), as well as Standard Oil of California (BP) and Gulf Oil (Chevron), among others. The Task Force was charged with monitoring government and academic research, evaluating the implications of emerging science for the petroleum and gas industries and identifying where reductions in greenhouse gas emissions from Defendants' fossil fuel products could be made.[35]

72. In 1979, API prepared a background paper on carbon dioxide and climate for the $CO_2$ and Climate Task Force, stating that $CO_2$ concentrations were rising steadily in the atmosphere, and predicting when the first clear effects of global warming might be detected.[36] The API reported to its members that although global warming would occur, it would likely go undetected until approximately the year 2000, because, the API believed, its effects were being temporarily masked by a natural cooling trend. However, this cooling trend, the API warned its members, would reverse around 1990, adding to the warming caused by carbon dioxide.

73. In 1980, API's $CO_2$ Task Force invited Dr. John Laurmann, "a recognized expert in the field of CO2 and climate," to present to its members.[37] The meeting lasted for seven hours and included a "complete technical discussion" of global warming caused by fossil fuels, including "the scientific basis and technical evidence of CO2 buildup, impact on society, methods of modeling and their consequences, uncertainties, policy implications, and conclusions that can be drawn from present knowledge." Representatives from Standard Oil of Ohio (predecessor to BP),

---

[35] Neela Banerjee, *Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too*, INSIDE CLIMATE NEWS (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco.

[36] Memorandum from R.J. Campion to J.T. Burgess, *The API's Background Paper on $CO_2$ Effects*, CLIMATE INVESTIGATIONS CTR. (Sep. 6, 1979), https://www.industrydocuments.ucsf.edu/docs/lqwl0228.

[37] Letter from Jimmie J. Nelson, American Petroleum Institute, to AQ-9 Task Force, *The $CO_2$ Problem; Addressing Research Agenda Development*, CLIMATE INVESTIGATIONS CTR. (Mar. 18, 1980), https://www.industrydocuments.ucsf.edu/docs/gffl0228.

Texaco (now Chevron), Exxon, and the API were present, and the minutes of the meeting were distributed to the entire API $CO_2$ Task Force. Laurmann informed the Task Force of the "scientific consensus on the potential for large future climatic response to increased CO2 levels" and that there was "strong empirical evidence that [the carbon dioxide] rise [was] caused by anthropogenic release of CO2, mainly from fossil fuel burning." Unless fossil fuel production and use were controlled, atmospheric carbon dioxide would be twice preindustrial levels by 2038, with "likely impacts" along the following trajectory:

1°C RISE (2005): BARELY NOTICEABLE

2.5°C RISE (2038): MAJOR ECONOMIC CONSEQUENCES, STRONG REGIONAL DEPENDENCE

5°C RISE (2067): GLOBALLY CATASTROPHIC EFFECTS

Laurmann warned the API $CO_2$ Task Force that global warming of 2.5°C could "bring[] world economic growth to a halt[.]" Laurmann also suggested that action should be taken immediately, asking, "Time for action?" and noting that if achieving high market penetration for new energy sources would require a long time period (*e.g.,* decades), then there would be "no leeway" for delay. The minutes of the API $CO_2$ Task Force's meeting show that one of the Task Force's goals was "to help develop ground rules for […] the cleanup of fuels as they relate to $CO_2$ creation," and the Task Force discussed the requirements for a worldwide "energy source changeover" away from fossil fuels.

74. In 1980, Imperial Oil Limited (a Canadian ExxonMobil subsidiary) reported to managers and environmental staff at multiple affiliated Esso and Exxon companies that there was "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere.[38] Imperial

---

[38] IMPERIAL OIL LTD., REVIEW OF ENVIRONMENTAL PROTECTION ACTIVITIES FOR 1978–1979 (Aug. 6, 1980), http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/p2.

noted that "[t]echnology exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost of power generation."

75.     In December 1980, Exxon's Henry Shaw distributed a memorandum on the "$CO_2$ Greenhouse Effect."[39] Shaw stated that the future buildup of carbon dioxide was a function of fossil fuel use, and that internal calculations performed at Exxon indicated that atmospheric carbon dioxide would double around the year 2060. According to the "most widely accepted" climate models, Shaw reported, such a doubling of carbon dioxide would "most likely" result in global warming of approximately 3°C, with a greater effect in polar regions. Calculations predicting a lower temperature increase, such as 0.25°C, were "not held in high regard by the scientific community," Shaw said. Shaw also noted that the ability of the oceans to absorb heat could delay (but not prevent) the temperature increase "by a few decades," and that natural, random temperature fluctuations would hide global warming from $CO_2$ until around the year 2000. The memo included the Figure below, which illustrates global warming anticipated by Exxon, as well as the company's understanding that significant global warming would occur before exceeding the range of natural variability and being detected.

---

[39] Memorandum from Henry Shaw to T.K. Kett, *Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect* (Dec 18, 1980), https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And.html.



**Figure 4: Future global warming predicted internally by Exxon in 1980**[40]

The memo reported that such global warming would cause "increased rainfall[] and increased evaporation," which would have a "dramatic impact on soil moisture, and in turn, on agriculture." Some areas would turn to desert, and the American Midwest would become "much drier." "[W]eeds and pests," the memo reported, "would tend to thrive with increasing global average temperature." Other "serious global problems" could also arise, such as the melting of the West Antarctic ice sheet, which "could cause a rise in the sea level on the order of 5 meters." The memo called for "society" to pay the bill, estimating that some adaptive measures would cost no more than "a few percent" of Gross National Product (*i.e.*, 400 billion USD in 2018).[41] Exxon predicted that national policy action would not occur until around 1989, when the Department of Energy

---

[40] The company anticipated a doubling of carbon dioxide by around 2060 and that the oceans would delay the warming effect by a few decades, leading to approximately 3° C warming by the end of the century.

[41] *See Gross National Product*, FED. RESERVE BANK OF ST. LOUIS (updated Oct. 8, 2020), https://fred.stlouisfed.org/series/GNPA.

would finish a ten-year study of carbon dioxide and global warming.[42] Shaw also reported that Exxon had studied various responses for avoiding or reducing a carbon dioxide build-up, including "stopping all fossil fuel combustion at the 1980 rate" and "investigat[ing] the market penetration of non-fossil fuel technologies." The memo estimated that such non-fossil energy technologies "would need about 50 years to penetrate and achieve roughly half of the total [energy] market."

76. In February 1981, Exxon's Contract Research Office prepared and distributed an "Scoping Study on $CO_2$" to the leadership of Exxon Research and Engineering Company.[43] The study reviewed Exxon's current research on carbon dioxide and considered whether to expand Exxon's research on carbon dioxide or global warming further at that time. The study recommended against expanding Exxon's research activities in those areas, because its current research programs were sufficient for achieving the company's goals of closely monitoring federal research, building credibility and public relations value, and developing in-house expertise with regard to carbon dioxide and global warming. However, the study recommended that Exxon centralize its activities in monitoring, analyzing, and disseminating outside research being done on carbon dioxide and global warming. The study stated that Exxon's James Black was actively monitoring and keeping the company apprised of outside research developments, including those on climate modeling and "$CO_2$-induced effects." The study also noted that other companies in the fossil fuel industry were "auditing Government meetings on the subject." In discussing "options for reducing $CO_2$ build-up in the atmosphere," the study noted that although capturing $CO_2$ from flue gases was technologically possible, the cost was high, and "energy conservation or shifting to renewable energy sources[] represent the only options that might make sense."

---

[42] Shaw, *supra* note 39.

[43] Letter from G.H. Long, Exxon Research and Engineering Co., to P.J. Lucchesi et al., *Atmospheric CO₂ Scoping Study*, CLIMATE INVESTIGATIONS CTR. (Feb. 5, 1981), https://www.industrydocuments.ucsf.edu/docs/yxfl0228.

77.     Thus, by 1981, Exxon and other fossil fuel companies were actively monitoring all aspects of carbon dioxide and global warming research both nationally and internationally, and Exxon had recognized that a shift to renewable energy sources would be necessary to avoid a large carbon dioxide build-up in the atmosphere and resultant global warming.

78.     Exxon scientist Roger Cohen warned his colleagues in a 1981 internal memorandum that "future developments in global data gathering and analysis, along with advances in climate modeling, may provide strong evidence for a delayed $CO_2$ effect of a truly substantial magnitude," and that under certain circumstances it would be "very likely that we will unambiguously recognize the threat by the year 2000."[44] Cohen had expressed concern that the memorandum understated the potential effects of unabated $CO_2$ emissions from Defendants' fossil fuel products, saying, "it is distinctly possible that [Exxon Planning Division's] [...] scenario will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)."[45]

79.     In 1981, Exxon's Henry Shaw, the company's lead climate researcher at the time, prepared a summary of Exxon's current position on the greenhouse effect for Edward David Jr., president of Exxon Research and Engineering, stating in relevant part:

- "Atmospheric $CO_2$ will double in 100 years if fossil fuels grow at 1.4%/a"
- "3°C global average temperature rise and 10°C at poles if $CO_2$ doubles"
  - "Major shifts in rainfall/agriculture"
  - "Polar ice may melt"[46]

---

[44] Memorandum from Roger W. Cohen to W. Glass, CLIMATEFILES (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption.

[45] *Id.*

[46] Memorandum from Henry Shaw to Dr. E.E. David, *CO2 Position Statement*, INSIDE CLIMATE NEWS (May 15, 1981), https://insideclimatenews.org/documents/exxon-position-co2-1981.

80.     In 1982, another report prepared for API by scientists at the Lamont-Doherty Geological Observatory at Columbia University recognized that atmospheric $CO_2$ concentration had risen significantly from about 290 parts per million at the beginning of the industrial revolution to about 340 parts per million in 1981.[47] The report acknowledged that despite differences in climate modelers' predictions, there was scientific consensus that a doubling of atmospheric CO2 from the pre-industrial revolution value would result in a global mean temperature rise of 4°C.[48] It went further, warning that "[s]uch a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably and the world food supply can be affected."[49] Exxon's own modeling research acknowledged and confirmed this scientific consensus, and the company's results were later published in at least three peer-reviewed scientific papers.[50]

81.     Also in 1982, Exxon's Environmental Affairs Manager distributed a primer on climate change to a "wide circulation [of] Exxon management […] intended to familiarize Exxon personnel with the subject."[51] The primer was "restricted to Exxon personnel and not to be distributed externally." The primer compiled science on climate change, confirmed fossil fuel combustion as a primary anthropogenic contributor to global warming, and estimated a $CO_2$

---

[47] AM. PETROLEUM INST., CLIMATE MODELS AND CO2 WARMING: A SELECTIVE REVIEW AND SUMMARY 4 (Lamont-Doherty Geological Observatory, Columbia University, Mar. 1982), https://assets.documentcloud.org/documents/2805626/1982-API-Climate-Models-and-CO2-Warming-a.pdf.

[48] *Id.* at 5.

[49] *Id.*

[50] *See* Memorandum from Roger W. Cohen, Exxon Research and Engineering Co., to A.M. Natkin, Exxon Corp. Office of Science and Technology, CLIMATEFILES (Sept. 2, 1982), http://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research (discussing research articles).

[51] Memorandum from M.B. Glaser, Exxon Research and Engineering Co., to R.W. Cohen et al., *CO₂ "Greenhouse" Effect* (Nov. 12, 1982), https://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20 Primer%20on%20CO2%20Greenhouse%20Effect.pdf.

doubling [i.e., 580 ppm] by 2070 with a "Most Probable Temperature Increase" of more than 2°C

over the 1979 level, as shown in the Figure below.



**Figure 5: Exxon's internal prediction of future carbon dioxide increase
and global warming from 1982[52]**

The report also warned of "uneven global distribution of increased rainfall and increased

evaporation," that "disturbances in the existing global water distribution balance would have

dramatic impact on soil moisture, and in turn, on agriculture," and that the American Midwest

would dry out. In addition to effects on global agriculture, the report stated, "there are some

potentially catastrophic effects that must be considered." Melting of the Antarctic ice sheet could

result in global sea level rise of five meters, which would "cause flooding on much of the U.S.

---

[52] The company predicted a doubling of atmospheric carbon dioxide concentrations above pre-industrial levels by around 2070 (left curve), with a temperature increase of more than 2°Cover the 1979 level (right curve). The same document indicated that Exxon estimated that by 1979 a global warming effect of approximately 0.25°C may already have occurred.

East Coast, including the State of Florida and Washington, D.C." Weeds and pests would "tend to thrive with increasing global temperature." The primer warned of "positive feedback mechanisms" in polar regions, which could accelerate global warming, such as deposits of peat "containing large reservoirs of organic carbon" becoming "exposed to oxidation" and releasing their carbon into the atmosphere. "Similarly," the primer warned, "thawing might also release large quantities of carbon currently sequestered as methane hydrates" on the sea floor. "All biological systems are likely to be affected," and "the most severe economic effects could be on agriculture." The report recommended studying "soil erosion, salinization, or the collapse of irrigation systems" in order to understand how society might be affected and might respond to global warming, as well as "[h]ealth effects" and "stress associated with climate related famine or migration[.]" The report estimated that undertaking "[s]ome adaptive measures" (not all of them) would cost "a few percent of the gross national product estimated in the middle of the next century" (i.e., 400 billion USD in 2018).[53] To avoid such impacts, the report discussed an analysis from the Massachusetts Institute of Technology and Oak Ridge National Laboratory, which studied energy alternatives and requirements for introducing them into widespread use, and which recommended that "vigorous development of non-fossil energy sources be initiated as soon as possible."[54] The primer also noted that other greenhouse gases related to fossil fuel production, such as methane, could contribute significantly to global warming, and that concerns over carbon dioxide could be reduced if fossil fuel use were decreased due to "high price, scarcity, [or] unavailability." "Mitigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion," the primer stated. The primer was widely distributed to Exxon leadership.

---

[53] *See Gross National Product*, *supra* note 41.

[54] M.B. Glaser, *supra* note 51.

61

82.     In September 1982, the Director of Exxon's Theoretical and Mathematical Sciences Laboratory, Roger Cohen, wrote Alvin Natkin of Exxon's Office of Science and Technology to summarize Exxon's internal research on climate modeling.[55] Cohen reported:

> [O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$. The consensus is that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)°C$. […] The temperature rise is predicted to be distributed nonuniformly over the earth, with above-average temperature elevations in the polar regions and relatively small increases near the equator. There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations of the biosphere. The time required for doubling of atmospheric $CO_2$ depends on future world consumption of fossil fuels.

Cohen described Exxon's own climate modeling experiments, reporting that they produced "a global averaged temperature increase that falls well within the range of the scientific consensus," were "consistent with the published predictions of more complex climate models," and were "also in agreement with estimates of the global temperature distribution during a certain prehistoric period when the earth was much warmer than today." "In summary," Cohen wrote, "the results of our research are in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate." Cohen noted that the results would be presented to the scientific community by Exxon's collaborator Martin Hoffert at a Department of Energy meeting, as well as by Exxon's Brian Flannery at the Exxon-supported Ewing Symposium, later that year.

83.     In October 1982, at the fourth biennial Maurice Ewing Symposium at the Lamont-Doherty Geophysical Observatory which was attended by members of API and the Exxon Research and Engineering Company, the Observatory's president E. E. David delivered a speech

---

[55] Cohen, *supra* note 50.

titled: "Inventing the Future: Energy and the $CO_2$ 'Greenhouse Effect.'"[56] His remarks included the following statement: "Few people doubt that the world has entered an energy transition away from dependence upon fossil fuels and toward some mix of renewable resources that will not pose problems of $CO_2$ accumulation." He went on, discussing the human opportunity to address anthropogenic climate change before the point of no return:

> It is ironic that the biggest uncertainties about the $CO_2$ buildup are not in predicting what the climate will do, but in predicting what people will do. . . .[It] appears we still have time to generate the wealth and knowledge we will need to invent the transition to a stable energy system.

84.     Throughout the early 1980s, at Exxon's direction, Exxon climate scientist Henry Shaw forecasted emissions of $CO_2$ from fossil fuel use. Those estimates were incorporated into Exxon's 21st century energy projections and were distributed among Exxon's various divisions. Shaw's conclusions included an expectation that atmospheric $CO_2$ concentrations would double by 2090 per the Exxon model, with an attendant 2.3–5.6° F average global temperature increase. Shaw compared his model results to those of the EPA, the National Academy of Sciences, and the Massachusetts Institute of Technology, indicating that the Exxon model predicted a longer delay than any of the other models, although its temperature increase prediction was in the mid-range of the four projections.[57]

85.     During the 1980s, many Defendants formed their own research units focused on climate modeling. The API, including the API $CO_2$ Task Force, provided a forum for Defendants

---

[56] Dr. E.E. David, Jr., President, Exxon Research and Engineering Co., Remarks at the Fourth Annual Ewing Symposium, Tenafly, NJ, CLIMATEFILES (Oct. 26, 1982), http://www.climatefiles.com/exxonmobil/inventing-future-energy-co2-greenhouse-effect.

[57] Neela Banerjee, *More Exxon Documents Show How Much It Knew About Climate 35 Years Ago*, INSIDE CLIMATE NEWS (Dec. 1, 2015), https://insideclimatenews.org/news/01122015/documents-exxons-early-co2-position-senior-executives-engage-and-warming-forecast.

to share their research efforts and corroborate their findings related to anthropogenic greenhouse gas emissions.[58]

86. During this time, Defendants' statements expressed an understanding of their obligation to consider and mitigate the externalities of unabated promotion, marketing, and sale of their fossil fuel products. For example, in 1988, Richard Tucker, the president of Mobil Oil, presented at the American Institute of Chemical Engineers National Meeting, the premier educational forum for chemical engineers, where he stated:

> [H]umanity, which has created the industrial system that has transformed civilization, is also responsible for the environment, which sometimes is at risk because of unintended consequences of industrialization. . . . [M]aintaining the health of this life-support system is emerging as one of the highest priorities. . . . [W]e must all be environmentalists.
>
> . . .
>
> The environmental covenant requires action on many fronts . . . the low-atmosphere ozone problem, the upper-atmosphere ozone problem and the greenhouse effect, to name a few. . . . Our strategy must be to reduce pollution before it is ever generated—to prevent problems at the source.
>
> . . .
>
> Prevention means engineering a new generation of fuels, lubricants and chemical products. . . . Prevention means designing catalysts and processes that minimize or eliminate the production of unwanted byproducts. . . . Prevention on a global scale may even require a dramatic reduction in our dependence on fossil fuels—and a shift towards solar, hydrogen, and safe nuclear power. It may be possible that—just possible—that the energy industry will transform itself so completely that observers will declare it a new industry. . . . Brute force, low-tech responses and money alone won't meet the challenges we face in the energy industry.[59]

87. Also in 1988, the Shell Greenhouse Effect Working Group issued a confidential internal report, "The Greenhouse Effect," which acknowledged global warming's anthropogenic

---

[58] Banerjee, *supra* note 35.

[59] Richard F. Tucker, *High Tech Frontiers in the Energy Industry: The Challenge Ahead*, Address at the AIChE National Meeting, Washington, D.C. (Nov. 30, 1988), https://babel.hathitrust.org/cgi/pt?id=pur1.32754074119482&view=1up&seq=531&q1=humanity%20industrial%20 system%20civilization.

nature: "Man-made carbon dioxide, released into and accumulated in the atmosphere, is believed to warm the earth through the so-called greenhouse effect." The authors also noted the burning of fossil fuels as a primary driver of $CO_2$ buildup and warned that warming could "create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather." They further pointed to the potential for "[d]irect operational consequences" of sea level rise on "offshore installations, coastal facilities and operations (*e.g.* platforms, harbors, refineries, depots)."[60]

88.     Similar to early warnings by Exxon scientists, the Shell report notes that "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation." The authors mention the need to consider policy changes on multiple occasions, noting that "[t]he potential implications for the world are . . . so large that policy options need to be considered much earlier" and that research should be "directed more to the analysis of policy and energy options than to studies of what we will be facing exactly."

89.     In 1989, Esso Resources Canada (ExxonMobil) commissioned a report on the impacts of climate change on existing and proposed natural gas facilities in the Mackenzie River Valley and Delta, including extraction facilities on the Beaufort Sea and a pipeline crossing Canada's Northwest Territory.[61] It reported that "large zones of the Mackenzie Valley could be affected dramatically by climatic change" and that "[t]he greatest concern in Norman Wells [oil town in North West Territories, Canada] should be the changes in permafrost that are likely to

---

[60] SHELL INTERNATIONALE PETROLEUM, GREENHOUSE EFFECT WORKING GROUP, THE GREENHOUSE EFFECT (May 1988), https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239.

[61] *See* Stephen Lonergan & Kathy Young, *An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic*, 7 ENERGY EXPLORATION & EXPLOITATION 359–81 (1989).

occur under conditions of climate warming."[62] The report concluded that, in light of climate models showing a "general tendency towards warmer and wetter climate," operation of those facilities would be compromised by increased precipitation, increase in air temperature, changes in permafrost conditions, and significantly, sea level rise and erosion damage.[63] The authors recommended factoring those eventualities into future development planning and also warned that "[a] rise in sea level could cause increased flooding and erosion damage on Richards Island."

90.      Ken Croasdale, a senior ice researcher for Exxon's subsidiary Imperial Oil, stated to an audience of engineers in 1991 that greenhouse gases are rising "due to the burning of fossil fuels. Nobody disputes this fact."[64]

91.      Also in 1991, Shell produced a film called "Climate of Concern." The film advises that while "no two [climate change projection] scenarios fully agree, . . . [they] have each prompted the same serious warning. A warning endorsed by a uniquely broad consensus of scientists in their report to the UN at the end of 1990." The warning was an increasing frequency of abnormal weather, and of sea level rise of about one meter over the coming century. Shell specifically described the impacts of anthropogenic sea level rise on tropical islands, "barely afloat even now, . . . [f]irst made uninhabitable and then obliterated beneath the waves. Wetland habitats destroyed by intruding salt. Coastal lowlands suffering pollution of precious groundwater." It warned of "greenhouse refugees," people who abandoned homelands inundated by the sea, or were displaced because of catastrophic changes to the environment. The video concludes with a stark admonition:

---

[62] *Id.* at 369, 376.

[63] *Id.* at 360, 377–78.

[64] RONALD C. KRAMER, CARBON CRIMINALS, CLIMATE CRIMES 66 (1st ed. 2020).

"Global warming is not yet certain, but many think that the wait for final proof would be irresponsible. Action now is seen as the only safe insurance."[65]

92. Also in 1991, BP released a short film called "The Earth – What Makes Weather?" In it, a narrator states: "Our . . . dependence on carbon-based fuels is now a cause for concern. When coal, oil or gas are burned, they release carbon dioxide and other reactive gases." The narrator then goes on to explain:

> As the earth gives off heat, carbon dioxide, together with water vapor, absorbs and radiates it back, acting like a blanket. . . . If world population growth is matched by energy consumption, even more carbon dioxide will be released, making this greenhouse effect even stronger. An overall increase in temperature of even a few degrees could disrupt our climate with devastating consequences. If the oceans got warmer and the ice sheets began to melt, sea levels would rise, encroaching on coastal lowlands. From warmer seas, more water would evaporate, making storms and the havoc they cause more frequent. . . . Catastrophic floods could become commonplace, and low-lying countries like Bangladesh would be defenseless against them. Too much water or too little. Away from the coasts we could see a return to the conditions which devastated America's Midwest in the 1930s. Global warming could repeat on a more disastrous scale the dustbowl phenomenon which virtually destroyed farming on the Great Plains. . . . The threat of such climatic change is now one of our most urgent concerns.[66]

The film was not widely distributed.

93. The fossil fuel industry was at the forefront of carbon dioxide research for much of the latter half of the 20th century. It developed cutting edge and innovative technology and worked with many of the field's top researchers to produce exceptionally sophisticated studies and models. For instance, in the mid-nineties Shell began using scenarios to plan how the company could

---

[65] Jelmer Mommers, *Shell Made a Film About Climate Change in 1991 (Then Neglected to Heed Its Own Warning)*, DE CORRESPONDENT (Feb. 28, 2017), https://thecorrespondent.com/6285/shell-made-a-film-about-climate-change-in-1991-then-neglected-to-heed-its-own-warning.

[66] Vatan Hüzeir, *BP Knew the Truth About Climate Change 30 Years Ago*, FOLLOW THE MONEY (May 26, 2020), https://www.ftm.nl/artikelen/bp-video-climate-change-1990-engels; *see also* BP Video Library, *This Earth – What Makes Weather?* (1991), https://www.bpvideolibrary.com/record/463.

respond to various global forces in the future. In one scenario published in a 1998 internal report, Shell paints an eerily prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the U.S. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry or the government. After all, two successive IPCC reports since 1993 have reinforced the human connection to climate change . . . Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[67]

94.      Fossil fuel companies did not just consider climate change impacts in scenarios. In the mid-1990s, ExxonMobil, Shell, and Imperial Oil (ExxonMobil) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's own Environmental Impact Statement declared: "The impact of a global warming sea-level rise may be particularly significant in Nova Scotia. The long-term tide gauge records at a number of locations along the N.S. coast have shown sea level has been rising over the past century. . . . For the design of coastal and offshore structures, an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for the proposed project life (25 years)."[68]

95.      Climate change research conducted by Defendants and their industry associations frequently acknowledged uncertainties in their climate modeling—those uncertainties, however, were merely with respect to the magnitude and timing of climate impacts resulting from fossil fuel consumption, not that significant changes would eventually occur. The Defendants' researchers

---

[67] ROYAL DUTCH/SHELL GROUP, GROUP SCENARIOS 1998–2020 115, 122 (1998), http://www.documentcloud.org/documents/4430277-27-1-Compiled.html.

[68] EXXONMOBIL, SABLE PROJECT DEVELOPMENT PLAN, vol. 3, 4–77, http://soep.com/about-the-project/development-plan-application.

and the researchers at their industry associations harbored little doubt that climate change was occurring and that fossil fuel products were, and are, the primary cause.

96. Despite the overwhelming information about the threats to people and the planet posed by continued unabated use of their fossil fuel products, Defendants failed to act as they reasonably should have to mitigate or avoid those dire adverse impacts. Defendants instead adopted the position, as described below, that they had a license to continue the unfettered pursuit of profits from those products. This position was an abdication of Defendants' responsibility to consumers and the public, including the County, to act on their unique knowledge of the reasonably foreseeable hazards of unabated production and consumption of their fossil fuel products.

**D. Defendants Did Not Disclose Known Harms Associated with the Extraction, Promotion, and Consumption of Their Fossil Fuel Products, and Instead Affirmatively Acted to Obscure Those Harms and Engaged in a Campaign to Deceptively Protect and Expand the Use of Their Fossil Fuel Products.**

97. By 1988, Defendants had amassed a compelling body of knowledge about the role of anthropogenic greenhouse gases, and specifically those emitted from the normal use of Defendants' fossil fuel products, in causing global warming and its cascading impacts, including disruptions to the hydrologic cycle, extreme precipitation and drought, heatwaves, and associated consequences for human communities and the environment. On notice that their products were causing global climate change and dire effects on the planet, Defendants faced the decision whether or not to take steps to limit the damages their fossil fuel products were causing and would continue to cause Earth's inhabitants, including the people of the County.

98. Defendants at any time before or thereafter could and reasonably should have taken any number of steps to mitigate the damages caused by their fossil fuel products, and their own comments reveal an awareness of what some of those steps should have been. Defendants should have warned consumers, the public, and regulators of the dangers known to Defendants of the

69

unabated consumption of their fossil fuel products, and they could and should have taken reasonable steps to limit the potential greenhouse gas emissions arising out of their fossil fuel products.

99.     Several key events during the period 1988–1992 appear to have prompted Defendants to change their tactics from general research and internal discussion on climate change to a public campaign aimed at deceiving the public about and evading regulation of their fossil fuel products and/or emissions therefrom. They include:

a.     In 1988, National Aeronautics and Space Administration (NASA) scientists confirmed that human activities were actually contributing to global warming.[69] On June 23rd of that year, NASA scientist James Hansen's presentation of this information to Congress engendered significant news coverage and publicity for the announcement, including coverage on the front page of the *New York Times*. In that Congressional hearing Hansen asserted "with 99% confidence" that global warming was already occurring.[70]

b.     On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors introduced S. 2666, "The Global Environmental Protection Act," to regulate $CO_2$ and other greenhouse gases. Four more bipartisan bills to significantly reduce $CO_2$ pollution were introduced over the following ten weeks, and in August, U.S. Presidential candidate George H.W. Bush pledged that his presidency would combat the greenhouse effect with "the White House effect."[71] Political will in the United States to reduce anthropogenic greenhouse gas emissions and mitigate the harms associated with Defendants' fossil fuel products was gaining momentum.

---

[69] *See* Peter C. Frumhoff et al., *The Climate Responsibilities of Industrial Carbon Producers*, 132 CLIMATIC CHANGE 157, 161 (2015).

[70] Amy Lieberman & Susanne Rust, *Big Oil Braced for Global Warming While It Fought Regulations*, L.A. TIMES (Dec. 31, 2015), https://graphics.latimes.com/oil-operations.

[71] *The White House and the Greenhouse*, N.Y. TIMES (May 9, 1989), http://www.nytimes.com/1989/05/09/opinion/the-white-house-and-the-greenhouse.html.

c.      In December 1988, the United Nations formed the Intergovernmental Panel on Climate Change (IPCC), a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

d.      In 1990, the IPCC published its First Assessment Report on anthropogenic climate change,[72] in which it concluded that (1) "there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be," and (2) that

> emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapour, will increase in response to global warming and further enhance it.[73]

The IPCC reconfirmed those conclusions in a 1992 supplement to the First Assessment report.[74]

e.      The United Nations began preparing for the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of 172 world governments, of which 116 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change (UNFCCC), an international environmental treaty providing protocols for future negotiations aimed at "stabiliz[ing] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."[75]

100.    Those world events marked a shift in public discussion of climate change and its consequences, and the initiation of international efforts to curb anthropogenic greenhouse

---

[72] *See* IPCC, Reports, https://www.ipcc.ch/reports.

[73] IPCC, Climate Change: The IPCC Scientific Assessment xi (1990), https://archive.ipcc.ch/ipccreports/far/wg_I/ipcc_far_wg_I_spm.pdf.

[74] IPCC, 1992 IPCC Supplement to the First Assessment Report (1992).

[75] United Nations Framework Convention on Climate Change, art. 2 (1992), https://unfccc.int/resource/docs/convkp/conveng.pdf.

71

emissions—developments that had stark implications for, and would have diminished the profitability of, Defendants' fossil fuel products.

101.   But rather than collaborating with the international community by acting to forestall, or at least decrease, their fossil fuel products' contributions to global warming, and its impacts, including sea level rise, disruptions to the hydrologic cycle, and associated consequences to the County and other communities, Defendants embarked on a decades-long campaign of deception designed to maximize continued dependence on their products and undermine national and international efforts to rein in greenhouse gas emissions.

102.   Defendants' campaign to conceal, discredit, and/or misrepresent information that tended to support restricting consumption of (and thereby decreasing demand for) Defendants' fossil fuel products, took several forms. The campaign enabled Defendants to accelerate their business practice of exploiting fossil fuel reserves, and concurrently externalize the social and environmental costs of their fossil fuel products. Those activities stood in direct contradiction to Defendants' own prior recognition that the science of anthropogenic climate change was clear and that action was needed to avoid or mitigate dire consequences to the planet and communities like the County.

103.   Defendants took affirmative steps to conceal, from the County and the general public, the foreseeable impacts of the use of their fossil fuel products on the Earth's climate and associated harms to people and communities. As described below, Defendants embarked on a concerted public-relations campaign to cast doubt on the science connecting global climate change to fossil fuel products and greenhouse gas emissions, in order to influence public perception of the existence of anthropogenic global warming and sea level rise, disruptions to weather cycles, extreme precipitation and drought, and other associated consequences. The effort included

72

promoting their hazardous products through advertising campaigns that failed to warn of the existential risks associated with the use of those products, and the initiation and funding of climate change denialist organizations, designed to influence consumers to continue using Defendants' fossil fuel products irrespective of those products' damage to communities and the environment.

104.    For example, in 1988, Joseph Carlson, an Exxon public affairs manager, described the "Exxon Position," which included, among others, two important messaging tenets: (1) "[e]mphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse Effect"; and (2) "[r]esist the overstatement and sensationalization [sic] of potential greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."[76]

105.    Reflecting on his time as an Exxon consultant in the 1980s, Professor Martin Hoffert, a former New York University physicist who researched climate change, expressed regret over Exxon's "climate science denial program campaign" in his sworn testimony before Congress:

> [O]ur research [at Exxon] was consistent with findings of the United Nations Intergovernmental Panel on Climate Change on human impacts of fossil fuel burning, which is that they are increasingly having a perceptible influence on Earth's climate. . . . If anything, adverse climate change from elevated CO2 is proceeding faster than the average of the prior IPCC mild projections and fully consistent with what we knew back in the early 1980's at Exxon. . . . I was greatly distressed by the climate science denial program campaign that Exxon's front office launched around the time I stopped working as a consultant—but not collaborator— for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[77]

---

[76] Memorandum from Joseph M. Carlson, *The Greenhouse Effect* (Aug. 3, 1988), https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-Greenhouse-Effect.pdf.

[77] *Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change*, Hearing Before the Subcomm. *On Civil Rights and Civil Liberties of the Comm. On Oversight and Reform*, 116th Cong. 7–8 (Oct. 23, 2019) (statement of Martin Hoffert, Former Exxon Consultant, Professor Emeritus, Physics, N.Y. Univ.), https://oversight.house.gov/legislation/hearings/examining-the-oil-industry-s-efforts-to-suppress-the-truth-about-climate-change.

73

106. A 1994 Shell report entitled "The Enhanced Greenhouse Effect: A Review of the Scientific Aspects" by Royal Dutch Shell environmental advisor Peter Langcake stands in stark contrast to the company's 1988 report on the same topic. Whereas before, the authors recommended considering policy solutions early on, Langcake warned of the potentially dramatic "economic effects of ill-advised policy measures." While the report recognized the IPCC conclusions as the mainstream view, Langcake still emphasized scientific uncertainty, noting, for example, that "[t]he postulated link between any observed temperature rise and human activities has to be seen in relation to natural variability, which is still largely unpredictable." The Shell Group position is stated clearly in the report: "Scientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas emissions beyond 'no regrets' measures could be premature, divert resources from more pressing needs and further distort markets."[78]

107. In 1991, for example, the Information Council for the Environment ("ICE"), whose members included affiliates, predecessors and/or subsidiaries of Defendants, launched a national climate change science denial campaign with full-page newspaper ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. Included among the campaign strategies was "[r]eposition[ing] global warming as theory (not fact)." Its target audience included older less-educated males who are "predisposed to favor the ICE agenda, and likely to be even more supportive of that agenda following exposure to new info."[79] ICE also targeted younger, lower-income women with its deceptive messages, noting that:

---

[78] P. LANGCAKE, SHELL INTERNATIONALE PETROLEUM, THE ENHANCED GREENHOUSE EFFECT: A REVIEW OF THE SCIENTIFIC ASPECTS (Dec. 1994), https://www.documentcloud.org/documents/4411099-Document11.html#document/p15/a411511.

[79] UNION OF CONCERNED SCIENTISTS, *Deception Dossier #5: Coal's Information Council on the Environment" Sham* (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf (last visited Oct. 8, 2020); *see also* Kathy Mulvey et al., *The Climate Deception Dossiers* (Union of Concerned Scientists, July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf.

These women are more receptive than other audience segments to factual information concerning evidence for global warming. They are likely to be "green" consumers, to believe the earth is warming, and to think the problem is serious. However, they are also likely to soften their support for federal legislation after hearing new information on global warming.[80]

108.    A goal of ICE's advertising campaign was to change public opinion and avoid regulation. A memo from Richard Lawson, president of the National Coal Association, asked members to contribute to the ICE campaign with the justification that "policymakers are prepared to act [on global warming]. Public opinion polls reveal that 60% of the American people already believe global warming is a serious environmental problem. Our industry cannot sit on the sidelines in this debate."[81]

109.    The following images are examples of ICE-funded print advertisements challenging the validity of climate science and intended to obscure the scientific consensus on anthropogenic climate change and induce political inertia to address it.[82]

  

**Figure 6: Information Council for the Environment Advertisements**

[80] *Id.*

[81] Naomi Oreskes, *My Facts Are Better Than Your Facts: Spreading Good News About Global Warming* (2010), in PETER HOWLETT ET AL., HOW WELL DO FACTS TRAVEL?: THE DISSEMINATION OF RELIABLE KNOWLEDGE 136–66, (Cambridge University Press, 2011).

[82] UNION OF CONCERNED SCIENTISTS, *supra* note 79, at 47–49.

110.    In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." Exxon CEO Lee Raymond wrote the publication's preface in which he inaccurately stated that "[t]aking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." Raymond also misleadingly implied that climate change was an "unproven theory" and claimed that "a multinational effort, under the auspices of the United Nations, is underway to cut the use of fossil fuels, based on the unproven theory that they affect the earth's climate." Raymond concluded his preface by attacking advocates for limiting the use of his company's fossil fuel products as "drawing on bad science, faulty logic, or unrealistic assumptions." He failed to mention Exxon's contrary findings such as those in the 1982 Cohen Memo.[83]

111.    The publication itself described the greenhouse effect as "unquestionably real and definitely a good thing," while ignoring the severe consequences that would result from the influence of the increased $CO_2$ concentration on the Earth's climate. Instead, it characterized the greenhouse effect as simply "what makes the earth's atmosphere livable." Directly contradicting Exxon's own knowledge and peer-reviewed science, the publication ascribed the rise in temperature since the late 19th century to "natural fluctuations that occur over long periods of time" rather than to the anthropogenic emissions that Exxon itself and other scientists had confirmed were responsible. The publication also falsely challenged the computer models that projected the future impacts of unabated fossil fuel product consumption, including those developed by Exxon's own employees, as having been "proved to be inaccurate." The publication contradicted the numerous reports prepared by and circulated among Exxon's own staff, and by the API, stating

---

[83] EXXON CORP., *Global Warming: Who's Right?* (1996), https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right.html.

that "the indications are that a warmer world would be far more benign than many imagine . . . moderate warming would reduce mortality rates in the U.S., so a slightly warmer climate would be more healthful." The publication did not mention Exxon's earlier conclusion that significant sea level rise would cause catastrophic flooding.

112.    API published an extensive report in the same year warning against concern over $CO_2$ buildup and any need to curb consumption or regulate the fossil fuel industry. The introduction stated that "there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil." The authors discouraged the further development of certain alternative energy sources, writing that "government agencies have advocated the increased use of ethanol and the electric car, without the facts to support the assertion that either is superior to existing fuels and technologies" and that "[p]olicies that mandate replacing oil with specific alternative fuel technologies freeze progress at the current level of technology, and reduce the chance that innovation will develop better solutions." The paper also denied the human connection to climate change, by falsely stating that no "scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms." The report's message was false but clear: "[F]acts don't support the arguments for restraining oil use."[84]

113.    In a speech presented at the World Petroleum Congress in Beijing in 1997 at which many of the Defendants were present, Exxon CEO Lee Raymond reiterated those views. This time, he presented a false dichotomy between stable energy markets and abatement of the marketing, promotion, and sale of fossil fuel products Defendants knew to be hazardous. He stated:

> [T]here are some people who argue that we should drastically curtail our use of
> fossil fuels for environmental reasons. . . . [M]y belief [is] that such proposals are

---

[84] SALLY BRAIN GENTILLE ET AL., AMERICAN PETROLEUM INST., REINVENTING ENERGY: MAKING THE RIGHT CHOICES (1996), http://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy.

77

neither prudent nor practical. With no readily available economic alternatives on the horizon, fossil fuels will continue to supply most of the world's and this region's energy for the foreseeable future.

. . .

Governments also need to provide a stable investment climate. . . . They should avoid the temptation to intervene in energy markets in ways that give advantage to one competitor over another—or one fuel over another.

. . .

We also have to keep in mind that most of the greenhouse effect comes from natural sources. . . . Leaping to radically cut this tiny sliver of the greenhouse pie on the premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.

. . .

[L]et's agree there's a lot we really don't know about how climate will change in the 21st century and beyond. . . . It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now. . . . [I]t's bad public policy to impose very costly regulations and restrictions when their need has yet to be proven.[85]

114.    Imperial Oil (ExxonMobil) CEO Robert Peterson falsely denied the established

connection between Defendants' fossil fuel products and anthropogenic climate change in the

Summer 1998 Imperial Oil Review, "A Cleaner Canada":

[T]his issue [referring to climate change] has absolutely nothing to do with pollution and air quality. Carbon dioxide is not a pollutant but an essential ingredient of life on this planet. . . . [T]he question of whether or not the trapping of "greenhouse" gases will result in the planet's getting warmer . . . has no connection whatsoever with our day-to-day weather.

. . .

There is absolutely no agreement among climatologists on whether or not the planet is getting warmer, or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate. . . . I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[86]

---

[85] Lee R. Raymond, Chairman and Chief Executive Officer, Exxon Corp., Address at the World Petroleum Congress (Oct. 13, 1997), https://assets.documentcloud.org/documents/2840902/1997-Lee-Raymond-Speech-at-China-World-Petroleum.pdf.

[86] Robert Peterson, *A Cleaner Canada*, IMPERIAL OIL REVIEW (Summer 1998), https://www.desmogblog.com/sites/beta.desmogblog.com/files/A%20Cleaner%20Canada%20Imperial%20Oil.pdf.

115.    Mobil (ExxonMobil) paid for a series of "advertorials," advertisements located in the editorial section of the *New York Times* and meant to look like editorials rather than paid ads. Those ads discussed various aspects of the public discussion of climate change and sought to undermine the justifications for tackling greenhouse gas emissions as unsettled science. The 1997 advertorial below[87] argued that economic analysis of emissions restrictions was faulty and inconclusive and therefore a justification for delaying action on climate change.

---

[87] Mobil, *When Facts Don't Square with the Theory, Throw Out the Facts*, N.Y. TIMES A31 (Aug. 14, 1997), https://www.documentcloud.org/documents/705550-mob-nyt-1997-aug-14-whenfactsdontsquare.html.

# When facts don't square with the theory, throw out the facts



That seems to characterize the administration's attitude on two of its own studies which show that international efforts to curb global warming could spark a big run-up in energy prices.

For months, the administration—playing its cards close to the vest—has promised to provide details of the emission reduction plan it will put on the table at the climate change meeting in Kyoto, Japan, later this year. It also promised to evaluate the economics of that policy and measure its impact. Those results are important because proposals submitted by other countries thus far would be disruptive and costly to the U.S. economy.

Yet, when the results from its own economic models were finally generated, the administration started distancing itself from the findings and models that produced them. The administration's top economic advisor said that economic models can't provide a "definitive answer" on the impact of controlling emissions. The effort, he said, was "futile." At best, the models can only provide a "range of potential impacts."

Frankly, we're puzzled. The White House has promised to lay the economic facts before the public. Yet, the administration's top advisor said such an analysis won't be based on models and it will "preclude...detailed numbers." If you don't provide numbers and don't rely on models, what kind of rigorous economic examination can Congress and the public expect?

We're also puzzled by ambivalence over models. The administration downplays the utility of economic models to forecast cost impacts 10–15 years from now, yet its negotiators accept as gospel the 50–100-year predictions of global warming that have been generated by climate models—many of which have been criticized as seriously flawed.

The second study, conducted by Argonne National Laboratory under a contract with the Energy Department, examined what would happen if the U.S. had to commit to higher energy prices under the emission reduction plans that several nations had advanced last year. Such increases, the report concluded, would result in "significant reductions in output and employment" in six industries—aluminum, cement, chemical, paper and pulp, petroleum refining and steel.

Hit hardest, the study noted, would be the chemical industry, with estimates that up to 30 percent of U.S. chemical manufacturing capacity would move offshore to developing countries. Job losses could amount to some 200,000 in that industry, with another 100,000 in the steel sector. And despite the substantial loss of U.S. jobs and manufacturing capacity, the net emission reduction could be insignificant since developing countries will not be bound by the emission targets of a global warming treaty.

Downplaying Argonne's findings, the Energy Department noted that the study used outdated energy prices (mid-1996), didn't reflect the gains that would come from international emissions trading and failed to factor in the benefits of accelerated developments in energy efficiency and low-carbon technologies.

What it failed to mention is just what these new technologies are and when we can expect their benefits to kick in. As for emissions trading, many economists have theorized about the role they could play in reducing emissions, but few have grappled with the practicality of implementing and policing such a scheme.

We applaud the goals the U.S. wants to achieve in these upcoming negotiations—namely, that a final agreement must be "flexible, cost-effective, realistic, achievable and ultimately global in scope." But until we see the details of the administration's policy, we are concerned that plans are being developed in the absence of rigorous economic analysis. Too much is at stake to simply ignore facts that don't square with preconceived theories.



**Mobil** The energy to make a difference.

http://www.mobil.com                    ©1997 Mobil Corporation

**Figure 7: 1997 Mobil Advertorial**

116. In 2000, an ExxonMobil newspaper advertisement misleadingly implied that the same climate models it relied on internally were unreliable: "Today's global models simply don't work at a regional level." It went on to assert that the National Assessment Synthesis Report (on climate change) "is written as a political document, not an objective summary of the underlying science." The advertisement failed to disclose what ExxonMobil's own internal documents had already confirmed: that burning fossil fuels would result in catastrophic climate change.[88]

117. In 1998, API, on behalf of its members, developed a Global Climate Science Communications Plan that stated that unless "climate change becomes a non-issue . . . there may be no moment when we can declare victory for our efforts." Rather, API proclaimed that "[v]ictory will be achieved when . . . average citizens 'understand' (recognize) uncertainties in climate science; [and when] recognition of uncertainties becomes part of the 'conventional wisdom.'"[89] The multi-million-dollar, multi-year proposed budget included public outreach and the dissemination of educational materials to schools to "begin to erect a barrier against further efforts to impose Kyoto-like measures in the future"[90]—a blatant attempt to disrupt international efforts, pursuant to the UNFCCC, to negotiate a treaty that curbed greenhouse gas emissions.

118. Soon after, API distributed a memo to its members illuminating API's and Defendants' concern over the potential regulation of Defendants' fossil fuel products: "Climate is at the center of the industry's business interests. Policies limiting carbon emissions reduce

---

[88] ExxonMobil, *Political cart before a scientific horse*, WASH. POST (2000), https://www.documentcloud.org/documents/2477866-exxon-ad.html.

[89] Email from Joe Walker to Global Climate Science Team, *Draft Global Climate Science Communications Plan* (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

[90] *Id.*

petroleum product use. That is why it is API's highest priority issue and defined as 'strategic.'"[91] Further, the API memo stresses many of the strategies that Defendants individually and collectively utilized to combat the perception of their fossil fuel products as hazardous. They included:

a. Influencing the tenor of the climate change "debate" as a means to establish that greenhouse gas reduction policies like the Kyoto Protocol were not necessary to responsibly address climate change;

b. Maintaining strong working relationships between government regulators and communications-oriented organizations like the Global Climate Coalition, the Heartland Institute, and other groups carrying Defendants' message minimizing the hazards of the unabated use of their fossil fuel products and opposing regulation thereof;

c. Building the case for (and falsely dichotomizing) Defendants' positive contributions to a "long-term approach" (ostensibly for regulation of their products) as a reason for society to reject short term fossil fuel emissions regulations, and engaging in climate change science uncertainty research; and

d. Presenting Defendants' positions on climate change in domestic and international forums, including by preparing rebuttals to IPCC reports.

119. Additionally, Defendants mounted a deceptive public campaign against regulation of their business practices in order to continue wrongfully promoting and marketing their fossil fuel products, despite their own knowledge and the growing national and international scientific consensus about the hazards of doing so.

---

[91] *Allegations of Political Interference with Government Climate Change Science, Hearing Before the Comm. on Oversight and Government Reform,* 110th Cong. 324 (Mar. 19, 2007), https://ia601904.us.archive.org/25/items/gov.gpo.fdsys.CHRG-110hhrg37415/CHRG-110hhrg37415.pdf.

120. The Global Climate Coalition (GCC), on behalf of Defendants and other fossil fuel companies, funded deceptive advertising campaigns and distributed misleading material to generate public uncertainty around the climate debate, with the specific purpose of preventing U.S. adoption of the Kyoto Protocol, despite the leading role that the U.S. had played in the Protocol negotiations.[92] Despite an internal primer stating that various "contrarian theories" (i.e., climate change skepticism) do not "offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change," GCC excluded this section from the public version of the backgrounder[93] and instead funded and promoted some of those same contrarian theories. Between 1989 and 1998, the GCC spent $13 million on advertisements as part of a campaign to cast doubt on climate science.[94]

121. For example, in a 1994 report, the GCC stated that "observations have not yet confirmed evidence of global warming that can be attributed to human activities," that "[t]he claim that serious impacts from climate change have occurred or will occur in the future simply has not been proven," and "[c]onsequently, there is no basis for the design of effective policy action that would eliminate the potential for climate change."[95] In 1995, the GCC published a booklet called "Climate Change: Your Passport to the Facts," which stated, "While many warnings have reached the popular press about the consequences of a potential man-made warming of the Earth's

---

[92] *Id.*

[93] Memorandum from Gregory J. Dana, Assoc. of Int'l Auto. Mfrs., to AIAM Technical Committee, *Global Climate Coalition (GCC) - Primer on Climate Change Science - Final Draft* (Jan. 18, 1996), http://www.webcitation.org/6FyqHawb9.

[94] Wendy E. Franz, Kennedy School of Government, Harvard University, *Science, Skeptics and Non-State Actors in the Greenhouse*, ENRP Discussion Paper E-98-18, at 13 (Sept. 1998), https://www.belfercenter.org/sites/default/files/legacy/files/Science%20Skeptics%20and%20Non-State%20Actors%20in%20the%20Greenhouse%20-%20E-98-18.pdf.

[95] GCC, *Issues and Options: Potential Global Climate Change*, CLIMATE FILES (1994), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1994-potential-global-climate-change-issues.

atmosphere during the next 100 years., there remains no scientific evidence that such a dangerous warming will actually occur."[96]

122.    A key strategy in Defendants' efforts to discredit scientific consensus on climate change and the IPCC was to bankroll scientists who, although accredited, held fringe opinions that were even more questionable given the sources of their research funding. Those scientists obtained part or all of their research budget from Defendants directly or through Defendant-funded organizations like API,[97] but they frequently failed to disclose their fossil fuel industry underwriters.[98]

123.    Creating a false sense of disagreement in the scientific community (despite the consensus that its own scientists, experts, and managers had previously acknowledged) has had an evident impact on public opinion. A 2007 Yale University-Gallup poll found that while 71 percent of Americans personally believed global warming was happening, only 48 percent believed that there was a consensus among the scientific community, and 40 percent believed there was a lot of disagreement among scientists over whether global warming was occurring.[99]

124.    2007 was the same year the IPCC published its Fourth Assessment Report, in which it concluded that "there is *very high confidence* that the net effect of human activities since 1750

---

[96] GCC, *Climate Change: Your Passport to the Facts*, CLIMATE FILES (1995), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1995-climate-change-facts-passport.

[97] *E.g.*, Willie Soon & Sallie Baliunas, *Proxy Climatic and Environmental Changes of the Past 1000 Years*, 23 CLIMATE RESEARCH 88, 105 (Jan. 31, 2003), http://www.int-res.com/articles/cr2003/23/c023p089.pdf.

[98] *E.g.*, *Smithsonian Statement: Dr. Wei-Hock (Willie) Soon*, SMITHSONIAN (Feb. 26, 2015), https://web.archive.org/web/20181105223030/https://www.si.edu/newsdesk/releases/smithsonian-statement-dr-wei-hock-willie-soon.

[99] *American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll*, Yale Program on Climate Change Communication (July 31, 2007), http://climatecommunication.yale.edu/publications/american-opinions-on-global-warming.

has been one of warming."[100] The IPCC defined "very high confidence" as at least a 9 out of 10 chance.[101]

125. Defendants borrowed pages out of the playbook of prior denialist campaigns. A "Global Climate Science Team" ("GCST") was created that mirrored a front group created by the tobacco industry, known as The Advancement of Sound Science Coalition, whose purpose was to sow uncertainty about the fact that cigarette smoke is carcinogenic. The GCST's membership included Steve Milloy (a key player on the tobacco industry's front group), Exxon's senior environmental lobbyist; an API public relations representative; and representatives from Chevron and Southern Company that drafted API's 1998 Communications Plan. There were no scientists on the "Global Climate Science Team." GCST developed a strategy to spend millions of dollars manufacturing climate change uncertainty. Between 2000 and 2004, Exxon donated $50,000 to Milloy's Advancement of Sound Science Center; and an additional $60,000 to the Free Enterprise Education Institute and $50,000 to the Free Enterprise Action Institute, both of which were registered to Milloy's home address.[102]

126. Defendants, through their trade association memberships, worked directly, and often in a deliberately obscured manner, to evade regulation of the emissions resulting from use of their fossil fuel products.

127. Defendants have funded dozens of think tanks, front groups, and dark money foundations pushing climate change denial. These include the Competitive Enterprise Institute, the

---

[100] IPCC, *Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change* (2007), https://www.ipcc.ch/pdf/assessment-report/ar4/wg1/ar4-wg1-spm.pdf.

[101] *Id.*

[102] Seth Shulman et al., *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, UNION OF CONCERNED SCIENTISTS (Jan. 19, 2007), http://www.ucsusa.org/sites/default/files/ legacy/assets/documents/global_warming/exxon_report.pdf.

Heartland Institute, Frontiers for Freedom, Committee for a Constructive Tomorrow, and Heritage Foundation. From 1998 to 2014 ExxonMobil spent almost $31 million funding numerous organizations misrepresenting the scientific consensus that Defendants' fossil fuel products were causing climate change, sea level rise, and injuries to the County, among other communities.[103] Several Defendants have been linked to other groups that undermine the scientific basis linking Defendants' fossil fuel products to climate change and sea level rise, including the Frontiers of Freedom Institute and the George C. Marshall Institute.

128. Exxon acknowledged its own previous success in sowing uncertainty and slowing mitigation through funding of climate denial groups. In its 2007 Corporate Citizenship Report, Exxon declared: "In 2008, we will discontinue contributions to several public policy research groups whose position on climate change could divert attention from the important discussion on how the world will secure the energy required for economic growth in an environmentally responsible manner."[104] Despite this pronouncement, Exxon remained financially associated with several such groups after the report's publication.

129. Defendants could have contributed to the global effort to mitigate the impacts of greenhouse gas emissions by, for example delineating practical technical strategies, policy goals, and regulatory structures that would have allowed them to continue their business ventures while reducing greenhouse gas emissions and supporting a transition to a lower carbon future. Instead, Defendants undertook a momentous effort to evade international and national regulation of greenhouse gas emissions to enable them to continue unabated fossil fuel production.

---

[103] *ExxonMobil Climate Denial Funding 1998–2014*, EXXONSECRETS (last visited October 9, 2020), http://exxonsecrets.org/html/index.php.

[104] EXXONMOBIL, *2007 Corporate Citizenship Report* (Dec. 31, 2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html.

130.    As a result of Defendants' tortious, false, and misleading conduct, consumers of Defendants' fossil fuel products and policy-makers, in Hawai'i as elsewhere, have been deliberately and unnecessarily deceived about: the role of fossil fuel products in causing global warming, sea level rise, disruptions to the hydrologic cycle, and increased extreme precipitation, heatwaves, drought and other consequences of the climate crisis; the acceleration of global warming since the mid-20[th] century and the continuation thereof; and the fact that the continued increase in fossil fuel product consumption creates severe environmental threats and significant economic costs for communities, including the County. Reasonable consumers and policy makers have also been deceived about the depth and breadth of the state of the scientific evidence on anthropogenic climate change, and in particular, about the strength of the scientific consensus demonstrating the role of fossil fuels in causing both climate change and a wide range of potentially destructive impacts, including sea level rise, disruptions to the hydrologic cycle, extreme precipitation, heatwaves, drought, and associated consequences.

**E.    In Contrast to Their Public Statements, Defendants' Internal Actions Demonstrate Their Awareness of and Intent to Profit from the Unabated Use of Fossil Fuel Products.**

131.    In contrast to their public-facing efforts challenging the validity of the scientific consensus about anthropogenic climate change, Defendants' acts and omissions evidence their internal acknowledgement of the reality of climate change and its likely consequences. Those actions include, but are not limited to, making multi-billion-dollar infrastructure investments for their own operations that acknowledge the reality of coming anthropogenic climate-related change. Those investments included (among others), raising offshore oil platforms to protect against sea level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm

severity; and developing and patenting designs for equipment intended to extract crude oil and/or natural gas in areas previously unreachable because of the presence of polar ice sheets.[105]

132. For example, in 1973 Exxon obtained a patent for a cargo ship capable of breaking through sea ice[106] and for an oil tanker[107] designed specifically for use in previously unreachable areas of the Arctic.

133. In 1974, Chevron obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses,[108] allowing for drilling in areas with increased ice floe movement due to elevated temperature.

134. That same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions,[109] allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.

135. Shell obtained a patent similar to Texaco's (Chevron) in 1984.[110]

136. In 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea

---

[105] Lieberman & Rust, *supra* note 70.

[106] ExxonMobil Research Engineering Co., *Patent US3727571A: Icebreaking cargo vessel* (granted Apr. 17, 1973), https://www.google.com/patents/US3727571.

[107] ExxonMobil Research Engineering Co., *Patent US3745960A: Tanker vessel* (granted July 17, 1973), https://www.google.com/patents/US3745960.

[108] Chevron Research & Technology Co., *Patent US3831385A: Arctic offshore platform* (granted Aug. 27, 1974), https://www.google.com/patents/US3831385.

[109] Texaco Inc., *Patent US3793840A: Mobile, arctic drilling and production platform* (granted Feb. 26, 1974), https://www.google.com/patents/US3793840.

[110] Shell Oil Co., *Patent US4427320A: Arctic offshore platform* (granted Jan. 24, 1984), https://www.google.com/patents/US4427320.

level rise. Those design changes were ultimately carried out by Shell's contractors, adding substantial costs to the project.[111]

     a. The Troll field, off the Norwegian coast in the North Sea, was proven to contain large natural oil and gas deposits in 1979, shortly after Norske Shell was approved by Norwegian oil and gas regulators to operate a portion of the field.

     b. In 1986, the Norwegian parliament granted Norske Shell authority to complete the first development phase of the Troll field gas deposits, and Norske Shell began designing the "Troll A" gas platform, with the intent to begin operation of the platform in approximately 1995. Based on the very large size of the gas deposits in the Troll field, the Troll A platform was projected to operate for approximately 70 years.

     c. The platform was originally designed to stand approximately 100 feet above sea level—the amount necessary to stay above waves in a once-in-a-century strength storm.

     d. In 1989, Shell engineers revised their plans to increase the above-water height of the platform by 3–6 feet, specifically to account for higher anticipated average sea levels and increased storm intensity due to global warming over the platform's 70-year operational life.[112]

     e. Shell projected that the additional 3–6 feet of above-water construction would increase the cost of the Troll A platform by as much as $40 million.

**F. Defendants' Actions Have Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis.**

137. As greenhouse gas pollution accumulates in the atmosphere, some of which does not dissipate for potentially thousands of years (namely $CO_2$), climate changes and consequent adverse environmental changes compound, and their frequencies and magnitudes increase. As

---

[111] *Greenhouse Effect: Shell Anticipates a Sea Change*, N.Y. TIMES (Dec. 20, 1989), http://www.nytimes.com/1989/12/20/business/greenhouse-effect-shell-anticipates-a-sea-change.html.

[112] *Id.*; Lieberman & Rust, *supra* note 70.

those adverse environmental changes compound and their frequencies and magnitudes increase, so too do the physical, environmental, economic, and social injuries resulting therefrom.

138. Delayed efforts to curb anthropogenic greenhouse gas emissions have therefore increased environmental harms and increased the magnitude and cost to address harms, including to the County, that have already occurred or are locked in by previous emissions.

139. Therefore, Defendants' campaign to obscure the science of climate change so as to protect and expand the use of fossil fuels greatly increased and continues to increase the harms and rate of harms suffered by the County and its residents. The costs of inaction on anthropogenic climate change and its adverse environmental effects were not lost on Defendants. In a 1997 speech by John Browne, Group Executive for BP America, at Stanford University, Browne described Defendants' and the entire fossil fuel industry's responsibility and opportunities to reduce use of fossil fuel products, reduce global $CO_2$ emissions, and mitigate the harms associated with the use and consumption of such products:

> A new age demands a fresh perspective of the nature of society and responsibility.
>
> We need to go beyond analysis and to take action. It is a moment for change and for a rethinking of corporate responsibility. . . .
>
> [T]here is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature.
>
> The prediction of the IPCC is that over the next century temperatures might rise by a further 1 to 3.5 degrees centigrade [1.8°–6.3° F], and that sea levels might rise by between 15 and 95 centimetres [5.9 and 37.4 inches]. Some of that impact is probably unavoidable, because it results from current emissions. . . .
>
> [I]t would be unwise and potentially dangerous to ignore the mounting concern.
>
> The time to consider the policy dimensions of climate change is not when the link between greenhouse gases and climate change is conclusively proven … but when the possibility cannot be discounted and is taken seriously by the society of which we are part. . . .

90

> We [the fossil fuel industry] have a responsibility to act, and I hope that through our actions we can contribute to the much wider process which is desirable and necessary.
>
> BP accepts that responsibility and we're therefore taking some specific steps.
>
> To control our own emissions.
>
> To fund continuing scientific research.
>
> To take initiatives for joint implementation.
>
> To develop alternative fuels for the long term.
>
> And to contribute to the public policy debate in search of the wider global answers to the problem.[113]

140.    Despite Defendants' knowledge of the foreseeable, measurable, and significant harms associated with the unabated consumption and use of their fossil fuel products, in Hawai'i and elsewhere, and despite Defendants' knowledge of technologies and practices that could have helped to reduce the foreseeable dangers associated with their fossil fuel products, Defendants continued to wrongfully market and promote heavy fossil fuel use and mounted a campaign to obscure the connection between their fossil fuel products and the climate crisis, dramatically increasing the cost of abatement. At all relevant times, Defendants were deeply familiar with opportunities to reduce the use of their fossil fuel products, reduce global greenhouse gas emissions associated therewith, and mitigate the harms associated with the use and consumption of such products. Examples of that recognition include, but are not limited to the following:

a.    In 1961, Phillips Petroleum Company filed a patent application for a method to purify gas, among other things, as "natural gas containing gasoline hydrocarbons can contain undesirable amounts of sulfur and other compounds such as carbon dioxide which are undesirable in the finished gasoline product." [114]

---

[113] John Browne, *BP Climate Change Speech to Stanford*, CLIMATE FILES (May 19, 1997), http://www.climatefiles.com/bp/bp-climate-change-speech-to-stanford.

[114] Phillips Petroleum Co., *Patent US3228874A: Method for recovering a purified component from a gas* (filed Aug. 22, 1961), https://patents.google.com/patent/US3228874.

b.      In 1963, Esso (Exxon Mobil) obtained multiple patents on technologies for fuel cells, including on the design of a fuel cell and necessary electrodes,[115] and on a process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.[116]

c.      In 1970, Esso (Exxon Mobil) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines (the system also increased the efficiency of the fossil fuel products used in such engines, thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology).[117]

d.      In 1980, Imperial Oil wrote in its "Review of Environmental Protection Activities for 1978–79: "There is no doubt that increases in fossil fuel usage and decreases in forest cover are aggravating the potential problem of increased $CO_2$ in the atmosphere. Technology exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost of power generation."[118]

e.      A 1987 company briefing produced by Shell on "Synthetic Fuels and Renewable Energy" noted that while "immediate prospects" were "limited," "nevertheless it is by pursuing commercial opportunities now and in the near future that the valuable experience needed for further development will be gained." The brief also noted that "the task of replacing oil resources is likely to become increasingly difficult and expensive and there will be a growing need to develop lean, convenient alternatives. Initially these will supplement and eventually replace

---

[115] ExxonMobil Research Engineering Co., *Patent US3116169A: Fuel cell and fuel cell electrodes* (granted Dec. 31, 1963), https://www.google.com/patents/US3116169.

[116] ExxonMobil Research Engineering Co., *Patent US3113049A: Direct production of electrical energy from liquid fuels* (granted Dec. 3, 1963), https://www.google.com/patents/US3113049.

[117] ExxonMobil Research Engineering Co., *Patent US3513929A: Low-polluting engine and drive system* (granted May 26, 1970), https://www.google.com/patents/US3513929.

[118] IMPERIAL OIL LTD., REVIEW OF ENVIRONMENTAL PROTECTION ACTIVITIES FOR 1978–1979, *supra* note 38, at 2.

valuable oil products. Many potential energy options are as yet unknown or at very early stages of research and development. New energy sources take decades to make a major global contribution. Sustained commitment is therefore needed during the remainder of this century to ensure that new technologies and those currently at a relatively early stage of development are available to meet energy needs in the next century."[119]

f.      A 1989 article in a publication from Exxon Corporate Research for company use only stated: "$CO_2$ emissions contribute about half the forcing [sic] leading to a potential enhancement of the Greenhouse Effect. Since energy generation from fossil fuels dominates modern $CO_2$ emissions, strategies to limit $CO_2$ growth focus near term on energy efficiency and long term on developing alternative energy sources. Practiced at a level to significantly reduce the growth of greenhouse gases, these actions would have substantial impact on society and our industry—near-term from reduced demand for current products, long term from transition to entirely new energy systems."[120]

g.      In 1996, more than thirty years after API's president warned that "time is running out" for the world to address the "catastrophic consequences of pollution," API published the book "Reinventing Energy: Making the Right Choices" to refute this very conclusion. Contradicting the scientific consensus known by its members for decades, the book claims: "Currently, no conclusive—or even strongly suggestive—scientific evidence exists that human

---

[119] *Synthetic Fuels and Renewable Energy*, SHELL SERVICE BRIEFING, no. 2, 1987, https://assets.documentcloud.org/documents/4411089/Document2.pdf.

[120] Brian Flannery, *Greenhouse Science*, CONNECTIONS: CORPORATE RESEARCH, EXXON RESEARCH & ENGINEERING CO. (Fall 1989), http://www.climatefiles.com/exxonmobil/1989-exxon-mobil-article-technologys-place-marketing-mix.

activities are significantly affecting sea levels, rainfall, surface temperatures, or the intensity and frequency of storms."[121]

h. The book downplayed nearly every aspect of established climate science. API baldly claimed that scientists do not understand how carbon flows in and out of the atmosphere and whether fossil fuels are even responsible for increasing concentrations of atmospheric $CO_2$. It then explained that even if some warming does occur, such warming "would present few if any problems" because, for example, farmers could be "smart enough to change their crop plans" and low-lying areas would "likely adapt" to sea level rise.[122]

i. As the County's vulnerability demonstrates, however, such adaptations, made necessary by Defendants' conduct, are enormously expensive. Defendants' strategy merely transferred the significant costs and externalities of their actions onto the County, and in the process, they reaped billions of dollars in profit.

j. In the publication, API also contended that "the state of the environment does not justify the call for the radical lifestyle changes Americans would have to make to substantially reduce the use of oil and other fossil fuels" and that the "benefits of alternatives aren't worth the cost of forcing their use." "Some jobs definitely will be created in making, distributing and selling alternatives. But they will come at the expense of lost jobs in the traditional automobile and petroleum industries," the authors continued. "Alternatives will likely be more expensive than conventional fuel/vehicle technology. Consumers, obviously, will bear these increased expenses, which means they will have less to spend on other products and cost jobs."[123]

---

[121] AMERICAN PETROLEUM INSTITUTE, REINVENTING ENERGY: MAKING THE RIGHT CHOICES 79 (1996), http://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy.

[122] *Id*. at 86–87.

[123] *Id*. at 59, 68, 69.

k.   API published this book in service of one goal—ensuring its members could continue to produce and sell fossil fuels in massive quantities that it knew would devastate the planet. The book's final section reveals this purpose. API concluded: "[S]evere reduction in greenhouse gas emissions by the United States or even all developed countries would impose large costs on countries but yield little in the way of benefits—even under drastic climate change scenarios."[124]

141.   Defendants could have made major inroads to mitigate the County's injuries through technology by developing and employing technologies to capture and sequester greenhouse gases emissions associated with conventional use of their fossil fuel products. Defendants had knowledge dating at least back to the 1960s, and indeed, internally researched and perfected many such technologies. For instance:

a.   Phillips Petroleum Company (ConocoPhillips) obtained a patent in 1966 for a "Method for recovering a purified component from a gas" outlining a process to remove carbon from natural gas and gasoline streams;[125] and

b.   In 1973, Shell was granted a patent for a process to remove acidic gases, including $CO_2$, from gaseous mixtures.

142.   Despite this knowledge, Defendants' later forays into the alternative energy sector were largely pretenses. For instance, in 2001, Chevron developed and shared a sophisticated information management system to gather greenhouse gas emissions data from its explorations and production to help regulate and set reduction goals.[126] Beyond this technological breakthrough,

---

[124] *Id.* at 89.

[125] Phillips Petroleum Co., *Patent US3228874A: Method for recovering a purified component from a gas* (granted Jan. 11, 1966), https://patents.google.com/patent/US3228874.

[126] *Chevron Introduces New System to Manage Energy Use* (press release), CHEVRON CORP. (Sept. 25, 2001), https://web.archive.org/web/20170510120220/https://www.chevron.com/stories/chevron-introduces-new-system-to-manage-energy-use (accessed October 9, 2020).

Chevron touted "profitable renewable energy" as part of its business plan for several years and launched a 2010 advertising campaign promoting the company's move towards renewable energy. Despite all this, Chevron rolled back its renewable and alternative energy projects in 2014.[127]

143.    Similarly, ConocoPhillips's 2012 Sustainable Development report declared developing renewable energy a priority in keeping with their position on sustainable development and climate change.[128] Their 10-K filing from the same year told a different story: "As an independent E&P company, we are solely focused on our core business of exploring for, developing and producing crude oil and natural gas globally."[129]

144.    Likewise, while Shell orchestrated an entire public relations campaign around energy transitions towards net zero emissions, a fine-print disclaimer in its 2016 net-zero pathways report reads: "We have no immediate plans to move to a net-zero emissions portfolio over our investment horizon of 10–20 years."[130]

145.    BP, appearing to abide by the representations Lord Browne made in his speech described in paragraph 137, *supra*, engaged in a rebranding campaign to convey an air of environmental stewardship and renewable energy to its consumers. This included renouncing its membership in the GCC in 2007, changing its name from "British Petroleum" to "BP" while adopting the slogan "Beyond Petroleum," and adopting a conspicuously green corporate logo. However, BP's self-touted "alternative energy" investments during this turnaround included investments in natural gas, a fossil fuel, and in 2007 the company reinvested in Canadian tar sands,

---

[127] Benjamin Elgin, *Chevron Dims the Lights on Green Power*, BLOOMBERG (May 29, 2014), https://www.bloomberg.com/news/articles/2014-05-29/chevron-dims-the-lights-on-renewable-energy-projects.

[128] CONOCOPHILLIPS, *Sustainable Development* (2013), http://www.conocophillips.com/sustainable-development/Documents/2013.11.7%201200%20Our%20Approach%20Section%20Final.pdf.

[129] ConocoPhillips, Form 10-K, U.S. SEC. & EXCH. COMM'N (Dec. 31, 2012), https://www.sec.gov/Archives/edgar/data/1163165/000119312513065426/d452384d10k.htm.

[130] SHELL INT'L BV, *Energy Transitions Towards Net Zero Emissions* (NZE) (2016).

96

a particularly high-carbon source of oil.[131] The company ultimately abandoned its wind and solar assets in 2011 and 2013, respectively, and even the "Beyond Petroleum" moniker in 2013.[132]

146.    After posting a $10 billion quarterly profit, Exxon in 2005 stated that "We're an oil and gas company. In times past, when we tried to get into other businesses, we didn't do it well. We'd rather re-invest in what we know."[133]

147.    Even if Defendants did not adopt technological or energy source alternatives that would have reduced use of fossil fuel products, reduced global greenhouse gas pollution, and/or mitigated the harms associated with the use and consumption of such products, Defendants could have taken other practical, cost-effective steps to reduce the use of their fossil fuel products, reduce global greenhouse gas pollution associated therewith, and mitigate the harms associated with the use and consumption of such products. Those alternatives could have included, among other measures:

a.    Acknowledging and sharing the validity of scientific evidence on anthropogenic climate change and the damages it will cause people; communities, including the County and the environment. Acceptance of that evidence along with associated warnings and actions would have altered the debate from *whether* to combat climate change and sea level rise to *how* to combat it; and avoided much of the public confusion that has ensued over more than 30 years, since at least 1988;

b.    Forthrightly communicating with Defendants' shareholders, banks, insurers, the public, regulators, and the County about the global warming hazards of Defendants'

---

[131] Fred Pearce, *Greenwash: BP and the Myth cf a World 'Beyond Petroleum'*, THE GUARDIAN, (Nov. 20, 2008), https://www.theguardian.com/environment/2008/nov/20/fossilfuels-energy.

[132] Javier E. David, *'Beyond Petroleum' No More? BP Goes Back to Basics*, CNBC (Apr. 20, 2013), http://www.cnbc.com/id/100647034.

[133] James R. Healy, *Alternate Energy Not in Cards at ExxonMobil*, USA TODAY (Oct. 28, 2005), https://usatoday30.usatoday.com/money/industries/energy/2005-10-27-oil-invest-usat_x.htm.

fossil fuel products that were known to Defendants, which would have enabled those groups to make material, informed decisions about whether and how to address climate change and sea level rise vis-à-vis Defendants' products;

        c.     Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort public debate, and to cause many consumers and business and political leaders to think the relevant science was far less certain that it actually was;

        d.     Sharing their internal scientific research with the public, and with other scientists and business leaders, so as to increase public understanding of the scientific underpinnings of climate change and its relation to Defendants' fossil fuel products;

        e.     Supporting and encouraging policies to avoid dangerous climate change, and demonstrating corporate leadership in addressing the challenges of transitioning to a low-carbon economy;

        f.     Prioritizing alternative sources of energy through sustained investment and research on renewable energy sources to replace dependence on Defendants' inherently hazardous fossil fuel products; and

        g.     Adopting their shareholders' concerns about Defendants' need to protect their businesses from the inevitable consequences of profiting from their fossil fuel products. Over the period of 1990-2015, Defendants' shareholders proposed hundreds of resolutions to change Defendants' policies and business practices regarding climate change. Those included increasing renewable energy investment, cutting emissions, and performing carbon risk assessments, among others.

148.    Despite their knowledge of the foreseeable harms associated with the consumption of Defendants' fossil fuel products, and despite the existence and fossil fuel industry knowledge

of opportunities that would have reduced the foreseeable dangers associated with those products, Defendants wrongfully and falsely promoted, campaigned against regulation of, and concealed the hazards of use of their fossil fuel products.

**G.      Defendants Continue to Mislead About the Impact of Their Fossil Fuel Products on Climate Change Through Greenwashing Campaigns and Other Misleading Advertisements in Hawai'i and Elsewhere.**

149.    Defendants' coordinated campaign of disinformation and deception continues today, even as the scientific consensus about the cause and consequences of climate change has strengthened. Defendants have falsely claimed through advertising campaigns in Hawai'i and/or intended to reach Hawai'i, that their businesses are substantially invested in lower carbon technologies and renewable energy sources. In truth, each Defendant has invested minimally in renewable energy while continuing to expand its fossil fuel production. They have also claimed that certain of their fossil fuel products are "green" or "clean," and that using these products will sufficiently reduce or reverse the dangers of climate change. None of Defendants' fossil fuel products are "green" or "clean" because they all continue to pollute and ultimately warm the planet.

150.    Instead of widely disseminating this information, reducing their pollution, and transitioning to non-polluting products, Defendants placed profits over people. In connection with selling gasoline and other fossil fuel products to consumers in the County throughout Hawai'i, Defendants have failed to inform those consumers about the effects of their fossil fuel products in causing and accelerating the climate crisis.

151.    Defendants' advertising and promotional materials fail to disclose the extreme safety risk associated with the use of Defendants' dangerous fossil fuel products, which are causing "catastrophic" climate change, as understood by Defendants' and the industry's own scientists

decades ago and with the effects of global warming now being felt in the County. They continue to omit that important information to this day.

152.     Moreover, Defendants have not just failed to disclose the catastrophic danger their products cause. After having engaged in a long campaign to deceive the public about the science behind climate change, Defendants are now engaging in "greenwashing" by employing false and misleading advertising campaigns promoting themselves as sustainable energy companies committed to finding solutions to climate change, including by investing in alternative energy.

153.     These misleading "greenwashing" campaigns are intended to capitalize on consumers' concerns for climate change and lead a reasonable consumer to believe that Defendants are actually substantially diversified energy companies making meaningful investments in low carbon energy compatible with avoiding catastrophic climate change.

154.     Contrary to this messaging, however, Defendants' spending on low carbon energy is substantially and materially less than Defendants indicate to consumers. According to a recent analysis, between 2010 and 2018, BP spent 2.3% of total capital spending on low carbon energy sources, Shell spent 1.2%, and Chevron and Exxon just 0.2% each.[134] Meanwhile, Defendants continue to expand fossil fuel production and typically do not even include non-fossil energy systems in their key performance indicators or reported annual production statistics.[135]

155.     Ultimately, Defendants currently claim to support reducing greenhouse gas emissions, but their conduct belies these statements. Defendants have continued to ramp up fossil fuel production globally, to invest in new fossil fuel development—including in tar

---

[134] Anjli Raval & Leslie Hook, *Oil and Gas Advertising Spree Signals Industry's Dilemma*, FIN. TIMES (Mar. 6, 2019), https://www.ft.com/content/5ab7edb2-3366-11e9-bd3a-8b2a211d90d5.

[135] *See, e.g.*, Reserves and production table, *A year of strong delivery and growth: BP Annual Report and Form 20-F 2017*, BP P.L.C. 24 (2018), https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-annual-report-and-form-20f-2017.pdf.

sands crude and shale gas fracking, some of the most carbon-intensive extraction projects—and to plan for unabated oil and gas exploitation indefinitely into the future.

156. Exxon is projected to increase oil production by more than 35% between 2018 and 2030—a sharper rise than over the previous 12 years.[136]

157. Shell is forecast to increase output by 38% by 2030, by increasing its crude oil production by more than half and its gas production by over a quarter.

158. Recently, BP projected its production of oil and gas is expected to increase just over 20% by 2030.[137]

159. Chevron set an oil production record in 2018 of 2.93 million barrels per day, and the company predicts further significant growth in oil production this year.[138] Like the other Defendants, it sees the next 20 years—the crucial window in which the world must reduce greenhouse gas emissions to avert the most catastrophic effects of the climate crisis—as a time of increased investment and production in its fossil fuel operations. For example, a 2019 investor report touts the company's "significant reserve additions in 2018" in the multiple regions in North America and around the world, as well as significant capital projects involving construction of refineries worldwide.[139]

---

[136] Jonathan Watts, Jillian Ambrose & Adam Vaughan, *Oil Firms to Pour Extra 7m Barrels Per Day Into Markets, Data Shows*, THE GUARDIAN (Oct. 10, 2019), https://www.theguardian.com/environment/2019/oct/10/oil-firms-barrels-markets.

[137] *Id.*

[138] Kevin Crowley & Eric Roston, *Chevron Aligns Strategy with Paris Deal But Won't Cap Output*, BLOOMBERG (Feb. 7, 2019), https://www.bloomberg.com/news/articles/2019-02-07/chevron-pledges-alignment-with-paris-accord-but-won-t-cap-output (accessed February 21, 2020).

[139] *Chevron 2019 Investor Presentation*, CHEVRON CORP. (Feb. 2019), https://chevroncorp.gcs-web.com/static-files/c3815b42-4deb-4604-8c51-bde9026f6e45.

## H.    Defendants Caused the County's Injuries.

160.    Defendants' individual and collective conduct, including, but not limited to, their failures to warn of the threats their fossil fuel products posed to the world's climate; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products; their public deception campaigns designed to obscure the connection between their products and global warming and its environmental, physical, social, and economic consequences; and their failure to pursue less hazardous alternatives available to them; is a substantial factor in causing global warming and consequent sea level rise and attendant flooding, erosion, and beach loss in the County; increased frequency and intensity of extreme weather events in the County, including hurricanes and tropical storms, "rain bomb" extreme precipitation events, drought, heatwaves, wildfires, and others; ocean warming and acidification that will injure or kill coral reefs in the County's waters; habitat loss of endemic species in the County, and range expansion of invasive and disease carrying-pest species; diminished availability of freshwater resources; and the cascading social, economic, and other consequences of those environmental changes. These adverse impacts will continue to increase in frequency and severity in the County.

161.    As actual and proximate results of Defendants' conduct, which caused the aforementioned environmental changes, the County has suffered and will continue to suffer severe harms and losses, including, but not limited to: injury or destruction of County-owned or operated facilities and property deemed critical for operations, utility services, and risk management, as well as other assets that are essential to community health, safety, and well-being; increased planning and preparation costs for community adaptation and resiliency to global warming's effects; decreased tax revenue due to impacts on the County's tourism- and ocean-based economy; and increased costs associated with public health impacts.

162.    The County already has incurred, and will foreseeably continue to incur, injuries and damages due to Defendants' conduct, their contribution to the climate crisis, and the environmental, physical, social, and economic consequences of the climate crisis's impact on the environment. As a result of Defendants' wrongful conduct described in this Complaint, the County has, is, and will experience significant adverse impacts attributable to Defendants' conduct, including, but not limited to:

### *Rising Temperatures*

163.    The average air temperature in the County is warming, and the rate at which it is doing so is accelerating. 2019 was the warmest year on record for nearly every city in Hawai'i, including Kahului on the island of Maui, which broke or tied 61 daily record temperatures in 2019 alone.[140] Kahului broke or tied daily temperature records every month in 2019 except February and March.[141]

164.    Warming air temperatures have led to heat waves, expanded pathogen and invasive species ranges, thermal stress for native flora and fauna, increased electricity demand, increased occurrence and intensity of wildfire, threats to human health such as from heat stroke and dehydration, and decreased water supply due to increased evaporation and demand.

### *Sea Level Rise*

165.    The County is already experiencing sea level rise and associated impacts, and will experience significant additional and accelerating sea level rise over the coming decades through at least the end of the century. The County is particularly vulnerable to the impacts of sea level

---

[140] NOAA National Centers for Environmental Information, STATE OF THE CLIMATE: NATIONAL CLIMATE REPORT FOR 2019, (Jan. 2020) https://www.ncdc.noaa.gov/sotc/national/201913/supplemental/page-1.

[141] *What winter? In 2019, Hawaii broke or tied 273 heat records. In 2020, expect more of the same*, HAWAII NEWS NOW (Jan. 2, 2020) https://www.hawaiinewsnow.com/2020/01/02/hawaii-broke-or-tied-hundreds-heat-records-warm-winter-is-expected.

rise because of its substantial developed coastline and substantial low-lying areas, particularly along the south coast of the island of Maui, Kahului on the island of Maui, and the city of Kaunakakai on the island of Moloka'i.

166.    The figure below delineates the island of Maui's sea level rise exposure area, a State of Hawai'i-recognized sea level rise vulnerability zone that the County is using to formulate sea level rise adaptation strategies.



**Figure 8: Maui's Sea Level Rise Exposure Area**

*Loss of Land and Infrastructure*

167.    More than $3.2 billion in assets, including over 3,100 acres of land, 760 structures such as hotels that are critical to Maui's tourism-based economy, and 11.2 miles of major roads, are located within the Sea Level Rise Exposure area and are at risk of inundation and destruction due to sea level rise estimated to occur by the year 2100.

168.    The same is true for the other islands in the County. On Molokaʻi over 2,500 acres of land, 780 structures, and 2.2 miles of major roads are located within the Sea Level Rise Exposure area. Areas that are expected to be exposed to chronic flooding include Moʻomomi, Hale o Lono Harbor, and Kapaʻakea. These areas include important communities and natural assets including portions of the Moʻomomi Preserve, located in northwest Molokaʻi which is home to rare native and endangered species; Hale o Lono Harbor, a manmade harbor on the southwestern coast of the island that hosts two annual outrigger canoe competitions; and Kapaʻakea, a Hawaiian Homelands community near Kaunakakai. These areas would all become flooded with 3.2 feet of sea level rise. The coastal community of Kapaʻakea will suffer from an increased frequency and severity of flooding which will make some areas near the coast impassable or uninhabitable.



**Figure 9: Molokai's Sea Level Rise Exposure Area**

169.    On Lānaʻi, approximately 380 acres of land, 13 structures, and 0.2 miles of roads are located within the Sea Level Rise Exposure area. Low lying, economically important areas,

105

such as Hulopoʻe Bay and Mānele Bay would experience increased frequency and extent of flooding. This would interrupt interisland shipping and travel and impact residents, visitors, and all forms of economic activity.



**Figure 10: Lānai's Sea Level Rise Exposure Area**

170.    In total, more than 2,000 County residents will be displaced with that level of sea level rise. It is estimated that the economic losses in the County due to structure and land loss will be in the billions of dollars, which does not include the cost to fortify, rebuild, or relocate critical infrastructure.

171.    The County's critical infrastructure is concentrated along low-lying shores and is highly vulnerable to flooding and erosion. Of the top 20 state coastal highways susceptible to erosion and structural degradation as a result of sea level rise, the County has 10 — five each on Maui and Molokaʻi. Portions of many coastal roads, such as Honoapiʻilani Highway, which

connects West Maui and Central Maui, will become chronically flooded by 2100 and lawmakers are already developing plans to relocate the highway. Two portions of highway on Moloka'i, one in Kalua'aha and the other in Puko'o are also at high risk of flooding and erosion as a result of rising sea levels. This will result in wide-spread regional issues such as loss of commerce, loss of access to emergency services and increased traffic on other roads and highways, some of which serve as the only access in and out of many communities; and service disruptions due to damage or loss of electric and telecommunication transmission lines that commonly follow roads subject to flooding and subsurface saltwater intrusion.

172.    Critical transportation hubs and other critical infrastructure, such as the County's five commercial harbors and five airports, will become increasingly exposed to chronic flooding from sea level rise, resulting in disruption of interisland and transoceanic shipping and travel that will impact the County and its residents, visitors, and all forms of economic activity. Since the County is almost entirely dependent upon imported food, fuel, and material, the vulnerability of ports and airports to extreme events, sea level rise, and increasing wave heights is of serious concern. Native Hawaiian cultural and historical resources are located near the County's shorelines and are already threatened by coastal erosion associated with sea level rise at areas that have served as burial grounds, home sites, fishponds, and other places of cultural significance. Even if all carbon emissions were to cease immediately, the County would continue to experience sea level rise and its associated impacts due to the "locked in" greenhouse gases already emitted and the lag time between emissions and sea level rise.

*Wildfires*

173.    Wildfires are becoming more frequent, intense, and destructive in the County. As climate changes, stronger El Niño events become more frequent.   El Niños alter Hawaii's weather

107

patterns, bringing wetter summers which in turn provide prime conditions for fast-growing grasses and invasive species, followed by prolonged periods of drought and hotter average temperatures, which desiccate vegetation thereby increasing the fuel available for fires.

174.    The County's fire "season" now runs year-round, rather than only a few months of the year. In 2019, called the "year of fire" on Maui, 26,000 acres burned in the County—more than six times the total area burned in 2018.

### Ecosystem Harm

175.    The County's natural resources are in decline because of global warming. Many species endemic to the County and the Hawaiian Islands are already showing shifting habitats because of environmental changes attributable to global warming. Hawai'i is often referred to as the "Endangered Species Capital of the World." While comprising less than one percent of the United States' land mass, nearly a third of the species listed as endangered or threatened in the United States are in Hawai'i – about 500 species. That is nearly double the next highest state, California, which has about 300 endangered species.

176.    For example, the population of the kiwikiu (or kīkēkoa), also known as the Maui parrotbill, has dropped to less than 300. The kiwikiu can only be found in 19 square miles of mesic and wet forests at 3,940–7,050 feet on the windward slopes of Maui's largest mountain, Haleakalā. The bird's range is shrinking as a result of climate change and mosquitos carrying avian malaria are moving higher up the mountain due to rising temperatures.

177.    In addition, the 'ahinahina, or silversword, which grow on the slopes of Haleakalā are also rapidly disappearing. The number of 'ahinahina have declined by approximately sixty percent since the 1990s. This decline is a direct result of the hotter and drier conditions on the mountain due to climate change.

178.    The 'i'iwi, or scarlet Hawaiian honeycreeper, which can be found in east Maui, is also in danger of immediate or near-term extinction. The 'i'iwi is a beautiful red bird with a long, curved salmon-colored bill. Like the kiwikiu, the habitat of the 'i'iwi is shrinking as a result of climate change. While it was once found in native forests on all Hawaiian islands, it is now restricted to elevations above 1,250 meters where it is too cool for mosquitoes to deliver diseases such as avian malaria and avian pox. As temperatures increase, the 'i'iwi will be pushed farther upslope and will run out of room altogether.

179.    Over 200 plant taxa in Hawai'i are considered to have 50 or fewer individuals remaining in the wild. Many of these endangered species are only found in the County. The Center for Biological Diversity estimated it would cost about $2.3 billion a year to implement recovery plans for every federally listed species.[142]

180.    Increased atmospheric carbon has also resulted in more $CO_2$ uptake in the ocean, which in turn drives ocean acidification. Ocean acidification prevents marine organisms, many at or near the bottom of the food chain, from forming shells, which threatens their survival. Increasing sea surface temperatures are shifting marine species' ranges and causing coral bleaching and death. In 2019 the Hawai'i State Department of Land and Natural Resources conducted a rapid assessment of coral health at Molokini and along Maui's south shore from Makena to Māʻalaea. The study found about 50 percent of a coral species that makes up much of Molokini's reef already was bleached or "paling heavily."[143]

---

[142] Noah Greenwald, Brett Hartl, Loyal Mehrhoff, & Jamie Pang, *Shortchanged Funding Needed to Save America's Most Endangered Species Center for Biological Diversity*, CENTER FOR BIOLOGICAL DIVERSITY 1, 6 (2016), https://www.biologicaldiversity.org/programs/biodiversity/pdfs/Shortchanged.pdf.

[143] *See* Department of Land & Natural Resources, *As Ocean Waters Heat Up Evidence of Coral Bleaching is Appearing* (Sept. 11, 2019), https://dlnr.hawaii.gov/blog/2019/09/11/nr19-162.

181.    In addition to the loss of the intrinsic value of those unique natural resources, those changes contribute to adverse effects on the County's tourism and fishing industries, which in turn impact economic activity within and revenue to the County.

### *Public Health*

182.    Public health impacts of Defendants' conduct have injured and will continue to cause injury to the County. Extreme heat-induced public health impacts in the County will result in increased risk of heat-related illnesses (mild heat stress to fatal heat stroke) and the exacerbation of pre-existing conditions in the medically fragile, chronically ill, and vulnerable.

183.    Changes in air temperature, rain, and carbon dioxide concentrations in air can lead to more ozone, pollen, mold spores, fine particles, and chemicals that can irritate and damage the lungs and airways. Increased extreme temperatures, heat waves, and wildfires have contributed and will contribute to and exacerbate, allergies, respiratory disease, and other health issues in children and adults. Vulnerable populations such as the disabled, the elderly, children, people who live alone, people of color, and less-resourced communities are more likely to suffer health effects from higher air temperatures, flooding, and air pollution. As pest species ranges expand, vector-borne illnesses will increase in the County's population. The County has borne and will continue to bear costs associated with mitigating and responding to these public health threats.

### *Impacts to Native Hawaiian Communities and Cultural Resources*

184.    Compounding those physical and environmental impacts are cascading social and economic impacts that cause injuries to the County that have and will continue to arise out of localized climate change-related conditions. In particular, low-income communities, communities of color, and Native Hawaiian communities are and will continue to be the hardest hit by the physical and environmental consequences of Defendants' actions, and will require the most

resources, including from the County, to respond and adapt to the climate crisis. Income inequality is growing in the County.[144] In areas of the County where populations are majority Native Hawaiian, such as on the island of Moloka'i,[145] incomes are well below the statewide average and unemployment levels are often twice that of those statewide.[146] Moloka'i ranks among the County's most socially vulnerable communities, as measured by the capacity to prepare for and respond to hazardous events.[147] Native Hawaiian communities, people of color, and low-income residents in the County therefore experience exacerbated climate crisis impacts of Defendants' conduct, including, but not limited to, in the following ways:

185.    Increased sea levels and storms caused by climate change have disparate impacts among the County's communities. In general, lower-income residents are hit harder by weather events because many are unable to prepare for extreme weather in advance and will need to use a bigger proportion of their resources to rebuild in the aftermath. Native Hawaiian and other communities living on Moloka'i are especially vulnerable to sea level rise, as increased flooding, erosion, and destruction of coastal roads, homes, businesses, and beaches is predicted over the coming decades.[148] Much of the island's critical infrastructure is located on low-lying shores and is thus particularly at risk from sea level rise.[149] Furthermore, 3.2 feet of sea level rise would flood

---

[145] LILI'UOKALANI TRUST, *Community Profile: Moloka'i* (July 11, 2018),
https://onipaa.org/media/W1siZiIsIjIwMTgvMDkvMDYvMjFfMjlfMzNfNDYyX0NvbW11bml0eV9Qcm9maWxl
X01vbG9rYWlfUmV2aXNlZC5wZGYiXV0/Community%20Profile%20Molokai%20Revised.pdf?sha=e2db5540.

[146] Wade Graham, *Why Molokai Is The Least Developed Hawaiian Island*, HONOLULU CIVIL BEAT (Sept. 4, 2019),
https://www.civilbeat.org/2019/09/why-molokai-is-the-least-developed-hawaiian-island.

[147] *See CDC Ranks Moloka'i Among the Most Vulnerable Communities in Maui County*, MAUI NOW (Mar. 31,
2020), https://mauinow.com/2020/03/31/cdc-ranks-molokai-among-the-most-vulnerable-communities-in-maui-
county.

[148] *Hawai'i Sea Level Rise Vulnerability and Adaptation Report*, HAWAI'I CLIMATE CHANGE MITIGATION &
ADAPTATION COMM'N 115–16, 122, 126, 129, 131, 134–35 (2017), https://climateadaptation.hawaii.gov/wp-
content/uploads/2017/12/SLR-Report_Dec2017.pdf.

[149] *Id.* at 126.

111

coastal portions of the Hawaiian Home Lands, areas intended to provide economic self-sufficiency for Native Hawaiians, thereby displacing Native Hawaiian families in communities such as Keʻanae and Wailua in East Maui and Kalamaʻula on Molokaʻi.[150] In addition, communities in the Hawaiian Home Lands of Kalamaʻula, Kamiloloa, Makakupaʻia, and Hoʻolehua-Pālāʻau on Molokaʻi, as well as Waiehu, Leialiʻi, and Kahikinui on Maui, are at high risk of displacement from sea level rise, tsunamis, and waves.[151]

186.    Coastal and beach erosion also jeopardize Native Hawaiian cultural and historical sites, including burial grounds, home sites, and fishponds, as well as fishing and cultural practices.[152] On Molokaʻi alone there are 26 cultural sites within the Sea Level Rise Exposure Area. This includes cultural sights on Lāʻau Point that may be flooded as a result of sea level rise.

187.    Those who face housing insecurity or lack access to reliable transportation lack resources to protect themselves from extreme temperatures, storms, and flooding, and are therefore likely to disproportionately rely on County resources to obtain protection during climate emergencies. Residents who live further from central Maui, where healthcare resources are concentrated, are particularly vulnerable to weather-related emergencies.

188.    The climate crisis exacerbates poor air quality since increased temperatures worsen smog, and extreme weather and flooding can trigger higher levels of allergenic air pollutants like mold and pollen. This will have an outsized impact on the County's low-income residents, Indigenous communities, and communities of color, since these communities generally experience higher exposure to poor air quality and suffer higher instances of many negative health outcomes associated with it, like respiratory and cardiovascular-related illnesses. For instance, Native

---

[150] *Id.* at 105, 129.

[151] *Id.* at 129.

[152] *Id.* at 105, 129.

Hawaiians suffer disproportionality from cardiovascular disease.[153] These disproportionate impacts will worsen as the climate crisis accelerates.

189.    Climate change is expected to exacerbate food and energy insecurity, which will affect those who are already struggling first and most intensely.[154]

190.    The County's tourism industry, which is the County's leading economic sector,[155] is also at risk from climate change, jeopardizing the livelihoods of County residents who work in tourism service jobs. Low-wage workers, including those from Native Hawaiian communities and communities of color, experience disproportionately greater impacts when the tourism sector declines.

### *Planning Costs*

191.    County officials, planners, and natural resource managers are incorporating climate adaptation into land management. But new planning and implementation actions come at significant cost to the County.

192.    In December 2017, the Hawai'i Climate Change Mitigation and Adaptation Commission released a 304-page report detailing the expected effects and costs of climate change in the State of Hawai'i. On March 2, 2018, the Maui County mayor signed a proclamation officially accepting that report. That proclamation acknowledges that climate change is real and directs "County departments to use the Report in their plans, programs and capital improvement decisions,

---

[153] *Report: Native Hawaiians Face A 'Public Health Crisis'*, HONOLULU CIVIL BEAT (Jan. 17, 2017), https://www.civilbeat.org/2017/01/report-native-hawaiians-face-a-public-health-crisis.

[154] *See Climate Impacts on Agriculture and Food Supply*, U.S. ENVTL. PROT. AGENCY (last visited July 31, 2020), https://archive.epa.gov/epa/climate-impacts/climate-impacts-agriculture-and-food-supply.html#:~:text=Climate%20change%20can%20disrupt%20food,result%20in%20reduced%20agricultural%20productivity; *Climate Impacts on Energy*, U.S. ENVTL. PROT. AGENCY (last visited July 31, 2020), https://19january2017snapshot.epa.gov/climate-impacts/climate-impacts-energy_.html#:~:text=Increases%20in%20temperature%20will%20likely,oil%2C%20and%20wood%20for%20heating.

[155] *Visitor Industry*, MAUI COUNTY (last visited Oct. 8, 2020), https://www.mauicounty.gov/1133/Visitor-Industry.

113

to mitigate impacts to infrastructure and critical facilities triggered by sea level rise." The Maui County mayor also called on the County Planning Department to propose rule changes to the Maui, Moloka'i and Lāna'i Planning Commissions to include sea level rise in their shoreline setback calculations.

193.    The County is undertaking extensive planning efforts across County agencies, as well as funding independent efforts, to assess the County's vulnerability to a broad range of climate change-related impacts and to develop adaptation and resilience strategies. Earlier this year the Maui County Council established a Climate Action and Resilience Committee in order to accelerate adaptation and resilience strategies in preparations for intensifying climate-change impacts. In addition, the Maui County Planning Department has led a planning process to develop a set of guidelines and protocols to build back after a damaging coastal event to help make communities more resilient to sea level rise.

### Damages Already Incurred

194.    The County has already incurred damages as a direct and proximate result of Defendants' conduct, including, but not limited to:

195.    The County has spent over $5.5 million designing and constructing an 1,100-foot rock mound revetment to protect the Wailuku-Kahului Wastewater Reclamation Facility in Kahului from increasing shoreline erosion, rising sea levels, and increased risk of damage from tsunamis.

196.    The County has incurred significant costs responding to increasingly severe wildfires, including two fires in July 2019 that burned 9,200 acres and for which the Mayor declared a state of emergency, and a 4,100-acre blaze that required forced evacuations and road closures in October 2019. The County provides firefighting personnel for such fires, which are

becoming increasingly frequent and intense as the Earth warms. Additionally, the County has provided emergency shelter for displaced residents at significant expense.

197.    Erosion, storm surges, flooding, wave run-up, and increased wave energy have damaged the County's shoreline and adjacent infrastructure, including, but not limited to roads and utility lines. For instance, in November 2018, the County temporarily repaired a 30-foot section of Lower Honoapiʻilani Road, which had been damaged by excessive runoff from upstream in the watershed, and sea-level-rise induced erosion in Kaʻopala Bay, which threatened water and sewage lines under the Road. The coastline there had already been degraded by sea-level rise and increasingly severe wave activity. The County has incurred costs to study shoreline erosion mitigation measures at that site, including construction of a seawall or managed retreat. Over 11 miles of County roads are at risk of flooding with the 3.2 feet of sea-level rise expected by 2100.



**Figure 11: Temporary Repair of a Section of Lower Road at Kaʻopala, July 2020**



**Figure 12: Damage to Lower Honoapiʻilani Road, 2018**

198.    The County's property and resources[156] have been and will continue to be inundated and/or flooded by sea water and extreme precipitation, among other climate-change related intrusions, causing injury and damages thereto and to improvements thereon, and preventing free passage on, use of, and normal enjoyment of that real property, or permanently destroying them. For instance, sea level rise is both inundating and accelerating beach loss at County's network of beach parks, effectively eliminating portions of those vital community resources which are also critical drivers of the County's ocean- and tourism-based economy.

---

[156] The County disclaims injuries arising on federal property in the County.

116



**Figure 13: King Tide Flooding at Ukumehama Beach Park, West Maui, July 2019**

199.    The County has planned and is planning, at significant expense, adaptation and mitigation strategies to address climate change related impacts in order to preemptively mitigate and/or prevent injuries to itself and its citizens. Those efforts include, but are not limited to, preparation of a Multi-Hazard Mitigation Plan, which will assess sea level rise, increasingly frequent and intense wildfires, and other effects of Defendants' conduct on critical County infrastructure, and propose measures to mitigate adverse impacts on that infrastructure; evaluation of coastal roads within the County, prioritization of roads and shoreline areas requiring mitigation measures, and evaluation of the appropriate mitigation measures to protect against sea level rise, increased flooding and runoff, and other climate change impacts on that critical infrastructure; dedication of County staff time and resources to planning for, permitting, and implementing sea level rise-response actions at both public and private property, including to protect thousands of residents from the imminent impacts of sea level rise-driven coastal erosion; and preparation of a

117

countywide wastewater pump station inundation study, by which the County's Wastewater Reclamation Division is analyzing and preparing for seal level rise, increased severity of storm surges, and other climate change impacts on the County wastewater system, as well as propose improvement and adaption options to mitigate the identified impacts. Additionally, the County has incurred and will incur significant expense in educating and engaging the public on climate change issues, and to promote and implement policies to mitigate and adapt to climate change impacts, including promoting energy and water efficiency and renewable energy. For instance, the County has formed a County Council Committee on Climate Action and Resilience; and a Community Working Group on Climate Emergency and a Just Transition to Restore a Safe Climate, consisting of County staff and community members. Implementation of those planning and outreach processes has and will come at a substantial cost to the County.



**Figure 14: County-Authorized Erosion Protection for Imminently Threatened
High-Density Condominiums, January 2020**

200.    The County, at significant expense, has initiated adaptation measures at many of its public resources to mitigate, and to the extent possible, prevent further injury to its property and facilities. For instance, the County has begun a sand dune restoration project at the Kamaole I Beach Park to mitigate the impact of sea level rise-related erosion.

201.    The County Department of Parks and Recreation is in the process of closing and removing an 80-year-old pavilion and Baldwin Beach Park in Pāʻia which was destroyed due to rising sea levels and erosion. Baldwin Beach Park is one of the largest beach parks in the County's system of parks and recreational facilities and is one of three major parks along Maui's north shore that attract high levels of use. The County is constructing a new pavilion behind the shoreline setback to protect it from severe fluctuations in beach sand and flood risk caused by sea level rise caused by climate change.



**Figure 15: Damage to Baldwin Park Pavilion, August 2020**

202.    But for Defendants' conduct, the County would have suffered no or far less serious injuries and harms than it has endured, and foreseeably will endure, due to the climate crisis and its physical, environmental, social, and economic consequences.

203.    Defendants' conduct as described herein is therefore an actual, substantial, and proximate cause of the County's climate crisis-related injuries.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Public Nuisance)

### (Against All Defendants)

204.    The County realleges each and every allegation contained above, as though set forth herein in full.

205.    Defendants, individually and in concert with each other, by their affirmative acts and omissions, have unlawfully annoyed and/or done damage to the County; worked hurt, inconvenience, and damage upon the County; annoyed and disturbed the County's free use and enjoyment of its property and rendered its ordinary use uncomfortable; and injured the County in its enjoyment of its legal rights. The annoyance, harm, damage, and injury to the County's rights and property has occurred and will continue to occur on and in public places within the County such that members of the public are likely to come within the range of its influence, and has injured public infrastructure and appurtenances within the County, which therefore affect the public at large.

206.    The nuisance created and/or substantially contributed to by Defendants is substantial and unreasonable. It has caused, continues to cause, and will continue to cause far into the future, significant harm to the County and to the community as alleged herein, and that harm

outweighs any offsetting benefit. County residents' health and safety are matters of great public interest and of legitimate concern to the County, and to the entire State of Hawai'i.

207. Defendants specifically created, contributed to, and/or assisted, and/or were a substantial contributing factor in the creation of the public nuisance by, *inter alia*:

a. Affirmatively and knowingly promoting the sale and use of fossil fuel products in Hawai'i and elsewhere which Defendants knew to be hazardous and knew would cause or exacerbate global warming and related consequences, including, but not limited to, sea level rise, drought, wildfire, extreme precipitation events, extreme heat events, and ocean acidification;

b. Affirmatively and knowingly concealing the hazards that Defendants knew would result from the normal use of their fossil fuel products by misrepresenting and casting doubt on the integrity of scientific information related to climate change;

c. Disseminating and funding the dissemination in and outside of Hawai'i of information intended to mislead customers, consumers, and regulators regarding the known and foreseeable risk of climate change and its consequences, which follow from the normal, intended use of Defendants' fossil fuel products;

d. Affirmatively and knowingly campaigning in and outside of Hawai'i against the regulation of their fossil fuel products, despite knowing the hazards associated with the normal use of those products, in order to continue profiting from use of those products by externalizing those known costs onto people, the environment, and communities, including the County; and failing to warn the public, including, but not limited to, the County and its residents, about the hazards associated with the use of fossil fuel products.

208. Because of their superior knowledge of fossil fuel products, Defendants were in the best position to prevent the nuisance, but failed to do so, including by failing to warn customers,

121

retailers, and the County of the risks posed by their fossil fuel products, and failing to take any other precautionary measures to prevent or mitigate those known harms.

209.    The public nuisance caused, contributed to, maintained, and/or participated in by Defendants has caused and/or imminently threatens to cause special injury to the County. The public nuisance has also caused and/or imminently threatens to cause substantial injury to real and personal property directly owned and/or operated by the County for the cultural, historic, economic, and public health benefit of the County's residents, and for their health, safety, and general welfare.

210.    The seriousness of rising sea levels, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, increased frequency and severity of wildfire, restricted availability of fresh drinking water, and the associated consequences of those and other climate crisis-related physical and environmental changes affecting the County, is extremely grave and outweighs the social utility of Defendants' conduct because, *inter alia*,

      a.    the resulting interference with the public's rights is expected to become so regular and severe that it will cause material deprivation of and/or interference with the use and enjoyment of the County's public and private property;

      b.    the ultimate nature of the harm is the destruction of real and personal property, loss of public cultural, historic, natural, and economic resources, and damage to the public health, safety, and general welfare, rather than mere annoyance;

      c.    the interference borne is the loss of property, infrastructure, and public resources owned and/or operated by the County, which will actually be borne by the County's residents, businesses, and visitors as loss of use of public and private property and infrastructure;

122

loss of cultural, historic, and economic resources; damage to the public health, safety, and general welfare; diversion of tax dollars away from other public services to the mitigation of and/or adaptation to climate change impacts; and other adverse impacts;

d. the County's property, which serves myriad uses including residential, infrastructural, commercial, historic, cultural, and ecological, is not suitable for regular inundation, flooding, and/or other physical or environmental consequences of the climate crisis;

e. Defendants, and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, Defendants instead acted affirmatively to obscure them from public consciousness; and

f. it was practical for Defendants, and each of them, considering their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce and extensive scientific engineering expertise, to develop better technologies and to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated greenhouse gas pollution and eased the transition to a lower carbon economy.

211. Defendants' conduct in and outside of Hawai'i was a substantial contributing factor in the unreasonable violation of public rights enjoyed by the County and its residents as set forth above, because Defendants knew or should have known that their conduct would create a continuing problem with long-lasting significant negative effects on the rights of the public, and absent Defendants' conduct the violations of public rights described herein would not have occurred, or would have been less severe.

212.    Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous and were and are causing and contributing to the nuisance complained of, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impact upon the rights of others, including the County and its residents. Therefore, the County requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish those Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

213.    Wherefore, the County prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### (Private Nuisance)

### (Against All Defendants)

214.    The County realleges each and every allegation contained above, as though set forth herein in full.

215.    The County owns, occupies, and manages extensive real property within the County's borders that has been and will continue to be injured by rising sea levels, higher sea level, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, increased frequency and severity of wildfire, and the associated consequences of those physical and environmental changes.

216.    Defendants, individually and in concert with each other, by their affirmative acts and omissions both in and outside Hawaiʻi, have unlawfully annoyed and/or done damage to the County; worked hurt, inconvenience, and damage upon the County; annoyed and disturbed the County's free use and enjoyment of its property and rendered its ordinary use uncomfortable; and injured the County in its enjoyment of its legal rights.

124

217.    The County has not consented to Defendants' conduct in creating the unreasonably injurious conditions on its real property or to the associated harms of that conduct.

218.    The seriousness of rising sea levels, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, increased frequency and severity of wildfire, restricted availability of fresh drinking water, other adverse environmental impacts of Defendants' conduct, and the associated consequences of those physical and environmental changes, is extremely grave and outweighs the social utility of Defendants' conduct because, *inter alia*,

a.    the resulting interference is expected to become so regular and severe that it will cause material deprivation of and/or interference with the use and enjoyment of public and private property in the County;

b.    the ultimate nature of the harm is the destruction of real and personal property, loss of public cultural, historic, natural, and economic resources, and damage to the public health, safety, and general welfare, rather than mere annoyance;

c.    the interference borne is the loss of property, infrastructure, and public resources within the County, which will actually be borne by the County's residents as loss of use of public and private property and infrastructure; loss of cultural, historic, and economic resources; damage to the public health, safety, and general welfare; reduction of fresh drinking water supply; diversion of tax dollars away from other public services to the mitigation of and/or adaptation to climate change impacts; and other adverse impacts;

d.    the County's property, which serves myriad uses including residential, infrastructural, commercial, historic, cultural, and ecological, is not suitable for regular inundation, flooding, and/or other physical or environmental consequences of anthropogenic global warming;

125

e.    Defendants, and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, Defendants instead acted affirmatively to obscure them from public consciousness; and

f.    it was practical for Defendants, and each of them, considering their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce and extensive scientific engineering expertise, to develop better technologies and to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated greenhouse gas pollution and eased the transition to a lower carbon economy.

219.    Defendants' conduct in and outside of Hawai'i was a direct and proximate cause of the County's injuries, and a substantial factor in bringing about the harms suffered by the County as described in this Complaint.

220.    Defendants' acts and omissions as alleged herein are indivisible causes of the County's injuries and damages as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

221.    Wherefore, the County prays for relief as set forth below.

## THIRD CAUSE OF ACTION

### (Strict Liability Failure to Warn)

### (Against All Defendants)

222.    The County realleges each and every allegation contained above, as though set forth herein in full.

223.    Defendants, and each of them, at all times had a duty to issue adequate warnings to the County, the public, consumers, and public officials of the reasonably foreseeable or knowable severe risks posed by their fossil fuel products.

224.    Defendants, and each of them, are and were at all relevant times sellers engaged in the business of marketing, promoting, and selling fossil fuel products in and outside of Hawaiʻi, and their products were expected to and in fact did reach the end user without any substantial or relevant change in their condition.

225.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products, including, but not limited to, the likelihood and likely severity of global warming, global and local sea level rise, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, increased frequency and severity of wildfire, and the associated consequences of those physical and environmental changes, including the County's harms and injuries described herein.

226.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, that the climatic effects described herein

127

rendered their fossil fuel products dangerous, or likely to be dangerous, when used as intended or in a reasonably foreseeable manner.

227. Throughout the times at issue, Defendants breached their duty of care by failing to adequately warn any consumers or any other party of the climate effects that inevitably flow from the intended use and foreseeable misuse of their fossil fuel products.

228. Throughout the times at issue, Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products would cause grave climate changes, undermining and rendering ineffective any warnings that Defendants may have also disseminated.

229. Given the grave dangers presented by the climate effects that inevitably flow from the normal and foreseeable use of fossil fuel products, a reasonable extractor, manufacturer, formulator, seller, marketer, promoter, or other participant responsible for introducing fossil fuel products into the stream of commerce, would have warned of those known, inevitable climate effects.

230. Defendants' conduct in and outside of Hawai'i was a direct and proximate cause of the County's injuries and a substantial factor in bringing about the harms suffered by the County as alleged herein.

231. As a direct and proximate result of Defendants' and each of their acts and omissions, the County has sustained and will sustain substantial expenses and damages set forth in this Complaint, including damage to publicly owned infrastructure and real property, and injuries to public resources that interfere with the rights of the County, and of its residents.

232. Defendants' acts and omissions as alleged herein are indivisible causes of the County's injuries and damage as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

233. Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous and that they had not provided reasonable and adequate warnings against those known dangers, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impact upon the rights of others, including the County. Therefore, the County requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish those Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

234. Wherefore, the County prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Negligent Failure to Warn)

### (Against All Defendants)

235. The County realleges each and every allegation contained above, as though set forth herein in full.

236. Defendants, and each of them, at all times had a duty to issue adequate warnings to the County, the public, consumers, and public officials of the reasonably foreseeable or knowable severe risks posed by their fossil fuel products.

129

237.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates, trade associations and industry groups, and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products, including, but not limited to, the likelihood and likely severity of global warming, global and local sea level rise, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, increased frequency and severity of wildfire, other adverse environmental changes, and the associated consequences of those physical and environmental changes, including the County's harms and injuries described herein.

238.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates, trade associations and industry groups, and/or from the international scientific community, that the climate effects described herein rendered their fossil fuel products dangerous, or likely to be dangerous, when used as intended or in a reasonably foreseeable manner.

239.    Throughout the times at issue, Defendants breached their duty of care by failing to adequately warn any consumers, including, but not limited to, the County, its residents, and any other party, of the climate effects that inevitably flow from the intended or foreseeable use of their fossil fuel products.

240.    Throughout the times at issue, Defendants individually and in concert widely disseminated marketing materials in and outside of Hawai'i, refuted the scientific knowledge generally accepted at the time, advanced pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers, including, but not limited to, the County and its residents, from recognizing the risk that fossil fuel products would cause grave

climate changes, undermining and rendering ineffective any warnings that Defendants may have also disseminated.

241. Given the grave dangers presented by the climate effects that inevitably flow from the normal or foreseeable use of fossil fuel products, a reasonable manufacturer, seller, or other participant responsible for introducing fossil fuel products into the stream of commerce, would have warned of those known, inevitable climate effects.

242. Defendants' conduct in and outside of Hawai'i was a direct and proximate cause of the County's injuries and a substantial factor in bringing about the harms suffered by the County as alleged herein.

243. As a direct and proximate result of Defendants' and each of their acts and omissions, the County has sustained and will sustain substantial expenses and damages as set forth in this Complaint, including damage to publicly owned infrastructure and real property, and injuries to public resources that interfere with the rights of the County and its residents.

244. Defendants' acts and omissions as alleged herein are indivisible causes of the County's injuries and damage as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

245. Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous and that they had not provided reasonable and adequate warnings against those known dangers, and acted with conscious disregard for the probable dangerous consequences of their conduct's and

131

products' foreseeable impact upon the rights of others, including the County's. Therefore, the County requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

246. Wherefore, the County prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Trespass)

### (Against All Defendants)

247. The County realleges each and every allegation contained above, as though set forth herein in full.

248. The County owns, leases, occupies, and/or controls real property throughout the County.

249. Defendants, and each of them, have intentionally, recklessly, or negligently caused flood waters, extreme precipitation, saltwater, and other materials, to enter the County's real property, by distributing, analyzing, recommending, merchandising, advertising, promoting, marketing, and/or selling fossil fuel products, knowing those products in their normal or foreseeable operation and use would cause global and local sea levels to rise and more frequent and extreme precipitation events to occur, among other adverse environmental changes, and the associated consequences of those physical and environmental changes.

250. The County did not give permission for Defendants, or any of them, to cause floodwaters, extreme precipitation, saltwater, and other materials to enter its property as a result of Defendants' fossil fuel products.

251. The County has been and will continue to be actually injured and continues to suffer damages as a result of Defendants, and each of them, having caused flood waters, extreme

precipitation, saltwater, and other materials, to enter its real property, by *inter alia* submerging real property owned by the County, causing flooding and an increased water table which has invaded and threatens to invade real property owned by the County and rendered it unusable, causing storm surges and heightened waves which have invaded and threatened to invade real property owned by the County, and in so doing rendering the County's property unusable.

252. Defendants' and each Defendant's introduction of their fossil fuel products into the stream of commerce in and outside of Hawai'i, coupled with their tortious conduct described herein, was a substantial factor in bringing about the harms and injuries to the County's public and private real property as alleged herein.

253. Defendants' acts and omissions, as alleged herein, are indivisible causes of the County's injuries and damage as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

254. Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impact upon the rights of others, including the County and its residents. Therefore, the County requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

255. Wherefore, the County prays for relief as set forth below.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the **COUNTY OF MAUI**, demands judgment be entered in its favor against Defendants, jointly and severally, as follows:

1.    Compensatory damages in an amount according to proof;

2.    Equitable relief, including abatement of the nuisances complained of herein in and near the County;

3.    Reasonable attorneys' fees as permitted by law;

4.    Punitive damages;

5.    Disgorgement of profits;

6.    Costs of suit; and

7.    For such and other relief as the court may deem proper.

DATED:    Wailuku, Maui, Hawaii, October 12, 2020.

MOANA M. LUTEY
Corporation Counsel

By: ___/s/ MOANA M. LUTEY___
RICHELLE M. THOMSON
KEOLA R. WHITTAKER
Deputies Corporation Counsel

VICTOR M. SHER (*pro hac vice* forthcoming)
MATTHEW K. EDLING (*pro hac vice* forthcoming)
CORRIE J. YACKULIC (*pro hac vice* forthcoming)
TIMOTHY R. SLOANE (*pro hac vice* forthcoming)

Attorneys for Plaintiff
COUNTY OF MAUI

## DEMAND FOR JURY TRIAL

The County hereby demands a jury trial on all causes of action for which a jury is available

under the law.

DATED:    Wailuku, Maui, Hawaii, October 12, 2020.

MOANA M. LUTEY
Corporation Counsel

By:    /s/ MOANA M. LUTEY
RICHELLE M. THOMSON
KEOLA R. WHITTAKER
Deputies Corporation Counsel

VICTOR M. SHER (*pro hac vice* forthcoming)
MATTHEW K. EDLING (*pro hac vice* forthcoming)
CORRIE J. YACKULIC (*pro hac vice* forthcoming)
TIMOTHY R. SLOANE (*pro hac vice* forthcoming)

Attorneys for Plaintiff
COUNTY OF MAUI

PAUL S. AOKI, 1286
Acting Corporation Counsel
ROBERT M. KOHN, 6291
NICOLETTE WINTER, 9588
JEFF A. LAU, 8577
530 S. King Street, Room 110
Honolulu, Hawai'i 96813
Telephone:     (808) 768-5234
Facsimile:     (808) 768-5105
Email:     paoki@honolulu.gov
               robert.kohn@honolulu.gov
               nwinter@honolulu.gov
               jlau3@honolulu.gov

Electronically Filed
FIRST CIRCUIT
1CCV-20-0000380
22-MAR-2021
09:44 AM
Dkt. 45 CAMD

SHER EDLING LLP
VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
MICHAEL H. BURGER (*pro hac vice* pending)
CORRIE J. YACKULIC (*pro hac vice* pending)
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Telephone:     (628) 231-2500
Facsimile:     (628) 231-2929
Email:     vic@sheredling.com
               matt@sheredling.com
               michael@sheredling.com
               corrie@sheredling.com

Attorneys for Plaintiffs CITY AND
COUNTY OF HONOLULU and HONOLULU
BOARD OF WATER SUPPLY

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
STATE OF HAWAI'I

| | |
|---|---|
| CITY AND COUNTY OF HONOLULU AND HONOLULU BOARD OF WATER SUPPLY, | CIVIL NO. 1CCV-20-0000380 |
| | (Other Non-Vehicle Tort) |
| Plaintiffs, | FIRST AMENDED COMPLAINT |
| vs. | |
| SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; EXXON | Trial Date:  None. |

# EXHIBIT "E"

MOBIL CORP.; EXXONMOBIL OIL
CORPORATION; ROYAL DUTCH SHELL
PLC; SHELL OIL COMPANY; SHELL OIL
PRODUCTS COMPANY LLC; CHEVRON
CORP; CHEVRON USA INC.; BHP GROUP
LIMITED; BHP GROUP PLC; BHP
HAWAII INC.; BP PLC; BP AMERICA
INC.; MARATHON PETROLEUM CORP.;
CONOCOPHILLIPS; CONOCOPHILLIPS
COMPANY; PHILLIPS 66; PHILLIPS 66
COMPANY; AND DOES 1 through 100,
inclusive,

           Defendants.

**FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................. 1

II.    PARTIES ............................................................................................................. 5

    A.    Plaintiffs........................................................................................... 5

    B.    Defendants ........................................................................................ 6

    C.    Relevant Non-Parties: Fossil Fuel Industry Associations................................... 27

III.   AGENCY ........................................................................................................... 29

IV.   JURISDICTION AND VENUE........................................................................... 30

V.    FACTUAL BACKGROUND.............................................................................. 30

    A.    Climate Disruption—Cause and Effects................................................ 30

    B.    Attribution....................................................................................... 34

    C.    Defendants Went to Great Lengths to Understand, and Either Knew or Should Have Known About the Dangers Associated with Their Fossil Fuel Products................................................................................ 35

    D.    Defendants Did Not Disclose Known Harms Associated with the Extraction, Promotion, and Consumption of Their Fossil Fuel Products, and Instead Affirmatively Acted to Obscure Those Harms and Engaged in a Concerted Campaign to Evade Regulation. ........................................................... 60

    E.    In Contrast to Their Public Statements, Defendants' Internal Actions Demonstrate Their Awareness of and Intent to Profit from the Unabated Use of Fossil Fuel Products. .................................................................. 76

    F.    Defendants' Actions Have Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis............................................ 79

    G.    Defendants Continue to Mislead About the Impact of Their Fossil Fuel Products on Climate Change Through Greenwashing Campaigns and Other Misleading Advertisements. ......................................................... 86

    H.    Defendants Caused Plaintiffs' Injuries. ................................................ 89

VI.   CAUSES OF ACTION ....................................................................................... 101

    **FIRST CAUSE OF ACTION (Public Nuisance)** .......................................................................................... 101

    **SECOND CAUSE OF ACTION (Private Nuisance)**......................................................................................... 105

    **THIRD CAUSE OF ACTION (Strict Liability Failure to Warn)**................................................................. 108

**FOURTH CAUSE OF ACTION**
**(Negligent Failure to Warn)** ...................................................................................... 111

**FIFTH CAUSE OF ACTION**
**(Trespass)** .................................................................................................................. 113

VII.    **PRAYER FOR RELIEF** .................................................................................. 115

## I.    INTRODUCTION

1.      Defendants, major corporate members of the fossil fuel industry, have known for nearly half a century that unrestricted production and use of their fossil fuel products create greenhouse gas pollution that warms the planet and changes our climate. They have known for decades that those impacts could be catastrophic and that only a narrow window existed to take action before the consequences would be irreversible. They have nevertheless engaged in a coordinated, multi-front effort to conceal and deny their own knowledge of those threats, discredit the growing body of publicly available scientific evidence, and persistently create doubt in the minds of customers, consumers, regulators, the media, journalists, teachers, and the public about the reality and consequences of the impacts of their fossil fuel pollution.

2.      At the same time, Defendants have promoted and profited from a massive increase in the extraction and consumption of oil, coal, and natural gas, which has in turn caused an enormous, foreseeable, and avoidable increase in global greenhouse gas pollution and a concordant increase in the concentration of greenhouse gases,[1] particularly carbon dioxide ("$CO_2$") and methane, in the Earth's atmosphere. Those disruptions of the Earth's otherwise balanced carbon cycle have substantially contributed to a wide range of dire climate-related effects, including but not limited to global atmospheric and ocean warming,  ocean acidification, melting polar ice caps and glaciers, more extreme and volatile weather, drought, and sea level rise.

3.      Plaintiffs, the City and County of Honolulu and its departments and agencies ("City"), and the Honolulu Board of Water Supply ("BWS"),[2] along with Plaintiffs' residents,

---

[1] As used in this Complaint, the term "greenhouse gases" refers collectively to carbon dioxide, methane, and nitrous oxide. Where a cited source refers to a specific gas or gases, or when a process relates only to a specific gas or gases, this Complaint refers to each gas by name.

[2] As used herein, "County" refers to the Plaintiffs' geographic areas.

ratepayers, infrastructure, and natural resources, suffer the consequences of Defendants' campaign of deception.

4.      Defendants are extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and/or sellers of fossil fuel products, each of which contributed to deceiving the public about the role of their products in causing the global climate crisis. Decades of scientific research has shown that pollution from Defendants' fossil fuel products plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution and increased atmospheric $CO_2$ concentrations that has occurred since the mid-20th century. This dramatic increase in atmospheric $CO_2$ and other greenhouse gases is the main driver of the gravely dangerous changes occurring to the global climate.

5.      Anthropogenic greenhouse gas pollution, primarily in the form of $CO_2$, is far and away the dominant cause of global warming, resulting in severe impacts including but not limited to sea level rise, disruption to the hydrologic cycle, more frequent and intense extreme precipitation events and associated flooding, more frequent and intense heatwaves, more frequent and intense droughts, and associated consequences of those physical and environmental changes.[3] The primary cause of this is the combustion of coal, oil, and natural gas, referred to collectively in this Complaint as "fossil fuel products."[4]

6.      The rate at which Defendants have extracted and sold fossil fuel products has exploded since the Second World War, as have emissions from those products. The substantial

---

[3]*See* IPCC, *Climate Change 2014: Synthesis Report*, Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. IPCC, Geneva, Switzerland (2014) 6, Figure SMP.3, https://www.ipcc.ch/report/ar5/syr.

[4] *See* Pierre Friedlingstein, et al., *Global Carbon Budget 2019*, 11 EARTH SYST. SCI. DATA 1783 (2019), https://www.earth-syst-sci-data.net/11/1783/2019 (accessed Feb. 21, 2020).

majority of all greenhouse gas emissions in history has occurred since the 1950s, a period known as the "Great Acceleration."[5] About three quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s,[6] and more than half have occurred since the late 1980s.[7] The annual rate of $CO_2$ emissions from extraction, production, and consumption of fossil fuels has increased substantially since 1990.[8]

7.      Defendants have known for more than 50 years that greenhouse gas pollution from their fossil fuel products would have a significant adverse impact on the Earth's climate and sea levels. Defendants' awareness of the negative implications of their actions corresponds almost exactly with the Great Acceleration and with skyrocketing greenhouse gas emissions. With that knowledge, Defendants took steps to protect their own assets from those threats through immense internal investment in research, infrastructure improvements, and plans to exploit new opportunities in a warming world.

8.      Instead of warning of those known consequences from the intended and foreseeable uses of their products and working to minimize the damage associated with the use and combustion of such products, Defendants concealed the dangers, promoted false and misleading information, sought to undermine public support for greenhouse gas regulation, and engaged in massive campaigns to promote the ever-increasing use of their products at ever-greater volumes. All Defendants' actions in concealing the dangers of, promoting false and misleading information

---

[5] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 THE ANTHROPOCENE REVIEW 81, 81 (2015).

[6] R. J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 BIOGEOSCIENCES 1845, 1851 (2012).

[7] *Id.*

[8] Friedlingstein et al., *supra* note 4.

3

about, and engaging in massive campaigns to promote increasing use of their fossil fuel products has contributed substantially to the buildup of $CO_2$ in the atmosphere that drives global warming and its physical, environmental, and socioeconomic consequences, including those on Plaintiffs.

9. Defendants are directly responsible for the substantial increase in all $CO_2$ emissions between 1965 and the present. Defendants individually and collectively played leadership roles in denialist campaigns to misinform and confuse the public and obscure the role of Defendants' products in causing global warming and its associated impacts. But for such campaigns, climate crisis impacts on Plaintiffs would have been substantially mitigated or eliminated altogether. Accordingly, Defendants are directly responsible for a substantial portion of the climate crisis-related impacts on Plaintiffs.

10. As a direct and proximate consequence of Defendants' wrongful conduct, the average sea level will rise substantially along the County's coastline, causing flooding, erosion, and beach loss; extreme weather, including hurricanes and tropical storms, "rain bomb" events, drought, heatwaves, and other phenomena will become more frequent, longer-lasting, and more severe; ocean warming and acidification will reduce fish catch and injure or kill coral reefs that protect the island from increasingly intense storm surges; freshwater supplies will become increasingly scarce; endemic species will lose habitat, while invasive and disease carrying-pest species will thrive; and the cascading social, economic, and other consequences of those environmental changes—all due to anthropogenic global warming—will increase in the County.

11. As a direct result of those and other climate crisis-caused environmental changes, Plaintiffs have suffered and will continue to suffer severe injuries, including but not limited to: injury or destruction of City- and/or BWS-owned or operated facilities critical for operations, utility services, and risk management, as well as other assets essential to community health, safety,

4

and well-being; increased planning and preparation costs for community adaptation and resiliency to the effects of the climate crisis; decreased tax revenue due to impacts on the local tourism and ocean-based economy and property tax base; and others.

12. Defendants' individual and collective conduct, including but not limited to their introduction of fossil fuel products into the stream of commerce knowing, but failing to warn of, the threats posed to the world's climate; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products; their public deception campaigns designed to obscure the connection between their products and global warming and the environmental, physical, social, and economic consequences flowing from it; and their failure to pursue less hazardous alternatives, actually and proximately caused Plaintiffs' injuries.

13. Accordingly, the Plaintiffs bring this action against Defendants for Public Nuisance, Private Nuisance, Strict Liability for Failure to Warn, Negligent Failure to Warn, and Trespass.

14. Plaintiffs hereby disclaim injuries arising on federal property and those arising from special-formula fossil-fuel products that Defendants designed specifically for, and provided exclusively to, the federal government for use by the military for military and national defense purposes.

15. Plaintiffs seek to ensure that the parties who have profited from externalizing the consequences and costs of dealing with global warming and its physical, environmental, social, and economic consequences, bear the costs of those impacts, rather than the City, BWS, taxpayers, ratepayers, residents, or broader segments of the public.

## II. PARTIES

### A. Plaintiffs

16. Plaintiff, the City and County of Honolulu, brings this action as an exercise of its

5

police power, which includes but is not limited to its power to prevent injuries to and pollution of the City's property and waters, to prevent and abate nuisances, and to prevent and abate hazards to public health, safety, welfare, and the environment.

17.     The City consists of several Offices, Departments, and Divisions, each with purview over City operations, facilities, property, and/or programs that have been injured by Defendants' conduct as alleged herein and consequent global warming-related impacts. Among those agencies are the City's Office of Climate Change, Sustainability, and Resiliency, which plans for and prepares the City, its subdivisions, and its constituents for environmental changes and associated injuries, including those caused by Defendants' conduct; the Department of Parks and Recreation, which operates and maintains the City's network of beach parks and other recreational resources; the Department of Facility Maintenance, which maintains the City's critical public infrastructure such as roads, bridges, flood control systems, City buildings, and others; the Department of Land Management, which manages City-owned real property, including property lost to coastal erosion and flooding; and the Department of Environmental Services, which operates the City's wastewater infrastructure and is undertaking expensive retrofit projects to protect that infrastructure from sea level rise.

18.     Plaintiff the Honolulu Board of Water Supply is a semi-autonomous agency that owns, operates, and maintains the public drinking water system and manages municipal water resources in the County. BWS must plan for drinking water shortages and must repair infrastructure damaged as a result of Defendants' conduct. BWS finances its capital projects and operations from water sales to businesses and consumers in the County.

**B.     Defendants**

19.     When reference in this Complaint is made to an act or omission of the Defendants, unless specifically attributed or otherwise stated, such references should be interpreted to mean

6

that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such an act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

20.     **Sunoco Entities**

a.     Sunoco LP is a fossil fuel product distributor, marketer, and promoter. Sunoco LP is registered in Delaware and has its headquarters in Dallas, Texas. Sunoco LP consists of numerous divisions, subsidiaries and affiliates engaged in all aspects of the fossil fuel industry, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, distribution, and/or sales.

b.     Sunoco LP controls and has controlled companywide decisions about the quantity, nature, and extent of fossil fuel production, marketing, and sales, including those of its subsidiaries. Sunoco LP's managing partners determine whether and to what extent Sunoco subsidiary holdings around the globe—including Hawai'i—market, produce, and/or distribute fossil fuel products.

c.     Sunoco LP controls and has controlled companywide decisions related to climate change and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries.

d.     On information and belief, each of Sunoco LP's subsidiaries functions as an alter ego of Sunoco LP, including by conducting fossil fuel-related business in Hawai'i that Sunoco LP would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both Sunoco LP and the subsidiary, and employing the same people.

7

e. Aloha Petroleum LLC is a subsidiary of Sunoco LP. Aloha Petroleum LLC is registered in Delaware and has its principal place of business in Dallas, Texas. Aloha Petroleum LLC's principal line of business includes the marketing, terminaling, and distribution of gasoline, diesel, ethanol, lubricants, and other petroleum products in Hawai'i. Aloha Petroleum LLC purchased the assets of Shell Oil Company, Inc., in the State of Hawai'i in or about 2010.

f. Aloha Petroleum, Ltd. is a subsidiary of Sunoco LP. Aloha Petroleum, Ltd. is incorporated in Hawai'i with its principal place of business in Honolulu. Aloha Petroleum, Ltd.'s principal line of business includes the marketing, terminaling, and distribution of gasoline, diesel, biodiesel, ethanol, lubricants, and other petroleum and fossil fuel products. Aloha Petroleum, Ltd. was formerly known as Associated Oil, a division of Tidewater Oil. At times relevant to this litigation, Associated Oil was a subsidiary of Phillips 66, a predecessor-in-interest to ConocoPhillips.

g. Defendants Sunoco LP, Aloha Petroleum LLC, Aloha Petroleum, Ltd., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "Sunoco."

h. Sunoco has and continues to tortiously market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to Plaintiffs. A substantial portion of Sunoco's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Hawai'i, from which Sunoco derives and has derived substantial revenue. Sunoco is one of the largest fossil fuel product marketers and sellers in Hawai'i. Sunoco has a long history of marketing and selling fossil fuel products in Hawai'i, including operating numerous gas stations going back to at least the mid-20th century. Sunoco

8

acquired Shell Hawaii's assets in 2010, which included 32 retail sites, five fuel distribution terminals, and associated assets on Oʻahu, Maui, the Big Island, and Kauaʻi. Sunoco was a member of the American Petroleum Institute's $CO_2$ Task Force during the 1970s and 1980s, which played a key role in hiding the industry's knowledge concerning climate change and disseminating misinformation. Sunoco retains the license for, and operates, Shell-branded gas stations across Hawaiʻi, in addition to its own Aloha-branded stations. Sunoco maintains an interactive website by which it directs prospective customers to Aloha-branded service stations in Hawaiʻi. Sunoco offers an Aloha-branded proprietary credit card known as the "Save-A-$ Club Card," which allows consumers in Hawaiʻi to pay for gasoline and other products at Aloha-branded service stations, and which encourages consumers to use Aloha-branded gas stations by offering various rewards, including discounts on gasoline purchases.

21. **Exxon Entities**

a. Exxon Mobil Corporation is a multi-national, vertically integrated energy and chemicals company incorporated in the State of New Jersey with its headquarters and principal place of business in Irving, Texas. Exxon Mobil Corporation is among the largest publicly traded international oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., ExxonMobil Refining & Supply Corporation, Exxon Company, U.S.A., Exxon Corporation, and Mobil Corporation. Exxon Mobil Corporation is registered to do business in Hawaiʻi and has a registered agent for service of process in Honolulu, Hawaiʻi.

b. Exxon Mobil Corporation controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its

9

subsidiaries. Exxon Mobil Corporation's 2017 Form 10-K filed with the United States Securities and Exchange Commission represents that its success, including its "ability to mitigate risk and provide attractive returns to shareholders, depends on [its] ability to successfully manage [its] overall portfolio, including diversification among types and locations of our projects."

c. Exxon Mobil Corporation controls and has controlled companywide decisions related to climate change and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries. Exxon Mobil Corporation's Board holds the highest level of direct responsibility for climate change policy within the company. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management Committee are actively engaged in discussions relating to greenhouse gas emissions and the risks of climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries to provide an estimate of greenhouse gas-related emissions costs in their economic projections when seeking funding for capital investments.

d. On information and belief, each of Exxon Mobil Corporation's subsidiaries functions as an alter ego of Exxon Mobil Corporation, including by conducting fossil fuel-related business in Hawai'i that Exxon Mobil Corporation would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both Exxon Mobil Corporation and the subsidiary, and employing the same people.

e. Exxonmobil Oil Corporation is incorporated in the State of New York with its principal place of business in Irving, Texas. Exxonmobil Oil Corporation is registered to do business in Hawai'i and has a registered agent for service of process in Honolulu, Hawai'i. Exxonmobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Mobil Oil Corporation.

f.      "Exxon" as used hereafter means collectively Defendants Exxon Mobil Corporation and Exxonmobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions.

g.      Exxon consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

h.      Exxon has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to Plaintiffs. A substantial portion of Exxon's fossil fuel products are or have been transported, traded, supplied, distributed, promoted, marketed, sold, and/or consumed in Hawai'i, from which Exxon derives and has derived substantial revenue. For example, Exxon directly and through its subsidiaries and/or predecessors in interest supplied substantial quantities of fossil fuel products, including but not limited to crude oil, to Hawai'i during the period relevant to this litigation.

22.     **Shell Entities**

a.      Royal Dutch Shell PLC is a vertically integrated, multinational energy and petrochemical company. Royal Dutch Shell is incorporated in England and Wales, with its headquarters and principal place of business in the Hague, Netherlands. Royal Dutch Shell PLC consists of numerous divisions, subsidiaries and affiliates engaged in all aspects of the fossil fuel industry, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

11

b.      Royal Dutch Shell PLC controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Royal Dutch Shell PLC's Board of Directors determines whether and to what extent Shell subsidiary holdings around the globe produce Shell-branded fossil fuel products. For instance, in 2015, a Royal Dutch Shell PLC subsidiary employee admitted in a deposition that Royal Dutch Shell PLC's Board of Directors made the decision whether to drill a particular oil deposit off the coast of Alaska.

c.      Royal Dutch Shell PLC controls and has controlled companywide decisions related to climate change and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries. Overall accountability for climate change within the Shell group of companies lies with Royal Dutch Shell PLC's Chief Executive Officer and Executive Committee. For instance, at least as early as 1988, Royal Dutch Shell PLC, through its subsidiaries, was researching companywide $CO_2$ emissions and concluded that the Shell group of companies accounted for "4% of the $CO_2$ emitted worldwide from combustion," and that climatic changes could compel the Shell group, as controlled by Royal Dutch Shell PLC, to "examine the possibilities of expanding and contracting [its] business accordingly." Royal Dutch Shell PLC's CEO has stated that Royal Dutch Shell PLC would reduce the carbon footprint of its products, including those of its subsidiaries "by reducing the net carbon footprint of the full range of Shell emissions, from our operations and from the consumption of our products." Additionally, in November 2017, Royal Dutch Shell PLC announced it would reduce the carbon footprint of "its energy products" by "around" half by 2050. Royal Dutch Shell PLC's effort is inclusive of all fossil fuel products produced under the Shell brand, including those of its subsidiaries.

12

d.      On information and belief, each of Royal Dutch Shell PLC's subsidiaries functions as an alter ego of Royal Dutch Shell PLC, including by conducting fossil fuel-related business in Hawaiʻi that Royal Dutch Shell PLC would otherwise conduct if it were present in Hawaiʻi, sharing directors and officers with supervisory roles over both Royal Dutch Shell PLC and the subsidiary, and employing the same people.

e.      Shell Oil Company is a wholly owned subsidiary of Royal Dutch Shell PLC that acts on Royal Dutch Shell PLC's behalf and subject to Royal Dutch Shell PLC's control. Shell Oil Company is incorporated in Delaware and with its principal place of business in Houston, Texas. Shell Oil Company is registered to do business in Hawaiʻi and has a registered agent for service of process in Honolulu, Hawaiʻi. Shell Oil Company was formerly known as, did or does business as, and/or is the successor in liability to Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Shell Trading (US) Company, Shell Energy Services, The Pennzoil Company, Shell Oil Products Company LLC, Shell Oil Products Company, Star Enterprise LLC, and Pennzoil-Quaker State Company.

f.      Shell Oil Products Company LLC is a wholly owned subsidiary of Royal Dutch Shell PLC. Shell Oil Products Company LLC is incorporated in the State of Delaware and maintains its principal place of business in Houston, Texas. Shell Oil Products Company LLC is registered to do business in Hawaiʻi and has a registered agent for service of process in Honolulu, Hawaiʻi. Shell Oil Products Company LLC is an energy and petrochemical company involved in refining, transportation, distribution and marketing of Shell fossil fuel products.

g.      Defendants Royal Dutch Shell PLC, Shell Oil Company, Shell Oil Products Company LLC, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to as "Shell."

13

h.      Shell has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to Plaintiffs. A substantial portion of Shell's fossil fuel products are or have been supplied, traded, distributed, promoted, marketed, sold, and/or consumed in Hawai'i, from which Shell derives and has derived substantial revenue. Among other endeavors, Shell has marketed and/or markets gasoline and other fossil fuel products to consumers in Hawai'i, including through over thirty-five Shell-branded petroleum service stations located in Hawai'i. Shell maintains an interactive website by which it directs prospective customers to Shell-branded service stations in Hawai'i. Shell offers a proprietary credit card known as the "Shell Fuel Rewards Card," which allows consumers in Hawai'i to pay for gasoline and other products at Shell-branded service stations, and which encourages consumers to use Shell-branded gas stations by offering various rewards, including discounts on gasoline purchases. Shell further maintains a smartphone application known as the "Shell US App" that offers Hawai'i consumers a cashless payment method for gasoline and other products at Shell-branded service stations. Hawai'i consumers utilize the payment method by providing their credit card information through the application. Hawai'i consumers can also receive rewards including discounts on gasoline purchases by registering their personal identifying information into the Shell US App and using the application to identify and activate gas pumps at Shell service stations during a purchase. Shell continues to license the Shell fossil fuel product brand name to petroleum sellers in Hawai'i. During the period relevant to this litigation, Shell owned and operated five fossil fuel distribution terminals and associated assets on O'ahu, Maui, the Big Island, and Kaua'i.

14

23. **Chevron Entities**

a. Chevron Corporation is a multi-national, vertically integrated energy and chemicals company incorporated in the State of Delaware, with its global headquarters and principal place of business in San Ramon, California.

b. Chevron Corporation operates through a web of United States and international subsidiaries at all levels of the fossil fuel supply chain. Chevron Corporation and its subsidiaries' operations consist of: (1) exploring for, developing, and producing crude oil and natural gas; (2) processing, liquefaction, transportation, and regasification associated with liquefied natural gas; (3) transporting crude oil by major international oil export pipelines; (4) transporting, storing, and marketing natural gas; (5) refining crude oil into petroleum products; marketing of crude oil and refined products; (6) transporting crude oil and refined products by pipeline, marine vessel, motor equipment, and rail car; (7) basic and applied research in multiple scientific fields including chemistry, geology, and engineering; and (8) manufacturing and marketing of commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

c. Chevron Corporation controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries.

d. Chevron Corporation controls and has controlled companywide decisions related to climate change and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries.

e. On information and belief, each of Chevron Corporation's subsidiaries functions as an alter ego of Chevron Corporation, including by conducting fossil fuel-related business in Hawai'i that Chevron Corporation would otherwise conduct if it were present in

15

Hawai'i, sharing directors and officers with supervisory roles over both Chevron Corporation and the subsidiary, and employing the same people.

f. Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal place of business located in San Ramon, California. Chevron U.S.A. Inc. is registered to do business in and has a registered agent for service of process in Honolulu, Hawai'i. Chevron U.S.A. Inc. is a wholly-owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and subject to Chevron Corporation's control. Chevron U.S.A. Inc. was formerly known as, and did or does business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, Chevron Chemical Company, Texaco, Inc., and Unocal Corp.

g. "Chevron" as used hereafter, means collectively, Defendants Chevron Corporation and Chevron U.S.A. Inc., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions.

h. Chevron has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to Plaintiffs. A substantial portion of Chevron's fossil fuel products are or have been refined, traded, distributed, promoted, marketed, sold, and/or consumed in Hawai'i, from which Chevron derives and has derived substantial revenue. For example, during the period relevant to this litigation, Chevron owned and operated a 58,000-barrel-per-day refinery on O'ahu. Chevron owns and operates four fossil fuel storage terminals on O'ahu, Maui, Kaua'i, and the Big Island. Additionally, Chevron markets and/or has marketed gasoline and other fossil fuel products to consumers, including through over eighty Chevron-branded petroleum services stations in Hawai'i. Chevron offers proprietary credit cards

16

known as the "Chevron Techron Advantage Card," and "Texaco Techron Advantage Card," which allow consumers in Hawai'i to pay for gasoline and other products at Chevron- and/or Texaco-branded service stations, and which encourage consumers in Hawai'i to use Chevron- and/or Texaco-branded service stations by offering various rewards, including discounts on gasoline purchases at Chevron and/or Texaco service stations and cash rebates. Chevron maintains an interactive website by which it directs prospective customers to Chevon- and Texaco-branded service stations in Hawai'i. Chevron further maintains smartphone applications known as the "Chevron App" and "Texaco App" that offer Hawai'i consumers a cashless payment method for gasoline and other products at Chevron- and/or Texaco-branded service stations. Consumers in Hawai'i utilize the payment method by providing their credit card information through the application. Consumers in Hawai'i can also receive rewards including discounts on gasoline purchases by registering their personal identifying information into the Chevron App and Texaco App and using the application to identify and activate gas pumps at Chevron and/or Texaco service stations during a purchase.

24.     **BHP Entities**

a.     BHP is a dual-listed company consisting of two parent companies: BHP Group Limited, which is registered in Australia and maintains its headquarters in Melbourne, Victoria, Australia; and BHP Group plc, which is registered in England and Wales, and maintains its headquarters in London, England. Collectively, those entities are referred to herein as "BHP Group."

b.     BHP Group operates as a multinational, vertically-integrated, petroleum, natural gas, and coal company, consisting of multiple affiliates, subsidiaries, and segments. BHP

17

Group's fossil fuel products-related operations consist of exploration, evaluation, development, extraction, processing, transportation, marketing, and logistics.

c. BHP Group controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries.

d. BHP Group controls and has controlled companywide decisions related to climate change and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries.

e. On information and belief, each of BHP Group's subsidiaries functions as an alter ego of BHP Group, including by conducting fossil fuel-related business in Hawaiʻi that BHP Group would otherwise conduct if it were present in Hawaiʻi, sharing directors and officers with supervisory roles over both BHP Group and the subsidiary, and employing the same people.

f. BHP Group owns several subsidiaries that do fossil fuel products-related business in the United States, including in Hawaiʻi, including, but not limited to, BHP Hawaii Inc. BHP Hawaii Inc. is incorporated in Hawaiʻi.

g. "BHP," as used hereafter, refers to BHP Group and BHP Hawaii Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions.

h. BHP has tortiously distributed, marketed, advertised, and promoted its products in Hawaiʻi, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawaiʻi, including to Plaintiffs. A substantial portion of BHP's fossil fuel products are or have been manufactured, refined, traded, distributed, promoted, marketed, sold, and/or consumed in Hawaiʻi, from which BHP derives and has derived substantial revenue. For example, BHP owned and operated a fossil fuel refinery in Kapolei on Oʻahu during the time relevant to this litigation. Additionally, BHP marketed fossil fuel products to Hawaiʻi

18

consumers through more than thirty BHP-branded retail petroleum service stations throughout Hawai'i.

25. **BP Entities**

a. BP P.L.C. is a multi-national, vertically integrated energy and petrochemical public limited company, registered in England and Wales with its principal place of business in London, England. BP P.L.C. consists of three main operating segments: (1) exploration and production, (2) refining and marketing, and (3) gas power and renewables. BP P.L.C. is the ultimate parent company of numerous subsidiaries, referred to collectively as the "BP Group," which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as gasoline; and market and sell oil, fuel, other refined petroleum products, and natural gas worldwide. BP P.L.C.'s subsidiaries explore for oil and natural gas under a wide range of licensing, joint arrangement, and other contractual agreements.

b. BP P.L.C. controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. BP P.L.C. is the ultimate decisionmaker on fundamental decisions about the BP Group's core business, *i.e.*, the level of companywide fossil fuels to produce, including production among BP P.L.C.'s subsidiaries. For instance, BP P.L.C. reported that in 2016–17 it brought online thirteen major exploration and production projects. Those contributed to a 12-percent increase in the BP Group's overall fossil fuel product production. Those projects were carried out by BP P.L.C.'s subsidiaries. Based on those projects, BP P.L.C. expects the BP Group to deliver to customers 900,000 barrels of new product per day by 2021. BP P.L.C. further reported that in 2017 it sanctioned three new exploration projects in Trinidad, India, and the Gulf of Mexico.

c.    BP P.L.C. controls and has controlled companywide decisions related to climate change and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries. BP P.L.C. makes fossil fuel production decisions for the entire BP Group based on factors including climate change. BP P.L.C.'s Board is the highest decision-making body within the company, with direct responsibility for the BP Group's climate change policy. BP P.L.C.'s chief executive is responsible for maintaining the BP Group's system of internal control that governs the BP Group's business conduct. BP P.L.C. reviews climate change risks facing the BP Group through two executive committees as part of BP Group's established management structure, and directs Group-wide strategy and decisions regarding climate change.

d.    On information and belief, each of BP P.L.C.'s subsidiaries functions as an alter ego of BP P.L.C., including by conducting fossil fuel-related business in Hawai'i that BP P.L.C. would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both BP P.L.C. and the subsidiary, and employing the same people.

e.    BP America Inc. is a wholly owned subsidiary of BP P.L.C. that acts on BP P.L.C.'s behalf and is subject to BP P.L.C.'s control. BP America Inc. is a vertically integrated energy and petrochemical company incorporated in the State of Delaware with its headquarters and principal place of business in Houston, Texas. BP America Inc., consists of numerous divisions and affiliates in all aspects of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP America Inc. is registered to do business in Hawai'i and has a registered agent for service of process in Honolulu, Hawai'i. BP America Inc. was formerly known as, did or does business as, and/or is the successor in liability to Amoco Corporation; Amoco Oil Company; ARCO Products Company; Atlantic Richfield

20

Delaware Corporation; Atlantic Richfield Company (a Delaware Corporation); BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Amoco Plc; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); The Atlantic Richfield Company (a Pennsylvania corporation) and its division, the Arco Chemical Company.

f. Defendants BP P.L.C. and BP America, Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

g. BP has and continues to tortiously distribute, market, advertise, and promote its products in Hawaiʻi, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawaiʻi, including to Plaintiffs. A substantial portion of BP's fossil fuel products are or have been supplied, transported, traded, distributed, promoted, marketed, sold, and/or consumed in Hawaiʻi, from which BP derives and has derived substantial revenue. For example, BP directly and through its subsidiaries and/or predecessors in interest supplied substantial quantities of fossil fuel products, including but not limited to crude oil, to Hawaiʻi during the period relevant to this litigation. At times relevant to this complaint, BP engaged in the production of crude oil in Alaska, a substantial portion of which is shipped to, shipped through, and sold to refinery customers in Hawaiʻi. BP maintains an interactive website by which it directs prospective customers to retail locations in Hawaiʻi offering BP's fossil fuel products for sale, including but not limited to its Castrol brand of lubricants. BP offers a proprietary credit card known as the "BP Credit Card," which allows consumers in Hawaiʻi to pay for gasoline and other products. Consumers who use the BP Credit Card receive various rewards, including discounts on gasoline purchases.

21

26.    **Marathon Petroleum Corporation**

a.    Marathon Petroleum Corporation is a multinational energy company incorporated in Delaware and with its principal place of business in Findlay, Ohio. Marathon Petroleum Corporation was spun off from the operations of Marathon Oil Corporation in 2011. It consists of multiple subsidiaries and affiliates involved in fossil fuel product refining, marketing, retail, and transport, including both petroleum and natural gas products. Marathon Petroleum Corporation merged in October 2018 with Andeavor Corporation, formerly known as Tesoro Corporation.

b.    Marathon Petroleum Corporation is a successor-in-interest to Tesoro Corporation and Tesoro Hawaii Corporation.

c.    Marathon Petroleum Corporation controls and has controlled companywide decisions about the quantity and extent of its fossil fuel production and sales, including those of their subsidiaries.

d.    Marathon Petroleum Corporation controls and has controlled companywide decisions related to climate change and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries.

e.    On information and belief, each of Marathon Petroleum Corporation's subsidiaries functions as an alter ego of Marathon Petroleum Corporation, including by conducting fossil fuel-related business in Hawai'i that Marathon Petroleum Corporation would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both Marathon Petroleum Corporation and the subsidiary, and employing the same people.

22

f.      Defendant Marathon Petroleum Corporation and its predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to as "Marathon."

g.      Marathon has and continues to tortiously distribute, market, advertise, and promote its products in Hawai'i, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawai'i, including to the Plaintiffs. A substantial portion of Marathon's fossil fuel products are or have been refined, transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Hawai'i, from which Marathon derives and has derived substantial revenue. For example, during the time relevant to this litigation, Marathon marketed gasoline and other fossil fuel products to consumers in Hawai'i, including through over thirty petroleum service stations it owned in Hawai'i and operated under the "Tesoro" name. Additionally, during the time relevant to this litigation, Marathon owned and operated the largest petroleum refinery in Hawai'i which was capable of refining 94,000 barrels of fossil fuel per day.

27.     **ConocoPhillips Entities**

a.      ConocoPhillips is a multinational energy company incorporated in the State of Delaware and with its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that carry out ConocoPhillips's fundamental decisions related to all aspects of the fossil fuel industry, including exploration, extraction, production, manufacture, transport, and marketing.

b.      ConocoPhillips controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. ConocoPhillips' most recent annual report subsumes the operations of the entire ConocoPhillips

23

group of subsidiaries under its name. Therein, ConocoPhillips represents that its value—for which ConocoPhillips maintains ultimate responsibility—is a function of its decisions to direct subsidiaries to explore for and produce fossil fuels: "Unless we successfully add to our existing proved reserves, our future crude oil, bitumen, natural gas and natural gas liquids production will decline, resulting in an adverse impact to our business." ConocoPhillips optimizes the ConocoPhillips group's oil and gas portfolio to fit ConocoPhillips' strategic plan. For example, in November 2016, ConocoPhillips announced a plan to generate $5 billion to $8 billion of proceeds over two years by optimizing its business portfolio, including its fossil fuel product business, to focus on low cost-of-supply fossil fuel production projects that strategically fit its development plans.

c.      ConocoPhillips controls and has controlled companywide decisions related to global warming and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries. For instance, ConocoPhillips' board has the highest level of direct responsibility for climate change policy within the company. ConocoPhillips has developed and implements a corporate Climate Change Action Plan to govern climate change decision-making across all entities in the ConocoPhillips group.

d.      On information and belief, each of ConocoPhillips's subsidiaries functions as an alter ego of ConocoPhillips, including by conducting fossil fuel-related business in Hawai'i that ConocoPhillips would otherwise conduct if it were present in Hawai'i, sharing directors and officers with supervisory roles over both ConocoPhillips and the subsidiary, and employing the same people.

e.      ConocoPhillips Company is a wholly owned subsidiary of ConocoPhillips that acts on ConocoPhillips' behalf and subject to ConocoPhillips' control. ConocoPhillips

24

Company is incorporated in Delaware and has its principal office in Bartlesville, Oklahoma. ConocoPhillips Company is qualified to do business in Hawaiʻi and has a registered agent for service of process in Honolulu, Hawaiʻi.

f.     Phillips 66 is a multinational energy and petrochemical company incorporated in Delaware and with its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips.

g.     Phillips 66 Company is a wholly owned subsidiary of Phillips 66 that acts on Phillips 66's behalf and subject to Phillips 66's control. Phillips 66 Company is incorporated in Delaware and has its principal office in Houston, Texas. Phillips 66 Company is qualified to do business in Hawaiʻi and has a registered agent for service of process in Honolulu, Hawaiʻi. Phillips 66 Company was formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, Tosco Refining Co., and Associated Oil (a predecessor-in-interest of defendant Aloha Petroleum, Ltd.).

h.     Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "ConocoPhillips."

i.     ConocoPhillips has and continues to tortiously distribute, market, advertise, and promote its products in Hawaiʻi, with knowledge that those products have caused and will continue to cause climate crisis-related injuries in Hawaiʻi, including to Plaintiffs. A substantial portion of ConocoPhillips's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Hawaiʻi, from which ConocoPhillips derives and has derived substantial revenue. For instance, ConocoPhillips

25

transports and delivers crude oil to purchasers, refiners, and/or distributors in Hawai'i, including through its subsidiaries. ConocoPhillips has owned and/or operated a bulk fossil fuel terminal near Honolulu, at which it received imported fossil fuels for distribution and sale throughout Hawai'i. ConocoPhillips has marketed and/or markets gasoline and other fossil fuel products to consumers in Hawai'i, including through ConocoPhillips Phillips 66, and/or 76-branded petroleum service stations located in Hawai'i. ConocoPhillips maintains an interactive website by which it directs prospective customers to retail locations in Hawai'i offering ConocoPhillips' and Phillips 66's fossil fuel products for sale, including but not limited to 76-branded gasoline and service stations. ConocoPhillips also offers multiple proprietary credit cards, including the "Drive Savvy Rewards Credit Card" and the "76 Fleet Card," which allow consumers and business customers in Hawai'i to pay for gasoline and other products at Phillips 66, Conoco, and 76 branded service stations. Consumers who use ConocoPhillips' proprietary credit cards receive various rewards, including discounts on gasoline purchases. ConocoPhillips further maintains smartphone applications, including the "My 76 App" and the "My Phillips 66 App," which offer Hawai'i consumers a cashless payment method for gasoline and other products at Phillips 66- and 76-branded service stations. Hawai'i consumers utilize the payment method by providing their credit card information through the application. Hawai'i consumers can also receive rewards including discounts on gasoline purchases by registering their personal identifying information into the My 76 App and My Phillips 66 App and using the application to identify and activate gas pumps at service stations during a purchase.

26

C.      **Relevant Non-Parties: Fossil Fuel Industry Associations**

28.      As set forth in greater detail below, each Defendant had actual knowledge that its fossil fuel products were hazardous. Defendants obtained knowledge of the hazards of their products independently and through their membership and involvement in trade associations.

29.      Each Defendant's fossil fuel promotion and marketing efforts were assisted by fossil fuel and manufacturing trade associations, including but not limited to those described below. Acting on behalf of the Defendants and others, the industry associations engaged in a long-term course of conduct on Defendants' behalf to misrepresent, omit, and conceal the dangers of Defendants' fossil fuel products.

a.      **The American Petroleum Institute (API)**: API is a national trade association formed in 1919 and based in the District of Columbia. API's purpose is to advance its individual members' collective business interests. Among other functions, API coordinates among members of the petroleum industry and gathers information of interest to the industry and disseminates that information to its members. Member companies participate in API strategy, governance, and operation through membership dues and by contributing company officers and other personnel to API boards, committees, and task forces. The following Defendants and/or their predecessors in interest are and/or have been API members at times relevant to this litigation: Exxon, BP, Shell, Marathon, Chevron, BHP, ConocoPhillips, and Sunoco. Relevant information known to be held by API was also held by Defendants and their predecessors-in-interest through (a) distribution of information held by API to its members and (b) participation of officers and other personnel of Defendants and their predecessors-in-interest in API boards, committees, and task forces. API has been a member of at least five organizations that have promoted disinformation about fossil fuel products to consumers, including the Global Climate Coalition,

27

Partnership for a Better Energy Future, Coalition for American Jobs, Alliance for Energy and Economic Growth, and Alliance for Climate Strategies.

        b.    **The Western States Petroleum Association (WSPA)**: WSPA is a trade association representing oil producers in Arizona, California, Nevada, Oregon, and Washington.[9] The following Defendants and/or their predecessors in interest are and/or have been WSPA members at times relevant to this litigation: Exxon, BP, Chevron, Shell, and ConocoPhillips.[10]

        c.    **The American Fuel and Petrochemical Manufacturers (AFPM):** AFPM is a national association of petroleum and petrochemical companies. AFPM has promoted disinformation about fossil fuel products to consumers, through its membership in Partnership for a Better Energy Future. The following Defendants and/or their predecessors in interest are and/or have been AFPM members at times relevant to this litigation: Exxon, BP, Marathon, Chevron, and ConocoPhillips.[11]

        d.    **U.S. Oil & Gas Association (USOGA)** is a national trade association representing oil and gas producers, formerly known as the Mid-Continent Oil & Gas Association. The following Defendants and/or their predecessors in interest are and/or have been USOGA members at times relevant to this litigation: Exxon, BP, Chevron, BHP, and ConocoPhillips.[12]

---

[9] Western States Petroleum Association, *About* (webpage), https://www.wspa.org/about. (accessed Jan. 23, 2020)

[10] Western States Petroleum Association, *Member Companies* (webpage) (accessed Jan. 23, 2020), https://www.wspa.org/about.

[11] American Fuel and Petrochemical Manufacturers, *Membership Directory* (webpage), https://www.afpm.org/membership-directory, (accessed Jan. 23, 2020).

[12] *See, e.g.*, Louisiana Mid-Continent Oil & Gas Association, *Member Companies* (webpage) https://www.lmoga.com/membership/member-companies, (accessed Jan. 23, 2020).

e. **Western Oil & Gas Association** was a California nonprofit trade association representing the oil and gas industries, consisting of over 75 member companies. Its members included companies and individuals responsible for more than 65 percent of petroleum production and 90 percent of petroleum refining and marketing in the Western United States.[13] The following Defendants and/or their predecessors in interest are and/or have been WOGA members at times relevant to this litigation: Exxon, Chevron, ConocoPhillips, and Shell.[14]

f. **The Information Council for the Environment (ICE)**: ICE was formed by coal companies and their allies, including Western Fuels Association and the National Coal Association. Associated companies included Pittsburg and Midway Coal Mining (Chevron).

g. **The Global Climate Coalition (GCC)**: GCC was an industry group formed to oppose greenhouse gas emission reduction initiatives. GCC was founded in 1989, shortly after the first meeting of the Intergovernmental Panel on Climate Change ("IPCC"), the United Nations body for assessing the science related to climate change. GCC disbanded in or around 2001. Founding members included API. Over the course of its existence, GCC corporate members included Amoco (BP), API, Chevron, Exxon, Ford, Shell Oil, Texaco (Chevron) and Phillips Petroleum (ConocoPhillips). Over its existence other members and funders included ARCO (BP), and the Western Fuels Association.

## III. AGENCY

30. At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator, and/or joint venturer of each of the remaining

---

[13] *Am. Petroleum Inst. v. Knecht*, 456 F. Supp. 889, 894 (C.D. Cal. 1978), *aff'd*, 609 F.2d 1306 (9th Cir. 1979).

[14] *Id.* at 894 n.3.

Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and joint venture, and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct was wrongful and/or constituted a breach of duty.

## IV. JURISDICTION AND VENUE

31. This Court has subject matter jurisdiction over this civil action under Hawai'i Revised Statutes section 603-21.5.

32. This Court has personal jurisdiction over Defendants because they either are domiciled in Hawai'i; were served with process in Hawai'i; are organized under the laws of Hawai'i; maintain their principal place of business in Hawai'i; transact business in Hawai'i; perform work in Hawai'i; contract to supply goods, manufactured products, or services in Hawai'i; caused tortious injury in Hawai'i; engage in persistent courses of conduct in Hawai'i; derive substantial revenue from manufactured goods, products, or services used or consumed in Hawai'i; and/or have interests in, use, or possess real property in Hawai'i.

33. Venue in this Court is proper under Hawai'i Revised Statutes section 603-36(5) because the Plaintiffs' claims for relief arose in the City and County of Honolulu.

## V. FACTUAL BACKGROUND

### A. Climate Disruption—Cause and Effects

34. Human-caused warming of the Earth is unequivocal. As a result, the atmosphere and oceans are warming, sea level is rising, snow and ice cover is diminishing, oceans are acidifying, and hydrologic systems have been altered, among other environmental changes.

35. The mechanism by which human activity causes global warming and climate disruption is well-established: ocean and atmospheric warming is overwhelmingly caused by

30

anthropogenic greenhouse gas emissions.

36. Greenhouse gases are largely byproducts of humans combusting fossil fuels to produce energy and using fossil fuels to create petrochemical products.

37. Prior to World War II, most anthropogenic $CO_2$ emissions were caused by land-use practices, such as forestry and agriculture, which altered the ability of the land and global biosphere to absorb $CO_2$ from the atmosphere; the impacts of such activities on Earth's climate were relatively minor. Since that time, however, both the annual rate and total volume of anthropogenic $CO_2$ emissions have increased enormously following the advent of major uses of oil, gas, and coal.

38. The graph below illustrates the increasing annual rate of global $CO_2$ emissions since the 1850s, including those produced from combusting fossil fuel products, including Defendants' products.[15]

---

[15] P. Frumhoff et al. *The Climate Responsibilities of Industrial Carbon Producers*, 132 CLIMATIC CHANGE 157, 164 (2015), https://link.springer.com/article/10.1007/s10584-015-1472-5.



**Figure 1: Annual Anthropogenic Carbon Dioxide Emissions and Partitioning in the Environment, 1850–2018**

39.     Because of the increased burning of fossil fuel products, concentrations of greenhouse gases in the atmosphere are now at a level unprecedented in at least 3 million years.[16]

40.     As greenhouse gases accumulate in the atmosphere, the Earth radiates less energy back to space. This accumulation and associated disruption of the Earth's energy balance have myriad environmental and physical consequences, including but not limited to the following:

---

[16] *More CO₂ than ever before in 3 million years, shows unprecedented computer simulation*, SCIENCE DAILY (April 3, 2019), https://www.sciencedaily.com/releases/2019/04/ 190403155436.htm; *see also* IPCC, *Climate Change 2014: Synthesis Report*, *supra* note 3, at 4.

a. Warming of the Earth's average surface temperature both locally and globally, and increased frequency and intensity of heatwaves; to date, global average air temperatures have risen approximately 1 degree C (1.8 degrees F) above preindustrial temperatures; temperatures in particular locations have risen more;

b. Sea level rise, due to the thermal expansion of warming ocean waters and runoff from melting glaciers and ice sheets;

c. Flooding and inundation of land and infrastructure, increased erosion, higher wave run-up and tides, increased frequency and severity of storm surges, saltwater intrusion, and other impacts of higher sea levels;

d. Changes to the global climate, and generally toward longer periods of drought interspersed with fewer and more severe periods of precipitation, and associated impacts on the quantity and quality of water resources available to both human and ecological systems;

e. Ocean acidification, due to the increased uptake of atmospheric carbon dioxide by the oceans;

f. Increased frequency and intensity of extreme weather events due to the increase in the atmosphere's ability to hold moisture and increased evaporation;

g. Changes to terrestrial and marine ecosystems, and consequent impacts on the range of flora and fauna; and

h. Adverse impacts on human health associated with extreme weather, extreme heat, decreased air quality, and vector-borne illnesses.

41.     As discussed in Section H below, these consequences of Defendants' conduct and their exacerbation of the climate crisis are already impacting Plaintiffs and will continue to increase in severity in the County.

42.     Without Defendants' exacerbation of global warming caused by their conduct as alleged herein, the current physical and environmental changes caused by global warming would have been far less than those observed to date.  Similarly, effects that will occur in the future would also be far less.[17]

### B.     Attribution

43.     Normal and intended use of Defendants' fossil fuel products released a substantial percentage of anthropogenic greenhouse gases to the atmosphere between 1965 and the present, with contributions currently continuing essentially unabated.

44.     Defendants' contributions to the buildup of greenhouse gases via their fossil fuel products in the Earth's environment are quantifiable both individually and in the aggregate.

45.     Defendants' efforts between 1965 and the present to deceive about the consequences of the normal use of their fossil fuel products; to conceal the hazards of those products from consumers; their promotion of their fossil fuel products despite knowing the dangers associated with those products; their dogged campaign against regulation of those products based on falsehoods, omissions, and deceptions; and their failure to pursue less hazardous alternative products available to them; unduly inflated the market for their fossil fuel products. Consequently,

---

[17] Peter U. Clark, et al., *Consequences of Twenty-First-Century Policy for Multi-Millenial Climate and Sea-Level Change*, NATURE CLIMATE CHANGE 6 at 365 ("Our modelling suggests that the human carbon footprint of about [470 billion tons] by 2000 . . . has already committed Earth to a [global mean sea level] rise of  ~1.7m (range of 1.2 to 2.2 m).").

34

substantially more anthropogenic greenhouse gases have been emitted to the environment than would have been absent that conduct.

46. By quantifying greenhouse gas pollution attributable to Defendants' products and conduct, climatic and environmental responses to those emissions are also calculable, and can be attributed to Defendants on an individual and aggregate basis.

47. Defendants' conduct caused a substantial portion of global atmospheric greenhouse gas concentrations, and the attendant historical, projected, and committed disruptions to the environment—and consequent injuries to Plaintiffs—associated therewith.

48. Defendants, individually and together, have substantially and measurably contributed to Plaintiffs' climate crisis-related injuries.

### C. Defendants Went to Great Lengths to Understand, and Either Knew or Should Have Known About the Dangers Associated with Their Fossil Fuel Products.

49. The fossil fuel industry has known about the potential warming effects of greenhouse gas emissions since as early as the 1950s. In 1954, geochemist Harrison Brown and his colleagues at the California Institute of Technology wrote to the American Petroleum Institute, informing the trade association that preliminary measurements of natural archives of carbon in tree rings indicated that fossil fuels had caused atmospheric carbon dioxide levels to increase by about 5% since 1840.[18] The American Petroleum Institute funded the scientists for various research projects, and measurements of carbon dioxide continued for at least one year and possibly longer, although the results were never published or otherwise made available to the public.[19]

---

[18] *See* Benjamin Franta, *Early oil industry knowledge of CO2 and global warming*, NATURE CLIMATE CHANGE 8, 1024–25 (2018).

[19] *Id*.

50.     In 1957, H. R. Brannon of Humble Oil (predecessor-in-interest to ExxonMobil) measured an increase in atmospheric carbon dioxide similar to that measured by Harrison Brown. Brannon communicated this information to the American Petroleum Institute. Brannon knew of Brown's measurements, compared them with his, and found they agreed. Brannon published his results in the scientific literature, which was available to Defendants and/or their predecessors-in-interest.[20]

51.     In 1959, the American Petroleum Institute organized a centennial celebration of the American oil industry at Columbia University in New York City.[21] High-level representatives of Defendants were in attendance. One of the keynote speakers was the nuclear physicist Edward Teller. Teller warned the industry that "a temperature rise corresponding to a 10 per cent increase in carbon dioxide will be sufficient to melt the icecap and submerge . . . [a]ll the coastal cities." Teller added that since "a considerable percentage of the human race lives in coastal regions, I think that this chemical contamination is more serious than most people tend to believe."

52.     Following his speech, Teller was asked to "summarize briefly the danger from increased carbon dioxide content in the atmosphere in this century." He responded that "there is a possibility the icecaps will start melting and the level of the oceans will begin to rise."

53.     By 1965, concern over the potential for fossil fuel products to cause disastrous global warming reached the highest levels of the United States' scientific community. In that year, President Lyndon B. Johnson's Science Advisory Committee's Environmental Pollution Panel

---

[20] H. R. Brannon, Jr., A. C. Daughtry, D. Perry, W. W. Whitaker, and M. Williams, 1957. Radiocarbon evidence on the dilution of atmospheric and oceanic carbon by carbon from fossil fuels, AMERICAN GEOPHYSICAL UNION TRANSACTIONS 38, 643—650.

[21] *See* Allan Nevins & Robert G. Dunlop, Energy and Man: A Symposium (Appleton-Century-Crofts, New York) (1960); *see also* Franta, *supra* note 18, at 1024–25.

reported that a 25% increase in carbon dioxide concentrations could occur by the year 2000, that

such an increase could cause significant global warming, that melting of the Antarctic ice cap and

rapid sea level rise could result, and that fossil fuels were the clearest source of the pollution.[22]

President Johnson announced in a special message to Congress that "[t]his generation has altered

the composition of the atmosphere on a global scale through . . . a steady increase in carbon dioxide

from the burning of fossil fuels."[23]

54.     Three days after President Johnson's Science Advisory Committee report was

published, the president of the American Petroleum Institute, Frank Ikard, addressed leaders of the

petroleum industry in Chicago at the trade association's annual meeting. Ikard relayed the findings

of the report to industry leaders, saying,

> The substance of the report is that there is still time to save the world's peoples
> from the catastrophic consequence of pollution, but time is running out.[24]

Ikard also relayed that "by the year 2000 the heat balance will be so modified as possibly to cause

marked changes in climate beyond local or even national efforts" and quoted the report's finding

that "the pollution from internal combustion engines is so serious, and is growing so fast, that an

alternative nonpolluting means of powering automobiles, buses, and trucks is likely to become a

national necessity."

55.     Thus, by 1965, Defendants and their predecessors-in-interest were aware that the

scientific community had found that fossil fuel products, if used profligately, would cause global

---

[22] President's Science Advisory Committee, *Restoring the Quality of Our Environment: Report
of the Environmental Pollution Panel*, 9 (Nov. 1965), https://hdl.handle.net/2027/uc1.b4315678
(accessed Feb. 21, 2020).

[23] President Lyndon B. Johnson, *Special Message to Congress on Conservation and Restoration
of Natural Beauty* (Feb. 8, 1965), http://acsc.lib.udel.edu/items/show/292.

[24] *See* Franta, *supra* note 18, at 1024–25.

warming by the end of the century, and that such global warming would have wide-ranging and costly consequences.

56. In 1968, API received a report from the Stanford Research Institute, which it had hired to assess the state of research on environmental pollutants, including carbon dioxide.[25] The assessment endorsed the findings of President Johnson's Scientific Advisory Council from three years prior, stating, "Significant temperature changes are almost certain to occur by the year 2000, and . . . there seems to be no doubt that the potential damage to our environment could be severe." The scientists warned of "melting of the Antarctic ice cap" and informed API that [p]ast and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere." What was missing, the scientists said, was work on "air pollution technology and . . . systems in which $CO_2$ emissions would be brought under control."[26]

57. In 1969, the Stanford Research Institute delivered a supplemental report on air pollution to API, projecting with alarming particularity that atmospheric $CO_2$ concentrations would reach 370 ppm by 2000[27]—almost exactly what it turned out to be (369 ppm).[28] The report explicitly connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere."

---

[25] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants*, Stanford Research Institute (Feb. 1968), https://www.smokeandfumes.org/documents/document16 (accessed Feb. 21, 2020).

[26] *Id.*

[27] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants Supplement*, Stanford Research Institute (June 1969).

[28] NASA Goddard Institute for Space Studies, *Global Mean $CO_2$ Mixing Ratios (ppm): Observations*, https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt (accessed Feb. 21, 2020).

38

58.     By virtue of their membership and participation in API at that time, Defendants received or should have received the Stanford Research Institute reports and were on notice of their conclusions.

59.     In 1972, API members, including Defendants, received a status report on all environmental research projects funded by API. The report summarized the 1968 SRI report describing the impact of fossil fuel products, including Defendants', on the environment, including global warming and attendant consequences. Defendants and/or their predecessors-in-interest that received this report include, but were not limited to: American Standard of Indiana (BP), Asiatic (Shell), Ashland (Marathon), Atlantic Richfield (BP), British Petroleum (BP), Chevron Standard of California (Chevron), Esso Research (ExxonMobil), Ethyl (formerly affiliated with Esso, which was subsumed by ExxonMobil), Getty (ExxonMobil), Gulf (Chevron, among others), Humble Standard of New Jersey (ExxonMobil/Chevron/BP), Marathon, Mobil (ExxonMobil), Pan American (BP), Shell, Standard of Ohio (BP), Texaco (Chevron), Union (Chevron), Skelly (ExxonMobil), Colonial Pipeline (ownership has included BP, ExxonMobil, and Chevron entities, among others), Continental (ConocoPhillips), Dupont (former owner of Conoco), Phillips (ConocoPhillips), and Caltex (Chevron).[29]

60.     In 1977, James Black of Exxon's Products Research Division presented to the Exxon Corporation Management Committee on the greenhouse effect. The next year, in 1978, Black presented to another internal Exxon group, PERCC. In a memo to the Vice President of

---

[29] American Petroleum Institute, *Environmental Research, A Status Report*, Committee for Air and Water Conservation (Jan. 1972), http://files.eric.ed.gov/fulltext/ED066339.pdf.

Exxon Research and Engineering, Black summarized his presentations.[30] He reported that "current scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel consumption," and that doubling atmospheric carbon dioxide, according to the best climate model available, would "produce a mean temperature increase of about 2° C to 3° C over most of the earth," with double to triple as much warming at the poles. The figure below, reproduced from Black's memo, illustrates Exxon's understanding of the timescale and magnitude of global warming its products would cause.



**Figure 2: Future Global Warming Predicted Internally by Exxon in 1977**[31]

---

[30] Memo from J.F. Black to F.G. Turpin, *The Greenhouse Effect*, Exxon Research and Engineering Company (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-on-greenhouse-effect-for-exxon-corporation-management-committee.

[31] *Id.* The company predicted global warming of 3° C by 2050, with 10° C warming in polar regions. The difference between the dashed and solid curves prior to 1977 represents global warming that Exxon believed may already have been occurring.

The impacts of such global warming, Black reported, would include "more rainfall," which would "benefit some areas and would harm others." "Some countries would benefit, but others could have their agricultural output reduced or destroyed. [...] Even those nations which are favored, however, would be damaged for a while since their agricultural and industrial patterns have been established on the basis of the present climate." Black reported that "It is currently estimated that mankind has a 5–10 yr. time window to obtain the necessary information" and "establish what must be done," at which time, "hard decisions regarding changes in energy strategies might become critical."

61.     Also in 1977, Henry Shaw of the Exxon Research and Engineering Technology Feasibility Center attended a meeting of scientists and governmental officials in Atlanta, Georgia, on developing research programs to study carbon dioxide and global warming.[32] Shaw's internal memo to Exxon's John W. Harrison reported that "The climatic effects of carbon dioxide release may be the primary limiting factor on energy production from fossil fuels[.]"

62.     In 1979, Exxon's W. L. Ferrall distributed an internal memorandum.[33] The memo reported: "The most widely held theory [about global warming] is that: The increase [in carbon dioxide] is due to fossil fuel combustion; [i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface; [and t]he present trend of fossil fuel consumption will cause dramatic

---

[32] Henry Shaw, *Environmental Effects of Carbon Dioxide* (Oct. 31, 1977), Climate Investigations Center Collection. Climate Investigations Center. https://www.industrydocuments.ucsf.edu/docs/tpwl0228 (accessed Feb. 21, 2020).

[33] Exxon Research and Engineering Company, Ferrall, WL; Knisely, S. Controlling the CO2 Concentration in the Atmosphere (Oct. 16, 1979), Climate Investigations Center Collection. Climate Investigations Center. https://www.industrydocuments.ucsf.edu/docs/mqwl0228 (accessed Feb. 21, 2020).

environmental effects before the year 2050. [...] The <u>potential</u> problem is great and urgent." The

memo stated that if limits were not placed on fossil fuel production:

> Noticeable temperature changes would occur around 2010 as the [carbon dioxide] concentration reaches 400 ppm [parts per million]. Significant climatic changes occur around 2035 when the concentration approaches 500 ppm. A doubling of the pre-industrial concentration [*i.e.*, 580 ppm] occurs around 2050. The doubling would bring about dramatic changes in the world's environment[.]

Those projections proved remarkably accurate: annual average atmospheric $CO_2$ concentrations

surpassed 400 parts per million in 2015 for the first time in millions of years.[34] Limiting the carbon

dioxide concentration in the atmosphere to 440 ppm, or a 50% increase over preindustrial levels,

which the memo said was "assumed to be a relatively safe level for the environment," would

require fossil fuel emissions to peak in the 1990s and non-fossil energy systems to be rapidly

deployed. Eighty percent of fossil fuel resources, the memo calculated, would have to be left in

the ground to avoid doubling atmospheric carbon dioxide concentrations. Certain fossil fuels, such

as shale oil, could not be substantially exploited at all.

63.     In November 1979, Exxon's Henry Shaw wrote to Exxon's Harold Weinberg

urging "a very aggressive defensive program in […] atmospheric science and climate because there

is a good probability that legislation affecting our business will be passed."[35] Shaw stated that an

expanded research effort was necessary to "influence possible legislation on environmental

controls" and "respond" to environmental groups, which had already opposed synthetic fuels

programs based on carbon dioxide emissions. Shaw suggested the formation of a "small task force"

---

[34] Nicola Jones, *How the World Passed a Carbon Threshold and Why It Matters*, YALE ENVIRONMENT 360 (Jan. 26, 2017), http://e360.yale.edu/features/how-the-world-passed-a-carbon-threshold-400ppm-and-why-it-matters (accessed Feb. 21, 2020).

[35] Henry Shaw, Memo from H Shaw to HN Weinberg Regarding Research in Atmospheric Science (Nov. 19, 1979), Climate Investigations Center Collection. Climate Investigations Center. https://www.industrydocuments.ucsf.edu/docs/yqwl0228 (accessed Feb. 21, 2020).

to evaluate a potential program in carbon dioxide and climate, acid rain, carcinogenic particulates, and other pollution issues caused by fossil fuels.

64.     In 1979, the API and its members, including Defendants, convened a Task Force to monitor and share cutting edge climate research among the oil industry. The group was initially called the $CO_2$ and Climate Task Force, but in 1980 changed its name to the Climate and Energy Task Force (hereinafter referred to as "API $CO_2$ Task Force"). Membership included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company, including Exxon, Mobil (ExxonMobil), Amoco (BP), Phillips (ConocoPhillips), Texaco (Chevron), Shell, Sunoco, Sohio (BP), as well as Standard Oil of California (BP) and Gulf Oil (Chevron), among others. The Task Force was charged with monitoring government and academic research, evaluating the implications of emerging science for the petroleum and gas industries, and identifying where reductions in greenhouse gas emissions from Defendants' fossil fuel products could be made.[36]

65.     In 1979, the API prepared a background paper on carbon dioxide and climate for the $CO_2$ and Climate Task Force, stating that $CO_2$ concentrations were rising steadily in the atmosphere, and predicting when the first clear effects of global warming might be detected.[37] The API reported to its members that although global warming would occur, it would likely go undetected until approximately the year 2000, because, the API believed, its effects were being

---

[36] Neela Banerjee, *Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too*, INSIDE CLIMATE NEWS (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco (accessed Jan. 28, 2020).

[37] RJ Campion, *Memorandum from RJ Campion to JT Burgess Regarding the API's Background Paper on CO2 Effects* (Sept. 6, 1979), https://www.industrydocuments.ucsf.edu/docs/lqwl0228.

temporarily masked by a natural cooling trend. However, this cooling trend, the API warned its members, would reverse around 1990, adding to the warming caused by carbon dioxide.

66.     In 1980, the API's $CO_2$ Task Force invited Dr. John Laurmann, "a recognized expert in the field of CO2 and climate," to present to its members.[38] The meeting lasted for seven hours and included a "complete technical discussion" of global warming caused by fossil fuels, including "the scientific basis and technical evidence of CO2 buildup, impact on society, methods of modeling and their consequences, uncertainties, policy implications, and conclusions that can be drawn from present knowledge." Representatives from Standard Oil of Ohio (predecessor to BP), Texaco (now Chevron), Exxon, and the API were present, and the minutes of the meeting were distributed to the entire API $CO_2$ Task Force. Laurmann informed the Task Force of the "scientific consensus on the potential for large future climatic response to increased CO2 levels" and that there was "strong empirical evidence that [the carbon dioxide] rise [was] caused by anthropogenic release of CO2, mainly from fossil fuel burning." Unless fossil fuel production and use were controlled, atmospheric carbon dioxide would be twice preindustrial levels by 2038, with "likely impacts" along the following trajectory:

1° C RISE (2005): BARELY NOTICEABLE

2.5° C RISE (2038): MAJOR ECONOMIC CONSEQUENCES, STRONG REGIONAL DEPENDENCE

5° C RISE (2067): GLOBALLY CATASTROPHIC EFFECTS

Laurmann warned the API $CO_2$ Task Force that global warming of 2.5° C could "bring[] world economic growth to a halt[.]"  Laurmann also suggested that action should be taken immediately,

---

[38] American Petroleum Institute, Nelson, Jimmie J. *The CO2 Problem; Addressing Research Agenda Development* (March 18, 1980), Climate Investigations Center Collection. Climate Investigations Center. https://www.industrydocuments.ucsf.edu/docs/gffl0228 (accessed Feb. 21, 2020).

asking, "Time for action?" and noting that if achieving high market penetration for new energy sources would require a long time period (*e.g.*, decades), then there would be "no leeway" for delay. The minutes of the API $CO_2$ Task Force's meeting show that one of the Task Force's goals was "to help develop ground rules for […] the cleanup of fuels as they relate to $CO_2$ creation," and the Task Force discussed the requirements for a worldwide "energy source changeover" away from fossil fuels.

67. In 1980, Imperial Oil Limited (a Canadian ExxonMobil subsidiary) reported to managers and environmental staff at multiple affiliated Esso and Exxon companies that there was "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere.[39] Imperial noted that "Technology exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost of power generation."

68. In December 1980, Exxon's Henry Shaw distributed a memorandum on the "$CO_2$ Greenhouse Effect."[40] Shaw stated that the future buildup of carbon dioxide was a function of fossil fuel use, and that internal calculations performed at Exxon indicated that atmospheric carbon dioxide would double around the year 2060. According to the "most widely accepted" climate models, Shaw reported, such a doubling of carbon dioxide would "most likely" result in global warming of approximately 3° C, with a greater effect in polar regions. Calculations predicting a lower temperature increase, such as 0.25° C, were "not held in high regard by the scientific

---

[39] Imperial Oil Ltd., *Review of Environmental Protection Activities for 1978–1979* (Aug. 6, 1980), http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/p2 (accessed Feb. 21, 2020).

[40] Henry Shaw to T. K. Kett (memo), *Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect* (Dec. 18, 1980), https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And.html.

community," Shaw said. Shaw also noted that the ability of the oceans to absorb heat could delay (but not prevent) the temperature increase "by a few decades," and that natural, random temperature fluctuations would hide global warming from $CO_2$ until around the year 2000. The memo included the Figure below, which illustrates global warming anticipated by Exxon, as well as the company's understanding that significant global warming would occur before exceeding the range of natural variability and being detected.



**Figure 3: Future Global Warming Predicted Internally by Exxon in 1980**[41]

The memo reported that such global warming would cause "increased rainfall[] and increased evaporation," which would have a "dramatic impact on soil moisture, and in turn, on agriculture." Some areas would turn to desert, and the American Midwest would become "much drier."

---

[41] The company anticipated a doubling of carbon dioxide by around 2060 and that the oceans would delay the warming effect by a few decades, leading to approximately 3° C warming by the end of the century.

"[W]eeds and pests," the memo reported, "would tend to thrive with increasing global average temperature." Other "serious global problems" could also arise, such as the melting of the West Antarctic ice sheet, which "could cause a rise in the sea level on the order of 5 meters." The memo called for "society" to pay the bill, estimating that some adaptive measures would cost no more than "a few percent" of Gross National Product (*i.e.*, 400 billion USD in 2018).[42] Exxon predicted that national policy action would not occur until around 1989, when the Department of Energy would finish a ten-year study of carbon dioxide and global warming.[43] Shaw also reported that Exxon had studied various responses for avoiding or reducing a carbon dioxide build-up, including "stopping all fossil fuel combustion at the 1980 rate" and "investigat[ing] the market penetration of non-fossil fuel technologies." The memo estimated that such non-fossil energy technologies "would need about 50 years to penetrate and achieve roughly half of the total [energy] market."

69.    In February 1981, Exxon's Contract Research Office prepared and distributed a "Scoping Study on $CO_2$" to the leadership of Exxon Research and Engineering Company.[44] The study reviewed Exxon's current research on carbon dioxide and considered whether to expand Exxon's research on carbon dioxide or global warming further at that time. The study recommended against expanding Exxon's research activities in those areas, because its current research programs were sufficient for achieving the company's goals of closely monitoring federal research, building credibility and public relations value, and developing in-house expertise with

---

[42] For 2018 Gross National Product, *see* Federal Reserve Bank of St. Louis, Gross National Product. https://fred.stlouisfed.org/series/GNPA (accessed Feb. 21, 2020).

[43] Henry Shaw to T. K. Kett (memo) (Dec. 18, 1980), *supra* note 40.

[44] Exxon Research and Engineering Company, Long, GH. [Letter from GH Long to PJ Lucchesi and the Others Regarding the Attached Report on Atmospheric CO2 Scoping Study] (Feb. 05, 1981), Climate Investigations Center Collection. Climate Investigations Center; Exxon Mobil. https://www.industrydocuments.ucsf.edu/docs/yxfl0228 (accessed Feb. 21, 2020).

regard to carbon dioxide and global warming. However, the study recommended that Exxon centralize its activities in monitoring, analyzing, and disseminating outside research being done on carbon dioxide and global warming. The study stated that Exxon's James Black was actively monitoring and keeping the company apprised of outside research developments, including those on climate modeling and "$CO_2$-induced effects." The study also noted that other companies in the fossil fuel industry were "auditing Government meetings on the subject." In discussing "options for reducing $CO_2$ build-up in the atmosphere," the study noted that although capturing $CO_2$ from flue gases was technologically possible, the cost was high, and "energy conservation or shifting to renewable energy sources[] represent the only options that might make sense."

70.     Thus, by 1981, Exxon and other fossil fuel companies were actively monitoring all aspects of carbon dioxide and global warming research both nationally and internationally, and Exxon had recognized that a shift to renewable energy sources would be necessary to avoid a large carbon dioxide build-up in the atmosphere and resultant global warming.

71.     Exxon scientist Roger Cohen warned his colleagues in a 1981 internal memorandum that "future developments in global data gathering and analysis, along with advances in climate modeling, may provide strong evidence for a delayed $CO_2$ effect of a truly substantial magnitude," and that under certain circumstances it would be "very likely that we will unambiguously recognize the threat by the year 2000."[45] Cohen had expressed concern that the memorandum understated the potential effects of unabated $CO_2$ emissions from Defendants' fossil fuel products, saying, "it is distinctly possible that [Exxon Planning Division's] [...] scenario will

---

[45] Roger W. Cohen, *Exxon Memo to W. Glass about possible "catastrophic" effect of $CO_2$*, Exxon Inter-Office Correspondence (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption (accessed Feb. 21, 2020).

produce effects which will indeed be catastrophic (at least for a substantial fraction of the world's population)."[46]

72. In 1981, Exxon's Henry Shaw, the company's lead climate researcher at the time, prepared a summary of Exxon's current position on the greenhouse effect for Edward David Jr., president of Exxon Research and Engineering, stating in relevant part:

- "Atmospheric $CO_2$ will double in 100 years if fossil fuels grow at 1.4%/a[2].
- 3° C global average temperature rise and 10°C at poles if $CO_2$ doubles.
  - Major shifts in rainfall/agriculture
  - Polar ice may melt"[47]

73. In 1982, another report prepared for API by scientists at the Lamont-Doherty Geological Observatory at Columbia University recognized that atmospheric $CO_2$ concentration had risen significantly compared to the beginning of the industrial revolution from about 290 parts per million to about 340 parts per million in 1981 and acknowledged that despite differences in climate modelers' predictions, there was scientific consensus that "a doubling of atmospheric $CO_2$ from [ ] pre-industrial revolution value would result in an average global temperature rise of (3.0 ± 1.5)° C [5.4 ± 2.7° F]." It went further, warning that "[s]uch a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably and the world food supply can be affected."[48] Exxon's own modeling research confirmed this, and the company's results were later published in

---

[46] *Id.*

[47] Henry Shaw, *Exxon Memo to E. E. David, Jr. regarding "CO₂ Position Statement"*, Exxon Inter-Office Correspondence (May 15, 1981), https://insideclimatenews.org/documents/exxon-position-co2-1981 (accessed Feb. 21, 2020).

[48] American Petroleum Institute, *Climate Models and CO₂ Warming: A Selective Review and Summary*, Lamont-Doherty Geological Observatory (Columbia University) (Mar. 1982), https://assets.documentcloud.org/documents/2805626/1982-API-Climate-Models-and-CO2-Warming-a.pdf (accessed Feb. 21, 2020).

at least three peer-reviewed scientific papers.[49]

74.     Also in 1982, Exxon's Environmental Affairs Manager distributed a primer on climate change to a "wide circulation [of] Exxon management [...] intended to familiarize Exxon personnel with the subject."[50] The primer was "restricted to Exxon personnel and not to be distributed externally." The primer compiled science on climate change, confirmed fossil fuel combustion as a primary anthropogenic contributor to global warming, and estimated a $CO_2$ doubling [i.e., 580 ppm] by 2070 with a "Most Probable Temperature Increase" of more than 2° C over the 1979 level, as shown in the Figure below.

---

[49] *See* Roger W. Cohen, *Exxon Memo Summarizing Findings of Research in Climate Modeling*, Exxon Research and Engineering Company (Sept. 2, 1982), https://insideclimatenews.org/documents/consensus-co2-impacts-1982 (discussing research articles) (accessed Feb. 21, 2020).

[50] M. B. Glaser, *Exxon Memo to Management Regarding "CO₂ 'Greenhouse' Effect"*, Exxon Research and Engineering Company (Nov. 12, 1982), https://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf (accessed Feb. 21, 2020).

GROWTH OF ATMOSPHERIC $CO_2$ AND AVERAGE GLOBAL
TEMPERATURE INCREASE AS A FUNCTION OF TIME

**Figure 4: Exxon's Internal Prediction of Future Carbon Dioxide Increase
and Global Warming from 1982**[51]

The report also warned of "uneven global distribution of increased rainfall and increased

evaporation," that "disturbances in the existing global water distribution balance would have

dramatic impact on soil moisture, and in turn, on agriculture," and that the American Midwest

would dry out. In addition to effects on global agriculture, the report stated, "there are some

potentially catastrophic effects that must be considered." Melting of the Antarctic ice sheet could

result in global sea level rise of five meters, which would "cause flooding on much of the U.S.

---

[51] *Id.* The company predicted a doubling of atmospheric carbon dioxide concentrations above
pre-industrial levels by around 2070 (left curve), with a temperature increase of more than 2° C
over the 1979 level (right curve). The same document indicated that Exxon estimated that by
1979 a global warming effect of approximately 0.25° C may already have occurred.

51

East Coast, including the State of Florida and Washington, D.C." Weeds and pests would "tend to thrive with increasing global temperature." The primer warned of "positive feedback mechanisms" in polar regions, which could accelerate global warming, such as deposits of peat "containing large reservoirs of organic carbon" becoming "exposed to oxidation" and releasing their carbon into the atmosphere. "Similarly," the primer warned, "thawing might also release large quantities of carbon currently sequestered as methane hydrates" on the sea floor. "All biological systems would be affected," and "the most severe economic effects could be on agriculture." The report recommended studying "soil erosion, salinization, or the collapse of irrigation systems" in order to understand how society might be affected and might respond to global warming, as well as "[h]ealth effects" and "stress associated with climate related famine or migration[.]" The report estimated that undertaking "[s]ome adaptive measures" (not all of them) would cost "a few percent of the gross national product estimated in the middle of the next century".[52] To avoid such impacts, the report discussed an analysis from the Massachusetts Institute of Technology and Oak Ridge National Laboratory, which studied energy alternatives and requirements for introducing them into widespread use, and which recommended that "vigorous development of non-fossil energy sources be initiated as soon as possible."[53] The primer also noted that other greenhouse gases related to fossil fuel production, such as methane, could contribute significantly to global warming, and that concerns over carbon dioxide could be reduced if fossil fuel use were decreased due to "high price, scarcity, [or] unavailability." "Mitigation of the 'greenhouse effect' would require major

---

[52] For 2018 Gross National Product, *see* Federal Reserve Bank of St. Louis, Gross National Product. https://fred.stlouisfed.org/series/GNPA (accessed Feb. 21, 2020).

[53] M. B. Glaser, *Exxon Memo to Management regarding "$CO_2$ 'Greenhouse' Effect"*, Exxon Research and Engineering Company (Nov. 12, 1982), https://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf (accessed Feb. 21, 2020).

reductions in fossil fuel combustion," the primer stated. The primer was widely distributed to Exxon leadership.

75.     In September 1982, the Director of Exxon's Theoretical and Mathematical Sciences Laboratory, Roger Cohen, wrote Alvin Natkin of Exxon's Office of Science and Technology to summarize Exxon's internal research on climate modeling.[54] Cohen reported:

> [O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$. The consensus is that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)°$ C. […] The temperature rise is predicted to be distributed nonuniformly over the earth, with above-average temperature elevations in the polar regions and relatively small increases near the equator. There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations of the biosphere. The time required for doubling of atmospheric $CO_2$ depends on future world consumption of fossil fuels.

Cohen described Exxon's own climate modeling experiments, reporting that they produced "a global average temperature increase that falls well within the range of the scientific consensus," were "consistent with the published predictions of more complex climate models," and were "also in agreement with estimates of the global temperature distribution during a certain prehistoric period when the earth was much warmer than today." "In summary," Cohen wrote, "the results of our research are in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate." Cohen noted that the results would be presented to the scientific community by Exxon's collaborator Martin Hoffert at a Department of Energy meeting, as well as by Exxon's Brian Flannery at the Exxon-supported Ewing Symposium, later that year.

---

[54] Roger W. Cohen, *Exxon Memo Summarizing Findings of Research in Climate Modeling*, *supra* note 49.

76.    In October 1982, the fourth biennial Maurice Ewing Symposium at the Lamont-Doherty Geophysical Observatory was attended by members of API and Exxon Research and Engineering Company. The Observatory's president E.E. David delivered a speech titled: "Inventing the Future: Energy and the $CO_2$ 'Greenhouse Effect.'"[55] His remarks included the following statement: "[F]ew people doubt that the world has entered an energy transition away from dependence upon fossil fuels and toward some mix of renewable resources that will not pose problems of $CO_2$ accumulation." He went on, discussing the human opportunity to address anthropogenic climate change before the point of no return:

> It is ironic that the biggest uncertainties about the $CO_2$ buildup are not in predicting what the climate will do, but in predicting what people will do. . . .[It] appears we still have time to generate the wealth and knowledge we will need to invent the transition to a stable energy system.

77.    Throughout the early 1980s, at Exxon's direction, Exxon climate scientist Henry Shaw forecasted emissions of $CO_2$ from fossil fuel use. Those estimates were incorporated into Exxon's 21st century energy projections and were distributed among Exxon's various divisions. Shaw's conclusions included an expectation that atmospheric $CO_2$ concentrations would double in 2090 per the Exxon model, with an attendant 2.3–5.6º F average global temperature increase. Shaw compared his model results to those of the EPA, the National Academy of Sciences, and the Massachusetts Institute of Technology, indicating that the Exxon model predicted a longer delay than any of the other models, although its temperature increase prediction was in the mid-range of the four projections.[56]

---

[55] E. E. David, Jr., *Inventing the Future: Energy and the $CO_2$ Greenhouse Effect: Remarks at the Fourth Annual Ewing Symposium, Tenafly, NJ* (1982), http://sites.agu.org/publications/files/2015/09/ch1.pdf (accessed Feb. 21, 2020).

[56] Neela Banerjee, *More Exxon Documents Show How Much It Knew About Climate 35 Years Ago*, INSIDE CLIMATE NEWS (Dec. 1, 2015),

78.     During the 1980s, many Defendants formed their own research units focused on climate modeling. The API, including the API $CO_2$ Task Force, provided a forum for Defendants to share their research efforts and corroborate their findings related to anthropogenic greenhouse gas emissions.[57]

79.     During this time, Defendants' statements expressed an understanding of their obligation to consider and mitigate the externalities of unabated promotion, marketing, and sale of their fossil fuel products. For example, in 1988, Richard Tucker, the president of Mobil Oil, presented at the American Institute of Chemical Engineers National Meeting, the premier educational forum for chemical engineers, where he stated:

> [H]umanity, which has created the industrial system that has transformed civilization, is also responsible for the environment, which sometimes is at risk because of unintended consequences of industrialization. . . . Maintaining the health of this life-support system is emerging as one of the highest priorities. . . . [W]e must all be environmentalists.
>
> The environmental covenant requires action on many fronts . . . the low-atmosphere ozone problem, the upper-atmosphere ozone problem and the greenhouse effect, to name a few. . . . Our strategy must be to reduce pollution before it is ever generated—to prevent problems at the source.
>
> Prevention means engineering a new generation of fuels, lubricants and chemical products. . . . Prevention means designing catalysts and processes that minimize or eliminate the production of unwanted byproducts. . . . Prevention on a global scale may even require a dramatic reduction in our dependence on fossil fuels—and a shift towards solar, hydrogen, and safe nuclear power. It may be possible that—just possible—that the energy industry will transform itself so completely that observers will declare it a new industry. . . . Brute force, low-tech responses and money alone won't meet the challenges we face in the energy industry.[58]

---

https://insideclimatenews.org/news/01122015/documents-exxons-early-co2-position-senior-executives-engage-and-warming-forecast (accessed Jan. 28, 2020).

[57] Banerjee, *supra* note 36.

[58] Richard E. Tucker, *High Tech Frontiers in the Energy Industry: The Challenge Ahead*, AIChE National Meeting (Nov. 30, 1988), https://hdl.handle.net/2027/pur1.32754074119482 (accessed Feb. 21, 2020).

80.    Also in 1988, the Shell Greenhouse Effect Working Group issued a confidential internal report, "The Greenhouse Effect," which acknowledged global warming's anthropogenic nature: "Man-made carbon dioxide released into and accumulated in the atmosphere is believed to warm the earth through the so-called greenhouse effect." The authors also noted the burning of fossil fuels as a primary driver of $CO_2$ buildup and warned that warming could "create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather." They further pointed to the potential for "direct operational consequences" of sea level rise on "offshore installations, coastal facilities and operations (*e.g.* platforms, harbors, refineries, depots)."[59]

81.    Similar to early warnings by Exxon scientists, the Shell report notes that "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation." The authors mention the need to consider policy changes on multiple occasions, noting that "the potential implications for the world are . . . so large that policy options need to be considered much earlier" and that research should be "directed more to the analysis of policy and energy options than to studies of what we will be facing exactly."[60]

82.    In 1989, Esso Resources Canada (ExxonMobil) commissioned a report on the impacts of climate change on existing and proposed natural gas facilities in the Mackenzie River Valley and Delta, including extraction facilities on the Beaufort Sea and a pipeline crossing

---

[59] Greenhouse Effect Working Group, *The Greenhouse Effect*, Shell Internationale Petroleum (May 1988), https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239 (accessed Feb. 21, 2020).

[60] *Id.*

56

Canada's Northwest Territory.[61] It reported that "large zones of the Mackenzie Valley could be affected dramatically by climatic change" and that "the greatest concern in Norman Wells [oil town in North West Territories, Canada] should be the changes in permafrost that are likely to occur under conditions of climate warming."[62] The report concluded that, in light of climate models showing a "general tendency towards warmer and wetter climate," operation of those facilities would be compromised by increased precipitation, increase in air temperature, changes in permafrost conditions, and significantly, sea level rise and erosion damage.[63] The authors recommended factoring those eventualities into future development planning and also warned that "a rise in sea level could cause increased flooding and erosion damage on Richards Island."

83.    In 1991, Shell produced a film called "Climate of Concern." The film advises that while "no two [climate change projection] scenarios fully agree, . . . [they] have each prompted the same serious warning. A warning endorsed by a uniquely broad consensus of scientists in their report to the UN at the end of 1990." The warning was an increasing frequency of abnormal weather, and of sea level rise of about one meter over the coming century. Shell specifically described the impacts of anthropogenic sea level rise on tropical islands, "barely afloat even now, . . . [f]irst made uninhabitable and then obliterated beneath the waves. Wetland habitats destroyed by intruding salt. Coastal lowlands suffering pollution of precious groundwater." It warned of "greenhouse refugees," people who abandoned homelands inundated by the sea, or were displaced because of catastrophic changes to the environment. The video concludes with a stark admonition:

---

[61] *See* Stephen Lonergan & Kathy Young, *An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic*, 7 ENERGY EXPLORATION & EXPLOITATION 359–81 (1989).

[62] *Id.* at 369, 376.

[63] *Id.* at 360, 377–78.

"Global warming is not yet certain, but many think that the wait for final proof would be irresponsible. Action now is seen as the only safe insurance."[64]

84.     The fossil fuel industry was at the forefront of carbon dioxide research for much of the latter half of the 20th century. They developed cutting edge and innovative technology and worked with many of the field's top researchers to produce exceptionally sophisticated studies and models. For instance, in the mid-nineties Shell began using scenarios to plan how the company could respond to various global forces in the future. In one scenario published in a 1998 internal report, Shell paints an eerily prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the U.S. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry or the government. After all, two successive IPCC reports since 1993 have reinforced the human connection to climate change… Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[65]

85.     Fossil fuel companies did not just consider climate change impacts in scenarios. In the mid-1990s, ExxonMobil, Shell, and Imperial Oil (ExxonMobil) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's own Environmental Impact Statement declared: "The impact of a global warming sea-level rise may be particularly significant in Nova

---

[64] Jelmer Mommers, *Shell Made a Film About Climate Change in 1991 (Then Neglected To Heed Its Own Warning)*, DE CORRESPONDENT (Feb. 27, 2017), https://thecorrespondent.com/6285/shell-made-a-film-about-climate-change-in-1991-then-neglected-to-heed-its-own-warning (accessed Feb. 21, 2020).

[65] Royal Dutch/Shell Group, Group Scenarios 1998–2020, 115, 122 (1998), http://www.documentcloud.org/documents/4430277-27-1-Compiled.html (accessed Feb. 21, 2020).

Scotia. The long-term tide gauge records at a number of locations along the N.S. coast have shown sea level has been rising over the past century. . . . For the design of coastal and offshore structures, an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for the proposed project life (25 years)."[66]

86. Climate change research conducted by Defendants and their industry associations frequently acknowledged uncertainties in their climate modeling—those uncertainties, however, were merely with respect to the magnitude and timing of climate impacts resulting from fossil fuel consumption, not that significant changes would eventually occur. The Defendants' researchers and the researchers at their industry associations harbored little doubt that climate change was occurring and that fossil fuel products were, and are, the primary cause.

87. Despite the overwhelming information about the threats to people and the planet posed by continued unabated use of their fossil fuel products, Defendants failed to act as they reasonably should have to mitigate or avoid those dire adverse impacts. Defendants instead adopted the position, as described below, that they had a license to continue the unfettered pursuit of profits from those products. This position was an abdication of Defendants' responsibility to consumers and the public, including Plaintiffs, to act on their unique knowledge of the reasonably foreseeable hazards of unabated production and consumption of their fossil fuel products.

---

[66] ExxonMobil, Sable Project, Development Plan, *Volume 3—Environmental Impact Statement*, Ch 4: Environmental Setting, 4-77, http://soep.com/about-the-project/development-plan-application (accessed Feb. 21, 2020).

**D.  Defendants Did Not Disclose Known Harms Associated with the Extraction, Promotion, and Consumption of Their Fossil Fuel Products, and Instead Affirmatively Acted to Obscure Those Harms and Engaged in a Concerted Campaign to Evade Regulation.**

88.     By 1988, Defendants had amassed a compelling body of knowledge about the role of anthropogenic greenhouse gases, and specifically those emitted from the normal use of Defendants' fossil fuel products, in causing global warming and its cascading impacts, including disruptions to the hydrologic cycle, extreme precipitation and drought, heatwaves, and associated consequences for human communities and the environment. On notice that their products were causing global climate change and dire effects on the planet, Defendants faced the decision whether or not to take steps to limit the damages their fossil fuel products were causing and would continue to cause Earth's inhabitants, including County residents.

89.     Defendants at any time before or thereafter could and reasonably should have taken any number of steps to mitigate the damages caused by their fossil fuel products, and their own comments reveal an awareness of what some of those steps may have been. Defendants should have made reasonable warnings to consumers, the public, and regulators of the dangers known to Defendants of the unabated consumption of their fossil fuel products, and they could and should have taken reasonable steps to limit the potential greenhouse gas emissions arising out of their fossil fuel products.

90.     But several key events during the period 1988–1992 appear to have prompted Defendants to change their tactics from general research and internal discussion on climate change to a public campaign aimed at evading regulation of their fossil fuel products and/or emissions therefrom. They include:

60

a. In 1988, National Aeronautics and Space Administration (NASA) scientists confirmed that human activities were actually contributing to global warming.[67] On June 23 of that year, NASA scientist James Hansen's presentation of this information to Congress engendered significant news coverage and publicity for the announcement, including coverage on the front page of the New York Times.

b. On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors introduced S. 2666, "The Global Environmental Protection Act," to regulate $CO_2$ and other greenhouse gases. Four more bipartisan bills to significantly reduce $CO_2$ pollution were introduced over the following ten weeks, and in August, U.S. presidential candidate George H.W. Bush pledged that his presidency would "combat the greenhouse effect with the White House effect."[68] Political will in the United States to reduce anthropogenic greenhouse gas emissions and mitigate the harms associated with Defendants' fossil fuel products was gaining momentum.

c. In December 1988, the United Nations formed the Intergovernmental Panel on Climate Change (IPCC), a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

---

[67] *See* Frumhoff et al., *supra* note 15.

[68] N.Y. TIMES, *The White House and the Greenhouse* (May 9, 1998), http://www.nytimes.com/1989/05/09/opinion/the-white-house-and-the-greenhouse.html (accessed Feb. 21, 2020).

d.  In 1990, the IPCC published its First Assessment Report on anthropogenic climate change,[69] in which it concluded that (1) "there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be," and (2) that

>   emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapour, will increase in response to global warming and further enhance it.[70]

The IPCC reconfirmed those conclusions in a 1992 supplement to the First Assessment report.[71]

e.  The United Nations began preparing for the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of 172 world governments, of which 116 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change (UNFCCC), an international environmental treaty providing protocols for future negotiations aimed at "stabiliz[ing] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."[72]

---

[69] *See* IPCC, *Reports*, http://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml.

[70] IPCC, *Climate Change: The IPCC Scientific Assessment*, "Policymakers Summary" (1990), https://www.ipcc.ch/site/assets/uploads/2018/03/ipcc_far_wg_I_spm.pdf (accessed Feb. 21, 2020).

[71] IPCC, *1992 IPCC Supplement: Scientific Assessment* (1992), https://www.ipcc.ch/site/assets/uploads/2018/05/ipcc_wg_I_1992_suppl_report_scientific_assessment.pdf (accessed Feb. 21, 2020).

[72] United Nations, *United Nations Framework Convention on Climate Change*, Article 2 (1992), https://unfccc.int/resource/docs/convkp/conveng.pdf (accessed Feb. 21, 2020).

62

91.     Those world events marked a shift in public discussion of climate change, and the initiation of international efforts to curb anthropogenic greenhouse emissions—developments that had stark implications for, and would have diminished the profitability of, Defendants' fossil fuel products.

92.     But rather than collaborating with the international community by acting to forestall, or at least decrease, their fossil fuel products' contributions to global warming and its impacts including sea level rise, disruptions to the hydrologic cycle, and associated consequences to Plaintiffs and other communities, Defendants embarked on a decades-long campaign designed to maximize continued dependence on their products and undermine national and international efforts to rein in greenhouse gas emissions.

93.     Defendants' campaign, which focused on concealing, discrediting, and/or misrepresenting information that tended to support restricting consumption of (and thereby decreasing demand for) Defendants' fossil fuel products, took several forms. The campaign enabled Defendants to accelerate their business practice of exploiting fossil fuel reserves, and concurrently externalize the social and environmental costs of their fossil fuel products. Those activities stood in direct contradiction to Defendants' own prior recognition that the science of anthropogenic climate change was clear and that action was needed to avoid or mitigate dire consequences to the planet and communities like Plaintiffs'.

94.     Defendants took affirmative steps to conceal, from Plaintiffs and the general public, the foreseeable impacts of the use of their fossil fuel products on the Earth's climate and associated harms to people and communities. Defendants embarked on a concerted public relations campaign to cast doubt on the science connecting global climate change to fossil fuel products and greenhouse gas emissions, in order to influence public perception of the existence of anthropogenic

63

global warming and sea level rise, disruptions to weather cycles, extreme precipitation and drought, and other associated consequences. The effort included promoting their hazardous products through advertising campaigns that failed to warn of the existential risks associated with the use of those products, and the initiation and funding of climate change denialist organizations, designed to influence consumers to continue using Defendants' fossil fuel products irrespective of those products' damage to communities and the environment.

95.     For example, in 1988, Joseph Carlson, an Exxon public affairs manager, described the "Exxon Position," which included, among others, two important messaging tenets: (1) "[e]mphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse Effect"; and (2) "[r]esist the overstatement and sensationalization [sic] of potential greenhouse effect which could lead to noneconomic development of non-fossil fuel resources."[73]

96.     A 1994 Shell report entitled "The Enhanced Greenhouse Effect: A Review of the Scientific Aspects" by Royal Dutch Shell environmental advisor Peter Langcake stands in stark contrast to the company's 1988 report on the same topic. Whereas before, the authors recommended consideration of policy solutions early on, Langcake in 1994 warned of the potentially dramatic "economic effects of ill-advised policy measures." While the report recognized the IPCC conclusions as the mainstream view, Langcake still emphasized scientific uncertainty, noting, for example, that "the postulated link between any observed temperature rise and human activities has to be seen in relation to natural variability, which is still largely unpredictable." The Shell Group position is stated clearly in the report: "Scientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas emissions beyond

---

[73] Joseph M. Carlson, *Exxon Memo on "The Greenhouse Effect"* (Aug. 3, 1988), https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-Greenhouse-Effect.pdf (accessed Feb. 21, 2020).

64

'no regrets' measures could be premature, divert resources from more pressing needs and further distort markets."[74]

97.     In 1991, for example, the Information Council for the Environment (ICE), whose members included affiliates, predecessors and/or subsidiaries of Defendants, launched a national climate change science denial campaign with full-page newspaper ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. Included among the campaign strategies was to "reposition global warming as theory (not fact)." Its target audience included older, less-educated males who are "predisposed to favor the ICE agenda, and likely to be even more supportive of that agenda following exposure to new info."[75]

98.     A goal of ICE's advertising campaign was to change public opinion and avoid regulation. A memo from Richard Lawson, president of the National Coal Association asked members to contribute to the ICE campaign with the justification that "policymakers are prepared to act [on global warming]. Public opinion polls reveal that 60% of the American people already believe global warming is a serious environmental problem. Our industry cannot sit on the sidelines in this debate."[76]

---

[74] P. Langcake, *The Enhanced Greenhouse Effect: A review of the Scientific Aspects*, (Dec. 1994), https://www.documentcloud.org/documents/4411099-Document11.html#document/p15/a411511 (accessed in Feb. 21, 2020).

[75] Union of Concerned Scientists, *Deception Dossier #5: Coal's "Information Council on the Environment" Sham* (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf (accessed Jan. 28, 2020).

[76] Naomi Oreskes, *My Facts Are Better Than Your Facts: Spreading Good News About Global Warming* (2010), in Peter Howlett et al., *How Well Do Facts Travel?: The Dissemination of Reliable Knowledge*, 136–66, Cambridge University Press (2011).

99.     The following images are examples of ICE-funded print advertisements challenging the validity of climate science and intended to obscure the scientific consensus on anthropogenic climate change and induce political inertia to address it.[77]

  

**<u>Figure 5</u>: Information Council for the Environment Advertisements**

100.   In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." In the publication's preface, Exxon CEO Lee Raymond inaccurately stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." The publication described the greenhouse effect as "unquestionably real and definitely a good thing," while ignoring the severe consequences that would result from the influence of the increased $CO_2$ concentration on the Earth's climate. Instead, it characterized the greenhouse effect as simply "what makes the earth's atmosphere livable." Directly contradicting Exxon's own knowledge and peer-reviewed science, the publication ascribed the rise in temperature since the

---

[77] Union of Concerned Scientists, *supra* note 75, at 47–49.

late 19th century to "natural fluctuations that occur over long periods of time" rather than to the anthropogenic emissions that Exxon itself and other scientists had confirmed were responsible. The publication also falsely challenged the computer models that projected the future impacts of unabated fossil fuel product consumption, including those developed by Exxon's own employees, as having been "proved to be inaccurate." The publication contradicted the numerous reports prepared by and circulated among Exxon's staff, and by the API, stating that "the indications are that a warmer world would be far more benign than many imagine . . . moderate warming would reduce mortality rates in the US, so a slightly warmer climate would be more healthful." Raymond concluded his preface by attacking advocates for limiting the use of his company's fossil fuel products as "drawing on bad science, faulty logic, or unrealistic assumptions"—despite the important role that Exxon's own scientists had played in compiling those same scientific underpinnings.[78]

101.    API published an extensive report in the same year warning against concern over $CO_2$ buildup and any need to curb consumption or regulate the fossil fuel industry. The introduction stated that "there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil." The authors discouraged the further development of certain alternative energy sources, writing that "government agencies have advocated the increased use of ethanol and the electric car, without the facts to support the assertion that either is superior to existing fuels and technologies" and that "policies that mandate replacing oil with specific alternative fuel technologies freeze progress at the current level of technology, and reduce the chance that innovation will develop better solutions." The paper also denied the human connection

---

[78] Exxon Corp., *Global Warming: Who's Right?* (1996), https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right.html (accessed Feb. 21, 2020).

to climate change, by falsely stating that no "scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms." The report's message was false but clear: "Facts don't support the arguments for restraining oil use."[79]

102.    In a speech presented at the World Petroleum Congress in Beijing in 1997 at which many of the Defendants were present, Exxon CEO Lee Raymond reiterated those views. This time, he presented a false dichotomy between stable energy markets and abatement of the marketing, promotion, and sale of fossil fuel products Defendants knew to be hazardous. He stated:

> Some people who argue that we should drastically curtail our use of fossil fuels for environmental reasons . . . my belief [is] that such proposals are neither prudent nor practical. With no readily available economic alternatives on the horizon, fossil fuels will continue to supply most of the world's and this region's energy for the foreseeable future.
>
> Governments also need to provide a stable investment climate . . . . They should avoid the temptation to intervene in energy markets in ways that give advantage to one competitor over another or one fuel over another.
>
> We also have to keep in mind that most of the greenhouse effect comes from natural sources . . . Leaping to radically cut this tiny sliver of the greenhouse pie on the premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.
>
> Let's agree there's a lot we really don't know about how climate will change in the 21st century and beyond . . . It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now. It's bad public policy to impose very costly regulations and restrictions when their need has yet to be proven.[80]

---

[79] Sally Brain Gentille et al., *Reinventing Energy: Making the Right Choices, American Petroleum Institute* (1996), http://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy (accessed March 5, 2020).

[80] Lee R. Raymond, *Energy—Key to Growth and a Better Environment for Asia-Pacific Nations*, World Petroleum Congress (Oct. 13, 1997), https://assets.documentcloud.org/documents/2840902/1997-Lee-Raymond-Speech-at-China-World-Petroleum.pdf (accessed Feb. 21, 2020).

103.    Imperial Oil (ExxonMobil) CEO Robert Peterson falsely denied the established connection between Defendants' fossil fuel products and anthropogenic climate change in the Summer 1998 Imperial Oil Review, "A Cleaner Canada:"

> [T]his issue [referring to climate change] has absolutely nothing to do with pollution and air quality. Carbon dioxide is not a pollutant but an essential ingredient of life on this planet. . . . [T]he question of whether or not the trapping of 'greenhouse' gases will result in the planet's getting warmer . . . has no connection whatsoever with our day-to-day weather.

> There is absolutely no agreement among climatologists on whether or not the planet is getting warmer, or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate. . . .I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[81]

104.    Mobil (ExxonMobil) paid for a series of "advertorials," advertisements located in the editorial section of the New York Times and meant to look like editorials rather than paid ads. Those ads discussed various aspects of the public discussion of climate change and sought to undermine the justifications for tackling greenhouse gas emissions as unsettled science. The 1997 advertorial below[82] argued that economic analysis of emissions restrictions was faulty and inconclusive and therefore a justification for delaying action on climate change.

---

[81] Robert Peterson, *A Cleaner Canada* in *Imperial Oil Review* (1998), https://www.documentcloud.org/documents/6555577-1998-Robert-PetersonA-Cleaner-Canada-Imperial.html (accessed Feb. 21, 2020).

[82] Mobil, *When Facts Don't Square with the Theory, Throw Out the Facts*, N.Y. TIMES, A31 (Aug.14, 1997), https://www.documentcloud.org/documents/705550-mob-nyt-1997-aug-14-whenfactsdontsquare.html (accessed Feb. 21, 2020).

69

like race,

But when we no longer allow those choices, both civility and common sense will have been diminished. ☐

who was dragged from his sister's car by police officers and shot in the face at point-blank range. The cops

who have the power to do something about those officers, but choose not to. ☐

# When facts don't square with the theory, throw out the facts

 That seems to characterize the administration's attitude on two of its own studies which show that international efforts to curb global warming could spark a big run-up in energy prices.

For months, the administration—playing its cards close to the vest—has promised to provide details of the emission reduction plan it will put on the table at the climate change meeting in Kyoto, Japan, later this year. It also promised to evaluate the economics of that policy and measure its impact. Those results are important because the proposals submitted by other countries thus far would be disruptive and costly to the U.S. economy.

Yet, when the results from its own economic models were finally generated, the administration started distancing itself from the findings and models that produced them. The administration's top economic advisor said that economic models can't provide a "definitive answer" on the impact of controlling emissions. The effort, she said, was "futile." At best, the models can only provide a "range of potential impacts."

Frankly, we're puzzled. The White House has promised to lay the economic facts before the public. Yet, the administration's top advisor said such an analysis won't be based on models and it will "preclude...detailed numbers." If you don't provide numbers and don't rely on models, what kind of rigorous economic examination can Congress and the public expect?

We're also puzzled by ambivalence over models. The administration downplays the utility of economic models to forecast cost impacts 10–15 years from now, yet its negotiators accept as gospel the 50–100-year predictions of global warming that have been generated by climate models—many of which have been criticized as seriously flawed.

The second study, conducted by Argonne National Laboratory under a contract with the Energy Department, examined what would happen if the U.S. had to commit to higher energy prices under the emission reduction plans that several nations had advanced last year. Such increases, the report concluded, would result in "significant reductions in output and employment" in six industries—aluminum, cement, chemical, paper and pulp, petroleum refining and steel.

Hit hardest, the study noted, would be the chemical industry, with estimates that up to 30 percent of U.S. chemical manufacturing capacity would move offshore to developing countries. Job losses could amount to some 200,000 in that industry, with another 100,000 in the steel sector. And despite the substantial loss of U.S. jobs and manufacturing capacity, the net emission reduction could be insignificant since developing countries will not be bound by the emission targets of a global warming treaty.

Downplaying Argonne's findings, the Energy Department noted that the study used outdated energy prices (mid-1996), didn't reflect the gains that would come from international emissions trading and failed to factor in the benefits of accelerated developments in energy efficiency and low-carbon technologies.

What it failed to mention is just what these new technologies are and when we can expect their benefits to kick in. As for emissions trading, many economists have theorized about the role they could play in reducing emissions, but few have grappled with the practicality of implementing and policing such a scheme.

We applaud the goals the U.S. wants to achieve in these upcoming negotiations—namely, that a final agreement must be "flexible, cost-effective, realistic, achievable and ultimately global in scope." But until we see the details of the administration's policy, we are concerned that plans are being developed in the absence of rigorous economic analysis. Too much is at stake to simply ignore facts that don't square with preconceived theories.



http://www.mobil.com

©1997 Mobil Corporation

**Figure 6: 1997 Mobil Advertorial**

70

105. In 1998, API, on behalf of its members, developed a Global Climate Science Communications Plan that stated that unless "climate change becomes a non-issue . . . there may be no moment when we can declare victory for our efforts." Rather, API proclaimed that "[v]ictory will be achieved when . . . average citizens 'understand' (recognize) uncertainties in climate science; [and when] recognition of uncertainties becomes part of the 'conventional wisdom.'"[83] The multi-million-dollar, multi-year proposed budget included public outreach and the dissemination of educational materials to schools to "begin to erect a barrier against further efforts to impose Kyoto-like measures in the future"[84]—a blatant attempt to disrupt international efforts, pursuant to the UNFCCC, to negotiate a treaty that curbed greenhouse gas emissions.

106. Soon after, API distributed a memo to its members illuminating API's and Defendants' concern over the potential regulation of Defendants' fossil fuel products: "Climate is at the center of the industry's business interests. Policies limiting carbon emissions reduce petroleum product use. That is why it is API's highest priority issue and defined as 'strategic.'"[85] Further, the API memo stresses many of the strategies that Defendants individually and collectively utilized to combat the perception of their fossil fuel products as hazardous. They included:

    a. Influencing the tenor of the climate change "debate" as a means to establish that greenhouse gas reduction policies like the Kyoto Protocol were not necessary to responsibly address climate change;

---

[83] Joe Walker, *E-mail to Global Climate Science Team, attaching the Draft Global Science Communications Plan* (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf (accessed Feb. 21, 2020).

[84] *Id.*

[85] *Id.*

b. Maintaining strong working relationships between government regulators and communications-oriented organizations like the Global Climate Coalition, the Heartland Institute, and other groups carrying Defendants' message minimizing the hazards of the unabated use of their fossil fuel products and opposing regulation thereof;

c. Building the case for (and falsely dichotomizing) Defendants' positive contributions to a "long-term approach" (ostensibly for regulation of their products) as a reason for society to reject short term fossil fuel emissions regulations, and engaging in climate change science uncertainty research; and

d. Presenting Defendants' positions on climate change in domestic and international forums, including by preparing rebuttals to IPCC reports.

107. Additionally, Defendants mounted a deceptive public campaign against regulation of their business practices in order to continue wrongfully promoting and marketing their fossil fuel products, despite their own knowledge and the growing national and international scientific consensus about the hazards of doing so.

108. The Global Climate Coalition (GCC), on behalf of Defendants and other fossil fuel companies, funded deceptive advertising campaigns and distributed misleading material to generate public uncertainty around the climate debate, with the specific purpose of preventing U.S. adoption of the Kyoto Protocol, despite the leading role that the U.S. had played in the Protocol negotiations.[86] Despite an internal primer stating that various "contrarian theories" [*i.e.*, climate change skepticism] do not "offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change," GCC excluded this section from the public

---

[86] *Id.*

72

version of the backgrounder and instead funded efforts to promote some of those same contrarian theories over subsequent years.[87]

109.    A key strategy in Defendants' efforts to discredit scientific consensus on climate change and the IPCC was to bankroll scientists who, although accredited, held fringe opinions that were even more questionable given the sources of their research funding. Those scientists obtained part or all of their research budget from Defendants directly or through Defendant-funded organizations like API,[88] but they frequently failed to disclose their fossil fuel industry underwriters.[89]

110.    Creating a false sense of disagreement in the scientific community (despite the consensus that its own scientists, experts, and managers had previously acknowledged) has had an evident impact on public opinion. A 2007 Yale University-Gallup poll found that while 71 percent of Americans personally believed global warming was happening, only 48 percent believed that there was a consensus among the scientific community, and 40 percent believed there was a lot of disagreement among scientists over whether global warming was occurring.[90]

---

[87] Gregory J. Dana, *Memo to AIAM Technical Committee Re: Global Climate Coalition (GCC)—Primer on Climate Change Science—Final Draft*, Association of International Automobile Manufacturers (Jan. 18, 1996), http://www.webcitation.org/6FyqHawb9 (accessed Feb. 21, 2020).

[88] *E.g.*, Willie Soon & Sallie Baliunas, *Proxy Climatic and Environmental Changes of the Past 1000 Years*, 23 CLIMATE RESEARCH 88, 105 (Jan. 31, 2003), http://www.int-res.com/articles/cr2003/23/c023p089.pdf.

[89] *E.g.*, Newsdesk, *Smithsonian Statement: Dr. Wei-Hock (Willie) Soon*, SMITHSONIAN (Feb. 26, 2015), http://newsdesk.si.edu/releases/smithsonian-statement-dr-wei-hock-willie-soon.

[90] *American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll*, Yale Program on Climate Change Communication (July 31, 2007), http://climatecommunication.yale.edu/publications/american-opinions-on-global-warming (accessed Feb. 21, 2020).

111.    2007 was the same year the IPCC published its Fourth Assessment Report, in which it concluded that "there is *very high confidence* that the net effect of human activities since 1750 has been one of warming."[91] The IPCC defined "very high confidence" as at least a 9 out of 10 chance.[92]

112.    Defendants borrowed pages out of the playbook of prior denialist campaigns. A "Global Climate Science Team" ("GCST") was created that mirrored a front group created by the tobacco industry, known as The Advancement of Sound Science Coalition, whose purpose was to sow uncertainty about the fact that cigarette smoke is carcinogenic. The GCST's membership included Steve Milloy (a key player on the tobacco industry's front group), Exxon's senior environmental lobbyist; an API public relations representative; and representatives from Chevron and Southern Company that drafted API's 1998 Communications Plan. There were no scientists on the "Global Climate Science Team." GCST developed a strategy to spend millions of dollars manufacturing climate change uncertainty. Between 2000 and 2004, Exxon donated $110,000 to Milloy's efforts and another organization, the Free Enterprise Education Institute and $50,000 to the Free Enterprise Action Institute, both registered to Milloy's home address.[93]

113.    Defendants, through their trade association memberships, worked directly, and often in a deliberately obscured manner, to evade regulation of the emissions resulting from use of their fossil fuel products.

---

[91] IPCC, *Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change* (2007), https://www.ipcc.ch/pdf/assessment-report/ar4/wg1/ar4-wg1-spm.pdf (accessed Feb. 21, 2020).

[92] *Id.*

[93] Seth Shulman et al., *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, Union of Concerned Scientists, 19 (Jan. 2007), https://www.ucsusa.org/sites/default/files/2019-09/exxon_report.pdf (accessed Feb. 21, 2020).

114.    Defendants have funded dozens of think tanks, front groups, and dark money foundations pushing climate change denial. These include the Competitive Enterprise Institute, the Heartland Institute, Frontiers for Freedom, Committee for a Constructive Tomorrow, and Heritage Foundation. From 1998 to 2014 ExxonMobil spent almost $31 million funding numerous organizations misrepresenting the scientific consensus that Defendants' fossil fuel products were causing climate change, sea level rise, and injuries to Plaintiffs, among other communities.[94] Several Defendants have been linked to other groups that undermine the scientific basis linking Defendants' fossil fuel products to climate change and sea level rise, including the Frontiers of Freedom Institute and the George C. Marshall Institute.

115.    Exxon acknowledged its own previous success in sowing uncertainty and slowing mitigation through funding of climate denial groups. In its 2007 Corporate Citizenship Report, Exxon declared: "In 2008, we will discontinue contributions to several public policy research groups whose position on climate change could divert attention from the important discussion on how the world will secure the energy required for economic growth in an environmentally responsible manner."[95] Despite this pronouncement, Exxon remained financially associated with several such groups after the report's publication.

116.    Defendants could have contributed to the global effort to mitigate the impacts of greenhouse gas emissions by, for example, delineating practical technical strategies, policy goals, and regulatory structures that would have allowed them to continue their business ventures while

---

[94] ExxonSecrets.org, *ExxonMobil Climate Denial Funding 1998–2014* (accessed June 27, 2018), http://exxonsecrets.org/html/index.php (accessed Feb. 21, 2020).

[95] ExxonMobil, *2007 Corporate Citizenship Report* (Dec. 31, 2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html (accessed Feb. 21, 2020).

reducing greenhouse gas emissions and supporting a transition to a lower carbon future. Instead, Defendants undertook a momentous effort to evade international and national regulation of greenhouse gas emissions to enable them to continue unabated fossil fuel production.

117. As a result of Defendants' tortious, false, and misleading conduct, reasonable consumers of Defendants' fossil fuel products and policy-makers have been deliberately and unnecessarily deceived about: the role of fossil fuel products in causing global warming, sea level rise, disruptions to the hydrologic cycle, and increased extreme precipitation, heatwaves, drought and other consequences of the climate crisis; the acceleration of global warming since the mid-20[th] century and the continuation thereof; and about the fact that the continued increase in fossil fuel product consumption creates severe environmental threats and significant economic costs for communities like the City and resource managers like BWS. Reasonable consumers and policy makers have also been deceived about the depth and breadth of the state of the scientific evidence on anthropogenic climate change, and in particular, about the strength of the scientific consensus demonstrating the role of fossil fuels in causing both climate change and a wide range of potentially destructive impacts, including sea level rise, disruptions to the hydrologic cycle, extreme precipitation, heatwaves, drought, and associated consequences.

**E.  In Contrast to Their Public Statements, Defendants' Internal Actions Demonstrate Their Awareness of and Intent to Profit from the Unabated Use of Fossil Fuel Products.**

118. In contrast to their public-facing efforts challenging the validity of the scientific consensus about anthropogenic climate change, Defendants' acts and omissions evidence their internal acknowledgement of the reality of climate change and its likely consequences. Those actions include, but are not limited to, making multi-billion-dollar infrastructure investments for their own operations that acknowledge the reality of coming anthropogenic climate-related change. Those investments included (among others), raising offshore oil platforms to protect against sea

level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm severity; and developing and patenting designs for equipment intended to extract crude oil and/or natural gas in areas previously unreachable because of the presence of polar ice sheets.[96]

119. For example, in 1973 Exxon obtained a patent for a cargo ship capable of breaking through sea ice[97] and for an oil tanker[98] designed specifically for use in previously unreachable areas of the Arctic.

120. In 1974, Chevron obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses,[99] allowing for drilling in areas with increased ice flow movement due to elevated temperature.

121. That same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions,[100] allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.

122. Shell obtained a patent similar to Texaco's (Chevron) in 1984.[101]

---

[96] Amy Lieberman & Suzanne Rust, *Big Oil Braced for Global Warming While it Fought Regulations*, L.A. TIMES (Dec. 31, 2015), http://graphics.latimes.com/oil-operations (accessed Jan. 28, 2020).

[97] Patents, *Icebreaking cargo vessel*, Exxon Research Engineering Co. (Apr. 17, 1973), https://www.google.com/patents/US3727571.

[98] Patents, *Tanker vessel*, Exxon Research Engineering Co. (July 17, 1973), https://www.google.com/patents/US3745960.

[99] Patents, *Arctic offshore platform*, Chevron Research & Technology Co. (Aug. 27, 1974), https://www.google.com/patents/US3831385.

[100] Patents, *Mobile, arctic drilling and production platform*, Texaco Inc. (Feb. 26, 1974), https://www.google.com/patents/US3793840.

[101] Patents, *Arctic offshore platform*, Shell Oil Co. (Jan. 24, 1984), https://www.google.com/patents/US4427320.

123.    In 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea level rise. Those design changes were ultimately carried out by Shell's contractors, adding substantial costs to the project.[102]

      a.  The Troll field, off the Norwegian coast in the North Sea, was proven to contain large natural oil and gas deposits in 1979, shortly after Norske Shell was approved by Norwegian oil and gas regulators to operate a portion of the field.

      b.  In 1986, the Norwegian parliament granted Norske Shell authority to complete the first development phase of the Troll field gas deposits, and Norske Shell began designing the "Troll A" gas platform, with the intent to begin operation of the platform in approximately 1995. Based on the very large size of the gas deposits in the Troll field, the Troll A platform was projected to operate for approximately 70 years.

      c.  The platform was originally designed to stand approximately 100 feet above sea level—the amount necessary to stay above waves in a once-in-a-century strength storm.

      d.  In 1989, Shell engineers revised their plans to increase the above-water height of the platform by 3–6 feet, specifically to account for higher anticipated average sea

---

[102] *Greenhouse Effect: Shell Anticipates a Sea Change*, N.Y. TIMES (Dec. 20, 1989), http://www.nytimes.com/1989/12/20/business/greenhouse-effect-shell-anticipates-a-sea-change.html.

levels and increased storm intensity due to global warming over the platform's 70-year operational life.[103]

e.  Shell projected that the additional 3–6 feet of above-water construction would increase the cost of the Troll A platform by as much as $40 million.

**F.   Defendants' Actions Have Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis.**

124.   As greenhouse gas pollution accumulates in the atmosphere, some of which does not dissipate for potentially thousands of years (namely $CO_2$), climate changes and consequent adverse environmental changes compound, and their frequencies and magnitudes increase. As those adverse environmental changes compound and their frequencies and magnitudes increase, so too do the physical, environmental, economic, and social injuries resulting therefrom.

125.   Delayed efforts to curb anthropogenic greenhouse gas emissions have therefore increased environmental harms and increased the magnitude and cost to address harms, including to Plaintiffs, that have already occurred or are locked in by previous emissions.

126.   Therefore, Defendants' campaign to obscure the science of climate change so as to protect and expand the use of fossil fuels greatly increased and continues to increase the harms and rate of harms suffered by Plaintiffs and residents of the County.

127.   The costs of inaction on anthropogenic climate change and its adverse environmental effects were not lost on Defendants. In a 1997 speech by John Browne, Group Executive for BP America, at Stanford University, Browne described Defendants' and the entire fossil fuel industry's responsibility and opportunities to reduce use of fossil fuel products, reduce

---

[103] *Id.*; Lieberman & Rust, *Big Oil braced for global warming while it fought regulations*, *supra* note 96.

79

global $CO_2$ emissions, and mitigate the harms associated with the use and consumption of such products:

A new age demands a fresh perspective of the nature of society and responsibility.

We need to go beyond analysis and to take action. It is a moment for change and for a rethinking of corporate responsibility. . . .

[T]here is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature.

The prediction of the IPCC is that over the next century temperatures might rise by a further 1 to 3.5 degrees centigrade [1.8º– 6.3º F], and that sea levels might rise by between 15 and 95 centimetres [5.9 and 37.4 inches]. Some of that impact is probably unavoidable, because it results from current emissions. . . .

[I]t would be unwise and potentially dangerous to ignore the mounting concern.

The time to consider the policy dimensions of climate change is not when the link between greenhouse gases and climate change is conclusively proven … but when the possibility cannot be discounted and is taken seriously by the society of which we are part. . . .

We [the fossil fuel industry] have a responsibility to act, and I hope that through our actions we can contribute to the much wider process which is desirable and necessary.

BP accepts that responsibility and we're therefore taking some specific steps.

To control our own emissions.

To fund continuing scientific research.

To take initiatives for joint implementation.

To develop alternative fuels for the long term.

And to contribute to the public policy debate in search of the wider global answers to the problem.[104]

---

[104] John Browne, *BP Climate Change Speech to Stanford*, Climate Files (May 19, 1997), http://www.climatefiles.com/bp/bp-climate-change-speech-to-stanford (accessed Feb. 21, 2020).

128.    Despite Defendants' knowledge of the foreseeable, measurable, and significant harms associated with the unabated consumption and use of their fossil fuel products, and despite Defendants' knowledge of technologies and practices that could have helped to reduce the foreseeable dangers associated with their fossil fuel products, Defendants continued to wrongfully market and promote heavy fossil fuel use and mounted a campaign to obscure the connection between their fossil fuel products and the climate crisis, dramatically increasing the cost of abatement. At all relevant times, Defendants were deeply familiar with opportunities to reduce the use of their fossil fuel products, reduce global greenhouse gas emissions associated therewith, and mitigate the harms associated with the use and consumption of such products. Examples of that recognition include, but are not limited to the following:

    a.    In 1963, Esso (Exxon Mobil) obtained multiple patents on technologies for fuel cells, including on the design of a fuel cell and necessary electrodes,[105] and on a process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.[106]

    b.    In 1970, Esso (Exxon Mobil) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines (the system also increased the efficiency of the fossil fuel products used in such engines,

---

[105] Patents, *Fuel cell and fuel cell electrodes*, Exxon Research Engineering Co. (Dec. 31, 1963), https://www.google.com/patents/US3116169 (accessed Feb. 21, 2020).

[106] Patents, *Direct production of electrical energy from liquid fuels*, Exxon Research Engineering Co. (Dec. 3, 1963), https://www.google.com/patents/US3113049 (accessed Feb. 21, 2020).

thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology).[107]

129.    Defendants could have made major inroads to mitigate Plaintiffs' injuries through technology by developing and employing technologies to capture and sequester greenhouse gases emissions associated with conventional use of their fossil fuel products. Defendants had knowledge dating at least back to the 1960s, and indeed, internally researched and perfected many such technologies. For instance:

    a.    Phillips Petroleum Company (ConocoPhillips) obtained a patent in 1966 for a "Method for recovering a purified component from a gas" outlining a process to remove carbon from natural gas and gasoline streams;[108] and

    b.    In 1973, Shell was granted a patent for a process to remove acidic gases, including $CO_2$, from gaseous mixtures.

130.    Despite this knowledge, Defendants' later forays into the alternative energy sector were largely pretenses. For instance, in 2001, Chevron developed and shared a sophisticated information management system to gather greenhouse gas emissions data from its explorations and production to help regulate and set reduction goals.[109] Beyond this technological breakthrough, Chevron touted "profitable renewable energy" as part of its business plan for several years and

---

[107] Patents, *Low-polluting engine and drive system*, Exxon Research Engineering Co. (May 16, 1970), https://www.google.com/patents/US3513929 (accessed Feb. 21, 2020).

[108] Patents, *Method for recovering a purified component from a gas*, Phillips Petroleum Co. (Jan. 11, 1966), https://www.google.com/patents/US3228874 (accessed Feb. 21, 2020).

[109] Chevron, *Chevron Introduces New System to Manage Energy Use* (press release) (Sept. 25, 2001), https://www.chevron.com/stories/chevron-introduces-new-system-to-manage-energy-use (accessed Feb. 21, 2020).

launched a 2010 advertising campaign promoting the company's move towards renewable energy. Despite all this, Chevron rolled back its renewable and alternative energy projects in 2014.[110]

131. Similarly, ConocoPhillips' 2012 Sustainable Development report declared developing renewable energy a priority in keeping with their position on sustainable development and climate change.[111] Their 10-K filing from the same year told a different story: "As an independent E&P company, we are solely focused on our core business of exploring for, developing and producing crude oil and natural gas globally."[112]

132. Likewise, while Shell orchestrated an entire public relations campaign around energy transitions towards net zero emissions, a fine-print disclaimer in its 2016 net-zero pathways report reads: "We have no immediate plans to move to a net-zero emissions portfolio over our investment horizon of 10–20 years."[113]

133. BP, appearing to abide by the representations Lord Browne made in his speech described in paragraph 126, above, engaged in a rebranding campaign to convey an air of environmental stewardship and renewable energy to its consumers. This included renouncing its membership in the GCC in 2007, changing its name from "British Petroleum" to "BP" while adopting the slogan "Beyond Petroleum," and adopting a conspicuously green corporate logo.

---

[110] Benjamin Elgin, *Chevron Dims the Lights on Green Power*, BLOOMBERG (May 29, 2014), https://www.bloomberg.com/news/articles/2014-05-29/chevron-dims-the-lights-on-renewable-energy-projects (accessed Feb. 21, 2020).

[111] ConocoPhillips, *Sustainable Development* (2013), http://www.conocophillips.com/sustainable-development/Documents/2013.11.7%201200%20Our%20Approach%20Section%20Final.pdf (accessed Feb. 21, 2020).

[112] ConocoPhillips, Form 10-K, U.S. Securities and Exchange Commission (Dec. 31, 2012), https://www.sec.gov/Archives/edgar/data/1163165/000119312513065426/d452384d10k.htm (accessed Feb. 21, 2020).

[113] *Energy Transitions Towards Net Zero Emissions* (NZE), Shell (2016).

83

However, BP's self-touted "alternative energy" investments during this turnaround included investments in natural gas, a fossil fuel, and in 2007 the company reinvested in Canadian tar sands, a particularly high-carbon source of oil.[114] The company ultimately abandoned its wind and solar assets in 2011 and 2013, respectively, and even the "Beyond Petroleum" moniker in 2013.[115]

134.    After posting a $10 billion quarterly profit, Exxon in 2005 stated that "We're an oil and gas company. In times past, when we tried to get into other businesses, we didn't do it well. We'd rather re-invest in what we know."[116]

135.    Even if Defendants did not adopt technological or energy source alternatives that would have reduced use of fossil fuel products, reduced global greenhouse gas pollution, and/or mitigated the harms associated with the use and consumption of such products, Defendants could have taken other practical, cost-effective steps to reduce the use of their fossil fuel products, reduce global greenhouse gas pollution associated therewith, and mitigate the harms associated with the use and consumption of such products. Those alternatives could have included, among other measures:

   a. Accepting and sharing scientific evidence on the validity of anthropogenic climate change and the damages it will cause people, communities, public entities like Plaintiffs, and the environment. Mere acceptance of that information—and associated warnings and actions—would have altered the debate from *whether* to

---

[114] Fred Pearce, *Greenwash: BP and the Myth of a World 'Beyond Petroleum*,' THE GUARDIAN, (Nov. 20, 2008), https://www.theguardian.com/environment/2008/nov/20/fossilfuels-energy (accessed Feb. 21, 2020).

[115] Javier E. David, *'Beyond Petroleum' No More? BP Goes Back to Basics*, CNBC (Apr. 20, 2013), http://www.cnbc.com/id/100647034 (accessed Feb. 21, 2020).

[116] James R. Healy, *Alternate Energy Not in Cards at ExxonMobil*, USA TODAY (Oct. 28, 2005), https://usatoday30.usatoday.com/money/industries/energy/2005-10-27-oil-invest-usat_x.htm (accessed Feb. 21, 2020).

combat climate change and sea level rise to *how* to combat it; and avoided much of the public confusion that has ensued over more than 30 years, since at least 1988;

b. Forthrightly communicating with Defendants' shareholders, banks, insurers, the public, regulators and Plaintiffs about the global warming and sea level rise hazards of Defendants' fossil fuel products that were known to Defendants, would have enabled those groups to make material, informed decisions about whether and how to address climate change and sea level rise vis-à-vis Defendants' products;

c. Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort public debate, and to cause many consumers and business and political leaders to think the relevant science was far less certain that it actually was;

d. Sharing their internal scientific research with the public, and with other scientists and business leaders, so as to increase public understanding of the scientific underpinnings of climate change and its relation to Defendants' fossil fuel products;

e. Supporting and encouraging policies to avoid dangerous climate change, and demonstrating corporate leadership in addressing the challenges of transitioning to a low-carbon economy;

f. Prioritizing alternative sources of energy through sustained investment and research on renewable energy sources to replace dependence on Defendants' inherently hazardous fossil fuel products;

g. Adopting their shareholders' concerns about Defendants' need to protect their businesses from the inevitable consequences of profiting from their fossil fuel products. Over the period of 1990-2015, Defendants' shareholders proposed

85

hundreds of resolutions to change Defendants' policies and business practices regarding climate change. Those included increasing renewable energy investment, cutting emissions, and performing carbon risk assessments, among others.

136. Despite their knowledge of the foreseeable harms associated with the consumption of Defendants' fossil fuel products, and despite the existence and fossil fuel industry knowledge of opportunities that would have reduced the foreseeable dangers associated with those products, Defendants wrongfully and falsely promoted, campaigned against regulation of, and concealed the hazards of use of their fossil fuel products.

**G.    Defendants Continue to Mislead About the Impact of Their Fossil Fuel Products on Climate Change Through Greenwashing Campaigns and Other Misleading Advertisements.**

137. Defendants' coordinated campaign of disinformation and deception continues today, even as the scientific consensus about the cause and consequences of climate change has strengthened. Defendants have falsely claimed through advertising campaigns that their businesses are substantially invested in lower carbon technologies and renewable energy sources. In truth, each Defendant has invested minimally in renewable energy while continuing to expand its fossil fuel production. They have also claimed that certain of their fossil fuel products are "green" or "clean," and that using these products will sufficiently reduce or reverse the dangers of climate change. None of Defendants' fossil fuel products are "green" or "clean" because they all continue to pollute and ultimately warm the planet.

138. Instead of widely disseminating this information, reducing their pollution, and transitioning to non-polluting products, Defendants placed profits over people. In connection with selling gasoline and other fossil fuel products to consumers in the County, Defendants have failed

86

to inform consumers about the effects of their fossil fuel products in causing and accelerating the climate crisis.

139.    Defendants' advertising and promotional materials fail to disclose the extreme safety risk associated with the use of Defendants' dangerous fossil fuel products, which are causing "catastrophic" climate change, as understood by Defendants' and the industry's own scientists decades ago and with the effects of global warming now being felt in the County. They continue to omit that important information to this day.

140.    Moreover, Defendants have not just failed to disclose the catastrophic danger their products cause. After having engaged in a long campaign to deceive the public about the science behind climate change, Defendants are now engaging in "greenwashing" by employing false and misleading advertising campaigns promoting themselves as sustainable energy companies committed to finding solutions to climate change, including by investing in alternative energy.

141.    These misleading "greenwashing" campaigns are intended to capitalize on consumers' concerns for climate change and lead a reasonable consumer to believe that Defendants' are actually substantially diversified energy companies making meaningful investments in low carbon energy compatible with avoiding catastrophic climate change.

142.    Contrary to this messaging, however, Defendants' spending on low carbon energy is substantially and materially less than Defendants indicate to consumers. According to a recent analysis, between 2010 and 2018, BP spent 2.3% of total capital spending on low carbon energy sources, Shell spent 1.2%, and Chevron and Exxon just 0.2% each.[117] Meanwhile, Defendants

---

[117] Anjli Raval & Leslie Hook, *Oil and gas advertising spree signals industry's dilemma*, FINANCIAL TIMES (Mar. 6, 2019), https://www.ft.com/content/5ab7edb2-3366-11e9-bd3a-8b2a211d90d5 (accessed Feb. 21, 2020).

continue to expand fossil fuel production and typically do not even include non-fossil energy systems in their key performance indicators or reported annual production statistics.[118]

143. Ultimately, Defendants currently claim to support reducing greenhouse gas emissions, but their conduct belies these statements. Defendants have continued to ramp up fossil fuel production globally, to invest in new fossil fuel development—including in tar sands crude and shale gas fracking, some of the most carbon-intensive extraction projects—and to plan for unabated oil and gas exploitation indefinitely into the future.

144. Exxon and Shell are projected to increase oil production by more than 35% between 2018 and 2030—a sharper rise than over the previous 12 years.[119]

145. Shell is forecast to increase output by 38% by 2030, by increasing its crude oil production by more than half and its gas production by over a quarter.[120]

146. BP has projected production of oil and gas is expected to increase just over 20% by 2030.[121]

147. Chevron set an oil production record in 2018 of 2.93 million barrels per day, and the company has predicted further significant growth in oil production.[122] Like the other

---

[118] *See, e.g.*, Reserves and production table (p. 24). A year of strong delivery and growth: BP Annual Report and Form 20-F 2017. https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-annual-report-and-form-20f-2017.pdf (accessed Feb. 21, 2020).

[119] Jonathan Watts, Jillian Ambrose & Adam Vaughan, *Oil firms to pour extra 7m barrels per day into markets, data shows*, The Guardian (Oct. 10, 2019), https://www.theguardian.com/environment/2019/oct/10/oil-firms-barrels-markets (accessed Feb. 21, 2020).

[120] *Id.*

[121] *Id.*

[122] Kevin Crowley & Eric Roston, *Chevron Aligns Strategy With Paris Deal But Won't Cap Output*, BLOOMBERG (Feb. 7, 2019), https://www.bloomberg.com/news/articles/2019-02-07/chevron-pledges-alignment-with-paris-accord-but-won-t-cap-output (accessed Feb. 21, 2020).

Defendants, it sees the next 20 years—the crucial window in which the world must reduce greenhouse gas emissions to avert the most catastrophic effects of climate change—as a time of increased investment and production in its fossil fuel operations. For example, a 2019 investor report touts the company's "significant reserve additions in 2018" in the multiple regions in North America and around the world, as well as significant capital projects involving construction of refineries worldwide.[123]

### H. Defendants Caused Plaintiffs' Injuries.

148. Defendants' individual and collective conduct, including, but not limited to, their failures to warn of the threats their fossil fuel products posed to the world's climate; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products; their public deception campaigns designed to obscure the connection between their products and global warming and its environmental, physical, social, and economic consequences; and their failure to pursue less hazardous alternatives available to them; is a substantial factor in causing global warming and consequent sea level rise and attendant flooding, erosion, and beach loss in the County; increased frequency and intensity of extreme weather events in the County, including hurricanes and tropical storms, "rain bomb" events, drought, heatwaves, and others; ocean warming and acidification that will injure or kill coral reefs in the County's waters; habitat loss of endemic species in the County, and range expansion of invasive and disease carrying-pest species; diminished availability of freshwater resources; and the cascading social, economic, and other consequences of those environmental changes. These adverse impacts, and their consequences for Plaintiffs, will continue to increase in frequency and severity in the County.

---

[123] Chevron, Chevron 2019 Investor Presentation (Feb. 2019), https://chevroncorp.gcs-web.com/static-files/c3815b42-4deb-4604-8c51-bde9026f6e45 (accessed Feb. 21, 2020).

149.     As actual and proximate results of Defendants' conduct, which caused the aforementioned environmental changes, Plaintiffs have suffered and will continue to suffer severe injuries, including but not limited to: injury or destruction of City- or BWS-owned or operated facilities and property deemed critical for operations, utility services, and risk management, as well as other assets that are essential to community health, safety, and well-being; increased planning and preparation costs for community adaptation and resiliency to global warming's effects; decreased tax revenue due to impacts on the local tourism- and ocean-based economy; increased costs associated with public health impacts; and others.

150.     Plaintiffs already have incurred, and will foreseeably continue to incur, injuries and damages due to Defendants' conduct, its contribution to the climate crisis, and the environmental, physical, social, and economic consequences of the climate crisis's impact on the environment. As a result of Defendants' wrongful conduct described in this Complaint, Plaintiffs have, are, and will experience significant adverse impacts attributable to Defendants' conduct, including but not limited to:

a.     The average air temperature in the County is currently warming at a rate that is approximately four times faster than the warming rate fifty years ago. Warming air temperatures have led to heat waves, expanded pathogen and invasive species ranges, thermal stress for native flora and fauna, increased electricity demand, increased occurrence and intensity of wildfire, threats to human health such as from heat stroke and dehydration, and decreased water supply due to increased evaporation and demand. Rapid warming at the highest elevations has reduced precipitation—the main source of freshwater for Plaintiffs. Extreme temperatures

90

have stressed the County's electrical resources and induced the local electrical utility to issue emergency requests to curtail air conditioning use.

b. Plaintiffs are already experiencing sea level rise and associated impacts, and will experience significant additional sea level rise over the coming decades through at least the end of the century. Plaintiffs are particularly vulnerable to the impacts of sea level rise because of its substantial developed coastline and substantial low-lying areas, particularly along the south coast of Oʻahu. The figure below delineates the County's sea level rise exposure area, a State of Hawaiʻi-recognized sea level rise vulnerability zone that Plaintiffs are using to formulate sea level rise adaptation strategies. More than $19 billion in assets and 38 miles of roads are located within the Seal Level Rise Exposure area and are at risk of damage or destruction due to sea level rise estimated to occur by the year 2100, including but not limited to freshwater supply pipelines that are subject to higher levels of corrosion due to saltwater intrusion; and wastewater infrastructure, such as the wastewater outfall at Sand Island that will cost hundreds of millions to retrofit against rising seas and coastal erosion, as well as eroded wastewater pipelines and related infrastructure along the highway in Waiʻanae that will cost additional millions of dollars to armor. High tide flooding in the County has substantially increased since the 1960s. The City has already lost 25% of its beaches to the erosive force of rising seas, the increased frequency and power of storm surges, and aggravated wave run-up and impacts, and those losses continue to mount. Native Hawaiian cultural sites, built structures, natural resources, infrastructure including roads, sewerage, and beach parks, and other resources are more frequently flooded and, in some cases,

inundated. As sea level continues to rise, low-lying, populated coastal communities such as Waialua will experience increased frequency and severity of flooding ultimately leading to permanent inundation and making some areas of the coast impassable or uninhabitable. Even if all carbon emissions were to cease immediately, Plaintiffs would continue to experience sea level rise due to the "locked in" greenhouse gases already emitted and the lag time between emissions and sea level rise.



**Figure 7: Oʻahu's Sea Level Rise Exposure Area**

c. Fresh water is becoming scarcer in the County due to global warming.[124] Changes in wind patterns have caused a decline in rainfall over the last thirty years, and a shift to less frequent and more intense rainstorms interspersed with longer and more frequent drought. Declining precipitation trends have caused a decrease in stream

---

[124] *See* Water Research Foundation, *Impacts of Climate Change on Honolulu Water Supplies and Planning Strategies for Mitigation*, Project No. 4637 (2019).

92

base flow and warming temperatures cause increased surface water evaporation, which in turn reduces aquifer recharge. BWS anticipates and is planning for substantial reduction in sustainable yields due to diminishing recharge.[125] Saltwater intrusion and coastal erosion due to sea level rise has further reduced available freshwater resources and damages drinking water delivery infrastructure, including by corrosion and inundation. For example, there are at least 24 low-elevation or coastal pipeline bridge crossings in BWS's system that are subject to coastal erosion impacts.[126] Moreover, the length of pipeline affected by marine inundation is expected to increase five-fold with a 3.2-foot increase in sea level.[127] Groundwater inundation—a consequence of sea level rise that will cause the groundwater table to rise until it breaches the land surface—will have an even greater effect, with the length of impacted pipelines increasing from roughly 700 feet of pipe to 52,000 feet from 2050 to 2100.[128] Loss of freshwater resources is a critical issue that BWS has taken planning and piloting steps to address given the absence of replacement freshwater sources in the County. BWS has already expended significant resources preparing watershed-scale vulnerability assessments and modifying watershed management plans to mitigate the adverse impacts of global warming on freshwater availability. Reduced freshwater availability may require Plaintiffs to undertake aggressive and expensive adaptation strategies, including sea water desalination, private water rights revocation, and stormwater capture coupled with installation of aquifer reinjection wells. Such

---

[125] *See* Honolulu Board of Water Supply, *Impacts of Climate Change on Honolulu Water Supplies and Planning Strategies for Mitigation* (Feb. 20, 2019), https://www.boardofwatersupply.com/bws/media/Board/board-meeting-material-2020-01-27_03.pdf

[126] *See id.* .

[127] *See* Water Research Foundation, *supra* note 124.

[128] *Id.*

93

projects come with enormous costs. For example, BWS estimates that the construction of two projects designed for climate resilience, the Kalaeloa Seawater Desalination Facility and the Kapolei Brackish Water Desalination Plant, will likely cost over $100 million.[129]

d. Plaintiffs' natural resources are in decline because of global warming. Many species endemic to the County and the Hawaiian Islands are already showing shifting habitats because of environmental changes attributable to global warming. Several native forest bird species are projected to lose over half of their ranges by 2100, and of those, some will lose their ranges entirely, putting them at severe risk of extinction. Increased atmospheric carbon has resulted in more $CO_2$ uptake in the ocean, which in turn drives ocean acidification. Ocean acidification prevents marine organisms, many at or near the bottom of the food chain, from forming shells, which threatens their survival. Increasing sea surface temperatures are shifting marine species' ranges and causing coral bleaching and death. In addition to the loss of the intrinsic value of those unique natural resources, those changes contribute to adverse effects on the County's tourism and fishing industries, which in turn impact economic activity within the County and revenue to the City. Ocean acidification and warming will reduce fish catch and injure or kill coral, which serves as a "bumper" that absorbs force of water as it moves toward land and comes ashore, also results in increased exposure to increasingly intense storm surge and hurricane wave runup.

[129] *See* Honolulu Board of Water Supply, *Minutes: Regular Meeting of the Board of Water Supply* (Jan. 27, 2020), https://www.boardofwatersupply.com/getattachment/6c8ba447-b01f-4430-a19d-f1badd7dce9a/board-meeting-minutes-2020-01-27.pdf.aspx; *see also* Honolulu Board of Water Supply, *Board of Water Supply Kapolei Base Yard and Brackish Desalination Plant, Final Environmental Assessment and Finding of No Significant Impact* (Oct. 31, 2018), http://oeqc2.doh.hawaii.gov/EA_EIS_Library/2018-11-23-OA-FEA-Kapolei-Base-Yard-and-Brackish-Desalination-Plant.pdf.

e. Public health impacts of Defendants' conduct have injured and will continue to cause injury to Plaintiffs. Extreme heat-induced public health impacts in the County will result in increased risk of heat-related illnesses (mild heat stress to fatal heat stroke) and the exacerbation of pre-existing conditions in the medically fragile, chronically ill, and vulnerable. Increased extreme temperatures and heat waves have and will contribute to and exacerbate, allergies, respiratory disease, and other health issues in children and adults. As pest species ranges expand, vector-borne illnesses will increase in the County's population.

151. Compounding those physical and environmental impacts are cascading social and economic impacts that cause injuries to Plaintiffs that have and will continue to arise out of localized climate change-related conditions.

152. Plaintiffs have already incurred damages as a direct and proximate result of Defendants' conduct, including but not limited to:

a. Flooding and intense runoff during rain bomb events has destroyed sections of the City's drainways normally used to divert rainfall away from populated areas. The image below shows a section of the Hahaione Channel that was destroyed during a massive rain bomb in April 2018. The City incurred significant costs providing emergency response at the drainway to ensure that injuries to people and property were minimized; and in rebuilding the drainway, which was not designed to handle the increased extreme runoff under the new hydrological regime in the County.



**Figure 8: Destruction of the Hahaione Channel After Rainbomb Event, 2018**

    b.  Water mains in the BWS drinking water system have been corroded due to subsurface saltwater intrusion, resulting in failure and breakage. The costs of necessary repairs to those mains have increased because of higher tides, which flood the subsurface work area excavated for main repairs. The combined image below shows a broken water main in the County in 2018. The image on the left, taken during the low tide, shows a broken water main that has been excavated for repair. The image on the right shows the same work site at high tide, at which time work on the broken main was impossible. Additionally, the oil slick in the excavated pit illustrates a further impact of Defendants' conduct and associated sea level rise: eventual oil spills from groundwater inundation as the water table rises.

96



**Figure 9: Water Main Repairs at Intersection of Nimitz and Alakawa, July 2018**

c. Erosion, storm surges, flooding, and wave run-up at the City's network of beach parks have damaged infrastructure and facilities at those important public resources, which are also drivers of the local ocean- and tourism-based economy. The image below shows damage at the City's parks associated with those adverse environmental impacts of Defendants' conduct.



**Figure 10: Destruction of Public Facilities, Maunalahilahi Beach Park, 2018**

d. Plaintiffs' property and resources[130] have been and will continue to be inundated and/or flooded by sea water and extreme precipitation, among other climate-change related intrusions, causing injury and damages thereto and to improvements thereon, and preventing free passage on, use of, and normal enjoyment of that real property, or permanently destroying them. For instance, sunny day flooding associated with high tides exacerbated by sea level rise have caused flooding at Waikiki Beach and the City's nearby beach parks, roads, and sidewalks; chronic tidal flooding in Mapunapuna persists despite that the City installed expensive

---

[130] Plaintiffs disclaim injuries arising on federal property.

"duckbill valves" on outfalls to mitigate that problem. Over five miles of beaches in the County have already been lost due to sea level rise. Additionally, extreme precipitation and associated erosion, runoff, flooding, and mudslides, as well as sunny-day flooding associated with higher tides, have rendered City roads impassable. With 3.2 feet of sea level rise, more than 18 miles of coastal roads on Oʻahu will be impassible.



**Figure 11: Sunny Day Flooding in Mapunapuna, July 2019**

e. Plaintiffs have planned and are planning, at significant expense, adaptation and mitigation strategies to address climate change related impacts in order to preemptively mitigate and/or prevent injuries to Plaintiffs and County residents. Those efforts include, but are not limited to, the City's development of a Resilience

Strategy[131] and BWS's development of planning strategies for mitigation.[132] Additionally, Plaintiffs have incurred and will incur significant expense in educating and engaging the public on climate change issues, and to promote and implement policies to mitigate and adapt to climate change impacts, including promoting energy and water efficiency and renewable energy. Implementation of those planning and outreach processes will come at a substantial cost to Plaintiffs.

f.  Plaintiffs, at significant expense, have initiated adaptation measures at many of their public resources to mitigate, and to the extent possible, prevent further injury to their property and facilities. For instance, the City has initiated a multi-million-dollar project to repair and stabilize the seawall at Hale'iwa Beach Park; conducted a massive effort to redistribute sand and restore Dunes at Sunset Beach North Shore to mitigate additional beach loss; and installed a sand mattress at Waikiki Beach to prevent the shoreline from moving landward by approximately 10-20 feet.

153.    But for Defendants' conduct, Plaintiffs would have suffered no or far fewer serious injuries and harms than they have endured, and foreseeably will endure, due to the climate crisis and its physical, environmental, social, and economic consequences.

154.    Defendants' conduct as described herein is therefore an actual, substantial, and proximate cause of Plaintiffs' climate crisis-related injuries.

---

[131] City and County of Honolulu Office of Climate Change, Sustainability and Resiliency, *Ola: O'ahu Resilience Strategy* (accessed Jan. 8, 2020) https://www.resilientoahu.org/resilience-strategy.

[132] *See* Water Research Foundation, *supra* note 124.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### (Public Nuisance)

#### (Against All Defendants)

155.    Plaintiffs reallege each and every allegation contained above, as though set forth herein in full.

156.    Defendants, individually and in concert with each other, by their affirmative acts and omissions, have unlawfully annoyed and/or done damage to Plaintiffs; worked hurt, inconvenience, and damage upon Plaintiffs; annoyed and disturbed Plaintiffs' free use and enjoyment of their property and rendered its ordinary use uncomfortable; and injured Plaintiffs in their enjoyment of their legal rights. The annoyance, harm, damage, and injury to Plaintiffs' rights and property has occurred and will continue to occur on and in public places within the County such that members of the public are likely to come within the range of its influence, and has injured public infrastructure and appurtenances within the County, which therefore affect the public at large.

157.    The nuisance created and contributed to by Defendants is substantial and unreasonable. It has caused, continues to cause, and will continue to cause far into the future, significant harm to the community as alleged herein, and that harm outweighs any offsetting benefit. County residents' health and safety are matters of great public interest and of legitimate concern to Plaintiffs, and to the entire state.

158.    Defendants specifically created, contributed to, and/or assisted, and/or were a substantial contributing factor in the creation of the public nuisance by, *inter alia*:

> a.    Affirmatively and knowingly promoting the sale and use of fossil fuel products which Defendants knew to be hazardous and knew would cause or exacerbate

101

global warming and related consequences, including, but not limited to, sea level rise, drought, extreme precipitation events, extreme heat events, and ocean acidification;

b. Affirmatively and knowingly concealing the hazards that Defendants knew would result from the normal use of their fossil fuel products by misrepresenting and casting doubt on the integrity of scientific information related to climate change;

c. Disseminating and funding the dissemination of information intended to mislead customers, consumers, and regulators regarding the known and foreseeable risk of climate change and its consequences, which follow from the normal, intended use of Defendants' fossil fuel products;

d. Affirmatively and knowingly campaigning against the regulation of their fossil fuel products, despite knowing the hazards associated with the normal use of those products, in order to continue profiting from use of those products by externalizing those known costs onto people, the environment, and communities, including Plaintiffs; and failing to warn the public about the hazards associated with the use of fossil fuel products.

159.    Because of their superior knowledge of fossil fuel products, Defendants were in the best position to prevent the nuisance, but failed to do so, including by failing to warn customers, retailers, and Plaintiffs of the risks posed by their fossil fuel products, and failing to take any other precautionary measures to prevent or mitigate those known harms.

160.    The public nuisance caused, contributed to, maintained, and/or participated in by Defendants has caused and/or imminently threatens to cause special injury to Plaintiffs. The public nuisance has also caused and/or imminently threatens to cause substantial injury to real and

personal property directly owned and/or operated by Plaintiffs for the cultural, historic, economic, and public health benefit of Plaintiffs' residents and customers, and for their health, safety, and general welfare.

161.    The seriousness of rising sea levels, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, restricted availability of fresh drinking water, and the associated consequences of those physical and environmental changes, is extremely grave and outweighs the social utility of Defendants' conduct because, *inter alia*,

a.   interference with the public's rights due to sea level rise, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes as described above, is expected to become so regular and severe that it will cause material deprivation of and/or interference with the use and enjoyment of Plaintiffs' public and private property;

b.   the ultimate nature of the harm is the destruction of real and personal property, loss of public cultural, historic, natural, and economic resources, and damage to the public health, safety, and general welfare, rather than mere annoyance;

c.   the interference borne is the loss of property, infrastructure, and public resources owned and/or operated by Plaintiffs, which will actually be borne by Plaintiffs' residents and customers as loss of use of public and private property and infrastructure; loss of cultural, historic, and economic resources; damage to the public health, safety, and general welfare; diversion of tax dollars away from other

103

public services to the mitigation of and/or adaptation to climate change impacts; and other adverse impacts;

d. Plaintiffs' property, which serves myriad uses including residential, infrastructural, commercial, historic, cultural, and ecological, is not suitable for regular inundation, flooding, and/or other physical or environmental consequences of the climate crisis;

e. Defendants, and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, Defendants instead acted affirmatively to obscure them from public consciousness;

f. it was practical for Defendants, and each of them, considering their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce and extensive scientific engineering expertise, to develop better technologies and to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated greenhouse gas pollution and eased the transition to a lower carbon economy.

162. Defendants' actions were a substantial contributing factor in the unreasonable violation of public rights enjoyed by Plaintiffs and County residents as set forth above, because Defendants knew or should have known that their conduct would create a continuing problem with long-lasting significant negative effects on the rights of the public, and absent Defendants' conduct the violations of public rights described herein would not have occurred, or would have been less severe.

163. Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous and

104

were and are causing and contributing to the nuisance complained of, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impact upon the rights of others, including Plaintiffs and County residents. Therefore, Plaintiffs request an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish those Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

164.    Wherefore, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION

### (Private Nuisance)

### (Against All Defendants)

165.    Plaintiffs reallege each and every allegation contained above, as though set forth herein in full.

166.    Plaintiffs own, occupy, and manage extensive real property within the County that has been and will continue to be injured by rising sea levels, higher sea level, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes.

167.    Defendants, individually and in concert with each other, by their affirmative acts and omissions, have unlawfully annoyed and/or done damage to Plaintiffs; worked hurt, inconvenience, and damage upon Plaintiffs; annoyed and disturbed Plaintiffs' free use and enjoyment of their property and rendered its ordinary use uncomfortable; and injured Plaintiffs in their enjoyment of their legal rights.

168.    Plaintiffs have not consented to Defendants' conduct in creating the unreasonably injurious conditions on their real property or to the associated harms of that conduct.

169.    The seriousness of rising sea levels, higher sea level, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes, is extremely grave and outweighs the social utility of Defendants' conduct because, *inter alia*,

   a.  interference with the public's rights due to sea level rise, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes as described above, is expected to become so regular and severe that it will cause material deprivation of and/or interference with the use and enjoyment of public and private property in the County;

   b.  the ultimate nature of the harm is the destruction of real and personal property, loss of public cultural, historic, natural, and economic resources, and damage to the public health, safety, and general welfare, rather than mere annoyance;

   c.  the interference borne is the loss of property, infrastructure, and public resources within the County, which will actually be borne by the Plaintiffs and their residents and customers as loss of use of public and private property and infrastructure; loss of cultural, historic, and economic resources; damage to the public health, safety, and general welfare; reduction of fresh drinking water supply; diversion of tax dollars away from other public services to the mitigation of and/or adaptation to climate change impacts; and other adverse impacts;

106

d. Plaintiffs' property, which serves myriad uses including residential, infrastructural, commercial, historic, cultural, and ecological, is not suitable for regular inundation, flooding, and/or other physical or environmental consequences of anthropogenic global warming;

e. Defendants, and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, Defendants instead acted affirmatively to obscure them from public consciousness;

f. it was practical for Defendants, and each of them, considering their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce and extensive scientific engineering expertise, to develop better technologies and to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated greenhouse gas pollution and eased the transition to a lower carbon economy.

170. Defendants' conduct was a direct and proximate cause of Plaintiffs' injuries, and a substantial factor in bringing about the harms suffered by Plaintiffs as described in this Complaint.

171. Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiffs' injuries and damages as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

172. Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous and were and are causing and contributing to the nuisance complained of, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impact upon the rights of others, including Plaintiffs and County residents. Therefore, Plaintiffs request an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish those Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

173. Wherefore, Plaintiffs pray for relief as set forth below.

## THIRD CAUSE OF ACTION

### (Strict Liability Failure to Warn)

### (Against All Defendants)

174. Plaintiffs reallege each and every allegation contained above, as though set forth herein in full.

175. Defendants, and each of them, at all times had a duty to issue adequate warnings to Plaintiffs, the public, consumers, and public officials of the reasonably foreseeable or knowable severe risks posed by their fossil fuel products.

176. Defendants, and each of them, are and were at all relevant times sellers engaged in the business of extracting and/or selling fossil fuel products, and their products were expected to and in fact did reach the end user without any substantial or relevant change in their condition.

177. Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products, including the likelihood and likely severity

108

of global warming, global and local sea level rise, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes, including Plaintiffs' harms and injuries described herein.

178. Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, that the climatic effects described herein rendered their fossil fuel products dangerous, or likely to be dangerous, when used as intended or in a reasonably foreseeable manner.

179. Throughout the times at issue, Defendants breached their duty of care by failing to adequately warn any consumers or any other party of the climate effects that inevitably flow from the intended use and foreseeable misuse of their fossil fuel products.

180. Throughout the times at issue, Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products would cause grave climate changes, undermining and rendering ineffective any warnings that Defendants may have also disseminated.

181. Given the grave dangers presented by the climate effects that inevitably flow from the normal and foreseeable use of fossil fuel products, a reasonable extractor, manufacturer, formulator, seller, or other participant responsible for introducing fossil fuel products into the stream of commerce, would have warned of those known, inevitable climate effects.

182. Defendants' conduct was a direct and proximate cause of Plaintiffs' injuries and a substantial factor in bringing about the harms suffered by Plaintiffs as alleged herein.

183. As a direct and proximate result of Defendants' and each of their acts and omissions, Plaintiffs have sustained and will sustain substantial expenses and damages set forth in this Complaint, including damage to publicly owned infrastructure and real property, and injuries to public resources that interfere with the rights of Plaintiffs, and of their residents and customers.

184. Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiffs' injuries and damage as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

185. Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous and that they had not provided reasonable and adequate warnings against those known dangers, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impact upon the rights of others, including Plaintiffs. Therefore, Plaintiffs request an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish those Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

186. Wherefore, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Negligent Failure to Warn)

### (Against All Defendants)

187.    Plaintiffs reallege each and every allegation contained above, as though set forth herein in full.

188.    Defendants, and each of them, at all times had a duty to issue adequate warnings to Plaintiffs, the public, consumers, and public officials of the reasonably foreseeable or knowable severe risks posed by their fossil fuel products.

189.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products, including the likelihood and likely severity of global warming, global and local sea level rise, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, other adverse environmental changes, and the associated consequences of those physical and environmental changes, including Plaintiffs' harms and injuries described herein.

190.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates and/or from the international scientific community, that the climate effects described herein rendered their fossil fuel products dangerous, or likely to be dangerous, when used as intended or in a reasonably foreseeable manner.

191.    Throughout the times at issue, Defendants breached their duty of care by failing to adequately warn any consumers or any other party of the climate effects that inevitably flow from the intended or foreseeable use of their fossil fuel products.

111

192.    Throughout the times at issue, Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing the risk that fossil fuel products would cause grave climate changes, undermining and rendering ineffective any warnings that Defendants may have also disseminated.

193.    Given the grave dangers presented by the climate effects that inevitably flow from the normal or foreseeable use of fossil fuel products, a reasonable manufacturer, seller, or other participant responsible for introducing fossil fuel products into the stream of commerce, would have warned of those known, inevitable climate effects.

194.    Defendants' conduct was a direct and proximate cause of Plaintiffs' injuries and a substantial factor in bringing about the harms suffered by Plaintiffs as alleged herein.

195.    As a direct and proximate result of Defendants' and each of their acts and omissions, Plaintiffs have sustained and will sustain substantial expenses and damages as set forth in this Complaint, including damage to publicly owned infrastructure and real property, and injuries to public resources that interfere with the rights of Plaintiffs and their residents and customers.

196.    Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiffs' injuries and damage as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

197. Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous and that they had not provided reasonable and adequate warnings against those known dangers, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impact upon the rights of others, including Plaintiffs'. Therefore, Plaintiffs request an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

198. Wherefore, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Trespass)

### (Against All Defendants)

199. Plaintiffs reallege each and every allegation contained above, as though set forth herein in full.

200. Plaintiffs own, lease, occupy, and/or control real property throughout the County.

201. Defendants, and each of them, have intentionally, recklessly, or negligently caused flood waters, extreme precipitation, saltwater, and other materials, to enter Plaintiffs' real property, by distributing, analyzing, recommending, merchandising, advertising, promoting, marketing, and/or selling fossil fuel products, knowing those products in their normal or foreseeable operation and use would cause global and local sea levels to rise and more frequent and extreme precipitation events to occur, among other adverse environmental changes, and the associated consequences of those physical and environmental changes.

202.    Plaintiffs did not give permission for Defendants, or any of them, to cause floodwaters, extreme precipitation, saltwater, and other materials to enter their property as a result of the use of Defendants' fossil fuel products.

203.    Plaintiffs have been and continue to be actually injured and continue to suffer damages as a result of Defendants and each of their having caused flood waters, extreme precipitation, saltwater, and other materials, to enter their real property, by *inter alia* submerging real property owned by Plaintiffs, causing flooding and a rising water table which has invaded and threatens to invade real property owned by Plaintiffs and rendered it unusable, causing storm surges and heightened waves which have invaded and threatened to invade real property owned by Plaintiffs, and in so doing rendering Plaintiffs' property unusable.

204.    Defendants' and each Defendant's introduction of their fossil fuel products into the stream of commerce, coupled with their tortious conduct described herein, was a substantial factor in bringing about the harms and injuries to Plaintiffs' public and private real property as alleged herein.

205.    Defendants' acts and omissions, as alleged herein, are indivisible causes of Plaintiffs' injuries and damage as alleged herein, because, *inter alia*, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere.

206.    Defendants' wrongful conduct as set forth herein was committed with actual malice. Defendants had actual knowledge that their products were defective and dangerous, and acted with conscious disregard for the probable dangerous consequences of their conduct's and

114

products' foreseeable impact upon the rights of others, including Plaintiffs and County residents. Therefore, Plaintiffs request an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

207.    Wherefore, Plaintiffs pray for relief as set forth below.

## VII.    PRAYER FOR RELIEF

Plaintiffs seek judgment against those Defendants for:

1.    Compensatory damages in an amount according to proof;

2.    Equitable relief, including abatement of the nuisances complained of herein in and near the County;

3.    Reasonable attorneys' fees as permitted by law;

4.    Punitive damages;

5.    Disgorgement of profits;

6.    Costs of suit; and

7.    For such and other relief as the Court may deem proper.

**CORPORATION COUNSEL FOR THE CITY AND COUNTY OF HONOLULU AND THE HONOLULU BOARD OF WATER SUPPLY**
PAUL S. AOKI
Acting Corporation Counsel

DATED: March 22, 2021    By:    _/s/ Robert M. Kohn_____
ROBERT M. KOHN
NICOLETTE WINTER
JEFF A. LAU
Deputies Corporation Counsel

**SHER EDLING LLP**

VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)

115

MICHAEL H. BURGER (*pro hac vice* pending)
CORRIE J. YACKULIC (*pro hac vice* pending)
STEPHANIE D. BIEHL (*pro hac vice* pending)
KATIE H. JONES (*pro hac vice* pending)
MARTIN R. QUIÑONES (*pro hac vice* pending)
ADAM M. SHAPIRO (*pro hac vice* pending)
TIMOTHY R. SLOANE (*pro hac vice* pending)
NICOLE E. TEIXEIRA (*pro hac vice* pending)
QUENTIN C. KARPILOW (*pro hac vice* pending)


*Attorneys for Plaintiffs the City and County of
Honolulu and the Honolulu Board of Water Supply*

116

## REQUEST FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action for which a jury is available under the law.

**CORPORATION COUNSEL FOR THE CITY AND COUNTY OF HONOLULU AND THE HONOLULU BOARD OF WATER SUPPLY**
PAUL S. AOKI
Acting Corporation Counsel

DATED: March 22, 2021        By:        */s/ Robert M. Kohn*
ROBERT M. KOHN
NICOLETTE WINTER
JEFF A. LAU
Deputies Corporation Counsel

**SHER EDLING LLP**

VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
MICHAEL H. BURGER (*pro hac vice* pending)
CORRIE J. YACKULIC (*pro hac vice* pending)
STEPHANIE D. BIEHL (*pro hac vice* pending)
KATIE H. JONES (*pro hac vice* pending)
MARTIN R. QUIÑONES (*pro hac vice* pending)
ADAM M. SHAPIRO (*pro hac vice* pending)
TIMOTHY R. SLOANE (*pro hac vice* pending)
NICOLE E. TEIXEIRA (*pro hac vice* pending)
QUENTIN C. KARPILOW (*pro hac vice* pending)

*Attorneys for the City the City and County of Honolulu and Honolulu Board of Water Supply*

117

ANNE E. LOPEZ                          7609
Attorney General of Hawaiʻi

MELISSA J. KOLONIE                     10209
Supervising Deputy Attorney General
WADE H. HARGROVE III                   7897
LYLE T. LEONARD                        9376
Deputy Attorneys General
Department of the Attorney General
State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Telephone: (808) 587-3050
Facsimile: (808) 587-3077
Email: wade.h.hargrove@hawaii.gov

(Additional counsel listed on signature page)

Attorneys for Plaintiff
STATE OF HAWAIʻI

**Electronically Filed
FIRST CIRCUIT
1CCV-25-0000717
01-MAY-2025
12:02 PM
Dkt. 1 CMPS**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAIʻI, ex rel. ANNE E. LOPEZ, ATTORNEY GENERAL,<br><br>Plaintiffs<br><br>vs.<br><br>BP P.L.C.;<br>BP AMERICA INC.;<br>BP PRODUCTS NORTH AMERICA INC.;<br>CHEVRON CORP.;<br>CHEVRON USA INC.;<br>EXXON MOBIL CORP.;<br>EXXONMOBIL OIL CORPORATION;<br>SHELL P.L.C.;<br>SHELL USA, INC.;<br>EQUILON ENTERPRISES LLC d/b/a<br>SHELL OIL PRODUCTS US;<br>SHELL TRADING (US) COMPANY;<br>SUNOCO LP;<br>ALOHA PETROLEUM, LTD.; | CIVIL NO.<br><br>(Other Non-Vehicle Tort)<br><br>**COMPLAINT; SUMMONS**<br><br>**JURY TRIAL DEMANDED**<br><br>Trial Date: None<br><br>(Caption continued on next page) |

# EXHIBIT "F"

ALOHA PETROLEUM LLC;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66;
PHILLIPS 66 COMPANY;
WOODSIDE ENERGY HAWAII INC. f/k/a
BHP HAWAII INC.;
AMERICAN PETROLEUM INSTITUTE;
AND DOES 1 through 100, inclusive,

     Defendants.

**COMPLAINT**

**TABLE OF CONTENTS**

COMPLAINT AND DEMAND FOR JURY TRIAL .................................................................1

I.      INTRODUCTION .................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................7

III.    PARTIES ............................................................................................................10

        A.      Plaintiff ..................................................................................................10

        B.      Defendants ..............................................................................................11

IV.     AGENTS AND CO-CONSPIRATORS ..............................................................47

V.      FACTUAL BACKGROUND...............................................................................49

        A.      Defendants Are Responsible for Causing and Accelerating Climate Change.......49

        B.      Defendants Knew or Should Have Known the Dangers Associated with
                Fossil Fuel Products....................................................................................54

        C.      Despite Their Early Knowledge of Real and Severe Harm Posed by the
                Consumption of Fossil Fuel Products, Defendants Affirmatively Acted to
                Obscure Those Harms and Engaged in a Campaign to Deceptively Protect
                and Expand the Use of Fossil Fuel Defendants' Fossil Fuel Products. .................74

        D.      In Contrast to Public Misrepresentations About the Risks of Climate Change,
                Fossil Fuel Defendants' Internal Actions Demonstrate Their Awareness of
                and Intent to Profit from Uses of Fossil Fuel Products They Knew Were
                Hazardous. ................................................................................................94

        E.      Defendants Slowed the Development of Alternative Energy Sources and
                Knowingly Exacerbated the Costs of Adapting to and Mitigating the
                Adverse Impacts of the Climate Crisis. ..............................................................97

        F.      Defendants Continue to Deceive Hawai'i Consumers Through Misleading
                Advertisements That Portray the Fossil Fuel Defendants as Climate-Friendly
                Energy Companies and Obscure Their Role in Causing Climate Change...........104

                i.      Exxon's Misleading and Deceptive Greenwashing  Campaigns .............110

                ii.     Shell's Misleading and Deceptive Greenwashing Campaigns ................112

                iii.    BP's Misleading and Deceptive Greenwashing Campaigns....................115

                iv.     Chevron's Misleading and Deceptive Greenwashing  Campaigns..........119

                v.      Sunoco's Misleading and Deceptive Greenwashing Campaigns.............125

                vi.     ConocoPhillips' Misleading and Deceptive Greenwashing  Campaigns 126

                vii.    WEH's Misleading and Deceptive Greenwashing Campaigns ...............130

                viii.   API's Misleading and Deceptive Greenwashing Campaigns ..................132

G.      Fossil Fuel Defendants and API Also Made Misleading Claims About
        Specific "Green" or "Greener" Fossil Fuel Products............................................137

H.      Defendants' Deceit Only Recently Began Coming to Light, and Their
        Misconduct Is Ongoing and Yet to be Fully Uncovered. ...................................145

I.      Hawaiʻi Has Suffered, Is Suffering, and Will Suffer Injuries from
        Defendants' Conduct. .........................................................................................149

        i.      Sea Level Rise in Hawaiʻi.........................................................................153

        ii.     Changing Precipitation Patterns and Increased Fire Risk in Hawaiʻi......158

        iii.    Warming Oceans Around Hawaiʻi..............................................................160

        iv.     Harms to Ecological Resources and Native Hawaiian Traditional
                and Customary Practices  .........................................................................162

        v.      Harmful Health Outcomes in Hawaiʻi.......................................................166

        vi.     Hawaii's Economic Vulnerability from Climate Change........................168

VI.     CAUSES OF ACTION ....................................................................................171

        FIRST CAUSE OF ACTION
        NEGLIGENCE ..............................................................................................171

        SECOND CAUSE OF ACTION
        PUBLIC NUISANCE ......................................................................................174

        THIRD CAUSE OF ACTION
        PRIVATE NUISANCE ....................................................................................176

        FOURTH CAUSE OF ACTION
        TRESPASS .....................................................................................................179

        FIFTH CAUSE OF ACTION
        HARM TO PUBLIC TRUST RESOURCES ...................................................181

        SIXTH CAUSE OF ACTION
        CIVIL AIDING AND ABETTING ................................................................184

        SEVENTH CAUSE OF ACTION
        HAWAIʻI UNFAIR OR DECEPTIVE ACTS OR PRACTICES STATUTE.....186

        EIGHTH CAUSE OF ACTION
        STRICT LIABILITY FOR FAILURE TO WARN...........................................188

        PRAYER FOR RELIEF ..................................................................................193

        REQUEST FOR JURY TRIAL.......................................................................196

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The State of Hawai'i ("Plaintiff," "State," or "Hawai'i"), acting through its Attorney General, Anne E. Lopez ("Attorney General"), on its own behalf, as trustee of State natural resources and property, as owner, lessor, occupier, and manager of State property, and in its *parens patriae* capacity on behalf of its residents, brings this action against Defendants BP p.l.c.; BP America Inc.; BP Products North America Inc.; Chevron Corporation; Chevron U.S.A. Inc.; Exxon Mobil Corporation; ExxonMobil Oil Corporation; Shell p.l.c.; Shell USA, Inc.; Equilon Enterprises LLC d/b/a Shell Oil Products US; Shell Trading (US) Company; Sunoco LP; Aloha Petroleum LLC; Aloha Petroleum, Ltd.; ConocoPhillips; ConocoPhillips Company; Phillips 66; Phillips 66 Company; and Woodside Energy Hawaii Inc. f/k/a BHP Hawaii Inc. (the "Fossil Fuel Defendants"); and the American Petroleum Institute ("API") (collectively, "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.      The fossil fuel industry has known for decades, based on its own internal research, that fossil fuels produce carbon dioxide ("$CO_2$") and other greenhouse gas ("GHG") pollution that can have catastrophic consequences for the planet and its people. The industry, including Fossil Fuel Defendants, took these internal scientific findings seriously, investing heavily to protect its own assets, infrastructure, and operations from warming temperatures, rising seas, stronger storms, and other climate change impacts. But rather than warn consumers and the public in a manner commensurate with the risks Defendants knew of, fossil fuel companies and their surrogates mounted a decades-long campaign of deception to discredit the scientific consensus on climate change; create doubt in the minds of consumers, the media, business leaders, and the public about the climate change impacts of burning fossil fuels; and delay the energy economy's transition to a lower-carbon future while maximizing their own profits.

2.      This successful climate deception campaign had, and continues to have, the purpose and effect of inflating and sustaining the market for fossil fuels, which drove up GHG emissions, accelerated global warming, and brought about devastating climate change impacts to Hawai'i,

1

including to the State's frontline communities in particular.[1] The State has already experienced and will continue to face the effects of climate change, including sea level rise, fire risk, and extreme weather (among others). As a result of the fossil fuel industry's lies and deceit, the State is confronted with the real costs of protecting Hawaii's people, natural and cultural resources, businesses, and infrastructure from hazards of climate change.

3.      Despite the clear harm to Hawai'i and other communities across the country, Defendants continue to peddle climate disinformation and attempt to mislead the public about the environmental impacts of Fossil Fuel Defendants' fossil fuel products and derivatives of Fossil Fuel Defendants' fossil fuel products (all together, "fossil fuel products").

4.      The State of Hawai'i brings this action against Defendants for creating, contributing to, and/or assisting in the creation of climate change-related harms in Hawai'i by their failure to warn abetted by a multi-decadal sophisticated campaign of disinformation. As alleged herein, Defendants created, contributed to, and/or assisted in the creation of public and private nuisances; caused trespasses on State property; caused harm to public trust resources; failed to adequately warn the State and its residents, who are consumers, of the risks of climate change, climate change-related harms, and other dangers Defendants knew would inevitably follow from the intended or reasonably foreseeable use of fossil fuel products; engaged in unfair and deceptive acts and practices; and violated their duties to exercise due care in the advertising, marketing, selling, distributing, and/or labeling of fossil fuel products, to act reasonably for the protection of Hawai'i and its residents, and to avoid inflicting on Hawai'i and its residents the injuries described herein.

5.      The Fossil Fuel Defendants are major members of the fossil fuel industry—including extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and/or

---

[1] The Hawai'i Climate Change Mitigation & Adaptation Commission has identified equity as one of the primary considerations for all climate action. *See* Hawai'i Climate Change Mitigation & Adaptation Commission, *Statement on Climate Equity* (Nov. 6, 2019), https://perma.cc/9UN7-B3CV. The State recognizes that the most socially vulnerable communities and individuals face disproportionate impacts from climate change, and the State is committed to identifying, recognizing, and addressing the inequitable distribution of benefits, burdens and processes caused by climate change impacts and policy. *Id.*; Makena Coffman, Suwan Shen & Maja Schjervheim, *Social Vulnerability to Climate Change in Hawai'i: Data, Indicators, and "Gap" Assessment*, a report to the State of Hawai'i Climate Change Mitigation and Adaptation Commission (May 4, 2022), https://perma.cc/A4AS-MHGG.

sellers of raw and refined fossil fuel products. Each Fossil Fuel Defendant funded, staffed, organized, and otherwise supported efforts to deceive the public and consumers—including in Hawaiʻi—about the role of fossil fuel products in causing the global climate crisis.

6. The rate at which Fossil Fuel Defendants have extracted and sold fossil fuel products has exploded since World War II, which has driven a concurrent increase in $CO_2$ and other GHG emissions. Fossil fuel emissions—especially $CO_2$—are the dominant driver of climate change.[2] The substantial majority of all anthropogenic[3] GHG emissions in history have occurred from the 1950s to the present, a period known as the "Great Acceleration."[4] About three-quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s,[5] and more than half have occurred since the early 1990s.[6] The annual rate of $CO_2$ emissions from extraction, production, and consumption of fossil fuels has increased substantially since 1990.[7]

7. Defendants have known for more than 60 years that GHG pollution from fossil fuel products would have significant adverse impacts on the Earth's climate and sea levels. Armed with that knowledge, Fossil Fuel Defendants privately took steps to protect their own assets from climate change-related harms and risks through immense investments in research, technology, infrastructure improvements, and plans to exploit new business opportunities in a warming world.

8. But instead of warning the public of the known consequences flowing from the intended and foreseeable use of Fossil Fuel Defendants' fossil fuel products or representing those consequences truthfully, Defendants concealed and misrepresented the dangers of fossil fuels; disseminated false and misleading information about the existence, causes, and dangers of climate

---

[2] *See* Intergovernmental Panel on Climate Change ("IPCC"), *Summary for Policymakers*, *in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report* 4–9 (2021), https://perma.cc/WQS2-2VRK.

[3] The term "anthropogenic" is defined by the Merriam Webster Dictionary as "of, or relating to, or resulting from the influence of human beings on nature." Merriam Webster Dictionary, *Anthropogenic*, https://perma.cc/LV59-6Y62.

[4] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 The Anthropocene Rev. 81, 81 (2015).

[5] R. J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 Biogeosciences 1845, 1851 (2012); Glob. Carbon Budget, *The Latest GCB Data*, https://globalcarbonbudgetdata.org/latest-data.html (last visited Apr. 30, 2025).

[6] *Id.*

[7] Glob. Carbon Project, *Global Carbon Budget 2021*, https://perma.cc/2S6Y-NC2A.

change; and aggressively promoted the use of fossil fuel products at ever-greater volumes knowing the dangers this increased use posed. Starting no later than the 1980s, Defendants have spent millions of dollars orchestrating a massive disinformation campaign to cast doubt on the science of climate change; to shuttle climate denialist theories into mainstream media and science despite the fact that Fossil Fuel Defendants' own scientists had already debunked those theories; and to conceal the role of fossil fuels in driving the climate crisis. More recently, Defendants have layered a different tactic onto their commercial deception campaign: "greenwashing." Defendants falsely advertise certain fossil fuel products as "green" or "clean," while concealing the fact that those products are leading causes of climate change. Defendants falsely portray themselves as leaders in solving the problem of climate change, and as acting consistently with goals set by scientists and the international community to reduce fossil fuel development and use. Fossil Fuel Defendants also misleadingly exaggerate their investments in wind, solar, and other lower carbon energy resources to exploit and deceive consumers and encourage continued consumption of fossil fuel products. Defendants individually and collectively played leadership roles in these campaigns, which were intended to and did target consumers, their own customers, and the public, including those in Hawai'i.

9.     Defendants perpetrated a decades-long campaign of deception with a singular aim. The tactics, front groups, and funding that Defendants deployed to carry out their campaign of deception varied, was updated, and became more sophisticated over time. As described in this Complaint, those tactics ranged from outright climate denial to creating fake advocacy groups, paying scientists, and distributing greenwashing advertisements. But Defendants' purpose has not changed—Defendants' aim has been and continues to be to deceive consumers and the public about the harms of their fossil fuel products and their corporate activities for the purpose of maintaining their business and economic interests, driving up sales, and increasing profits. As shown by their continued wrongful conduct, Defendants' campaign of deception worked, and it still works today.

4

10. Defendants, individually and collectively, have substantially and measurably contributed to the State's climate change-related injuries. Defendants' actions in concealing the dangers of fossil fuel products and promoting false and misleading information about fossil fuel products have contributed substantially to consumer demand for fossil fuels and the consequent buildup of $CO_2$ in the atmosphere that drives climate change and its physical, environmental, and socioeconomic consequences, including those in Hawai'i. *See* Section V.I, *infra.* Substantially more anthropogenic GHGs have been emitted into the atmosphere than would have been emitted absent Defendants' tortious and deceptive conduct. If not for Defendants' tortious and deceptive conduct, the damaging consequences of climate change in Hawai'i would have been far less extreme than those currently occurring. Similarly, future harmful effects would also have been far less damaging and costly—or would have been avoided entirely.

11. While Defendants have promoted and profited from the extraction and consumption of fossil fuels, Hawai'i has spent, and will continue to spend, substantial sums to recover from and adapt to climate change-induced harms. For example, Hawai'i will have to fortify infrastructure against sea level rise, extreme precipitation, extreme storms, and coastal and inland flooding. Hawai'i will also have to undertake numerous other interventions that have and will become necessary to protect its people and infrastructure from increased temperatures, increased fire risk, vector-born illnesses, lost jobs and economic activity, and other climate change hazards.

12. Sea levels around Hawai'i are rising at rates unprecedented in the history of human civilization because of climate change. Sea level rise is already affecting Hawai'i communities, property, and infrastructure. And this threat grows every day as global warming reaches ever more dangerous levels and sea level rise accelerates. The current amount of sea level rise caused by Defendants' tortious and deceptive conduct is an irreversible condition on any relevant time scale; it will last hundreds or even thousands of years. Defendants' tortious and deceptive conduct thus caused harm that must be abated with costly adaptation infrastructure.

13. Similarly, climate change causes more frequent and extreme weather events, extreme precipitation, riverine flooding, drought, extreme heat, increased fire risk, vector-borne

illnesses, and reduced air quality, which damage and strain public infrastructure and create cascading public health problems. Climate change is also threatening many of Hawaii's cultural resources and economically significant industries because of sea level rise, ocean warming, and ocean acidification. Climate change has impacted and will continue to impact Hawaii's public trust resources and Native Hawaiian traditional and customary practices.

14. These consequences have and will continue to disproportionately impact Hawaii's frontline communities, as climate change exacerbates existing environmental and public health stressors associated with socioeconomic and racial disparities.

15. Defendants' tortious and deceptive conduct was a substantial factor in bringing about these climate change impacts in Hawai'i.

16. Fossil Fuel Defendants' individual and collective conduct—including, but not limited to, their introduction of fossil fuel products into the stream of commerce while knowing but failing to warn of the threats those products pose to the world's climate; their wrongful promotion of fossil fuel products, including the misrepresentation and concealment of known hazards associated with the intended use of those products; and Defendants' public deception campaigns designed to obscure the connection between fossil fuel products and climate change— was a direct and proximate cause of injuries to the State.

17. Accordingly, Hawai'i brings this action against Defendants for negligence, public nuisance, private nuisance, trespass, harm to trust property and conspiracy to commit those torts, and unfair and deceptive acts or practices. Hawai'i also alleges strict liability for failure to warn against Fossil Fuel Defendants, and civil aiding and abetting against API. Hawai'i respectfully requests that this Court order Defendants to abate, directly or through an abatement fund, the harm caused by their conduct, and that this Court use its equitable powers to order Defendants to mitigate future harm to the environment and people of Hawai'i attributable to Defendants' unlawful actions, including, but not limited to, by granting preliminary and permanent equitable relief. Hawai'i also respectfully requests that this Court order Defendants to pay damages, treble damages, and civil penalties.

18.     The State does *not* seek relief with respect to any federal property, land, or assets.

19.     The State hereby disclaims injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes. The State seeks no recovery or relief attributable to these injuries.

20.     The State does *not* seek to impose liability on Defendants for their direct emissions of GHGs and does *not* seek to restrain Defendants from engaging in their lawful business operations.

21.     The State seeks relief for injuries in Hawaiʻi caused by Defendants' tortious, deceptive, and unlawful conduct within and outside of Hawaiʻi.

22.     This suit shall not preempt, displace, or subsume the climate-deception suits brought by the City and County of Honolulu or the County of Maui ("Local Government Entities"), which are *City and County of Honolulu et al. v. Sunoco LP et al.*, No. 1CCV-20-0000380, and *County of Maui v. Sunoco LP et al.*, No. 2CCV-20-0000283, respectively. The geographic areas covered by those suits are excluded from, and not subsumed by, this action, except as to state-owned property and assets, and except as to harms or violations for which the State or State agencies (i) have exclusive authority to recover damages or obtain injunctive relief and/or (ii) have concurrent, supplementary, complementary, and/or overlapping authority to recover damages or obtain injunctive relief with the Local Government Entities if the Local Government Entities are unable to pursue claims for such harms or violations.

23.     This case is fundamentally about shifting the costs of climate change-related harms back onto the entities whose failure to warn and deception caused and exacerbated them. Hawaiʻi seeks to ensure that the parties who have profited from deceiving consumers and the public about climate change bear the costs of that deceptive commercial activity.

## II.     JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction over this civil action pursuant to Hawaiʻi Revised Statutes ("HRS") § 603-21.5. No federal subject-matter jurisdiction is invoked herein.

7

25. This Court has personal jurisdiction over Defendants because they either are domiciled in Hawaiʻi; were served with process in Hawaiʻi; are organized under the laws of Hawaiʻi; maintain their principal place of business in Hawaiʻi; transact business in Hawaiʻi; perform work in Hawaiʻi; contract to supply goods, manufactured products, or services in Hawaiʻi; caused tortious injury in Hawaiʻi; engage in persistent courses of conduct in Hawaiʻi; derive substantial revenue from manufactured goods, products, or services used or consumed in Hawaiʻi; and/or have interests in, use, or possess real property in Hawaiʻi. This Court has personal jurisdiction over Defendants pursuant to HRS § 634-35 because, among other things, the causes of action arise from and/or relate to Defendants' transaction of business within this State, commission of tortious acts within this State, and/or ownership, use, or possession of any real estate situated in this State. Each Defendant has had sufficient minimum contacts with the State and has purposefully directed activities toward this State and/or purposefully availed itself of the privileges and obligations of conducting business in this State such that this Court's exercise of jurisdiction over each Defendant is reasonable and consistent with the Constitution and laws of the United States. Among other relevant factors, Hawaiʻi has a paramount interest in having this dispute adjudicated in the courts of this State. Each Defendant caused injurious acts to be done, or caused the consequences of those acts to occur, within Hawaiʻi, as set forth in detail herein.

26. Additionally, jurisdiction is proper over each non-resident Defendant for the following reasons:

a. With respect to its subsidiaries, each non-resident Fossil Fuel Defendant controls and has controlled its direct and indirect subsidiaries' decisions about the quantity and extent of its fossil fuel production and sales; determines whether and to what extent to market, produce, and/or distribute its fossil fuel products; and controls and has controlled its direct and indirect subsidiaries' decisions related to its marketing and advertising, specifically communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment and humans. Each subsidiary Defendant is the agent of its parent Defendant. As agents, the subsidiaries of each non-resident Defendant conducted activities at the

direction and for the benefit of its parent company. Specifically, the subsidiaries furthered each parent company's campaign of deception and denial through misrepresentations, omissions, and/or affirmative promotion of the company's fossil fuel products as safe with knowledge of the climate change-related harms that would result from the intended use of those products, all of which resulted in climate change-related injuries in Hawaiʻi and increased sales to the parent company. The subsidiaries' jurisdictional activities are properly attributed to each parent company and serve as a basis to assert jurisdiction over each of the non-resident Defendant parent companies.

b.      Through their various agreements with dealers, franchises, or otherwise, the Fossil Fuel Defendants have directed and controlled the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuel products at their respective branded gas stations in Hawaiʻi, including point-of-sale advertising and marketing. The Fossil Fuel Defendants dictate which grades and formulations of their gasoline may be sold at their respective branded stations.

c.      Fossil Fuel Defendants, in coordination with trade organizations, including Defendant API, conspired to conceal and misrepresent the known dangers of burning fossil fuels, to knowingly withhold material information regarding the consequences of using fossil fuel products, to spread knowingly false and misleading information to the public regarding the weight of climate science research, and to promote consumer demand for fossil fuel products, which they knew were harmful. Through their own actions and through their membership and/or participation in climate denialist front groups, each Defendant was and is a member of that conspiracy. Defendants committed substantial acts to further the conspiracy in Hawaiʻi by making misrepresentations and misleading omissions to Hawaiʻi consumers about the existence, causes, and effects of global warming; by affirmatively promoting Fossil Fuel Defendants' fossil fuel products as safe, with knowledge of the disastrous impacts that would result from the intended use of those products; and by failing to warn Hawaiʻi consumers about the disastrous impacts of fossil fuel use. A substantial effect of the conspiracy has also occurred and will occur in Hawaiʻi, as the State has suffered and will suffer injuries from Defendants' wrongful conduct, including but

9

not limited to the following: sea level rise, coastal and riverine flooding, extreme heat and related illnesses, drought, fire risk, reduced air quality, vector-borne diseases, and other social and economic consequences of these environmental changes. Defendants knew or should have known, based on information provided to them from their internal research divisions, affiliates, trade associations, and industry groups, that their actions in Hawaiʻi and elsewhere would result in these injuries in and to the State of Hawaiʻi. Finally, the climate effects described herein are direct and foreseeable results of Defendants' conduct in furtherance of the conspiracy.

27.     Venue is proper in the First Circuit pursuant to HRS § 603-36(5) because some part of the tortious conduct and injuries at issue occurred in the First Circuit. The injuries to the State have occurred statewide, including on Oʻahu.

### III.     PARTIES

#### A.     Plaintiff

28.     Plaintiff State of Hawaiʻi is a sovereign state bringing this action by and through its Attorney General, which maintains its principal office at 425 Queen Street Honolulu, HI 96813. The State brings this action pursuant to the powers vested in the Attorney General by the common law and by the Hawaiʻi Constitution and Hawaiʻi statutes, including HRS §§ 28-1, 28-2, 480-3.1, 480-14, 661-10.

29.     The State brings this action in its capacity as sovereign on its own behalf, as trustee of the State's natural resources—which are held in trust for the benefit of Hawaii's people—as owner of State property or of substantial interests in property, in the public interest, and pursuant to its *parens patriae* capacity on behalf of its residents.

30.     The State's natural resources include without limitation aquatic animals, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, beaches, lava extensions, public lands the State holds in trust, and State-owned lands ("State natural resources").

31.     The State owns, leases, occupies, and manages extensive real property, some of which is held in trust, which may include but is not limited to: trails, roads, bridges and abutments,

culverts, dams, harbors, submerged lands, rivers and other bodies of water, beaches, dunes, lava extensions, boardwalks, piers, seawalls, parks, camping areas, picnic areas, historic sites, islands, lands, buildings and appurtenances, and other improvements and infrastructure thereto ("State property").

32.    The State also brings this action pursuant to the Attorney General's common law, constitutional, and statutory authority to protect the State's natural resources and property, including property held in trust, and the State's police powers. Those powers and authority include, but are not limited to, the power and authority to prevent and abate nuisance and to prevent and abate hazards to public health, safety, welfare, and the environment.

### B.    Defendants

33.    Defendants are among the largest oil and gas companies in the world and a national oil and gas industry trade association. The fossil fuel products produced by the Fossil Fuel Defendants (and promoted by all Defendants) are responsible for the emission of billions of tons of GHGs globally.

34.    When this Complaint references an act or omission of Defendants, unless otherwise stated, such references should be interpreted to mean that the officers, directors, agents, employees, or representatives of Defendants committed or authorized such an act or omission or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the course and scope of their employment or agency.

35.    **<u>BP entities:</u> BP p.l.c.; BP America Inc.; and BP Products North America Inc.**

a.    Defendant **BP p.l.c.** is a multinational, vertically integrated energy and petrochemical public limited company registered in England and Wales with its principal office in London, England. BP p.l.c. consists of three main operating segments: (1) exploration and production, (2) refining and marketing, and (3) "gas and low-carbon energy." BP p.l.c. is the ultimate parent company of numerous subsidiaries, referred to collectively as the "BP Group," which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as

11

gasoline; and market and sell oil, gasoline, other refined petroleum products, and natural gas worldwide. BP p.l.c. was formerly known as, did or does business as, and/or is the successor in liability to British Petroleum Company, British Petroleum Company p.l.c., BP Amoco p.l.c., Amoco Corporation, and Atlantic Richfield Company.

b.        BP p.l.c. controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. BP p.l.c. is the ultimate decision-maker on fundamental decisions about the BP Group's core business, i.e., the volume of group-wide fossil fuels to produce and market, including among BP p.l.c.'s subsidiaries. BP p.l.c.'s 2022 Annual Report summarizes the company's "Strategic progress," including on offshore and exploration projects and acquisitions and sales of various oil and gas operations that contributed to a 12% increase in the BP Group's overall fossil fuel product production. These projects were carried out by BP p.l.c.'s subsidiaries.

c.        BP p.l.c. controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, climate change, GHG emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. BP p.l.c makes and has made decisions on the production and use of fossil fuel reserves for the entire BP Group based on factors including climate change. BP p.l.c.'s Board of Directors is the company's highest decision-making body, with direct responsibility for the BP Group's policies concerning climate change. BP p.l.c.'s chief executive is responsible for maintaining the BP Group's system of internal control that governs the BP Group's business conduct. BP p.l.c.'s senior leadership directly oversees and has overseen a "carbon steering group," which manages climate change-related matters and consists of two committees—both overseen directly by the board—focused on climate change-related investments.

d.        BP p.l.c. does and has done business in Hawai'i through its wholly-owned subsidiaries, divisions, and/or affiliates, including BP America Inc., BP Products North America Inc., and BP Lubricants USA Inc. BP p.l.c. has formerly done business in Hawai'i through its

wholly-owned subsidiaries, divisions, and/or affiliates, including BP U.S.A., Inc., BP North America Petroleum, Inc., BP Exploration & Oil Company, BP Exploration & Oil Inc., BP Amoco Chemical Company, BP Oil, Amoco Oil Company, and The American Oil Company.

e.  Defendant **BP America Inc.** is a wholly owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. is a vertically integrated energy and petrochemical company incorporated in the state of Delaware with its headquarters and principal office at 501 Westlake Park Blvd., Houston, Texas 77079. BP America Inc. is registered to do business in Hawai'i, where it is and has been engaged in oil and gas business. BP America Inc. consists of numerous divisions and affiliates in all aspects of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP America Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

f.  **BP Products North America Inc.** is a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP Products North America Inc. is and has been engaged in fossil fuel exploration, production, refining, and marketing. BP Products North America Inc. is incorporated in Maryland and has its principal office in Chicago, Illinois. BP Products North America Inc. initially registered to do business in Hawai'i in 1959 and remains qualified to do business in Hawai'i today, where it is and has been engaged in oil and gas business in the State. In Hawai'i, BP Products North America Inc. was formerly known as, or did business as, The American Oil Company, Amoco Oil Company, and BP Oil. BP Products North America Inc. registered and operated various trademarks in Hawai'i, including "Amoco," "Permalube," and "you expect more from Amoco and you get it."

13

g.      Defendants BP p.l.c., BP America Inc., and BP Products North America Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

h.      The State's claims against BP arise out of and are related to the acts and omissions of BP in Hawai'i and elsewhere that caused or will cause injuries in Hawai'i.

i.      BP has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. BP's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and BP's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of BP's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of BP's fossil fuel products from the State and its residents such that use of BP's fossil fuel products in Hawai'i would not decline.

j.      Over the last several decades and continuing to the present day, BP has advertised on television, online, and social media in the Hawai'i market related to its fossil fuel products. BP has advertised in national and local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[8] BP has also advertised on national television programs that aired in Hawai'i. For example, in 2019 BP ran a series of advertisements on national television programs broadcast in Hawai'i that touted the carbon emissions benefits of

---

[8] *See, e.g.*, Honolulu Star-Bulletin (Apr. 21, 1977), https://perma.cc/9RZM-VVX2.

its biowaste to energy program.[9] In another television advertisement that aired on a program broadcast in Hawai'i, BP claimed, "[w]e all want more energy, but with less carbon footprint. That's why at BP we're working to make energy that's cleaner and better."[10] BP also promoted its investments in wind energy, while positioning natural gas as a necessary alternative in the event the "wind ever stops blowing."[11] Similarly, BP has published a variety of advertisements on social media platforms that reached Hawai'i consumers.[12] As further detailed herein, these advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of BP's fossil fuel products and climate change, and/or misrepresenting BP's products or BP itself as environmentally friendly.

k.      Significant quantities of BP's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which activities BP derives and has derived substantial revenue. For example, BP has sold crude oil to refinery customers in Hawai'i.

l.      BP, through its affiliates, subsidiaries, and/or predecessors, had multiple local dealers and stations in Hawai'i that it promoted and advertised to Hawai'i residents. For example, in 1977 there were 68 ARCO-branded stations selling gasoline to Hawai'i consumers.[13] ARCO-branded gas stations sold gasoline to Hawai'i consumers through the early 2000s.[14] Until 1978, BP's predecessors operated a petroleum terminal and warehouse on Kalaniana'ole Avenue in Hilo that was capable of processing or storing one million gallons of petroleum.[15] BP's current

---

[9] *See, e.g.*, CNN, *CNN Tonight with Don Lemon* (Oct. 3, 2019, 11:48 PM PDT), https://archive.org/details/CNNW_20191004_060000_CNN_Tonight_With_Don_Lemon/start/2892/end/2940; *see also* Honolulu Star-Advertiser (Oct. 3, 2019), https://perma.cc/7HXY-T3AK (confirming that *CNN Tonight with Don Lemon* aired in Hawai'i on Oct. 3, 2019 from 8:00 PM to 9:00 PM HST, or 11:00 PM to 12:00 AM PDT).

[10] *See, e.g.*, CNN, *The Situation Room* (Feb. 19, 2019, 2:55 PM PST), https://archive.org/details/CNNW_20190219_220000_Situation_Room_With_Wolf_Blitzer/start/3349/end/3405?q=That%27s+why+at+BP+we%27re+working+to+make+energy+that%27s+cleaner+and+better; *see also* Honolulu Star-Advertiser (Feb. 17, 2019), https://perma.cc/5UA6-FNT3 (confirming that *The Situation Room* aired in Hawai'i on Feb. 17, 2019 from 12:00 PM to 1:00 PM HST, or 2:00 PM to 3:00 PM PST).

[11] *See e.g.*, BP, *Fowler, Indiana*, aired on KITV (Jan. 29, 2019).

[12] *See, e.g.*, BP America, *From renewables to natural gas…*, Facebook Ad Libr., https://perma.cc/QQ6B-578Y; BP America, *Listen now to the Energy Trilemma podcast…*, Facebook Ad Libr., https://perma.cc/6DSC-9PRJ.

[13] Honolulu Star-Bulletin (Apr. 21, 1977), https://perma.cc/9RZM-VVX2.

[14] *See, e.g.*, Honolulu Star-Bulletin (June 23, 2000), https://perma.cc/HJV5-LTZZ.

[15] *See, e.g.*, Hawaii Tribune-Herald (Aug. 24, 1978), https://perma.cc/32XL-6DML.

15

operations in Hawai'i include "Air bp", a division of BP that supplies fuels and lubricants to the aviation industry.[16]

m.       BP also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Hawai'i consumers under its Castrol brand name. Castrol products are available at approximately 50 car service stations, distributors, and retail outlets across Hawai'i.[17] Castrol products are distributed and advertised throughout Hawai'i.[18]

36.       **Chevron entities: Chevron Corporation and Chevron U.S.A. Inc.**

a.       Defendant **Chevron Corporation** is a multinational, vertically integrated energy and chemicals company incorporated in Delaware, with its global headquarters and principal office in San Ramon, California. Chevron Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of California, Texaco Inc., and ChevronTexaco Corporation.

b.       Chevron Corporation operates through a web of United States and international subsidiaries at all levels of the fossil fuel supply chain. Chevron Corporation and its subsidiaries' operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

c.       Chevron Corporation controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. Chevron Corporation determines whether and to what extent its corporate holdings market, produce, and/or distribute fossil fuel products.

---

[16] BP, *Our US operations*, https://www.bp.com/en_us/united-states/home/where-we-operate.html (choose Enter Location; then search Air bp – Hawaii) (last visited Feb. 21, 2025).

[17] Castrol, *Where to Buy or Service*, Hawai'i, https://www.castrol.com/en_us/united-states/home/product-finder.html?page=wheretobuy (choose Show Filter; then Search Address) (last visited Feb. 21, 2025).

[18] *See, e.g.*, HI Now Staff, *Get top of the line Aloha Petroleum lubricants for your car at Lex Brodie's* (Sept. 23, 2022), https://perma.cc/HNK9-QDG3; Honolulu Star-Advertiser (July 13, 2017), https://perma.cc/R4HZ-AHXH.

d.      Chevron Corporation controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, climate change, GHG emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Overall accountability for climate change within Chevron Corporation lies with Chevron Corporation's Board of Directors and Executive Committee.

e.      Chevron Corporation does business in Hawai'i through its wholly owned subsidiaries, divisions, and/or affiliates, including Chevron U.S.A. Inc., Chevron Shipping Company LLC, Chevron Phillips Chemical Company LP, Chevron Oronite Company LLC, Chevron Marine Products LLC, Chevron Intellectual Property LLC, and Chevron Environmental Management Company. Chevron Corporation has done business in Hawai'i through its wholly owned subsidiaries, divisions, affiliates, and/or predecessors including Chevron Chemical Company, Chevron Industries, Inc., Chevron Shipping Company, and Texaco Inc.

f.      Defendant **Chevron U.S.A. Inc.** is a wholly owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal office in San Ramon, California. Chevron U.S.A. Inc. is registered to do business in Hawai'i. Through its predecessors, Chevron U.S.A. Inc. has been registered to do business in Hawai'i since 1965. Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Chevron Energy Solutions Company, Chevron Products Company, Chevron U.S.A. Production Company, Chevron U.S.A. Products Company, ChevronTexaco Exploration & Production Company, ChevronTexaco Products Company, Gulf Oil Corp., and Warren Petroleum Company.

g.      Defendants Chevron Corporation and Chevron U.S.A. Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

h.      The State's claims against Chevron arise out of and are related to the acts and omissions of Chevron in Hawai'i and elsewhere that caused and will cause injuries in Hawai'i.

17

i.  Chevron has purposefully directed its tortious conduct toward Hawaiʻi by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawaiʻi, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawaiʻi, including without limitation injuries to the State's property, infrastructure, and natural resources. Chevron's statements in Hawaiʻi and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Chevron's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Chevron's products. That conduct was purposefully directed to reach Hawaiʻi and obscure the dangers of Chevron's fossil fuel products from the State and its residents such that use of Chevron's fossil fuel products in Hawaiʻi would not decline.

j.  Chevron—both directly and through its subsidiaries and/or predecessors-in-interest—has supplied substantial quantities of fossil fuel products to Hawaiʻi.

k.  As early as 1948, Chevron had multiple local dealers and stations in Hawaiʻi that it promoted and advertised to Hawaiʻi residents.[19] By the mid-1950s, there were dozens of Chevron local dealers and stations on Oʻahu alone.[20] By 1988, there were at least 75 local Chevron dealers or stations in Hawaiʻi.[21] Today, there are more than 30 Texaco stations, a Chevron-owned brand, in Hawaiʻi.[22]

l.  Over the last several decades and continuing to the present day, Chevron has advertised on television, online, social media, and outdoor advertisements in the Hawaiʻi market related to its fossil fuel products. Since no later than 1945, and continuing to the present day, Chevron has advertised in national and local print publications, including multiple Hawaiʻi

---

[19] *See, e.g.*, Honolulu Star-Advertiser (Sept. 30, 1948), https://perma.cc/YG4E-VVGT.
[20] *See, e.g.*, Honolulu Star-Advertiser (June 26, 1956), https://perma.cc/WL6U-NTH2.
[21] *See, e.g.*, Honolulu Star-Advertiser (Oct. 3, 1988), https://perma.cc/PH69-HN3D.
[22] Chevron, *Find a Station*, https://www.chevronwithtechron.com/en_us/home/gas-station-near-me.html (last visited Feb. 21, 2025).

18

newspapers, circulated widely to Hawai'i consumers.[23] For example, in 2006 Chevron ran a full-page advertisement in the Honolulu Star-Advertiser in which they touted that they "maintain some of the highest environmental standards on earth" and are "[d]eveloping energy today, protecting Hawaii for tomorrow."[24] Chevron has also extensively advertised its fossil fuel products in the Hawai'i market on social media accounts that have thousands of followers from Hawai'i.[25] For example, Chevron claimed in 2021, via its "Texaco in Hawaii" social media accounts that "[f]ueling your car at Texaco stations helps to reduce your carbon footprint" via a carbon offset project.[26] Chevron has extensively advertised this carbon offset project exclusively to Hawai'i consumers through not just social media, but also through television commercials, Hawai'i news stations, and at gas stations in Hawai'i.[27] In one such commercial, Chevron claimed that by choosing to fill up at Texaco stations, consumers help "power carbon offset programs and local eco initiatives."[28] Chevron has widely advertised on national television channels and their local affiliates that broadcast in Hawai'i. For example, in 2021 Chevron broadcast an ad in Hawai'i claiming it "believe[s] the future of energy is lower carbon," and touting how they are "taking action", such as "tying [its] executives' pay to lowering the carbon emissions intensity of [its] operations."[29] In another ad, Chevron explains how it has partnered with another company to

---

[23] *See, e.g.*, Honolulu Star-Bulletin (Oct. 31, 1945), https://perma.cc/W7FP-DNVV; Hawaii Tribune-Herald (July 3, 1946), https://perma.cc/Q5M4-R9CU; Hawaii Tribune-Herald (Sept. 17, 1970), https://perma.cc/99TW-LFYL; Honolulu Star-Advertiser (July 2, 2006), https://perma.cc/B55S-3HSJ; Honolulu Star-Advertiser (Dec. 22, 2012), https://perma.cc/2LZF-F5G6.

[24] Honolulu Star-Advertiser (July 2, 2006), https://perma.cc/B55S-3HSJ.

[25] *See, e.g.*, Facebook (Texaco in Hawaii), https://perma.cc/W8VJ-33D3; Instagram (@texacoinhawaii), https://perma.cc/HDS4-RZHY; TikTok (@ies_texacoinhawaii), https://perma.cc/FB69-K54Q.

[26] Facebook (Texaco in Hawaii) (Jan. 31, 2021), https://perma.cc/8SCV-HC9P.

[27] *See, e.g.*, Chevron, *Hoala Program*, aired on KHNL (Sept. 26, 2021); Brandon Kubo, Sponsored by Texaco in Hawaii, *Texaco helps the environment and community with free gas giveaway*, Hawaii News Now (Sept. 28, 2021), https://perma.cc/BQ9L-YGHJ; Texaco in Hawaii, *Rise Up and Make New*, Facebook Ad Libr., https://perma.cc/U6MQ-DP5C; Texaco in Hawaii, *Ho'āla - Rise Up and Make New*, YouTube, https://perma.cc/SUX4-3X5L.

[28] Chevron, *Hoala Program*, aired on KGMB (Mar. 30, 2020).

[29] Chevron, *Steps Toward Better Tomorrow*, aired on KHON (June 5, 2021); *see also* CNN, *Anderson Cooper 360* (May 24, 2021 at 9:14 PM PDT), https://archive.org/details/CNNW_20210525_040000_Anderson_Cooper_360/start/891/end/951?q=to+make+progress+we+must+keep+taking+steps+forward; Honolulu Star-Advertiser (May 24, 2021), https://perma.cc/QPW8-E2LV (confirming that *Anderson Cooper 360* aired on CNN in Hawai'i on May 24, 2021 from 6:00 PM to 7:00 PM HST, or 9:00 PM to 10:00 PM PDT).

"transform farm waste into renewable natural gas . . . to provide an alternative source of power for a cleaner way forward."[30] As further detailed herein, these advertisements contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Chevron's fossil fuel products and climate change, and/or misrepresenting Chevron's products or Chevron itself as environmentally friendly.

     m.     Chevron has owned and operated fossil fuel refinery and distribution facilities in Hawaiʻi. For example, until 2016 Chevron owned and operated a 58,000-barrel-per-day refinery on Oʻahu, a pipeline distribution system, and fossil fuel product distribution terminals on Oʻahu, Maui, Kauaʻi, and the Big Island.[31]

     n.     Significant quantities of Chevron's fossil fuel products have been transported, traded, manufactured, distributed, promoted, marketed, sold, and consumed in Hawaiʻi, from which activities Chevron has derived substantial revenue. For example, in the late 1980s, Chevron's Hawaiʻi refinery generated roughly 14 percent of the company's profits in the United States.[32] Additionally, Chevron had more than 20 percent of the retail gasoline market share in Hawaiʻi from 1983 to 2001.[33] Chevron conducted and controlled, either directly or through franchise agreements, retail fossil fuel sales at Chevron and Texaco gas station locations throughout Hawaiʻi, at which locations it promoted, advertised, and sold its fossil fuel products under its various brand names, including Chevron and Texaco.

     o.     Chevron offers proprietary credit cards, known as the "Chevron Techron Advantage Card" and "Texaco Techron Advantage Card," which allow consumers in Hawaiʻi to pay for gasoline and other products at Chevron- and/or Texaco-branded service stations, and which encourage consumers in Hawaiʻi to use Chevron- and/or Texaco-branded service. Chevron

---

[30] Chevron, *Transforming the Future*, aired on KITV (Feb. 16, 2020).

[31] Island Energy Services, *Island Energy Completes Acquisition of Chevron's Hawaiʻi Assets* (Nov. 2, 2016), https://perma.cc/G5SL-Q7LU.

[32] *See, e.g.*, Honolulu Star-Bulletin (Aug. 11, 1999), https://perma.cc/KGD4-EFJT.

[33] Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii*, 58 & Figure 4.1 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

maintains an interactive website and smartphone applications by which it directs prospective customers to Texaco-branded service stations in Hawai'i.

p.      Chevron also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Hawai'i consumers under its Delo and Techron brand names. These products are sold at stores across the State.[34]

37.      **Exxon entities: Exxon Mobil Corporation and ExxonMobil Oil Corporation**

a.      Defendant **Exxon Mobil Corporation** is a New Jersey corporation headquartered in Spring, Texas, that has been registered to do business in Hawai'i since 1972 and remains so today. Exxon Mobil Corporation is a multinational, vertically integrated energy and chemical company and one of the largest publicly traded international oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Standard Oil Company of New Jersey; and Mobil Corporation. In Hawai'i, Exxon Mobil Corporation does or has done business through its wholly-owned subsidiaries, divisions, affiliates, and/or trade names, including Exxon Mobil Alaska Production Inc., ExxonMobil Product Solutions Company, ExxonMobil Fuels & Lubricants Company, ExxonMobil Fuels Marketing, ExxonMobil Gas & Power Marketing Company, ExxonMobil Gas Marketing Company, ExxonMobil Lubricants & Petroleum Specialties, ExxonMobil Product Refining & Supply, Southwest Grease, and Southwest Grease Products.

b.      Defendant **ExxonMobil Oil Corporation** is a wholly owned subsidiary of Exxon Mobil Corporation, acts on Exxon Mobil Corporation's behalf, and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation is a New York corporation headquartered in Spring, Texas, has been registered to do business in Hawai'i since 1967, and remains registered to do business in Hawai'i for the purpose of producing, transporting, refining,

---

[34] Chevron Lubricants, *Find a Retailer*, https://perma.cc/4UUE-MUZM (search address: Hawai'i).

21

and marketing petroleum and natural gas. ExxonMobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of New York and Mobil Oil Corporation.

c.     Exxon Mobil Corporation controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. Exxon Mobil Corporation's 2022 Form 10-K filed with the SEC represents that its success, including its "ability to mitigate risk and provide attractive returns to shareholders, depends on [its] ability to successfully manage [its] overall portfolio." Exxon Mobil Corporation determines whether and to what extent its subsidiaries market, produce, and/or distribute fossil fuel products. For example, on October 11, 2023, Exxon Mobil Corporation announced its acquisition of Pioneer Natural Resources in a press release that referred to the corporate family generally as "ExxonMobil."

d.     Exxon Mobil Corporation controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Exxon Mobil Corporation's Board of Directors holds the highest level of direct responsibility for climate change policy. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management Committee have been actively engaged in discussions relating to GHG emissions and the risks of climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries, when seeking funding for capital investments, to provide estimates of project costs related to GHG emissions.

e.     Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Exxon."

22

f. The State's claims against Exxon arise out of and are related to the acts and omissions of Exxon in Hawai'i and elsewhere that caused and will cause injuries in Hawai'i.

g. Exxon consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

h. Exxon has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. Exxon's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Exxon's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Exxon's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of Exxon's fossil fuel products from the State and its residents such that use of Exxon's fossil fuel products in Hawai'i would not decline.

i. Over the past several decades and continuing to the present day, Exxon has advertised on television, online, and social media advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1948, and continuing to the present day, Exxon and its predecessors have advertised their fossil fuel products in national and local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[35] For example,

---

[35] *See, e.g.*, Hawaii Tribune-Herald (Aug. 9, 1948), https://perma.cc/8ZN6-43RU; Honolulu Star-Advertiser (Apr. 11, 1976), https://perma.cc/86W5-ZB82; Honolulu Star-Bulletin (Apr. 29, 1979), https://perma.cc/8U2Q-2XPZ.

23

in the 1970s and 1980s, Mobil ran dozens of advertorials in Hawai'i newspapers under its "Observations" column, which promoted its Mobil 1 gasoline,[36] touted its investments in solar energy,[37] and highlighted the negatives of wind energy.[38] Exxon has also advertised on national television programs that aired in Hawai'i. For example, in 2015, Exxon ran a series of television advertisements on programs that aired in Hawai'i touting that Exxon's "cleaner-burning natural gas" is "helping dramatically reduce America's emissions."[39] Likewise, in 2016, Exxon aired a commercial in Hawai'i describing itself as a "leader in carbon capture" and working to make the technology "better, more affordable, so we can reduce emissions around the world."[40] Exxon also repeatedly advertised its efforts to produce biofuel from algae in commercials broadcast in Hawai'i.[41] Similarly, Exxon's social media advertisements have reached consumers in Hawai'i.[42] As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions designed to hide the connection between the production and use of Exxon's fossil fuel products and climate change, and/or misrepresenting Exxon's products or Exxon itself as environmentally friendly.

j.      Significant quantities of Exxon's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which activities Exxon has derived substantial revenue.

k.      Exxon also—both directly and through its subsidiaries and/or predecessors-in-interest—has supplied substantial quantities of fossil fuel products to Hawai'i. For

---

[36] *See, e.g.*, Honolulu Star-Advertiser (Apr. 11, 1976), https://perma.cc/86W5-ZB82.

[37] *See, e.g.*, Honolulu Star-Advertiser (Feb. 8, 1976), https://perma.cc/B4Q9-Q9PF.

[38] *See, e.g.*, Honolulu Star-Advertiser (Apr. 27, 1980), https://perma.cc/P96V-YUBF.

[39] *See, e.g.*, CNN, *Amanpour* (Dec. 8, 2015, 11:15 PM PST), https://archive.org/details/CNNW_20151209_070000_Amanpour/start/942/end/1002?q=%22You+may+not+even+think+about+the+energy+that+lights+up+your+world%22; *see also* Honolulu Star-Advertiser (Dec. 6, 2015), https://perma.cc/4P76-7ZQZ (confirming that CNN's Amanpour aired in Hawai'i on Dec. 8, 2015 from 9:00 PM to 9:30 PM HST, or 11:00 PM to 11:30 PM PST).

[40] ExxonMobil, *Carbon Capture Technology*, aired on KITV (Dec. 10, 2016).

[41] *See e.g.*, ExxonMobil, *Energy Farmer*, aired on KITV (Apr. 30, 2017); ExxonMobil, *Not Small at All ("The Tiny Organism")*, aired on KHNL (Apr. 16, 2018).

[42] *See, e.g.*, ExxonMobil, *We support the goals set forth by the Paris Agreement…*, Facebook Ad Libr., https://perma.cc/5DWZ-YAWZ.

example, Exxon has supplied crude oil to Par Hawai'i Refining LLC to be refined on Hawai'i and distributed to consumers.

l.      Exxon also markets and sells petroleum products, including engine lubricants and motor oils sold under the "Mobil 1" brand name, to Hawai'i customers through local retailers. Exxon maintains an interactive website by which it directs prospective customers to local retailers that sell its engine lubricants and motor oils.[43] In the 1990s, Exxon was hiring lubricants sales representatives in Hawai'i.[44] Today, Exxon works with, and directs potential customers to, authorized distributors of its industrial lubricants in Hawai'i.[45]

38.      **Shell entities: Shell p.l.c.; Shell USA, Inc.; Equilon Enterprises LLC d/b/a Shell Oil Products US; and Shell Trading (US) Company**

a.      Defendant **Shell p.l.c.** (formerly Royal Dutch Shell P.L.C.) is a vertically integrated multinational energy and petrochemical company. Shell p.l.c. is incorporated in England and Wales, with its headquarters and principal office in London, England. Shell p.l.c. is the ultimate parent company of numerous divisions, subsidiaries, and affiliates, referred to collectively as the "Shell Group," that engage in all aspects of fossil fuel production, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

b.      Shell p.l.c. controls and has controlled group-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Shell p.l.c.'s Board of Directors determines whether and to what extent Shell subsidiary holdings around the globe produce Shell-branded fossil fuel products.

c.      Shell p.l.c. controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning

---

[43] Mobil, *Product Locator*, https://perma.cc/ES4V-G87J (search address: Hawai'i).
[44] *See, e.g.*, Honolulu Star-Bulletin (May 1, 1991), https://perma.cc/76VD-X9NC.
[45] Mobil, *Hawaiian Isles Petroleum, LLC*, https://www.mobil.com/en/lubricants/distributors/hawaiian-isles-petroleum-llc-hawaii-usa-101946 (last visited Feb. 25, 2025).

climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Overall accountability for climate change within the Shell Group lies with Shell p.l.c.'s Chief Executive Officer and Executive Committee. For instance, at least as early as 1988, Shell p.l.c., through its predecessors and subsidiaries, was researching company-wide $CO_2$ emissions and concluded that the Shell Group accounted for 4% of the $CO_2$ emitted worldwide from combustion and that climatic changes could compel the Shell Group, as controlled by Shell p.l.c., to examine the possibilities of expanding and contracting its business accordingly.

d. Shell p.l.c. does business in Hawai'i through wholly owned subsidiaries, divisions, and/or affiliates, including Shell USA, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Global Solutions (US) Inc., Shell MS Fuel Card, LLC, and Pennzoil-Quaker State Company.

e. Defendant **Shell USA, Inc.** (formerly Shell Oil Company) is a wholly owned subsidiary of Shell p.l.c. that acts on Shell p.l.c.'s behalf and is subject to Shell p.l.c.'s control. Shell USA, Inc. is incorporated in Delaware, with its principal office in Houston, Texas. Shell USA, Inc. has been registered to do business in Hawai'i since 1949. Shell USA, Inc. was formerly known as, did or does business as, and/or is the successor in liability to Shell Oil Company; Shell Oil; Deer Park Refining LP; Shell Oil Products US; Shell Chemical LP; Shell Trading (US) Company; Shell Energy Resources Company; Shell Energy Services Company, L.L.C.; The Pennzoil Company; and Pennzoil-Quaker State Company.

f. Defendant **Equilon Enterprises LLC d/b/a Shell Oil Products US ("Shell Oil Products US")** is a wholly owned subsidiary of Shell p.l.c. that acts on Shell p.l.c.'s behalf and is subject to Shell p.l.c.'s control. It is a Delaware limited liability corporation with its principal office in Houston, Texas. In 1998, Shell Oil Products US registered in Hawai'i to trade and supply transportation fuels and lubricants and to provide related services. It remains registered in Hawai'i today.

g. **Shell Trading (US) Company** is a wholly owned subsidiary of Shell p.l.c., that acts on Shell p.l.c.'s behalf and is subject to Shell p.l.c.'s control. It is a Delaware corporation

with its principal office in Houston, Texas. In 1999, it registered in Hawai'i to engage in the trading of crude oil and petroleum products. It remains registered in Hawai'i today.

h.    Defendants Shell p.l.c., Shell USA, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US, and Shell Trading (US) Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Shell."

i.    The State's claims against Shell arise out of and are related to the acts and omissions of Shell in Hawai'i and elsewhere that caused and will cause injuries in Hawai'i.

j.    Shell has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. Shell's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Shell's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Shell's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of Shell's fossil fuel products from the State and its residents such that use of Shell's fossil fuel products in Hawai'i would not decline.

k.    Over the last several decades and continuing to the present day, Shell has advertised on television, online, social media, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1928, and continuing to the present day, Shell has advertised its fossil fuel products in national and local print publications, including multiple

27

Hawai'i newspapers, circulated widely to Hawai'i consumers.[46] As early as 1970, Shell advertised to Hawai'i consumers that its fossil fuel products offered clean air benefits.[47] Shell has also advertised on television programs that aired in Hawai'i. For example, in 2016, Shell ran an ad in Hawai'i promoting its "Eco-Marathon" where students devised "ideas that could revolutionize the way we travel," including "reengineer[ing cars] to meet our growing energy challenges."[48] Similarly, in 2023, Shell advertised how its renewable race fuel was reducing emissions by 60% in Indy Car Racing, explaining that "[Shell] is moving forward with Indy Car because we're moving forward with everybody."[49] Shell also ran a series of television advertisements in 2024 on programs aired in Hawai'i which posited Shell as a leader in renewable energy.[50] Similarly, Shell's social media advertisements have reached consumers in Hawai'i.[51] As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Shell's fossil fuel products and climate change and/or misrepresenting Shell's products or Shell itself as environmentally friendly.

l.      Significant quantities of Shell's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which activities Shell has derived substantial revenue. Shell conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Hawai'i, at which locations it promotes, advertises, and sells its fossil fuel products under its Shell brand

---

[46] *See, e.g.*, Honolulu Star-Advertiser (May 10, 1928), https://perma.cc/256P-JJQB; Honolulu Star-Bulletin (Jan. 11, 1930), https://perma.cc/Y7DW-RT6J and https://perma.cc/346Z-F9Q7 (p. 2); Honolulu Star-Advertiser (Feb. 27, 1970), https://perma.cc/YUD6-FZ2B; Honolulu Star-Bulletin (June 4, 1970), https://perma.cc/S7ZC-TPQQ; Hawaii Tribune-Herald (May 14, 1989), https://perma.cc/N2RL-5FYW.

[47] Honolulu Star-Bulletin (June 4, 1970), https://perma.cc/S7ZC-TPQQ.

[48] Shell, *Eco-Marathon*, aired on KHNL (Jan. 29, 2016).

[49] Shell, *Moving Forward for Progress*, aired on KHNL (May 28, 2023).

[50] *See, e.g.*, FOX News, *Hannity* (Apr. 17, 2024, 11:25 PM PDT), https://archive.org/details/FOXNEWSW_20240418_060000_Hannity/start/1537/end/1597?q=%22Shell+Powering+Progress%22+; *see also* Honolulu Star-Advertiser (Apr. 17, 2024), https://perma.cc/ZW9N-REFG (confirming that FOX News's *Hannity* aired in Hawai'i on Apr. 17, 2024 from 8:00 PM to 9:00 PM HST, or 11:00 PM to 12:00 AM PDT).

[51] *See, e.g.*, Shell, *Shell's Climate Ambition*, Facebook Ad Libr., https://perma.cc/F2AC-QM3825; Shell USA, *Shell Renewable Race Fuel*, Facebook Ad Libr., https://perma.cc/Q4V5-XEPS.

name. There are more than 40 Shell-branded petroleum service stations in Hawai'i, and Shell maintains an interactive website by which it directs prospective customers to Shell-branded service stations in Hawai'i.[52] Shell-branded service stations in Hawai'i contain advertisements that direct consumers to Shell's website. Shell has sold a substantial percentage of all retail gasoline in Hawai'i.[53] Shell also has supplied jet fuel for aircrafts at Honolulu International Airport.[54] Shell also supplies, markets, and promotes its Pennzoil line of lubricants at retail and service stations throughout Hawai'i.[55] Shell owned five fuel distribution terminals and associated assets on O'ahu, Maui, Kaua'i, and the Big Island until the sale of those assets to Aloha Petroleum in 2010.[56]

m.      Shell historically directed its fossil fuel product advertising, marketing, and promotional campaigns to Hawai'i, including through maps that identified the locations of its service stations in Hawai'i. Shell offers a proprietary credit card known as the "Shell Fuel Rewards Card," which allows consumers in Hawai'i to pay for gasoline and other products at Shell-branded service stations and encourages consumers to use Shell-branded gas stations by offering various rewards, including discounts on gasoline purchases. Shell further maintains a smartphone application known as the "Shell App" that offers Hawai'i consumers a cashless payment method for gasoline and other products as well as rewards, including gasoline discounts at Shell-branded service stations.

39.     **Sunoco entities: Sunoco LP; Aloha Petroleum LLC; and Aloha Petroleum, Ltd.**

a.      Defendant **Sunoco LP** is a fossil fuel product distributor, marketer, and promoter. Sunoco LP is registered in Delaware and has its headquarters in Dallas, Texas. Sunoco LP was formerly known as, did or does business as, and/or is the successor in liability to Sunoco, Inc., Sun Company, Inc., Optima, Sun Oil Company, Aloha Petroleum LLC, and Aloha Petroleum

---

[52] Shell, *Shell Stations in Hawaii*, https://find.shell.com/us/fuel/locations/hawaii (last visited Feb. 25, 2025).

[53] *See, e.g.*, Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii*, 58 & Figure 4.1 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

[54] *See, e.g.*, Honolulu Star-Advertiser (Jan. 18, 1960), https://perma.cc/HZ95-QE34.

[55] Pennzoil, *Retail Locations & Oil Change Near Me*, https://www.pennzoil.com/en_us/oil-change-retail-locations.html (search location or facilities: Hawai'i) (last visited Feb. 25, 2025).

[56] Aloha Petroleum, *History*, https://perma.cc/6WPC-UQZR.

Ltd. Sunoco LP is one of the largest independent fuel distributors in the US. Sunoco LP consists of numerous divisions, subsidiaries, and affiliates engaged in all aspects of the fossil fuel industry, including exploration, development, extraction, and manufacturing; and energy production, transport, trading, marketing, distribution, and/or sales.

b.  Sunoco LP controls subsidiaries registered to do business in Hawai'i, including Sunoco LLC, Sunoco Retail LLC, Sunoco Global LLC, Aloha Petroleum LLC, and Aloha Petroleum, Ltd.

c.  Sunoco LP controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and related to communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Sunoco LP's managing partners determine whether and to what extent Sunoco subsidiary holdings around the globe—including in Hawai'i—market, produce, and/or distribute fossil fuel products.

d.  **Aloha Petroleum LLC** is a subsidiary of Sunoco LP. Aloha Petroleum LLC is registered in Delaware and has its principal place of business in Dallas, Texas. In 2015, Aloha Petroleum LLC registered in Hawai'i to engage in the marketing, terminaling, and distribution of gasoline, diesel, biodiesel, ethanol, lubricants, and other petroleum products in Hawai'i. It remains registered in Hawai'i today. Aloha Petroleum LLC has owned and operated retail stores that sell motor fuel in Hawai'i, and has operated terminal facilities in Hawai'i.

e.  **Aloha Petroleum, Ltd.** is a subsidiary of Sunoco LP. Aloha Petroleum, Ltd. is incorporated in Hawai'i with its principal place of business in Honolulu. Aloha Petroleum Ltd. was incorporated in Hawai'i in 1977 and remains registered in Hawai'i today to engage in the marketing, terminaling, and distribution of gasoline, diesel, biodiesel, ethanol, lubricants, and other petroleum products in Hawai'i. Aloha Petroleum, Ltd. was formerly known as Associated Oil, a division of Tidewater Oil. Associated Oil was a subsidiary of Phillips 66, a predecessor-in-interest to ConocoPhillips. In 2010, Aloha Petroleum, Ltd. acquired a variety of Shell Hawai'i

assets, including five fuel distribution terminals, 32 gas stations, and associated assets on Oʻahu, Maui, Kauaʻi, and the Big Island.[57] Aloha Petroleum, Ltd. is the authorized distributor and retailer of Shell gasoline in Hawaiʻi.[58] Aloha Petroleum, Ltd. operates in Hawaiʻi under a variety of trade names, including Aloha Gas and Aloha Petroleum.

f.        Through its ownership of Aloha Petroleum LLC and Aloha Petroleum, Ltd., Sunoco LP supplies Sunoco-branded motor fuel wholesale to Sunoco-branded gas stations in Hawaiʻi. In press releases, Sunoco LP has described itself as operating convenience stores and/or fuel outlets in Hawaiʻi.[59]

g.        Defendants Sunoco LP, Aloha Petroleum LLC, Aloha Petroleum, Ltd., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, including but not limited to Sunoco LLC, Sunoco Retail LLC, Sunoco, Inc., Sun Company, Inc., and Sun Oil Company are collectively referred to herein as "Sunoco."

h.        The State's claims against Sunoco arise out of and are related to the acts and omissions of Sunoco in Hawaiʻi and elsewhere that caused or will cause injuries in Hawaiʻi.

i.        Sunoco has purposefully directed its tortious conduct toward Hawaiʻi by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawaiʻi, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawaiʻi, including without limitation injuries to the State's property, infrastructure, and natural resources. Sunoco's statements in Hawaiʻi and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Sunoco's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Sunoco's products.

---

[57] *Id.*

[58] Aloha Petroleum, *Aloha & Shell Branded Dealer Opportunities*, https://perma.cc/FC5P-5NM4.

[59] *See, e.g.*, Sunoco LP, *Sunoco LP Announces 4Q and Full Year 2014 Financial and Operating Results* (Feb. 18, 2015), https://perma.cc/VE9E-2DPT.

31

That conduct was purposefully directed to reach Hawai'i and obscure the dangers of Sunoco's fossil fuel products from the State and its residents such that use of Sunoco's fossil fuel products in Hawai'i would not decline.

j. Over the last several decades and continuing to the present day, Sunoco has advertised on online, social media, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1922, and continuing to the present day, Sunoco has advertised its fossil fuel products in national and local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[60] Sunoco has also advertised its fossil fuel products on its social media platforms that have thousands of followers from Hawai'i. For example, in 2024 the "Aloha Gas" Facebook and Instagram accounts posted that they offer "eco-friendly gasoline that helps reduce emissions and protect our beautiful island environment."[61] As further detailed herein, Sunoco's advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Sunoco's fossil fuel products and climate change, and/or misrepresenting Sunoco's products or Sunoco itself as environmentally friendly.

k. Significant quantities of Sunoco's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i,[62] from which activities Sunoco derives and has derived substantial revenue.

---

[60] *See, e.g.*, Honolulu Star-Advertiser (May 21, 1922), https://perma.cc/YF78-XF4M; Honolulu Star-Bulletin (Aug. 30, 1977), https://perma.cc/Q3BN-NE54; Honolulu Star-Advertiser (Dec. 3, 1980), https://perma.cc/2XYQ-SPYX; Hawaii Tribune-Herald (Dec. 5, 2005), https://perma.cc/88HP-38GT; Honolulu Star-Bulletin (Nov. 18, 2009), https://perma.cc/W4TX-MXKW.

[61] *See* Aloha Gas, *5 things to know about fueling up at Aloha*, Facebook (Mar. 25, 2024), https://perma.cc/FE2M-VK2B; Aloha Gas (@alohagasltd), *5 things to know about fueling up at Aloha*, Instagram (Mar. 25, 2024), https://perma.cc/F6CK-RAY5.

[62] *See, e.g.*, Hawaii Tribune-Herald (May 23, 1989), https://perma.cc/VQ3C-CXHZ.

l.      Sunoco currently owns and operates five active fuel terminals in Hawaiʻi with a combined storage capacity of more than 850,000 barrels of oil.[63] Sunoco also currently owns a fuel terminal in Hawaiʻi that is out of service.[64]

m.      Sunoco conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas stations throughout Hawaiʻi, at which it promotes, advertises, and sells its fossil fuel products. There are currently more than 50 gas stations throughout Hawaiʻi that are owned, operated, or branded by Sunoco or Aloha Petroleum, Inc.[65] In addition to its own Aloha-branded stations, Sunoco has licensed and operated Shell-branded gas stations across Hawaiʻi, and remains the authorized distributor and retailer of Shell gasoline in Hawaiʻi.[66]

n.      Sunoco has also marketed and sold other fossil fuel products, including engine lubricants and motor oils, to Hawaiʻi customers under its Sunoco brand name.[67]

o.      Sunoco, through Aloha Petroleum, Inc., markets and advertises its fossil fuel products in Hawaiʻi by maintaining an interactive website available to prospective Hawaiʻi customers that directs the State's residents to Sunoco's retail gas stations branded as Aloha Petroleum, Inc.[68] Sunoco also promotes its products in Hawaiʻi by regularly updating and actively promoting its Aloha-branded credit card known as the "Save-A-$ Club Card," which encourages customers to buy fuel at its Hawaiʻi stations in exchange for rewards.[69]

---

[63] *See* Sunoco, *Nawiliwili Terminal*, https://perma.cc/T3HN-R7G4; Sunoco, *Kahului, HI Terminal*, https://perma.cc/7WFC-7N56; Sunoco, *Honolulu, HI Terminal*, https://perma.cc/FWL5-PYLU; Sunoco, *Thomas F Malone (TFM) Terminal*, https://perma.cc/LWA6-JKRL; Sunoco, *Hilo West Terminal*, https://perma.cc/4BC6-C3QU.

[64] Sunoco, *Hilo East Terminal*, https://perma.cc/4H4S-3WPK.

[65] Aloha Petroleum, Inc., *Aloha Gas Locations*, https://perma.cc/U9BX-ZHRC.

[66] Aloha Petroleum, Inc., *Shell Hawaii*, https://perma.cc/Z7QQ-UAH6.

[67] *See, e.g.*, Honolulu Star-Advertiser (May 21, 1922), https://perma.cc/YF78-XF4M.

[68] Aloha Petroleum, *Aloha Gas Locations*, https://perma.cc/U9BX-ZHRC.

[69] *See, e.g.*, Aloha Petroleum, Inc., *Save-A-$ Club*, https://perma.cc/Z8K9-S8S4.

40. **ConocoPhillips entities**: **ConocoPhillips**; **ConocoPhillips Company**; **Phillips 66**; **Phillips 66 Company**

a. Defendant **ConocoPhillips** is a multinational energy company incorporated in the State of Delaware and with its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that carry out ConocoPhillips' fundamental decisions related to all aspects of the fossil fuel industry, including exploration, extraction, production, manufacture, transport, and marketing.

b. ConocoPhillips controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. ConocoPhillips' most recent annual report subsumes the operations of the entire ConocoPhillips group of subsidiaries under its name. Therein, ConocoPhillips represents that its value—for which ConocoPhillips maintains ultimate responsibility—is a function of its decisions to direct subsidiaries to explore for and produce fossil fuels: "Unless we successfully add to our existing proved reserves, our future crude oil, bitumen, natural gas and [natural gas liquids] production will decline, resulting in an adverse impact to our business." ConocoPhillips optimizes the ConocoPhillips group's oil and gas portfolio to fit ConocoPhillips' strategic plan. For example, in November 2016, ConocoPhillips announced a plan to generate $5 billion to $8 billion of proceeds over two years by optimizing its business portfolio, including its fossil fuel product business, to focus on low cost-of-supply fossil fuel production projects that strategically fit its development plans.

c. In November 2024, ConocoPhillips acquired Marathon Oil Corporation.[70] This acquisition added more than 2 billion barrels of oil equivalent reserves to ConocoPhillips' portfolio. ConocoPhillips has done and does business in Hawaiʻi through its wholly owned subsidiary, Marathon Oil Company. Marathon Oil Company was registered to do business in Hawaiʻi in 2002 and remains registered in Hawaiʻi today to own and operate property and

---

[70] ConocoPhillips, *ConocoPhillips completes acquisition of Marathon Oil Corporation* (Nov. 22, 2024), https://perma.cc/3537-5SEQ.

equipment for the exploration, transportation, refining, and marketing of petroleum and petroleum products.

d.     ConocoPhillips controls and has controlled companywide decisions related to global warming and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries. For instance, ConocoPhillips' board has the highest level of direct responsibility for climate change policy within the company. ConocoPhillips has developed and implements a corporate Climate Change Action Plan to govern climate change decision-making across all entities in the ConocoPhillips group.

e.     Defendant **ConocoPhillips Company** is a wholly owned subsidiary of ConocoPhillips that acts on ConocoPhillips' behalf and subject to ConocoPhillips' control. ConocoPhillips Company is incorporated in Delaware and has its principal office in Bartlesville, Oklahoma. Through its predecessors, ConocoPhillips Company has been registered to do business in Hawai'i since 1960 and remains registered today. In Hawai'i, ConocoPhillips Company was formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company; Phillips 66 Company; Phillips Chemical Company; Phillips Oil Company; Conoco Inc.; ConocoPhillips ANS Marketing Company; Tosco Corporation; and Tosco Refining Company, Inc. ConocoPhillips Company has operated under various trade names in Hawai'i, including the trade name "Phillips 66 Company," which was registered to manufacture, refine, and market petroleum products and byproducts.

f.     Defendant **Phillips 66** is a multinational energy and petrochemical company incorporated in Delaware and with its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips.

g.     Defendant **Phillips 66 Company** is a wholly owned subsidiary of Phillips 66 that acts on Phillips 66's behalf and subject to Phillips 66's control. Phillips 66 Company is incorporated in Delaware and has its principal office in Houston, Texas. Phillips 66 Company is registered to do business in Hawai'i as an oil and gas distributor. Phillips 66 Company was

35

formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, Tosco Refining Co., and Associated Oil (a predecessor-in-interest of defendant Aloha Petroleum, Ltd.).

h.     Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "ConocoPhillips."

i.     The State's claims against ConocoPhillips arise out of and are related to the acts and omissions of ConocoPhillips in Hawai'i and elsewhere that caused or will cause injuries in Hawai'i.

j.     ConocoPhillips has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. ConocoPhillips' statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and ConocoPhillips' affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of ConocoPhillips' products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of ConocoPhillips' fossil fuel products from the State and its residents such that use of ConocoPhillips' fossil fuel products in Hawai'i would not decline.

k.     Over the last several decades and continuing to the present day, ConocoPhillips has advertised on television, online, social media, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1966, and continuing to the present day, ConocoPhillips has advertised its fossil fuel products in national and local print

36

publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[71] ConocoPhillips has also advertised on its social media platforms that have thousands of followers and reach consumers in Hawai'i.[72] For example, in 2020 Phillips 66 ran an advertisement on Facebook and Instagram that reached Hawai'i consumers that touted their plans to support renewable fuels.[73] ConocoPhillips has also advertised on national television programs that aired in Hawai'i. For example, in 2011 ConocoPhillips ran a series of greenwashing television advertisements that aired in Hawai'i which promoted natural gas as clean, contributing to environmental protection, and creating fewer emissions.[74] ConocoPhillips has also advertised on local Hawai'i television networks. For example, in an ad from 2018 promoting its 76-branded gas stations, ConocoPhillips claimed that its fuel is "better for your car, [and] better for the environment."[75] As further detailed herein, ConocoPhillips' advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of ConocoPhillips' fossil fuel products and climate change, and/or misrepresenting ConocoPhillips' products or ConocoPhillips itself as environmentally friendly.

l.     A substantial portion of ConocoPhillips' fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which ConocoPhillips derives and has derived substantial revenue. For example, through its subsidiaries, ConocoPhillips transports and delivers crude oil to purchasers, refiners, and/or distributors in Hawai'i. ConocoPhillips has owned and/or operated a bulk fossil fuel terminal near Honolulu, at which it received imported fossil fuels for distribution and sale throughout Hawai'i. ConocoPhillips has also owned and/or operated a bulk fossil fuel terminal near Kawaihae, Hawai'i.

---

[71] *See, e.g.*, Honolulu Star-Bulletin (Aug. 12, 1966), https://perma.cc/AZA6-VL82; Hawaii Tribune-Herald (Oct. 3, 1967), https://perma.cc/G6PK-K9L6; Hawaii Tribune-Herald (July 19, 1998), https://perma.cc/D6HV-ETMJ.

[72] *See, e.g.*, ConocoPhillips, *Mapping Migration to Enhance Conservation*, Facebook Ad Libr., https://perma.cc/2PAQ-VFLT; Phillips 66, *What are renewable fuels?*, https://perma.cc/7955-S29V.

[73] Phillips 66, *What are renewable fuels?*, https://perma.cc/7955-S29V.

[74] *See, e.g.*, CNN, *CNN Newsroom* (Oct. 30, 2011, 3:54 PM PDT), https://perma.cc/FF2Z-RDVE; *see also* Honolulu Star-Advertiser (Oct. 30, 2011), https://perma.cc/4JMX-LZA3 (confirming that *CNN Newsroom* aired on CNN in Hawai'i on Oct. 30, 2011 from 12:00 PM to 1:00 PM HST, or 3:00 PM to 4:00 PM PDT).

[75] ConocoPhillips, *76 Hawai'i Commercial*, aired on KHII (June 17, 2018).

m.  ConocoPhillips has marketed gasoline and other fossil fuel products to consumers in Hawai'i, including through ConocoPhillips, Phillips 66, and/or 76-branded petroleum service stations located in Hawai'i. Phillips 66-branded stations began selling gasoline in Hawai'i no later than 1966.[76] By 1971, there were more than 30 Phillips 66 dealers throughout Hawai'i.[77] By 2003, ConocoPhillips was considered one of the principal marketers of gasoline in Hawai'i and marketed under the 76 brand at more than 50 stations throughout Hawai'i.[78] At roughly the same time, ConocoPhillips posited itself in Hawai'i newspapers as "one of the world's oldest and proudest gasoline brands" that featured "[t]he 76 Brand Gasoline."[79] Today, there are almost 50 stations with the 76 brand throughout Hawai'i.[80] ConocoPhillips maintains multiple interactive websites by which it directs prospective customers to 76-branded gasoline stations in Hawai'i.[81]

n.  ConocoPhillips offers multiple proprietary credit cards, including the "Phillips 66 Credit Card," the "Conoco Credit Card", and the "76 Credit Card" which allow consumers and business customers in Hawai'i to pay for gasoline and other products at 76-branded service stations. Consumers who use ConocoPhillips' proprietary credit cards receive various rewards, including discounts on gasoline purchases. ConocoPhillips further maintains a smartphone application called the "Fuel Forward App" which offers Hawai'i consumers a cashless payment method for gasoline and other products at 76-branded service stations, as well as rewards and discounts on gasoline purchases.

41. **Woodside Energy Hawaii Inc. (f/k/a BHP Hawaii Inc.)**

a.  Defendant Woodside Energy Hawaii Inc. ("WEH") is incorporated in Hawai'i with its principal place of business in Houston, Texas. WEH was incorporated in Hawai'i

---

[76] *See, e.g.*, Honolulu Star-Bulletin (Aug. 12, 1966), https://perma.cc/AZA6-VL82.

[77] Honolulu Star-Bulletin (May 21, 1971), https://perma.cc/D76P-K5B7.

[78] Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii* 121 & Attachment B at p. 3 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

[79] Honolulu Star-Bulletin (Dec. 11, 2002), https://perma.cc/8EQD-U55H.

[80] Phillips 66 Company, *Find a Station (76)* (Search address: Hawai'i), https://www.76.com/station-finder/ (last visited Feb. 28, 2025); Phillips 66 Company, *Find a Station* (search address: Hawai'i), https://www.conoco.com/station-finder/ (last visited Feb. 28, 2025).

[81] ConocoPhillips 66 Company, *Find a Station (76)*, https://www.76.com/station-finder/ (last visited Feb. 28, 2025).

in 1970 and remains registered in Hawai'i today. From 1994 to 2022, WEH was known as BHP Hawaii Inc. WEH has also been known as Pacific Resources, Inc. and BHP Petroleum Americas (Hawaii) Inc. WEH has registered and operated a variety of trade names in Hawai'i, including "Hawaii's Energy Leader," "Hawaii's Energy People," "Pacific Resources," "PRI," "Isle Gasohol," "Enerco," "BHP," "BHP Petroleum," and "BHPPA (Hawaii)."

b.     WEH is a wholly-owned subsidiary of Woodside Energy Group Ltd., an Australian petroleum exploration and production company with its headquarters in Perth, Australia. Until 2022, WEH was a subsidiary of BHP Group Limited, an Australian entity with headquarters in Melbourne, Australia.

c.     WEH and its predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "WEH."

d.     The State's claims against WEH arise out of and are related to the acts and omissions of WEH in Hawai'i and elsewhere that caused or will cause injuries in Hawai'i.

e.     WEH has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. WEH's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and WEH's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of WEH's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of WEH's fossil fuel products from the State and its residents such that use of WEH's fossil fuel products in Hawai'i would not decline.

39

f.     Over the last several decades, WEH has advertised on television, newspaper, online, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. In the 1980s and 1990s, WEH advertised its fossil fuel products in local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[82] For example, in the 1990s WEH ran a series of advertorials in Hawai'i newspapers about its gas products, some of which claimed that gas energy is "friendly to Hawai'i's environment" and can "[help] preserve Hawai'i's clean air."[83] WEH also advertised on local television programs in Hawai'i, including commercials that highlighted the company's support for environmental nonprofits in Hawai'i.[84] Similarly, WEH produced print advertisements in Hawai'i that, for example, touted WEH's efforts to reduce air emission and posited WEH as "working hard to preserve Hawaii's environment."[85] As further detailed herein, WEH's advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of WEH's fossil fuel products and climate change, and/or misrepresenting WEH's products or WEH itself as environmentally friendly.

g.     In the 1980s and 1990s, WEH developed and distributed a wide variety of educational materials on the environment and conservation for Hawai'i students.[86] For example, WEH distributed approximately 25,000 booklets throughout Hawai'i on energy and resource conservation as part of its "Part of the Solution" campaign.[87]

---

[82] *See, e.g.*, Honolulu Star-Advertiser (Nov. 30, 1990), https://perma.cc/KQJ8-BRYK; Honolulu Star-Bulletin (Oct. 31, 1997), https://perma.cc/WJ8V-WL2H; Honolulu Star-Advertiser (Aug. 16, 1988), https://perma.cc/QYX7-Z7YW.

[83] Honolulu Star-Bulletin (Sep. 7, 1995), https://perma.cc/3N4Z-KLKG; *see also* Honolulu Star-Bulletin (June 13, 1996), https://perma.cc/D4HA-CBYR; Honolulu Star-Bulletin (June 12, 1997), https://perma.cc/2FSW-8DNM.

[84] *See, e.g.*, BHP Hawaii Inc., *TV Spots* (archived by web.archive on Jan. 28, 1998), https://web.archive.org/web/19980128154413/http://energypeople.com/bhp/energy/energy.html; *see also* BHP Hawaii Inc., *Todd* (archived by web.archive on Nov. 4, 1996), https://web.archive.org/web/19961104034128/http://www.energypeople.com/energy/todd.aiff.

[85] BHP Hawaii Inc., Print Ads, Ad 3 (archived by web.archive on Jan. 28, 1998), https://perma.cc/28UL-YP2Z.

[86] *See, e.g.*, Honolulu Star-Bulletin (Oct. 14, 1993), https://perma.cc/9TXX-QUL5; Honolulu Star-Advertiser (Oct. 16, 1993), https://perma.cc/M8GE-F82P.

[87] BHP Hawaii Inc., *Environment, Solve It!* (archived by web.archive on May 24, 1997), https://perma.cc/PS3Y-78SV.

h.  Significant quantities of WEH's fossil fuel products have been transported, traded, distributed, promoted, marketed, manufactured, sold, and consumed in Hawai'i, from which activities WEH has derived substantial revenue. Until approximately 1998, WEH owned and operated more than 30 gasoline stations throughout Hawai'i under the BHP Gas Express network.[88] At the time it sold its operations in 1998, WEH provided 40% of the gasoline consumed in Hawai'i, more than 60% of the diesel fuel consumed in Hawai'i, and 95% of the fuel used by ships in Hawai'i.[89] WEH had more than $1 billion in revenue in the 1997 fiscal year.

i.  WEH owned and operated Hawaii's largest crude oil refinery near Kapolei, O'ahu from approximately 1989 to 1998.[90] This refinery had a processing capacity of 95,000 barrels of crude oil per day, a storage capacity of 5.2 million barrels, and featured a 22-mile pipeline that delivered products to the Honolulu area.[91] On its website, WEH claimed that 85% of the products it manufactured in Hawai'i were distributed and consumed in Hawai'i, including "gasoline, jet fuel, diesel fuel, ship bunker fuels, residual fuel oil, butane, propane, naptha, synthetic natural gas, asphalt, and prilled sulphur."[92]

42.  BP, Chevron, Exxon, Shell, Sunoco, ConocoPhillips, and WEH are collectively referred to as the "Fossil Fuel Defendants."

43.  **American Petroleum Institute ("API")**

a.  API is a national trade association representing the oil and gas industry, created in 1919. It is a nonprofit corporation based in the District of Columbia. With more than 600 members, API is the country's largest petroleum trade association. Its purpose is to advance its members' collective business interests, which include increasing the sale and consumer consumption of fossil fuels in Hawai'i and elsewhere for the financial profit of API's members,

---

[88] Honolulu Star-Bulletin (May 29, 1998), https://perma.cc/QV39-VBGV.

[89] Honolulu Star-Bulletin (May 29, 1998), https://perma.cc/QV39-VBGV; *see also* BHP Hawaii Inc., *BHP Hawaii* (archived by web.archive on Nov. 4, 1996), https://perma.cc/F25S-JK3F?type=image.

[90] Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii*, 6–7 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

[91] BHP Hawaii Inc., *Refinery* (archived by web.archive on May 24, 1997), https://perma.cc/5G2B-Z9Y7.

[92] BHP Hawaii Inc., *BHP Hawaii* (archived by web.archive on Nov. 4, 1996), https://perma.cc/F25S-JK3F?type=image.

including Fossil Fuel Defendants and other fossil fuel companies. API coordinates members of the petroleum industry, gathers information of interest to the industry, and disseminates that information to its members. API acts and has acted as an advertising and marketing arm for its member companies' fossil fuel products, including Fossil Fuel Defendants, in Hawai‘i and elsewhere.[93]

　　　　b.　　The State's claims against API arise out of and are related to API's tortious and deceptive acts and omissions in Hawai‘i and elsewhere that caused and will cause injuries in Hawai‘i.

　　　　c.　　API has targeted advertising campaigns at Hawai‘i consumers in Hawai‘i newspapers,[94] advertised on local television networks and on national television programs that were broadcast in Hawai‘i,[95] and run social media advertisements that reached Hawai‘i consumers. For example, in 2019 API ran an advertisement on Facebook that reached Hawai‘i consumers that touted the emissions reduction achievements of natural gas and oil companies.[96] API also promoted the expansion of fossil fuel extraction and consumption in Hawai‘i and to Hawai‘i consumers, and engaged in other Hawai‘i-based activities that promoted fossil fuel products for the financial benefit of API's members, including the Fossil Fuel Defendants, while misleading Hawai‘i consumers about the environmental and climate impacts of those products.[97] As part of its "Power Past Impossible" campaign which began in 2017, API ran a series of misleading

---

[93] Through this Complaint, the State is not challenging API's lobbying efforts but rather is upholding and enforcing Hawai‘i law against API for API's illegal acts and omissions in Hawai‘i and elsewhere, which have caused injuries in Hawai‘i. Any API lobbying effort that may incidentally be connected to API's illegal conduct merely exemplifies API's significant contacts with Hawai‘i.

[94] *See, e.g.*, Honolulu Star-Bulletin (May 10, 1971), https://perma.cc/E87J-5FA2; Honolulu Star-Advertiser (June 19, 1972), https://perma.cc/R5ZG-5ST7.

[95] *See, e.g.*, Am. Petroleum Inst., *Power Past Impossible*, aired on KGMB (Aug. 21, 2017) ("Natural gas comes cleaner"); CNN, *The Lead With Jake Tapper* (Mar. 18, 2024, 11:36 PM PDT), https://perma.cc/MDC2-58Z9; *see also* Honolulu Star-Advertiser (Mar. 18, 2024), https://perma.cc/YL8U-BMR2 (confirming that *The Lead With Jake Tapper* aired in Hawai‘i on CNN on Mar. 18, 2024 from 8:00 PM to 9:00 PM HST, or 11:00 PM to 12:00 AM PDT).

[96] Am. Petroleum Inst., *Did you know…*, Facebook Ad Libr., https://perma.cc/RE82-P8TT.

[97] *See, e.g.*, Am. Petroleum Inst., *Oil and Natural Gas Stimulate Hawaii Economic and Job Growth* (2015), https://perma.cc/3Z3Q-XC3K; Am. Petroleum Inst., *The people of Hawaii are part of the oil and natural gas industry* (2015), https://perma.cc/LLV6-SVSU; ICF, Prepared for Am. Petroleum Inst., *Benefits and Opportunities of Natural Gas Use, Transportation, and Production, Hawaii* (June 2017), https://perma.cc/KCJ7-SXCN.

advertisements that portrayed the oil and gas industry as a sustainable, healthy, and essential part of societal progress.[98] For example, one API advertisement which ran on television programs broadcast in Hawaiʻi claimed that "thanks to natural gas the air up here is cleaner than it's been in 25 years;"[99] This greenwashing statement was misleading because it gave the impression that natural gas is environmentally friendly when in fact the greenhouse gas emissions from natural gas combustion contribute to the catastrophic climate change impacts alleged in this Complaint.

d. API's advertising campaigns that appeared in Hawaiʻi promoted, among other things, the expansion of fossil fuel product sale and consumption, expansion of commercial fossil fuel infrastructure, false claims that oil derricks save trees, misleading and repeated assertions that combusting natural gas is a climate change solution and that natural gas is "clean-burning" and good for the environment, and misleading advertisements about how API and the fossil fuel industry are protecting the environment by, among other things, working to get the "least pollution" from "every drop of oil."[100]

e. Among other activities in Hawaiʻi during the 1970s, API ran advertisements on network television stations that aired in Hawaiʻi and ran multiple ads in Hawaiʻi newspapers under API's nationwide advertisement campaign themed, "a country that runs on oil can't afford to run short."[101] Those ads promoted the expanded use of and exploration for fossil fuel products, and were specifically targeted at Hawaiʻi residents by being published in Hawaiʻi newspapers read

---

[98] *See* Am. Petroleum Inst., *API Launches Power Past Impossible Campaign During Super Bowl Showing Natural Gas and Oil Benefit to Consumers in Everyday Life*, PR Newswire (Feb. 5, 2017, 6:32 PM ET), https://perma.cc/UE5Y-QFAQ.

[99] *See* Am. Petroleum Inst., *Thanks to Natural Gas*, aired on KGMB (Mar. 15, 2018); CNN, *CNN Newsroom* (Nov. 1, 2018, 12:50 PM PDT), https://perma.cc/UV67-QA3V; *see also* West Hawaii Today (Oct. 28, 2020), https://perma.cc/ZS6V-6LJQ (confirming that *CNN Newsroom* aired on CNN in Hawaiʻi on Nov. 1, 2018 from 9:00 AM to 10:00 AM HST, or 12:00 PM to 1:00 PM PDT).

[100] *See, e.g.*, Honolulu Star-Bulletin (May 3, 1971), https://perma.cc/66CS-R9DX; Honolulu Star-Bulletin (May 10, 1971), https://perma.cc/E87J-5FA2; Jack Gerard, Am. Petroleum Inst., National Opinion, *Obama shuns success in curbing climate change*, Honolulu Star Advertiser (Dec. 12, 2015), https://perma.cc/R5PU-9W4D; Lem Smith, Am. Petroleum Inst., Opinion, *Natural gas helps curb carbon dioxide emissions*, Honolulu Star-Advertiser (Mar. 16, 2020), https://perma.cc/WU6J-PE2J.

[101] *See, e.g.*, Honolulu Star-Bulletin (May 3, 1971), https://perma.cc/66CS-R9DX; Honolulu Star-Bulletin (May 10, 1971), https://perma.cc/E87J-5FA2; Honolulu Star-Bulletin (Oct. 18, 1971), https://perma.cc/AP7M-TG9C; Honolulu Star-Bulletin (Sept. 13, 1971), https://perma.cc/5HCY-A8LB; *see also* Philip H. Dougherty, *Advertising: Oil Prepares a Counterattack*, N.Y. Times (Apr. 23, 1971), https://perma.cc/P4BG-W93T.

by Hawaiʻi residents.[102] According to API's ad campaign manager, James C. Shelby, there was nothing political about the $4 million nation-wide API campaign, which featured full-page ads in at least 160 newspapers and commercials that ran across all major television networks.[103]

f.      API directed misleading information at Hawaiʻi residents by stating in the *Honolulu Star-Advertiser* in 2016 that natural gas is "clean-burning" and has driven the US to become the world leader in reducing carbon emissions, and that fossil fuel is "cleaner and more efficient than ever."[104] In another statement made in the *Honolulu Star-Advertiser* in 2016, API claimed that "[g]iven the proven success of natural gas in reducing emissions, taking it out of the equation is unnecessary."[105] These greenwashing claims about fossil fuels deceptively portrayed fossil fuels as environmentally friendly and a long-term climate solution, and concealed the harmful climate impacts of continued oil and gas development.[106]

g.      API targeted Hawaiʻi residents and tourists visiting Hawaiʻi by publishing an online blog in 2017 highlighting how petroleum-based products and fossil fuel energy help competitors reach the finish line of the Ironman World Championship in Kona, Hawaiʻi.[107]

h.      All Fossil Fuel Defendants and/or their predecessors-in-interest or parent companies are or have been key API members. All Fossil Fuel Defendants except Sunoco and WEH are currently API members. Multiple Fossil Fuel Defendants held key API leadership roles, including BP, Shell, Exxon, Chevron, Sunoco, and ConocoPhillips.

i.      Executives from Exxon, BP, Chevron, Shell, and Sunoco have served on the API Executive Committee and/or as API Chairman, essentially serving as corporate officers. For example, Exxon's CEO served on API's Executive Committee, including as President and

---

[102] *Id*.

[103] Philip H. Dougherty, *Advertising: Oil Prepares a Counterattack*, N.Y. Times (Apr. 23, 1971), https://perma.cc/P4BG-W93T.

[104] Jack Gerard, Am. Petroleum Inst., Insight, *Should U.S. still develop fossil fuels? Yes*, Honolulu Star Advertiser (Oct. 17, 2016), https://perma.cc/33UE-PHCC.

[105] Kyle Isakower, Am. Petroleum Inst., *Insight, Can 'clean' energy replace fossil fuels? No*, Honolulu Star-Advertiser (May 23, 2016), https://perma.cc/8Z79-RB4G.

[106] *See* International Institute for Sustainable Development, *Navigating Energy Transitions: Mapping the road to 1.5°C* (2022), https://perma.cc/WN9R-7AHG.

[107] Am. Petroleum Inst., *Energy is Hawaii, Iron Constitution!* (Oct. 2017), https://perma.cc/3G2R-9HA9.

44

Chairman, for 21 of the 29 years between 1991 and 2020. Multiple high-level executives from Exxon, such as Presidents, Vice Presidents, CEOs, COOs, and Chairmen, served on API's Board in each year between 1994 and 2002. BP's CEO served as API's Chairman in 1988, 1989, and 1998. Multiple high-level executives from BP served on API's Board of Directors between 1994 and 2002. The Chairman and CEO of BP's predecessor ARCO served as API Treasurer in 1998 and Chairman in 1999. Chevron's CEO served as API Chairman in 1994, 1995, 1997, 1998, 2003, and 2012. In 2002, Chevron's CEO served as API Treasurer. Chairman and CEO of Chevron's predecessor Texaco served as API Board Chairman in 2001, and as Treasurer in 1999. Multiple high-level executives from Chevron served on API's Board of Directors in each year between 1994 and 2002. Shell's President served as API Treasurer in 1997 and sat on the Board's Executive Committee from at least 2005 to 2006. Multiple high-level Shell executives served on API's Board of Directors between 1994 and 2002. Sunoco's President served as API Board Chairman between 1965 and 1967. ConocoPhillips' Chairman and CEO was API Chairman from 2016 to 2018. Phillips 66's Chairman and CEO served as API Board President from 2020 to 2022. Multiple high-level ConocoPhillips executives served on API's Board of Directors between 1994 and 2002.

j.      Member companies participate in API strategy, governance, and operation through their membership dues and by contributing company officers and other personnel to API boards, committees, and task forces. Fossil Fuel Defendants have collectively steered the policies and trade practices of API through membership, Executive Committee roles, and/or providing budgetary funding for API. Fossil Fuel Defendants have used their control over and involvement in API to develop and execute a long-term advertising and communications campaign centered on climate change denialism. The goal of the campaign was to influence consumer demand for Fossil Fuel Defendants' fossil fuel products. Fossil Fuel Defendants directly controlled, supervised, and participated in API's misleading messaging regarding climate change.[108] That conduct directly

---

[108] *See* H.R. Comm. on Oversight and Accountability Democrats & S. Comm. on the Budget, *Denial, Disinformation, and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change* (April 2024), Doc. No. SOC-HCOR-123718 (March 2018 email from Darren Woods to API Executive Committee, including representatives from Shell, Phillips 66, BP, and Chevron, noting that he was about to become API's Chair and that "it will be important to have a clear view of where *we* want to take API." (emphasis added)).

impacted Hawaiʻi, as Fossil Fuel Defendants worked with API to create and disseminate misleading advertisements that promote consumption of fossil fuel products throughout Hawaiʻi.

k.      Relevant information was shared among API and Fossil Fuel Defendants and Fossil Fuel Defendants' predecessors-in-interest through the following: (1) API's distribution of information to its members, and/or (2) participation of Fossil Fuel Defendants' officers and other personnel, and those of Fossil Fuel Defendants' predecessors-in-interest, on API boards, committees, and task forces. This includes representatives of Exxon, Chevron, BP, Shell, and Sunoco sitting on both API's Committee for Air and Water Conservation and a special advisory group to API's Committee for Public Affairs, which worked together to develop research reports on air emissions and other environmental topics. In addition, representatives from Chevron and Exxon chaired API's Engineering and Technical Research Committee, and representatives from BP and Exxon chaired API's Health and Biological Research Committee, also developing research documents. Different representatives of Exxon, Chevron, BP, Shell, and Sunoco rotated in and out of these positions throughout the time periods discussed in this Complaint.[109]

l.      API has acted on behalf of and under the supervision and control of Fossil Fuel Defendants. Under this control and supervision, API has, since no later than 1988, participated in and led several coalitions, front groups, and organizations that have promoted disinformation about the climate impacts of fossil fuel products to consumers—including, but not limited to, the Global Climate Coalition, Partnership for a Better Energy Future, Coalition for American Jobs, Alliance for Energy and Economic Growth, and Alliance for Climate Strategies. These front groups were formed to promote climate disinformation and advocacy from a purportedly objective source, when in fact these groups were financed and controlled by Fossil Fuel Defendants and other oil and gas companies. Defendants have benefited from the spread of this disinformation because, among other things, it has ensured a thriving consumer market for oil and gas, resulting in substantial profits for Fossil Fuel Defendants.

---

[109] Am. Petroleum Inst., Comm. for Air and Water Conservation & Comm. on Pub. Affs., *Environmental Research: A Status Report*, 135–46 (Jan. 1972) (listing members of relevant committees and their fossil fuel company affiliations), https://perma.cc/X4S8-TGR3.

m.    API admitted its role in promoting Fossil Fuel Defendants' fossil fuel products. For example, in 1964, API President Frank Ikard stated that "API also works hard to promote the use of petroleum products . . . . [W]e cannot, of course, engage directly in selling gasoline to customers. But if we can't sell the steak, we can sell the sizzle." Ikard continued, "[w]e can contribute to gasoline sales, for example, by telling as many motorists as possible about the wonderful places to go in this country and about some of the historic trails that connect them. This we are doing by means of a national campaign of localized newspaper ads carrying the theme: 'See America Best By Car.'"[110] Dozens of these "See America Best By Car" newspaper ads from Shell appeared in Hawai'i in 1964.[111]

## IV.    AGENTS AND CO-CONSPIRATORS

44.    As detailed below, each Fossil Fuel Defendant had actual knowledge, or should have known, that its fossil fuel products were hazardous in that the intended use of those products for combustion would substantially contribute to climate change and result in harms to Hawai'i. The Fossil Fuel Defendants obtained knowledge of the hazards of their products independently and through their membership and involvement in trade associations like Defendant API, and in other entities described herein.

45.    Fossil Fuel Defendants and/or API employed, financed, and participated in several industry-created front groups to serve their mission of flooding the markets with climate change disinformation and denialism. These organizations, acting under Fossil Fuel Defendants' and/or API's supervision and control, assisted the deception campaign by implementing public advertising and outreach campaigns to discredit climate science and by funding scientists to cast doubt upon climate science and upon the extent to which climate change is caused by human activity. In sum, Fossil Fuel Defendants and/or API, through front groups, engaged in a significant

---

[110] Address by Frank N. Ikard, President, American Petroleum Institute, at the Annual Meeting of the Interstate Oil Compact Commission, Broadwater Beach Hotel, Biloxi, Mississippi, Dec. 11, 1964 (Bernard Majewski Papers, Box 59, American Heritage Center, University of Wyoming).

[111] *See, e.g.*, Honolulu Star-Advertiser (Aug. 12, 1964), https://perma.cc/B6ZN-V4CL; Hawaii Tribune-Herald (July 21, 1964), https://perma.cc/M7KV-6T6M; Honolulu Star-Advertiser (Oct. 19, 1964), https://perma.cc/SQ3N-R4GG.

marketing campaign that misrepresented and concealed the dangers of fossil fuel products with the aim of protecting or enhancing sales of those products to consumers, including consumers in Hawai'i. Fossil Fuel Defendants and/or API actively supervised, facilitated, consented to, and/or directly participated in the misleading messaging of these front groups, from which Fossil Fuel Defendants profited significantly, including in the form of increased sales in Hawai'i.

46. **The Information Council for the Environment ("ICE")** was formed by coal companies and their allies, including Western Fuels Association and the National Coal Association. Associated companies included Pittsburg and Midway Coal Mining (Chevron).

47. **The Global Climate Coalition ("GCC")** was an industry group formed to preserve and expand consumer demand for fossil fuel products by publicly casting doubt on climate science and opposing GHG emission reduction initiatives. The GCC was founded in 1989 in reaction to the first meeting of the Intergovernmental Panel on Climate Change ("IPCC"), the United Nations body for assessing the science related to climate change, and to NASA scientist James Hansen's presentation to the Senate Committee on Energy and Natural Resources, in which Hansen emphasized that climate change was already happening and would lead to dire consequences if left unaddressed. The GCC disbanded in or around 2001. Founding members included API, Shell Oil Company (currently, Shell); Texaco, Inc. (currently, Chevron); Amoco (currently, BP); and ARCO (owned by BP at the time). GCC board membership during its existence included high-level executives from the founding members and Chevron, Exxon, and Mobil (Exxon).  Amoco (BP), ARCO (BP), API, Chevron, Exxon, Shell, Texaco (Chevron), and Phillips Petroleum (ConocoPhillips) were also corporate members of the GCC over the course of the GCC's existence. The GCC Board of Directors was comprised of high-level executives from the fossil fuel industry: in 1994, for instance, the GCC Board was comprised of executives from API, Exxon, Phillips Petroleum Company (ConocoPhillips), and Texaco (Chevron).[112] In 1995,

---

[112] Glob. Climate Coalition, *Background Information on the Global Climate Coalition*, 4 (Feb. 1, 1994), https://perma.cc/3W2B-G33X.

GCC's Board of Directors included high-level executives from Texaco (Chevron), API, and ARCO.[113]

## V. FACTUAL BACKGROUND

### A. Defendants Are Responsible for Causing and Accelerating Climate Change.

48. The atmosphere and oceans are warming, sea levels are rising, snow and ice cover are diminishing, oceans are acidifying, and hydrogeologic systems have been altered, among other environmental changes.[114] These changes are directly harming people's health, lives, lifestyles, livelihoods, and property, including in Hawaiʻi. According to the IPCC, the evidence that humans are causing this warming of the Earth is unequivocal.[115]

49. The mechanism by which human activity causes global warming and climate change is equally well-established: ocean and atmospheric warming is overwhelmingly caused by anthropogenic GHG emissions.[116] Over the past few decades, actual GHG emission rates have exceeded the rates previously predicted under "worst case" global emissions scenarios.

50. When used as intended to produce energy and create petrochemical products, fossil fuels release GHGs, including $CO_2$ and methane, which trap atmospheric heat and increase global temperatures. $CO_2$ is by far the most important GHG because combustion of massive amounts of fossil fuels has released hundreds of billions of tons of $CO_2$ into the atmosphere.

---

[113] Glob. Climate Coalition, *IRS 1024 Attachment C: Global Climate Coalition Board of Directors* (1995), https://perma.cc/TE7R-4D3A.

[114] IPCC, *Global Carbon and Other Biogeochemical Cycles and Feedbacks*, in *Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report* 676–79 (2021).

[115] IPCC, *Climate Change 2021: The Physical Science Basis*, v, 4, 41, 63, 150, 425, 506 (2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_FullReport_small.pdf.

[116] *Id.* at 41.

49

51.     Prior to World War II, most anthropogenic $CO_2$ emissions were caused by land-use practices, such as forestry and agriculture, which altered the capacity of the land and global biosphere to absorb and sequester $CO_2$ from the atmosphere. Those activities did not significantly alter atmospheric $CO_2$ concentrations, and their impacts on Earth's climate were relatively minor. Since that time, however, both the annual rate and total volume of anthropogenic $CO_2$ emissions have increased enormously following the dramatic rise in the combustion of oil, gas, and coal. Figure 1 below shows that while $CO_2$ emissions attributable to forestry and other land-use changes have remained relatively constant, total emissions attributable to fossil fuels have increased dramatically since the 1950s.[117]



**Figure 1: Total Annual Carbon Dioxide Emissions by Source, 1860-2022**

52.     This acceleration of fossil fuel emissions has led to a correspondingly sharp rise in atmospheric concentration of $CO_2$. Since 1960, the concentration of $CO_2$ in the atmosphere has spiked from under 320 parts per million (ppm) to approximately 427 ppm.[118] The concentration of

---

[117] Glob. Carbon Project, *Global Carbon Budget 2023*, 85 (Dec. 5, 2023), https://perma.cc/LE9K-AMBB.
[118] Nat'l Oceanic and Atmospheric Admin. ("NOAA"), *Trends in Atmospheric Carbon Dioxide ($Co_2$): Full Record*, Glob. Monitoring Lab'y, https://perma.cc/5AWZ-ZWXF.

atmospheric $CO_2$ has also been accelerating. From 1960 to 1970, atmospheric $CO_2$ increased by an average of approximately 0.9 ppm per year.[119]

53.     The graph below (Figure 2) indicates the tight nexus between the sharp increase in emissions from the combustion of fossil fuels and the steep rise of atmospheric concentrations of $CO_2$.



**Figure 2: Atmospheric CO₂ Concentration and Annual Emissions[120]**

54.     The increase in atmospheric $CO_2$ caused by fossil fuel combustion has been clearly documented and measured, and the ratio of different carbon isotopes in the atmosphere indicates that fossil fuel combustion is the overwhelming source of the increased concentration.[121]

55.     The burning of fossil fuel products has caused concentrations of GHGs in the atmosphere to rise to levels not seen in at least three million years.[122]

---

[119] NOAA, *Trends in Atmospheric Carbon Dioxide (Co₂): Growth Rate*, Glob. Monitoring Lab'y, https://perma.cc/YBQ8-FGLR.

[120] Rebecca Lindsey, *Climate Change: Atmospheric Carbon Dioxide*, Climate.gov (Apr. 9, 2024), https://perma.cc/6MPK-6FE7.

[121] NOAA, *The Data: What Carbon-14 Tells Us*, Glob. Monitoring Lab'y, https://perma.cc/83JP-P9AG.

[122] Potsdam Inst. for Climate Impact Research, *More CO₂ Than Ever Before in 3 Million Years, Shows Unprecedented Computer Simulation*, Sci. Daily (Apr. 3, 2019), https://perma.cc/4XZB-7BLD.

56.     As GHGs accumulate in the atmosphere, the Earth radiates less energy back to space. The result has been dramatic planetary warming. Ocean and land surface temperatures have increased at a rapid pace during the late 20th and early 21st centuries:

a.     2024 was the hottest year on record by globally averaged surface temperatures, exceeding the mid-20th century mean ocean and land surface temperatures by approximately 2.32°F.[123] Between June 2023 and July 2024 there were 14-straight months of record-breaking global temperatures.[124] The last ten years have been the hottest on record.[125]

b.     This trend appears certain to continue. January 2025 was the hottest January ever.[126] February 2025 was the third-hottest February on record.[127]

57.     2024 was the hottest year on record for global ocean temperatures.[128] Between April 2023 and June 2024, the ocean experienced 15-straight months of record-breaking temperatures.[129] Moreover, the average global ocean temperature of each month from January through April 2024 was at least 0.15°C (0.27°F) higher than the previous monthly records.[130] The increase in hotter temperatures and more frequent positive anomalies during the Great Acceleration are occurring both globally and locally, including in Hawai'i. The graph below (Figure 3) shows the increase in global land and ocean temperature anomalies since 1850, as measured against the 1901–2000 global average temperature.[131]

---

[123] NOAA Nat'l Ctr. for Env't Info., *Annual 2024 Global Climate Report* (Jan. 2025), https://perma.cc/L2HA-LLW2.

[124] *Id.*

[125] *Id.*

[126] Coepernicus, *Copernicus: January 2025 was the warmest on record globally, despite an emerging La Niña* (Feb. 6, 2025), https://perma.cc/246N-WWTJ.

[127] Coepernicus, *Surface air temperature for February 2025* (Mar. 2025), https://perma.cc/6V2R-4FLD.

[128] NOAA Nat'l Ctr. for Env't Info, *Assessing the Global Climate in 2024* (Jan. 10, 2025), https://perma.cc/RJ7V-T97Q.

[129] NOAA, *supra* note 123.

[130] *Id.*

[131] *See id.*



**Figure 3: Global Land and Ocean Temperature Anomalies, January – December**

58.    Increasing surface temperatures, both locally and globally, are disrupting the Earth's energy balance and leading to myriad environmental and physical consequences, including, but not limited to, the following:

      a.    Increased frequency and intensity of heat waves;

      b.    Sea level rise, due to the thermal expansion of warming ocean waters and runoff from melting glaciers and ice sheets;

      c.    Changes to the global climate generally, bringing about longer droughts and dry periods interspersed with fewer and more severe periods of precipitation, and associated impacts to the quantity and quality of water resources available to both human and ecological systems;

      d.    Increased frequency and intensity of extreme weather events due to increases in evaporation, evapotranspiration, and precipitation, a consequence of the warming atmosphere's increased ability to hold moisture;

      e.    Adverse impacts on human health associated with extreme weather, extreme heat, wildfires, worsening air quality, and vector-borne illnesses;

f. Flooding and inundation of land and infrastructure, increased erosion, higher wave run-up and tides, increased frequency and severity of storm surges, saltwater intrusion, and other impacts of higher sea levels;

g. Ocean acidification, primarily due to the increased uptake of atmospheric carbon dioxide by the oceans; and

h. Changes to terrestrial and marine ecosystems, and consequent impacts on the populations and ranges of flora and fauna.

**B.      Defendants Knew or Should Have Known the Dangers Associated with Fossil Fuel Products.**

59. For decades, Fossil Fuel Defendants have known that their fossil fuel products posed and continue to pose risks of "severe" and even "catastrophic" impacts on the global climate through the work and warnings of their own scientists and/or through trade associations such as API. Defendants consistently researched or funded research into significant issues relevant to fossil fuels and were aware of significant scientific reports on climate change science and impacts at the time the reports were issued. Thus, Defendants developed a sophisticated understanding of climate change that far exceeded the knowledge of the public, ordinary consumers, and the State. Yet each Fossil Fuel Defendant decided to continue its conduct and commit itself to massive fossil fuel production. This was a deliberate and malicious decision to place company profits ahead of human safety and well-being and to foist onto the public the costs of abating and adapting to the harms of climate change.

60. This industry knowledge was concealed at the time, only recently began to come to light outside of Defendants' spheres, and Defendants are still concealing their full knowledge.[132]

61. In 1954, geochemist Harrison Brown and his colleagues at the California Institute of Technology wrote to API, informing the trade association that preliminary measurements of natural archives of carbon in tree rings indicated that fossil fuels had caused atmospheric carbon

---

[132] *See* discussion *infra* ¶¶ 255–269.

dioxide levels to increase by about 5% since 1840.[133] API provided those scientists funding for various research projects, and measurements of carbon dioxide continued for at least one year, if not longer, although the results were never published or otherwise made available to the public.[134] In 1957, H.R. Brannon of Humble Oil Company (predecessor-in-interest to Exxon) measured an increase in atmospheric carbon dioxide attributable to fossil fuels, similar to—and in agreement with—that measured by Harrison Brown.[135]

62.     In 1959, API organized a centennial celebration of the American oil industry at Columbia University in New York City.[136] High-level representatives of Defendants were in attendance. One of the keynote speakers was nuclear physicist Edward Teller. Teller warned the industry that "a temperature rise corresponding to a 10[%] increase in carbon dioxide will be sufficient to melt the icecap and submerge . . . [a]ll the coastal cities."  Teller added that since "a considerable percentage of the human race lives in coastal regions, I think that this chemical contamination is more serious than most people tend to believe."[137] Following his speech, Teller was asked to "summarize briefly the danger from increased carbon dioxide content in the atmosphere in this century."  He responded that "there is a possibility the icecaps will start melting and the level of the oceans will begin to rise."[138]

63.     By 1965, concern over the potential for fossil fuel products to cause disastrous global warming reached the highest levels of the United States' scientific community. In that year, President Lyndon B. Johnson's Science Advisory Committee's Environmental Pollution Panel reported that a 25% increase in carbon dioxide concentrations could occur by the year 2000, that such an increase could cause significant global warming, that melting of the Antarctic ice cap and

---

[133] *See* Benjamin Franta, *Early Oil Industry Knowledge of CO2 and Global Warming*, 8 Nature Climate Change 1024, 1024–25 (2018).

[134] *Id.*

[135] *Id.*; H.R. Brannon, Jr. et al., *Radiocarbon Evidence on the Dilution of Atmospheric and Oceanic Carbon by Carbon from Fossil Fuels*, 38 Am. Geophysical Union Transactions 643, 644–46 (1957).

[136] *See* Allan Nevins & Robert G. Dunlop, *Energy and Man: A Symposium* (Appleton-Century-Crofts, Inc. 1960); *see also* Franta, *supra* note 133, at 1024–25.

[137] Edward Teller, *Energy Patterns of the Future*, in *Energy and Man: A Symposium* 58 (Appleton-Century-Crofts, Inc. 1960).

[138] *Id.* at 70.

rapid sea-level rise could result, and that fossil fuels were the clearest source of the carbon dioxide pollution.[139]

64.    Three days after President Johnson's Science Advisory Committee report was published, the president of API, Frank Ikard, addressed leaders of the petroleum industry in Chicago at the trade association's annual meeting. Ikard relayed the report to industry leaders, saying, "[o]ne of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts," and quoting the report's finding that "the pollution from internal combustion engines is so serious, and is growing so fast, that an alternative nonpolluting means of powering automobiles, buses, and trucks is likely to become a national necessity."[140] Mr. Ikard summarized the report by saying, "[t]he substance of the report is that there is still time to save the world's peoples from the catastrophic consequences of pollution, but time is running out."[141]

65.    Thus, by 1965, Defendants and/or their predecessors-in-interest were aware that the scientific community had found that the unrestrained use of fossil fuel products would cause global warming by the end of the century, and that such global warming would have wide-ranging and costly consequences.

66.    In 1968, API received a report from the Stanford Research Institute, which it had hired to assess the state of research on environmental pollutants, including carbon dioxide.[142] The assessment endorsed the findings of President Johnson's Scientific Advisory Council from three years prior, stating that carbon dioxide emissions were "almost certain" to produce "significant" temperature increases by 2000, and that these emissions were almost certainly attributable to fossil fuels. The report warned of major changes in the Earth's environment and a "rise in sea levels,"

---

[139] The White House, *Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel President's Science Advisory* Committee, 119–24 (Nov. 1965), https://perma.cc/998L-PNQV.

[140] Frank N. Ikard, *Meeting the Challenges of 1966*, in *Proceedings of the Am. Petroleum Inst.* 13 (1965), https://perma.cc/CHQ7-HXGA.

[141] *Id.*

[142] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants*, Stanford Rsch. Inst. (Feb. 1968), https://perma.cc/A58L-QVPK.

and concluded: "there seems to be no doubt that the potential damage to our environment could be severe." The scientists warned of "melting of the Antarctic ice cap" and informed API that "[p]ast and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere."  What was missing, the scientists said, was work on "air pollution technology and . . . systems in which $CO_2$ emissions would be brought under control."[143]

67.      In 1969, the Stanford Research Institute delivered a supplemental report on air pollution to API, projecting with alarming particularity that atmospheric $CO_2$ concentrations would reach 370 parts per million (ppm) by 2000.[144] This projection turned out to almost exactly match the actual $CO_2$ concentrations measured in 2000 of 369.64 ppm.[145] The report explicitly connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere."

68.      By virtue of their membership and participation in API at that time, Fossil Fuel Defendants received or should have received the Stanford Research Institute reports and were on notice of their conclusions.

69.      In 1972, API members—including Fossil Fuel Defendants—received a status report on all environmental research projects funded by API. The report summarized the 1968 SRI report describing the impact of fossil fuel products—including Fossil Fuel Defendants'—on the environment, including global warming and its attendant consequences. Fossil Fuel Defendants and/or their predecessors-in-interest that received this report included but were not limited to: American Standard of Indiana (BP), Asiatic (Shell), Atlantic Richfield (BP), British Petroleum (BP), Chevron Standard of California (Chevron), Esso Research (Exxon), Ethyl (formerly affiliated with Esso, which was subsumed by Exxon), Getty (Exxon), Gulf (Chevron, among others), Humble Standard of New Jersey (Exxon, Chevron, BP), Mobil (Exxon), Pan American (BP), Shell, Standard of Ohio (BP), Sun (Sunoco), Texaco (Chevron), Union (Chevron), Skelly

---

[143] *Id.* at 108, 110, 112.

[144] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, Supplement*, Stanford Rsch. Inst., 3 (June 1969), https://perma.cc/J5YU-SNZ7.

[145] NASA Goddard Inst. for Space Stud., *Global Mean CO2 Mixing Ratios (ppm): Observations*, https://perma.cc/QE9P-PNYY.

(Exxon), Colonial Pipeline (ownership has included BP, ExxonMobil, and Chevron entities, among others), Continental (ConocoPhillips), DuPont (former owner of Conoco), Phillips (ConocoPhillips), and Caltex (Chevron).[146]

70.     Among other Defendants, "Shell was actively supporting research that clearly underscored the dangers posed by burning its fossil fuel products from the mid-1970s."[147]

71.     In 1977, James Black of Exxon gave a presentation to Exxon executives on the "greenhouse effect," which was summarized in an internal memo the following year. Black reported that "[t]here is general scientific agreement that the most likely manner in which mankind is influencing the global climate is through carbon dioxide release from the burning of fossil fuels." He noted that "current [scientific] opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel consumption," and relayed that doubling atmospheric carbon dioxide would, according to the best climate model available, "produce a mean temperature increase of about 2°C to 3°C [3.6°F to 5.4°F] over most of the earth," with two to three times as much warming at the poles.[148] Black also reported that "[p]resent thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might

---

[146] Am. Petroleum Inst., *supra* note 109.

[147] Matthew Green, *Lost Decade: How Shell Downplayed Early Warnings Over Climate Change*, Desmog (Mar. 31, 2023), https://perma.cc/VBU3-YYPT.

[148] Memorandum from J.F. Black, Exxon Rsch. and Eng'g Co., to F.G. Turpin, Exxon Rsch. & Eng'g Co., *The Greenhouse Effect*, 2, 14, 23, 26 (June 6, 1978), https://perma.cc/9KUU-XUPH.

become critical."[149] Figure 4 below, reproduced from Black's memo, illustrates Exxon's understanding of the timescale and magnitude of global warming that its products would cause.

**Figure 4: Future Global Warming Predicted Internally by Exxon in 1977**[150]



72.    Also in 1977, Henry Shaw of the Exxon Research and Engineering Technology Feasibility Center attended a meeting of scientists and governmental officials in Atlanta, Georgia, on developing research programs to study carbon dioxide and global warming. Shaw's internal memo to Exxon's John W. Harrison reported that "[t]he climatic effects of carbon dioxide release may be the primary limiting factor on energy production from fossil fuels[.]"[151]

73.    In 1979, an internal Exxon memorandum stated, "The most widely held theory [about the increase in $CO_2$ concentration in the atmosphere] is that: The increase is due to fossil fuel combustion; [i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface; [and t]he present trend of fossil fuel consumption will cause dramatic environmental effects before the

---

[149] *Id.* at 3.

[150] *Id.* at 26. The company predicted global warming of 1°C to 3°C (1.8°F to 5.4°F) by 2050, with 10°C (18°F) warming in polar regions. The difference between the lower dashed and solid curves prior to 1977 represents global warming that Exxon believed may already have been occurring. *Id.*

[151] Memorandum from Henry Shaw to John W. Harrison, *Environmental Effects of Carbon Dioxide*, Climate Investigations Ctr. (Oct. 31, 1977), https://perma.cc/7TZD-N5XP.

year 2050. . . . The potential problem is great and urgent." The memo added that, if limits were not placed on fossil fuel production,

> Noticeable temperature changes would occur around 2010 as the [$CO_2$] concentration reaches 400 ppm. Significant climatic changes occur around 2035 when the concentration approaches 500 ppm. A doubling of the pre-industrial concentration [i.e., 580 ppm] occurs around 2050. The doubling would bring about dramatic changes in the world's environment[.][152]

Those projections proved remarkably accurate. Annual average atmospheric $CO_2$ concentrations surpassed 400 ppm in 2015 for the first time in millions of years.[153] And due to "committed warming"—the reality that future increases in global temperatures are caused by GHGs that have *already* been emitted—future warming is certain to occur even if all greenhouse gas emissions ceased today. Put differently, because GHGs can linger in the atmosphere for hundreds of years, there is a lag time between emissions on the one hand, and atmospheric GHG concentrations that lead to warming, on the other. Given this lag time, limiting the $CO_2$ concentration in the atmosphere to 440 ppm, or a 50% increase over preindustrial levels, which the Exxon memo said was "assumed to be a relatively safe level for the environment," would require fossil fuel emissions to peak in the 1990s and non-fossil energy systems to be rapidly deployed. Eighty percent of fossil fuel resources, the memo calculated, would have to be left in the ground to avoid doubling atmospheric carbon dioxide concentrations. Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[154]

74. But instead of disclosing to consumers any aspects of these research findings, in November 1979, according to internal correspondence, Exxon urged "a very aggressive defensive program in . . . atmospheric science and climate" to "anticipate the strong intervention of

---

[152] Memorandum from W.L. Ferrall, Exxon Rsch. and Eng'g Co. to Dr. R.L. Hirsch, *Controlling Atmospheric $CO_2$*, 1–2, 5 (Oct. 16, 1979), https://perma.cc/B4F3-NYTH.

[153] Nicola Jones, *How the World Passed a Carbon Threshold and Why It Matters*, Yale Env't 360 (Jan. 26, 2017), https://perma.cc/5WWJ-ZF3F.

[154] Ferrall, *supra* note 152, at 3, 6–7.

environmental groups."[155] It urged an expanded research effort to "prepare[] for, and [get] ahead of the government in making the public aware of pollution problems."[156]

75.     In 1979, API and its members, including Fossil Fuel Defendants, convened a task force to monitor and share cutting edge climate research among the oil industry. The group was initially called the $CO_2$ and Climate Task Force, but changed its name to the Climate and Energy Task Force in 1980 (hereinafter referred to as "Task Force"). API kept and distributed meeting minutes to Task Force members. Membership included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company, including Exxon, Mobil (Exxon), Amoco (BP), Phillips (ConocoPhillips), Texaco (Chevron), Shell, Sunoco, Sohio (BP), as well as Standard Oil of California (Chevron) and Gulf Oil (Chevron, among others). The Task Force was charged with assessing the implications of emerging science on the petroleum and gas industries and identifying where reductions in GHG emissions from fossil fuel products could be made.[157]

76.     In 1979, a paper prepared by API for the Task Force asserted that $CO_2$ concentrations were rising, and predicted that, although global warming would occur, it would likely go undetected until approximately the year 2000 because its effects were being temporarily masked by a natural cooling trend.[158]

77.     In 1980, the Task Force invited Dr. J.A. Laurman, a "recognized expert in the field of $CO_2$ and climate," to make a presentation to its members.[159] The meeting lasted for seven hours and included a "complete technical discussion" of global warming caused by fossil fuels, including "the scientific basis and technical evidence of $CO_2$ buildup, impact on society, methods of modeling and their consequences, uncertainties, policy implications, and conclusions that can be drawn from present knowledge."[160] Attendees to the presentation included scientists and

---

[155] Memorandum from H. Shaw to H.N. Weinberg, *Research in Atmospheric Science*, 1–2 (Nov. 19, 1979), https://perma.cc/G7GX-QECB.

[156] *Id.*

[157] Am. Petroleum Inst., *AQ-9 Task Force Meeting Minutes* (Mar. 18, 1980), https://perma.cc/36C9-DM7P.

[158] Memorandum from R. J. Campion to J. T. Burgess, *Comments on The API's Background Paper on $CO_2$ Effects* (Sept. 6, 1979), https://perma.cc/R7JJ-MT2S.

[159] Letter from J. J. Nelson, Am. Petroleum Inst. to AQ-9 Task Force, *The $CO_2$ Problem; Addressing Research Agenda Development*, 1–2 (Mar. 18, 1980), https://perma.cc/2SV2-T7R6.

[160] *Id.*

executives from API, Texaco (a predecessor to Chevron), Exxon, and SOHIO (a predecessor to BP), and the minutes of the meeting were distributed to the entire Task Force. Dr. Laurman's written presentation informed the Task Force that there was a "Scientific Consensus on the Potential for Large Future Climatic Response to Increased $CO_2$ Levels." He further informed the Task Force in his presentation that, though the exact temperature increases were difficult to predict, the "physical facts agree on the probability of large effects 50 years away." He warned the Task Force of a 2.5ºC (4.5ºF) global temperature rise by 2038, which would likely have "MAJOR ECONOMIC CONSEQUENCES," and a 5ºC (9ºF) rise by 2067, which would likely produce "GLOBALLY CATASTROPHIC EFFECTS." He also suggested that, despite uncertainty in climate modeling, "THERE IS NO LEEWAY" in the time for acting.

78.     At this presentation, API minutes show that the Task Force discussed topics including "the technical implications of energy source changeover" and "ground rules for energy release of fuels and the cleanup of fuels as they relate to $CO_2$ creation." The Task Force also discussed a potential area for investigation: alternative energy sources as a means of mitigating $CO_2$ emissions from fossil fuel products. These efforts called for research and development to "Investigate the Market Penetration Requirements of Introducing a New Energy Source into World Wide Use," including the technical implications of energy source changeover.[161] The Task Force even asked the question "what is the 50 year future of fossil fuels?"[162]

79.     In 1980, a Canadian Esso (Exxon) company report sent to managers and staff at affiliated Esso and Exxon companies stated that there was "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere, and that "[t]echnology exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost of power generation."[163]

---

[161] *Id.*

[162] *Id.* at 3.

[163] Imperial Oil Ltd., *Review of Environmental Protection Activities for 1978–1979*, 2 (Aug. 6, 1980), https://perma.cc/AK7D-BEBL.

80.     In December 1980, an Exxon manager distributed a memorandum on the "$CO_2$ Greenhouse Effect" attributing future buildup of carbon dioxide to fossil fuel use, and explaining that internal calculations indicated that atmospheric carbon dioxide could double by around 2060, "most likely" resulting in global warming of approximately $3.0 \pm 1.5°C$ (2.7 to 8.1°F).[164] Calculations predicting a lower temperature increase, such as 0.25°C (0.45°F), were "not held in high regard by the scientific community[.]" The memo also reported that such global warming would cause "increased rainfall[] and increased evaporation," which would have a "dramatic impact on soil moisture, and in turn, on agriculture" and other "serious global problems[.]" The memo called for "society" to pay the bill, estimating that some adaptive measures would cost no more than "a few percent" of gross national product.[165] Shaw also reported that Exxon had studied various responses for avoiding or reducing a carbon dioxide build-up, including "stopping all fossil fuel combustion at the 1980 rate" and "investigat[ing] the market penetration of non-fossil fuel technologies." The memo estimated that such non-fossil energy technologies "would need about 50 years to penetrate and achieve roughly half of the total [energy] market."[166] The memo included Figure 5 below, which illustrates global warming anticipated by Exxon as well as the company's understanding that significant global warming would occur before exceeding the range of natural variability.

---

[164] Memorandum from Henry Shaw to T.K. Kett, *Exxon Research and Engineering Company's Technological Forecast: CO₂ Greenhouse Effect*, 3 (Dec. 18, 1980), https://perma.cc/22P8-W4V3.

[165] *Id.* at 3–5.

[166] *Id.* at 5–6.



**Figure 5: Future Global Warming Predicted Internally by Exxon in 1980**[167]

81.     In February 1981, Exxon's Contract Research Office prepared and distributed a "Scoping Study on $CO_2$" to the leadership of Exxon Research and Engineering Company.[168] The study reviewed Exxon's carbon dioxide research and considered whether to expand its research on carbon dioxide or global warming further. It recommended against expanding those research areas because Exxon's current research programs were sufficient for achieving the company's goals of closely monitoring federal research, building credibility and public relations value, and developing in-house expertise regarding $CO_2$ and global warming, and noted that Exxon employees were actively monitoring and keeping the company apprised of outside research developments, including those on climate modeling and "$CO_2$-induced effects." In discussing "options for reducing $CO_2$ build-up in the atmosphere," the study noted that although capturing $CO_2$ from flue gases (i.e., exhaust gas produced by combustion) was technologically possible, the cost was high,

---

[167] *Id.* at 13. The company anticipated a doubling of carbon dioxide by around 2060 and that the oceans would delay the warming effect by a few decades, leading to approximately 3°C (5.4°F) warming by the end of the century.

[168] Letter from G.H. Long, Exxon Rsch. & Eng'g Co., to P.J. Lucchesi et al., *Atmospheric $CO_2$ Scoping Study* (Feb. 5, 1981), https://perma.cc/Y79X-CWAL.

and "energy conservation or shifting to renewable energy sources[] represent the only options that might make sense."[169]

82.     Exxon scientist Roger Cohen warned his colleagues in a 1981 internal memorandum that "future developments in global data gathering and analysis, along with advances in climate modeling, may provide strong evidence for a delayed $CO_2$ effect of a truly substantial magnitude," and that under certain circumstances it would be "very likely that we will unambiguously recognize the threat by the year 2000."[170] Cohen had expressed concern that the memorandum understated the potential effects of reckless $CO_2$ emissions from fossil fuel products, saying, "it is distinctly possible" that $CO_2$ emissions "will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)."[171]

83.     Also in 1981, Exxon's Henry Shaw, the company's lead climate researcher at the time, prepared a summary of Exxon's current position on the greenhouse effect for Edward David Jr., president of Exxon Research and Engineering Company, stating in relevant part:

- "Atmospheric $CO_2$ will double in 100 years if fossil fuels grow at 1.4% [per year].
- $3^{\circ}C$ global average temperature rise and $10^{\circ}C$ at poles if $CO_2$ doubles.
  - Major shifts in rainfall/agriculture
  - Polar ice may melt"[172]

84.     Thus, by 1981, Exxon and other fossil fuel companies knew $CO_2$ accumulation in the atmosphere from fossil fuel consumption would lead to global warming, were actively monitoring all aspects of $CO_2$ and global warming research, and recognized that a shift away from fossil fuels and towards renewable energy sources would be necessary to avoid a large $CO_2$ buildup in the atmosphere and resultant global warming.

85.     In 1982, another API-commissioned report showed the average increase in global temperature from a doubling of atmospheric concentrations of $CO_2$ and projected, based upon

---

[169] *Id.* at 13.

[170] Memorandum from R.W. Cohen to W. Glass (Aug. 18, 1981), https://perma.cc/SR32-7UB6.

[171] *Id.*

[172] Memorandum from Henry Shaw to Dr. E. E. David, Jr., *CO₂ Position Statement* (May 15, 1981), https://perma.cc/U7A5-YTLG.

computer modeling, global warming of between 2ºC and 3.5ºC [3.6ºF to 6.3ºF]. The report projected potentially "serious consequences for man's comfort and survival," and noted that "the height of the sea level can increase considerably."[173] Exxon's own modeling research confirmed this.[174] In a 1982 internal memorandum, Exxon's Corporate Research and Science Laboratories acknowledged a "clear scientific consensus," based on computer modeling, that "a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$ºC [2.7ºF to 8.1ºF]."[175] The memo continued: "There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere."

86.    Also in 1982, Exxon's Environmental Affairs Manager distributed a primer on climate change to a "wide circulation [of] Exxon management . . . intended to familiarize Exxon personnel with the subject."[176] The primer also was "restricted to Exxon personnel and not to be distributed externally."[177] The primer compiled science on climate change available at the time, and confirmed fossil fuel combustion as a primary anthropogenic contributor to global warming. The primer included the original version of Figure 6 below, which estimated a $CO_2$ doubling around 2090 based on Exxon's long-range modeled outlook. The primer warned that the melting of the Antarctic ice sheet could result in global sea level rise of five feet which would "cause flooding on much of the U.S. East Coast, including the State of Florida and Washington, D.C."[178] Indeed, it warned that "there are some potentially catastrophic events that must be considered,"

---

[173] Am. Petroleum Inst., *Climate Models and CO₂ Warming: A Selective Review and Summary*, 3–5 (Mar. 1982), https://perma.cc/2ZDX-QMTX.

[174] *See* Memorandum from Roger W. Cohen, Exxon Rsch. & Eng'g Co., to A.M. Natkin, Off. of Sci. & Tech., Exxon Corp. (Sept. 2, 1982), https://perma.cc/5JSE-GBNS

[175] *Id.* at 1.

[176] Memorandum from M. B. Glaser to R.W. Cohen et al., *CO₂ "Greenhouse" Effect*, Exxon Rsch. & Eng'g Co. (Nov. 12, 1982), https://perma.cc/3FRQ-5WX9.

[177] *Id.*

[178] *Id.* at 13.

including sea level rise from melting polar ice sheets. It noted that some scientific groups were concerned "that once the effects are measurable, they might not be reversible."[179]



**Figure 6: Exxon's Internal Prediction of Future $CO_2$ Increase and Global Warming from 1982**[180]

---

[179] *Id.* at 2.

[180] G. Supran et al., *Assessing ExxonMobil's Global Warming Projections*, 379 SCI. 153 (Jan. 13, 2023), https://perma.cc/ZB6B-8KVU. Exxon predicted a doubling of atmospheric carbon dioxide concentrations above

The primer recommended studying "soil erosion, salinization, or the collapse of irrigation systems" in order to understand how society might be affected and might respond to global warming, as well as "[h]ealth effects" and "stress associated with climate related famine or migration[.]"[181] The primer again estimated that undertaking "[s]ome adaptive measures" (not all of them) would cost "a few percent of the gross national product estimated in the middle of the next century" (gross national product was $27.820 trillion in 2023).[182] To avoid such impacts, the primer discussed a scientific analysis which studied energy alternatives and requirements for introducing them into widespread use, and which recommended that "vigorous development of non-fossil energy sources be initiated as soon as possible."[183] The primer also noted that the analysis indicated that other GHGs related to fossil fuel production, such as methane (which is a more powerful GHG than $CO_2$), "may significantly contribute to a global warming," and that concerns over $CO_2$ would be reduced if fossil fuel use were decreased due to "high price, scarcity, [or] unavailability."[184] "Mitigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion," the primer stated.[185] The primer was widely distributed to Exxon leadership.

87.    In September 1982, the Director of Exxon's Theoretical and Mathematical Sciences Laboratory, Roger Cohen, wrote Alvin Natkin of Exxon's Office of Science and Technology to summarize Exxon's internal research on climate modeling.[186] Cohen reported:

> [O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$. The consensus is that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)°C$ [$(2.7$ to $8.1)°F$]. . . . The temperature rise is predicted to be distributed nonuniformly over the earth, with above-average temperature elevations in the polar regions and relatively small increases near the

---

preindustrial levels by around 2090 (left curve), with a temperature increase of more than 2°C (3.6°F) over the 1979 level (right curve). *Id.*

[181] Glaser, *supra* note 176, at 14.

[182] *Id.*; *see* Fed. Reserve Bank of St. Louis, *Gross National Product* (updated Mar. 30, 2023), https://perma.cc/A8VK-MED9.

[183] Glaser, *supra* note 176, at 18.

[184] *Id.* at 18, 29.

[185] *Id.* at 2.

[186] Cohen, *supra* note 174, at 1−2.

equator. There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations of the biosphere. The time required for doubling of atmospheric $CO_2$ depends on future world consumption of fossil fuels.

Cohen described Exxon's own climate modeling experiments, reporting that they produced "a global averaged temperature increase that falls well within the range of the scientific consensus," were "consistent with the published predictions of more complex climate models," and were "also in agreement with estimates of the global temperature distribution during a certain prehistoric period when the earth was much warmer than today." "In summary," Cohen wrote, "the results of our research are in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate."

88.      In October 1982, at the fourth biennial Maurice Ewing Symposium at the Lamont-Doherty Geophysical Observatory, Exxon Research and Engineering Company's President E.E. David, Jr. delivered a speech titled, "Inventing the Future: Energy and the $CO_2$ 'Greenhouse Effect.'"[187] His remarks included the following statement: "[i]t is ironic that the biggest uncertainties about the $CO_2$ buildup are not in predicting what the climate will do, but in predicting what people will do."[188]

89.      Throughout the early 1980s, at Exxon's direction, Exxon climate scientist Henry Shaw forecasted emissions of $CO_2$ from fossil fuel use. Those estimates were incorporated into Exxon's twenty-first century energy projections and were distributed among Exxon's various divisions. Shaw's conclusions included an expectation that atmospheric $CO_2$ concentrations would double in 2090 per the Exxon model, with an attendant 2.3°C to 5.6°C (4.1°F to 10.1°F) average global temperature increase.[189]

---

[187] Dr. E.E. David, Jr., President, Exxon Rsch. & Eng'g Co., Remarks at the Fourth Annual Ewing Symposium, Tenafly, NJ, ClimateFiles (Oct. 26, 1982), https://perma.cc/46A6-5524.

[188] *Id.* at 4.

[189] Neela Banerjee, *More Exxon Documents Show How Much It Knew About Climate 35 Years Ago*, Inside Climate News (Dec. 1, 2015), https://perma.cc/W25H-KNS8.

90. During the 1980s, many Fossil Fuel Defendants formed their own research units focused on climate modeling. API, including the Task Force, provided a forum for Fossil Fuel Defendants to share their research efforts and corroborate their findings related to anthropogenic GHG emissions.[190]

91. During this time, Fossil Fuel Defendants' statements expressed an understanding of their obligation to consider and mitigate the externalities of reckless promotion, marketing, and consumption of their fossil fuel products. For example, in 1988, Richard Tucker, the president of Mobil Oil, a predecessor of Exxon, presented at the American Institute of Chemical Engineers National Meeting, the premier educational forum for chemical engineers, where he stated:

> [H]umanity, which has created the industrial system that has transformed civilization, is also responsible for the environment, which sometimes is at risk because of unintended consequences of industrialization. . . . Maintaining the health of this life-support system is emerging as one of the highest priorities. . . . [W]e must all be environmentalists.
>
> The environmental covenant requires action on many fronts . . . the low-atmosphere ozone problem, the upper-atmosphere ozone problem and the greenhouse effect, to name a few. . . . Our strategy must be to reduce pollution before it is ever generated—to prevent problems at the source.
>
> Prevention means engineering a new generation of fuels, lubricants and chemical products. . . . Prevention means designing catalysts and processes that minimize or eliminate the production of unwanted byproducts. . . . Prevention on a global scale may even require a dramatic reduction in our dependence on fossil fuels—and a shift towards solar, hydrogen, and safe nuclear power. It may be possible that—just possible—that the energy industry will transform itself so completely that observers will declare it a new industry. . . . Brute force, low-tech responses and money alone won't meet the challenges we face in the energy industry.[191]

92. In 1987, Shell published an internal "brief for companies of the Royal Dutch/Shell Group" titled "Air pollution: an oil industry perspective." In this report, the company described the greenhouse effect as occurring "largely as a result of burning fossil fuels and deforestation."[192]

---

[190] Neela Banerjee, *Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too*, Inside Climate News (Dec. 22, 2015), https://perma.cc/BZQ8-8KG7.

[191] Richard E. Tucker, *High Tech Frontiers in the Energy Industry: The Challenge Ahead*, AIChE National Meeting, 523 (Nov. 30, 1988), https://perma.cc/LA2Z-BH3V.

[192] Shell Briefing Serv., *Air pollution: An Oil Industry Perspective*, 1 SBS 4 (1987), https://perma.cc/W5AQ-SV8Q.

Shell further acknowledged the "concern that further increases in carbon dioxide levels could cause climatic changes, notably a rise in overall temperature, having major environmental, social and economic consequences."[193]

93.      In 1988, the Shell Greenhouse Effect Working Group issued a confidential internal report, "The Greenhouse Effect," which acknowledged global warming's anthropogenic nature: "Man-made carbon dioxide, released into and accumulated in the atmosphere, is believed to warm the earth through the so-called greenhouse effect." The authors also noted the burning of fossil fuels as a primary driver of $CO_2$ buildup and warned that warming could "create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather." They further pointed to the potential for "direct operational consequences" of sea level rise on "offshore installations, coastal facilities and operations (e.g., platforms, harbors, refineries, depots)."[194]

94.      Similar to early warnings by Exxon scientists, the 1988 Shell report noted that "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation." The authors mentioned the need to consider policy changes on multiple occasions, noting that "the potential implications for the world are . . . so large that policy options need to be considered much earlier" and that research should be "directed more to the analysis of policy and energy options than to studies of what we will be facing exactly."[195]

95.      Fossil Fuel Defendants also meticulously examined plausible scenarios if they failed to act in the face of their internal knowledge. For instance, Shell evaluated in a 1989 internal confidential planning document the issue of "climate change – the greenhouse effect, global warming," which the document identified as "the most important issue for the energy industry."[196] The document compared a scenario in which society "addresses the potential problem" with one

---

[193] *Id.* at 5.
[194] Shell Internationale Petroleum, Greenhouse Effect Working Group, *The Greenhouse Effect*, 1, 27 (May 1988), https://perma.cc/Z2JR-9YT7.
[195] *Id.* at 1, 6.
[196] Shell, *Scenarios 1989–2010: Challenge and Response*, 33 (Oct. 1989), https://perma.cc/Y8WA-Y28C.

71

in which it does not. Acknowledging that "[c]hanging emission levels . . . and changing atmospheric $CO_2$ concentration has been likened to turning around a VLCC [very large crude carrier]," even "substantial efforts" by 2010 would have "hardly any impact on $CO_2$ concentration." In later years, however, the impacts are "strikingly different;" early efforts "will not prevent the problem arising, but … could mitigate the problem." The document described the consequences of failing to address the problem right away:

> These seem small changes but they mask more dramatic temperature changes which would take place at temperate latitudes. There would be more violent weather – more storms, more droughts, more deluges. Mean sea level would rise at least 30 cm. Agricultural patterns would be most dramatically changed. Something as simple as a moderate change in rainfall pattern disrupts eco-systems, and many species of trees, plants, animals and insects would not be able to move and adapt.
>
> The changes would, however, most impact on humans [sic]. In earlier times, man was able to respond with his feet. Today, there is no place to go because people already stand there. Perhaps those in industrial countries could cope with a rise in sea level (the Dutch examples) but for poor countries such defences are not possible. The potential refugee problem … could be unprecedented. Africans would push into Europe, Chinese into the Soviet Union, Latins into the United States, Indonesians into Australia. Boundaries would count for little – overwhelmed by the numbers. Conflicts would abound. Civilization could prove a fragile thing. The logic of [reducing emissions] is a society choosing to channel some investments into environmental maintenance against this contingency [197]

96.    In another 1989 confidential internal planning document, Shell anticipated that "public/media pressures" to "adopt[] environmental programmes" such as "much tighter targets for $CO_2$ emissions" could prompt "effective consumer responses" that "will lead to intense and unpredictable pressures on business."[198] The scenario envisioned that "[c]oncerns about global warming and depletion will depress production of fossil fuels, their market share declining as renewables are actively promoted," given that "[w]here there can be real consumer choice it will be a dominant force, especially where interest is heightened by obvious environmental impact."[199]

---

[197] *Id.* at 35–36.
[198] *See* Shell UK, *UK Scenarios 1989*, 31, 34 (Nov. 1989), https://perma.cc/6BZP-YEK7.
[199] *Id.* at 34.

97.     In yet another scenario published in a 1998 internal report, Shell paints an eerily prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the U.S. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry or the government. After all, two successive IPCC reports since 1993 have reinforced the human connection to climate change . . . Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[200]

98.     In a 1997 speech at Stanford University, John Browne, Group Executive for BP America, noted that "there is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature."[201]

99.     Climate change research conducted by Fossil Fuel Defendants and their industry associations frequently acknowledged uncertainties in their climate modeling. Those uncertainties, however, were largely with respect to the magnitude and timing of climate impacts resulting from fossil fuel consumption, not with respect to whether significant changes would eventually occur. Fossil Fuel Defendants' researchers and the researchers at their industry associations harbored little doubt that climate change was occurring and that fossil fuel products were, and are, the primary cause. As Ken Croasdale, a senior researcher for Exxon's subsidiary Imperial Oil, stated

---

[200] Royal Dutch/Shell Group, *The Group of the Future and the Group Scenarios 1998–2020 Report*, 115, 118 (1998), https://perma.cc/6C6L-EA7J.

[201] John Browne, *BP Climate Change Speech to Stanford*, ClimateFiles (May 19, 1997), https://perma.cc/6D53-KQT2.

to an audience of engineers in 1991, GHGs are rising "due to the burning of fossil fuels. Nobody disputes this fact."[202]

    **C.    Despite Their Early Knowledge of Real and Severe Harm Posed by the Consumption of Fossil Fuel Products, Defendants Affirmatively Acted to Obscure Those Harms and Engaged in a Campaign to Deceptively Protect and Expand the Use of Fossil Fuel Defendants' Fossil Fuel Products.**

100.    Despite the overwhelming evidence about the threats to people and the planet posed by continued use of fossil fuel products amassed leading up to and throughout the 1980s, Defendants failed to act reasonably to mitigate or avoid those dire adverse impacts. Defendants instead dismissed and devalued the safety of the public and the planet, including the State and its residents, and continued their unfettered pursuit of profits from Fossil Fuel Defendants' fossil fuel products—including by intentionally misleading and deceiving the public regarding these threats.

101.    Exxon has all but admitted to these decisions. In a secretly recorded video from 2021, an Exxon executive stated:

> Did we aggressively fight against some of the science? Yes.
> Did we join some of these shadow groups to work against some of the early efforts? Yes, that's true. There's nothing illegal about that.
> We were looking out for our investments. We were looking out for our shareholders.[203]

102.    On notice that fossil fuel products were causing global climate change and dire effects on the planet, Defendants could and should have issued reasonable warnings to consumers and the public of the known dangers of consuming fossil fuel products. Instead, Defendants engaged in advertising and communications campaigns—through media including but not limited to radio, television, print, and online advertising—intended to promote consumer demand for Fossil Fuel Defendants' fossil fuel products by downplaying the harms and risks of climate change. Initially, the campaigns tried to show that global warming was not occurring. More recently, the campaigns have sought to minimize the risks and harms from climate change. The deception

[202] Sara Jerving et al., *Special Report: What Exxon Knew About the Earth's Melting Arctic*, L.A. Times (Oct. 9, 2015), https://perma.cc/7NNH-9QSY.

[203] Jeff Brady, *Exxon Lobbyist Caught on Video Talking About Undermining Biden's Climate Push*, NPR (July 1, 2021, 11:37 AM ET), https://perma.cc/MAZ7-TLG4.

campaigns have had the purpose and effect of inflating and sustaining the market for fossil fuels, which—in turn—drove up GHG emissions, accelerated global warming, delayed the energy economy's transition to a lower-carbon future, and brought about climate change harms to Hawai'i. These effects are ongoing and continue to worsen in the State due to Defendants' conduct.

103. Defendants' conduct was and is an abdication and contravention of their responsibility to consumers and the public, including the State and its residents, to act on their unique knowledge of the reasonably foreseeable hazards of reckless production and promotion of fossil fuel products. Had Defendants acted responsibly to issue reasonable warnings instead of engaging in a disinformation campaign, consumers would have acted sooner and faster to reduce their fossil fuel consumption and stimulate demand for non-carbon energy alternatives whose use does not imperil the Earth. This process is now underway, but was wrongfully delayed and is still being slowed by Defendants' deception and continued downplaying of the reality and severity of climate change—and of fossil fuels' role in causing it.

104. Several key events between 1988 and 1992 prompted Defendants to pivot from researching and discussing climate change internally to affirmatively deceiving consumers and the public about the climatic dangers of fossil fuels. As climate change—and the role of fossil fuels in causing it—became an increasingly prominent concern, Defendants realized that accurate consumer and public understanding of the dangers of fossil fuels would pose a paramount threat to Fossil Fuel Defendants' business models, their assets, and their profits. Key events that precipitated the shift from research to deception included the following:

a. In 1988, National Aeronautics and Space Administration ("NASA") scientists confirmed that human activities were contributing to global warming.[204] On June 23 of that year, NASA scientist James Hansen's presentation of this information to Congress engendered significant news coverage and publicity for the announcement, including coverage on the front page of *The New York Times*.

---

[204] *See* Peter C. Frumhoff et al., *The Climate Responsibilities of Industrial Carbon Producers*, 132 Climatic Change 157, 161 (2015), https://perma.cc/QKA6-VBXP.

b.      On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors introduced S. 2666, "The Global Environmental Protection Act," to regulate $CO_2$ and other GHGs. Three more bipartisan bills to significantly reduce $CO_2$ pollution were introduced over the following ten weeks, and in August, U.S. Presidential candidate George H.W. Bush pledged that his presidency would combat the greenhouse effect with "the White House effect."[205] Political will in the United States to reduce anthropogenic GHG emissions and mitigate the harms associated with Fossil Fuel Defendants' fossil fuel products was gaining momentum.

c.      In December 1988, the United Nations formed the IPCC, a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

d.      In 1990, the IPCC published its First Assessment Report on anthropogenic climate change,[206] which concluded that (1) "there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be," and (2) that

> emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapour, will increase in response to global warming and further enhance it.[207]

The IPCC reconfirmed those conclusions in a 1992 supplement to the First Assessment Report.[208]

e.      The United Nations held the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of 172 world governments, of which 116 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change ("UNFCCC"), an international, environmental treaty providing protocols for future negotiations

---

[205] N.Y. Times Editorial Board, *The White House and the Greenhouse*, N.Y. Times (May 9, 1989), https://perma.cc/4NSN-KS2D.

[206] *See* IPCC, *Reports*, ipcc.ch/reports (last visited Nov. 14, 2024).

[207] IPCC, *Policymaker Summary of Working Group I (Scientific Assessment of Climate Change), in Climate Change: The IPCC 1990 and 1992 Assessments*, 63 (1990), https://perma.cc/2LZV-MV7J.

[208] IPCC, *1992 IPCC Supplement, in Climate Change: The IPCC 1990 and 1992 Assessments* (1992), https://perma.cc/2LZV-MV7J.

aimed at "stabiliz[ing] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."[209]

105.    To perpetuate and maximize dependence on fossil fuel products, Defendants embarked on a decades-long series of disinformation campaigns designed to stymie consumer and public understanding of climate change and the role of fossil fuel consumption in causing it.

106.    Defendants' campaigns focused on concealing, discrediting, and/or misrepresenting information that tended to support decreasing consumption of fossil fuels, thereby preserving and inflating demand for Fossil Fuel Defendants' products and staving off the transition to a lower-carbon economy. The campaigns enabled Fossil Fuel Defendants to accelerate their business practice of exploiting fossil fuel reserves and to concurrently externalize the social and environmental costs of fossil fuel products. Those activities directly contradicted Defendants' internal recognition that the science of anthropogenic climate change was clear and that consumption of fossil fuels would result in dire consequences for the planet and states like Hawai'i.

107.    In 1988, Joseph Carlson, an Exxon public affairs manager, stated in an internal memo that Exxon "is providing leadership through API in developing the petroleum industry position" on "the greenhouse effect."[210] He then went on to describe the "Exxon Position," which included two important messaging tenets among others: (1) "[e]mphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse Effect"; and (2) "[r]esist the overstatement and sensationalization [sic] of potential greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."[211]

108.    Also in 1988 and a few months after NASA scientist James Hansen's presentation to Congress, Frank Sprow, Exxon's head of corporate research, sent a memo to Exxon colleagues warning that "[i]f a worldwide consensus emerges that action is needed to mitigate against Greenhouse gas effects, substantial negative impacts on Exxon could occur." Sprow continued,

---

[209] United Nations, *United Nations Framework Convention on Climate Change*, art. 2 (1992), https://perma.cc/59UX-HCZ3.
[210] Memorandum from Joseph M. Carlson, *The Greenhouse Effect*, 2, 7 (Aug. 3, 1988), https://perma.cc/GHC9-NM2E.
[211] *Id.* at 7–8.

"[a]ny additional R&D efforts within Corporate Research on Greenhouse should have two primary purposes: 1. Protect the value of our resources (oil, gas, coal). 2. Preserve Exxon's business options." According to *The Wall Street Journal*, Sprow stated in an interview that this memo was adopted by Exxon as policy.[212]

109.    Reflecting on his time as an Exxon consultant in the 1980s, Professor Martin Hoffert, a former New York University physicist who researched climate change, expressed regret over Exxon's "climate science denial program campaign" in his sworn testimony before Congress:

> [O]ur research [at Exxon] was consistent with findings of the United Nations Intergovernmental Panel on Climate Change on human impacts of fossil fuel burning, which is that they are increasingly having a perceptible influence on Earth's climate. . . . If anything, adverse climate change from elevated $CO_2$ is proceeding faster than the average of the prior IPCC mild projections and fully consistent with what we knew back in the early 1980's at Exxon. . . . I was greatly distressed by the climate science denial program campaign that Exxon's front office launched around the time I stopped working as a consultant—but not collaborator—for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[213]

110.    Likewise, Shell "shaped a series of influential industry-backed publications that downplayed or omitted key risks; emphasized scientific uncertainties; and pushed for more fossil fuels, particularly coal."[214] In 1992, for instance, Shell had released a publication for wide external distribution purporting to describe the "Basic Scientific Facts" of the "Potential Augmented Greenhouse Effect."[215] This document downplayed the scientific consensus (that Shell internally acknowledged) by referring to the "relatively few established scientific fundamentals" regarding the causes of climate change.[216] It also misleadingly suggested that a "particular cause" of climate

---

[212] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, The Wall Street J. (Sept. 14, 2023, 5:30 AM ET), https://perma.cc/9BQ4-UN3C.

[213] *Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change, Hearing Before the Subcomm. on Civil Rights and Civil Liberties of the Comm. on Oversight and Reform*, 116th Cong. 7–8 (Oct. 23, 2019) (statement of Martin Hoffert, Former Exxon Consultant, Professor Emeritus, Physics, New York University), https://perma.cc/6E4K-EERL.

[214] Green, *supra* note 147.

[215] Jan Kuyper, *Potential Augmented Greenhouse Effect, & Depletion of the Ozone Layer*, Shell Grp. 3 (Sept. 1992), https://perma.cc/SM9A-FDAD.

[216] *Id.* at 5.

change was "difficult" to identify, even though Shell had identified the use of its products as a significant contributor to the greenhouse effect in the previous decade.[217] For example, in 1985, a Shell UK environmental scientist published an article laying out the scientific fact that "[b]urning of fossil fuels which have taken millions of years to form has effectively upset the balance [of the Carbon Cycle] leading to an increase in $CO_2$ in the atmosphere."[218]

111. A 1994 Shell report entitled "The Enhanced Greenhouse Effect: A Review of the Scientific Aspects" similarly emphasized scientific uncertainty, falsely stating, for example, that "the postulated link between any observed temperature rise and human activities has to be seen in relation to natural variability, which is still largely unpredictable."[219]

112. In 1996, API published an extensive report that denied the human connection to climate change by falsely stating that "no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms." [220]

113. In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." In the publication's preface, Exxon CEO Lee Raymond inaccurately stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." The publication described the greenhouse effect as "unquestionably real and definitely a good thing," while ignoring the severe consequences that would result from the influence of the increased $CO_2$ concentration on the Earth's climate. Instead, it falsely characterized the greenhouse effect as simply "what makes the earth's atmosphere livable." Directly contradicting Exxon's own internal knowledge and peer-reviewed science, the publication misleadingly ascribed the rise in temperature since the late nineteenth century to "natural fluctuations that occur over long periods

---

[217] *Id.*

[218] T.G. Wilkinson, *Why and How to Control Energy Pollution: Can Harmonisation Work?,* 8 Conservation & Recycling 7, 19 (1985), https://perma.cc/6ZCB-ACTP.

[219] P. Langcake, Shell Internationale Petroleum, *The Enhanced Greenhouse Effect: A Review of the Scientific Aspects*, 9 (Dec. 1994), https://perma.cc/FM7F-U8ZP.

[220] Sally Gentille et al., *Reinventing Energy: Making the Right Choices*, Am. Petroleum Inst., 63 (1996), https://perma.cc/J63S-RLSW.

of time" rather than to the anthropogenic emissions that Exxon itself and other scientists had confirmed were responsible. The publication also falsely challenged the computer models that projected the future impacts of fossil fuel product consumption, including those developed by Exxon's own employees, as having been "proved to be inaccurate." The publication contradicted the numerous reports prepared by and circulated among Exxon's staff, and by API, stating that "the indications are that a warmer world would be far more benign than many imagine . . . moderate warming would reduce mortality rates in the US, so a slightly warmer climate would be more healthful." Raymond concluded his preface by criticizing the basis for reducing consumption of his company's fossil fuel products as "drawing on bad science, faulty logic, or unrealistic assumptions"—despite the important role that Exxon's own scientists had played in compiling those same scientific underpinnings.[221]

114. Imperial Oil (Exxon) CEO Robert Peterson falsely denied the established connection between Fossil Fuel Defendants' fossil fuel products and anthropogenic climate change in the Summer 1998 Imperial Oil Review, "A Cleaner Canada":

> [T]his issue [referring to climate change] has absolutely nothing to do with pollution and air quality. Carbon dioxide is not a pollutant but an essential ingredient of life on this planet. . . . [T]he question of whether or not the trapping of 'greenhouse' gases will result in the planet's getting warmer . . . has no connection whatsoever with our day-to-day weather.
>
> There is absolutely no agreement among climatologists on whether or not the planet is getting warmer, or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate. . . . I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[222]

115. Exxon paid for a series of "advertorials," advertisements located in the editorial section of *The New York Times* and meant to look like editorials rather than paid ads. These ads discussed various aspects of the public discussion of climate change and sought to undermine the justifications for tackling GHG emissions as unsettled science. For example, the 1993 Mobil

---

[221] Exxon Corp., *Global Warming: Who's Right?* (1996), https://perma.cc/77FT-9AKV.
[222] Robert Peterson, *A Cleaner Canada*, Imperial Oil Rev. 29 (1998), https://perma.cc/29RV-PXJU.

advertorial below argued that "what's wrong with so much of the global warming rhetoric" is "[t]he lack of solid scientific data," and quoted a purportedly neutral scientific expert who insisted that "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."[223] It also quoted another purportedly neutral scientist who asserted that "the net impact [of a modest warming] may yet be beneficial."

---

[223] Mobil, *Apocalypse No*, N.Y. Times, A19 (Feb. 25, 1993), https://perma.cc/MGA5-W43N.

# Apocalypse no

For the first half of 1992, America was inundated by the media with dire predictions of global warming catastrophes, all of which seemed to be aimed at heating up the rhetoric from the Earth Summit in Rio de Janeiro last June.

Unfortunately, the media hype proclaiming that the sky was falling did not properly portray the consensus of the scientific community. After the Earth Summit, there was a noticeable lack of evidence of the sky actually falling and subsequent colder than normal temperatures across the country cooled the warming hysteria as well.

Everybody, of course, remembers the Earth Summit and the tons of paper used up in reporting on it—paper now buried in landfills around the world. But few people ever heard of a major document issued at the same time and called the "Heidelberg Appeal." The reason? It just didn't make "news."

Perhaps that is because the Appeal urged Summit attendees to avoid making important environmental decisions based on "pseudo-scientific arguments or false and non-relevant data."

The Heidelberg Appeal was issued initially by some 264 scientists from around the world, including 52 Nobel Prize winners. Today, the Appeal carries the signatures of more than 2,300 scientists—65 of them Nobel Prize winners—from 79 countries. If nothing else, its message is illustrative of what's wrong with so much of the global warming rhetoric. The lack of solid scientific data.

Scientists can agree on certain facts pertaining to global warming. First, the greenhouse effect is a natural phenomenon; it accounts for the moderate temperature that makes our planet habitable. Second, the concentration of greenhouse gases (mainly carbon dioxide) has increased and there has been a slight increase in global temperatures over the past century. Finally, if present trends continue, carbon dioxide levels will double over the next 50 to 100 years.

Controversy arises when trying to link past changes in temperatures to increased concentrations of greenhouse gases. And it arises again when climate prediction models are used to conclude Earth's temperature will climb drastically in the next century and—based on such models—to propose policy decisions that could drastically affect the economy.

According to Arizona State University climatologist Dr. Robert C. Balling in his book, *The Heated Debate* (San Francisco: Pacific Research Institute for Public Policy, 1992), until knowledge of the interplay between oceans and the atmosphere improves, "model predictions must be treated with considerable caution." Moreover, models don't simulate the complexity of clouds, nor do they deal adequately with sea ice, snow or changes in intensity of the sun's energy.

And they don't stand up to reality testing. Comparing actual temperatures over the last 100 years against model calculations, the models predicted temperature increases higher than those that actually occurred. Moreover, most of the earth's temperature increase over the last century occurred before 1940. Yet, the real build-up in man-made $CO_2$ didn't occur until after 1940. Temperatures actually fell between 1940 and 1970.

Sifting through such data, Dr. Balling has concluded, "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."

Other scientists have an even more interesting viewpoint. Notes atmospheric physicist S. Fred Singer, president of the Washington, D.C.-based Science & Environmental Policy Project, "the net impact [of a modest warming] may well be beneficial."

All of which would seem to suggest that the jury's still out on whether drastic steps to curb $CO_2$ emissions are needed. It would seem that the phenomenon—and its impact on the economy—are important enough to warrant considerably more research before proposing actions we may later regret.

Perhaps the sky isn't falling, after all.



**Figure 7: 1993 Mobil Advertorial**

82

The first of those purportedly neutral scientific experts, Robert C. Balling, acknowledged five years after the advertorial ran that he had received $408,000 in research funding from the fossil fuel industry over the past decade, including from Exxon.[224] The second, S. Fred Singer, was not a climatologist, and had previously been funded by tobacco companies to spread doubt about the scientific claim that exposure to second-hand smoke causes cancer.[225]

116. Many other Exxon advertorials falsely or misleadingly characterized the state of climate science research to the readership of *The New York Times*' op-ed page. A sample of these untruthful statements includes:

- "We don't know enough about the factors that affect global warming and the degree to which—if any—that man-made emissions (namely, carbon dioxide) contribute to increases in Earth's temperature."[226]

- "[G]reenhouse-gas emissions, which have a warming effect, are offset by another combustion product—particulates—which leads to cooling."[227]

- "Even after two decades of progress, climatologists are still uncertain how—or even if—the buildup of man-made greenhouse gases is linked to global warming. It could be at least a decade before climate models will be able to link greenhouse warming unambiguously to human actions. Important answers on the science lie ahead."[228]

- "[I]t is impossible for scientists to attribute the recent small surface temperature increases to human causes."[229]

- "Within a decade, science is likely to provide more answers on what factors affect global warming, thereby improving our decision-making. We just don't have this information today. Answers to questions about climate change will require more reliable measurements of temperature at many places on Earth, better understanding of clouds and ocean currents along with greater computer power."[230]

---

[224] DeSmog, *Robert C. Balling, Jr.*, https://perma.cc/T6YY-SFFY (last visited Nov. 18, 2024).

[225] Naomi Oreskes & Erik M. Conway, *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming*, 150–54 (Bloomsbury Press, 1st ed. 2011).

[226] Mobil, *Climate Change: A Prudent Approach*, N.Y. Times (Nov. 13, 1997), https://perma.cc/8D9V-H88D.

[227] Mobil, *Less Heat, More Light on Climate Change*, N.Y. Times (July 18, 1996), https://perma.cc/BQJ3-4G2S.

[228] Mobil, *Climate Change: Where We Come Out*, N.Y. Times (Nov. 20, 1997), https://perma.cc/YX2Q-EZ87.

[229] ExxonMobil, *Unsettled Science* (Mar. 23, 2000), reproduced in https://perma.cc/YNM7-QT9J.

[230] Mobil, *Science: What We Know and Don't Know* (1997), reproduced in https://perma.cc/YNM7-QT9J.

117.    A peer-reviewed quantitative analysis of Exxon's climate communications between 1989 and 2004 found that, while 83% of the company's peer-reviewed papers and 80% of its internal documents acknowledged the reality and human origins of climate change, 81% of its advertorials communicated doubt about those conclusions.[231] Put differently, Exxon demonstrated a clear tendency to contradict its own peer-reviewed research in statements meant for lay audiences, including the State and its residents. Based on this "statistically significant" discrepancy between internal and external communications, the authors concluded that "ExxonMobil misled the public."[232]

118.    Fossil Fuel Defendants also worked jointly through industry and front groups such as Defendant API and other groups like ICE and the GCC to fund, conceive, plan, and carry out sustained and widespread campaigns of denial and disinformation about the existence of climate change and fossil fuel products' contribution to it, despite their own knowledge and the growing national and international scientific consensus about the hazards of doing so. The campaigns included a long-term pattern of direct misrepresentations and material omissions to consumers, as well as a plan to influence consumers indirectly by affecting public opinion through the mass dissemination of misleading research. Although Fossil Fuel Defendants were competitors in the marketplace, they combined and collaborated with each other and with industry and front groups such as Defendant API, and others like ICE and the GCC, on these public campaigns to misdirect and stifle public knowledge in order to inflate consumer demand for fossil fuels. The efforts included promoting hazardous fossil fuel products through advertising campaigns that failed to warn of the existential risks associated with the use of those products, and that were designed to influence consumers to continue using Fossil Fuel Defendants' fossil fuel products irrespective of those products' damage to communities and the environment.

119.    One of the key organizations used by Defendants to coordinate the fossil fuel industry's response to the world's growing awareness of climate change was the International

---

[231] Geoffrey Supran & Naomi Oreskes, *Assessing ExxonMobil's Climate Change Communications (1977–2014)*, 12 Envtl. Rsch. Letter 12 (2017), https://perma.cc/3W29-Z9NY.

[232] *Id.*

Petroleum Industry Environmental Conservation Association ("IPIECA"). In 1987, the IPIECA formed a "Working Group on Global Climate Change" chaired by Duane LeVine, Exxon's manager for science and strategy development. The Working Group also included Brian Flannery from Exxon, Leonard Bernstein from Mobil, Terry Yosie from API, and representatives from BP, Shell, and Texaco (Chevron). In 1990, the Working Group sent a strategy memo created by LeVine to hundreds of oil companies around the world, including Defendants. This memo explained that, to forestall a global shift away from burning fossil fuels for energy, the industry should emphasize uncertainties in climate science and the need for further research.[233]

120. In 1991, the Information Council for the Environment, also known as ICE, whose members included affiliates, predecessors and/or subsidiaries of Defendants, launched a national climate change science denial campaign with full-page newspaper ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. Included among the campaign strategies was a plan to "reposition global warming as theory (not fact)." The target audience for its "consumer-based media awareness program" included demographics who were "not typically active information-seekers" and thought to be "predisposed to favor the ICE agenda, and likely to be even more supportive of that agenda following exposure to new information."[234]

121. A goal of ICE's advertising campaign was to change public opinion and consumer perceptions of climate risk. A memo from Richard Lawson, president of the National Coal Association, a predecessor to the National Mining Association, warned, "[p]ublic opinion polls reveal that 60% of the American people already believe global warming is a serious environmental problem. Our industry cannot sit on the sidelines in this debate."[235]

---

[233] Benjamin A. Franta, *Big Carbon's Strategic Response to Global Warming, 1950-2020*, 140 (2022) (Ph. D. Dissertation, Stanford Univ.), https://perma.cc/GCN6-CBN2.

[234] Union of Concerned Scientists, *Deception Dossier #5: Coal's "Information Council on the Environment" Sham*, 9, 16, 26 (1991), https://perma.cc/BN2P-FKYS (last visited Nov. 18, 2024).

[235] Naomi Oreskes, *My Facts Are Better Than Your Facts: Spreading Good News About Global Warming* (2010), in Peter Howlett et al., *How Well Do Facts Travel?:* The Dissemination of Reliable Knowledge, 149–50 (Cambridge Univ. Press 2011).

122. The following images are examples of ICE-funded print advertisements challenging the validity of climate science and intended to obscure the scientific consensus on anthropogenic climate change in order to inflate consumer demand for fossil fuels:[236]



**Figure 8: Information Council for the Environment Advertisements**

123. The Global Climate Coalition, also known as GCC, on behalf of Defendants and other fossil fuel companies, spent millions of dollars on deceptive advertising campaigns and misleading material to discredit climate science and generate public uncertainty around the climate debate, and thereby inflate consumer demand for fossil fuels. The GCC operated between 1989 and 2001. Its founding members included Defendants Exxon, Shell, and API. Defendants BP and Chevron also participated as members of the GCC. William O'Keefe, former president of the GCC, was also a former executive of API.[237] GCC's position on climate change contradicted decades of its members' internal scientific reports by asserting that natural trends, not human combustion of fossil fuels, was responsible for rising global temperatures:

> The GCC believes that the preponderance of the evidence indicates that most, if not all, of the observed warming is part of a natural warming trend which began approximately 400 years ago. If there is an anthropogenic component to this observed warming, the GCC believes that it must be very small and must be superimposed on a much larger natural warming trend.[238]

---

[236] Union of Concerned Scientists, *supra* note 234, at 47–49.

[237] Jeff Nesmith, *Industry Promotes Skeptical View of Global Warming*, Cox News Service (May 29, 2003).

[238] Glob. Climate Coal., *Global Climate Coalition: An Overview*, 2 (Nov. 1996), https://perma.cc/2R82-SXZN.

124.    The GCC's promotion of overt climate change denialism also contravened its internal assessment confirming that climate change was real and supported by overwhelming scientific evidence. In December 1995, the GCC's Science and Technology Advisory Committee ("GCC-STAC"), whose members included employees of Mobil Oil Corporation (an Exxon predecessor) and API, drafted a primer on the science of global warming for GCC members. The primer concluded that the GCC's contrarian theories "do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change." However, the GCC excluded this section from the publicly released version of the report.[239] Nonetheless, for years afterward, the GCC and its members continued to tout their contrarian theories about global warming, even though the GCC had admitted internally these arguments were invalid. Between 1989 and 1998, the GCC spent $13 million on one ad campaign to obfuscate the public's understanding of climate science and undermine its trust in climate scientists.[240] For example, the GCC distributed a video to hundreds of journalists, which claimed that carbon dioxide emissions would increase crop production and feed the hungry people of the world.[241]

125.    In a 1994 public report, the GCC stated that "observations have not yet confirmed evidence of global warming that can be attributed to human activities," and that "[t]he claim that serious impacts from climate change have occurred or will occur in the future simply has not been proven."[242] In 1994, the GCC Board of Directors was composed of high-level executives from API, Exxon, and Texaco (Chevron). Representatives from Shell, Amoco (BP), and BP were also GCC members at that time.[243] In 1995, the GCC published a booklet called "Climate Change: Your Passport to the Facts," which stated, "While many warnings have reached the popular press about

---

[239] Memorandum from Gregory J. Dana, Assoc. of Int'l Auto. Mfrs., to AIAM Technical Committee, *Global Climate Coalition (GCC) - Primer on Climate Change Science - Final Draft*, 16 (Jan. 18, 1996), https://perma.cc/C9FV-C35P.

[240] Wendy E. Franz, Kennedy Sch. of Gov't, Harvard Univ., *Science, Skeptics and Non-State Actors in the Greenhouse*, ENRP Discussion Paper E-98-18, 1, 13 (Sept. 1998), https://perma.cc/E4GR-8DK4.

[241] The Center for Media and Democracy, *Global Climate Coalition*, Source Watch, https://perma.cc/7K47-G6CP.

[242] GCC, *Issues and Options: Potential Global Climate Change,* Climate Files (1994), https://perma.cc/5RNF-BNH6.

[243] GCC, *supra* note 112.

87

the consequences of a potential man-made warming of the Earth's atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous warming will occur."[244] In 1995, GCC's Board of Directors included high-level executives from Texaco (Chevron), API, ARCO, and Phillips Petroleum Company.[245]

126.    In 1997, William O'Keefe, chairman of the GCC and executive vice president of API, falsely wrote in a *Washington Post* op-ed, "[c]limate scientists don't say that burning oil, gas, and coal is steadily warming the earth."[246] This statement contradicted the established scientific consensus as well as Defendants' own knowledge. Yet Defendants did nothing to correct the public record, and instead continued to fund the GCC's anti-scientific climate skepticism.

127.    In addition to publicly spreading false and misleading information about the climate science consensus, the GCC also sought to undermine credible climate science from within the IPCC. After becoming a reviewer of IPCC's Second Assessment Report in 1996, the GCC used its position to accuse the convening author of a key chapter in the Report of modifying its conclusions. The GCC claimed that the author, climatologist Ben Santer, had engaged in "scientific cleansing" that "understate[d] uncertainties about climate change causes and effect . . . to increase the apparent scientific support for attribution of changes to climate to human activities."[247] The GCC also arranged to spread the accusation among reporters, editors of scientific journals, and even the op-ed page of the *Wall Street Journal*.[248] This effort "was widely perceived to be an attempt on the part of the GCC to undermine the credibility of the IPCC."[249]

128.    In the late 1990s, alarmed by significant legal judgments against Big Tobacco for decades of publicly denying the health risks of smoking cigarettes, Defendants shifted away from openly denying anthropogenic warming and toward peddling a subtler but still deceptive form of

---

[244] GCC, *Climate Change: Your Passport to the Facts*, Climate Files (1995), https://perma.cc/W3FL-UPDH (last visited Nov. 14, 2024).
[245] 1995 GCC IRS 1024 and Attachments, *supra* note 113.
[246] William O'Keefe, *A Climate Policy*, The Wash. Post (July 4, 1997, 8:00 PM EDT), https://perma.cc/3EG7-8GRG.
[247] Franz, *supra* note 240, at 14.
[248] Oreskes & Conway, supra note 225, at 205–13; *see also* S. Fred Singer, *Climate Change and Consensus*, 271 Sci. 581 (Feb. 2, 1996); Frederick Seitz, *A Major Deception on 'Global Warming'*, Wall Street J. (June 12, 1996).
[249] Franz, *supra* note 240, at 15.

climate change skepticism. A Shell employee explained that the company "didn't want to fall into the same trap as the tobacco companies who have become trapped in all their lies."[250] Several large fossil fuel companies, including BP and Shell, left the GCC (although all Fossil Fuel Defendants remained members of API),[251] and Defendants began claiming they had accepted climate science all along.[252]

129.    Despite the shift in public messaging, Defendants surreptitiously continued to organize and fund programs designed to deceive the public about the weight and veracity of the climate science consensus. In 1998, API convened a Global Climate Science Communications Team ("GCSCT") whose members included representatives from Exxon, Chevron, and API. There were no scientists on the "Global Climate Science Communications Team." Steve Milloy (a key player in the tobacco industry's deception campaigns) and his organization, The Advancement of Sound Science Coalition ("TASSC"), were also founding members of the GCSCT. TASSC was a fake grassroots citizen group created by the tobacco industry to sow uncertainty by discrediting the scientific link between exposure to second-hand cigarette smoke and increased rates of cancer and heart disease. Philip Morris launched TASSC on the advice of its public relations firm, which advised Philip Morris that the tobacco company itself would not be a credible voice on the issue of smoking and public health. TASSC, through API and with the approval of Defendants, also became a front group for the fossil fuel industry beyond its role in GCSCT, using the same tactics it had honed while operating on behalf of tobacco companies to spread doubt about climate science. Although TASSC posed as a grassroots group of concerned citizens, it received significant funding from Defendants. For example, between 2000 and 2004, Exxon donated $50,000 to Milloy's Advancement of Sound Science Center; and an additional $60,000 to the Free Enterprise Education Institute (a.k.a. the Free Enterprise Action Institute), both of which were registered to Milloy's home address.[253] The GCSCT, including TASSC, represented a continuation of

---

[250] Nathaniel Rich, *Losing Earth: A Recent History*, 186 (London: Picador 2020).

[251] *Id.* at 177.

[252] Franta (2022), *supra* note 233, at 170.

[253] Union of Concerned Scientists, *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, 20 (July 16, 2007), https://perma.cc/44CD-ARPN.

Defendants' concerted actions to sow doubt and confusion about climate change in order to inflate consumer demand for fossil fuels.

130.   The GCSCT's and Defendants' concerted efforts involved a multi-million-dollar, multi-year plan that, among other elements, sought to: (a) "[d]evelop and implement a national media relations program to inform the media about uncertainties in climate science to generate national, regional, and local media coverage on the scientific uncertainties"; (b) "[d]evelop a global climate science information kit for media including peer-reviewed papers that undercut the 'conventional wisdom' on climate science"; (c) "[p]roduce . . . a steady stream of op-ed columns"; and (d) "[d]evelop and implement a direct outreach program to inform and educate members of Congress . . . and school teachers/students about uncertainties in climate science"[254]—a blatant attempt to deceive consumers and the public, including in Hawai'i, in order to ensure a continued and unimpeded market for fossil fuel products.

131.   Exxon, Chevron, and API directed and contributed to the development of the plan, which set forth the criteria by which the contributors would know when their efforts to manufacture doubt had been successful. "Victory," they wrote, "will be achieved when . . . average citizens 'understand' (recognize) uncertainties in climate science" and "recognition of uncertainties becomes part of the 'conventional wisdom.'"[255] In other words, the plan was crafted to achieve Defendants' goal of using disinformation to plant doubt about the reality of climate change in an effort to prevent consumers from accessing vital information, inflate consumer demand for fossil fuel products, and increase Fossil Fuel Defendants' already large profits.

132.   In furtherance of the strategies described in these memoranda, Defendants made misleading statements to consumers, including in Hawai'i, about climate change, the relationship between climate change and fossil fuel products, and the urgency of the problem. Defendants made these statements in public fora and in advertisements published in newspapers and other media

---

[254] E-mail from Joe Walker to Global Climate Science Team, *Draft Global Climate Science Communications Plan*, 5–7 (Apr. 3, 1998), https://perma.cc/7Y5L-YYA6.
[255] *Id.* at 4.

90

with substantial circulation to Hawaiʻi, including national publications such as *The New York Times*, *The Wall Street Journal*, and *The Washington Post*.

133. Another key strategy in Defendants' efforts to discredit scientific consensus on climate change and the IPCC was to bankroll unqualified or unscrupulous scientists to advance fringe conclusions about climate change. These scientists obtained part or all of their research budget from Fossil Fuel Defendants directly or through Fossil Fuel Defendant-funded organizations like Defendant API.[256] During the early- to mid-1990s, Exxon directed some of this funding to Dr. Fred Seitz, Dr. Fred Singer, and/or Seitz and Singer's Science and Environmental Policy Project ("SEPP") in order to launch repeated attacks on mainstream climate science and IPCC conclusions, even as Exxon scientists participated in the IPCC.[257] Seitz and Singer were not climate scientists. Rather, they and SEPP had previously been paid by the tobacco industry to create doubt in the public mind about the hazards of smoking.[258] Singer also acted as a paid consultant for Sun (Sunoco) and Shell.[259]

134. Industry-funded scientists frequently failed to disclose their fossil fuel industry underwriters.[260] At least one, Dr. Wei-Hock Soon, contractually agreed to allow donors to review his research before publication, and his housing institution agreed not to disclose the funding arrangement without prior permission from his fossil fuel donors.[261] Between 2001 and 2012, various fossil fuel interests, including Exxon and API, paid Soon over $1.2 million.[262] "Dr. Soon, in correspondence with his corporate funders, described many of his scientific papers as 'deliverables' that he completed in exchange for their money."[263] His Defendant-funded research

---

[256] *E.g.*, Willie Soon & Sallie Baliunas, *Proxy Climatic and Environmental Changes of the Past 1000 Years*, 23 Climate Rsch. 89, 105 (Jan. 31, 2003), https://perma.cc/9V32-EY8H.

[257] Union of Concerned Scientists (2007), *supra* note 253.

[258] The Center for Media and Democracy, *S. Fred Singer*, Source Watch, https://perma.cc/X35L-DYUY; The Center for Media and Democracy, *Frederick Seitz*, https://perma.cc/TV67-ABUH.

[259] *Id.*

[260] *E.g.*, *Smithsonian Statement: Dr. Wei-Hock (Willie) Soon*, Smithsonian (Feb. 26, 2015), https://perma.cc/A4KY-W3NM.

[261] Union of Concerned Scientists, *The Climate Deception Dossier #1: Dr. Wei-Hock Soon's Smithsonian Contracts*, 6 (2015), https://perma.cc/JL2V-XYGL.

[262] Justin Gillis & John Schwartz, *Deeper Ties to Corporate Cash for Doubtful Climate Researcher*, N.Y. Times (Feb. 21, 2015), https://perma.cc/897V-7B22.

[263] *Id.*

includes articles in scientific journals accusing the IPCC of overstating the negative environmental effects of carbon dioxide emissions and arguing that the sun is responsible for recent climate trends. Soon was the lead author of a 2003 article that argued that the climate had not changed significantly. The article was widely promoted by other denial groups funded by Exxon, including via "Tech Central Station," a website supported by Exxon.[264] Soon published other bogus "research" in 2009, attributing global warming to solar activity, for which Exxon paid him $76,106.[265] This 2009 grant was made several years after Exxon had publicly committed not to fund climate change deniers.[266]

135. Defendants have also funded dozens of think tanks, front groups, and dark money foundations pushing climate change denial. These include the Competitive Enterprise Institute, the Heartland Institute, Frontiers for Freedom, Committee for a Constructive Tomorrow, and Heritage Foundation. According to the Union of Concerned Scientists, from 1998 to 2017, Exxon spent over $36 million funding numerous organizations misrepresenting the scientific consensus[267] that fossil fuel products were causing climate change. Several Defendants have been connected to other groups that undermine the scientific basis linking fossil fuel products to climate change and sea level rise, including the Frontiers of Freedom Institute and the George C. Marshall Institute.

136. Philip Cooney, an attorney at API from 1996 to 2001, testified at a 2007 Congressional hearing that it was "typical" for API to fund think tanks and advocacy groups that minimized fossil fuels' role in causing climate change.[268]

137. Creating a false perception of disagreement in the scientific community (despite the consensus that its own scientists, experts, and managers had previously acknowledged) disrupted vital channels of communication between scientists and the public. A 2007 Yale University-Gallup poll found that only 48% of Americans believed that there was a consensus among the scientific

---

[264] Union of Concerned Scientists (2007), *supra* note 253, at 13–15.

[265] *Willie Soon FOIA Grants Chart* (Jan. 28, 2011), https://perma.cc/LJA5-BEQM.

[266] ExxonMobil, *2007 Corporate Citizenship Report*, 39 (2007), https://perma.cc/G4DK-TZGS.

[267] Union of Concerned Scientists, *ExxonMobil Foundation & Corporate Giving to Climate Change Denier & Obstructionist Organizations* (1998–2017), https://perma.cc/W3Q4-PCX2.

[268] Transcript of Deposition of Philip Cooney, U.S., House of Reps., Exec. Session Comm. on Oversight and Gov't, 32:3–5 (Mar. 12, 2007), https://perma.cc/M8YK-CWD4.

community that global warming was happening, and 40% believed there was a lot of disagreement among scientists over whether global warming was occurring.[269] Eight years later, a 2015 Yale-George Mason University poll found that "[o]nly about one in ten Americans understands that nearly all climate scientists (over 90%) are convinced that human-caused global warming is happening, and just half . . . believe a majority do."[270] Further, it found that 33% of Americans believe that climate change is mostly due to natural causes, compared to the 97% of peer-reviewed papers that acknowledge that global warming is real and at least partly human-caused.[271] The lack of progress, and even the regress, in the public understanding of climate science over this period—during which Defendants professed to accept the conclusions of mainstream climate science—demonstrates the success of Defendants' campaign to thwart dissemination of genuine scientific expertise and accurate information to the public regarding the effects fossil fuel consumption.

138.  As a result of Defendants' tortious, false, and misleading conduct, consumers of Fossil Fuel Defendants' fossil fuel products in Hawaiʻi and elsewhere have been deliberately and unnecessarily deceived about: the role of fossil fuel products in causing global warming, sea level rise, disruptions to the hydrologic cycle, and increased extreme precipitation, heat waves, and other consequences of the climate crisis; the acceleration of global warming since the mid-twentieth century and the continuation thereof; and the fact that the continued increase in fossil fuel consumption creates severe environmental threats and significant economic costs for coastal states, including Hawaiʻi. Consumers in Hawaiʻi and elsewhere have also been deceived about the depth and breadth of the state of the scientific evidence on anthropogenic climate change and, in particular, about the scientific consensus confirming the role of fossil fuels in causing both climate change and a wide range of potentially destructive impacts, including sea level rise, disruptions to the hydrologic cycle, extreme precipitation, heat waves, and associated consequences.

---

[269] *American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll*, Yale Program on Climate Change Commc'n (July 31, 2007), https://perma.cc/JU76-XV82.

[270] Anthony Leiserowitz et al., *Climate Change in the American Mind*, Yale Program on Climate Change Commc'n. & George Mason Univ., Ctr. for Climate Change Commc'n, 9 (Oct. 2015), https://perma.cc/4M77-25RM.

[271] *Id.* at 7.

**D. In Contrast to Public Misrepresentations About the Risks of Climate Change, Fossil Fuel Defendants' Internal Actions Demonstrate Their Awareness of and Intent to Profit from Uses of Fossil Fuel Products They Knew Were Hazardous.**

139. In contrast to their public-facing efforts challenging the validity of the scientific consensus about anthropogenic climate change, Fossil Fuel Defendants' acts and omissions evidence their internal acknowledgement of the reality of climate change and its likely consequences. Those actions include, but are not limited to, making multi-billion-dollar infrastructure investments to protect their own operations against anthropogenic climate change-related hazards such as: raising offshore oil platforms to protect against sea level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm severity; developing technology and infrastructure to extract, store, and transport fossil fuels in a warming arctic environment; and developing and patenting designs for equipment intended to extract crude oil and/or natural gas in areas previously unreachable because of the presence of polar ice sheets.[272]

140. For example, oil and gas reserves in the Arctic that were not previously reachable due to sea ice are becoming increasingly reachable as sea ice thins and melts due to climate change.[273] In 1973, Exxon obtained a patent for a cargo ship capable of breaking through sea ice[274] and for an oil tanker[275] designed specifically for use in previously unreachable areas of the Arctic.

141. In 1974, Chevron obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses,[276] allowing for drilling in areas with increased ice floe movement due to elevated temperature.

---

[272] Amy Lieberman & Susanne Rust, *Big Oil Braced for Global Warming While It Fought Regulations*, L.A. Times (Dec. 31, 2015), https://perma.cc/PWZ4-L9LC.

[273] James Henderson & Julia Loe, *The Prospects and Challenges for Arctic Oil Development,* Oxford Inst. for Energy Stud., 1 (Nov. 2014), https://perma.cc/VDJ3-U5FZ.

[274] Icebreaking Cargo Vessel, ExxonMobil Techn. & Rsch. Eng'g Co., U.S. Patent No. 3727571A (filed July 7, 1971) (issued Apr. 17, 1973), https://perma.cc/YF73-R6AG.

[275] Tanker Vessel, ExxonMobil Rsch. Eng'g Co., U.S. Patent No.3745960A (filed May 6, 1971) (issued July 17, 1973), https://perma.cc/WL9C-DQ99.

[276] Arctic Offshore Platform, Chevron Rsch. & Techn. Co., U.S. Patent No. 3831385A (filed June 26, 1972) (issued Aug. 27, 1974), https://perma.cc/MF5D-DSM9.

142. That same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions,[277] allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.

143. In 1984, Shell obtained a patent for an Arctic offshore platform adapted for conducting operations in the Beaufort Sea, an area that previously was largely unreachable because of ice but has become increasingly accessible as polar ice has melted.[278]

144. As described below, in 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea level rise. Those design changes were ultimately carried out by Shell's contractors, adding substantial costs to the project.[279]

a. The Troll natural gas and oil field, off the Norwegian coast in the North Sea, was proven to contain large natural oil and gas deposits in 1979, shortly after Norske Shell was approved by Norwegian oil and gas regulators to operate a portion of the field.

b. In 1986, the Norwegian parliament granted Norske Shell authority to complete the first development phase of the Troll field gas deposits, and Norske Shell began designing the "Troll A" gas platform, with the intent to begin operation of the platform in approximately 1995. Based on the very large size of the gas deposits in the Troll field, the Troll A platform was projected to operate for approximately 70 years.

c. The platform was originally designed to stand approximately 100 feet above sea level—the amount necessary to stay above waves in a once-in-a-century strength storm.

d. In 1989, Shell engineers revised their plans to increase the above-water height of the platform by 3 to 6 feet, specifically to account for higher anticipated average sea

---

[277] Mobile, Arctic Drilling and Production Platform, Texaco Inc., U.S. Patent No. 3793840A (filed Oct. 18, 1971) (issued Jan. 24, 1974), https://perma.cc/2TB6-WBY9.

[278] Arctic Offshore Platform, Shell Oil Co., U.S Patent No. 4427320A (filed Feb. 19, 1982) (issued Jan. 24, 1984), https://perma.cc/YXH9-CS2B.

[279] *Greenhouse Effect: Shell Anticipates a Sea Change*, N.Y. Times (Dec. 20, 1989), https://perma.cc/PJV7-6H25.

levels and increased storm intensity due to global warming over the platform's 70-year operational life.[280]

    e.    Shell projected that the additional 3 to 6 feet of above-water construction would increase the cost of the Troll A platform by as much as $32 million.

145.    In 1989, Esso Resources Canada (Exxon) commissioned a report on the impacts of climate change on existing and proposed natural gas facilities in the Mackenzie River Valley and Delta, including extraction facilities on the Beaufort Sea and a pipeline crossing Canada's Northwest Territory.[281] It reported that "large zones of the Mackenzie Valley could be affected dramatically by climatic change" and that "the greatest concern in Norman Wells [oil town in North West Territories, Canada] should be the changes in permafrost that are likely to occur under conditions of climate warming."[282] The report concluded that, in light of climate models showing a "general tendency towards warmer and wetter climate," operation of those facilities would be compromised by increased precipitation, increase in air temperature, changes in permafrost conditions, and, significantly, sea level rise and erosion damage.[283] The authors recommended factoring those eventualities into future development planning and also warned that "a rise in sea level could cause increased flooding and erosion damage on Richards Island."

146.    In the mid-1990s, Exxon, Shell, and Imperial Oil (Exxon) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's Environmental Impact Statement declared, "The impact of a global warming sea level rise may be particularly significant in Nova Scotia. The long-term tide gauge records at a number of locations along the N.S. coast have shown sea level has been rising over the past century. . . . For the design of coastal and offshore structures,

---

[280] *Id.*; Lieberman & Rust, *supra* note 272.

[281] *See* Stephen Lonergan & Kathy Young, *An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic*, 7 Energy Exploration & Exploitation 359–81 (1989).

[282] *Id.* at 369, 376.

[283] *Id.* at 360, 377–78.

an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for the proposed project life (25 years)."[284]

> **E.  Defendants Slowed the Development of Alternative Energy Sources and Knowingly Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis.**

147.    As GHG pollution accumulates in the atmosphere, some of which does not dissipate for potentially thousands of years (namely $CO_2$), climate changes and consequent adverse environmental changes compound, and their frequencies and magnitudes increase—a phenomenon about which Defendants were keenly aware for decades. As those adverse environmental changes compound and their frequencies and magnitudes increase, so too do the physical, environmental, economic, and social injuries that result from them.

148.    By sowing doubt about the future consequences of unrestricted fossil fuel consumption, Defendants' deception campaign successfully delayed the transition to alternative energy sources, which Defendants forecasted could penetrate half of a competitive energy market in 50 years if allowed to develop unimpeded. This delay caused the emission of huge amounts of avoidable GHGs and has increased the magnitude of and cost to address environmental harms, including in Hawai'i, that have already occurred or are unavoidable due to previous emissions.

149.    Knowledge of the full extent of the risks associated with the routine use of fossil fuel products is material to consumers' decisions to purchase and use those products. Had consumer demand to transition away from fossil fuels—and the market for affordable, reliable sources of clean energy—been allowed to develop earlier had Defendants provided warnings commensurate with the risks and absent Defendants' deception, the subsequent impacts of climate change could have been avoided or reduced.

150.    As with cigarettes, history demonstrates that when consumers are made aware of the extent of the harmful effects or qualities of the products they purchase, they often choose to stop purchasing them, to reduce their purchases, or to make different purchasing decisions. This

---

[284] ExxonMobil, *Sable Project: Development Plan, Vol. 3: Environmental Impact Statement*, 4–77 (Feb. 1996), https://web.archive.org/web/20151106083051/http://soep.com/about-the-project/development-plan-application.

phenomenon holds especially true when products have been shown to harm public health or the environment. For example, increased consumer awareness of the role of pesticides in harming human health, worker health, and the environment has spurred a growing market for food grown organically and without the use of harmful pesticides. With access to information about how their food is grown, consumers have demanded healthier choices, and the market has responded.

151.    A consumer who received accurate information about how fossil fuel use was a primary driver of climate change, and about the true extent of the resultant dangers and impacts to the environment and to public health, likely would have decreased their use of fossil fuel products and/or demanded lower-carbon transportation options. Indeed, recent studies and surveys have found that consumers with substantial awareness of climate change are largely willing "to change their consumption habits . . . to help reduce the impacts of climate change."[285] In addition, informed consumers often attempt to contribute toward solving environmental problems by supporting companies that they perceive to be developing "green" or more environmentally friendly products.[286] If consumers had been aware of what Defendants knew about climate change when Defendants knew it, many consumers likely would have opted to use less carbon-intense travel; avoid or combine car travel trips; carpool; switch to more fuel-efficient vehicles, hybrid vehicles, or electric vehicles; demand more charging infrastructure for electric vehicles; use a car-sharing service; seek transportation alternatives all or some of the time, if and when available (e.g., public transportation, biking, or walking); electrify houses and office buildings; or adopt any combination of these choices. Consumers, including in Hawaiʻi, were deprived of the knowledge to make these choices.

152.    Defendants have been aware for decades that clean energy presents a feasible alternative to fossil fuels. In 1980, Exxon forecasted that non-fossil fuel energy sources, if pursued,

---

[285] *Changes in Consumers' Habits Related to Climate Change May Require New Marketing and Business Models*, The Conf. Bd. (Oct. 26, 2022), https://perma.cc/2FFC-WYAY.

[286] *See, e.g.*, Anthony Leiserwitz et al., *Consumer Activism on Global Warming,* Yale Program on Climate Change Commc'n & George Mason Univ. Ctr. for Climate Change Commc'n, George Mason University, eds (Sept. 2021), https://perma.cc/5VXC-BN2H.

could penetrate half of a competitive energy market in approximately 50 years.[287] This internal estimate was based on extensive modeling within the academic community, including research conducted by the Massachusetts Institute of Technology's David Rose, which concluded that a transition to non-fossil energy could be achieved in around 50 years. Exxon circulated an internal memo approving of Rose's conclusions, stating they were "based on reasonable assumptions."[288] But instead of warning consumers about the dangers of burning fossil fuels, Defendants chose to deceive consumers and restrict the availability of truthful information in the market to preserve Fossil Fuel Defendants' profits and assets. As a result, much time has been lost during which consumers and market forces would have spurred a societal transition away from fossil fuels, which would have reduced or eliminated entirely the harmful effects of climate change in Hawai'i.

153. The costs of inaction on anthropogenic climate change and its adverse environmental effects were understood by Defendants. In a 1997 speech by John Browne, Group Executive for BP America, at Stanford University, Browne described Defendants' knowledge of foreseeable climate change and the entire fossil fuel industry's responsibility and opportunities to reduce use of fossil fuel products, reduce global $CO_2$ emissions, and mitigate the harms associated with the use and consumption of such products, but misleadingly described BP's own actions:

> A new age demands a fresh perspective of the nature of society and responsibility. We need to go beyond analysis and to take action. It is a moment for change and for a rethinking of corporate responsibility. . . .
>
> [T]here is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature.
>
> The prediction of the IPCC is that over the next century temperatures might rise by a further 1 to 3.5 degrees centigrade [1.8º–6.3º F], and that sea levels might rise by between 15 and 95 centimetres [5.9 and 37.4 inches]. Some of that impact is probably unavoidable, because it results from current emissions. . . .
>
> [I]t would be unwise and potentially dangerous to ignore the mounting concern.

---

[287] Shaw, *supra* note 164, at 5.

[288] Exxon Research and Engineering Company, Coordination and Planning Division, *CO₂ Greenhouse Effect: A Technical Review*, at 17–18 (Apr. 1, 1982), https://perma.cc/83JJ-27CW.

. . .

> We [the fossil fuel industry] have a responsibility to act, and I hope that through our actions we can contribute to the much wider process which is desirable and necessary.
>
> BP accepts that responsibility and we're therefore taking some specific steps.
>
> To control our own emissions.
> To fund continuing scientific research.
> To take initiatives for joint implementation.
> To develop alternative fuels for the long term.[289]

154.    Defendants' own knowledge of foreseeable climate change harms and their acknowledged responsibility to act to abate climate change make it all the more egregious that Defendants chose to cast doubt upon the scientific consensus on climate change, and deceived consumers about the relationship between consumption of fossil fuels and climate change and the magnitude of the threat posed by fossil fuel use. Consumers equipped with complete and accurate knowledge about the climate and the public health effects of continued consumption of fossil fuels likely would have reduced fossil fuel consumption and formed a receptive customer base for clean energy alternatives decades before such demand in fact developed. Instead, Defendants' campaign of deception allowed them to exploit public uncertainty to reap substantial profits.

155.    The delayed emergence of a scalable market for non-fossil fuel energy is attributable in substantial part to Defendants' deception and their obfuscation of the reality and severity of the climatic consequences associated with normal use of fossil fuels. The societal transition to a low-carbon economy would have been far cheaper had Defendants issued reasonable warnings about the dangers of runaway consumption of fossil fuels of which they were aware.

156.    Despite Defendants' knowledge of the foreseeable, measurable, and significant harms associated with the unrestrained consumption and use of fossil fuel products, and despite Defendants' knowledge of technologies and practices that could have helped to reduce the foreseeable dangers associated with fossil fuel products, Defendants continued to misleadingly and

---

[289] Browne, *supra* note 201.

100

wrongfully market and promote heavy fossil fuel use and mounted a campaign to obscure the connection between fossil fuel products and the climate crisis, dramatically increasing the costs of abatement. This campaign was intended to and did reach and influence consumers and the public, including in Hawai'i.

157.    For example, in 2006, Exxon wrote a letter to the Royal Society recognizing that "the accumulation of greenhouse gases in the Earth's atmosphere poses risks that may prove significant for society and ecosystems." "Yet behind closed doors, Exxon took a very different tack: Its executives strategized over how to diminish concerns about warming temperatures, and they sought to muddle scientific findings that might hurt its oil-and-gas business."[290]

158.    Fossil Fuel Defendants were deeply familiar with opportunities to reduce the use of their fossil fuel products and associated global greenhouse emissions, mitigate the harms associated with the use and consumption of their products, and promote the development of alternative, clean energy sources. Examples of that recognition include, but are not limited to, the following:

a.    In 1963, Esso (Exxon) obtained multiple patents on technologies for fuel cells,[291] including on the design of a fuel cell and necessary electrodes,[292] and on a process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.[293]

b.    In 1970, Esso (Exxon) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines (the system also increased the efficiency of the

---

[290] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, The Wall Street J. (Sept. 14, 2023, 5:30 am ET), https://perma.cc/9BQ4-UN3C.

[291] Fuel cells use the chemical energy of hydrogen or other fuels to produce electricity. *See* U.S. Dep't of Energy, *Fuel Cells*, https://perma.cc/6W5L-EZGV.

[292] Fuel Cell and Fuel Cell Electrodes, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3116169A (filed Mar. 14, 1960) (issued Dec. 31, 1963), https://perma.cc/8NKJ-DEUL.

[293] Direct Production of Electrical Energy from Liquid Fuels, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3113049A (filed Jan. 3, 1961) (issued Dec. 3, 1963), https://perma.cc/CWW4-W4MF.

fossil fuel products used in such engines, thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology).[294]

c.    In 1980, Imperial Oil wrote in its "Review of Environmental Protection Activities for 1978–79": "There is no doubt that increases in fossil fuel usage and decreases in forest cover are aggravating the potential problem of increased $CO_2$ in the atmosphere. Technology exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost of power generation."[295]

d.    A 1987 company briefing Shell produced on "Synthetic Fuels and Renewable Energy" noted that while "immediate prospects" were "limited," "nevertheless it is by pursuing commercial opportunities now and in the near future that the valuable experience needed for further development will be gained." The brief also noted that "the task of replacing oil resources is likely to become increasingly difficult and expensive and there will be a growing need to develop lean, convenient alternatives. Initially these will supplement and eventually replace valuable oil products . . . Many potential energy options are as yet unknown or at very early stages of research and development. New energy sources take decades to make a major global contribution. Sustained commitment is therefore needed during the remainder of this century to ensure that new technologies and those currently at a relatively early stage of development are available to meet energy needs in the next century."[296]

e.    A 1989 article in a publication from Exxon Corporate Research for company use only stated: "$CO_2$ emissions contribute about half the forcing leading to a potential enhancement of the Greenhouse Effect. Since energy generation from fossil fuels dominates modern $CO_2$ emissions, strategies to limit $CO_2$ growth focus near term on energy efficiency and long term on developing alternative energy sources. Practiced at a level to significantly reduce the growth of greenhouse gases, these actions would have substantial impact on society and our

---

[294] Low-polluting Engine and Drive System, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3513929A (filed Aug. 25, 1967) (issued May 26, 1970), https://perma.cc/N4AF-2M67.

[295] Imperial Oil Ltd., *Review of Environmental Protection Activities for 1978–1979* 2 (Aug. 6, 1980), https://perma.cc/T68E-Q3JB.

[296] Shell Briefing Serv., *Synthetic Fuels and Renewable Energy*, 2 SBS (1987), https://perma.cc/CK92-YZC4.

industry—near-term from reduced demand for current products, long term from transition to entirely new energy systems."[297]

159.    Defendants could have taken practical, cost-effective steps to mitigate the risks posed by fossil fuel products. Those alternatives could have included, among other measures:

a.    Acknowledging scientific evidence of anthropogenic climate change and the damages it is causing and will cause people, communities, and the environment. Acceptance of that evidence, along with associated warnings and actions, would have allowed the public and the State to move beyond debating *whether* climate change was occurring to deciding *how* to combat it; avoided much of the public confusion that has ensued over more than 30 years, since no later than 1988; and contributed to an earlier and quicker transition to energy sources compatible with minimizing catastrophic climatic consequences.

b.    Forthrightly communicating with Fossil Fuel Defendants' shareholders, consumers, banks, insurers, the public, and the State and warning them about the climate hazards of Fossil Fuel Defendants' fossil fuel products that were known to Defendants, which would have enabled those groups to make material, informed decisions about whether and how to address climate change and sea level rise vis-à-vis Fossil Fuel Defendants' products—including whether and how much to invest in alternative clean energy sources compared to fossil fuels;

c.    Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort consumer awareness of the climatic dangers of fossil fuels, and to cause many consumers and business leaders to think the relevant science was far less certain that it actually was; and

d.    Sharing their internal scientific research with consumers and the public, and with other scientists and business leaders, to increase public understanding of the scientific underpinnings of climate change and its relation to Fossil Fuel Defendants' fossil fuel products.

---

[297] Brian Flannery, *Greenhouse Science*, Connections, Exxon Rsch. & Eng'g Co. (Fall 1989), https://perma.cc/A4MC-67LC.

103

**F.     Defendants Continue to Deceive Hawaiʻi Consumers Through Misleading Advertisements That Portray the Fossil Fuel Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change.**

160.    Defendants' coordinated campaign of disinformation and deception continues today, even as the scientific consensus about the causes and consequences of climate change has strengthened. Fossil Fuel Defendants have falsely claimed through advertising campaigns in Hawaiʻi and/or campaigns intended to reach Hawaiʻi that their businesses are substantially invested in lower-carbon technologies and renewable energy sources. In truth, however, each Fossil Fuel Defendant has invested minimally in renewable energy while continuing to expand its fossil fuel production. Reasonable consumers exposed to Fossil Fuel Defendants' advertisements would understand Fossil Fuel Defendants to be far more substantially invested in alternative energy sources than in fact is the case—this is deception. Defendants have also claimed that some of their fossil fuel products are "green" or "clean," and that using these products will sufficiently reduce or mitigate the dangers of climate change. None of Fossil Fuel Defendants' fossil fuel products are "green" or "clean" because they all continue to cause climate change and related impacts, and this marketing misleadingly minimizes these products' adverse environmental impacts and induces consumers to purchase these products under false impressions. Collectively, these more recent deceptive promotional statements and practices are referred to as "greenwashing."

161.    Fossil Fuel Defendants intentionally greenwash their own brands and their fossil fuel products to maximize profit from fossil fuel consumption. Greenwashing is designed to increase consumption by portraying positive but false representations of Fossil Fuel Defendants and their products. While greenwashing occurs in many different forms—e.g., false advertising about "green" or "clean" fossil fuel products, or social media campaigns about Fossil Fuel Defendants' commitments to the environment or to renewable energy—the common purpose of all greenwashing is to create a positive, but false, narrative about Fossil Fuel Defendants and their products. That false narrative drives brand loyalty and trust among consumers, alters consumer behavior, and thus increases consumption of fossil fuel products. Greenwashing is especially

104

misleading today because consumers increasingly prioritize environmental sustainability, even when that means paying more, and because consumers report positive associations with brands that portray themselves as "green" or as committed to renewable energy.[298] Because consumers may conflate greenhouse gas emissions and other air pollutants,[299] even advertising that does not explicitly mention greenhouse gases may create a misleading impression that a brand is climate-friendly.

162.    Fossil Fuel Defendants' misleading greenwashing campaigns are intended to and do reach and influence the public and consumers, including in Hawaiʻi. These campaigns are intended to capitalize on consumers' concerns about climate change and lead consumers to believe that Fossil Fuel Defendants are substantially diversified energy companies making meaningful investments in low-carbon energy compatible with minimizing catastrophic climate change. At bottom, these deceptive campaigns are intended "to induce false positive perceptions"[300] of the Fossil Fuel Defendants' commitment to the environment while downplaying or otherwise concealing the role their fossil fuel products play in bringing about catastrophic climate harms.

163.    Fossil Fuel Defendants' greenwashing extends to their professed support for the Paris Agreement. Publicly, multiple Fossil Fuel Defendants pledged to help meet the goals of the agreement. Privately, they viewed participation and support for the agreement as politically convenient, risk-free, and unburdened by the necessity of any meaningful corresponding action on their part.[301] The Paris Agreement proved to be an opportunity for Fossil Fuel Defendants to tout their environmental bona fides by overemphasizing their minimal investments in clean or renewable forms of energy while they knowingly pursued business strategies undermining the

---

[298] Ronald S. Friedman & Dylan S. Campbell, *An Experimental Study of the Impact of Greenwashing on Attitudes toward Fossil Fuel Corporations' Sustainability Initiatives*, 17 Env't Commc'n 486 (2023), https://perma.cc/4JNF-UTKZ; *see also* Ravi Dutta-Powell et al., *Two Interventions for Mitigating the Harms of Greenwashing on Consumer Perceptions*, BIT Working Paper No. 001 (2023), https://perma.cc/S59N-ECV2.

[299] *E.g.*, Charlotte Noël et al., *The Public's Perceptions of Air Pollution. What's in a Name?* Environ Health Insights (Sep. 21 2022), doi: 10.1177/11786302221123563; Ann Bostrom et al., *Causal Thinking and Support for Climate Change Policies: International Survey Findings*, 22 Global Environmental Change 210 (Feb. 2012), https://doi.org/10.1016/j.gloenvcha.2011.09.012.

[300] Noémi Nemes et al., *An Integrated Framework to Assess Greenwashing*, 14 Sustainability 4431 (2022), https://perma.cc/H4AF-9VA3.

[301] *Denial, Disinformation, and Doublespeak*, *supra* note 108, at 17–21.

agreement's goal of limiting global warming to 2 degrees Celsius.[302] For example, Exxon publicly announced its support for the Paris Agreement in 2015, and reiterated its support in 2021. However, in a 2019 memo circulated to high-level executives at the Oil and Gas Climate Initiative ("OGCI"), an Exxon official recommended that the group remove all references to its support for the agreement in any public-facing document so as to avoid "commit[ting] [OGCI] members to enhanced climate-related governance, strategy, risk management, and performance metrics and targets."[303] Meanwhile, in 2024 Exxon announced that it would increase oil and gas production by about 10% over the next four years.[304]

164.    Fossil Fuel Defendants also engaged in doublespeak regarding their commitments to emission reduction measures, professing their support for such things as federal methane emissions regulations on one hand while lobbying against them on the other.[305] Moreover, in a bid to "stave off future regulation," Fossil Fuel Defendants, through a program convened by API, voluntarily pledged to limit their methane emissions.[306] Beyond methane emissions, multiple Fossil Fuel Defendants have pledged to meet certain emission reduction targets.[307] These pledges, however, elide continued long-term commitments to oil and gas production and internal doubts about the ability of the Fossil Fuel Defendants to actually meet their emissions targets.[308]

165.    Likewise, multiple Fossil Fuel Defendants widely promoted their token investments in carbon capture and other emissions-reducing technologies like algae-based biofuels despite concerns about their scalability and cost. For example, in an advertisement Exxon described its investment and utilization of carbon capture technology as "one way ExxonMobil is

---

[302] *Id*. at 18.

[303] *Id*. at 18 (quoting Doc. No. EM-HCOR3-00064980).

[304] *Id*.

[305] *Id*. at 25.

[306] *Id*. at 24, 26 (quoting Doc. No. BPA_HCOR_00039279 ("You begin by doing things voluntarily and then that (and not much more) becomes the regulation.")).

[307] *Id*. at 11.

[308] *See e.g., id*. at 14 (citing Doc No. SOC-HCOR-045422 (email thread in which Shell employee writes that "any credible route to net-zero emission requires significant electrification of end use as well as biofuels, hydrogen and some degree of carbon capture and storage)), (citing Doc. No. SOC-HCOR-391063 (*New York Magazine* article quoting Shell's Chief Economist as saying "We're going to get as much out of [oil and gas] for as long as we can")).

helping industrial plants . . . be more like plants."[309] The goal of such advertising was to convince people that "ExxonMobil is actively working on effective ways to reduce the world's $CO_2$ levels."[310] However, Exxon itself admitted that to reach net zero by 2050, carbon capture technology would need to be deployed at 185 times its current rate of deployment.[311] Indeed, Fossil Fuel Defendants viewed one of the key benefits of carbon capture technology as "sustain[ing] gas demand growth for longer[.]"[312] Similarly, beginning in 2008, multiple Fossil Fuel Defendants heavily promoted their funding and development of algae-based biofuels as viable clean energy alternatives only for all such efforts to be terminated by 2023 amid internal doubts about the technology's practicability.[313]

166. Contrary to their messaging about commitments to low-carbon energy and energy diversification, however, Fossil Fuel Defendants' spending on low-carbon energy is substantially and materially less than Fossil Fuel Defendants indicate to consumers. For example, according to a recent analysis, between 2010 and 2018, BP spent 2.3% of total capital spending on low-carbon energy sources, Shell spent 1.33%, Chevron spent 0.23%, Exxon spent 0.22%, and ConocoPhillips spent 0.03%, despite an array of greenwashing advertisements and promotion conveying these companies as committed to green, clean, or sustainable energy.[314]

167. Ultimately, although Fossil Fuel Defendants currently claim to support reducing GHG emissions, their conduct belies these statements. Fossil Fuel Defendants have continued to ramp up fossil fuel production globally; to invest in new fossil fuel development, including in shale oil production and shale gas fracking—some of the most carbon-intensive extraction projects; and to plan for unabated oil and gas exploitation indefinitely into the future.

---

[309] *Id*. at 31 (citing Doc. Nos. EM-HCOR3-00524824, EM-HCOR3-00519383, EM-HCOR3-00519355).

[310] *Id*. (quoting Doc. No. EM-HCOR3-00298426).

[311] *Id*. at 32 (citing ExxonMobil, Emissions (online at https://corporate.exxonmobil.com/what-we-do/energy-supply/globaloutlook/emissions) (accessed Apr. 29, 2024)).

[312] *Id*. at 34 (quoting Doc. No. BPA_HCOR_00037840; BPA_HCOR_00049634).

[313] *Id*. at 34–35 ("Exxon spent nearly half as much on *advertising* algae as a climate solution as it did on actually *researching* it.").

[314] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX.

168.    For example, Exxon's 2023 Corporate Plan update states that the company expects its oil and gas production to rise from 3.8 million oil-equivalent barrels per day in 2024 to about 4.2 million oil-equivalent barrels per day by 2027.[315] Exxon anticipates capital expenditures of between $23 billion and $27 billion annually through 2027, and says that it will "pursu[e]" $20 billion of vaguely-defined "lower-emissions opportunities" through 2027.[316] In 2023 alone, Exxon spent almost three times as much money acquiring fossil fuel producer Pioneer Natural Resources ($59.5 billion) than it has stated that it will invest in "lower carbon initiatives" (largely carbon capture technology) through 2027.[317]

169.    Similarly, Chevron announced in late 2023 that it would spend between $18.5 billion and $19.5 billion on new oil and gas projects in 2024, representing an 11% increase from the year before.[318] By contrast, Chevron expected to spend only $2 billion in 2024 to "lower the carbon intensity of traditional operations and grow new energy business lines."[319] In late 2024, Chevron announced that it would spend only $1.5 billion in 2025 on emissions-reduction efforts and alternative energy initiatives, a 25% drop from 2024.[320] In 2023 alone, Chevron spent more than five times as much money acquiring fossil fuel producer Hess as it has stated it will spend on lower-carbon energy projects through 2028.[321]

170.    Likewise, Shell spent almost six times more money on oil and gas development than on renewable technology in 2022.[322] In June 2023, Shell withdrew its 2021 pledge to cut oil production each year for the rest of the decade, announcing instead that it would maintain its

---

[315] Press Release, ExxonMobil, *Corporate Plan Update* (Dec. 6, 2023), https://perma.cc/XAM4-F3WR.

[316] *Id.*

[317] Aryn Baker, *How Chevron and Exxon's Latest Fossil Fuel Deals Compare to Their Green Spending*, Time Magazine (Oct. 25, 2023, 2:31 PM EDT), https://perma.cc/8ZF6-JL5D.

[318] Sabrina Valle, *Chevron Increases Project Spending Budget by 11% for 2024*, Reuters (Dec. 6, 2023, 8:56 PM EST), https://perma.cc/JB7J-6UXN.

[319] Sam Ramon, *Chevron Announces $16 Billion 2024 Capex Budget*, Chevron (Dec. 6, 2023), https://perma.cc/H4X5-FH2M.

[320] Kevin Crowly, Chevron Is Cutting Low-Carbon Spending by 25% Amid Belt Tightening, Bloomberg (Dec. 6, 2024), https://perma.cc/N9QX-V6MT.

[321] Baker, *How Chevron and Exxon's Latest Fossil Fuel Deals Compare to Their Green Spending*, *supra* note 317.

[322] Ron Bousso, *Exclusive: Shell Pivots Back to Oil to Win Over Investors*, Reuters (June 9, 2023, 1:06 PM EDT), https://perma.cc/3MYK-T6TV.

current level of oil production until 2030 and would invest $40 billion in oil and gas production between 2023 and 2035.[323] And while Shell states that approximately 12% of its 2021 capital spending went to its "Renewables and Energy Solutions" division, its own financial reporting indicates it dedicated only approximately 1.5% of its capital expenditures to developing renewable energy sources such as wind and solar power production, with the large majority of other spending directed to projects related to natural gas.[324] Shell also announced that notwithstanding its record profits in 2022, it would not increase spending on Renewables and Energy Solutions and would instead focus new spending on fossil fuel production.[325]

171.    BP has also scaled back its recently stated decarbonization goals. In 2020, BP stated its intention to reduce the company's total upstream emissions 20% by the year 2025, and 35–40% by the year 2030. In February 2023, however, BP reduced those projections to a 10–15% reduction by 2025, and a 20–30% reduction by 2030.[326, 327] BP had also pledged in 2020 to reduce its total oil and gas production 40% from 2019 levels by 2030[328]—again in 2023, however, BP lowered its goal to a 25% reduction.[329] In 2025, BP essentially rolled back its entire 2020 pledge when it announced that it is aiming to boost its oil and gas production back up to 2.5 million barrels per day by 2030, roughly 1% below its 2019 production average of 2.6 million barrels per day.[330]

172.    Fossil Fuel Defendants' greenwashing campaigns deceptively minimize their own role in causing climate change, including by suggesting that small changes in consumer choice and

---

[323] Lottie Limb, *Shell Joins BP and Total In U-Turning on Climate Pledges 'to Reward Shareholders'*, euronews (June 15, 2023, 16:10 GMT), https://perma.cc/9QR8-JQLB.

[324] Oliver Milman, *Shell's Actual Spending on Renewables is Fraction of What It Claims, Group Alleges*, The Guardian (Feb. 1, 2023, 8:00 EST), https://perma.cc/3QRS-FZYL.

[325] Will Mathis, *Shell Hits the Brakes on Growing Renewables Unit After Record 2022 Profit*, Bloomberg (Feb. 2, 2023, 7:49 AM EST), https://perma.cc/VEX5-KCJD.

[326] Evan Halper and Aaron Gregg, *BP Dials Back Climate Pledge Amid Soaring Oil Profits*, The Wash. Post (Feb. 7, 2023, 11:41 AM EST), https://perma.cc/HL7J-YZCV.

[327] BP, *Getting to Net Zero*, https://perma.cc/3SGK-8JGU; BP, *BP Integrated Energy Company Strategy Update* (Feb. 7, 2023), https://perma.cc/PA3U-2EZ4.

[328] Shadia Nasralla and Ron Bousso, *BP to Cut Fossil Fuels Output By 40% By 2030*, Reuters, (Aug. 4, 2020, 3:34 AM EDT), https://perma.cc/5PNG-ENJT.

[329] Stanley Reed, *BP, in a Reversal, Says It Will Produce More Oil and Gas*, N.Y. Times (Feb. 7, 2023), https://perma.cc/TV4V-QK2X.

[330] Joe Wallace, *BP to Slash Green Spending, Pivot Back to Oil*, The Wall Street Journal (Feb. 26, 2025), https://perma.cc/K3EX-RCCL.

behavior can adequately address climate change. These campaigns misleadingly portray Fossil Fuel Defendants as part of the solution to climate change and deceptively distract from the fact that their fossil fuel products are the primary driver of global warming and climate change.

173.    Below are representative excerpts from Fossil Fuel Defendants' greenwashing campaigns, which present a false image of Fossil Fuel Defendants as clean energy innovators taking meaningful action to address climate change. Fossil Fuel Defendants' actions to further entrench fossil fuel production and consumption squarely contradict their public affirmations of corporate responsibility and support for reducing global GHG emissions. Functionally, Fossil Fuel Defendants have cut fossil fuels from their brand but not their business operations. Their greenwashing advertisements are deceptive to Hawai'i consumers.

### i.    Exxon's Misleading and Deceptive Greenwashing Campaigns

174.    Beginning in 2009, Exxon ran a series of advertisements in print editions and posts in the electronic edition of *The New York Times*, as well as on Exxon's YouTube channel, in which Exxon misleadingly promotes its efforts to develop energy from alternative sources such as algae and plant waste—efforts that are vanishingly small in relation to the investments Exxon continues to make in fossil fuel production.

175.    For example, an online advertisement in *The New York Times*, accessible to and marketed toward Hawai'i consumers, promotes the company's development of algae biofuels. The advertisement misleadingly tells consumers that Exxon is "working to decrease [its] overall carbon footprint," and that the company's "sustainable and environmentally friendly" biodiesel fuel could reduce "carbon emissions from transportation" by greater than 50%.[331]

176.    As recently as 2018, Exxon claimed it would be producing 10,000 barrels per day of algae biofuel by 2025 and that this fuel could reduce "carbon emissions from transportation" by more than fifty percent.[332] In 2019, Exxon continued to advertise that "[it] is growing algae for

---

[331] ExxonMobil Paid Post, *The Future of Energy? It May Come From Where You Least Expect*, N.Y. Times, https://perma.cc/VBU3-8KH4.
[332] *Id.*

110

biofuels that could one day power planes, propel ships, and fuel trucks, and cut their emissions in half."[333]

177.    Exxon ultimately invested just $350 million of the $600 million it had promised to develop the technology before quietly pulling the plug on the project in December 2022.[334] But even $600 million likely would have fallen short; algae researchers believe several *billion* dollars would be necessary to truly commercialize biofuels, and that does not even account for the "fundamental biological limitations" associated with this technology.[335] In fact, statements from Exxon's spokesperson suggest that the money Exxon spent on advertising its algae biofuel was a substantial portion (more than a third) of what Exxon spent on actual development of algae biofuel.[336]

178.    Exxon's advertisements promoting its investments in "sustainable and environmentally friendly" energy sources also fail to mention that the company's investment in alternative energy is miniscule compared to its ongoing "business as usual" escalation of global fossil fuel exploration, development, and production activities. As explained above, Exxon has consistently spent—and will continue to spend—the vast majority of its capital expenditures on maintaining and expanding fossil fuel production.

179.    Supplementing this misleading campaign, Exxon has promoted dozens of multimedia advertisements on platforms such as Instagram, X (f/k/a Twitter), Facebook, and LinkedIn, where Exxon has millions of social media followers and its content has received hundreds of thousands of "likes" and "views." These advertisements emphasize its claimed leadership in research on lowering emissions, algae biofuel, climate change solutions, and clean energy research.[337] These advertisements were intended to and did reach the public and consumers

---

[333] Exxon Mobil, *Algae Potential*, iSpot TV (Oct. 19, 2019), https://perma.cc/N7KG-ELR4.

[334] Amy Westervelt, *Big Oil Firms Touted Algae as Climate Solution. Now All Have Pulled Funding*, The Guardian (Mar. 17, 2023), https://perma.cc/MF7Y-5AGS.

[335] *Id.*; *see also* Ben Elgin and Kevin Crowley, *Exxon Retreats From Major Climate Effort to Make Biofuels From Algae*, Bloomberg (Feb. 10, 2023), https://perma.cc/7LTQ-644J.

[336] *Id.*

[337] *See, e.g.*, ExxonMobil, *We support the goals set forth by the Paris Agreement…*, Facebook Ad Libr., https://perma.cc/5DWZ-YAWZ; ExxonMobil, *New renewable diesel*, Facebook Ad. Libr., https://perma.cc/6XLV-BD25.

in Hawaiʻi. An ordinary consumer viewing these advertisements would come away believing that Exxon is meaningfully invested in developing and deploying alternative energy technologies, whereas in truth nearly all the company's expenditures are directed toward present and future oil and gas development that hurtles Hawaiʻi and the world toward climate catastrophe. Exxon's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to increase fossil fuel production and sales in the future—renders these advertisements materially misleading.

180. Exxon's "Lights Across America" television advertisement stated that Exxon's natural gas is "helping dramatically reduce America's emissions."[338] Exxon ran this advertisement on a series of television advertisements that aired in Hawaiʻi.[339] Natural gas is a fossil fuel that contributes to planetary warming, which harms coastal states and islands, including Hawaiʻi. Natural gas production and use competes with and its long term use disincentivizes the use of wind and solar power, which emit no GHGs. Exxon's statement that it is "helping dramatically reduce America's emissions" misleadingly portrays Exxon as a "green" company.

181. In 2017, the Dutch Advertising Code Authority censured Shell and Exxon for advertising natural gas as the "cleanest fossil fuel." The Advertising Code Authority reasoned that the claim "suggested that fossil fuels can be clean in that they do not cause environmental damage. It is firm . . . that that suggestion is not correct."[340] Yet Exxon and Shell, along with other Defendants, continue to make the same representations in the United States, including in Hawaiʻi.

### ii. Shell's Misleading and Deceptive Greenwashing Campaigns

182. Like Exxon, Shell has misleadingly promoted, and continues to promote, itself to Hawaiʻi consumers as environmentally conscientious through advertisements in publications such

---

[338] Exxon Mobil TV Spot, *Lights Across America*, iSpot TV (Nov. 26, 2015), https://perma.cc/TJ8G-CBV5 (at 0:43).

[339] *See, e.g.*, CNN, *Amanpour* (Dec. 8, 2015 at 11:15 PM PST), https://archive.org/details/CNNW_20151209_070000_Amanpour/start/942/end/1002?q=%22You+may+not+even+think+about+the+energy+that+lights+up+your+world%22; *see also* Honolulu Star-Advertiser (Dec. 6, 2015), https://perma.cc/4P76-7ZQZ (confirming that CNN's Amanpour aired in Hawaiʻi on Dec. 8, 2015 from 9:00 PM to 9:30 PM HST, or 11:00 PM to 11:30 PM PST).

[340] Arthur Neslen, *Shell and Exxon Face Censure over Claim Gas was 'Cleanest Fossil Fuel'*, The Guardian (Aug. 14, 2017, 12:14 PM EDT), https://perma.cc/VR3R-TEPN.

as *The New York Times*. The advertisements are targeted at and read by Hawai‘i consumers and intended to influence consumer demand for Shell's products.

183.    As part of Shell's "Make the Future" campaign, the company has published numerous advertisements currently viewable on *The New York Times* website,[341] in which the company touts its investment in new energy sources, including liquified natural gas ("LNG") and biofuel, which Shell refers to as "cleaner sources."

184.    One Shell advertisement in *The Washington Post*, "The Making of Sustainable Mobility," refers to LNG as "a critical component of a sustainable energy mix" and a "lower-carbon fuel" that could "help decrease" $CO_2$ emissions.[342] The advertisement emphasizes Shell's leadership in "setting the course" for a "lower-carbon mobility future." Similarly, another Shell advertisement in *The Washington Post*, "The Mobility Quandary," emphasizes Shell's role in working to counteract climate change through investments in alternative energy, stating: "Shell is a bigger player than you might expect in this budding movement to realize a cleaner and more efficient transportation future."[343]

185.    Shell's statements emphasizing its involvement in these many areas of energy-related research, development, and deployment are misleading because the company's investments and activities are substantially smaller than its advertisements lead consumers to believe. As explained above, only 1.33% of Shell's capital spending from 2010 to 2018 was in low-carbon energy sources, and that number continues to be heavily outweighed by Shell's continued expansion of its fossil fuel business.[344]

---

[341] *See, e.g.*, Shell Paid Post, *Moving Forward: A Path To Net-Zero Emissions By 2070*, N.Y. Times, https://perma.cc/5J84-2MDW.

[342] *See, e.g.*, Content from Shell, *The Making of Sustainable Mobility*, Wash. Post, https://www.washingtonpost.com/brand-studio/shell/the-making-of-sustainable-mobility (last visited Nov. 13, 2024).

[343] Content from Shell, *The Mobility Quandary*, Wash. Post., https://www.washingtonpost.com/brand-studio/shell/the-mobility-quandary ("Another critical component of a sustainable energy mix in transportation is further investment in natural gas, a cleaner-burning fossil fuel . . . .").

[344] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX.

186.    Shell's "Make the Future" advertisements also misled consumers about the extent to which Shell has invested in clean energy technology. For example, "The Mobility Quandary" touts Shell's investments in hydrogen fuel cell technology, promoting hydrogen as "sustainable in the long-term" and "[o]ne of the cleaner sources" that power electric vehicles, stating that "[h]ydrogen fuel cell vehicles . . . emit nothing from their tailpipes but water vapor."[345] Shell's "In for the Long Haul" advertisement in *The New York Times* similarly promotes its investment in hydrogen fuel cells, as well as biofuels, as meaningful attempts to mitigate climate change.[346]

187.    One of Shell's public relations firms described the intent of Shell's "Make The Future" campaign, stating: "As part of their efforts to make consumers, particularly millennials, aware of their commitment to cleaner energy, Shell launched the #makethefuture campaign. The company tasked Edelman with the job of giving millennials a reason to connect emotionally with Shell's commitment to a sustainable future. We needed them to forget their prejudices about 'big oil' and think differently about Shell."[347]

188.    Shell's 2016 "#makethefuture" advertising campaign targets young people and misleadingly portrays the company as heavily engaged in developing and selling clean energy sources.[348]

189.    Shell's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to ramp up fossil fuel production and sales in the future—renders its advertisements materially misleading.

190.    In 2017, Shell's CEO promoted massive fossil fuel use by stating that the fossil fuel industry could play a "crucial role" in lifting people out of poverty.[349] Similarly, a 2017 Shell

---

[345] Shell, *The Mobility Quandary*, *supra* note 343.
[346] Shell, *Moving Forward, supra* note 341.
[347] *Shell: South Pole Energy Challenge*, Edelman, https://perma.cc/FUM8-PE7K.
[348] *See* Graham Readfearn, *Hey Millennials, Don't Fall for Shell's Pop Star PR*, The Guardian (April 25, 2018, 1:28 EDT), https://perma.cc/T5YD-YWGJ.
[349] Shell Speech by Ben van Beurden, CEO of Shell, *Deliver Today, Prepare for Tomorrow* (Mar. 9, 2017), https://perma.cc/NBQ4-LJT4.

114

website promotion stated: "We are helping to meet the world's growing energy demand while limiting $CO_2$ emissions, by delivering more cleaner-burning natural gas."[350]

191.    In 2023, the United Kingdom's Advertising Standards Authority banned Shell's marketing campaign in which Shell advertised itself as providing renewable energy, installing electric vehicle chargers, and catalyzing the energy transition.[351] The Authority found that the advertisements "gave the overall impression that a significant proportion of Shell's business comprised lower-carbon energy products," but that the campaign was misleading because the "vast majority" of Shell's business was oil and gas investments and extraction.[352] Shell, along with other Defendants, continues to make similar representations in the United States, including in Hawai'i. For example, Shell posited itself as a leader in renewable energy in multiple television advertisements in 2023 and 2024.[353] Shell ran these advertisements on a series of television shows that aired in Hawai'i.[354]

### iii.    BP's Misleading and Deceptive Greenwashing Campaigns

192.    BP also has misleadingly portrayed itself as diversifying its energy portfolio and reducing its reliance on fossil fuel sales, whereas its alternative energy portfolio is negligible compared to the company's ever-expanding fossil fuel portfolio. To this end, BP has employed a series of misleading greenwashing advertisements, which are intended to influence consumer demand for its products, including consumers in Hawai'i.

---

[350] Shell United States, *Transforming Natural Gas*, https://perma.cc/T9WV-SXRA.

[351] Ed Davey, *Shell's Clean Energy Advertising Campaign is Misleading, UK Watchdog Says*, Assoc. Press (June 7, 2023, 11:50 AM EST), https://perma.cc/9G3D-9P8K; *see also* Advert. Standards Authority, *ASA Ruling on Shell UK Ltd t/a Shell* (June 7, 2023), https://perma.cc/7QVU-MGYD.

[352] *Id.*

[353] *See, e.g.*, Shell TV Spot, *Progress at 225 MPH: Renewable Race Fuel*, iSpot TV (May 29, 2023), https://www.ispot.tv/ad/1zWK/shell-progress-at-225-mph-renewable-race-fuel; Shell TV Spot, *Renewable Electricity Plan: Houston Dash*, iSpot TV (June 20, 2023), https://www.ispot.tv/ad/1XFt/shell-renewable-electricity-plan-houston-dash.

[354] *See, e.g.*, FOX News, *Hannity* (Apr. 17, 2024 at 11:25 PM PDT), https://archive.org/details/FOXNEWSW_20240418_060000_Hannity/start/1537/end/1597?q=%22Shell+Powering+Progress%22+; *see also* Honolulu Star-Advertiser (Apr. 17, 2024), https://perma.cc/ZW9N-REFG (confirming that FOX News' *Hannity* aired in Hawai'i on Apr. 17, 2024 from 8:00 PM to 8:30 PM HST, or 11:00 PM to 11:30 PM PDT).

193.    BP ran its extensive "Beyond Petroleum" advertising and rebranding campaign from 2000 to 2008 and even changed its logo to a sunburst, evoking the renewable resource of the sun. The "Beyond Petroleum" advertising campaign falsely portrayed the company as heavily engaged in low-carbon energy sources and no longer investing in but rather moving "beyond" petroleum and other fossil fuels. In truth, BP invested a small percentage of its total capital expenditure during this period on alternative energy research. The vast majority of its capital expenditure was focused on fossil fuel exploration, production, refining, and marketing.[355] BP ultimately abandoned what had been, until then, its solar and wind assets in 2011 and 2013, respectively, and even the "Beyond Petroleum" moniker in 2013.[356]

194.    In 2019, BP launched an advertising campaign called "Possibilities Everywhere." These advertisements were misleading both in their portrayal of BP as heavily involved in non-fossil energy systems, including wind, solar, and electric vehicles, as well as in their portrayal of natural gas as environmentally friendly.

195.    One "Possibilities Everywhere" advertisement, called "Better fuels to power your busy life," stated:

> We [] want—and need—[] energy to be kinder to the planet. At BP, we're working to make our energy cleaner and better. . . . At BP, we're leaving no stone unturned to provide [the] extra energy the world needs while finding new ways to produce and deliver it with fewer emissions. . . . We're bringing solar and wind energy to homes from the US to India. We're boosting supplies of cleaner-burning natural gas. . . . More energy with fewer emissions? We see possibilities everywhere to help the world keep advancing.[357]

The accompanying video showed a busy household while a voiceover said, "We all want more energy, but with less carbon footprint. That's why at BP we're working to make energy that's

---

[355] *See* BP, *Annual Reports and Accounts 2008*, https://perma.cc/9CLF-JTS4.
[356] Javier E. David, *'Beyond Petroleum' No More? BP Goes Back to Basics*, CNBC (Apr. 20, 2013 12:00 AM EDT), https://perma.cc/U5UW-MYNK.
[357] *See* BP, *Better Fuels to Power Your Busy Life*, https://perma.cc/H42Q-LNSB.

cleaner and better."[358] This video was also extensively advertised on television, including on programs that aired in Hawai'i.[359]

196.    But BP's claim that non-fossil energy systems constitute a substantial portion of BP's business was materially false and misleading. At the time of the advertisement, BP owned only approximately 1.7 gigawatts ("GW") of wind capacity, which was dwarfed by other companies including GE, Siemens, and Vestas (with about 39 GW, 26 GW, and 23 GW capacities, respectively).[360] Overall, installed wind capacity in the United States was approximately 100 GW, meaning BP's installed capacity comprised a mere 1% of the market.[361] Yet, "Blade runners," another advertisement in BP's "Possibilities Everywhere" campaign, described the company as "one of the major wind energy businesses in the US."[362] In short, BP's proportionately small wind power portfolio was materially smaller than that conveyed in the company's advertisements.

197.    The same is true for BP's activities in solar energy, which consist predominantly of its purchase of the solar company Lightsource (rebranded Lightsource BP).[363] The total purchase price ($454 million) represents only a miniscule percentage of BP's annual capital spending ($16 billion in 2023), nearly all of which is spent on fossil fuel production.[364] This is a far cry from BP's claim that it was "leaving no stone unturned" to find "new" ways to produce lower-emissions energy and playing a "leading role" in "advancing a low carbon future." These claims convey the misleading impression to ordinary consumers that BP is substantially invested in developing and deploying clean energy technology, whereas in truth nearly all the company's

---

[358] *Id.*

[359] *See, e.g.*, CNN, *The Situation Room* (Feb. 19, 2019 at 2:55 PM PST), https://archive.org/details/CNNW_20190219_220000_Situation_Room_With_Wolf_Blitzer/start/3349/end/3405?q= That%27s+why+at+BP+we%27re+working+to+make+energy+that%27s+cleaner+and+better.; *See also* Honolulu Star-Advertiser (Feb. 17, 2019), https://perma.cc/5UA6-FNT3 (confirming that *The Situation Room* aired in Hawai'i on Feb. 19 from 12:00 PM to 1:00 PM HST, or 2:00 PM to 3:00 PM PST).

[360] For BP's wind capacity, see Press Release, *BP Advances Offshore Wind Growth Strategy* (Feb. 8, 2021), https://perma.cc/V33G-U6LU. For wind capacity of GE, Siemens, and Vestas, see Abby McClain, *The 10 Largest Wind Power Companies in the World* (Apr. 18, 2023), https://perma.cc/UB4P-WMXW.

[361] *See* Elizabeth Ingram, *U.S. Wind Capacity Grew 8% in 2019, AWEA says*, Renewable Energy World (Apr. 10, 2019), https://perma.cc/4U9D-7S33.

[362] *See* BP, *Blade Runners*, https://perma.cc/V7ZW-F58W.

[363] BP, *Annual Report and Form 20-F 42* (2017), https://perma.cc/PD35-ZML6; *see also* Ron Bousso, *BP to Buy Remaining 50% In Solar JV Lightsource BP*, Reuters (Nov. 30, 2023), https://perma.cc/4M4M-NT26.

[364] *See* BP, *4Q 2023 Quarterly Results*, https://perma.cc/3FZA-Q3LP.

117

present and future expenditures are directed toward oil and gas development that hurtles the world toward climate catastrophe. BP's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to ramp up fossil fuel production and sales in the future—renders these advertisements materially misleading.

198.    In BP's web advertisement "Rise and shine," the company nevertheless specifically touted its Lightsource partnership. "Our economics gurus believe [solar power] could account for 10% of the world's power by 2040," the advertisement stated, and "to help make that a reality, we've teamed up with Europe's largest solar company, [Lightsource BP]."[365] The advertisement highlighted Lightsource BP's 6.3-megawatt ("MW") floating solar power station near London and Lightsource BP's deal with Budweiser to supply renewable energy to its U.K. breweries. "Projects like these are advancing the possibilities of solar," BP claimed, "and even the rainy days can't dampen the excitement for this fast-growing energy source. That's because, whatever the weather, our cleaner-burning natural gas can play a supporting role to still keep your kettle ready for action."[366]

199.    This portrayal of solar power as BP's strong interest, with natural gas used only as a backup, is also false. BP's investments in natural gas outstrip its solar investments by a factor of approximately 100 or more, and only a small fraction of its natural gas products, an estimated 5% or less, are used to backup renewables. Thus, the overall impression given by the advertisements—that BP is substantially invested in solar energy, with its natural gas used only for backup—is materially misleading to consumers.

200.    BP misleadingly touts natural gas on its website as "a vital lower carbon energy source" and as playing a "crucial role" in a transition to a lower carbon future.[367] BP promotes continued massive fossil fuel use as enabling two billion people to be lifted out of poverty.[368]

---

[365] BP, *Rise and Shine*, https://perma.cc/MM6Q-M6D7.

[366] *Id.*

[367] BP, *Sustainability Report 2016*, https://perma.cc/2A7F-4YVZ; BP, *Shifting Towards Gas*, https://perma.cc/7W8P-NU37.

[368] BP, *Energy Outlook 2024* (July 10, 2024), https://perma.cc/YK6K-BTW3.

118

### iv.    Chevron's Misleading and Deceptive Greenwashing Campaigns

201.    Chevron also engaged in greenwashing campaigns designed to deceive consumers about Chevron's products and its commitment to addressing climate change, including consumers in Hawai'i.

202.    In 1996, Chevron claimed in a print advertisement that appeared in *The Atlantic* that the endangered Hawaiian Stilt was beginning to thrive for the first time in generations thanks to Chevron's refinery on O'ahu, Hawai'i.

203.    In 2001, Chevron developed and shared a sophisticated information management system to gather GHG emissions data from its explorations and production to help regulate and set reduction goals.[369] Beyond this technological breakthrough, Chevron touted "profitable renewable energy" as part of its business plan for several years and launched a 2010 advertising campaign promoting the company's move towards renewable energy. Despite this rhetoric—and Chevron renewable power group's $27 million profit in 2013—Chevron sold its renewable energy unit in 2014.[370]

204.    In 2006, Chevron ran a full-page advertisement in the *Honolulu Star-Advertiser* misleadingly stating that they "maintain some of the highest environmental standards on earth," and are "[d]eveloping energy today, protecting Hawaii for tomorrow":

---

[369] Press Release, *Chevron Introduces New System to Manage Energy Use*, Chevron (Sept. 25, 2001), https://perma.cc/LY9M-XW4Y.

[370] Ben Elgin, *Chevron Dims the Lights on Green Power*, Bloomberg (May 29, 2014), https://perma.cc/RZT7-WY9C.



**Figure 9: "Developing energy today, protecting Hawaiʻi for tomorrow" Chevron Advertisement**[371]

---

[371] Honolulu Star-Advertiser (July 2, 2006), https://perma.cc/B55S-3HSJ.

205.    Chevron's 2007 "Will You Join Us?" campaign and its 2008 "I Will" campaign both misleadingly portrayed the company as a leader in renewable energy. The campaigns' advertisements portrayed minor changes in consumer choices (e.g., changing light bulbs) as sufficient to address environmental problems such as climate change.[372]

206.    The overall thrust of the campaigns was to shift the perception of fault and responsibility for climate change to consumers and make Chevron's role, and that of the broader fossil fuel industry, appear small. The misleading solution promoted to consumers was not to transition away from fossil fuels, but instead to implement small changes in consumer behavior with continued reliance on fossil fuel products. By portraying GHG emissions as deriving from numerous sources in addition to fossil fuels, Chevron's advertisements obfuscated the fact that fossil fuels are the primary cause of increased GHG emissions and the primary driver of climate change.

207.    Misleading messages were emblazoned over images of everyday Americans, as in the example highlighted below:

[372] *See* Mark Robert Wills, *Chevron*, https://perma.cc/TW6G-W4BV; *see also* Jean Halliday, *Chevron: We're Not Big Bad Oil*, AdAge (Sept. 28, 2007), https://perma.cc/8T8Q-G9QY.



**Figure 10: "Will You Join Us?" Chevron Advertisement[373]**

208.    In 2010, Chevron launched an advertising campaign titled "We Agree." The print, internet, and television ad campaign expanded across the United States and internationally. For example, the advertisement below highlighted Chevron's supposed commitment to the development of renewable energy, stating in large letters next to a photo of a young girl, "It's time oil companies get behind the development of renewable energy. We agree." The advertisement emphasized: "We're not just behind renewables. We're tackling the challenge of making them affordable and reliable on a large scale."[374]

---

[373] Chevron, *I will leave the car at home more* (archived on web.archive.org on Sep. 30, 2009), https://perma.cc/M2HN-EKZZ.

[374] *See* Mark Robert Wills, *Chevron*, https://perma.cc/TW6G-W4BV.



**Figure 11: "We Agree" Chevron Advertisement**

209.    Chevron's portrayal of itself as a renewable energy leader was false and misleading. In reality, only 0.23% of Chevron's capital spending from 2010 to 2018 was in low-carbon energy sources, and 99.77% was in continued fossil fuel exploration and development—a stark contrast to the message communicated to consumers through the company's advertisements.[375]

---

[375] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX; Anjli Raval & Leslie Hook, *Oil and Gas Advertising Spree Signals Industry's Dilemma*, Fin. Times (Mar. 6, 2019), https://perma.cc/5JPC-V56J.

210.    By 2013, Chevron's "We Agree" campaign featured 1,700 print advertisements, 141 online projects, 55 web pages, and a local community advertising kit of more than 100 advertisements.[376] Chevron's "We Agree" campaign also featured misleading television advertisements. In one focused on renewable energy, a teacher says, "Ok, listen. Somebody has got to get serious. We need renewable energy." To which a Chevron environmental operations employee responds, "At Chevron we're investing millions in solar and biofuel technologies to make it work." In reality, Chevron has continued to overwhelmingly focus on fossil fuel extraction and development, and its investment of "millions" in renewables is miniscule in comparison to its investment of billions in fossil fuels. An ordinary consumer watching the "We Agree" advertisements would be misled into believing Chevron has meaningfully invested in developing and deploying clean technologies, whereas nearly all the company's spending is directed toward oil and gas development. Chevron's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to ramp up fossil fuel production and sales in the future—renders these advertisements materially misleading.

211.    Today, Chevron's website implores that they "believe the future of energy is lower carbon" while continuing to promote widespread use of fossil fuels, touting that a mix of oil and gas will be required to meet future energy demands and that Chevron is investing in its oil and gas operations to meet those demands.[377] A prior Chevron advertisement still available on the web promotes Chevron fossil fuels on a massive scale by stating that "our lives demand oil."[378]

212.    Recently, Chevron has also engaged in greenwashing advertisements targeted exclusively to Hawaiʻi consumers. For example, Chevron has extensively advertised a carbon offset program exclusively to Hawaiʻi consumers via social media, Hawaiʻi news stations, and at

---

[376] *See* Wills, *supra* note 372, *Chevron "We Agree" Case Study* Vimeo at 03:28.
[377] Chevron, *Explore a Lower Carbon Future For All*, https://perma.cc/5MBN-K93D; Chevron, *Sustainability Climate*, https://perma.cc/EA3T-MB2Z.
[378] Driving Sales Beyond, *Chevron Human Energy*, YouTube, at 0:59 (Feb. 26, 2009), https://perma.cc/WG28-WM7G.

gas stations in Hawai'i.[379] As part of this misleading campaign, Chevron has made claims such as: "Fueling your car at Texaco stations helps to reduce your carbon footprint";[380] "fill up your tank while helping the environment";[381] "It's a simple way for you as a driver to lower your carbon footprint";[382] and "Earth Day may be over, but we protect our island every day [through our offset program]."[383]

### v.  Sunoco's Misleading and Deceptive Greenwashing Campaigns

213.  Sunoco also engaged in greenwashing campaigns designed to deceive consumers about Sunoco's products and its commitment to addressing climate change, including consumers in Hawai'i.

214.  In 2019, Sunoco launched a nationwide advertising campaign, "Fuel Your Best," to promote its fuel. This campaign "drove two of Sunoco's record-highest sales quarters, ever."[384] Sunoco explains on its website that Sunoco Ultratech "help[s] your engine run cleaner" and that other fuels can have "[u]p to 200 percent more carbon monoxide and a 30 percent increase in hydrocarbon emissions."[385] Sunoco also ran multiple advertisements, through its own accounts and through social media influencers, stating that "[n]ot all fuels are created equal" and that Sunoco Ultratech is a fuel "that helps your engine run cleaner, longer, and more efficient."[386]

215.  Sunoco's website says that the company "takes great pride and commitment in working to protect the public and environment."[387]

---

[379] *See, e.g.*, Brandon Kubo, Sponsored by Texaco in Hawaii, *Texaco helps the environment and community with free gas giveaway*, Hawaii News Now (Sept. 28, 2021), https://perma.cc/BQ9L-YGHJ; Texaco in Hawaii, *Rise Up and Make New*, Facebook Ad Libr., https://perma.cc/U6MQ-DP5C; Texaco in Hawaii, *Ho'āla - Rise Up and Make New*, YouTube, https://perma.cc/SUX4-3X5L.

[380] Facebook, *Texaco in Hawaii* (Jan. 31, 2021), https://perma.cc/8SCV-HC9P.

[381] Brandon Kubo, Sponsored by Texaco in Hawaii, *Texaco helps the environment and community with free gas giveaway*, Hawaii News Now (Sept. 28, 2021), https://perma.cc/BQ9L-YGHJ.

[382] *Id*.

[383] Texaco in Hawaii, Facebook (Apr. 29, 2021), https://perma.cc/8SCV-HC9P.

[384] Effie, *Sunoco, Fuel Your Best* (2021), https://perma.cc/9W74-PBKP.

[385] News Staff, *Passion Meets Performance*, *5 Reasons to Always Use Top Tier Fuel*, Sunoco (Jan. 26, 2021), https://perma.cc/9VN9-L5PD.

[386] GoSunoco, *Fill Up With Sunoco UltraTech, Facebook* (Sep. 16, 2020), https://perma.cc/F6P5-52U3; TikTok, @milesabovetech (Mar. 3, 2023), https://perma.cc/4D2F-X6H5.

[387] Sunoco, *Discover Sunoco's History*, https://perma.cc/9BF3-XP4D.

216.    Sunoco created advertisements in the form of "license plate" posters that appeared above pump stations. According to the consultant who worked on the campaign, Sunoco "proudly *owned* the campaign" which ran for years. The Sunoco campaign "tap[ped] the tension between high performance and clean – two contrary brand attributes," and the campaign was "constantly refreshed with new *mean* and *green* brand messages." Overall, the campaign featured a new headline every week for a year and an auto show car with over 150 license plate advertisements on it. Sunoco messages featured on the license plates and the auto show car include "Proud sponsor of breathing" and "Do something good for the environment. Drive."



**Figure 12: Sunoco License Plate Advertisements**[388]

217.    Sunoco has also engaged in greenwashing advertisements targeted exclusively to consumers in Hawai'i. For example, in 2024 the "Aloha Gas" Facebook and Instagram accounts posted that they offer "eco-friendly gasoline that helps reduce emissions and protect our beautiful island environment."[389]

### vi.    ConocoPhillips' Misleading and Deceptive Greenwashing Campaigns

218.    ConocoPhillips has used misleading Facebook advertisements that reached Hawai'i consumers to position itself as supporting the transition to renewable energy and achievement of

---

[388] Marc Stoiber, *Case Study: Sunoco* (Oct. 22, 2024), https://perma.cc/VHD5-WJ52.
[389] *See* Aloha Gas, Facebook post (Mar. 25, 2024), https://perma.cc/FE2M-VK2B; @alohagasltd, Instagram post (Mar. 25, 2024), https://perma.cc/F6CK-RAY5.

state climate targets, despite the negligible fraction of its business invested in renewable energy compared to fossil fuels. For example, in 2020 ConocoPhillips ran an advertisement on Facebook and Instagram targeted at Hawai'i consumers that highlighted its "plans to support demand for renewable fuels." [390]

219.    ConocoPhillips has also directed greenwashing campaigns at consumers in Hawai'i through publications with significant circulation in Hawai'i. For example, in 2008, ConocoPhillips ran a series of advertisements in publications such as *The Atlantic* under the headline "Tomorrow begins today." The advertisements typically contained a picture of an older person and a child, and the text began with the phrase "[w]e're defined by what we pass on to the next generation," followed by statements such as: "That's why, as one of North America's leading producers of natural gas, ConocoPhillips is providing clean-burning fuel to homes"; "That's why ConocoPhillips is working to provide clean, efficient technology to turn coal into clean-burning fuel"; or "That's why ConocoPhillips is funding college and university programs, like biofuels research at Iowa State University, to develop new energy sources." The ads continued with statements such as: "And we're stepping up our own research to create new, cleaner fuels and improve environmental performance."; or "And, because we believe we're responsible for finding long-term solutions for future generations, ConocoPhillips is exploring new sources of secure, stable energy."[391]

220.    In 2011, ConocoPhillips directed a series of greenwashing television advertisements at consumers in Hawai'i and elsewhere which promoted natural gas as clean and environmentally friendly. For example, one television advertisement contained the statements: "We need to protect the environment"; "What about our planet?"; and "At ConocoPhillips, we're helping power America's economy with cleaner, affordable natural gas. More jobs, less emissions.

---

[390] Phillips 66, *What are renewable fuels?*, https://perma.cc/7955-S29V.

[391] *See, e.g.*, ConocoPhillips, *Tomorrow begins today* (archived Apr. 20, 2009), https://perma.cc/4VDM-VHXZ; ConocoPhillips, *Tomorrow begins today* (archived Apr. 18, 2009), https://perma.cc/6C4R-GGCB; ConocoPhillips, *Tomorrow begins today* (archived Nov. 16, 2008), https://perma.cc/H4YE-H964.

A good answer for everyone." This advertisement ran on programs that aired in Hawaiʻi.[392] The advertisements directed consumers to a ConocoPhillips website which contained additional misleading statements, including "Natural Gas is best for the environment," "Natural Gas is Clean," and "Natural gas for power production avoids some of the challenges facing wind, solar, biofuels and nuclear power generation technologies, such as visual impact, competing land uses, bird strikes and waste disposal."[393] ConocoPhillips also produced a series of print advertisements around this time with similar misleading statements (see Figure 13).

---

[392] *See, e.g.*, CNN, *CNN Newsroom* (Oct. 30, 2011 at 3:54 PM PDT), https://perma.cc/FF2Z-RDVE; *see also* Honolulu Star-Advertiser (Oct. 30, 2011), https://perma.cc/4JMX-LZA3 (confirming that *CNN Newsroom* aired on CNN in Hawaiʻi on Oct. 30, 2011 from 12:00 PM to 1:00 PM HST, or 3:00 PM to 4:00 PM PDT).

[393] *See* ConocoPhillips Company, *There's Power in Cooperation* (archived by web.archive on Oct. 17, 2011), https://perma.cc/F5F2-V5Q8; *see also* ConocoPhillips Company, *Clean* (archived by web.archive on Oct. 8, 2011), https://perma.cc/24KQ-EJCD.



**Figure 13: ConocoPhillips' Print Advertisement[394]**

221.    ConocoPhillips' 2012 Sustainable Development report declared developing renewable energy a priority in keeping with their position on sustainable development and climate change.[395] However, the company's 10-K filing from the same year told a different story: "As an independent E&P company, we are solely focused on our core business of exploring for, developing and producing crude oil and natural gas globally."[396] This is also reflected in ConocoPhillips' capital spending. From 2010 to 2018, only 0.03% of ConocoPhillips' capital

---

[394] ConocoPhillips Company, *There's Power in Cooperation*, *Class* (archived by web.archive on Mar. 16, 2012), https://perma.cc/WEM6-YSSC.

[395] ConocoPhillips, *Sustainable Development* (2012), https://perma.cc/8ETD-PT2J.

[396] ConocoPhillips, Form 10-K: Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 23 (Dec. 31, 2012), https://perma.cc/JP5G-MYQN.

spending was in low-carbon energy sources—a stark contrast to the message communicated to consumers through the company's advertisements.[397]

222.    ConocoPhillips made these misleading statements and omissions despite the fact that fossil fuels are the primary cause of increased greenhouse gas emissions and the primary driver of climate change, and that ConocoPhillips has continued to overwhelmingly focus on fossil fuel extraction and development. Further, describing natural gas as "clean-burning," "clean," and good for the environment is misleading because natural gas is a fossil fuel, the burning of which is the leading cause of climate change; and the focus on consumer use obscures the significant methane and other greenhouse gas emissions resulting from the extraction, production, and long-term use of natural gas.

### vii.    WEH's Misleading and Deceptive Greenwashing Campaigns

223.    Like other Fossil Fuel Defendants, WEH engaged in greenwashing advertisements designed to deceive Hawai'i consumers about WEH's products and its commitment to addressing climate change.

224.    WEH produced and directed print advertisements to Hawai'i consumers that, for example, touted WEH's efforts to reduce air emission and posited WEH as "working hard to preserve Hawaii's environment."[398]

---

[397] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX.

[398] BHP Hawaii Inc., *Print Ads, Ad 3* (archived by web.archive on Jan. 28, 1998), https://perma.cc/28UL-YP2Z.



**Figure 14: WEH's Print Advertisement[399]**

225.    WEH also produced and directed greenwashing television advertisements to Hawai'i consumers, including one advertisement that highlighted the company's support for environmental nonprofits in Hawai'i.[400]

226.    WEH ran a series of advertorials in Hawai'i newspapers in the 1990s which misleadingly promoted natural gas as a clean and environmentally friendly fossil fuel for Hawai'i consumers to cook with. For example, WEH misleadingly described natural gas as "helping to preserve Hawaii's clean air" and claimed that it is "friendly to Hawaii's environment because it is clean burning."[401]

---

[399] BHP Hawaii Inc., *Print Ads, Ad 3* (archived by web.archive on Jan. 28, 1998), https://perma.cc/28UL-YP2Z.
[400] *See, e.g.*, BHP Hawaii Inc., *TV Spots* (archived by web.archive on Jan. 28, 1998), https://perma.cc/9K4Y-4VB9; *see also* BHP Hawaii Inc., *Todd* (archived by web.archive on Nov. 4, 1996), https://web.archive.org/web/19961104034128/http://www.energypeople.com/energy/todd.aiff.
[401] Honolulu Star-Bulletin (June 13, 1996), https://perma.cc/D4HA-CBYR; Honolulu Star-Bulletin (Sep. 7, 1995), https://perma.cc/3N4Z-KLKG.

227.    WEH's advertisements in Hawaiʻi newspapers directed consumers in Hawaiʻi to their website, where WEH made misleading statements specifically targeted at consumers in Hawaiʻi.[402] The statements made on WEH's website promoted the continued use of WEH's petroleum products, gave the misleading impression that WEH's natural gas was clean and environmentally friendly, and posited WEH as a leader in environmental conservation and supporter of renewable energy. Statements made by WEH on its website include: "BHP Gas Company produces clean, efficient synthetic natural gas"; "[BHP's] plant uses a clean, no-polluting process that is environmentally compatible";[403] "Cleaning The Environment One Vehicle At A Time"; and "LP-Gas is a clean burning fuel with minimal emissions."[404] Additionally, although WEH claimed to "support[] development of alternative energy," they stated that "for now the solution to Hawaii's growing energy demands is oil."[405]

228.    WEH made these misleading statements and omissions despite the fact that fossil fuels are the primary cause of increased greenhouse gas emissions and the primary driver of climate change. Further, describing natural gas as "clean-burning," "clean," and good for the environment is misleading because natural gas is a fossil fuel, the burning of which is the leading cause of climate change; and the focus on consumer use obscures the significant methane and other greenhouse gas emissions resulting from the extraction, production, and long-term use of natural gas.

### viii.    API's Misleading and Deceptive Greenwashing Campaigns

229.    The Fossil Fuel Defendants also collectively promote their fossil fuel products through Defendant API, which makes public statements and claims about oil and natural gas. These public statements include advertisements and promotional campaign websites that have been directed at and/or reached Hawaiʻi, and which reasonable consumers would understand to

---

[402] *See, e.g.*, Honolulu Star-Bulletin (June 13, 1996), https://perma.cc/D4HA-CBYR; Honolulu Star-Bulletin (Oct. 31, 1997), https://perma.cc/WJ8V-WL2H.

[403] BHP Hawaii Inc., *BHP Gas Company* (archived by web.archive on Nov. 4, 1996), https://perma.cc/3GAH-37NK.

[404] BHP Hawaii Inc., *Clean Air* (archived by web.archive on June 12, 1997), https://perma.cc/DEH7-ZS88.

[405] BHP Hawaii Inc., Hana (archived by web.archive on Nov. 4, 1996), https://perma.cc/GRB6-WL8G.

mean that the Fossil Fuel Defendants' fossil fuel products are beneficial or benign and not harmful to the environment. In particular, API's marketing material falsely promotes the narrative that natural gas is an environmentally friendly fuel. For example, a Facebook advertisement by API that reached Hawai'i states, "Cleaner burning natural gas reduces CO2 emissions at home and bolsters energy security abroad."[406]

230.    In several advertisements in *The Washington Post*—e.g., "Why natural gas will thrive in the age of renewables," "Real climate solutions won't happen without natural gas and oil," and "Low- and no-carbon future starts with natural gas"—API has misleadingly touted natural gas as "part of the solution" to climate change. API falsely claims natural gas is "clean."[407] API also promotes natural gas's purported benefits through a campaign titled "Energy for a Cleaner Environment."

231.    API further claims, falsely, that, "[n]atural gas is an economical, environmentally friendly complement to renewable energy. The sooner green activists realize that, the more effective they'll be at continuing to slash emissions."[408]

232.    API markets itself as being an environmental steward, committed to helping reduce GHG emissions. API's 2021 Climate Action Framework portrays the organization as a partner in moving towards a climate solution, stating: "Our industry is essential to supplying energy that makes life modern, healthier and better while doing so in ways that tackle the climate challenge: lowering emissions, increasing efficiency, advancing technological innovation, building modern infrastructure and more."[409] As part of this campaign, API has offered on its website, in social media posts, and in other advertisements that have reached residents of Hawai'i, the image below, of lush greenery and a message that "88% of Americans favor energy companies helping meet

---

[406] Am. Petroleum Inst., *LNG is Pro-Environment and Pro-Energy Security*, Facebook Ad Libr., https://perma.cc/8X7Y-VAB7.

[407] Am. Petroleum Inst., *Why Natural Gas will Thrive in the Age of Renewables*, Wash. Post Creative Grp., https://perma.cc/U48M-VA8R; Mike Sommers, *Real Climate Solutions Won't Happen Without Natural Gas and Oil*, Wash. Post (Dec. 14, 2020), https://perma.cc/6RPX-R2SX.

[408] WP BrandStudio, *Low- And No-Carbon Future Starts with Natural Gas*, Wash. Post Creative Grp. (Content from API) (Feb. 15, 2019), https://perma.cc/ZRA7-7FDY.

[409] *Climate Action Framework*, Am. Petroleum Inst., 5 (2021), https://perma.cc/2DQN-2P52.

133

environmental challenges." API elaborates within the advertisement that "natural gas and oil []

powers and supports modern living . . . with lower emissions."



**Figure 15: API, We Are America's Generation Energy**[410]

233.    In 2017, API launched an advertising campaign called "Power Past Impossible,"

which portrayed the oil and gas industry as a sustainable, healthy, and essential part of societal

progress.[411] API President and CEO Jack Gerrard misleadingly stated that "greenhouse gas

emissions . . . are near 25 year lows," when GHG emissions globally were in fact increasing, and

total GHG emissions in the U.S. (including methane, not just carbon dioxide) had not been shown

to decline as claimed.[412] The campaign's opening advertisement, which aired nationally during the

---

[410] *We Are America's Generation Energy*, Am. Petroleum Inst. (2019), https://perma.cc/G9H3-62RP.

[411] *See* Am. Petroleum Inst., *API Launches Power Past Impossible Campaign During Super Bowl Showing Natural Gas and Oil Benefit to Consumers in Everyday Life*, PR Newswire (Feb. 5, 2017, 18:32 ET), https://perma.cc/UE5Y-QFAQ.

[412] *Id.*

Superbowl, stated: "Oil pumps life. Oil runs cleaner." The advertisement ignored the climate and public health harms caused by oil.[413] In 2018, API ran another advertisement under the same campaign which claimed, "thanks to natural gas the air up here is cleaner than it's been in 25 years." This advertisement ran on television programs broadcast in Hawaiʻi.[414] And as of July 21, 2020, the Power Past Impossible website described oil as "Energy for a Cleaner Environment." In touting the environmental benefits of oil, the website also made the following false or misleading assertions: "This is Energy for a Cleaner Environment," "99% Fewer Vehicle Emissions," and "Cleanest Air in More Than a Decade."[415] In 2020, API launched a nationwide advertising campaign called "Energy for Progress," which portrays the oil and gas industry as a leader in reducing GHG emissions.[416] The opening advertisement for the campaign states that "natural gas and oil companies have . . . reduced carbon emission levels to the lowest in a generation."[417] Similarly, in a September 2023 Twitter post, API stated "American natural gas & oil is committed to creating climate solutions."[418]

234. The Energy for Progress website also contains advertisements such as "Five Ways We're Helping to Cut Greenhouse Gas Emissions," which misleadingly portrays the oil and gas industry as an environmental leader by focusing on marginal improvements in operational emissions while ignoring the much greater emissions from the industry's products.[419]

---

[413] Am. Petroleum Inst. (@powerpastimpossible), *Oil: Power Past Impossible*, YouTube (Feb. 4, 2017), https://perma.cc/67CK-3AE9.

[414] *See, e.g.*, CNN, *CNN Newsroom* (Nov. 1, 2018 at 12:50 PM PDT), https://perma.cc/UV67-QA3V; *see also* West Hawaii Today (Oct. 28, 2020), https://perma.cc/ZS6V-6LJQ (confirming that *CNN Newsroom* aired on CNN in Hawaiʻi on Nov. 1, 2018 from 9:00 AM to 10:00 AM HST, or 12:00 PM to 1:00 PM PDT).

[415] *See* Am. Petroleum Inst., *Energy for a Cleaner Environment*, Power Past Impossible, https://perma.cc/FAS7-NNXB.

[416] *See API Launches New National Campaign 'Energy for Progress', Highlights U.S. Energy Leadership in Annual State of American Energy Event*, Am. Petroleum Inst. (Jan. 7, 2010), https://perma.cc/53NP-SCJZ.

[417] *See* Am. Petroleum Inst., *Solving Big Challenges Requires Energy*, YouTube (Jan. 7, 2020), https://perma.cc/32NW-ESFE.

[418] Am. Petroleum Inst. (@APIenergy), X (Sept. 5, 2023, 12:25 PM), https://perma.cc/4QJG-WTZB.

[419] *See* Am. Petroleum Inst., *Five Ways We're Helping to Cut Greenhouse Gas Emissions*, Am. Natural Gas & Oil Energy for Progress (Apr. 17, 2020), https://perma.cc/Q3KN-RHUC.



**Figure 16: API advertisement from its Energy for Progress campaign,
used as the campaign's Facebook banner.**[420]

235.     Tellingly, however, API's strategy does not advocate for or even mention a reduction in fossil fuel production as a strategy to protect the climate. Rather, it focuses on potential technological advances and shifting to heavier reliance on natural gas as a "clean fuel." And an internal API email shows that its Climate Action Framework was in fact organized around the purpose of "the continued promotion of natural gas in a carbon constrained economy."[421] As discussed above, natural gas is far from a "clean" fuel, as API misleadingly claims, because natural gas production and transmission contribute substantially to climate change by the release of methane, an extremely potent GHG, and combustion, which releases $CO_2$.

236.     API's misinformation campaign has and continues to reach Hawai'i residents. API has and continues to finance advertisements targeting Hawai'i consumers, including a recent advertisement stating "I am Pro-Natural Gas. It's Who I Am."[422] Another API advertisement stated

---

[420] Am. Natural Gas & Oil Energy for Progress, *LET'S CREATE CLIMATE SOLUTIONS TOGETHER* (photograph), Facebook, https://perma.cc/GK7X-W9KT.

[421] *See* Memorandum from Chairwoman Carolyn B. Maloney & Chairman Ro Khanna to Members of the U.S., House of Rep., Comm. on Oversight & Reform, *Investigation of Fossil Fuel Industry Disinformation* (Dec. 9, 2022), https://perma.cc/JSX6-JNLK.

[422] Energy Citizens, *I AM PRO-NATURAL GAS. ITS WHO I AM*, Am. Petroleum Inst., Facebook Ad Libr. (Oct. 2, 2024), https://perma.cc/87XN-VYKC.

that "[i]ndustry investment in carbon capture technology has kept America at the forefront of decreasing emissions."[423]

### G. Fossil Fuel Defendants and API Also Made Misleading Claims About Specific "Green" or "Greener" Fossil Fuel Products.

237.    Fossil Fuel Defendants and API have also engaged in extensive and highly misleading marketing efforts aimed at promoting some fossil fuel products as "green" and environmentally beneficial. For example, as early as the 1970 advertorial below (Figure 17)—at which time Chevron already knew of the environmental risks posed by its fossil fuel products— Chevron marketed a gasoline additive in Hawai'i as one that "helps towards cleaner air" by reducing "unburned hydrocarbon and carbon monoxide exhaust emissions dramatically."[424] The Chevron advertorial further claimed that "Clearly, this [additive] is a major step towards solving one of today's most urgent problems." Similarly, a Shell advertorial from 1970 that ran in Hawai'i and targeted Hawai'i consumers claimed that "[w]hen it comes to cleaner air, you can count on Shell to do its part."[425]

---

[423] Am. Petroleum Inst., *CARBON CAPTURE*, Facebook Ad Libr. (Jan. 22, 2020 - Feb. 3, 2020), https://perma.cc/7227-YDVK.
[424] Hawaii Tribune-Herald (Feb. 13, 1970), https://perma.cc/SJB8-5D4E.
[425] Honolulu Star-Bulletin (June 4, 1970), https://perma.cc/S7ZC-TPQQ.

137



**Figure 17: 1970 Chevron Advertorial in the _Hawaii Tribune-Herald_**[426]

238.    Fossil Fuel Defendants' advertising and promotional materials fail to disclose the extreme safety risk associated with the use of fossil fuel products, which are causing "catastrophic" climate change, as understood by Defendants for decades.[427] Fossil Fuel Defendants continue to omit that important information to this day, consistent with their goal of maintaining consumer demand for fossil fuel products despite the risks those products pose for the planet and its people.

239.    Defendants misleadingly represent that consumer use of certain fossil fuel products actually helps customers reduce emissions. But emphasizing relative climate and "green" benefits while concealing the dangerous effects of continued high rates of fossil fuel use creates an overall

---

[426] Hawaii Tribune-Herald (Feb. 13, 1970), https://perma.cc/SJB8-5D4E.
[427] _See, e.g._, ¶¶ 59–99, _supra_.

138

misleading picture that hides the dire climate impacts resulting from normal consumer use of Fossil Fuel Defendants' fossil fuel products. Contrary to Fossil Fuel Defendants' "green" claims, the development, production, refining, and consumer use of Fossil Fuel Defendants' fossil fuel products (even products that may yield relatively more efficient engine performance) *increase* GHG emissions to the detriment of public health and consumer welfare. No matter what chemicals are added to the fuel mixture, burning gasoline always emits GHGs, thereby contributing to climate change and its associated impacts. Fossil Fuel Defendants' additive marketing cloaks their gasoline products in an environmentally friendly veneer while misleadingly concealing the hazardous climatic effects of burning fossil fuels.

240.    In addition, at the same time Fossil Fuel Defendants have been actively promoting their "greener" gasoline products at Hawai'i gas stations and on their company websites, Fossil Fuel Defendants have also been massively expanding fossil fuel production and increasing emissions. If consumers understood the full degree to which Fossil Fuel Defendants' fossil fuel products contributed to climate change and realized that Fossil Fuel Defendants had not in fact materially invested in alternative energy sources or were otherwise environmentally cautious, they likely would have acted differently, e.g., by not purchasing Fossil Fuel Defendants' products or purchasing less of them.

241.    In the promotion of these and other fossil fuel products, including at their branded gas stations in Hawai'i, Fossil Fuel Defendants fail to disclose the fact that fossil fuels are the leading cause of climate change and that current levels of fossil fuel use—even purportedly "cleaner" or more efficient products—represent a direct threat to Hawai'i and the environment. Fossil Fuel Defendants' omissions in this regard are consistent with their goal of influencing consumer demand for fossil fuel products through greenwashing. Fossil Fuel Defendants also fail to require their vendors and third-party retail outlets to disclose facts pertaining to the impact the consumption of fossil fuels and their "cleaner" alternatives have on climate change when selling Fossil Fuel Defendants' fossil fuel products.

139

242. Fossil Fuel Defendants' marketing of these fossil fuel products to Hawai'i consumers as "safe," "clean," "emissions-reducing," and impliedly beneficial to the climate—when production and use of such products is the leading cause of climate change—is reminiscent of the tobacco industry's effort to promote "low-tar" and "light" cigarettes as an alternative to quitting smoking after the public became aware of the life-threatening health harms associated with smoking.[428]

243. As with tobacco companies' misleading use of scientific and engineering terms in advertising to enhance the credibility of their representations, Fossil Fuel Defendants' promotional materials for their fossil fuel products also misleadingly invoke similar terminology to falsely convey to Hawai'i consumers that the use of these products benefits the environment.

244. For example, Exxon advertises that its Synergy Diesel Efficient fuel will permit vehicles to "[r]educe emissions."[429] Exxon also publishes online content under the banner "Energy Factor," wherein Exxon claims that it "offers a range of products—including lightweight materials and advanced lubricants and fuels—that improve performance, durability, and efficiency to drive down emissions." With this "portfolio of solutions," Exxon claims, it is pursuing "[t]he vital task of reducing greenhouse gas emissions across the transportation sector."[430] Exxon consistently promotes Synergy fuels as "clean" or "cleaner," and the company's climate strategy mentions its Synergy fuel, claiming it can help reduce GHG emissions. Exxon also cites Synergy's alleged reduction of $CO_2$ emissions in Exxon's advertisement of the company's improved environmental performance. An advertisement on Exxon's website, which is reproduced on the following page, includes an image featuring a bright sunrise in a clear sky over hills of green grass, green trees, and little to no industrial or urban development.

---

[428] *See* Am. Cancer Soc'y Cancer Action Network, *23 Year History of the Racketeering Lawsuit Against the Tobacco Industry: Guilty of Deceiving the American Public*, at 1, 4 (History of DOJ Rico Lawsuit Fact Sheet) (Nov. 8, 2024), https://perma.cc/LG9J-T927; *see also* Tobacco Control Legal Consortium, *The Verdict Is In: Findings from United States v. Philip Morris, Section on Light Cigarettes*, at 1–9 (2006), https://perma.cc/9VGN-67NX.

[429] Exxon, *Synergy Diesel Efficient Fuels For Fleets, Light-Duty Trucks, and Passenger Vehicles*, https://perma.cc/Y78T-SVB5.

[430] Exxon, *Transforming Transportation*, https://perma.cc/P9AY-ZKFA.



**Figure 18: ExxonMobil Fuels "Environmental Performance" website**[431]

245.    From 2016 through at least 2022, Exxon promoted Mobil 1™ ESP x2 on the website Energy Factor—effectively a corporate blog for Exxon, in which Exxon claims to discuss

---

[431] ExxonMobil, *Environmental Performance*, https://perma.cc/4GUF-7YVS.

developing safe and reliable energy sources for the future—in a post titled, "Green motor oil? ExxonMobil scientists deliver an unexpected solution."[432] According to its advertisement for Mobil 1™ ESP x2, Exxon specially formulated the green oil to "contribute to [] carbon-emission reduction efforts." Exxon's advertising suggests to the consumer that purchase and use of this motor oil convey an environmental benefit, when in fact the opposite is true.

246.    Around 1990, Exxon unveiled its "Exxon Supreme, Reduced Emissions Unleaded" marketing campaign promoting "New Exxon 93 Supreme" gasoline that "has been reformulated to reduce emissions." In September 1996, Exxon discontinued the 93 Supreme gasoline marketing campaign after the Federal Trade Commission accused Exxon of false and misleading advertising. According to studies, high-octane premium gas, such as Exxon's 93 Supreme, not only consumes more energy to produce than a gallon of regular gas,[433] but also increases emissions.[434]

247.    Similarly, Shell advertises that using its gasoline "produce[s] fewer emissions."[435]

248.    BP markets its Invigorate gasoline as a "proprietary detergent additive" that "help[s] cars become clean, mean, driving machines," and its bp Diesel as fuel that "can reduce emissions with powerful, reliable, and energy efficient fuel made with low sulfur and additives."[436] BP's website also advertises its fuel selection as "including a growing number of lower-carbon and carbon-neutral products."[437]

249.    Chevron advertises its Techron fuel with claims that emphasize its supposed positive environmental qualities, such as: "less is more," "minimizing emissions," and "up to 50% cleaner."[438] In a Q&A on Chevron's website, one question says, "I care for the environment. Does

[432] Energy Factor, *Green Motor Oil? Exxonmobil Scientists Deliver an Unexpected Solution*, ExxonMobil (July 19, 2016), https://perma.cc/EW2H-57S6.

[433] Elizabeth Martin-Malikian, *High Octane: Eco-Adaptive Architecture*, 2012 ACSA Fall Conference 123 ("Making a gallon of premium gas thus consumes more energy than making a gallon of regular."), https://perma.cc/84GU-66VX.

[434] Cenk Sayin et al., *An Experimental Study of the Effect of Octane Number Higher than Engine Requirement on the Engine Performance and Emissions*, 25 Applied Thermal Eng'g 1315, 1317 (2005) ("The results demonstrated that as the octane number was increased from 91 to 93, CO emissions boosted nearly 5%.").

[435] *See, e.g.*, Shell, *Shell Gasolines*, https://perma.cc/R2SZ-7YNS.

[436] *See, e.g.*, BP, *Our Fuels*, https://perma.cc/Q439-PV9S.

[437] BP, *Advanced Fuels and Lubricants*, https://perma.cc/JC3F-9JLG.

[438] *See, e.g.*, Chevron, *Techron* (archived by web.archive on Feb. 21, 2022), https://web.archive.org/web/20220221084120/https://www.techron.com/.

142

Techron impact my car's emissions?" Chevron answers that "[g]asolines with Techron" clean up carburetors, fuel injectors, and intake valves, "giving you reduced emissions."[439] Chevron has made similar claims in advertisements in Hawai'i newspapers targeted to Hawai'i consumers.[440] As discussed above, Chevron has also extensively advertised its carbon offset program in Hawai'i and to Hawai'i consumers, including misleading claims such as, "[f]ueling your car at Texaco stations helps to reduce your carbon footprint."[441]

250.    Similarly, Sunoco has advertised its gasoline to consumers in Hawai'i as "eco-friendly gasoline that helps reduce emissions and protect our beautiful island environment."[442]

251.    These misrepresentations, which were intended to and did in fact reach and influence consumers, including consumers in Hawai'i, were misleading because they emphasize the fuels' supposed environmental benefits without disclosing the key role fossil fuels play in causing climate change.

252.    Additionally, Defendants often represent hydrogen fuel as "clean," "renewable," or "zero / low carbon." These representations omit that the vast majority of hydrogen fuel is produced from fossil gas.[443] For example, ExxonMobil issued an advertisement on Twitter stating, "Hydrogen is the most abundant element on earth. And because hydrogen fuel is versatile - and produces no emissions at point-of-use, #hydrogen can play a big role helping society meet its net-zero goals."[444] In another example, Shell has posted on Twitter, "A car that only emits water and heat? Learn more about #hydrogen, a fuel for the future that can help clean up transport today #makethefuture."[445]

---

[439] *Techron Technology*, Chevron, https://perma.cc/W4JH-LQPG.

[440] *See, e.g.*, Hawaii Tribune-Herald (July 11, 2006), https://perma.cc/A3VJ-R2C9.

[441] *See* Texaco in Hawaii, Facebook (Jan. 31, 2021), https://perma.cc/8SCV-HC9P.

[442] *See* Aloha Gas, *5 Things to Know About Fueling Up at Aloha*, Facebook (Mar. 25, 2024), https://perma.cc/FE2M-VK2B; @alohagasltd, Instagram (Mar. 25, 2024), https://perma.cc/F6CK-RAY5.

[443] *See* U.S. Dep't of Energy, *Hydrogen Production: Natural Gas Reforming*, Office of Energy Efficiency & Renewable Energy, https://perma.cc/E4Y5-3ATZ.

[444] ExxonMobil (@ExxonMobil), X (Aug. 3, 2023, 10:00 AM), https://perma.cc/WWP7-MK5L (The advertisement also includes a video where an Exxon employee touts hydrogen as "decarbonizing." The advertisement later shows a diagram (but nothing spoken) showing that hydrogen comes from natural gas.).

[445] Shell USA (@Shell USA), X (Dec. 20, 2017, 12:45 AM), https://perma.cc/X3EV-YP6B.

253.     Defendants also misrepresent the characteristics of biofuels. These misrepresentations fail to disclose that biofuels created from bioethanol and blended into gasoline are typically composed mostly of fossil fuel, and Fossil Fuel Defendants' production of biofuels is insignificant compared to fossil fuel production and fuel demand. For example, in addition to not disclosing the very small scope of these efforts, Exxon's advertisements do not acknowledge that Exxon's biodiesel fuel is generally a blend that uses only 5% to 20% biofuel, with the remainder composed of fossil fuel.[446] Thus, Exxon's greenwashing advertisements misleadingly overstate both the "sustainable" or "environmentally friendly" nature of its biodiesel investment as well as its scope. Chevron has a Renewable Energy Group that produces "EnDura Fuels," which it advertises as "A Simple Lower Carbon Solution Now."[447] The front page of Chevron's website, as of September 8, 2023, featured "renewable diesel,"[448] and another page on its website touts biofuels used on ships[449] and an advertising campaign linking to that page.[450] The page says, "Biofuels can quickly change transportation sectors for the better. When used as a marine fuel, biofuels can reduce greenhouse gas (GHG) emissions on a lifecycle analysis." Similarly, BP claims in advertisements that "We're making motor oil that's 25% sugarcane based" to "make energy cleaner and better."[451]

254.     As with the tobacco companies' use of scientific terms to promote "light" cigarettes, Fossil Fuel Defendants' claim that their purportedly high-tech new fossil fuel products help consumers reduce emissions renders their promotional materials misleading because they seek to convey—with the imprimatur of scientific credibility—an overall message that is false and

---

[446] *See* ExxonMobil, *Mobility Reimagined: On the Road to Lower GHG Emissions*, at 8, https://perma.cc/HGN3-K5VD.

[447] *Endura Fuels: A Simple Lower Carbon Solution Now*, Chevron Renewable Energy Grp., https://perma.cc/2WX9-RAPH.

[448] Chevron.com (archived by web.archive on Sep. 8, 2023), https://web.archive.org/web/20230908134310/https://www.chevron.com/; *see also* Chevron, *Energy Everywhere: Renewable Diesel – Episode 2*, YouTube, https://perma.cc/G8FQ-BHQJ (video embedded on front page).

[449] *Biofuels Steer into Maritime Sector*, Chevron (July 5, 2023), https://perma.cc/ZP9Y-22GW.

[450] Chevron, *Biofuels Steer into Maritime Sector*, Facebook Ad Libr. (Aug. 18-24, 2023), https://perma.cc/NK3K-J65G.

[451] BP America, *Possibilities Everywhere,* Facebook Ad Libr. (July 23–28, 2019), https://perma.cc/6XRE-N68Q.

contradicted by Defendants' own decades-old internal knowledge regarding the dangers of fossil fuel use.

**H.      Defendants' Deceit Only Recently Began Coming to Light, and Their Misconduct Is Ongoing and Yet to be Fully Uncovered.**

255.    Defendants' long campaign of deception has just started to be uncovered, with confidential documents beginning to enter certain public spheres. One of the early sources of this information was a niche non-profit news organization focused on covering environmental topics. Journalists at the organization uncovered archives and conducted interviews of former employees of one Defendant—Exxon—demonstrating that Exxon had sophisticated knowledge of the causes and consequences of climate change and the role its products played in causing climate change as far back as the 1970s.[452]

256.    Additional journalists then began to expose some information pertaining to Exxon's knowledge, and other select members of the fossil fuel industry related to the consequences of climate change and the role their products played in causing climate change going back to the 1970s.[453]

257.    As information about Defendants' tortious and deceptive conduct and knowledge of their fossil fuel products slowly trickled to light, the Center for International Environmental Law—another environmental non-profit organization—issued a report summarizing the evidence that had been uncovered up to that point.[454]

258.    Since then, public reporting on Defendants' deceptive conduct has become more widespread. In 2023, for example, the *Wall Street Journal* reported that Exxon worked "behind closed doors" to sow public doubt about climate change. The article was based on "documents reviewed by the Journal, which haven't been previously reported."[455] The fact that new, non-public

---

[452] Neela Banerjee et al., *Exxon: The Road Not Taken*, Inside Climate News (Sept. 16, 2015), https://perma.cc/U9L4-U99E.

[453] *See* Katie Jennings et al., *How Exxon Went from Leader to Skeptic on Climate Change Research*, L.A. Times (Oct. 23, 2015), https://perma.cc/5CEU-SUNP; Jerving et al., *supra* note 202; Lieberman & Rust, *supra* note 272.

[454] Caroll Muffett & Steven Feit, *Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis*, Ctr. for Int'l Envtl. Law 10 (Nov. 2017), https://perma.cc/TE6L-DSUL.

[455] Matthews & Eaton, *supra* note 290.

145

and potentially confidential documents are still being discovered demonstrates not just Defendants' efforts to conceal their knowledge of the role their products play in climate change, but also highlights the lengths Defendants' went—and continue to go—to conceal their role in obfuscating that science, their knowledge, and their role in bringing about catastrophic climate harms to consumers in Hawai'i and elsewhere. These recent investigations and reports are but a fraction of Defendants' knowledge and misconduct. The full extent of Defendants' deception and concealed knowledge remain unknown to Hawai'i.

259.    The fact that Defendants and their proxies knowingly provided incomplete and misleading information to the public, including Hawai'i consumers, only recently became discoverable due to, among other things:

a.    Defendants' above-described deception campaign, which continues to this day;

b.    Defendants' concealment and misrepresentations regarding the fact that fossil fuel products cause catastrophic harms; and

c.    The fact that Fossil Fuel Defendants used front groups such as API, GCC, and ICE to obscure their involvement in these actions, which put the public off the trail of inquiry.

260.    Moreover, Defendants' tortious misconduct—in the form of misrepresentations, omissions, and deceit—began decades ago and continues to this day. Now, rather than engaging in outright denials of the existence of climate change, Defendants deflect attention from their role in causing climate change by falsely portraying fossil fuel products as environmentally friendly, climate-friendly, or otherwise less environmentally damaging than those products really are, and by overstating Defendants' investments in renewable or alternative energy.

261.    Defendants have continued to mislead the public about the impact of fossil fuel products on climate change through "greenwashing." Through recent advertising campaigns and public statements in Hawai'i and/or intended to reach Hawai'i, including but not limited to online advertisements and social media posts, Defendants falsely and misleadingly portray these products as "green," and Fossil Fuel Defendants portray themselves as climate-friendly energy companies

146

that are deeply engaged in finding solutions to climate change. In reality, Defendants continue to primarily, and overwhelmingly, invest in, develop, promote, and profit from fossil fuel products and heavily market those products to consumers, with full knowledge that those products will continue to exacerbate climate change harms.

262.    Defendants' greenwashing exploits consumers' concerns about climate change and their desire to purchase "green" products and spend their consumer dollars on products and businesses that are taking substantial and effective measures to combat climate change. Defendants' false advertisements are likely to mislead the public, including Hawaiʻi consumers, by giving the impression that in purchasing Fossil Fuel Defendants' fossil fuel products, consumers are supporting genuine, substantial, and effective measures to mitigate climate change through these companies' alleged investments in clean energy. Defendants' greenwashing ultimately attempts to persuade consumers to continue purchasing Fossil Fuel Defendants' fossil fuel products.

263.    As described above, Fossil Fuel Defendants, directly and/or through membership in other organizations, continue to misrepresent their own activities, the fact that their products cause climate change, and the danger presented by climate change. Exemplars of continuing misrepresentations, omissions, and deceit follow below.

264.    As recently as June 2018, a post on the official Shell blog stated: "the potential extent of change in the climate itself could now be limited. In other words, the prospect of runaway climate change might have passed."[456] However, this statement is not supported by valid scientific research and was, and is, contradicted by various studies.[457]

265.    In March 2018, Chevron issued a report entitled "Climate Change Resilience: A Framework for Decision Making," which misleadingly stated that "[t]he IPCC Fifth Assessment

---

[456] David Hone, *Has Climate Change Run Its Course??*, Shell Climate Change Blog (June 14, 2018), https://perma.cc/C939-ZAEJ.

[457] *See, e.g.*, Fiona Harvey, *Carbon Emissions from Warming Soils Could Trigger Disastrous Feedback Loop*, The Guardian (Oct. 5, 2017), https://perma.cc/6LWD-KRX2; Jonathan Watts, *Domino-Effect of Climate Events Could Move Earth into a 'Hothouse' State*, The Guardian (Aug. 7, 2018), https://perma.cc/73FU-6RKE; Fiona Harvey, *'Tipping Points' Could Exacerbate Climate Crisis, Scientists Fear*, The Guardian (Oct. 9, 2018), https://perma.cc/2FBD-Q594.

Report concludes that there is warming of the climate system and that warming is due in part to human activity."[458] In reality, the Fifth Assessment report concluded that "[i]t is *extremely likely* [defined as 95–100% probability] that human influence has been the *dominant cause* of the observed warming since the mid-20th century."[459]

266.    Despite this fact, in April 2017, Chevron CEO and Chairman of the Board John Watson said on a podcast, "There's no question there's been some warming; you can look at the temperatures data and see that. The question and debate is around how much, and how much is caused by humans."[460]

267.    On May 27, 2015, at Exxon's annual shareholder meeting, then-CEO Rex Tillerson misleadingly downplayed global warming's risks by stating that climate models used to predict future impacts were unreliable: "What if everything we do, it turns out our models are lousy, and we don't get the effects we predict? Mankind has this enormous capacity to deal with adversity, and those solutions will present themselves as those challenges become clear."[461] But as noted above, in 1982, Exxon's scientific staff stated, based upon the climate models, that there was a "clear scientific consensus" with respect to the level of projected future global warming and starting shortly thereafter Exxon relied upon the projections of climate models, including its own climate models, in order to protect its own business assets. Tillerson's statement reached consumers because it was reported in the press, as is common when fossil fuel company CEOs make statements regarding climate change and as Exxon had reason to know would occur.

268.    Until approximately early 2017, Exxon's website continued to emphasize the "uncertainty" of global warming science and impacts: "current scientific understanding provides limited guidance on the likelihood, magnitude, or time frame" of events like temperature extremes

---

[458] Chevron, *Climate Change Resilience: A Framework for Decision Making*, at 20 (Mar. 2018), https://perma.cc/P6EQ-P47Q.

[459] IPCC, S*ummary for Policymakers: Working Group I Contribution to the Fifth Assessment Report*, at 17 (2013), https://perma.cc/DRD2-VFGR.

[460] Columbia Energy Exchange Podcast, *Guest John Watson, CEO, Chevron*, Ctr. on Glob. Energy Pol'y at Columbia (Apr. 10, 2017) (at 15:00), https://perma.cc/HVD6-3FD6.

[461] *Exxon CEO: Let's Wait for Science to Improve Before Solving Problem of Climate Change*, Dallas Morning News (May 27, 2015), https://perma.cc/666G-Y8MS.

and sea level rise.[462] Exxon's insistence on crystal-ball certainty was clear misdirection, since Exxon knew that the fundamentals of climate science were well-settled and showed global warming to be an unambiguous danger.[463]

269.    Until approximately early 2016, API's website referred to global warming as "possible man-made warming" and claimed that the human contribution is "uncertain." API removed this statement from its website in 2016 when journalistic investigations called attention to API's misleading statements on global warming and its participation in the $CO_2$ and Climate Task Force during the late 1970s and early 1980s.

### I.    Hawai'i Has Suffered, Is Suffering, and Will Suffer Injuries from Defendants' Conduct.

270.    Defendants' individual and collective conduct brought about or helped bring about climate change and consequent harms to Hawai'i. That conduct includes, but is not limited to, Fossil Fuel Defendants' failures to warn of the known threats fossil fuel products pose to the world's climate; Defendants' wrongful promotion of fossil fuel products and concealment of known hazards associated with the use of those products; and their public deception campaigns designed to mislead consumers to believe that fossil fuel products are climate-friendly, and to obscure the connection between fossil fuel products and the environmental, physical, social, and economic consequences of climate change.

271.    Hawai'i is experiencing global warming acutely. Over the last 60 years, atmospheric concentrations of carbon dioxide, as measured at NOAA's Mauna Loa Observatory, have increased by more than 100 parts per million, and this trend is accelerating.[464] Since 1950, temperatures in Hawai'i have risen by about 2 degrees Fahrenheit, and the annual number of hot

---

[462] *Meeting Global Needs – Managing Climate Change Business Risks*, ExxonMobil, https://perma.cc/9UW5-8PY5.

[463] *See* IPCC, *Climate Change 2014, Impacts, Adaptation, and Vulnerability, Summary for Policymakers* (2014), https://perma.cc/K2WB-XMMX.

[464] J.J. Marra et al., *Pacific Islands Climate Change Monitor: 2021*, Kenodo, at 6 (2021), https://perma.cc/M2LU-BW3P.

149

days and very warm nights has risen sharply.[465] By 2100, NOAA projects an increase of near-surface average annual temperature in Hawai'i of between 6-10 degrees Fahrenheit above 1950 levels in a high-emissions scenario, or an increase of 2-6 degrees Fahrenheit in a lower-emissions scenario.[466] As emissions continue and temperatures rise, the impacts of climate change will worsen.

272.    The exceptional rate of warming globally and in Hawai'i has caused manifold harms, including sea level rise, storm surge, extreme high tides and attendant flooding; warming and acidification of Hawai'i waters and concomitant damages to Hawai'i fishing and aquaculture; increased frequency and intensity of precipitation events and associated flooding; increased drought and fire risk; more dangerously hot days and heat-related illnesses; increased transmission of vector-borne diseases; reduced air quality; and the cascading social, cultural, economic, health, and other consequences of these environmental changes.

273.    While these harms are suffered by all Hawai'i residents, they particularly affect, and will continue to disproportionately impact, Hawaii's frontline communities.[467] Sea level rise, extreme precipitation, wildfires, extreme heat, vector-borne diseases, and other climate harms have unequal impacts on Hawai'i residents depending on social vulnerability factors including demographic characteristics, social and economic characteristics, community social capital, and public infrastructure and resources.[468] The lowest-lying areas of Hawai'i are most at risk from sea level rise, storm surge, extreme high tides, and attendant flooding. Many Hawai'i communities and State assets are also vulnerable to flooding from extreme precipitation events. And Hawai'i

---

[465] L.E. Stevens et al., *Hawai'i State Climate Summary 2022, NOAA Technical Report NESDIS 150-HI*, at 1 (2022), https://perma.cc/M7FK-MXMF.

[466] *Id*.

[467] S. Nazrul Islam & John Winkel, *Climate Change and Social Inequality*, UN Department of Economic & Social Affairs Working Paper No. 152, at 24 (October 2017), https://perma.cc/VG96-A56U. ("[I]nequality exerts the disproportionate effects through three channels, namely (i) increased exposure of disadvantaged groups to climate hazards, (ii) increased susceptibility to damage caused by climate hazards, and (iii) decreased ability to cope with and recover from the damage."); Makena Coffman, Suwan Shen & Maja Schjervheim, *Social Vulnerability to Climate Change in Hawai'i: Data, Indicators, and "Gap" Assessment*, A Report to The State of Hawai'i Climate Change Mitigation and Adaptation Commission (May 4, 2022), https://perma.cc/NXW4-UEGS.

[468] Coffman, *supra* note 467, at 9.

150

residents employed in the agriculture, fishing, aquaculture, and tourism industries are at particular risk of employment disruptions.

274.   Climate change has caused and will continue to cause significant harm to Native Hawaiians and Native Hawaiian traditional and customary practices. For Native Hawaiians, the land is an integral component of social, cultural, and spiritual life, and the principle of mālama ʻāina (to take care of the land) is therefore directly linked to conserving and protecting not only the land and its resources but also humankind and the spiritual world as well.[469] Because Native Hawaiian culture is inextricably bound to Hawaiʻi's natural environment, climate impacts threaten Native Hawaiian culture, identity, and social welfare.[470] Climate change has already impacted and will continue to harm Native Hawaiian traditional and customary practices including upland forest practices, traditional agriculture, and coastal and nearshore marine practices.[471]

275.   The State has suffered and will continue to suffer severe climate change harms because of Defendants' deceptive promotion of fossil fuel consumption as described in this Complaint. These include, but are not limited to, injury, obstruction, invasion, or destruction of State property, natural resources, and infrastructure, as well as other assets that are essential to community health, safety, and well-being; increased planning and implementation costs for confronting sea level rise, erosion, landslides, extreme precipitation, wildfires, extreme heat events, vector-borne diseases, and poor air quality; increased costs for emergency preparedness and response measures; and increased costs for public education and awareness, and for extensive community adaptation and resilience efforts.

276.   The Hawaiʻi legislature has recognized that "an existential climate emergency threatens humanity and the natural world" and has committed to "statewide action that is rooted in equity, self-determination, culture, tradition, and the belief that people locally and around the world have the right to clean, healthy, and adequate air, water, land, food, education, and

---

[469] Melody Kapilialoha et al., *Environmental Justice for Indigenous Hawaiians: Reclaiming Land and Resources*, 21 Nat. Resources & Env't 37 (2007).

[470]  D. Kapuaʻala Sproat, *An Indigenous People's Right to Environmental Self-Determination: Native Hawaiians and the Struggle Against Climate Change Devastation*, 35 Stan. Envtl. L.J. 157, 171 (2016).

[471] *Id.* at 172–81.

shelter."[472] In 2014, the legislature created an interagency climate adaptation committee, which in 2017 was renamed the Climate Change Mitigation and Adaptation Commission.[473] The Climate Change Mitigation and Adaptation Commission is charged with assessing climate change vulnerabilities; identifying people, communities, industries, and ecosystems vulnerable to climate impacts; establishing climate change mitigation and adaptation strategies; and providing policy direction and coordination among relevant stakeholders, among other responsibilities.[474]

277.    To prepare for and mitigate climate impacts in Hawai'i, State agencies have engaged and will continue to engage in planning and implementing adaptation and resiliency measures. For example, the Department of Land and Natural Resources has issued sea level rise vulnerability and adaptation reports, and DLNR's Commission on Water Resource Management and Hawai'i Drought Council have worked to predict drought seasons, develop guidelines on water conservation, monitor water quality, and manage risk for areas most likely to be impacted by water shortages.[475] The Department of Transportation has developed its Highway's Climate Adaptation Action Plan and Climate Insights for Infrastructure Platform.[476] DOT is also implementing resiliency into its construction projects, with over 280 active resiliency projects in calendar year 2025 collectively exceeding $1 billion in total project costs.[477] The Office of Planning and Sustainable Development has worked to identify vulnerable State facilities, and other offices within the Department of Business, Economic Development, and Tourism have implemented initiatives to promote renewable energy and protect against climate change impacts.[478] The Department of Hawaiian Homelands has engaged in resiliency planning for climate impacts to

---

[472] Senate Concurrent Resolution 44, S.D. 1, H.D. 1, 31st Leg., Reg. Sess. (2021).

[473] 2014 Haw. Sess. Laws Act 83; 2017 Haw. Sess. Laws Act 32.

[474] HRS § 225P-3.

[475] Climate Change Mitigation and Adaptation Commission, *2023 Annual Report*, https://perma.cc/A2HW-72W5.

[476] Hawai'i Dep't of Transp., *HDOT Climate Insights for Infrastructure*, https://perma.cc/Q2BT-CJJR.

[477] Hawai'i Dep't of Transp., *Improve Resiliency*, https://perma.cc/WA32-XH86.

[478] *E.g.*, Climate Change Mitigation and Adaptation Commission, *supra* note 475, Climate Change Mitigation and Adaptation Commission, *2024 Annual Report*, https://files.hawaii.gov/dlnr/reports-to-the-legislature/2025/CC25-Hawaii-Climate-Change-Report-FY24.pdf.

152

Hawaiian homesteads, including on Moloka'i.[479] The Department of Health has undertaken a Climate Change and Health Vulnerability Assessment and implemented a multi-stakeholder Hawai'i Climate Change and Health Working Group.[480] Other State departments have also engaged in climate mitigation, adaptation, and resiliency efforts,[481] and the need for these initiatives will only increase as climate impacts in Hawai'i become more severe.

278.    As a result of Defendants' wrongful conduct, Hawai'i has expended and will continue to expend resources to abate the existing and projected adverse harms of climate change on the State, including, but not limited to, efforts to abate the harms described below.

### i.    Sea Level Rise in Hawai'i

279.    Global warming has caused and continues to cause accelerated sea level rise in the Pacific Ocean with severe, and potentially catastrophic, consequences for the State. As the only U.S. state comprised entirely of islands, Hawai'i is uniquely vulnerable to sea level rise, and is projected to experience sea level rise that is 16 to 20 percent higher than the global average.[482] Furthermore, much of Hawaii's economic, cultural, and social life revolves around coastal resources and habitats. Therefore, the disruption and damage caused by sea level rise will have widespread and long-lasting impacts within the State beyond just the physical damage caused by flooding.

280.    Hawai'i is already feeling the impacts of sea level rise. As of 2021, 66 State-owned facilities have reported flooding from sea level rise and precipitation. These facilities include public housing complexes in Kāne'ohe, the Hulihe'e Palace historic site, and the Kaua'i and O'ahu

---

[479] Plan. Consultants Hawai'i, LLC & Coastal Planners, LLC, *South Moloka'i Shoreline Erosion Management Plan*, prepared for State of Hawai'i Dep't of Hawaiian Home Lands (Dec. 2022), https://dhhl.hawaii.gov/wp-content/uploads/2024/01/Dec-2022_Final-SM-SEMP_for-web.pdf.

[480] Climate Change & Health in Hawai'i Comprehensive Vulnerability Assessment, https://www.storydoc.com/9024b4f3c6dc04a5870b66b700a6fc19/c8741689-04ae-4347-97f7-a1261797b198/65c6dea641e4a2000b44585d; Hawai'i Climate Change and Health Working Group, https://climatehealthhawaii.org/.

[481] *E.g.*, Climate Change Mitigation and Adaptation Commission, *supra* note 475; Climate Change Mitigation and Adaptation Commission, *supra* note 478.

[482] Honolulu Climate Change Commission, *Sea Level Rise II – Guidance Document*, at 2 (July 29, 2022), https://perma.cc/8YHQ-WY75.

Community Correctional Centers.[483] Additionally, at least 43 miles of roads, 105 bridges, and 9 culverts are threatened by sea level rise hazards including flooding and coastal erosion.[484] Moreover, 70 percent of the State's beaches have already experienced erosion, and 13 miles of beach have been lost across the islands.[485] These impacts will continue to worsen as the sea level rises further. By 2050, NOAA predicts that more than 90 percent of the State's beaches will be receding.[486]

281.    The State has already undertaken efforts to fight erosion, including dune and beach restoration projects intended to prevent further shoreline loss. In response to coastal erosion that has impacted State highways, the Hawaiʻi Department of Transportation is proposing revetments in at least two locations along the Kamehameha Highway on Oʻahu to protect the threatened roadway.[487] For example, Punaluʻu Beach Park and the adjacent portions of Kamehameha Highway are threatened by erosion and inundation from sea level rise, and a feasibility study prepared for the Department of Land and Natural Resources found that interventions to protect the beach and highway could exceed $14 million or $30 million.[488] Some roads may need to be relocated entirely.[489] On Maui, plans are being made to relocate entire portions of the Honoapiʻilani Highway inland.[490] And far more extensive adaptation efforts will become necessary to mitigate the impacts of climate change in the future.

282.    The State's Climate Change Mitigation and Adaptation Commission has evaluated the extent of damage that would be caused by 3.2 feet of sea level rise above 2000 levels by 2100. This scenario, previously considered one of the more extreme outcomes, is now considered a mid-

[483] Hawaiʻi Off. of Plan. and Sustainable Dev., *2021 Annual Report for Act 178: Relating to Sea Level Rise Adaptation*, at 12 (December 2021), https://perma.cc/V8WF-EK9Y.
[484] Hawaiʻi Dep't of Transp., *Hawaii Highways Climate Adaptation Action Plan: Exposure Assessments*, at 44 (April 2021), https://perma.cc/P3UT-NEPF.
[485] Stevens, *supra* note 465, at 5.
[486] *Id*.
[487] Hawaiʻi State Climate Commission, *Hawaiʻi Sea Level Rise Vulnerability and Adaptation Report 2022 Update*, at 6 (2022) ("2022 SLR Report"), https://perma.cc/C5E2-UTMQ.
[488]  Sea Engineering, Inc., *Punaluʻu Beach Restoration Feasibility Study*, prepared for Hawaiʻi Dep't of Land and Nat. Resources (April 2024), https://perma.cc/GV2R-92PY.
[489] Hawaiʻi Dep't of Transp., *supra* note 484, at 46.
[490] Hawaiʻi State Climate Commission, *supra* note 487, at 6.

range outcome.[491] Under this scenario, Hawaiʻi will lose over 25,000 acres of land due to chronic flooding. That land will either be eroded into the ocean, submerged under inches or feet of standing water, or subject to seasonal flooding from high surf. Of those 25,000 acres, 34% are designated for urban use; 25% for agriculture, and 40% are designated for conservation.[492] Additionally, under a 3.2-foot sea level rise scenario, over 6,500 structures located near the shoreline will be lost or impacted, including hotels, shopping malls, small businesses, churches, schools, community centers, and apartment buildings. These homes, businesses, and community assets will need to be closed, relocated and rebuilt, displacing an estimated 20,000 residents. The total value of the impacted structures will amount to over $19 billion (in 2017 dollars), but this sum cannot account for the disruption and loss felt by those who will be forced to move.[493]

283.    This figure also does not account for the damages to the State's roads, utilities, and other important infrastructure, like airports and harbor facilities. Under the scenario of 3.2 feet of sea level rise by 2100, over 38 miles of roads in the State will be flooded, including sections of highways such as Kūhiō Highway on Kauaʻi, Kamehameha Highway on Oʻahu, and Honoapiʻilani Highway on Maui. Utility lines running parallel and beneath these roadways will also be damaged. In addition to the monetary damages, which will likely be an order of magnitude greater than the $19 billion in estimated losses from flooding to land and structures, this loss of infrastructure will impact commerce, access to emergency services, and traffic flow across the State.[494]

284.    Furthermore, 275 State-owned facilities are currently located in areas that will be impacted by sea level rise of 3.2 feet. This includes 28 airports, 17 harbors, 22 state parks, and 107 Department of Education facilities. Even under a much more conservative projection of 0.5 feet of

---

[491] *Id.* at ii. The Commission used the 3.2 feet benchmark in 2017 to assess the likely impacts of sea level rise by the end of the century. Based on recent emissions projections, the Commission recommended in its update to that 2017 report that going forwards the State use sea level rise of 4 feet as the revised planning and policy benchmark and apply a 6-foot benchmark for all future public infrastructure projects with low risk-tolerances. *Id.* at iv.

[492] Hawaiʻi Climate Change Mitigation and Adaptation Commission, *Hawaiʻi Sea Level Rise Vulnerability and Adaptation Report*, at ix (2017) ("2017 SLR Report"), https://perma.cc/Y8MP-CDLE; U.S. Glob. Change Rsch. Program, *Chapter 30: Hawaiʻi and US-Affiliated Pacific Islands*, at 25 (2023) ("Fifth National Climate Assessment"), https://perma.cc/PQ47-YDNS.

[493] *Id.*

[494] 2017 SLR Report, *supra* note 492, at ix.

sea level rise, 99 State-owned facilities will be impacted, with that number growing to 187 with 2 feet of sea level rise. If sea level rise reaches 6 feet, 431 State-owned facilities will be impacted.[495]

285.    Additionally, 3.2 feet of sea level rise would lead to the loss of invaluable natural and cultural resources across the State, resources which cannot be relocated or rebuilt. World-famous beaches like Sunset Beach  will be eroded if not lost altogether.[496] For example, on the Island of Hawaiʻi alone, approximately 692 acres of public beaches and parks, like Hōnaunau County Park and Puʻuohonua o Hōnaunau National Historical Park, fall within the threatened areas. [497]  3.2 feet of sea level rise will cause inundation of approximately 29% of current Hawaiian waterbird nesting habitat, and would likely result in the decline of currently endangered waterbird populations.[498]

286.    Sea level rise will lead to wastewater overflow caused by flooding to on-site sewage disposal systems, which could diminish water quality and harm marine ecosystems, and greater amounts of ocean water combining with freshwater will impact shoreline habitats.[499] Harms to coastal ecosystems and species will impact Native Hawaiian cultural traditions dependent on the natural environment, as well as fishing and aquaculture industries. Additionally, under a scenario of 3.2 feet sea level rise, almost 550 cultural sites will be flooded, as will many Hawaiian Home Lands communities.[500]

287.    Alongside sea level rise will come more frequent coastal flooding from high tide and storm surges, with severe effects to shoreline infrastructure, communities and ecosystems.[501] Rising sea levels, in tandem with natural variations in high tides, will lead to rapid increases in tidal flooding beginning in the mid-2030s. By the early 2040s, the City of Honolulu may

---

[495] Hawaiʻi Off. of Plan. and Sustainable Dev., *2021 Annual Report for Act 178: Relating to Sea Level Rise Adaptation*, at 6–8 (December 2021), https://perma.cc/V8WF-EK9Y.

[496] 2017 SLR Report, *supra* note 492, at xi.

[497] *Id*. at 84.

[498] Kristen C. Harmon et al., *The Role of Indigenous Practices in Expanding Waterbird Habitat in the Face of Rising Seas*, 34 Anthropocene, at 4, 6 (June 2021), https://perma.cc/7B7X-8YDS.

[499] 2017 SLR Report, *supra* note 492, at 84.

[500] *Id*. at xi.

[501] 2022 SLR Report*, supra* note 487, at 2.

experience as many as 6–14 flood days per month when rising sea levels combine with king tides.[502]

288.    Sea level rise and coastal flooding will be exacerbated by heavy rainfall overwhelming existing drainage systems. As the water table rises, drainage systems that rely on stormwater flowing from higher elevation to lower elevation waterways will be disrupted. Increasing sea levels and more frequent extreme precipitation events will and has already altered this balance, such that drainage systems become inundated even absent any rainfall. This has been commonly observed in Mapunapuna and Waikīkī.[503] The elevated water table caused by sea level rise will eventually rise to the point of breaking through the ground surface thereby creating new wetlands. The structural integrity of overlying infrastructure will be affected where this occurs, as will existing ecosystems unaccustomed to saturated soil and free-standing water bodies.[504]

289.    Hawaiʻi is already experiencing, and working to abate, current harms caused by sea level rise. But while harms to the State have commenced, additional and far more severe injuries will occur in the future if prompt action is not taken now. Indeed, the sea level rise harms inflicted on Hawaiʻi by climate change are insidious partly because they are projected to continue, and to worsen, far into the future. Beyond 2100, the IPCC projects with high confidence that sea levels will continue to rise for centuries due to continuing deep-ocean heat uptake and mass loss of the Greenland and Antarctic ice sheets, and will remain elevated for thousands of years.[505] The State must plan for future harms from sea level rise now to ensure that adaptation to protect human well-being and public and private property is done most efficiently and effectively.

---

[502] *Id*. at 4.

[503] *Id*. at 5.

[504] Charles H. Fletcher III, *Sea Level Rise in Hawaiʻi*, *in* WAIWAI: WATER AND THE FUTURE OF HAWAIʻI, 121, 130 (Kamanamaikalani Beamer ed., 2025).

[505] IPCC, Sixth Assessment Report, Chapter 9: Ocean, Cryosphere and Sea Level Change, at 1217 (2021), https://perma.cc/MC4R-FL3D.

### ii.    Changing Precipitation Patterns and Increased Fire Risk in Hawai'i

290.    Total annual rainfall in Hawai'i is declining, with the State experiencing longer dry periods, diminished freshwater availability, and heightened wildfire risk. These changes are occurring in Hawai'i and will continue to become more severe as a result of climate change.

291.    Annual rainfall has decreased in the State, particularly during recent years in the wet season, and is projected to decline further.[506] Historically, La Niña years were wetter than El Niño years. However, since the 1980s, Hawai'i has experienced less rainfall during the wet season of La Niña years. Furthermore, El Niño years have become more common. The combined effect has been drier conditions and longer periods of drought.[507] The State has also begun to experience more consecutive dry days. For example, in 2010 more than 40% of the State experienced "severe, extreme, or exceptional dry drought conditions," leading to less freshwater and increased wildfire risk.[508] The Island of Hawai'i has been most impacted by these drier conditions, with the largest long-term declines in annual and dry-season rainfall.[509]

292.    Climate impacts threaten Hawai'i water resources. As rainfall levels decline, Hawai'i will have decreasing access to freshwater.[510] Moreover, rising temperatures, changing frequency and intensity of extreme precipitation events, and sea level rise will impair access to freshwater. [511] As rainfall becomes more concentrated over shorter periods, less of it will reach and replenish underground aquifers as it instead is channeled into the ocean as runoff.[512] Pollution

---

[506] Mandeep Adhikari et al., *Climate change impacts shifting landscape of the dairy industry in Hawai'i*, Translational Animal Sci., at 1 (May 16, 2022), https://perma.cc/3EQL-Z3GF.

[507] Stevens, *supra* note 465, at 2.

[508] *Id*. at 2–3.

[509] *Id*. at 2.

[510] Fifth National Climate Assessment, *supra* note 492, at 17; Water Research Foundation, Impacts of Climate Change on Honolulu Water Supplies and Planning Strategies for Mitigation, Project No. 4637 (2019), https://perma.cc/5VFN-X8Q2; Richard Wallsgrove & David Penn, *Water Resources and Climate Change Adaptation in Hawai'i: Adaptive Tools in the Current Law and Policy Framework* (2012), https://perma.cc/NP8F-HGKD.

[511] *Id*.

[512] Li Cohen, *Hawaii is "on the verge of a greater catastrophe," locals says, as water crisis continues*, CBS News (Apr. 11, 2024), https://perma.cc/5U34-54L8.

158

of freshwater resources from flooding and saltwater intrusion will also affect the State's supply.[513] Coastal erosion, marine inundation, and groundwater inundation caused by climate change could also damage water delivery infrastructure.[514] Across the Hawaiian islands, freshwater availability is projected to decline as demand rises.[515] By 2030, the State may suffer from a freshwater shortfall of 100 million gallons per day.[516]

293.    The frequency of extreme precipitation events has also been altered, with certain areas in Hawai'i experiencing more extreme precipitation.[517] More frequent tropical cyclones are also attributed to climate change. These storms cause widespread damage to infrastructure, and, nationally, are the most expensive type of natural disaster. Since 1980, they have cost the U.S. $1.3 trillion, averaging to $22.8 billion per event.[518] In Hawai'i, approximately 74 miles of roads, 120 bridges, and 9 culverts are located in areas vulnerable to damage from storm surges equivalent to those from a Category 4 hurricane.[519]

294.    Climate change increases the threat of wildfires for Hawai'i.[520] The 2023 Maui wildfires were the deadliest in modern U.S. history and the worst natural disaster in the history of the State. More than 100 lives were lost, and more than 2,200 structures were destroyed, causing

---

[513] Fifth National Climate Assessment, *supra* note 492, at 17.

[514] Water Research Foundation, *supra* note 510.

[515] Center for Climate Integrity, *Hawai'i Climate Impacts and Costs*, at 2 (2024), https://perma.cc/K9WK-QRJU.

[516] Thomas W. Giambelluca, *Climate Change and Water in Hawai'i*, *in* WAIWAI: WATER AND THE FUTURE OF HAWAI'I 107, 115 (Kamanamaikalani Beamer ed., 2025).

[517] Stevens, *supra* note 465, at 3.

[518] Center for Climate Integrity, *supra* note 515, at 4.

[519] Hawai'i Dep't of Transp., *supra* note 484, at 2.

[520] Stevens, *supra* note 465, at 4; Fifth National Climate Assessment, *supra* note 492, at 44; Pacific Fire Exchange, *Changing Climate and Wildfire in Hawai'i: Current Observations and Future Projections* (Sep. 2022), https://perma.cc/U6LM-BCYN; Pacific Fire Exchange, *Changing Climate and Wildfire: a Crisis Brewing in the Pacific* (Apr. 2021), https://perma.cc/A5HK-CXD7; Clay Trauernicht, *Vegetation—Rainfall interactions reveal how climate variability and climate change alter spatial patterns of wildland fire probability on Big Island, Hawai'i*, Science of the Total Environment 650, 459–469 (2019), https://doi.org/10.1016/j.scitotenv.2018.08.347; *see also* Christopher Flavelle & Manuela Andreoni, *How Climate Change Turned Lush Hawaii Into a Tinderbox*, N.Y. Times (Aug. 10, 2023), https://perma.cc/GNZ8-7ZW4 (describing all three reasons behind the State's long-term decline in rainfall as likely related to climate change); Elliot Parsons & Christy Martin, *The Tragedy in Lahaina: How invasive grasses and shrubs are fueling the wildfire crisis in Hawai'i*, North Am. Invasive Species Mgmt. Ass'n (Oct. 10, 2023), https://perma.cc/T7CF-PTBP.

$5.5 billion of damage.[521] In 2021, 40,000 acres of ranchland and brush were burned across Maui and the Big Island.[522] Wildfires have caused incalculable loss to Hawai‘i communities.

295.    The number of wildfires in Hawai‘i in recent decades has increased four-fold,[523] and nearly 0.5% of all land in Hawai‘i is now burned by wildfire annually.[524] By late century the probability of wildfire in Hawai‘i will rise by as much as 375 percent under a high emissions scenario.[525] Across the State, 139 miles of roads and 97 bridges are located in areas vulnerable to wildfire.[526] State lands such as the Pu‘u Wa‘awa‘a Forest Reserve are threatened by increased wildfire risk due to climate change.[527]

### iii.    Warming Oceans Around Hawai‘i

296.    As the atmosphere grows warmer, so too does the ocean. These oceanic temperature changes vary across regions, but from 1901 to 2015, the global temperature of the sea surface rose an average of 0.13 degrees Fahrenheit per decade, with higher rates of warming occurring more recently.[528] Oceans are becoming more acidic too. This altered chemistry occurs as the oceans absorb larger amounts of carbon dioxide, which reacts with sea water to produce carbonic acid. This affects the pH levels of the ocean, rendering it more acidic.[529]

297.    Rising ocean temperatures and increasing acidity, along with more frequent marine heatwaves and falling oxygen concentrations, will have grave effects on the makeup of marine ecosystems. Over the course of the remainder of the century, between 10 to 40 percent of the marine biomass across the Pacific Ocean is projected to disappear.[530] Additionally, scientists

---

[521] U.S. Fire Admin., FEMA, *Preliminary After-Action Report: 2023 Maui Wildfire* (Feb. 8, 2024), https://perma.cc/GWH5-VQC6.

[522] Thomas Fuller, *Maui Town is Devasted by Deadliest Wildfire to Strike Hawaii*, N.Y. Times (Aug. 9, 2023), https://perma.cc/S6V7-GEMY.

[523] Hawai‘i Dep’t of Transp., *supra* note 484, at 61.

[524] Parsons & Martin, *supra* note 520.

[525] Hawai‘i Dep’t of Transp., *supra* note 484, at 61.

[526] *Id*. at 2.

[527] Pacific Islands Climate Adaptation Science Center et al., *Fire History and Risk at Pu‘u Wa‘awa‘a* (June 2021), https://perma.cc/AXV7-NK6Q; Christopher A. Wada et al., *Estimating Cost-Effectiveness of Hawaiian Dry Forest Restoration Using Spatial Changes in Water Yield and Landscape Flammability Under Climate Change,* Pacific Science 71(4), 401–424 (2017), https://perma.cc/A92E-5ULB.

[528] 2017 SLR Report, *supra* note 492, at 19.

[529] U.S. EPA, *Climate Change Connections: Hawai‘i (Coral Reefs)*, https://perma.cc/4TDA-BWSZ.

[530] Fifth National Climate Assessment, *supra* note 492, at 30.

expect that the historic range of many marine species will change, disrupting existing access to fisheries.[531] These harms will be felt not only by marine life, but also by the people who depend on them, including many Hawai'i residents who rely on the ocean to provide income and food, and whose social and cultural practices are closely interwoven with its health.

298.    Coral reefs are hit particularly hard by these impacts. Rising ocean temperatures and more frequent marine heatwaves will cause more coral bleaching events, leading to higher rates of coral mortality. Moreover, severe storms and greater acidity will impair the ability of coral reefs to grow and regenerate quick enough to keep pace with the rate at which they are dying.[532] Runoff containing sediment and pollutants, itself the byproduct of changing precipitation patterns, further compromises the health of nearshore coral reefs and fisheries.[533]

299.    Much of the coral reefs surrounding Hawai'i have been designated by NOAA as "highly-vulnerable" to the impacts of climate change. 25 percent of the coral reefs surrounding the Island of Hawai'i are classified in this manner, as are 24 percent of those around O'ahu, and 20 percent of those around Kaua'i.[534] According to the EPA, if the global emissions trajectory remains unchanged, environmental conditions will degrade further such that that the oceans will be unable to support the world's remaining reefs by 2050.[535]

300.    Hawaii's coral reefs are ecologically, culturally, and economically significant. Coral reefs provide critical habitat for marine species, including many which are unique to the Hawaiian Islands.[536] Additionally, many Native Hawaiians feel strong connections to the reefs, imbuing them with spiritual significance.[537] The health and continued existence of these reefs is integral to the viability of subsistence fishing and the Hawai'i fishing industry, which is valued at

---

[531] *Id.*

[532] NOAA Fisheries, *Ecosystem Status Report for Hawai'i*, at 52, 53 (2022), https://perma.cc/KG3R-DFFH.

[533] Fifth National Climate Assessment, *supra* note 492, at 18.

[534] NOAA Fisheries, *supra* note 532, at 56.

[535] U.S. EPA, *supra* note 529.

[536] *Id.*

[537] Gregg, T. M., et. al, *Puka Mai He Ko'a: The significance of corals in Hawaiian culture*, *in* Ethnobiology of Corals and Coral Reefs, 103 (N. Narchi & L. L. Price eds. 2015), https://doi.org/10.1007/978-3-319-23763-3_7.

161

$110 million.[538] Coral-reef fisheries provide Pacific Island communities between 50 to 90 percent of their dietary protein.[539] Coral reefs also generate revenue through tourism.[540]

301.    Additionally, coral reefs provide shoreline protection against strong waves. Annually, reefs in Hawaiʻi provide flood protection benefits to more than 6,800 people and $836 million in averted damages to property and economic activity.[541] Without such buffers, the State will suffer greater damage from sea level rise, flooding, and extreme weather events than it otherwise would have.[542] With a one meter loss in reef height, the 100-year floodplain would increase across Hawaiʻi by 12 square miles, imperiling 9,200 more people and $1.3 billion in property and economic activity.[543]

302.    Hawaiʻi suffers from and continues to suffer injuries caused by rising ocean temperatures, acidification, marine heatwaves, and deoxygenation, and must now adapt to protect its people, property, facilities, and equipment from impacts caused by climate change.

### iv.    Harms to Ecological Resources and Native Hawaiian Traditional and Customary Practices

303.    Climate change imperils Hawaii's ecological resources and the Native Hawaiian traditional and customary practices that are deeply interwoven with those ecological resources. Worsening climate change impacts will continue to threaten and even destroy regional ecosystems and biodiversity throughout this century and beyond.[544] Because Native Hawaiian culture is inextricably bound to Hawaiʻi's natural environment, climate impacts threaten Native Hawaiian culture, identity, and social welfare.[545] Climate change has already impacted and will continue to

---

[538] Rachel Hagen, *Underwater and Underrated: Coral Reefs and Climate Change*, American Security Project, 2 (Dec. 1, 2018), https://perma.cc/JR7Z-PGCH.

[539] Honolulu Climate Change Commission, *Climate Change Brief 2023*, at 25 (2023), fhttps://perma.cc/8KT5-F4S6.

[540] Hawaiʻi Dep't of Land and Nat. Resources, Division of Aquatic Resources, *Hawaiʻi Coral Reef Strategy 2030*, https://perma.cc/U9TW-2QUV; Hagen, *supra* note 538, at 1–2.

[541] USGS, *The value of US coral reefs for risk reduction - Hawaiʻi*, https://perma.cc/6R4Y-BNBW.

[542] U.S. EPA, *supra* note 529.

[543] USGS, *supra* note 541.

[544] Fifth National Climate Assessment, *supra* note 492, at 43.

[545] Sproat, *supra* note 470, at 171.

harm Native Hawaiian traditional and customary practices including upland forest practices, traditional agriculture, and coastal and nearshore marine practices.[546]

304. The forests of Hawai'i, which contain more than 175 native species of trees almost all found nowhere else on Earth, are threatened by climate change.[547] Nearly all of Hawaii's dryland forests have already disappeared in the last century, and some wet native ecosystems at higher elevations may cease to exist by 2100.[548] Hawaii's forests inform and sustain many practices of Native Hawaiian culture. Due to their significance as the source of physical and spiritual nourishment, the misty uplands are called wao akua, or the realm of the gods, sacred to Kū, the god of war and governance.[549] Many of the plants and animals inhabiting the wao akua are considered kinolau (the physical embodiment of spirits).[550] Alongside their spiritual significance, Hawaii's forests provide timber for woodworking and plants for traditional healing.[551] The dance form of hula relies on the availability of forest plants including the kauila plant, which is used to the craft the kāla'au, a rhythm stick used during the dance. However, kauila is vulnerable to climate change, and is becoming more difficult to gather as it becomes increasingly rare.[552]

305. As climate change affects habitat, Hawaii's wildlife is suffering from the impacts of climate change. For example, climactic shifts are known to affect nā manu nahele (Native Hawaiian forest birds), causing range loss and substantial declines in populations.[553] Nā manu nahele not only play important roles as pollinators, seed dispersers, and insect managers, but are interwoven into Native Hawaiian culture. According to custom, these birds act as 'aumakua (family deities) and messengers between akua (gods) and kānaka (people), and are celebrated through songs, stories, and proverbs, and in the creation of traditional feather adornments.[554] The high-

---

[546] *Id*. at 172–81.

[547] *Id*. at 173–74.

[548] *Id*.

[549] *Id*. at 174–75.

[550] *Id*.

[551] *Id*.

[552] *Id*. at 173, 175; U.S. F.W.S., *5-Year Review of Colubrina Oppositifolia (kauila)*, at 2 (2019), https://perma.cc/3AHD-643G (concluding kauila is vulnerable to climate change).

[553] Fifth National Climate Assessment, *supra* note 492, at 44.

[554] *Makahiki o Nā Manu Nahele*, Hawai'i Dep't of Land and Nat. Resources (2024), https://perma.cc/N9KS-ZCG2.

elevation habitats of the nā manu nahele are becoming more vulnerable to rising temperatures and the associated spread of vector-borne diseases like avian malaria. Over time, the range losses of these emblematic species are projected to be severe, including complete range collapses for ʻAkekeʻe, ʻAkikiki and Puaiohi.[555] Out of the once 50 species of honeycreeper birds in Hawaiʻi, only 17 remain, with 11 of them endangered. In 2023, only five ʻAkikiki were found on Kauaʻi.[556]

306.    Traditional forms of agriculture in Hawaiʻi are threatened by declining rainfall, reduced streamflow and groundwater, increasing temperatures and greater saltwater intrusion.[557] Water is the lifeblood of Native Hawaiian culture and the physical manifestation of Kāne, one of the four major gods of the Hawaiian pantheon.[558] The importance of water in Hawaiʻi is embodied in the phrase ola i ka wai (water is life).[559] Kalo (taro) cultivation requires a consistent supply of fresh water, and kalo cultivation is an important Native Hawaiian cultural practice.[560] Kalo fields are threatened by diminishing access to freshwater, and the remaining freshwater may become more saline as rising temperatures increase evaporation rates.[561] Additionally, sea level rise and attendant salt water inundation of the State's coastal plains will further harm the crop's viability.[562]

307.    Hawaii's nearshore and coastal habitats support myriad traditional practices, such as gathering marine life and maintaining fishponds, cultivating sea salt, and burying ancestral bones.[563] Climate change has impacted and will continue to impact these habitats and fundamentally disturb these practices.[564] For example, changes in marine species distribution and damage to coral reef will devastate subsistence fisheries.[565] Climate change also threatens ancient

---

[555] L.B. Fortini et al., *Large-Scale Range Collapse of Hawaiian Forest Birds under Climate Change and the Need 21st Century Conservation Options*, PLoS ONE (Oct. 28, 2015), at 1, 11, 13, https://perma.cc/QP3A-YJB2.

[556] *Nā Manu Nahele: Hawaiʻi's Forest Birds*, The Nature Conservancy (Sept. 25, 2024), https://perma.cc/XN92-Z4E5.

[557] Sproat, *supra* note 470, at 173, 176.

[558] D. Kapuaʻala Sproat, *From Wai to Kānāwai: Water Law in Hawaiʻi*, *in* Native Hawaiian Law: A Treatise 522, 526 (Melody Kapilialoha MacKenzie, Susan K. Serrano & D. Kapuaʻala Sproat eds., 2015).

[559] *Id*.

[560] Sproat, *supra* note 470, at 200–01.

[561] Jessica Terrell, *Climate Change is a Big Problem for Farmers in Hawaii*, Honolulu Civ. Beat (Sept. 26, 2021), https://perma.cc/B46X-99B8.

[562] Sproat, *supra* note 470, at 201.

[563] *Id*. at 178.

[564] *Id*. at 179.

[565] *Id*. at 178–80.

Hawaiian fishponds, which depend on a delicate balance between saltwater and freshwater.[566]  And

changes in climate and rising seas have disrupted the traditional practice of cultivating pa'akai (sea

salt), with practitioners unable to cultivate pa'akai at all in some years.[567]  Additionally, coastal

erosion and sea level rise threatens the cultural practice of burying 'iwi kupuna (ancestral remains)

along Hawai'i's shores.[568]

308.    Hawaii's coral reefs are also culturally important, in addition to being ecologically

and economically critical. For example, the reefs forming the Papahānaumokuākea Marine

National Monument are where Native Hawaiians believe life first began, and where the spirts of

their ancestors return to after death. The name of the Monument is derived from the two figures of

Papahānaumoku and Wākea and the roles they played in the creation story of the Hawaiian

Islands.[569] Therefore, the loss of these reefs and others will have grave cultural impacts, alongside

the economic and ecological losses that will occur.[570]

309.    Sea level rise will also directly impact Native Hawaiian communities and cultural

resources. Sea level rise will submerge lands that are part of the Hawaiian Home Lands Program.

On Moloka'i, homestead lots including in Kalama'ula, Kapa'akea, and Kamiloloa-One Ali'i are

vulnerable to sea level rise.[571] On Maui, 3 out of the 11 homesteads are vulnerable to the increasing

threat of sea level rise. Along with the land, many cultural and economic resources near the

shoreline are threatened by sea level rise, including traditional burial grounds, home sites, fish

ponds, and other places of cultural significance. Nearly 33 cultural sites in Maui alone are

threatened by only 1.1 feet of sea level rise—that number rises to 48 with 3.2 feet of sea level

---

[566] *Id.*

[567] *Id.* at 213–215.

[568] *Id.* at 179.

[569] Papahānaumokuākea: A Sacred Name, A Sacred Place, Papahānaumokuākea Marine National Monument, https://perma.cc/KEK7-ZJ2A.

[570] Tony Weir et. al, *Social and cultural issues raised by climate change in Pacific Island countries: an overview*, 17 Reg'l Envtl. Change (Apr. 2017), at 8, https://perma.cc/L2WA-E59S.

[571] Plan. Consultants Hawai'i, LLC & Coastal Planners, LLC, *supra* note 479.

rise.[572] Across all the islands, almost 550 cultural sites will be flooded by 3.2 feet of sea level rise.[573]

### v.    Harmful Health Outcomes in Hawaiʻi

310.    Climate change is already harming human health and well-being in Hawaiʻi, and is projected to have significant health impacts in the future.[574] Climate change affects the physical environment as well as all aspects of both natural and human systems—including social and economic conditions and the functioning of health systems. "It is therefore a threat multiplier, undermining and potentially reversing decades of health progress."[575]

311.    Climate change has, and will continue to have, constant, widespread, and severe impacts to the physical health of Hawaiʻi residents. Rising temperatures and intense heat waves, extreme weather events, related disruptions to health and emergency services, and increased proliferation of vector-borne disease and pathogens will and has already taken its toll. And these impacts will fall hardest on those who are most vulnerable, including the socioeconomically disadvantaged, the elderly, children, and those with disabilities.[576]

312.    Rising temperatures and more frequent and intense heatwaves pose serious, even fatal, threats to the health of Hawaiʻi residents, including by causing heat exhaustion and heat stroke. Heat also exacerbates many preexisting conditions, like certain respiratory, cerebral, and cardiovascular diseases. Rising temperatures along with high humidity are a particularly dangerous combination, as humidity impairs the ability of the body to cool itself off through sweating.[577] As climate change worsens, more Hawaiʻi residents will be hospitalized and die from heat-related illnesses. For example, recent data shows that between 400 and 600 people annually on Oʻahu seek emergency care for heat-related illnesses,[578] and that 82 percent of heat-related deaths in Honolulu

---

[572] 2017 SLR Report, *supra* note 492, at 105.

[573] *Id*. at xi.

[574] Fifth National Climate Assessment, *supra* note 492, at 21.

[575] World Health Org., *Climate Change* (Oct. 12, 2023), https://perma.cc/CU6R-WFY4.

[576] Fifth National Climate Assessment, *supra* note 492, at 21.

[577] Cnty. of Hawaiʻi, *Integrated Climate Action Plan for the Island of Hawaiʻi*, at 46 (June 2023), https://perma.cc/NM9M-F4L2.

[578] Savannah Harriman-Pote, *Extreme heat is setting records across the US. Could the same happen in Hawaiʻi?*, Hawaiʻi Pub. Radio (July 19, 2024), https://perma.cc/3VP7-MSSU.

can already be attributed to climate change.[579] Young children, older adults, outdoor workers, socioeconomically disadvantaged people, military personnel who are required to wear heavy gear and engage in vigorous activity, and non-acclimated visitors are all especially vulnerable to heat-related illness and death.[580]

313. Vector-borne diseases, fueled by a hotter climate and periods of intense rainfall, will and have proliferated throughout Hawaiʻi, impacting the health of humans and wildlife. These include diseases like dengue, chikungunya, Zika, and others that may emerge in the future. Increases in the frequency, duration, and extent of these diseases across the Pacific Islands region are linked to climate variability and are expected to increase further.[581]

314. More frequent extreme weather events will also impact human health. Stronger and more frequent tropical cyclones will pose serious risks to human health and wellbeing directly and will disrupt emergency services and critical infrastructure needed to respond to such events, amplifying their direct impacts. Other extreme weather events like droughts and floods will also have health impacts that extend beyond the initial disaster, including increases in food- and waterborne-pathogens, loss of access to emergency and medical services, loss of electricity, and damages to transportation infrastructure. These impacts will disproportionately fall on the State's more vulnerable populations.[582]

315. Beyond the immediate serious harm wildfire can cause to humans, wildlife, and structures, smoke from wildfire can also create air quality hazards that lead to further death and illness. Human exposure to smoke is linked with mortality, asthma, and other respiratory problems, in addition to worse outcomes for birth and COVID-19 infection.[583] In a recent study of 679 Lāhainā residents, most of whom lived in Lāhainā during the 2023 wildfire, 74 percent were found

---

[579] Fifth National Climate Assessment, *supra* note 492, at 23.

[580] *Id.*

[581] *Id.*

[582] *Id.* at 21.

[583] U.S. CDC, *Regional Health Effects - Hawaii and U.S. Affiliated Pacific Islands* (June 3, 2024), https://perma.cc/69CD-G6CT.

to have elevated blood pressure levels and a heightened risk of cardiovascular disease, and 60 percent suffered from poor respiratory health.[584]

316.    The emotional wellbeing of those who experience wildfire is also harmed. Extreme weather events like wildfire can impact the mental health and wellbeing of those who suffer through them, including causing posttraumatic stress disorder (PTSD) and major depressive disorder, with symptoms persisting for years.[585] The loss of cultural sites caused by wildfire can also have mental health consequences.[586] Local climate impacts such as floods, droughts, and sea level rise are linked to negative mental health outcomes.[587]

317.    The mental and physical health of Hawai'i residents will continue to be harmed by the worsening impacts of climate change. These harms will impose substantial and growing costs on both the State and its people.

### vi.    Hawaii's Economic Vulnerability from Climate Change

318.    Climate change harms Hawaii's economy by threatening industries that rely on marine ecosystems, tourism, and Hawaii's world-famous climate and ecology.

319.    Hawaii's agricultural industry will and has suffered from climate change-related impacts, such as more frequent and prolonged drought and rising temperatures. For example, between 2008 and 2016, the State lost $53.5 million in revenue from cattle production due to a severe drought.[588] Furthermore, rising temperatures could lead to severe heat stress and less foraging area for livestock. In particular, increased nighttime warming threatens the health of domesticated animals like beef, cattle, swine, and poultry, since these animals often rely on cooler nights to find relief from daytime heat stress. As temperatures continue to rise, animal productivity

---

[584] Brianna Sacks, *Months after Maui fires, residents report troubling health problems*, Wash. Post (May 15, 2024), https://perma.cc/W8YJ-CAPR.

[585] Velez German, M.D., & Adam Balkozar, M.D., *Maui's Wildfires Carry Immeasurable MH Toll*, 58 Psychiatric News No. 10, 15 (Sept. 26, 2023), https://perma.cc/RU3U-D9X7.

[586] Ryan Holliday et al., *The Health and Social Impacts of the Maui Wildfires: Post-Disaster Care from a Sociocultural Lens*, 83 Haw. J Health Soc. Welfare No. 3, 85, 86 (Mar. 2024), https://perma.cc/BH4Q-NVQQ.

[587] Fifth National Climate Assessment, *supra* note 492, at 23.

[588] *Id*. at 28.

and reproductivity will decline while mortality rises, causing economic harm to the State and to its livestock growers. [589]

320. Hotter temperatures also interfere with crop production. For example, hotter, drier conditions cause plants like sweet corn to struggle to retain enough moisture to catch pollen, leading to declining rates of pollination. The heat also makes it more difficult for certain plants to absorb moisture from the soil, stunting their ability to grow.[590]

321. Climate change has impeded the production of culturally and economically important crops like kalo, macadamia nuts, and coffee beans. Excess heat is increasing the salt content of kalo fields, which can severely damage the crop over time. Meanwhile, higher nighttime temperatures have led to problems with macadamia nut trees flowering, leading to lower overall yields. Heavy rains have also led to increases in pests and root-borne pathogens which have caused declines in macadamia nut trees on the Island of Hawai'i.[591] Coffee growers in Hawai'i have also been impacted by climate change. Rising temperatures accelerate the maturation process of coffee cherries, lowering the quality of the crop, and making the crop more vulnerable to heat stress, reducing overall yields and compromising the health of the plant. Changes in precipitation patterns, more frequent extreme weather events, and warmer conditions more favorable to pests and disease all take their toll as well.[592]

322. The Hawai'i fishing industry will also suffer from climate change, as rising ocean temperatures, more frequent marine heatwaves, and increasing acidification harm the health and viability of the coral reefs in the waters surrounding the State and alter the historic ranges of many marine species. Over the course of the century, the total biomass of marine species in the Pacific Ocean is projected to decline by between 10 to 40 percent, and many species are projected to shift beyond their historic ranges by as early as 2030.[593]

---

[589] Adhikari, *supra* note 506, at 7–9.
[590] Terrell, *supra* note 561.
[591] *Id.*
[592] *The Influence of Climate Change on Kona Coffee Production*, Kona Coffee, https://perma.cc/WQ4T-JGTY.
[593] Fifth National Climate Assessment, *supra* note 492, at 30.

323.     Since the 1950s, the global capacity of coral reefs to nurture fish has declined by 50 percent.[594] The Hawaiʻi fishing industry, which is valued at $110 million, is reliant on coral reefs to protect and nurture marine species.[595] Therefore, as global oceanic conditions become unsuitable for coral reefs, potentially as soon as 2050, the State's fishing industry will suffer gravely.[596] Additionally, warming oceans, extreme weather events, continued acidification, and sea level rise may also negatively affect aquaculture, species richness, and access to nearshore and open-ocean fish species for the Hawaiʻi fishing industry.[597]

324.     Tourism also constitutes a significant portion of Hawaii's economy. Prior to COVID-19, tourism accounted for about a quarter of total GDP in Hawaiʻi when considering direct, indirect, and induced impacts.[598] Tourism in Hawaiʻi will be affected by climate change. Structural and ecological damages from climate change, especially damages to beaches and recreation areas, as well as the deterioration of natural assets—like the ongoing disappearance of coral—and the growing frequency of vector-borne diseases may deter non-residents from visiting the State, leading to fewer jobs and less revenue derived from tourism.[599] The loss of coral reefs will particularly devastate the tourism industry in Hawaiʻi, as 60 percent of the State's tourism revenue comes from reef visitors, worth an estimated $304 million annually.[600]

325.     Sea level rise and erosion will impact Hawaii's world famous beaches, such as North Shore Oahu's "Seven Mile Miracle," the beaches of Kauai's North Shore, and West Maui beaches.[601] These beaches are treasured both by local residents and global tourists. Already 70 percent of Hawaii's beaches have eroded, with over 13 miles of beach lost as a result.[602] Sea level

---

[594] *Id*. at 18.

[595] Hagen, *supra* note 538, at 2.

[596] U.S. EPA, *supra* note 529.

[597] Fifth National Climate Assessment, *supra* note 492, at 18.

[598] DBEDT Research Division, Tourism and Hawaiʻi Economy (Oct. 2023), https://perma.cc/3TPQ-KGEA.

[599] Fifth National Climate Assessment, *supra* note 492, at 28.

[600] *Shallow Coral Reef Habitat*, NOAA, https://perma.cc/LH6R-87X8.

[601] 2017 SLR Report, *supra* note 492, at 66.

[602] Stevens, *supra* note 465, at 5.

rise and threats to coral will also impact Hawaii's surf breaks, threatening a beloved and culturally and economically significant activity in Hawaiʻi.[603]

\*\*\*

326.    Because of Defendants' failure to warn and affirmative campaign to deceive the public about climate change and Defendants' products, Hawaiʻi has suffered and will continue to suffer substantial injuries. Defendants' conduct as described herein is an actual, substantial, and proximate cause of Hawaii's climate change-related injuries.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
#### (Against All Defendants)

327.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

328.    Defendants are responsible for causing and accelerating climate change. *See e.g.*, Section V.A, ¶¶ 48–58, *supra*. Fossil fuel products release GHGs into the atmosphere, causing the harms in Hawaiʻi alleged in Section V.I, ¶¶ 270–326, *supra*—including but not limited to climate destabilization, global warming, more frequent and extreme precipitation and flooding, more frequent and extreme drought, more frequent and severe heat waves and extreme temperature days, greater fire risk, vector-borne illnesses, worsening air quality, more frequent and extreme weather events and storms, sea level rise, storm surge, and ocean acidification. The consequences and injuries associated with climate change include without limitation injuries to natural resources, cultural resources, human health and safety, property, infrastructure, and the economy in the State ("Climate-Related Harms").

329.    For years, Defendants possessed knowledge that fossil fuels are the primary cause of climate change and that, if unabated, climate change would cause Climate-Related Harms. *See, e.g.*, Section V.B., ¶¶ 59–99, *supra*.

---

[603] Claire Caulfield, *How Will Climate Change Affect Surfing In Hawaii?*, Honolulu Civil Beat (Nov. 18, 2019), https://perma.cc/MV95-ACZN.

171

330.    Given the scientific evidence available to and/or conducted by Defendants, as referenced herein, such injury was reasonably foreseeable to Defendants.

331.    Defendants had a duty to the State and its residents to exercise due care in the marketing, sale, and/or labeling of fossil fuel products and to act reasonably for the protection of the State and its residents and to avoid inflicting the injuries described herein.

332.    Defendants also had a duty to the State and its residents to honestly communicate their knowledge about the hazards of fossil fuel products, and a duty not to make false and misleading statements about the hazards of fossil fuel products.

333.    Defendants had superior knowledge of the risks posed by fossil fuel products.

334.    Defendants breached their duty of care when they advertised, promoted, and/or sold fossil fuel products, while failing to include warnings of the risk of harm associated with fossil fuel products, in a manner that they knew or should have known would result in injury to human health and safety, damage to property, infrastructure, and natural resources, loss of use of State services, and other damages to the State and its residents.

335.    Defendants further breached their duty of care by waging a years-long deceptive marketing and public relations campaign to discredit climate science.

336.    Any warnings provided by Defendants were rendered ineffective by Defendants' decades-long tortious campaign of deception described herein, and by their promulgating pseudo-scientific theories and false and misleading statements which cast doubt on the consensus of climate scientists—including Fossil Fuel Defendants' own scientists.

337.    Defendants individually and in concert failed to warn about the foreseeable dangers of fossil fuel products, widely disseminated misleading marketing materials, refuted the scientific knowledge generally accepted at the time—including by Fossil Fuel Defendants' own scientists—advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that directly and proximately prevented reasonable consumers from recognizing or discovering the latent risks posed by Fossil Fuel Defendants' fossil fuel products and their contributions to grave climate changes. This conduct directly and proximately inflated fossil fuel

172

consumption, which in turn delayed the emergence of clean-energy alternatives, delayed the transition to a lower-carbon economy, caused the emission of huge amounts of avoidable GHGs into the atmosphere, accelerated climate change, and exacerbated Climate-Related Harms in Hawai'i, causing loss to the State and its residents.

338.    A reasonably careful company would not engage in the decades-long tortious campaign of deception described herein, would not advertise, market, manufacture, or distribute fossil fuel products without proper warning, would warn of these products' hazardous properties, and/or would take steps to enhance the safety and/or reduce the risk of the products.

339.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the State suffered monetary and non-monetary losses and damages in amounts to be proven at trial. Defendants' conduct was a substantial factor in causing monetary and non-monetary injury to the lives and health of the State's residents, and to the State's property and natural resources, including by causing Climate-Related Harms.

340.    Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of negligence and civil conspiracy to commit negligence.

341.    Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

173

## SECOND CAUSE OF ACTION
## PUBLIC NUISANCE
### (Against All Defendants)

342.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

343.    Defendants, individually and in concert with each other, through their decades-long campaign of deception; their failure to include warnings of the risk of harm associated with fossil fuel products; and their affirmative promotion, advertisement, sale, and/or distribution of fossil fuel products, including in the State, have created, caused, contributed to, and assisted in creating a public nuisance of Climate-Related Harms that unreasonably endangers and injures public rights and the property, health, safety, peace, comfort, and welfare of Hawaii's residents.

344.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products, and their advertisement, marketing, promotion, sale, and/or distribution of fossil fuel products would injure public rights by causing long-lasting Climate-Related Harms when those products were used as intended or in a reasonably foreseeable manner. Defendants intentionally proceeded with their conduct despite their substantial certainty about the foreseeable harms to the State and its residents.

345.    Defendants individually and collectively created, caused, contributed to, and assisted in the creation of Climate-Related Harms in the State by, *inter alia*, affirmatively advertising, marketing, and promoting the sale and use of fossil fuel products within and outside the State, which Defendants knew would cause or exacerbate Climate-Related Harms in the State, while simultaneously engaging in the decades-long tortious campaign of deception described herein and failing to include warnings of the risk of harm associated with fossil fuel products.

346.    Each Defendant individually and collectively has created, caused, contributed to, and assisted in creating a public nuisance by substantially and unreasonably interfering with, obstructing, and/or threatening Hawaiʻi residents' health, safety, peace, comfort, and convenience—including, among other things, (i) Hawaiʻi residents' common public rights to enjoy

174

the State's natural resources and property free from unacceptable health risk, pollution, and contamination, (ii) Hawaiʻi residents' public rights with respect to State property held in trust for the public benefit, and (iii) the State's *parens patriae* and public trust abilities and responsibilities to protect, conserve, and manage the State's natural resources. These interferences include Climate-Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326, *supra*.

347.    The public nuisance created by Defendants' conduct affects the public at large and has occurred and will continue to occur on and in public places within the State such that members of the public are likely to come within the range of its influence.

348.    The State has not consented to Defendants' tortious conduct in creating the substantial and unreasonable public nuisance or the associated harms of that conduct.

349.    These Climate-Related Harms are injurious to health; indecent and offensive to the senses; interfere with the comfortable enjoyment of life, property, and natural resources; and constitute a substantial and unreasonable interference with rights enjoyed by the State and its residents. An ordinary person would be reasonably disturbed by these Climate-Related Harms.

350.    Defendants' conduct caused harm and will continue to cause worsening harm to the State and its residents many years into the future if the nuisance is not abated. Abatement will prevent the public nuisance from becoming as severe as it would become absent abatement.

351.    As a direct and proximate result of Defendants' acts and omissions, the State will be required to expend significant public resources to adapt to the impacts of Climate-Related Harms throughout the State to abate the nuisance. The public nuisance caused, contributed to, maintained, and/or participated in by Defendants has caused and imminently threatens to cause special injury to the State. Defendants' actions were a substantial contributing factor to the unreasonable violation of public rights in Hawaiʻi.

352.    The Climate-Related Harms are severe, exceed what the State and its residents should bear without compensation, and outweigh any utility of Defendants' tortious conduct.

353. Defendants are liable and subject to injunctive relief to abate the nuisance and prohibit the creation and continuance of this public nuisance, and the State is entitled to all direct and consequential damages from that nuisance, among other relief.

354. Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of public nuisance and civil conspiracy to commit public nuisance.

355. Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

**THIRD CAUSE OF ACTION**
**PRIVATE NUISANCE**
**(Against All Defendants)**

356. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

357. Defendants, individually and in concert with each other, through their decades-long campaign of deception, their failure to include warnings of the risk of harm associated with fossil fuel products, and their affirmative promotion, advertisement, sale, and/or distribution of fossil fuel products, including in the State, have created, caused, contributed to, and assisted in creating a private nuisance of Climate-Related Harms that substantially and unreasonably endangers and impairs the use, enjoyment, and value of State property.

176

358.    The State owns, leases, occupies, and manages extensive State property, some of which is held in trust. *See* Compl. ¶ 31, *supra*.

359.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products; and their advertising, marketing, promotion, sale, and/or distribution of fossil fuel products would cause Climate-Related Harms to occur in the State when those products were used as intended or in a reasonably foreseeable manner. Defendants proceeded with their conduct despite their substantial certainty about the foreseeable harms to the State. Defendants thus acted with the intent of interfering with the use and enjoyment of State property.

360.    Defendants individually and collectively created, caused, contributed to, and assisted in the creation of Climate-Related Harms in the State by, among other things, affirmatively advertising, marketing, and promoting the sale and use of fossil fuel products within and outside the State, which Defendants knew would cause or exacerbate Climate-Related Harms in the State and elsewhere, while simultaneously engaging in the decades-long tortious campaign of deception described herein and failing to include warnings of the risk of harm associated with fossil fuel products.

361.    State property has been and will be impaired by private nuisances from Climate-Related Harms caused by Defendants' tortious conduct, thereby impeding use and enjoyment of State property by the State and its residents for the public benefit and welfare. Defendants, by their individual and collective acts and omissions, have caused, created, and contributed to conditions on State property, and permitted those conditions to persist, which substantially and unreasonably interfere with the use and enjoyment of such property for the public benefit and welfare, and which materially diminishes the values of such property to the State and the public.

362.    The State has not consented to Defendants' conduct in creating the substantial and unreasonable conditions on its real property or to the associated harms of that conduct.

363.    These substantial and unreasonable conditions affect State property and reduce its value and its benefit to the State and its residents. These conditions include Climate Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326, *supra*.

364.    An ordinary person would be reasonably annoyed or disturbed by Defendants' conduct and resulting Climate-Related Harms.

365.    Defendants' conduct has caused and will continue to cause worsening harm to the State's property many years into the future if not abated. Abatement will prevent the private nuisance from becoming as severe as it would become absent abatement.

366.    As a direct and proximate result of Defendants' acts and omissions, the State will be required to expend significant public resources to adapt to the impacts of Climate-Related Harms to its properties throughout the State to abate the nuisance. Defendants' actions were a substantial contributing factor to the creation of a private nuisance and the injuries to the State.

367.    The Climate-Related Harms are severe, greater than the State and its residents should bear without compensation, and outweigh any utility of Defendants' tortious conduct.

368.    Defendants are liable and subject to injunctive relief to abate the nuisance and prohibit the creation and continuance of this private nuisance, and the State is entitled to all direct and consequential damages from that nuisance, among other relief.

369.    Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of private nuisance and civil conspiracy to commit private nuisance.

370.    Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice

178

toward the State and its residents may also be implied.  Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

### FOURTH CAUSE OF ACTION
### TRESPASS
### (Against All Defendants)

371.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

372.    Defendants, individually and in concert with each other, through their decades-long campaign of deception, their failure to include warnings of the risk of harm associated with fossil fuel products; and their affirmative advertisement, marketing, promotion, advertisement, sale, and/or distribution of fossil fuel products within and outside the State, acted intentionally and in a manner that created, caused, contributed to, and assisted in creating Climate-Related Harms that have entered and invaded, and will enter and invade, State property.

373.    The State owns, leases, occupies, and manages extensive real property, some of which is held in trust, and which was previously defined as "State property," Compl. ¶ 31, *supra*, that is already being invaded by multiple Climate-Related Harms.

374.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products; and their advertisement, marketing, promotion, sale, and/or distribution of fossil fuel products would cause Climate-Related Harms—including but not limited to rising sea levels, extreme precipitation, and flood waters—to intrude and enter State property, when those fossil fuel products were used as intended or in a reasonably foreseeable manner. Defendants proceeded with their tortious and deceptive conduct despite their substantial certainty about the foreseeable intrusion of State property. Defendants thus acted with the intent of causing Climate-Related Harms to invade and enter State property.

375.    Defendants had considerable scientific knowledge—including from Fossil Fuel Defendants' own scientists—affording them substantial certainty that GHG emissions from

combusting fossil fuel products cause, and will cause, sea level rise, extreme precipitation, flood events, and other extreme weather that cause seawater, river water, and extreme storm runoff to invade State property.

376. Defendants actually did foresee—including through Fossil Fuel Defendants' own studies—that their intentional conduct would cause such an invasion of State property.

377. By engaging in intentional conduct that Defendants were substantially certain would result in Climate-Related Harms in the State that enter and intrude upon State property, Defendants have intentionally intruded upon State property without permission or privilege.

378. These undeniably severe, substantial, and unreasonable conditions affecting and threatening State property include Climate-Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326.

379. The State has not consented to, and does not consent to, the intrusion of Climate-Related Harms on its property. Defendants knew or reasonably should have known that the State would not consent to this trespass.

380. The State is, and will continue to be, injured by the entry of Climate-Related Harms onto its properties caused by Defendants' intentional misconduct.

381. Defendants' tortious and deceptive conduct has caused and will continue to cause worsening harm to State property many years into the future if not abated. Abatement will prevent the trespass caused by Climate-Related Harms from becoming as severe as it would become absent abatement.

382. As a direct and proximate result of the Defendants' tortious acts and omissions, the State will be required to expend significant resources to adapt to the impacts of Climate-Related Harms to its properties throughout the State to abate those trespasses. Defendants' actions were a substantial contributing factor to the trespass upon State property and the injuries to the State.

383. The Climate-Related Harms are severe and greater than the State and the public should bear without compensation and outweigh any utility of the Defendants' tortious conduct.

384.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the State has suffered monetary and non-monetary losses and damages in amounts to be proven at trial.

385.    Each Defendant, individually and collectively, engaged in the tortious conduct alleged in this Count, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of the tort of trespass and civil conspiracy to commit trespass.

386.    Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

**FIFTH CAUSE OF ACTION**
**HARM TO PUBLIC TRUST RESOURCES**
**(Against All Defendants)**

387.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

388.    The public trust doctrine is enshrined in the Hawaiʻi Constitution, which provides that "[a]ll public natural resources are held in trust by the State for the benefit of the people." Haw. Const. art. XI, § 1. As the trustee of the State's public natural resources, the State has a constitutional obligation to protect those resources, including water resources. Haw. Const. art. XI, §§ 1, 7. The State also has an obligation to protect "all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who

181

are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778." Haw. Const. art. XII, § 7. Additionally, "[t]he lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as 'available lands' by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, shall be held by the State as a public trust for native Hawaiians and the general public." Haw. Const. art XII, § 4. Public trust resources in the State include but are not limited to navigable waters and the soils under them, shoreline lands below the high water mark, lava extensions, all water resources, conservation district lands owned by the State, and other public resources held in trust by the State.

389.    Defendants, individually and in concert with each other, through their decades-long campaign of deception, their failure to include warnings of the risk of harm associated with fossil fuel products, and their affirmative promotion, advertisement, sale, and/or distribution of fossil fuel products, including in the State, have harmed and threatened the State's public trust resources and unreasonably interfered with the public's use and enjoyment of public trust resources.

390.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products; and their advertising, marketing, promotion, sale, and/or distribution of fossil fuel products would cause Climate-Related Harms to occur in the State when those products were used as intended or in a reasonably foreseeable manner. Defendants proceeded with their conduct despite their substantial certainty about the foreseeable harms to the State. Defendants thus acted with the intent of interfering with the public's ability to use and enjoy public trust resources.

391.    Defendants' individually and collectively created, caused, contributed to, and assisted in the creation of Climate-Related Harms in the State by, among other things, affirmatively advertising, marketing, and promoting the sale and use of fossil fuel products within and outside the State, which Defendants knew would cause or exacerbate Climate-Related Harms in the State and elsewhere, while simultaneously engaging in the decades-long tortious campaign of deception

described herein and failing to include warnings of the risk of harm associated with fossil fuel products.

392. The State has not consented to Defendants' conduct in creating the harm to the State's public trust resources.

393. The harms and threats to the State's public trust resources include Climate Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326, *supra*.

394. As a direct and proximate result of Defendants' acts and omissions, the State's public trust resources have been and will be threatened, harmed, and degraded. The State will be required to expend significant public resources to adapt to the impacts of Climate-Related Harms. Defendants' actions were a substantial contributing factor to injuries and threats to public trust resources.

395. The Climate-Related Harms are severe, greater than the State and its residents should bear without compensation, and outweigh any utility of Defendants' tortious conduct.

396. Defendants are liable for harming the State's public trust resources, including natural resource damages, damages for harm to ecosystem services, and equitable relief to abate the harm, among other relief.

397. Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of private nuisance and civil conspiracy to harm public trust resources.

398. Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the

presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

## SIXTH CAUSE OF ACTION
## CIVIL AIDING AND ABETTING
### (Against API)

399.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

400.    The Fossil Fuel Defendants committed and are liable for negligence, public nuisance, private nuisance, trespass, and harm to public trust resources as alleged in Counts 1–5, each of which harmed the State and its residents as alleged therein and in Section V.I, ¶¶ 270–326, *supra*.

401.    API has long had actual knowledge Fossil Fuel Defendants were committing the torts alleged in Counts 1–5 because Fossil Fuel Defendants committed those torts collectively through API, and individually as members of API, which was and is the primary industry forum in which Fossil Fuel Defendants strategize about and execute the decades-long deception campaign at the core of the tortious conduct alleged in this lawsuit. Fossil Fuel Defendants have long worked through, and in full cooperation with, API to advance their decades-long deception campaign. Defendants' tortious conduct impacting Hawai'i, and API's assistance and encouragement of that conduct, remains ongoing today. For example, API assisted Fossil Fuel Defendants' commission of tortious activities by making public statements, including advertisements and promotional campaign websites that have been directed at and/or reached Hawai'i, giving the impression that Fossil Fuel Defendants' operations and fossil fuel products are beneficial or benign to the environment. For example, API promoted natural gas, one of Fossil Fuel Defendants' fossil fuel products, as a clean fuel that reduces carbon dioxide emissions, an "environmentally friendly complement to renewable energy," and as "part of the solution" to climate change. API also promoted the oil and gas industry, including Fossil Fuel Defendants, as leaders in tackling climate change while ignoring the emissions from the industry's products. API had, and continues to have, actual knowledge of Fossil Fuel Defendants' alleged tortious conduct

184

at the center of this lawsuit—all of which remains ongoing. *See, e.g.*, *id.* ¶¶ 43, 44–45, 47, 59–69, 75–78, 90, 112, 118–136, 148–151, 230–236, 269, *supra.*

402.    API had actual knowledge that it was aiding and abetting the torts alleged in Counts 1–5 because API acted on behalf of, as an agent for, and at the direction of Fossil Fuel Defendants to execute the decades-long deception campaign at the center of this lawsuit through marketing, advertising, and other means while simultaneously promoting Fossil Fuel Defendants' fossil fuel products with full knowledge that the foreseeable use of those products would cause Climate-Related Harms in the State and elsewhere. *See, e.g.*, *id.* ¶¶ 26(c), 43, 44–45, 47, 112, *supra.*

403.    API had actual knowledge that it was—at the direction of Fossil Fuel Defendants— conceiving, planning, funding, and carrying out the sustained and widespread campaign of denial and disinformation about the existence of climate change and about the role of Fossil Fuel Defendants' fossil fuel products in causing Climate-Related Harms. API had actual knowledge that it took those actions in order to misdirect and stifle public knowledge about climate change, and to promote consumer demand for fossil fuels. API's actual knowledge of its own role in the deception campaign is ongoing, with API's 2021 Climate Action Framework organized around the purpose of "the continued promotion of natural gas in a carbon constrained economy." *See, e.g.*, *id.* ¶¶ 118–119, 123–136, 230–236, 259–263, 269, *supra.*

404.    API gave substantial assistance and encouragement to the Fossil Fuel Defendants in committing the torts alleged in Counts 1–5, who likewise encouraged and accepted API's assistance, over decades and in close coordination during repeated API meetings and initiatives and through ongoing communication. API did so, and continues to do so, by actively marketing fossil fuel products and fossil fuel operations in a knowingly and intentionally misleading manner for Fossil Fuel Defendants' benefit and in breach of due care; assisting Fossil Fuel Defendants' campaign to conceal and obscure from the State and its residents data and information demonstrating that fossil fuel products were causing, and would increasingly cause, grave Climate-Related Harms in the State and elsewhere; widely disseminating materials refuting the scientific knowledge generally accepted at the time; promoting and amplifying pseudo-scientific theories;

185

and developing commercial public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products and operations were causing, and would increasingly cause, grave Climate-Related Harms in the State and elsewhere. Additionally, by acting as a front group on behalf of Fossil Fuel Defendants and providing the primary industry forum through which Fossil Fuel Defendants organized, conspired, strategized about, and executed their decades-long deception campaign, API was present at the time of the tortious conduct alleged in this lawsuit. *See, e.g.*, *id.* ¶¶ 43, 44–45, 47, 59–69, 75–78, 90, 112, 118–136, 148–151, 230–236, 269, *supra.*

405.   As a direct and proximate result of Fossil Fuel Defendants' acts and omissions, aided and abetted by API, the State will be required to expend significant public resources to adapt to Climate-Related Harms throughout the State, which are so severe as to exceed what the State and its residents should bear without compensation.

406.   Fossil Fuel Defendants' decades-long campaign of intentional deception was, and is, maliciously aided and abetted by API and wantonly designed by Fossil Fuel Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources; or to the State's residents' health, safety, and wellbeing—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Fossil Fuel Defendants and API acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and their conduct was so outrageous that malice toward the State and its residents may also be implied. Fossil Fuel Defendants and API's want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter API.

**SEVENTH CAUSE OF ACTION**
**HAWAI'I UNFAIR OR DECEPTIVE ACTS OR PRACTICES STATUTE**
**(Against All Defendants)**

407.   The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

186

408.    The Hawai'i unfair or deceptive acts or practices (UDAP) statute provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." HRS § 480-2(a).

409.    The Fossil Fuel Defendants' tortious actions, as alleged herein, have been undertaken in the conduct of trade or commerce. Fossil Fuel Defendants systematically and continually conducted trade or commerce throughout the State of Hawai'i by marketing, advertising, offering for sale, distributing, and selling the fossil fuel products directly and indirectly affecting the people of Hawai'i, and which are the subject of this lawsuit.

410.    API's tortious conduct, as alleged herein, has been undertaken in the conduct of trade or commerce, by engaging in the marketing, advertising, and promotion of fossil fuel products directly and indirectly affecting the people of Hawai'i. That marketing, advertising, and promotion is the subject of this lawsuit.

411.    In the course of trade or commerce, including the marketing, advertising, promotion, and (in the case of the Fossil Fuel Defendants) selling of fossil fuels to consumers in Hawai'i, Defendants made misrepresentations regarding the safety of and contributions to climate change made by fossil fuel products which Defendants intended would induce consumers to continue to use Fossil Fuel Defendants' fossil fuel products.

412.    The misrepresentations made by API and Fossil Fuel Defendants, both together and separately, or through front groups, regarding the safety of fossil fuels, the environmentally friendly nature of fossil fuels, and the production by Fossil Fuel Defendants of clean energy alternatives were false, omitted critical information, and therefore had a capacity or tendency to deceive.

413.    Defendants misled the State and its residents through a range of advertisements and promotional materials that contained false or misleading statements, misrepresentations, and significant omissions. These deceptive and/or unfair practices obscured the critical connection between the production and use of fossil fuel products and their adverse effects on climate change, thereby undermining the informed choices of consumers.

187

414.    The misrepresentations by Defendants were not only pervasive but also sophisticated, as they were supported by industry-funded research and extensive media campaigns designed to cast doubt on well-established climate science. As a result, reasonable consumers faced considerable difficulty in discerning Defendants' deceptive and/or unfair claims from legitimate scientific consensus, further perpetuating a harmful reliance on fossil fuel products.

415.    Defendants' misrepresentations and omissions as described herein are material to a consumer's decision to purchase and use fossil fuels and are likely to mislead consumers acting reasonably under the circumstances.

416.    Defendants' conduct offended public policy, was immoral, unethical, oppressive, or unscrupulous, and caused substantial harm to Hawaiʻi consumers and the State.

417.    Defendants' conduct described herein was deceptive and/or unfair in violation of HRS § 480-2.

418.    Defendants' conduct in violation of HRS § 480-2 was intentional.

419.    Defendants' conduct in violation of HRS § 480-2 has caused and will continue to cause Climate-Related Harms to the State and its residents.

420.    Each day that Defendants violated HRS § 480-2 constitutes a separate violation. HRS § 480-3.1. Each act in violation of HRS § 480-2 may constitute a separate violation.

### EIGHTH CAUSE OF ACTION
### STRICT LIABILITY FOR FAILURE TO WARN
### (Against Fossil Fuel Defendants)

421.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

422.    Fossil Fuel Defendants and their affiliates and subsidiaries were engaged in the business of advertising, manufacturing, promoting, and/or selling fossil fuel products. The Fossil Fuel Defendants placed these fossil fuel products into the stream of commerce knowing they would reach Hawaiʻi.

423.    Fossil Fuel Defendants' fossil fuel products were used, distributed, and sold in a manner in which they were reasonably foreseeably intended to be used, distributed, and sold,

including but not limited to being combusted for energy, combusted to power automobiles, refined into petrochemicals, and refined and/or incorporated into petrochemical products including, but not limited to, fuels and plastics.

424.    As manufacturers, marketers, distributors, promoters, and/or sellers of fossil fuel products, Fossil Fuel Defendants had a duty to warn the State and its residents (both of whom are users and consumers) of the risks posed by fossil fuel products.

425.    Fossil Fuel Defendants knew that fossil fuel products would be purchased, transported, stored, handled, used, and disposed of, including within Hawaiʻi, without notice of the hazards that fossil fuel products pose to State natural resources and property and to the State's residents.

426.    Fossil Fuel Defendants' failure to warn of these hazards made their fossil fuel products unreasonably dangerous.

427.    Fossil Fuel Defendants knew that by failing to warn the State and its residents of the risks posed by fossil fuels, their fossil fuel products would be purchased, transported, stored, handled, used, and disposed of without the State and its residents being aware of the hazards fossil fuels pose to human health and the environment.

428.    At the time of manufacture, merchandising, advertising, promotion, or sale, Fossil Fuel Defendants could have provided warnings or instructions regarding the full and complete risks fossil fuel products posed, including the risks of climate destabilization, Climate-Related Harms, and other dangers, because they knew and/or should have known of the unreasonable risks of harm associated with the use of these products, as described herein.

429.    Despite the Fossil Fuel Defendants' superior and unequal knowledge of the risks posed by fossil fuel products, the Fossil Fuel Defendants failed to adequately warn consumers and the State and its residents of the known and foreseeable risks of climate destabilization, Climate-Related Harms, and other dangers that would inevitably follow from the intended or reasonably foreseeable use of these products.

189

430.    Not only did Fossil Fuel Defendants fail to adequately warn, but the Fossil Fuel Defendants, through their decades-long tortious campaign of deception described herein, also represented, asserted, claimed, and warranted that their fossil fuel products were safe for their intended and foreseeable uses.

431.    Any warnings the Fossil Fuel Defendants may have issued as to the risks of their fossil fuel products were rendered ineffective and inadequate by Fossil Fuel Defendants' false and misleading public relations campaigns and statements about fossil fuel products, and their years-long efforts to conceal and misrepresent the dangers that follow from the intended or reasonably foreseeable use of such products.

432.    Fossil Fuel Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time—including by their own research divisions—advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable users and consumers, including the State and its residents, from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products would cause grave climate changes, undermining and rendering ineffective any warnings that Fossil Fuel Defendants may have disseminated.

433.    Accordingly, the ordinary user and consumer, including the State and its residents, would not have recognized and did not recognize that the use of fossil fuel products causes global and localized changes in climate, and would result in injuries to the State and its residents, communities, property, and resources, as described herein, or would not have recognized and did not recognize the extent of the harm that would be caused by fossil fuels.

434.    Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from trade associations and entities, and/or from the international scientific community, that the Climate-Related Harms described herein rendered their fossil fuel products dangerous, or likely to be dangerous, when used in the manner reasonably foreseeably intended.

435. The fossil fuel products that Fossil Fuel Defendants refined, formulated, designed, manufactured, merchandised, advertised, promoted, and/or sold—whether used as intended or used in a reasonably foreseeable manner—were not reasonably safe at the time they left Fossil Fuel Defendants' control because they lacked adequate warnings and instructions.

436. Fossil Fuel Defendants expected that their fossil fuel products would reach consumers and/or users without a substantial change in those products' conditions; and their fossil fuel products did reach consumers and/or users without a substantial change in those products' conditions.

437. Fossil Fuel Defendants have had actual and/or constructive knowledge about Climate-Related Harms, based on information known to their internal research divisions and affiliates, from their non-party trade associations and entities, and/or from the international scientific community, which rendered the fossil fuel products hazardous to State natural resources and property.

438. The foregoing facts relating to the hazards that fossil fuel products pose to State natural resources and property are not the sort of facts that the State and its residents could ordinarily observe or protect themselves against.

439. Fossil Fuel Defendants breached their duty to warn by unreasonably failing to provide the State and its residents with warnings regarding the potential and/or actual threat to human health and the environment caused by pollution released from the manufacturing and consumption of fossil fuels, despite Fossil Fuel Defendants' vast amounts of knowledge and research demonstrating the threats Fossil Fuel Defendants' fossil fuel products presented to the State and its residents.

440. Given the grave dangers presented by the climate effects that inevitably flow from the normal and foreseeable use of fossil fuel products, a reasonable extractor, manufacturer, formulator, seller, or other participant responsible for introducing fossil fuel products into the stream of commerce, would have warned of those known, inevitable climate effects.

191

441. Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, their fossil fuel products would not have earned widespread acceptance in the marketplace, fossil fuel alternatives could have been developed faster, investment in fossil fuel alternatives would be greater, and/or fossil fuel alternatives would be used in greater amounts.

442. Moreover, had the Fossil Fuel Defendants provided adequate warnings about the adverse impacts to public health and the environment, and to the State and its residents in particular, that result from the intended and reasonably foreseeable use of fossil fuel products, the State and its residents would have taken measures to decrease fossil fuel dependency in order to avoid or lessen the Climate-Related Harms and property damage that would inevitably follow.

443. As a result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products, Fossil Fuel Defendants are strictly liable to the State.

444. The Fossil Fuel Defendants consciously disregarded the health, safety, property, and rights of others in engaging in the decades-long tortious campaign of deception described herein.

445. As a direct and proximate result of Fossil Fuel Defendants' acts and omissions, the State has sustained and will sustain substantial expenses and damages, including damages for loss of use and enjoyment.

446. As a direct and proximate result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products, the State has incurred and will continue to incur costs and damages related to physical damage to State property, State infrastructure, human health, and natural resources.

447. As a direct and proximate result of Fossil Fuel Defendants' acts and omissions as alleged herein, the State and its residents have suffered monetary and non-monetary losses and damages in amounts to be proven at trial. Fossil Fuel Defendants' conduct was a substantial factor in bringing about the harms suffered by Plaintiffs as alleged herein.

448.    Fossil Fuel Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Fossil Fuel Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Fossil Fuel Defendants' scientists long foresaw. Fossil Fuel Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Fossil Fuel Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Fossil fuel Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

## PRAYER FOR RELIEF

WHEREFORE, the State of Hawai'i seeks judgment in its favor and against Defendants for:

A.    Compensatory damages in an amount according to proof;

B.    Punitive damages as permitted by law;

C.    Natural resource damages;

D.    Any other damages as permitted by law;

E.    Disgorgement of profits;

F.    Equitable relief, including abatement in Hawai'i of the nuisances complained of herein, for example by means of an equitable fund to pay for adaptation, mitigation, and resilience measures in the State;

G.    Civil penalties pursuant to HRS § 480-3.1;

H.    Damages pursuant to HRS § 480-13;

I.    Treble damages pursuant to HRS § 480-14;

J.    An order enjoining Defendants from engaging in the unfair or deceptive acts or practices described herein;

K.    A finding that Defendants are liable under each cause of action asserted herein;

L.    An order holding Defendants jointly and severally liable for all past damages the State has incurred, and future damages the State will incur as a result of Defendants'

193

conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, natural resource damages, any other compensatory and exemplary damages available under Hawaiʻi law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the State will face;

M.      Reasonable attorney fees, court costs, and other expenses of litigation as permitted by law;

N.      Pre-judgment and post-judgment interest; and

O.      Any other and further relief as the Court deems appropriate and just.


DATED: May 1, 2025                    **ANNE E. LOPEZ**
Honolulu, Hawaiʻi                     **ATTORNEY GENERAL**


                    By:    _/s/ Wade H. Hargrove III_____

                           MELISSA J. KOLONIE
                           Supervising Deputy Attorney General
                           WADE H. HARGROVE III
                           LYLE T. LEONARD
                           Deputy Attorneys General
                           Department of the Attorney General
                           State of Hawaiʻi
                           425 Queen Street
                           Honolulu, Hawaiʻi 96813
                           Telephone:    (808) 587-3050
                           Facsimile:    (808) 587-3077
                           Email:        wade.h.hargrove@hawaii.gov

                           VICTOR M. SHER (*pro hac vice* forthcoming)
                           MATTHEW K. EDLING (*pro hac vice* forthcoming)
                           STEPHANIE D. BIEHL (*pro hac vice* forthcoming)
                           WILLIAM LIANG    #11790
                           **SHER EDLING LLP**
                           100 Montgomery St., Ste. 1410
                           San Francisco, CA 94104
                           Telephone:    (628) 231-2500
                           Facsimile:    (628) 231-2929
                           Email: vic@sheredling.com

matt@sheredling.com
stephanie@sheredlig.com
william@sheredling.com

*Attorneys for Plaintiff State of Hawaiʻi*

195

## REQUEST FOR JURY TRIAL

The State of Hawai'i hereby demands a jury trial on all issues so triable.

**ANNE E. LOPEZ**
**ATTORNEY GENERAL**

DATED: May 1, 2025
Honolulu, Hawai'i       By:     */s/ Wade H. Hargrove III*

                      MELISSA J. KOLONIE
Supervising Deputy Attorney General
WADE H. HARGROVE III
LYLE T. LEONARD
Deputy Attorneys General
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Telephone:    (808) 587-3050
Facsimile:    (808) 587-3077
Email:        wade.h.hargrove@hawaii.gov

VICTOR M. SHER (*pro hac vice* forthcoming)
MATTHEW K. EDLING (*pro hac vice* forthcoming)
STEPHANIE D. BIEHL (*pro hac vice* forthcoming)
WILLIAM LIANG (#11790)
**SHER EDLING LLP**
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Telephone:    (628) 231-2500
Facsimile:    (628) 231-2929
Email:        vic@sheredling.com
                matt@sheredling.com
                stephanie@sheredling.com
                william@sheredling.com

*Attorneys for Plaintiff State of Hawai'i*

| STATE OF HAWAIʻI CIRCUIT COURT OF THE FIRST CIRCUIT | SUMMONS TO ANSWER CIVIL COMPLAINT / |
|---|---|

**CASE NUMBER**

**PLAINTIFF'S NAME & ADDRESS, TEL. NO.**

THE STATE OF HAWAIʻI, ex. rel., ANNE E. LOPEZ, ATTORNEY GENERAL

425 Queen Street

Honolulu, Hawaiʻi 96813

Telephone: (808) 587-3050

Facsimile: (808) 587-3077

| PLAINTIFF                                    VS. | DEFENDANT(S) |
|---|---|
| THE STATE OF HAWAIʻI, ex. rel., ANNE E. LOPEZ, ATTORNEY GENERAL | BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORP.; CHEVRON USA INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; SHELL P.L.C.; SHELL USA, INC.; EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US;  SHELL TRADING (US) COMPANY; SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; WOODSIDE ENERGY HAWAII INC. f/k/a BHP HAWAII INC.; AMERICAN PETROLEUM INSTITUTE; AND DOES 1 through 100, inclusive. |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to filed with the court and serve upon:

The State of Hawaiʻi, ex. rel., Anne E. Lopez, Attorney General

Wade H. Hargrove, III, Department of the Attorney General, 465 South King Street, Room 200, Honolulu, Hawaiʻi 96813

_____,

plaintiff, as indicated above/whose address is stated above, an Answer to the Complaint /

, which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRYOF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http:/www.courts.state.hi.us | **Effective Date of 1-DEC-2021 Signed by: /s/ Patsy Nakamoto Clerk, 1st Circuit, State of Hawaiʻi**  |
|---|---|

 If you need an accommodation for a disability when participating in a court program, service, or activity, please contact the ADA Coordinator of the XX Circuit as soon as possible to allow the court time to provide an accommodation. Phone No. 808-539-4400, TTY 808-539-4853, FAX 808-539-4402 or Send an e-mail to:  adarequest@courts.hawaii.gov. The court will try to provide, but cannot guarantee, your requested auxiliary aid, service or accommodation.

Form 1C-P-787 (12/21)  1CCT
Summons to Complaint

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| EARL I. ANZAI, ATTORNEY GENERAL FOR THE STATE OF HAWAII, as *Parens Patriae* for the Natural Persons Residing in Hawaii, and on behalf of the State of Hawaii, its Political Subdivisions and Governmental Agencies,<br><br>    Plaintiff,<br><br>  v.<br><br>CHEVRON CORPORATION; CHEVRON U.S.A., INC.; TESORO HAWAII CORPORATION, as Successor-In-Interest to BHP PETROLEUM AMERICAS REFINING INC.; BHP HAWAII INC; SHELL OIL COMPANY; SHELL OIL PRODUCTS COMPANY; TEXACO, INC.; TEXACO REFINING AND MARKETING, INC.; TESORO PETROLEUM CORPORATION; TESORO HAWAII CORPORATION; TOSCO CORPORATION; UNION OIL COMPANY OF CALIFORNIA; and UNOCAL CORPORATION,<br><br>    Defendants. | Civil No. 1:98-cv-00792-MWJS-WRP<br><br>**CERTIFICATE OF SERVICE** |

## CERTIFICATE OF SERVICE

I certify that on January 30, 2026, the foregoing motion and accompanying attachments were electronically filed with the U.S. District Court for the District of Hawaii using the CM/ECF system. I further certify that a copy of the foregoing motion and accompanying attachments will be sent via email or served by personal service as indicated below:

***Anzai Plaintiffs' Counsel***

Anne. E. Lopez                      [X] Email        [ ] Personal Service
Department of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813
(808) 586-1500
hawaiiag@hawaii.gov


Spencer Hosie                       [X] Email        [ ] Personal Service
Hosie & Partners LLP
149 New Montgomery Street, 4th Floor
San Francisco, CA 94105
(415) 247-6000
shosie@hosielaw.com


L. Richard DeRobertis               [X] Email        [ ] Personal
ServiceGaliher DeRobertis Waxman
820 Mililani Street, Suite 505
Honolulu, Hawaiʻi  96813
(888) 597-1441
Info@GaliherLaw.com

***Non-Parties***
City and County of Honolulu
c/o Dana M.O. Viola                 [ ] Email        [X] Personal Service
Corporation Counsel
County of Honolulu
530 S. King Street, Room 110

2

Honolulu, Hawai'i 96813
(808) 768-5234

Board of Water Supply
c/o Ernest Y.W. Lau                          [   ] Email          [X] Personal Service
Manager and Chief Engineer
Public Service Building (PSB)
630 South Beretania Street
Honolulu, Hawai'i 96843
(808)748-5000

County of Maui
c/o Victoria J. Takayesu                     [   ] Email          [X] Personal Service
Corporation Counsel
County of Maui
200 South High Street, Third Floor
Wailuku, Hawai'i 96793
(808) 270-7741

***Hawaii Litigation Counsel***
Melissa J. Kolonie                           [X] Email          [   ] Personal Service
Wade H. Hargrove III                         [X] Email          [   ] Personal Service
Lyle T. Leonard                              [X] Email          [   ] Personal Service
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu,  Hawai'i 96813
(808) 587-3050
(808) 587-3077
melissa.J.kolonie@hawaii.gov
wade.h.hargrove@hawaii.gov
lyle.t.leonard@hawaii.gov

Victor M. Sher                               [X] Email          [   ] Personal Service
Stephanie D. Biehl                           [X] Email          [   ] Personal Service
William Liang                                [X] Email          [   ] Personal Service
Sher Edling LLP
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

3

vic@sheredling.com
stephanie@sheredlig.com
william@sheredling.com

### *Honolulu Litigation Counsel*

| | | | |
|---|---|---|---|
| Dana M.O. Viola | [X] Email | [ ] Personal Service |
| Daniel Gluck | [X] Email | [ ] Personal Service |
| Jeff A. Lau | [X] Email | [ ] Personal Service |

Corporation Counsel
County of Honolulu
530 S. King Street, Room 110
Honolulu, Hawai'i 96813
(808) 768-5234
dviola@honolulu.gov
daniel.gluck@honolulu.gov
jlau3@honolulu.gov

| | | | |
|---|---|---|---|
| Victor M. Sher | [X] Email | [ ] Personal Service |
| Matthew K. Edling | [X] Email | [ ] Personal Service |
| Stephanie D. Biehl | [X] Email | [ ] Personal Service |
| Corrie J. Yackulic | [X] Email | [ ] Personal Service |
| William Liang | [X] Email | [ ] Personal Service |

Sher Edling LLP
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500
vic@sheredling.com
matt@sheredling.com
stephanie@sheredling.com
corrie@sheredling.com
william@sheredling.com

### *Maui Litigation Counsel*

| | | | |
|---|---|---|---|
| Victoria J. Takayesu | [X] Email | [ ] Personal Service |
| Kristin K. Tarnstrom | [X] Email | [ ] Personal Service |
| Mariana Lowy-Gerstmar | [X] Email | [ ] Personal Service |

Corporation Counsel
County of Maui
200 South High Street, Third Floor
Wailuku, Hawai'i 96793

4

(808) 270-7741
victoria.takayesu-hamilton@co.maui.hi.us
kristin.tarnstrom@co.maui.hi.us
mariana.lowy-gerstmar@co.maui.hi.us

| | | |
|---|---|---|
| Victor M. Sher | [X] Email | [ ] Personal Service |
| Matthew K. Edling | [X] Email | [ ] Personal Service |
| Stephanie D. Biehl | [X] Email | [ ] Personal Service |
| William Liang | [X] Email | [ ] Personal Service |

Sher Edling LLP
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500
vic@sheredling.com
matt@sheredling.com
stephanie@sheredling.com
william@sheredling.com

DATED: January 30, 2026, Honolulu, Hawai‘i.

/s/*Steve K. S. Chung*
Steven K. S. Chung (1751)
Anthony Suetsugu (9404)

IMANAKA ASATO, LLLC
745 Fort Street Mall, 17th Floor
Honolulu, Hawai‘i  96813
Telephone:   (808) 521-9500
Email: schung@imanaka-asato.com
        asuetsugu@imanaka-asato.com

5

## ADDITIONAL COUNSEL

Anthony J. Dick*
Christopher S. Dinkel*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001.2113
Telephone: (202) 879-3939
Email:   ajdick@jonesday.com
            cdinkel@jonesday.com

Caroline N. Mitchell*
Jerry C. Ling (8260)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Email:   cnmitchell@jonesday.com
            jling@jonesday.com

David Phillips*
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200
Email:  davidphillips@jonesday.com

Theodore J. Boutrous Jr.*
William E. Thomson*
GIBSON DUNN
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Email:  tboutrous@gibsondunn.com
            wthomson@gibsondunn.com

Andrea E. Smith*
GIBSON DUNN
811 Main Street, Suite 3000
Houston, TX 77002-6117
Telephone: (346) 718-6600
Email:  aesmith@gibsondunn.com

Joshua D. Dick*
GIBSON DUNN
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: (415) 393-8200
Email:  jdick@gibsondunn.com

Attorneys for Defendants
CHEVRON CORPORATION and CHEVRON U.S.A. INC.
*pro hac vice applications forthcoming

6