# EXHIBIT 5

**Nos. 23-947 & 23-952**

Iɴ Tʜᴇ

# Supreme Court of the United States

Sᴜɴᴏᴄᴏ LP, ᴇᴛ ᴀʟ., *Petitioners,*

v.

Cɪᴛʏ ᴀɴᴅ Cᴏᴜɴᴛʏ ᴏꜰ Hᴏɴᴏʟᴜʟᴜ, ᴇᴛ ᴀʟ., *Respondents.*

Sʜᴇʟʟ PLC, ᴇᴛ ᴀʟ., *Petitioners,*

v.

Cɪᴛʏ ᴀɴᴅ Cᴏᴜɴᴛʏ ᴏꜰ Hᴏɴᴏʟᴜʟᴜ, ᴇᴛ ᴀʟ., *Respondents.*

**On Petitions for Writs of Certiorari
to the Supreme Court of Hawai‘i**

**BRIEF FOR RESPONDENTS
CITY AND COUNTY OF HONOLULU,
AND HONOLULU BOARD OF WATER SUPPLY**

Dᴀɴᴀ M.O. Vɪᴏʟᴀ
  Corporation Counsel
Pᴀᴜʟ S. Aᴏᴋɪ
Rᴏʙᴇʀᴛ M. Kᴏʜɴ
Nɪᴄᴏʟᴇᴛᴛᴇ Wɪɴᴛᴇʀ
Jᴇꜰꜰ A. Lᴀᴜ
  Deputies Corporation Counsel
530 South King St., Room 110
Honolulu, HI 96813
(808) 768-5129
paoki@honolulu.gov
robert.kohn@honolulu.gov
nwinter@honolulu.gov
jlau3@honolulu.gov

Vɪᴄᴛᴏʀ M. Sʜᴇʀ
  *Counsel of Record*
Mᴀᴛᴛʜᴇᴡ K. Eᴅʟɪɴɢ
Mɪᴄʜᴀᴇʟ Bᴜʀɢᴇʀ
Mᴀʀᴛɪɴ D. QᴜɪÑᴏɴᴇs
Qᴜᴇɴᴛɪɴ C. Kᴀʀᴘɪʟᴏᴡ
Sher Edling LLP
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500
vic@sheredling.com
matt@sheredling.com
michael@sheredling.com
marty@sheredling.com
quentin@sheredling.com

*Counsel for Respondents the City and County of Honolulu
and Honolulu Board of Water Supply*



i

# QUESTIONS PRESENTED

1. Does the Court have jurisdiction under 28 U.S.C. § 1257(a) to review a state supreme court's affirmance on interlocutory appeal of an order denying motions to dismiss where the decision below does not constitute a final judgment, and no exception to the final judgment rule applies?

2. Does the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, or the defunct federal common law that it displaced, or national foreign policy, or the Constitution's structure generally, preempt state common-law causes of action where the defendants' alleged tortious conduct is deceptive consumer marketing and failures to warn and not the emission of regulated air pollutants?

iii

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................. 1

STATEMENT ................................................... 4

REASONS FOR DENYING THE PETITION ... 7

I. The Court Lacks Jurisdiction Under 28 U.S.C. § 1257(a) to Review the Interlocutory Decision Below .................... 7

II. There Is No Split of Authority Concerning Petitioners' Preemption Defenses .............. 11

    A. The Decision Below Does Not Conflict with *City of New York.* ......................... 11

    B. The Decision Below Does Not Conflict with Petitioners' Other Authority ....... 14

III. The Decision Below Is Correct .................. 16

    A. Neither Federal Common Law Nor "Constitutional Structure" Preempt Respondents' Claims ........................... 17

    B. The Clean Air Act Does Not Preempt Respondents' Claims .......................... 24

    C. Respondents' Claims Do Not Impinge on Federal Foreign Affairs Prerogatives ......................................... 26

IV. The Decision Below Is a Poor Vehicle. ..... 29

V. Further Percolation Is Warranted ........... 30

CONCLUSION ................................................. 33

v

# TABLE OF AUTHORITIES

Page

## Cases

*Abbott v. Veasey*,
137 S. Ct. 612 (2017) ...................................... 29

*Allstate Ins. Co. v. Hague*,
449 U.S. 302 (1981) ....................................... 23

*Am. Constr. Co. v. Jacksonville,
T. & K.W. Ry. Co.*,
148 U.S. 372 (1893) ....................................... 29

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011) ............................. 1, 5, 17-21

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ....................................... 27

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) ....................................... 28

*Bell v. Cheswick Generating Station*,
734 F.3d 188 (3d Cir. 2013) .......................... 16

*Bonaparte v. Appeal Tax Ct.*,
104 U.S. 592 (1881) ....................................... 22

*Box v. Planned Parenthood of Ind. & Ky., Inc.*,
139 S. Ct. 1780 (2019) .................................... 31

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ....................................... 20

*Brown-Forman Corp. v. Miller*,
528 S.W.3d 886 (Ky. 2017) ........................... 16

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) ........................................ 20

*Calvert v. Texas*,
141 S. Ct. 1605 (2021) ................................... 31

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ....................................... 24

vi

TABLE OF AUTHORITIES—Continued

Page

*City & Cnty. of Honolulu v. Sunoco LP,*
39 F.4th 1101 (9th Cir. 2022) ........................ 10

*City of Milwaukee v. Illinois,*
451 U.S. 304 (1981)............................... 18, 19, 21

*City of New York v. Chevron Corp.,*
993 F.3d 81 (2d Cir. 2021) ..................... 2, 12, 14

*Cox Broad. Corp. v. Cohn,*
420 U.S. 469 (1975).................................. 2, 7-10

*Coyle v. Smith,*
221 U.S. 559 (1911)...................................... 22

*Delaware ex rel. Jennings v. BP Am. Inc.,*
No. N20C-09-097, 2024 WL 98888
(Del. Super. Ct. Jan. 9, 2024) ........................ 16

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 2155 (2022)...................................... 21

*Doe v. Facebook, Inc.,*
142 S. Ct. 1087 (2022)................................... 10

*Edenfield v. Fane,*
507 U.S. 761 (1993)...................................... 20

*Edgar v. MITE Corp.,*
457 U.S. 624 (1982)...................................... 24

*Estelle v. Gamble,*
429 U.S. 97 (1976)........................................ 30

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963)...................................... 20

*Florida v. Thomas,*
532 U.S. 774 (2001)....................................... 9

*Flynt v. Ohio,*
451 U.S. 619 (1981)....................................... 9

TABLE OF AUTHORITIES—Continued

Page

*Franchise Tax Bd. v. Hyatt,*
    587 U.S. 230 (2019) .................................... 22, 23

*Freeman v. Grain Processing Corp.,*
    848 N.W.2d 58 (Iowa 2014) ........................... 16

*Georgia v. Tenn. Copper Co.,*
    206 U.S. 230 (1907) ...................................... 19

*Goodyear Atomic Corp. v. Miller,*
    486 U.S. 174 (1988) ...................................... 9

*Gordon Coll. v. DeWeese-Boyd,*
    142 S. Ct. 952 (2022) .................................... 10

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,*
    240 U.S. 251 (1916) .................................... 29, 33

*Illinois v. City of Milwaukee,*
    731 F.2d 403 (7th Cir. 1984) ...................... 14-16

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ........................ 6, 8, 18, 24-26

*Jefferson v. City of Tarrant,*
    522 U.S. 75 (1997) ....................................... 7

*Kansas v. Colorado,*
    206 U.S. 46 (1907) ....................................... 19

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ...................................... 24

*Local No. 438 Constr. & Gen. Laborers' Union*
    *v. Curry,*
    371 U.S. 542 (1963) ...................................... 9

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ...................................... 20

*Maslenjak v. United States,*
    582 U.S. 335 (2017) .................................... 31, 32

viii

TABLE OF AUTHORITIES—Continued

Page

*McCray v. New York,*
461 U.S. 961 (1983).......................................... 32

*Medellín v. Texas,*
552 U.S. 491 (2008).......................................... 27

*Mercantile Nat'l Bank v. Langdeau,*
371 U.S. 555 (1963).......................................... 9

*Merrick v. Diageo Americas Supply, Inc.,*
805 F.3d 685 (6th Cir. 2015).......................... 16

*Minnick v. Cal. Dep't of Corr.,*
452 U.S. 105 (1981).......................................... 10

*Missouri v. Illinois,*
200 U.S. 496 (1906).......................................... 19

*Mohawk Indus., Inc. v. Carpenter,*
558 U.S. 100 (2009).......................................... 29

*Mount Soledad Mem'l Ass'n v. Trunk,*
567 U.S. 944 (2012).......................................... 30

*Nat'l Football League v. Ninth Inning, Inc.,*
141 S. Ct. 56 (2020).......................................... 30

*Nat'l Pork Producers Council v. Ross,*
598 U.S. 356 (2023).................................... 17, 21

*New Jersey v. City of New York,*
283 U.S. 473 (1931).......................................... 19

*New York v. New Jersey,*
256 U.S. 296 (1921).......................................... 19

*Nike, Inc. v. Kasky,*
539 U.S. 654 (2003).......................................... 9

*North Carolina ex rel. Cooper v.*
*Tenn. Valley Auth.,*
615 F.3d 291 (4th Cir. 2010).......................... 15

TABLE OF AUTHORITIES—Continued

Page

*Nw. Airlines, Inc. v. Transp. Workers Union of Am.,*
451 U.S. 77 (1981) ........................................... 17

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
557 U.S. 193 (2009) ........................................ 30

*O'Melveny & Myers v. FDIC,*
512 U.S. 79 (1994) ..................................... 18, 20

*Ouellette v. Int'l Paper Co.,*
666 F. Supp. 58 (D. Vt. 1987) ......................... 8

*Pilot Life Ins. Co. v. Dedeaux,*
481 U.S. 41 (1987) .......................................... 26

*Rice v. Norman Williams Co.,*
458 U.S. 654 (1982) ........................................ 24

*Rodriguez v. FDIC,*
589 U.S. 132 (2020) ........................................ 19

*Southland Corp. v. Keating,*
465 U.S. 1 (1984) ............................................ 9

*Sunoco LP v. City & Cnty. of Honolulu,*
143 S. Ct. 1795 (2023) ..................................... 4

*Taylor v. Riojas,*
592 U.S. 7 (2020) ........................................... 29

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
451 U.S. 630 (1981) ........................................ 23

*United States v. Arthrex, Inc.,*
594 U.S. 1 (2021) ........................................... 23

*United States v. Bevans,*
16 U.S. (3 Wheat.) 336 (1818) ......................... 22

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ........................................ 25

TABLE OF AUTHORITIES—Continued

Page

*Va. Uranium, Inc. v. Warren,*
139 S. Ct. 1894 (2019) ...................................... 24

*Wrotten v. New York,*
560 U.S. 959 (2010) ......................................... 30

*Young v. Masci,*
289 U.S. 253 (1933) ......................................... 23

*Zschernig v. Miller,*
389 U.S. 429 (1968) ................................... 27, 29

**Statutes**

28 U.S.C. § 1257(a) ............................. i, 2, 7, 8, 29
42 U.S.C. § 7401 ................................................. i, 24

**Other Authorities**

Br. of Appellant,
*City of New York v. Chevron Corp.,*
No. 18-2188, 2018 WL 5905772
(2d Cir. Nov. 8, 2018) ......................................... 14

Br. of Appellant,
*City & Cnty. of Honolulu v. Sunoco LP,*
No. CAAP-22-0000135
(Haw. Ct. App. Jul. 27, 2022) ......................... 11

Restatement (Third) of Foreign Relations Law
§ 402 ................................................................. 23

Stephen M. Shapiro et al.,
*Supreme Court Practice* (11th ed. 2019) ......... 29

William J. Brennan, Jr., *Some Thoughts on the
Supreme Court's Workload,*
66 Judicature 230 (1983) ................................. 30

1

## INTRODUCTION

This case seeks to hold petitioners liable under Hawaiʻi tort law for deliberately concealing and misrepresenting the climate-change impacts of their fossil-fuel products. Although deceptive commercial practices fall squarely within the core interests and historic powers of the states, petitioners moved to dismiss this lawsuit on the theory that federal law exclusively governs any "claim[] involving transboundary pollution." Shell. Pet.16. The trial court denied the motion, and the Hawaiʻi Supreme Court unanimously affirmed after granting discretionary interlocutory appeal.

As the Hawaiʻi Supreme Court explained, petitioners mischaracterize the complaint as seeking to regulate pollution. Sunoco.App.51a ("Numerous courts have rejected similar attempts by oil and gas companies to reframe [analogous] complaints . . . ."). This suit does not request relief for "*all* effects of climate change," but "only for the effects of climate change allegedly *caused* by [petitioners'] breach of Hawaiʻi law regarding failures to disclose, failures to warn, and deceptive promotion." *Id.* 38a. Because "liability is causally tethered to [petitioners'] failure to warn and deceptive promotion," "nothing in this lawsuit incentivizes—much less compels—[petitioners] to curb their fossil fuel production or greenhouse gas emissions." *Id.* 50a. Based on that accurate characterization of the complaint, the Hawaiʻi Supreme Court rejected petitioners' preemption defenses, which rest on the Clean Air Act (CAA) and a congressionally displaced body of federal common law that once "governed 'suits brought by one State to abate pollution emanating from another State.'" *Ibid.* (quoting *Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 421 (2011)).

The ruling below does not warrant certiorari review for multiple reasons. To begin, this Court lacks jurisdiction under 28 U.S.C. § 1257(a) because the Hawai'i Supreme Court's decision is interlocutory and does not satisfy any exception to the final judgment rule. Reversing the decision below would not terminate the litigation; no federal policy would be "seriously erode[d]" by litigating this case to final judgment; and petitioners have raised additional federal defenses that might warrant this Court's review at a later date. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 479–83 (1975). Petitioners entirely ignore the jurisdictional defect, and their petitions should be denied on that basis alone.

Review would also be premature and unnecessary because the opinion below does not conflict with any other appellate decision. Petitioners rely heavily on *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), but that case is distinguishable. There, the plaintiff sought to hold the defendants liable for "admittedly legal commercial conduct in producing and selling fossil fuels." *Id.* at 86. The defendants could not "avoid all liability" unless they "cease[d] global production altogether." *Id.* at 93. The court thus held that the plaintiff's "effectively . . . strict liability" claims were preempted by the CAA or the federal common law of transboundary pollution because they would "regulate cross-border emissions." *Ibid.* Petitioners' "liability in this case," by contrast, does not arise "from lawful conduct in producing and selling fossil fuels." Sunoco. App.38a. Rather, it "results from allegedly tortious conduct," namely petitioners' "failures to disclose, failures to warn, and deceptive promotion." *Ibid.* The court below thus held that unlike in *City of New York*, respondents' claims neither "compel[]" petitioners to "curb their fossil fuel production" nor "subject [them] to any additional emissions regulation," and therefore

are not preempted by the CAA or any federal common law. *Id*. 50a, 64a (quotations omitted). That holding independently supports the result below and does not conflict with the reasoning or result in *City of New York*. Even though the court below disagreed with other parts of *City of New York*'s analysis, that disagreement is not outcome-determinative and does not warrant certiorari review.

The decision below also correctly applies this Court's precedents. Petitioners theorize that the "structure" of the Constitution bars this suit. Shell.Pet.19. That theory improperly attempts to cloak the former federal common law of interstate pollution in constitutional garb, with no foundation in the Constitution's text or history. There is no basis to constitutionalize the judge-made federal law underpinning petitioners' arguments, which in any event does not preempt respondents' state-law claims because (1) it has been displaced by the CAA, and (2) it never encompassed suits for deceptive marketing. This lawsuit also falls far outside the CAA's preemptive scope. The CAA "regulates pollution" and "does not concern itself in any way with the acts that trigger liability under [respondents'] Complaint, namely: the use of deception to promote the consumption of fossil fuel products." Sunoco.App.61a. For similar reasons, this suit does not impermissibly interfere with the federal government's foreign affairs power.

Finally, there is no reason for the Court to decide the questions presented now, rather than allowing them to percolate in the lower courts. Due to its interlocutory nature, the decision below is a poor vehicle for addressing petitioners' preemption defenses, which could be mooted by additional litigation. The Court will, moreover, have multiple opportunities to review those defenses in the future—either after final judg-

ment in this case if respondents prevail, or in analogous lawsuits progressing through other state courts. The same defenses are in fact currently being adjudicated by courts in four different states. Rather than short circuit the ordinary percolation process, this Court should deny certiorari, especially in light of this case's interlocutory posture and the absence of any actual split in authority.

## STATEMENT

1. Respondents allege petitioners have, for decades, intentionally misled consumers and the public about the climate-change effects of their fossil-fuel products, including in Hawai'i. *See, e.g.*, Shell.App.100a–101a. Those "failures to disclose and deceptive promotion increased fossil fuel consumption, which—in turn—exacerbated the local impacts of climate change in Hawai'i." Sunoco.App.76a. Respondents pleaded state-law claims for nuisance, trespass, and failure to warn. Shell.App.216a–231a. The complaint "do[es] not ask th[e] court to limit, cap, or enjoin the production and sale of fossil fuels" by petitioners or anyone else. Sunoco.App.38a. Instead, it seeks damages for local climate-change impacts in Honolulu that are attributable to petitioners' deceptive conduct, and it requests equitable relief to mitigate the ongoing risks posed by those local impacts through, for example, infrastructure projects to protect respondents from sea-level rise. Shell.App.203a–216a, 232a.

Petitioners removed the case to federal court, and the district court granted respondents' motion to remand. After the Ninth Circuit affirmed, petitioners sought review from this Court, which denied certiorari. *See* 143 S. Ct. 1795 (2023). Following remand, the state trial court denied petitioners' motions to dismiss the complaint based on lack of personal jurisdic-

tion, federal preemption, and California's anti-SLAPP statute. Shell.App.77a, 84a. The Hawai'i Supreme Court then unanimously affirmed after accepting petitioners' interlocutory appeal.

2. The Hawai'i Supreme Court held that respondents' state-law claims are not preempted by either federal common law or the CAA. Sunoco.App.37a–66a. As to the former, the court rejected petitioners' theory that "the basic scheme of the federal Constitution demands that federal common law govern any dispute involving air and water in their ambient or interstate aspects." *Id.* 37a (cleaned up). The court explained that the CAA displaced the federal common law of transboundary pollution, and federal common law does not retain preemptive force once Congress displaces it. *Id.* 39a–49a. Because petitioners "sa[id] they do not seek to *expand* federal common law to a new sphere," the court found they had "waived any argument to expand federal common law to cover [respondents'] claims here." *Id.* 52a (quotation omitted). Even if the argument had been made, the court held that judicial lawmaking would be inappropriate given Congress's enactment of the CAA, "a comprehensive legislative scheme to address interstate air pollution" that leaves no room for judges to legislate. *Id.* 53a.

As an alternative holding, the court concluded that "even if federal common law governing interstate pollution claims had not been displaced," respondents' claims "would not be preempted by it." *Id.* 49a. That "'specialized federal common law'" formerly "governed 'suits brought by one State to abate pollution emanating from another State.'" *Id.* 50a (quoting *AEP*, 564 U.S. at 421). By contrast, "nothing in [respondents'] lawsuit incentivizes—much less compels—[petitioners] to curb their fossil fuel production or greenhouse

gas emissions" because "[petitioners'] liability is causally tethered to their failure to warn and deceptive promotion." *Id.* 50a.

The court further held that the CAA itself does not preempt respondents' claims because they "arise from defendants' alleged failure to warn and deceptive marketing conduct, not emissions-producing activities regulated by the CAA." *Id.* 59a. In reaching that conclusion, the decision below carefully applied this Court's tests for express, field, obstacle, and impossibility preemption. *Id.* 56a–65a. Petitioners could not satisfy any of those tests, however, because the "CAA does not concern itself in any way with the acts that trigger liability under [the] Complaint, namely: the use of deception to promote the consumption of fossil fuel products." *Id.* 61a.

As for *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), the Hawai'i Supreme Court distinguished that case on its facts. Unlike the claims in *Ouellette*, respondents' claims "require additional tortious conduct to succeed"—*i.e.*, "[petitioners'] alleged deceptive marketing and failure to warn about the dangers of using their products." Sunoco.App.63a (quotation omitted). Thus, unlike in *Ouellette*, respondents' "claims do not subject [petitioners] to any additional emissions regulation at all" because "emissions are at most a link in the causal chain connecting [respondents'] alleged injuries to [petitioners'] unrelated liability-incurring behavior." *Id.* 64a.

The court affirmed the orders denying petitioners' motions to dismiss, and remanded the case for further proceedings. *Id.* 66a.

**REASONS FOR DENYING THE PETITION**

### I. The Court Lacks Jurisdiction Under 28 U.S.C. § 1257(a) to Review the Interlocutory Decision Below.

Petitioners seek certiorari review of a state supreme court's interlocutory order affirming denial of petitioners' motions to dismiss. Because there has been no "[f]inal judgment[] or decree[]," the Court lacks jurisdiction to grant review under 28 U.S.C. § 1257(a). No exception to the statute's final judgment requirement applies. Petitioners entirely fail to address this jurisdictional deficiency, notwithstanding their obligation to "show . . . that this Court has jurisdiction to review the judgment on a writ of certiorari." S. Ct. R. 14(1)(g)(i). The petition must be denied on this preliminary jurisdictional ground.

1. Certiorari review of state court decisions is available only from "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had." 28 U.S.C. § 1257(a). The statute "establishes a firm final judgment rule" that is jurisdictional and "not one of those technicalities to be easily scorned." *Jefferson v. City of Tarrant*, 522 U.S. 75, 81 (1997). The appeal below was interlocutory, Sunoco.App.13a, and "[e]ven if the [Hawai'i] Supreme Court [later] adheres to its interlocutory ruling as 'law of the case,' that determination will in no way limit [this Court's] ability to review the issue on final judgment," *Jefferson*, 522 U.S. at 83. Petitioners can seek certiorari then.

This Court recognizes four exceptions to the final judgment rule under *Cox Broadcasting Corp. v. Cohn*, 420 U.S. at 479–83. The Sunoco petition cites the pages from *Cox* describing the fourth exception, suggesting that is the purported basis for jurisdiction. Sunoco.

Pet.2.[1] That exception applies only where (1) "reversal of the state court on the federal issue would be preclusive of any further litigation," rather than "merely controlling the nature and character of" further state court proceedings, and (2) "a refusal immediately to review the state court decision might seriously erode federal policy." *Cox*, 420 U.S. at 482–83.

2. Neither element of the fourth *Cox* exception is satisfied here. First, reversing the decision below would not terminate the litigation even under petitioners' reasoning. Petitioners say that under *Ouellette*, this case can only proceed "under the law of the State in which the source of the pollution is located." Sunoco.Pet.26. Petitioners assert that proving any theory of liability based on source-state law "is impossible here," *ibid.*, but the issue was not litigated or decided below and will remain open on remand even if this Court grants the petitions and reverses. In *Ouellette* itself, this Court held that while the district court erred by applying Vermont common law to claims against a polluting defendant in New York, the lower court had "correctly denied [the defendant's] motion for summary judgment and judgment on the pleadings." 479 U.S. at 500. The Court therefore "remanded for further proceedings consistent with this opinion," *ibid.,* and litigation continued below under New York law, *see, e.g., Ouellette v. Int'l Paper Co.*, 666 F. Supp. 58 (D. Vt. 1987) (denying motions to dismiss). Here, as in *Ouellette*, a reversal adopting petitioners' arguments would at most control "the nature and character of" further litigation below, *Cox*, 420 U.S. at 483, which takes this case outside the fourth

---

[1] The Shell petition states baldly that "jurisdiction is invoked under 28 U.S.C. § 1257(a)," and it makes no mention of the finality rule or its exceptions. Shell.Pet.1.

*Cox* exception. *See also, e.g.*, *Nike, Inc. v. Kasky*, 539 U.S. 654, 660 (2003) (Stevens, J., concurring in dismissal of writ as improvidently granted) ("an opinion on the merits . . . could take any one of a number of different paths").

Second, petitioners have no argument that denying review "might seriously erode federal policy." *Cox*, 420 U.S. at 483. The Court has relied on the fourth *Cox* exception only in cases that "involved identifiable federal statutory or constitutional policies which would have been undermined by the continuation of the litigation in the state courts." *Flynt v. Ohio*, 451 U.S. 619, 622 (1981). This Court has most commonly reviewed a statutory preemption ruling based on that exception where denying immediate review would contravene a statutory mandate that certain controversies be heard in a specific forum.[2] Otherwise, the Court has required a concrete, immediate potential interference with express federal policy. In *Goodyear Atomic Corp. v. Miller*, for example, the Court accepted jurisdiction to consider whether state workers' compensation rules were preempted at "the only nuclear facility producing nuclear fuel for the Navy's nuclear fleet," which "ha[d] important implications for the regulation of federally owned nuclear production facilities" nationwide. 486 U.S. 174, 180 (1988). Nothing like those concerns are present here. Petitioners "make no claim of serious erosion of federal policy that is not common to all run-of-the-mine decisions" denying a preemption defense. *See Florida v. Thomas*, 532 U.S. 774, 780 (2001).

---

[2] *See, e.g.*, *Southland Corp. v. Keating*, 465 U.S. 1 (1984) (Federal Arbitration Act); *Local No. 438 Constr. & Gen. Laborers' Union v. Curry*, 371 U.S. 542 (1963) (National Labor Relations Act); *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555 (1963) (National Banking Act).

Petitioners gesture ominously at a "stark[] conflict with the policies and priorities of the federal government," Sunoco.Pet.14, and "encroach[ment] on U.S. foreign policy," Shell.Pet.19, but venture no further. Petitioners have not, here or in state court, identified any specific policy, program, statutory mandate, agency action, treaty, or international agreement that would be imperiled by deferring potential review to final judgment. Petitioners assert these climate-deception cases are "important," Sunoco.Pet.30–31, but that is not enough. The Court has repeatedly and consistently denied review in cases implicating issues of general public importance where finality is absent or suspect. *See, e.g.*, *Doe v. Facebook, Inc.*, 142 S. Ct. 1087, 1088–89 (2022) (Thomas, J., respecting denial of cert.) (Section 230 of the Communications Decency Act); *Gordon Coll. v. DeWeese-Boyd*, 142 S. Ct. 952, 955 (2022) (Alito J., respecting denial of cert.) (ministerial exception as to First Amendment Religion Clauses); *cf. Minnick v. Cal. Dep't of Corr.*, 452 U.S. 105 (1981) (dismissing writ as improvidently granted) (affirmative action).

Additionally, the *Cox* exceptions generally apply only where further proceedings "would not require the decision of other federal questions that might also require review by the Court" later. 420 U.S. at 477. That, too, is not the case here. As petitioners have made clear, they will press multiple additional federal defenses that were not at issue below, including "the government-contractor defense, . . . federal immunity, the Interstate and Foreign Commerce Clauses, the Due Process Clause, [and] the First Amendment." *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1110 (9th Cir. 2022). The Chevron petitioners in fact have a separate appeal pending in Hawai'i's Intermediate Court of Appeal, asserting that respondents'

claims infringe on Chevron's "constitutionally protected" speech. *See* Br. of Appellant at 1, *City & Cnty. of Honolulu v. Sunoco LP*, No. CAAP-22-0000135 (Haw. Ct. App. Jul. 27, 2022). None of those defenses have been fully litigated, and each might provide a basis for this Court's certiorari jurisdiction post-judgment.

## II. There Is No Split of Authority Concerning Petitioners' Preemption Defenses.

Even if this Court had jurisdiction, it should deny the petitions because they do not identify any certworthy split. All petitioners' appellate decisions are distinguishable for the same reason: In each, the plaintiffs sought to restrict interstate emissions by holding out-of-state defendants liable merely for selling fossil-fuel products or emitting pollution. This case, by contrast, cannot limit emissions of any sort because "the acts that trigger liability" are petitioners' "use of deception to promote the consumption of fossil fuel products," such that petitioners can sell fossil fuels while avoiding future liability so long as they disclose and accurately represent the climate risks of their products. Sunoco.App.61a.

### A. The Decision Below Does Not Conflict with *City of New York.*

*City of New York* is distinguishable from this case because the plaintiff's theory of liability there was materially different from respondents' here. Because of that difference, the court below held that respondents' claims would not be preempted even under *City of New York*'s reasoning. That alternative holding independently supports the result and implicates no conflict.

1. In *City of New York*, the plaintiff sought to hold several fossil-fuel companies "strict[ly] liab[le]" for climate impacts caused by "those companies' admittedly legal commercial conduct in producing and selling fossil fuels." 993 F.3d at 86, 93. Under the plaintiff's theory, the defendants would be required to "cease global production altogether" if they "want[ed] to avoid [future] liability." *Id.* at 93. As the plaintiff "admit[ted]," moreover, "a significant damages award" in its case would have "compel[led] the [defendants] to develop new means of pollution control." *Ibid.* (quotations omitted). Accordingly, the Second Circuit concluded that the "lawsuit would regulate cross-border emissions," *ibid.*, and therefore held that the suit was preempted by federal common law or the CAA. *See id.* at 90–91 (explaining that whether federal common law applies turns on "the nature of the [plaintiff's] lawsuit" and whether it is "a clash over regulating worldwide greenhouse gas emissions"); *id.* at 96 (explaining that the CAA "displaces the [plaintiff's] common law damages claims" because "if successful, [those claims] would operate as a *de facto* regulation on greenhouse gas emissions").

2. In contrast to *City of New York*, this suit does not and could not regulate pollution from any source. As correctly construed by the Hawaiʻi Supreme Court, the complaint does not seek to hold petitioners liable for merely "producing and selling fossil fuels." Sunoco. App.38a. It instead seeks relief "*only* for the effects of climate change allegedly *caused* by [petitioners'] breach of Hawaiʻi law regarding failures to disclose, failures to warn, and deceptive promotion." *Ibid.* (first emphasis added). As a result, "nothing in this lawsuit incentivizes—much less compels—[petitioners] to curb their fossil fuel production or greenhouse gas emissions." *Id.* 50a. So long as petitioners adequately

disclose and accurately represent the climate-change risks of their fossil fuels, they can produce and sell as much fossil fuels as they are able without incurring additional liability. Unlike *City of New York*, then, this lawsuit does not "subject [petitioners] to any additional emissions regulation at all." *Id.* 64a. The court below thus concluded that respondents' state-law claims are not preempted by federal common law or the CAA. *Id.* 37a–38a (federal common law), 65a (CAA).

3. The Hawai'i Supreme Court did expressly disagree with one part of the Second Circuit's analysis, namely that federal common law can preempt state law even after it is displaced by federal statute. *See* Sunoco.App.49a. But that disagreement was not outcome-determinative. For the reasons just discussed, the court below held in the alternative that even assuming "federal common law retains preemptive effect after displacement," it "would not preempt [respondents'] claims in this case." *Id.* 52a. That holding does not conflict with *City of New York*'s application of federal common law to claims that would have regulated emissions by holding the defendants strictly liable for their mere production and sale of fossil fuels. Because the court below determined that respondents' claims for deceptive marketing do *not* regulate emissions, it would have reached the same outcome even if it had fully adopted the Second Circuit's reasoning concerning the preemptive effect of congressionally displaced federal common law.

Contrary to petitioners' suggestions, moreover, *City of New York* did not implicitly reject a deception-based theory of liability, because the plaintiff in that case did not assert one. *See* Shell.Pet.4, 9, 13. The Second Circuit's preemption analysis did not mention the de-

fendants' alleged efforts to conceal and misrepresent their products' climate-change impacts. It instead explicitly characterized the plaintiff's claims as imposing "strict liability" for the mere release of "fossil fuel emissions." *City of New York*, 993 F.3d at 93. That matched the plaintiff's own characterization of its "particular theory of the claims," which "assume[d] that [the] [d]efendants' business activities have substantial social value and [did] not hinge on a finding that those activities themselves were unreasonable or violated any obligation." *See* Br. of Appellant, *City of New York*, No. 18-2188, 2018 WL 5905772, at *19 (2d. Cir. Nov. 8, 2018).

### B. The Decision Below Does Not Conflict with Petitioners' Other Authority.

Petitioners' other cases are distinguishable for the same reason as *City of New York*. The claims in those cases would have imposed liability on the defendants for merely releasing pollutants from a point source, and thus would have had the effect of regulating cross-border pollution. The claims in this case would have no such regulatory effect because they seek to hold petitioners liable only for the harms caused by their failure to warn and deceptive promotion.

1. The decision below does not conflict with *Illinois v. City of Milwaukee* (*Milwaukee III*), 731 F.2d 403 (7th Cir. 1984). In *Milwaukee III*, Illinois sought to hold the City of Milwaukee liable under Illinois law for "dump[ing] substantial quantities of pathogen-containing sewage into Lake Michigan," which then flowed into Illinois waters. *Id*. at 404. "Illinois' basic grievance" was that the "permits issued to Milwaukee pursuant to the [Clean Water Act] d[id] not impose stringent enough controls on the discharges." *Id*. at 412 n.5. But the court reasoned that if Illinois law

could impose a more demanding effluent standard on a permitted pollution source in Wisconsin, "[a]ny permit issued under the Act would be rendered meaningless." *Id.* at 414. The court thus held that the Clean Water Act preempted the plaintiff's claims under Illinois law, and expressly "limited" that holding "to the context of these cases." *Id.* at 410 n.2.

Respondents' claims are nothing like those in *Milwaukee III*. This suit does not allege that petitioners violated tort law duties by discharging pollutants from a point source, does not challenge the sufficiency of any pollution control measure, and does not interfere with any permitting decision under the CAA or any other federal law. Because respondents' claims "do not subject [petitioners] to any additional emissions regulation at all," Sunoco.App.64a, the reasoning in *Milwaukee III* simply does not apply here.

2. The decision below also does not conflict with *North Carolina ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291 (4th Cir. 2010). There, the plaintiff obtained an injunction under North Carolina law that would have imposed specific new emissions controls on power plants in Alabama and Tennessee. *Id.* at 296. The court held that the CAA preempted those state-law claims because they would impose air quality "standards" different from those "authorized by Congress, established by the EPA, and implemented through Alabama and Tennessee permits." *Id.* at 301.

Again, this lawsuit cannot interfere with any air quality standards imposed through the CAA permitting process. That is because, as the court below recognized, petitioners can "concurrently" "adher[e] to the CAA and separately issu[e] warnings and refrain[] from deceptive conduct as required by Hawai'i law." Sunoco.App.65a.

16

3. Petitioners' remaining appellate decisions are all inapposite for the same reason as *Milwaukee III* and *Cooper*. In each, the plaintiffs alleged that a point-source emitter violated state tort duties by releasing airborne pollutants. *See Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694–95 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 193–94, 197 (3d Cir. 2013); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 84–85 (Iowa 2014); *Brown-Forman Corp. v. Miller*, 528 S.W.3d 886, 890, 894 (Ky. 2017). The tortious conduct alleged here "is *not production of emissions*," but rather petitioners' "alleged deceptive marketing and failure to warn about the dangers of using their products." Sunoco.App.63a. As a result, the decision below does not conflict with any of petitioners' appellate authority.[3]

## III.  The Decision Below Is Correct.

Denying interlocutory review is also appropriate because the court below correctly rejected petitioners' preemption defenses. Petitioners ask this Court to consider a new constitutional preemption theory cobbled together from cases dealing with the displaced federal common law of interstate pollution, the CAA, and the federal foreign affairs power. Specifically, they say "the federal constitutional system" preempts all state-law "claims involving transboundary pollution." Shell.Pet.16. This constitutional "rule," petitioners insist, "emanates from 'the Constitution's structure and the principles of sovereignty and comity it

---

[3] Petitioners also cite the trial court decision in *Delaware ex rel. Jennings v. BP America Inc.*, No. N20C-09-097, 2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024), which dismissed in part claims similar to respondents'. *See* Shell.Pet.25–26. Delaware has sought interlocutory review of that ruling, which in any event provides no basis for this Court to grant certiorari.

embraces.'" Sunoco.Pet.22 (quoting *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023))). None of petitioners' cases adopt or support their novel, far-reaching constitutional rule, and neither federal common law, nor the CAA, nor any foreign policy preempts respondents' claims. Petitioners' mangled theory of constitutional preemption does not merit this Court's consideration.

### A. Neither Federal Common Law Nor "Constitutional Structure" Preempt Respondents' Claims.

Petitioners first argue that "the Constitution preempts [respondents'] claims." Shell.Pet.16 (capitalization omitted). That theory finds no support in this Court's precedents.

1. Petitioners' constitutional argument relies primarily on federal common-law cases involving interstate pollution. *See* Sunoco.Pet.5–6; Shell.Pet.16–18. Those cases address the judiciary's power to create federal common law in the absence of congressional action, however, and none of them hold that the Constitution implicitly prohibits state-law claims "seeking redress for interstate pollution." Sunoco.Pet.12. The court below correctly concluded that the federal common law of transboundary pollution cannot preempt respondents' claims for three primary reasons. *See* Sunoco.App.37a–53a.

First, when Congress enacted the CAA, it displaced any prior federal common law concerning transboundary air pollution. *See AEP*, 564 U.S. at 429. After displacement, the question of state-law preemption turns on the preemptive scope of the displacing statute, not a defunct body of judge-made federal law. *See, e.g., Nw. Airlines, Inc. v. Transp. Workers Union of Am.*,

451 U.S. 77, 95 n.34 (1981) ("[Following displacement,] the task of the federal courts is to interpret and apply statutory law, not to create common law."); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) (courts cannot "supplement federal statutory regulation" with federal common law because "matters left unaddressed in such a [regulation] are presumably left to the disposition provided by state law"); *City of Milwaukee v. Illinois* (*Milwaukee II*), 451 U.S. 304, 315 (1981) (judges must stop "rely[ing] on federal common law . . . when Congress has addressed the problem").

*Ouellette* and *AEP* make that point crystal clear. In *Ouellette*, the Court considered a preemption challenge to state-law claims that would formerly have been governed by the federal common law of interstate water pollution. 479 U.S. at 484, 487. Because the Clean Water Act had displaced the common law, the Court framed the relevant inquiry as whether the statute itself preempted the plaintiffs' state-law claims, which it resolved through a traditional statutory preemption analysis. *See id.* at 491–500. The Court used the same analysis 20 years later in *AEP*, when discussing the displacement of federal common law relating to greenhouse gas emissions. 564 U.S. at 429. After holding that the CAA displaced the plaintiffs' federal common-law claims, the Court remanded their state-law claims for further consideration by the lower courts, noting that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal [CAA]." *Ibid.* As the court below recognized here, this Court's precedent "requires analyzing the preemptive effect of *only* the CAA," without reference to any common law it displaced. Sunoco.App.37a.

Second, the federal common law of transboundary pollution would not preempt respondents' claims even

if it still existed. This Court has only applied that body of judge-made law in cases "brought by one State to abate pollution emanating from another State." *AEP*, 564 U.S. at 421.[4] But because petitioners' "liability is causally tethered to their failure to warn and deceptive promotion," "nothing in this lawsuit incentivizes—much less compels—[petitioners] to curb their fossil fuel production or greenhouse gas emissions" from any source. Sunoco.App.50a. The case thus falls outside the obsolete federal common law of interstate air pollution, whatever its scope might once have been.

Third, petitioners "waived any argument to expand federal common law to cover [respondents'] claims" below. *Id.* 52a. Even if petitioners had preserved the argument, they could not satisfy the "strict conditions [that] must be satisfied" before "federal judges may claim a new area for common lawmaking." *Rodriguez v. FDIC*, 589 U.S. 132, 136 (2020). "[O]ne of the most basic" conditions is that federal common law "must be necessary to protect uniquely federal interests." *Ibid.* (quotations omitted). The "cases in which judicial creation of a special federal rule would be justified" are

---

[4] *See also Missouri v. Illinois*, 200 U.S. 496, 517 (1906) (Missouri seeking "to restrain the discharge of . . . sewage" into Mississippi River tributary); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 236 (1907) (Georgia seeking "to enjoin the defendant copper companies from discharging noxious gas" in Tennessee); *Kansas v. Colorado*, 206 U.S. 46, 94–99, 117 (1907) (Kansas seeking to enjoin diversion of Colorado River water); *New York v. New Jersey*, 256 U.S. 296, 298 (1921) (New York seeking to "permanently enjoin[]" New Jersey defendants from "discharging . . . sewage" into New York harbor); *New Jersey v. City of New York*, 283 U.S. 473, 476–77 (1931) (New Jersey seeking "an injunction" that would "restrain[] the city from dumping garbage into the ocean or waters" off New Jersey coast); *Milwaukee II*, 451 U.S. at 311 (Illinois seeking "to eliminate all overflows and to achieve specified effluent limitations on treated sewage").

thus "limited to situations where there is a significant conflict between some federal policy or interest and the use of state law." *O'Melveny*, 512 U.S. at 87 (quotations omitted).

The court below correctly held that the state-law claims in this case do not present, let alone significantly conflict with, any uniquely federal interest. Sunoco.App.53a. Respondents' claims rest on the States' historic powers and interests in "ensuring the accuracy of commercial information in the marketplace." *Edenfield v. Fane*, 507 U.S. 761, 769 (1993); *see also, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541–42 (2001) ("advertising" is "a field of traditional state regulation" (cleaned up)); *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) ("unfair business practices" are "an area traditionally regulated by the States"); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 150 (1963) ("protection of consumers" is an area of "traditional [state] power"). Because there is no federal policy against accurately disclosing the environmental risks of fossil-fuel products, petitioners cannot show a "significant conflict between some federal policy or interest and the use of state law" in this case. *O'Melveny*, 512 U.S. at 87; *see also, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 509 (1988) (no preemption by federal common law where a defendant "could comply with both its [federal] obligations and the state-prescribed duty of care").

2. Petitioners acknowledge that Congress displaced the federal common law of interstate pollution. Sunoco.Pet.23; Shell.Pet.11. They nonetheless suggest that their proposed constitutional rule is supported by "the reason why" federal courts resorted to common lawmaking "in the first place." Sunoco.

21

Pet.28. But as this Court observed in *AEP*, the reason why federal common law exists in areas of "[e]nvironmental protection" is to "fill in statutory interstices." 564 U.S. at 421 (quotation omitted). And far from conflating federal-common-law rules with constitutional ones, this Court "ha[s] always recognized that federal common law is subject to the paramount authority of Congress." *Milwaukee II*, 451 U.S. at 313 (quotation omitted). The Court simply did not announce any constitutional rules *sub silentio* in its cases addressing the federal common law of transboundary pollution. In fact, none of those cases reference, much less analyze, any specific text or provision of the U.S. Constitution—the first and most basic step of any constitutional analysis. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) ("Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." (citations omitted)).

3. Petitioners' remaining cases are even further afield. The petitions speak in grand generalizations about the States' co-equal dignity, and the constitutional restraints on their assertion of power among one another, *see, e.g.*, Sunoco.Pet.21–23, but none of petitioners' cited authorities stand for a sweeping constitutional principle that any case "involving transboundary pollution" necessarily "raise[s] questions answerable only by federal law," Shell.Pet.3, 16.

If anything, petitioners' cases confirm that the Court will not lightly infer that the Constitution's structure preempts traditional state authority, even "in an area of national concern." Sunoco.Pet.16. In *National Pork Producers*, for example, the Court rejected the theory that the dormant Commerce Clause

precludes "state laws that have the 'practical effect of controlling commerce outside the State.'" 598 U.S. at 371–76; *see also Coyle v. Smith*, 221 U.S. 559, 565 (1911) (Congress could not, even temporarily, prohibit Oklahoma from relocating its capital as a condition of admission to the Union); *Bonaparte v. Appeal Tax Ct.*, 104 U.S. 592, 594–95 (1881) (a state may tax registered public debt issued by another state and held by one of the taxing state's residents, even if the debt would not be taxable in the issuing state); *United States v. Bevans*, 16 U.S. (3 Wheat.) 336, 386–91 (1818) (Marshall, C.J.) (Article III's grant of maritime and admiralty jurisdiction and Article I's grant of power to provide and maintain a navy did not automatically confer jurisdiction on federal courts to hear a trial for murder committed on a military vessel in Boston Habor, or divest Massachusetts courts of such jurisdiction). In *Franchise Tax Board v. Hyatt*, 587 U.S. 230, 245 (2019), the Court concluded that the framers "embed[ded] interstate sovereign immunity within the constitutional design," but only after conducting a searching and rigorous analysis of the Constitution's text and history, *id.* at 237–48. Petitioners offer no similar analysis here.

4. Finally, petitioners incorrectly assert that "only federal law can apply" to this lawsuit because it "implicat[es] the conflicting rights of States." Sunoco. Pet.28; Shell.Pet.23. But that assertion misapplies the rule on which it relies.

The Court has made clear that "States may not supply rules of decision governing 'disputes implicating the[ir] conflicting rights,'" such as "disputes over borders," "water rights," and "the interpretation of interstate compacts." *Hyatt*, 587 U.S. at 246 (quoting *Tex.*

23

*Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981)). That is because those controversies "involve[] a *direct conflict between sovereigns.*" *Id.* at 246–47 (emphasis added). When such a direct conflict arises, "[s]ome subjects that were decided by pure 'political power' before ratification now turn on federal 'rules of law.'" *Id.* at 246.

Those concerns are not implicated in this case, however, where non-sovereign plaintiffs seek to hold private companies liable under tort law for in-state injuries. And contrary to petitioners' insinuations, Sunoco.Pet.22, the U.S. Constitution does not preclude this suit simply because it involves out-of-state conduct. This Court has long recognized that "[t]he cases are many in which a person acting outside the State may be held responsible according to the law of the state for injurious consequences within it." *Young v. Masci*, 289 U.S. 253, 258–59 (1933); *see also, e.g.*, *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 307 (1981) (plurality) ("[A] set of facts giving rise to a lawsuit . . . may justify, in constitutional terms, application of the law of more than one jurisdiction."); Restatement (Third) of Foreign Relations Law § 402 & cmt. k (1987) (state law may generally apply to foreign conduct that "has or is intended to have substantial effect within [the forum State]").

The Court should therefore decline to review petitioners' novel theory of constitutional preemption, which invites it to "stare deeply into the penumbras" of the Supremacy Clause "to identify new structural limitations" on state authority. *United States v. Arthrex, Inc.*, 594 U.S. 1, 58 (2021) (Thomas, J. dissenting); *see also* Sunoco.Pet.2 (citing Supremacy Clause as only constitutional provision involved); Shell. Pet.1 (same).

## B. The Clean Air Act Does Not Preempt Respondents' Claims.

Petitioners also appear to advance an obstacle preemption defense based on the CAA and *Ouellette*. *See* Shell.Pet.29. That defense fails because respondents' "claims arise from [petitioners'] alleged failure to warn and deceptive marketing conduct, not emissions-producing activities regulated by the CAA." Sunoco.App.59a.

1. State law may be preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ouellette*, 479 U.S. at 492. This is "a high threshold" to clear. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011). Obstacle preemption must be "grounded in the text and structure of the statute at issue." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quotations omitted). It cannot arise from "brooding federal interest[s]," "judicial policy preference[s]," or "abstract and unenacted legislative desires." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901, 1907 (2019) (opinion of the court). Nor can it rest on "a hypothetical or potential conflict" between state and federal law. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). The operation of state law must actually "frustrate[] the objectives of the [federal act] in some substantial way." *Edgar v. MITE Corp.*, 457 U.S. 624, 632 (1982); *see also Kansas*, 589 U.S. at 212 (preemption requires more than an "overlap" in subject matter or the "possibility that federal enforcement priorities might be upset").

Respondents' state-law claims pose no such obstacle to the CAA. The statute's purpose is to protect the nation's air resources by preventing air pollution. *See* 42 U.S.C. § 7401. It achieves that objective by

"regulat[ing] pollution-generating emissions." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 308 (2014). The CAA's regulatory scheme "does not concern itself in any way with the acts that trigger liability under [respondents'] Complaint, namely: the use of deception to promote the consumption of fossil fuel products." Sunoco.App.61a. Nor does this lawsuit interfere at all with the Environmental Protection Agency's "authority to regulate greenhouse-gas emissions." Sunoco.Pet.26. As explained above, respondents' claims cannot regulate emissions because petitioners do not need to limit their fossil-fuel production, or their products' emissions, to avoid future liability. *See supra* Part II.A. And to the extent that petitioners are subject to any CAA emissions standards, they can simultaneously comply with those standards *and* their state-law duties to warn and not deceive consumers about the climate impacts of their products. *See* Sunoco.App.65a.

2. *Ouellette* does not support preemption here either. The Court there held that "[t]he [Clean Water Act] precludes *only* those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act." 479 U.S. at 497 (emphasis added). Because the plaintiffs in *Ouellette* sought to hold an out-of-state source of pollution liable for its "discharge of effluents" into interstate waters, *id.* at 484, the suit would effectively "compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA," *id.* at 495. It was therefore preempted by the Clean Water Act, which has an analogous preemptive reach to the CAA, as petitioners agree. Sunoco.Pet.26; Shell. Pet.23–24.

Unlike the defendant in *Ouellette*, petitioners do not need to "change [their] methods of . . . controlling pollution" or "cease operations" to "avoid the threat of ongoing liability" in this case. *Ouellette*, 479 U.S. at 495. They can avoid liability simply by "issuing warnings and refraining from deceptive conduct." Sunoco. App.65a. At most, this suit will encourage petitioners to be more truthful in the promotion of their products. Because "[t]he CAA does not bar [petitioners] from warning consumers about the dangers of using their fossil fuel products," the statute does not preempt respondents' claims. *Ibid.*

3. In passing, petitioners suggest that this case regulates emissions merely because emissions would have decreased if petitioners had adequately disclosed and accurately represented the climate impacts of their products. *See* Sunoco.Pet.25. But state law does not "regulate" an industry merely because it may "have an impact" on that industry. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987). Regulation means "[c]ontrol over something by rule or restriction." *Regulation*, Black's Law Dictionary (11th ed. 2019). This lawsuit does not and cannot control or restrict greenhouse gas emissions at all, for the reasons discussed above. *See supra* Part II.A.

## C. Respondents' Claims Do Not Impinge on Federal Foreign Affairs Prerogatives.

Petitioners also say permitting this case to proceed past the pleadings "would interfere with federal authority over foreign affairs." Shell.Pet.8. But petitioners have "never detail[ed] what those foreign relations are and how they conflict with [respondents'] state-law claims." Sunoco.App.49a (quotation omitted). Because petitioners have not shown that litigating this case will have a "more than incidental effect on for-

eign affairs," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418 (2003), the court below correctly held that petitioners had not established a preemption defense.

1. The Court has found certain state law preempted where "there is evidence of clear conflict between" it and the foreign policy of the United States, *id.* at 421, or where the state law "establish[es] its own foreign policy," *Zschernig v. Miller*, 389 U.S. 429, 441 (1968). But the federal government's foreign affairs power will only preempt state law which, at a minimum, "produce[s] something more than [an] incidental effect in conflict with express foreign policy of the National Government." *Garamendi*, 539 U.S. at 420; *see Zschernig*, 389 U.S. at 433, 441 (similar). The Court evaluates potential conflicts between state law and foreign policy against "the backdrop of traditional state legislative subject matter." *Garamendi*, 539 U.S. at 425; *see also Medellín v. Texas*, 552 U.S. 491, 532 (2008) (President's memorandum directing state courts to give effect to International Court of Justice decision did not have preemptive effect in part because it "reache[d] deep into the heart of the State's police powers").

Petitioners do not argue that Hawai'i is making its own foreign policy in this case, and they have not identified any "express foreign policy of the National Government" with which respondents' claims might conflict. *Garamendi*, 539 U.S. at 420. Nor could they. This case falls within the area of "traditional state responsibility" to remedy deceptive marketing and failures to warn about a product's dangers. *Id.* at 419 n.11; *see supra* Part III.A (collecting cases on areas of traditional state responsibility). The court below recognized as much in holding that respondents' claims do not come within the federal common law. *See*

Sunoco.App.53a ("We see no 'uniquely federal inter-
ests' in regulating marketing conduct, an area tradi-
tionally governed by state law.").

2. The petitions' vague assertions of a conflict be-
tray their position. Petitioners say respondents' claims
"encroach on U.S. foreign policy" by "challenging the
reasonableness of foreign-policy decisions that ad-
dress energy policy and global greenhouse emissions."
Shell.Pet.19; *see also* Sunoco.Pet. 27–28. But they do
not say what those foreign-policy decisions are or why
they are in conflict with state-law duties to warn and
avoid disinformation in the marketplace. Likewise,
petitioners assert that "[t]he 'reasonableness' element
of the state-law duty second-guesses national and in-
ternational judgments about energy policy." Shell.
Pet.21. But once again, they do not specify which judg-
ments or policies are at issue, or why Hawai'i tort law
would require a court to second-guess them.

Petitioners also speculate that a damages award in
this case might "affect the price and production of
fossil fuels abroad." Shell.Pet.20; *see also* Sunoco.
Pet.27. But a "proper [preemption] inquiry calls for
an examination of the elements of the common-law
duty at issue; it does not call for speculation as to
whether a jury verdict will prompt the manufacturer
to take any particular action (a question, in any
event, that will depend on a variety of cost/benefit
calculations best left to the manufacturer's accoun-
tants)." *Bates v. Dow Agrosciences LLC*, 544 U.S.
431, 445 (2005) (citation omitted). As explained
above, moreover, a damages award in this suit will at
most encourage petitioners to adequately and accu-
rately disclose the risks of their products. *See supra*
Part III.B. Even if those disclosures had the poten-
tial to impact foreign markets, that "incidental or in-

direct effect in foreign countries" would be insufficient to preempt state law here. *Zschernig*, 389 U.S. at 433–34 (quotations omitted).

## IV. The Decision Below Is a Poor Vehicle.

The interlocutory posture of this case makes it a particularly poor vehicle for considering petitioners' preemption defenses, even if the Court had jurisdiction to grant certiorari under § 1257(a).

This Court is "generally hesitant to grant review of non-final decisions," even when it has jurisdiction to do so. *Taylor v. Riojas*, 592 U.S. 7, 11 (2020) (Alito, J., concurring); *Abbott v. Veasey*, 137 S. Ct. 612, 613 (2017) (Roberts, C.J., respecting denial of cert.) ("Although there is no barrier to our review, the discriminatory purpose claim is in an interlocutory posture . . . ."). That is for good reason. Later developments in a case can moot the questions presented in an interlocutory appeal. *Am. Constr. Co. v. Jacksonville, T. & K.W. Ry. Co.*, 148 U.S. 372, 384 (1893) ("[M]any orders made in the progress of a suit become quite unimportant by reason of the final result, or of intervening matters."). Having a petitioner present all of its arguments to the Court in a single petition, rather than in a series of interlocutory appeals, also promotes judicial economy. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) ("Permitting piecemeal, prejudgment appeals . . . undermines efficient judicial administration . . . ." (cleaned up)). Accordingly, lack of finality is itself a "sufficient ground" for denying certiorari. *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 258 (1916). "And, except in extraordinary cases, [a] writ [of certiorari] is not issued until final decree." Stephen M. Shapiro et al., *Supreme Court Practice* § 4.18 (11th ed. 2019).

This is not one of those extraordinary cases. As litigation progresses towards final judgment, petitioners will raise other federal- and state-law defenses. *See supra* Part I. If petitioners were to prevail on any of those defenses, it could eliminate any need for this Court to review the questions presented, including petitioners' constitutional preemption theory. Denying the petitions is therefore consistent with the Court's "usual practice" of "avoid[ing] the unnecessary resolution of constitutional questions." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009); *see also* William J. Brennan, Jr., *Some Thoughts on the Supreme Court's Workload*, 66 Judicature 230, 231–32 (1983) ("[A]llowing the case to proceed to its final disposition below might produce a result that makes it unnecessary to address an important and difficult constitutional question."). If, on the other hand, respondents ultimately prevail on their claims, this Court will have the opportunity to review all of petitioners' challenges to final judgment in a single petition.

The Court should therefore adhere to its "normal practice of denying interlocutory review." *Estelle v. Gamble*, 429 U.S. 97, 114–15 (1976) (Stevens, J., dissenting); *see also Nat'l Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56, 57 (2020) (Kavanaugh, J., respecting denial of cert.) ("the interlocutory posture is a factor counseling against" review); *Wrotten v. New York*, 560 U.S. 959 (2010) (Sotomayor, J., respecting denial of certiorari) (similar); *Mount Soledad Mem'l Ass'n v. Trunk,* 567 U.S. 944, 944 (2012) (Alito, J., respecting denial of cert.) (similar).

## V. Further Percolation Is Warranted.

Finally, the benefits of percolation weigh heavily in favor of denying certiorari. This Court will have other opportunities to take up petitioners' federal preemp-

tion defenses, which are currently being evaluated by multiple state courts. There is no need to short-circuit the state courts' analysis, which "could yield insights (or reveal pitfalls)" that this Court "cannot muster guided only by [its] own lights." *Maslenjak v. United States*, 582 U.S. 335, 354 (2017) (Gorsuch, J., concurring in part and concurring in the judgment).

1. The percolation process has only just begun. The Hawaiʻi Supreme Court was the first appellate court to decide whether federal law preempts state-law claims that seek to hold fossil-fuel companies liable for concealing and misrepresenting the climate impacts of their products. It will not be the last. Already, a state trial court in Delaware has ruled on petitioners' preemption defenses in an analogous suit, and that ruling is the subject of a pending petition for interlocutory review by that state's supreme court. *See* Notice of Appeal from Interlocutory Order, *Delaware ex rel. Jennings v. BP Am., Inc.*, No. 54,2024 (Del. Feb. 8, 2024). In the near future, moreover, courts in Maryland, New Jersey, and South Carolina will adjudicate these same defenses, which have been raised in fully briefed motions to dismiss. And in all likelihood, petitioners and other defendants will advance those same theories of preemption in similar cases being litigated in Minnesota, Rhode Island, Illinois, and elsewhere.

The Court should allow the state courts to develop the issues, in keeping with "ordinary practice." *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1782 (2019) (per curiam). As this Court has repeatedly recognized, the collective wisdom of the lower courts is especially important when a petition raises "issue[s] of first impression," *id.* at 1784 (Thomas, J., concurring); or "complex" questions of law, *Calvert v. Texas*, 141 S. Ct. 1605, 1606 (2021) (Sotomayor, J.,

respecting denial of cert.). Although petitioners' theory of preemption lacks any merit, it is novel and complicated, relying on a confusing mélange of "federal common law," "constitutional structure," "principles of sovereignty and comity," "[f]oreign-policy principles," and statutory preemption. Sunco.Pet.22–24, 27. The petitions raise precisely the sort of legal questions that would benefit from additional exploration and deliberation by other courts below.

That conclusion is reinforced by petitioners' efforts to obtain a federal constitutional ruling from this Court. The need for percolation is particularly pronounced "in the context of constitutional adjudication, where the Court's decisions cannot be overruled" by Congress. Shapiro, *Supreme Court Practice* § 6.37(I).(1). The Court should not rush to review petitioners' theory of constitutional preemption and should instead wait to see how the lower courts grapple with that novel theory and whether any consensus emerges.

2. Petitioners identify no countervailing reason for prematurely terminating the percolation process. They urge immediate review so that this Court can "provide clarity" to state courts, who are just "beginning in earnest" to adjudicate cases like respondents'. Sunoco. Pet.33. That argument has it backwards: "This Court often speaks most wisely when it speaks last." *Maslenjak*, 582 U.S. at 354 (Gorsuch, J., concurring in part and concurring in the judgment). For that reason, it usually lets a legal question fully percolate in the lower courts before intervening. *E.g.*, *McCray v. New York*, 461 U.S. 961, 963 (1983) (Stevens, J., respecting denial of cert.) ("[I]t is a sound exercise of discretion for the Court to allow the various States to serve as laboratories in which the issue receives further study before it is addressed by this Court.").

Petitioners will not, moreover, suffer any significant or irreparable harm from litigating this case to final judgment. They gesture vaguely at "litigation costs" and the "threat[]" of a large "damages award." Sunoco. Pet.33. But these massive companies are well-equipped to handle the ordinary costs and risks of state-court litigation. In any event, petitioners simply describe the ordinary consequences of denying interlocutory appeals. They do not identify any "extraordinary" circumstances that would justify pre-judgment review by this Court. *Hamilton-Brown Shoe*, 240 U.S. at 258; *see also* Shapiro, *Supreme Court Practice* § 4.18 ("[I]n the absence of some such unusual factor, the interlocutory nature of a lower court judgment will generally result in a denial of certiorari.").

## CONCLUSION

The Court should deny the petitions for writ of certiorari.

Respectfully Submitted,

<table>
<tr><td>

DANA M.O. VIOLA<br>
  Corporation Counsel<br>
PAUL S. AOKI<br>
ROBERT M. KOHN<br>
NICOLETTE WINTER<br>
JEFF A. LAU<br>
  Deputies Corporation Counsel<br>
530 South King St., Room 110<br>
Honolulu, HI 96813<br>
(808) 768-5129<br>
paoki@honolulu.gov<br>
robert.kohn@honolulu.gov<br>
nwinter@honolulu.gov<br>
jlau3@honolulu.gov<br><br>
*Counsel for Respondents City and County of Honolulu and Honolulu Board of Water Supply*

</td><td>

VICTOR M. SHER<br>
  *Counsel of Record*<br>
MATTHEW K. EDLING<br>
MICHAEL BURGER<br>
MARTIN D. QUIÑONES<br>
QUENTIN C. KARPILOW<br>
Sher Edling LLP<br>
100 Montgomery St., Ste. 1410<br>
San Francisco, CA 94104<br>
(628) 231-2500<br>
vic@sheredling.com<br>
matt@sheredling.com<br>
michael@sheredling.com<br>
marty@sheredling.com<br>
quentin@sheredling.com<br><br>
*Counsel for Respondents*

</td></tr>
</table>

May 1, 2024