# EXHIBIT 6

## Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MARGERY S. BRONSTER, etc., et al.,   ) CIVIL NO. 98-00792SPK
                                     )
                    Plaintiffs,      )
                                     )
        vs.                          )
                                     )
CHEVRON CORPORATION, et al.,         )
                                     )
                    Defendants.      )
_____)

TRANSCRIPT OF PROCEEDINGS

The above-entitled matter came on for hearing on Friday, January 28, 2000, at 10:03 a.m., at Honolulu, Hawaii,

BEFORE:          THE HONORABLE SAMUEL P. KING
                 Senior United States District Judge
                 District of Hawaii

REPORTED BY:     STEPHEN B. PLATT, CMR, CRR
                 Official U.S. District Court Reporter
                 District of Hawaii

APPEARANCES:     SPENCER HOSIE, ESQ.
                 JEFFREY T. ONO, ESQ.
                 JACK A. ROSENZWEIG, ESQ.
                 HOWARD G. MCPHERSON, ESQ.

                              Attorneys for the Plaintiffs

                 RANDALL Y. YAMAMOTO, ESQ.
                 LAYNE KRUSE, ESQ.
                 DOUGLAS YOUNG, ESQ.
                 C. BRANDON WISOFF, ESQ.
                 GEORGE W. PLAYDON, JR., ESQ.
                 GARY G. GRIMMER, ESQ.

                              Attorneys for the Defendants

FRIDAY, JANUARY 28, 2000                    10:03 A.M.

-oo0oo-

THE CLERK: Civil Number 98-00792SPK, Margery S. Bronster, etc., et al., versus Chevron Corporation, et al. This hearing has been called for plaintiff's motion for approval of settlement agreement with defendants and motion for attorneys' fees and costs.

Counsel, your appearances for the record, please.

MR. HOSIE: Good morning, Your Honor.

Spencer Hosie appearing on behalf of the plaintiff, the Attorney General of the State of Hawaii.

MR. ONO: Jeffrey Ono appearing on behalf of the plaintiff.

MR. ROSENZWEIG: Deputy Attorney General Jack Rosenzweig, representing Attorney General Earl Anzai.

MR. McPHERSON: Howard McPherson also for the State of Hawaii, Your Honor.

MR. YAMAMOTO: Good morning, Your Honor.

Randall Yamamoto with Layne Kruse on behalf of Tesoro Petroleum and Tesoro Hawaii.

MR. YOUNG: Good morning, Your Honor.

Douglas Young with Brandon Wisoff and also George Playdon for defendant BHP, Hawaii.

MR. GRIMMER: Your Honor, Gary Grimmer on behalf of Tosco Corporation:

THE COURT: Okay. You have the conn.

MR. HOSIE: I'm sorry, Your Honor?

THE COURT: That's a navy term. You are running the ship. Go ahead.

MR. HOSIE: I will try to keep us off the shoals, Your Honor.

For the record, Your Honor, may it please the court, my name is Spencer Hosie, I am here as counsel for the plaintiff in this case, the Attorney General for the State of Hawaii.

Your Honor, after many months of hard-fought, and sometimes acrimonious negotiation, last November the state reached a settlement accord with two defendants. The defendants are BHP and Tesoro --

THE COURT: Just one second. If the clerks can't hear too well, you can come sit in the jury box, if you want to.

MR. WATKINS: We're fine.

THE COURT: Okay. Since you are going to give them $10 million, I thought they ought to be here.

MR. HOSIE: That's fair enough, Your Honor.

Together, the two companies had approximately 11 percent of the Hawaii gasoline market. Under the terms of the settlement, Your Honor, the defendants propose to pay the state $15 million cash money prompt, and they've also given

the state their commitment to assist in discovery as appropriate going forward.

In November, we filed a motion with this court, asking the court to preliminarily approve the settlement. This court did. Pursuant to the court's order, we published notice in seven newspapers, including running a half page ad in "USA Today," which is a newspaper of national circulation. Under the published notice and the court's order, any objectors to either the fee application or the settlement itself had to file written objections no later than December 31st. No objections were filed, and we know of none as we stand here now.

Also, under the court's order, individuals who did not wish to be bound by the settlement had the obligation to mail in a request for exclusion, essentially an opt out, also postmarked by December 31st, 1999. We have received a total of six opt outs, one from a person in jail in Florida, one from a California resident, and four from the State of Hawaii. With that brief procedural background, Your Honor, I would like to call our first and only witness, Professor Samuel Issacharoff.

THE COURT: Glad to have him.

Swear the witness.

(Professor Samuel Issacharoff approached the witness stand.)

MAR 02-00 03:00PM FROM-GALTHER DeROBERTIS NAKAMURA ONO TARTANT 18085912608 I-194 P.05/36 F-841

THE CLERK: Would you please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give before this court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Please be seated.

State your name for the record and spell your last name, please.

THE WITNESS: My name is Samuel Issacharoff, I-S-S-A-C-H-A-R-O-F-F.

SAMUEL ISSACHAROFF, called as a witness on behalf of the Plaintiffs, having been produced and duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HOSIE:

Q. Good morning, sir. Where are you employed?

A. I am a professor of law at Columbia Law School in New York City.

Q. And could you please summarize for the court your educational background?

A. Yes. I received a Bachelor of Arts degree from the State University of New York. I received a J.D. in 1983 from Yale law school. That's the relevant --

THE COURT: '83?

THE WITNESS: '83, yes, Your Honor.

THE COURT: Mine was '40.

THE WITNESS: I don't think we overlapped, Your Honor.

THE COURT: I don't remember you there.

THE WITNESS: No. Well, I was there in spirit, Your Honor.

BY MR. HOSIE:

Q. Professor Issacharoff, could you please summarize for us your professional experience prior to joining the faculty at the Columbia University law school?

A. I clerked for a judge on the Third Circuit Court of Appeals in Philadelphia, Judge Arlen Adams, after graduating law school. I then received a fellowship to work on prosecution of military officials in Argentina. I came back and went into private practice and also worked at an institution called Lawyers Committee Civil Rights Under Law between '85 and '89, handling matters in complex federal litigation primarily. In 1989, I joined the faculty of the University of Texas school of law. I stayed there, received tenure, was awarded a number of titles, including a named chair, the Joseph Chamile Chair, and Centennial Chair in Law. And this past year, 1999, I switched and moved to Columbia law school.

Q. As a professor, sir, have you had an area of expertise or

specialization?

A. I have several areas, but one of them that's particularly relevant here is, I teach civil procedure. I teach complex litigation. I publish, I think, pretty extensively in these areas.

Q. Specifically, have you published, sir, on class action procedures and protocols?

A. Yes, I have probably about a half dozen articles on class actions and related issues, and these have been pretty well received and cited by a number of authorities, including the United States Supreme Court.

Q. And have you published on the question of reasonable fee awards in complex litigation or common fund cases?

A. Yes, I have.

Q. All right, sir. You mentioned some of the courses you taught. Have you ever taught a course involving statutory interpretation or construction?

A. Yes, at University of Texas I taught a course called Legal Process, which was heavily focused on the issue of statutory interpretation. And, in addition, I teach regularly in the Institute for Judicial Administration a course on statutory interpretation for newly appointed federal and state judges.

Q. What is the Institute for Judicial Administration, sir?

A. It's an offshoot of the federal courts. Essentially,

they franchise out to one or two law schools to run programs for new federal judges, and they have expanded it now to include new state judges. And, basically, people come on to the bench from practice, either have limited areas of familiarity, or, in some cases, have not been courtroom lawyers, and need to be brought up to speed on various aspects of the issues they'll confront.

Q. And have you ever served as a special master in complex cases, sir?

A. Yes, I was appointed by Judge Robert Parker, then of the eastern district of Texas, now in the Fifth Circuit, to be one of the special masters in the ongoing asbestos litigation there. It was called the Cimino litigation.

Q. Sir, have you previously been qualified as an expert witness in fairness hearings for complex class action settlements?

A. Yes, on a number of occasions.

Q. Could you please cite us several?

A. Well, in the antitrust area, I have been in the In re: Nasdaq case, and my declaration there was cited -- was quoted by the court. To my knowledge, that's the largest private antitrust settlement in American history. I believe that's right. I've also been involved in a number of other large antitrust cases, including In re: Lease Oil, which is a multidistrict litigation case in the southern district of

Texas. I have been involved in some state cases, such as Weatherford Roofing, a large case in Texas. And I've been an expert on a number of other occasions, cases, In re: Prudential, In re: John Hancock, a number of cases.

Q. Sir, we, of course, retained you on behalf of the Attorney General in this case, but in recent memory, have we been averse to one another?

A. Yes.

Q. Could you please elaborate briefly on that?

A. Yes, you were on the wrong side of the In re: Lease Oil antitrust litigation, and we first became acquainted when I was a witness in that case, and you were part of a team that was directly adverse to the people who had retained me.

Q. Objectors to the settlement?

A. People with erroneous judgment.

Q. As you pointed out at the time, sir.

A. (Laughing.)

Q. Professor, could you please tell the court what we requested you do for this hearing?

A. Yes. You asked me to review the pleadings in the case, you asked me to review a number of documents in the case, you asked me to look at the underlying statutory authority for a parens patriae action and the accompanying legislative history, and to give an assessment under the general conditions of the parens patriae statute about whether -- how

courts should go about assessing whether this is a fair and adequate settlement.

Q. And have you reached any conclusions in that regard, sir?

A. Yes, I have.

Q. Briefly, could you outline your conclusions for us?

A. My conclusions are that this is a very good settlement, by all indications, that it -- the amount of the settlement is, especially given the first-to-settle issue here, seems to be quite favorable to the class; that the procedures undertaken, particularly the direct participation of the Attorney General in overseeing the settlement process, indicates that both the settlement and -- including the fee issue, in my mind, are fair.

Q. Thank you.

MR. HOSIE: Your Honor, at this point, I would like to explore Professor Issacharoff's conclusions in a little greater detail.

THE COURT: Go ahead.

BY MR. HOSIE:

Q. Sir, let me start by asking you this: Does the fact that this is a parens patriae action change, in your mind, the way a court should approach the fairness hearing?

A. Yes, it does.

Q. Would you please explain?

A. Under 15, U.S. Code 15 C, there is a provision, provision

Subsection C, that says that the court has the responsibility to oversee any dismissal or compromise of this action prior to trial. This is very much -- looks very much like the Rule 23(e) provision for a fairness hearing; however, in most class actions, the responsibility of the court is quite a bit heightened, because individual class members generally do not have an incentive and do not have a sufficient material interest in the outcome of the litigation to monitor the activities of the lawyers.

Here, by contrast, you have the most active party imaginable, that is, the State of Hawaii, acting as overseer of the actions of counsel and directly passing on the propriety of the settlement and, under the facts of this case, directly participating in the negotiation of the settlement terms. Under these circumstances, there should be, in my view, a much greater presumption that the oversight over the fairness of the settlement is handled primarily by the State Attorney General and secondarily by the court, as opposed to in a class action where that is exclusively the province of the court.

Q. Now, Professor, could you please share with us your understanding of the Attorney General's involvement in the prosecution of this antitrust action?

A. Yes. I am familiar with two instances where the State of Hawaii has entered into agreements with private counsel to

pursue its objectives, this case and the tobacco litigation. And in both cases, what I've observed is a very attentive participation by the Attorney General's Office, both under Attorney General Bronster and Anzai, in overseeing the work of the lawyers in directing sometimes down to the day-to-day conduct of the lawyers, in participating directly in proposed settlement negotiations, and in passing on the acceptability of the settlement. I think it's fair to say that in both of these instances, in my opinion, it was the Attorney General who made the ultimate decision whether or not this was an acceptable settlement. I don't think there's any question about that from what I can tell.

Q. Sir, you told us moments ago that you had concluded that the settlement was fair, reasonable and adequate. What did you base that on?

A. Well, I tried to figure out what the percentage return was, and this is just one indicator -- actually, let me go back a step. For me, the most important fact was that the Attorney General, who knows the case inside and out and has been statutorily charged with protecting the interests of Hawaii consumers, has accepted this as a fair and reasonable settlement. That's the most important thing for me. But then I stepped back, and I said, what if this were a class action? What would I think of this as a proposed settlement under Rule 23(e)? And, as best as I can assess from the

facts presented, this is a case which has settled for somewhere between 25 and 40 percent of the estimated value of the first order claim against the two defendants who are here. There is some empirical work on settlements in class actions, most notably in the securities context. There's one study done by the Federal Judicial Center of four districts in the United States and one done by the National Economic Research Associates of all securities cases. And what they have found is, depending upon the period of time that you're dealing with, cases in the securities area settle for between 8 and 15 cents on the dollar. I would venture that securities cases are far easier to prosecute than antitrust actions, and it's harder to get a sense of the dollar -- of the percentage recovery in antitrust cases because there are invariably disputes about the relevant market, and that's one of the big difficulties in valuing antitrust claims. This case doesn't have that, because, obviously, Hawaii's geographically separate, so that the relevant market, I don't believe, is in issue, in contention, in this case; it will not be going forward.

So I compared the 25 to 40 percent recovery here with the eight to 15 percent recovery in securities cases, and it seems that that's quite an extraordinary recovery.

In addition, this is a complex antitrust case involving allegations of concerted anticompetitive behavior

by a number of participants. Civil conspiracies are notoriously difficult to prove, and they are easier to prove when a defendant will not resist discovery and will assist in the discovery of information necessary to develop the full factual record. That's why in antitrust cases you very often get what's called a first to settle discount, that the first defendant who will settle gets a discount first because the cooperation is necessary, second, because, among other things, these are very expensive cases to prosecute, and the first to settle helps refuel the war chest.

Q. Now, sir, you mentioned the figures 25 to 40 percent. Do you know whether that's calculated as per single damages for the statutory four-year period?

A. I believe it is.

Q. And is that how courts tend to think about this matter in evaluating antitrust settlements?

A. My sense from the cases I've been in is, yes, although there's not a lot of case law on this point. But when I have been involved in cases like the Nasdaq case or In re: Lease Oil, that's the way in which the dollar amount was figured. You did not take the statutory trebling into account when trying to figure out the percentage basis of the settlement.

Q. And, sir, there have been no objections filed to the settlement. Does that fact have significance for you?

A. Yes, there is extensive case law on what courts should

look at -- again, in the fairness 23(e) class action context -- and among the factors that one looks at is whether there have been any objections, and courts have recognized that as a relevant issue.

Q.  All right, sir, I would like to move on and change subjects to ask you about the fee aspect of this:  Are you familiar with the Attorney General's contract with outside counsel?

A.  Yes, I am.

Q.  Have you read that, sir?

A.  Yes, I have.

Q.  What are your conclusions concerning that contract, particularly regarding the legitimacy of a contingency fee arrangement in a parens patriae case?

A.  Well, there's two separate issues, if I could separate them.  One is the permissibility of a contingency fee arrangement under Section 15(c), and the second is, if it is permissible, whether the terms that the Attorney General entered into here with outside counsel are within the range of normal terms in cases of this sort.  And, if it's all right with you, I --

Q.  Please, do separate them.

A.  -- will do the two separately:  First of all, 15(c) is a somewhat confusing statute at first reading, but I think that when it's put in the context of other attorney's fees

statutes, its meaning is actually quite clear. Under 15(c) A 2, there is a provision that the court shall award the state as monetary relief three-fold the total damages sustained and the cost of suit, and it says, including a reasonable attorney's fee. That's followed up by 15(c)(d), which says that in any action under Subsection A of this section, the amount of the plaintiff's attorney's fee, if any, shall be determined by the court.

This is a statute that was passed in 1976, the same year, basically, as Section 1988, which is the standard fee shifting statute that this court is undoubtedly most familiar with, and this provision is what's called an exception to the American rule; it allows a prevailing plaintiff to recover attorney's fees from a defendant. This requires the court to assess what is the amount of the reasonable attorney's fee and to award it to a plaintiff -- not to the plaintiff's lawyer, but to the plaintiff -- as part of the statutory recovery. That is standard fee shifting, and that has to be done by the court, because that is a transfer of wealth from one party to another, and that is a determination that only the court can make.

In addition, there is another provision of this statute which has confused some but I think is actually quite clear: Section 15(g) 1 --

Q. And this is 15 U.S.C.?

A.    15 U.S.C., Section 15(g), which is subtitled "Definitions." And, in this area, it says, "The term State Attorney General means the chief legal officer of a state or any other person authorized by state law to bring actions under Section 15(c) of this title."

It then goes on to say that the term does not include any person employed or retained on a contingency fee, based on a percentage of the monetary relief awarded under this section.

Now, at first glance, you may read this and say, oh, my God, this statute expressly forbids contingency fee arrangements, but that's not what this does. A parens patriae action is designed to put the power of bringing a representative action in the hands of the chief legal officer of the state. It gives to the Attorney General the power to bring an action without the usual safeguards that would attach in a Rule 23 certification process. And the Supreme Court, in recent class action cases such as the Amcam decision and the Ortiz decision last year stressed that that certification process, and particularly the adequacy of representation, was a central due process protection for absent class members.

The parens patriae provision says you don't have to go through the class certification process; instead, we're going to assign the power to act as the representative to the

Attorney General. That power is the power to bring suit and to bind absent class members, or absent consumers, in the state to the outcome of the litigation if they do not opt out.

15(g) says that's a very sensitive political power that's being given to the State Attorney General, and we want to make sure that it's handled by a party who is politically accountable to the consumers of that state. And the legislative history is quite clear that that's the intent behind this, as well. 15(g) says the state cannot give that power to another party. If a party seeking to bring a common fund contingency action in a normal class action way wants to be class representative, then you should go through Rule 23 and the procedures there. You cannot use 15(g) to get around that unless the State Attorney General's involved. So this is not a restriction on the type of contract that the State Attorney General may enter into with outside counsel, but it is a restriction on who can make the decisions to bring suit, to settle or not settle, and to be in charge of the suit. And everything I've seen in this case, as I've testified before, is that the Attorney General discharged the obligations consistent with 15(c) and 15(g).

Q. Is it fair to summarize, sir, that 15(g) speaks to who may be a proper plaintiff, not who may or may not serve as counsel for a proper plaintiff?

A.   That is absolutely correct.

Q.   Thank you.  Apart from that, sir, you are aware we are requesting a 22 percent fee award of the net recovery?

A.   Yes.

Q.   And how does that stack up against common fee awards in antitrust cases generally?

A.   There's a number of authorities I would refer to.  First of all, the one that's leading in this jurisdiction is case law out of the Ninth Circuit, which says that in a common fund case, the presumption is that the fair fee is 25 percent, and that the court has the power to adjust that upward or downward, depending upon unusual circumstances. But 25 percent is what's called the Ninth Circuit benchmark, so that the requested fee, at 22 percent, and particularly the diminishing recovery as the amounts in question go up, is significantly below the Ninth Circuit benchmark.  The "Manual for Complex Litigation, Third," which is the operative document from the Federal Judicial Center, refers to a benchmark of 25 to 30 percent in common fund cases.  Again, this is lower than that.

The studies that I referred to earlier by the Federal Judicial Center and the National Economic Research Associates find that in their respective areas of inquiry, the four districts for the Federal Judicial Center and all securities cases in the NERA -- the National Economic

Research Associates study -- what they found was that the fees tended to be in the 25 to 30 percent range in the Federal Judicial Center study and in the 30 to 33 percent range in the NERA study, so that by all relevant bench marks, the fee requested here is lower than what would normally be expected in a common fund case.

Q. Perhaps a reflection of the negotiations between counsel and the Attorney General?

A. I think it very clearly reflects the negotiation between counsel and the Attorney General, and it does so in a way that's reflected structurally. Generally, and the most recent ABA ethics discussion on fees reflects -- states this quite clearly, generally, the easy dollars -- the first dollars are the easy dollars; and the hard dollars to get in any case are the later dollars. This arrangement provides that once recovery -- if recovery reaches over $250 million, the amount of attorney's fees drops to 10 percent. Clients generally have an incentive to pay more for the hard dollars and pay less for the easy dollars, and there is a risk in this type of an arrangement that the lawyers may stop fighting a little too soon because there's just not that much more at stake for them. I'm not saying that that's your intention, but that's how the incentives work here. I think that the Attorney General could have been aware of that risk and decided that because of the projected direct involvement

of the Attorney General in overseeing all aspects of this case, they were going to hold your feet to the fire regardless, so that they were going to cut as hard a deal as they could, consistent with getting you to accept the case.

Q. Fair enough, sir. One final question on this fee issue: Given your reading of the federal parens patriae statute, 15 U.S.C. 15(c), is this court required to approve the fee sought here?

A. This court is required to do three things under this -- two things under this statute, first, if a fee shifting award is sought, this court has to award that, it has to make the determination of what is reasonable. That is not being sought here. The settlement waives all further claims against BHP and Tesoro for further attorney's fees. Second, the court has to look at the fee contract as part of the overall fairness of the settlement for the consumer class of Hawaiian residents, and that falls under the authority of the court under 15(c), Subsection C. But the court does not have to issue an order awarding attorney's fees to the plaintiff, since the plaintiffs are seeking their compensation here pursuant to contract between the state and the plaintiff's lawyers, the private lawyers -- yourself, sir. So, in my view, the only role that the court has to perform in this particular -- under these particular facts is, the court has to make sure that the overall structure of the settlement,

including the fact that part of it is going to go to pay for private counsel, is fair to Hawaii consumers, and that's it. There does not need, in my view, to be an order of the court approving the fee award as such.

Q. And is that a difference relative to a typical common fund antitrust case?

A. Yes, in a common fund antitrust case, what you have is no contract, and so the court is always in the position of trying to figure out what private parties would have contracted to had they been able to overcome the transaction barriers to contracting with lots and lots of consumers. Here, the court doesn't have to guess what private parties would have contracted to, there is a contract between sophisticated parties that's already before the court, so that that market-revealing quality that one looks to in common fund cases has already been performed by the most obvious market imaginable, that is, the direct contract between the two relevant parties.

Q. All right, sir. Moving to our final subject, the plan of allocation, are you familiar with the plan of allocation in this proposed settlement?

A. Well, there is no ultimate plan of allocation at this time. There is a plan to allocate certain fees, according to the contract with the state, and also to hold a certain amount in reserve for further prosecution of the case.

Q.   With the balance going into an escrow expense account?

A.   With interest-bearing, that's correct.

Q.   Indeed.  And does that strike you as an appropriate tactic to take at this point, sir?

A.   Yes.  At this point you have 12 percent of the relevant market settling out.  You have an antitrust prosecution which is obviously going forward, and going forward as quite a heated case.  It doesn't make sense to waste the administrative costs associated with disbursing this or to try to figure out what the most effective plan of allocation is at this time since we have not yet reached the end of this litigation.  I think that at some point in the final distribution, either through settlement or litigation, the class will have to be notified, or the consumers of Texas will have to be notified -- excuse me, Hawaii, I'm sorry -- the consumers of Hawaii will have to be notified of the plan of distribution so that they can object.  But at this point there's nothing wrong with holding it in reserve for the benefit of those consumers, and particularly since it's interest-bearing, they should be relatively cost indifferent to that.

Q.   Are you aware, Professor, of other cases in which district courts have approved similar plans of allocation?

A.   Yes.  I believe it's in the Nike case in New York that there was an almost identical plan of distribution; that is,

that the court held back a certain amount of the funds for the further prosecution of the case and postponed the determination of the allocation.

Q. One final question: This allocation of -- I think it's $3 million for the future prosecution of the case -- does that strike you as a good idea from the consumer's perspective?

A. Well, it strikes me as a good idea from the consumer's perspective, because the consumers have an interest in going after the remaining 88 percent of the market here. But, more significant than that, from the vantage point that I look at this from, whether this creates any legal problems, unlike in Amcam or Ortiz, you are not creating intraclass difficulties, you're not robbing Peter to pay Paul; you're not saying, we're going to give money to present injured and take it away from the future injured, or vice versa.

In an antitrust conspiracy, the claim is that all consumers of the relevant product -- here, gasoline -- were harmed by the activity of all the defendants, so that the people who are having money withheld today are exactly the same people who stand to gain in the future, so there's no intraclass allocation going on here, there is simply the rewarding -- the decision to use some of the proceeds to further the litigation efforts on behalf of the entire class that stands to benefit here. And that's a decision that's

made by the Attorney General, and it is, in my view,

perfectly consistent with the objectives of the statute.

Q.  Thank you, Professor.

MR. HOSIE:  We have nothing further for this witness, and we pass the witness.

THE COURT:  Any questions?

MR. KRUSE:  No, sir, Your Honor.

MR. YOUNG:  No, Your Honor.

THE COURT:  What do these people that opted out hope to get, if anything?

THE WITNESS:  Your Honor, when six people opt out of a consumer case, in my experience you look at what they actually say in their letters.  One is a -- apparently a jailhouse lawyer from Florida -- speaks about that.  In my experience, I would bet that if we looked at these letters, we would find one or two that said, I hate lawyers, I hate courts, I don't want anything to do with you people.  You would find some people who didn't understand.  Nobody's going to prosecute this case on their own.  Nobody has --

THE COURT:  Well, they can't share in any award.

THE WITNESS:  They can't share in any award, and the --

THE COURT:  As far as Tesoro is concerned?

THE WITNESS:  No.

THE COURT:  How about the other people?

THE WITNESS:  Oh, no, they can sue Tesoro directly.

THE COURT:  Yeah, I know that, but they can't share in the --

THE WITNESS:  In the future awards.

THE COURT:  -- in any award of this money.  If there's a plan that says that, you know, you give something to the consumers, they are out?

THE WITNESS:  That's correct, Your Honor.

THE COURT:  Suppose they are in on the others, they don't opt out?

THE WITNESS:  I believe that they have now opted out of the class, Your Honor.  I think that they --

THE COURT:  For all the --

THE WITNESS:  I believe so, because the class has been defined as the -- I would have to look at the notice a little more carefully, but I believe that the class is defined as all Hawaii consumers during the relevant period that we have.

THE COURT:  Well, they might hire a lawyer from Stanford, for instance, who --

THE WITNESS:  They might.  And some Stanford lawyers have no sense of economics, and they might actually come in and try to prosecute an antitrust case on behalf of four people.  But even Stanford professors, I think, or lawyers, might --

THE COURT: But they may say, we didn't opt out against the other people.

THE WITNESS: I --

THE COURT: What did the notice say? Notice was a settlement with Tesoro, wasn't it?

MR. HOSIE: It was, Your Honor. It was specific to Tesoro and BHP. I think it is a close question as to whether they have opted out for additional settlements.

THE COURT: Well, we will meet that one a few years down the line.

MR. HOSIE: I think that's probably correct, Your Honor.

THE COURT: Especially jailhouse lawyers. He may get a --

THE WITNESS: I think he hopes to appear here himself, Your Honor. I don't think that will happen.

THE COURT: This is a -- as you say, the first of several defendants, and we've already had a change in attorneys general. Judd Watkins, who is the assistant clerk of the court, is anxious to get his hands on that $10 million. What do you expect him to do with it? Put it in an interest-bearing account?

MR. HOSIE: Yes, Your Honor, and --

THE COURT: At what, 2 percent? 1.2 percent?

MR. HOSIE: It's probably a little more, but not

much more.  And this is commonly done in circumstances like these.

THE COURT:  Oh, we invest it all the time, but you had better get together with the clerk and make sure that he can put it in something which makes it not available for enough time to raise the interest rate.

MR. HOSIE:  We can certainly do that, Your Honor.

THE COURT:  Early withdrawal, and you've got --

MR. HOSIE:  Penalties.

THE COURT:  -- there's a penalty.  That's why I had Judd come up and listen.

Do you want to stand up and take a bow, Judd?

THE WITNESS:  Yes, sir (standing).  Good morning, Your Honor.  Good morning.

MR. HOSIE:  Your Honor, if the court approves the proposed settlement --

THE COURT:  See, you didn't bring a bag for the money yet, but I think you had better specify a little bit more clearly what the clerk is supposed to do with that.

MR. HOSIE:  And may we work directly with the clerk, Your Honor?  May we work directly with the clerk on that point?

THE COURT:  Yes.

MR. HOSIE:  Setting up --

THE COURT:  Yes, please.

MR. HOSIE: We would be happy to do that, Your Honor.

THE COURT: Yeah, we learned by hard knocks, because many years ago, somebody sued the clerk for not getting enough interest on his money.

MR. HOSIE: Oh. Well, I suspect what will make sense is an escrow trust account at the Bank of Hawaii that carries the best interest rate that we can negotiate, given the duration of the deposit.

THE COURT: But then you have to make sure that the clerk isn't going to be sued for putting it in something where it's not withdrawable without a penalty.

MR. HOSIE: And that is a tension, because we have a tentative trial date of a little more than a year from now, and I think this case will be tried, Your Honor, but we are getting through the middle game and into the end game, and so we could perhaps commit to a one-year CD.

THE COURT: I think the maximum interest rate is three years. They have three-year investments, don't they? Anyway, look into it.

MR. HOSIE: Absolutely.

THE COURT: Make sure the clerk is on board so you don't sue him later for not doing what you had in mind.

MR. HOSIE: Fair enough, Your Honor. Point taken.

THE COURT: Anybody else have any questions of the

good professor?

(No response.)

THE COURT:  Thank you very much, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Anybody have anything else to offer?

(No response.)

MR. HOSIE:  Your Honor, at this point, we would move the court to finally approve the proposed settlement and acknowledge the appropriateness, if you will, of the accompanying application for an award of fees and reimbursement of costs.

THE COURT:  Now, in that regard, I understand that the costs, about $415 million goes to the state to reimburse for already paid expenses?

MR. HOSIE:  $415,000 goes to the state to reimburse --

THE COURT:  Thousand?

MR. HOSIE:  -- checks the state wrote.

THE COURT:  Oh, I thought it was million.  We got carried away there.

MR. HOSIE:  Well, that's --

THE COURT:  Thousand, okay.  I was wondering how you were going to get $415 million out of 1.2 million.  And you want reimbursement for $54,886.08 as reimbursement for class notices?

MR. HOSIE: Yes. And, Your Honor, the defendants were kind enough to advance that money, and they have requested, and the Attorney General's approved, their reimbursement of that $54,000 sum from the settlement proceeds.

THE COURT: And what are the other expenses?

MR. HOSIE: In addition, outside counsel have incurred expenses of $815,035 above and beyond the $415-paid, and we, with the Attorney General's blessing, seek reimbursement of that $815,035 cost amount.

THE COURT: Very well.

MR. HOSIE: Thank you. And then the fee would be 22 percent of the net amount with the $3 million set aside for additional prosecution.

THE COURT: So ordered.

MR. HOSIE: Thank you, Your Honor.

THE COURT: Now, do you want to prepare the appropriate order?

MR. HOSIE: We will do it, Judge.

THE COURT: Run it through counsel.

MR. HOSIE: We'll do it.

THE COURT: Thank you very much.

MR. HOSIE: Thank you, sir.

THE COURT: Do you have any questions, Judd?

THE WITNESS: No, Your Honor. None, not at all.

(Discussion off the record among counsel.)

MR. HOSIE:  Your Honor, we do have the final judgment that was attached as an exhibit to the settlement agreement, which itself was an attachment to the state's motion for approval of settlement.

THE COURT:  Exhibit --

MR. HOSIE:  (Perusing document) -- and may I approach, Your Honor?

THE COURT:  The last exhibit is a press release.

MR. HOSIE:  It's Exhibit C, Your Honor.

THE COURT:  Exhibit C?  Okay, thank you.  Anybody object to any of the provisions of Exhibit C?

(No response.)

THE COURT:  So all you have to do is run it out of the computer.

MR. HOSIE:  Okay, we'll do that, sir.

THE COURT:  Have you all seen it?  Has everybody seen it?

MR. KRUSE:  Yes, sir, we have approved the form of the final judgment.

THE COURT:  Okay.

MR. YOUNG:  Everyone has seen it and approved.

THE COURT:  Give me a nice clean copy, and I'll sign it.

MR. HOSIE:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. HOSIE:  Not from the state, Your Honor.

THE COURT:  Thank you very much.

I've got your names all here, so you can't escape. (Tendering document to the clerk).  We'll stand in recess.

THE BAILIFF:  Court stands in recess.

(The hearing was recessed from 10:44 to 10:56 a.m.)

THE CLERK:  Civil 98-792SPK, Margery S. Bronster versus Chevron Corporation.  This is on the record again.

THE COURT:  Yes, what's the problem?

MR. YOUNG:  Spencer Hosie is with me.  My name is Douglas Young, with Brandon Wisoff and Layne Kruse.  We have the final judgment, and we have entered in the relevant dates on the final judgment.

THE COURT:  So you have it ready to sign?

MR. HOSIE:  Yes, Your Honor.

MR. YOUNG:  If it would please the court to fill it out in that form, we would rather have it done today, rather than later.

THE COURT:  Brought my own pen.

MR. YOUNG:  Thank you, Your Honor.  May I approach?

(Discussion off the record between the court and the clerk.)

THE COURT:  1999.  Somebody was --

MR. YOUNG:  We were optimistic, Your Honor.

FROM GAETHER DUROBERTS NAKAMURA ONO TARITANI   18009912000   T-194   P.34/36   F-841

THE COURT: Optimistic. Well, I was here. (Perusing documents). Is this a pencil or a pen?

(Discussion off the record between the court and the clerk.)

THE CLERK: How many copies are you going to need?

MR. YOUNG: I think we would like at least four copies, if that's possible.

THE CLERK: Do you need certified copies?

MR. YOUNG: Yes, please.

THE CLERK: Okay. You can follow me down to the Clerk's Office, and I'll do that for you there.

MR. YOUNG: Thank you.

THE COURT: Who is going to distribute this to all the various parties?

MR. HOSIE: Your Honor, the state will serve it.

THE COURT: The state will do it?

MR. HOSIE: The state will do it, Your Honor.

THE CLERK: And you will do a certificate of service or something to indicate for the record for the Clerk's Office that that has been done?

MR. HOSIE: Absolutely.

THE CLERK: Thank you.

THE COURT: See how much she protects me? I signed an order once -- I was assigned to Chicago. I signed an order, and it never got delivered to anybody. And they

waited and waited and waited.  The time for appeal passed...

MR. HOSIE:  Oh, no.

THE COURT:  But the appellate court said that was their problem.

THE CLERK:  That's Chicago; that isn't Hawaii.  We are the ohana spirit, right, Judge?

THE COURT:  Okay.

THE CLERK:  I'll be right back, Judge.  Thank you.

MR. HOSIE:  Thank you, Your Honor.

MR. YOUNG:  Thank you, Your Honor.

THE COURT:  We are in recess.

(The hearing in the above-entitled

cause was concluded at 10:55 a.m.)

-ooOoo-

-ooOoo-

I, Stephen B. Platt, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that the foregoing is a true and correct transcript of proceedings before the Honorable Samuel P. King, Senior United States District Judge.

WEDNESDAY, MARCH 1, 2000          STEPHEN B. PLATT, CSR NO. 248