# EXHIBIT 10

ANNE E. LOPEZ                                        7609
Attorney General of Hawai'i

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-25-0000717**
**01-MAY-2025**
**12:02 PM**
**Dkt. 1 CMPS**

MELISSA J. KOLONIE                                   10209
Supervising Deputy Attorney General
WADE H. HARGROVE III                                 7897
LYLE T. LEONARD                                      9376
Deputy Attorneys General
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Telephone: (808) 587-3050
Facsimile: (808) 587-3077
Email: wade.h.hargrove@hawaii.gov

(Additional counsel listed on signature page)

Attorneys for Plaintiff
STATE OF HAWAI'I


IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| STATE OF HAWAI'I, ex rel. ANNE E. LOPEZ, ATTORNEY GENERAL, | CIVIL NO. |
| | (Other Non-Vehicle Tort) |
| Plaintiffs | |
| | |
| vs. | **COMPLAINT; SUMMONS** |
| | **JURY TRIAL DEMANDED** |
| BP P.L.C.; | |
| BP AMERICA INC.; | |
| BP PRODUCTS NORTH AMERICA INC.; | |
| CHEVRON CORP.; | Trial Date: None |
| CHEVRON USA INC.; | |
| EXXON MOBIL CORP.; | |
| EXXONMOBIL OIL CORPORATION; | |
| SHELL P.L.C.; | (Caption continued on next page) |
| SHELL USA, INC.; | |
| EQUILON ENTERPRISES LLC d/b/a | |
| SHELL OIL PRODUCTS US; | |
| SHELL TRADING (US) COMPANY; | |
| SUNOCO LP; | |
| ALOHA PETROLEUM, LTD.; | |

ALOHA PETROLEUM LLC;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66;
PHILLIPS 66 COMPANY;
WOODSIDE ENERGY HAWAII INC. f/k/a
BHP HAWAII INC.;
AMERICAN PETROLEUM INSTITUTE;
AND DOES 1 through 100, inclusive,

Defendants.

**COMPLAINT**

## TABLE OF CONTENTS

COMPLAINT AND DEMAND FOR JURY TRIAL .................................................................1

I.      INTRODUCTION ....................................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................7

III.    PARTIES ...............................................................................................................10

        A.      Plaintiff ......................................................................................................10

        B.      Defendants .................................................................................................11

IV.     AGENTS AND CO-CONSPIRATORS ................................................................47

V.      FACTUAL BACKGROUND ................................................................................49

        A.      Defendants Are Responsible for Causing and Accelerating Climate Change. ......49

        B.      Defendants Knew or Should Have Known the Dangers Associated with Fossil Fuel Products. .....................................................................................54

        C.      Despite Their Early Knowledge of Real and Severe Harm Posed by the Consumption of Fossil Fuel Products, Defendants Affirmatively Acted to Obscure Those Harms and Engaged in a Campaign to Deceptively Protect and Expand the Use of Fossil Fuel Defendants' Fossil Fuel Products. .................74

        D.      In Contrast to Public Misrepresentations About the Risks of Climate Change, Fossil Fuel Defendants' Internal Actions Demonstrate Their Awareness of and Intent to Profit from Uses of Fossil Fuel Products They Knew Were Hazardous. ..................................................................................................94

        E.      Defendants Slowed the Development of Alternative Energy Sources and Knowingly Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis. ................................................................97

        F.      Defendants Continue to Deceive Hawai'i Consumers Through Misleading Advertisements That Portray the Fossil Fuel Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change...........104

                i.      Exxon's Misleading and Deceptive Greenwashing  Campaigns .............110

                ii.     Shell's Misleading and Deceptive Greenwashing Campaigns ................112

                iii.    BP's Misleading and Deceptive Greenwashing Campaigns....................115

                iv.     Chevron's Misleading and Deceptive Greenwashing  Campaigns..........119

                v.      Sunoco's Misleading and Deceptive Greenwashing Campaigns.............125

                vi.     ConocoPhillips' Misleading and Deceptive Greenwashing  Campaigns 126

                vii.    WEH's Misleading and Deceptive Greenwashing Campaigns ...............130

                viii.   API's Misleading and Deceptive Greenwashing Campaigns ..................132

G.    Fossil Fuel Defendants and API Also Made Misleading Claims About Specific "Green" or "Greener" Fossil Fuel Products............................................137

H.    Defendants' Deceit Only Recently Began Coming to Light, and Their Misconduct Is Ongoing and Yet to be Fully Uncovered. ...................................145

I.    Hawai'i Has Suffered, Is Suffering, and Will Suffer Injuries from Defendants' Conduct. ........................................................................................149

      i.    Sea Level Rise in Hawai'i.........................................................153

      ii.    Changing Precipitation Patterns and Increased Fire Risk in Hawai'i......158

      iii.    Warming Oceans Around Hawai'i.............................................160

      iv.    Harms to Ecological Resources and Native Hawaiian Traditional and Customary Practices ...........................................................162

      v.    Harmful Health Outcomes in Hawai'i.......................................166

      vi.    Hawaii's Economic Vulnerability from Climate Change........................168

VI.    CAUSES OF ACTION ..............................................................................171

    FIRST CAUSE OF ACTION
    NEGLIGENCE ..........................................................................................171

    SECOND CAUSE OF ACTION
    PUBLIC NUISANCE ................................................................................174

    THIRD CAUSE OF ACTION
    PRIVATE NUISANCE ..............................................................................176

    FOURTH CAUSE OF ACTION
    TRESPASS .................................................................................................179

    FIFTH CAUSE OF ACTION
    HARM TO PUBLIC TRUST RESOURCES .............................................181

    SIXTH CAUSE OF ACTION
    CIVIL AIDING AND ABETTING .............................................................184

    SEVENTH CAUSE OF ACTION
    HAWAI'I UNFAIR OR DECEPTIVE ACTS OR PRACTICES STATUTE.....186

    EIGHTH CAUSE OF ACTION
    STRICT LIABILITY FOR FAILURE TO WARN............................................188

    PRAYER FOR RELIEF ............................................................................193

    REQUEST FOR JURY TRIAL .................................................................196

## COMPLAINT AND DEMAND FOR JURY TRIAL

The State of Hawaiʻi ("Plaintiff," "State," or "Hawaiʻi"), acting through its Attorney General, Anne E. Lopez ("Attorney General"), on its own behalf, as trustee of State natural resources and property, as owner, lessor, occupier, and manager of State property, and in its *parens patriae* capacity on behalf of its residents, brings this action against Defendants BP p.l.c.; BP America Inc.; BP Products North America Inc.; Chevron Corporation; Chevron U.S.A. Inc.; Exxon Mobil Corporation; ExxonMobil Oil Corporation; Shell p.l.c.; Shell USA, Inc.; Equilon Enterprises LLC d/b/a Shell Oil Products US; Shell Trading (US) Company; Sunoco LP; Aloha Petroleum LLC; Aloha Petroleum, Ltd.; ConocoPhillips; ConocoPhillips Company; Phillips 66; Phillips 66 Company; and Woodside Energy Hawaii Inc. f/k/a BHP Hawaii Inc. (the "Fossil Fuel Defendants"); and the American Petroleum Institute ("API") (collectively, "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    The fossil fuel industry has known for decades, based on its own internal research, that fossil fuels produce carbon dioxide ("$CO_2$") and other greenhouse gas ("GHG") pollution that can have catastrophic consequences for the planet and its people. The industry, including Fossil Fuel Defendants, took these internal scientific findings seriously, investing heavily to protect its own assets, infrastructure, and operations from warming temperatures, rising seas, stronger storms, and other climate change impacts. But rather than warn consumers and the public in a manner commensurate with the risks Defendants knew of, fossil fuel companies and their surrogates mounted a decades-long campaign of deception to discredit the scientific consensus on climate change; create doubt in the minds of consumers, the media, business leaders, and the public about the climate change impacts of burning fossil fuels; and delay the energy economy's transition to a lower-carbon future while maximizing their own profits.

2.    This successful climate deception campaign had, and continues to have, the purpose and effect of inflating and sustaining the market for fossil fuels, which drove up GHG emissions, accelerated global warming, and brought about devastating climate change impacts to Hawaiʻi,

including to the State's frontline communities in particular.[1] The State has already experienced and will continue to face the effects of climate change, including sea level rise, fire risk, and extreme weather (among others). As a result of the fossil fuel industry's lies and deceit, the State is confronted with the real costs of protecting Hawaii's people, natural and cultural resources, businesses, and infrastructure from hazards of climate change.

3.       Despite the clear harm to Hawaiʻi and other communities across the country, Defendants continue to peddle climate disinformation and attempt to mislead the public about the environmental impacts of Fossil Fuel Defendants' fossil fuel products and derivatives of Fossil Fuel Defendants' fossil fuel products (all together, "fossil fuel products").

4.       The State of Hawaiʻi brings this action against Defendants for creating, contributing to, and/or assisting in the creation of climate change-related harms in Hawaiʻi by their failure to warn abetted by a multi-decadal sophisticated campaign of disinformation. As alleged herein, Defendants created, contributed to, and/or assisted in the creation of public and private nuisances; caused trespasses on State property; caused harm to public trust resources; failed to adequately warn the State and its residents, who are consumers, of the risks of climate change, climate change-related harms, and other dangers Defendants knew would inevitably follow from the intended or reasonably foreseeable use of fossil fuel products; engaged in unfair and deceptive acts and practices; and violated their duties to exercise due care in the advertising, marketing, selling, distributing, and/or labeling of fossil fuel products, to act reasonably for the protection of Hawaiʻi and its residents, and to avoid inflicting on Hawaiʻi and its residents the injuries described herein.

5.       The Fossil Fuel Defendants are major members of the fossil fuel industry— including extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and/or

---

[1] The Hawaiʻi Climate Change Mitigation & Adaptation Commission has identified equity as one of the primary considerations for all climate action. *See* Hawaiʻi Climate Change Mitigation & Adaptation Commission, *Statement on Climate Equity* (Nov. 6, 2019), https://perma.cc/9UN7-B3CV. The State recognizes that the most socially vulnerable communities and individuals face disproportionate impacts from climate change, and the State is committed to identifying, recognizing, and addressing the inequitable distribution of benefits, burdens and processes caused by climate change impacts and policy. *Id.*; Makena Coffman, Suwan Shen & Maja Schjervheim, *Social Vulnerability to Climate Change in Hawaiʻi: Data, Indicators, and "Gap" Assessment*, a report to the State of Hawaiʻi Climate Change Mitigation and Adaptation Commission (May 4, 2022), https://perma.cc/A4AS-MHGG.

sellers of raw and refined fossil fuel products. Each Fossil Fuel Defendant funded, staffed, organized, and otherwise supported efforts to deceive the public and consumers—including in Hawaiʻi—about the role of fossil fuel products in causing the global climate crisis.

6.    The rate at which Fossil Fuel Defendants have extracted and sold fossil fuel products has exploded since World War II, which has driven a concurrent increase in $CO_2$ and other GHG emissions. Fossil fuel emissions—especially $CO_2$—are the dominant driver of climate change.[2] The substantial majority of all anthropogenic[3] GHG emissions in history have occurred from the 1950s to the present, a period known as the "Great Acceleration."[4] About three-quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s,[5] and more than half have occurred since the early 1990s.[6] The annual rate of $CO_2$ emissions from extraction, production, and consumption of fossil fuels has increased substantially since 1990.[7]

7.    Defendants have known for more than 60 years that GHG pollution from fossil fuel products would have significant adverse impacts on the Earth's climate and sea levels. Armed with that knowledge, Fossil Fuel Defendants privately took steps to protect their own assets from climate change-related harms and risks through immense investments in research, technology, infrastructure improvements, and plans to exploit new business opportunities in a warming world.

8.    But instead of warning the public of the known consequences flowing from the intended and foreseeable use of Fossil Fuel Defendants' fossil fuel products or representing those consequences truthfully, Defendants concealed and misrepresented the dangers of fossil fuels; disseminated false and misleading information about the existence, causes, and dangers of climate

---

[2] *See* Intergovernmental Panel on Climate Change ("IPCC"), *Summary for Policymakers*, *in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report* 4–9 (2021), https://perma.cc/WQS2-2VRK.

[3] The term "anthropogenic" is defined by the Merriam Webster Dictionary as "of, or relating to, or resulting from the influence of human beings on nature." Merriam Webster Dictionary, *Anthropogenic*, https://perma.cc/LV59-6Y62.

[4] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 The Anthropocene Rev. 81, 81 (2015).

[5] R. J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 Biogeosciences 1845, 1851 (2012); Glob. Carbon Budget, *The Latest GCB Data*, https://globalcarbonbudgetdata.org/latest-data.html (last visited Apr. 30, 2025).

[6] *Id.*

[7] Glob. Carbon Project, *Global Carbon Budget 2021*, https://perma.cc/2S6Y-NC2A.

change; and aggressively promoted the use of fossil fuel products at ever-greater volumes knowing the dangers this increased use posed. Starting no later than the 1980s, Defendants have spent millions of dollars orchestrating a massive disinformation campaign to cast doubt on the science of climate change; to shuttle climate denialist theories into mainstream media and science despite the fact that Fossil Fuel Defendants' own scientists had already debunked those theories; and to conceal the role of fossil fuels in driving the climate crisis. More recently, Defendants have layered a different tactic onto their commercial deception campaign: "greenwashing." Defendants falsely advertise certain fossil fuel products as "green" or "clean," while concealing the fact that those products are leading causes of climate change. Defendants falsely portray themselves as leaders in solving the problem of climate change, and as acting consistently with goals set by scientists and the international community to reduce fossil fuel development and use. Fossil Fuel Defendants also misleadingly exaggerate their investments in wind, solar, and other lower carbon energy resources to exploit and deceive consumers and encourage continued consumption of fossil fuel products. Defendants individually and collectively played leadership roles in these campaigns, which were intended to and did target consumers, their own customers, and the public, including those in Hawaiʻi.

9.      Defendants perpetrated a decades-long campaign of deception with a singular aim. The tactics, front groups, and funding that Defendants deployed to carry out their campaign of deception varied, was updated, and became more sophisticated over time. As described in this Complaint, those tactics ranged from outright climate denial to creating fake advocacy groups, paying scientists, and distributing greenwashing advertisements. But Defendants' purpose has not changed—Defendants' aim has been and continues to be to deceive consumers and the public about the harms of their fossil fuel products and their corporate activities for the purpose of maintaining their business and economic interests, driving up sales, and increasing profits. As shown by their continued wrongful conduct, Defendants' campaign of deception worked, and it still works today.

10.     Defendants, individually and collectively, have substantially and measurably contributed to the State's climate change-related injuries. Defendants' actions in concealing the dangers of fossil fuel products and promoting false and misleading information about fossil fuel products have contributed substantially to consumer demand for fossil fuels and the consequent buildup of $CO_2$ in the atmosphere that drives climate change and its physical, environmental, and socioeconomic consequences, including those in Hawai'i. *See* Section V.I, *infra.* Substantially more anthropogenic GHGs have been emitted into the atmosphere than would have been emitted absent Defendants' tortious and deceptive conduct. If not for Defendants' tortious and deceptive conduct, the damaging consequences of climate change in Hawai'i would have been far less extreme than those currently occurring. Similarly, future harmful effects would also have been far less damaging and costly—or would have been avoided entirely.

11.     While Defendants have promoted and profited from the extraction and consumption of fossil fuels, Hawai'i has spent, and will continue to spend, substantial sums to recover from and adapt to climate change-induced harms. For example, Hawai'i will have to fortify infrastructure against sea level rise, extreme precipitation, extreme storms, and coastal and inland flooding. Hawai'i will also have to undertake numerous other interventions that have and will become necessary to protect its people and infrastructure from increased temperatures, increased fire risk, vector-born illnesses, lost jobs and economic activity, and other climate change hazards.

12.     Sea levels around Hawai'i are rising at rates unprecedented in the history of human civilization because of climate change. Sea level rise is already affecting Hawai'i communities, property, and infrastructure. And this threat grows every day as global warming reaches ever more dangerous levels and sea level rise accelerates. The current amount of sea level rise caused by Defendants' tortious and deceptive conduct is an irreversible condition on any relevant time scale; it will last hundreds or even thousands of years. Defendants' tortious and deceptive conduct thus caused harm that must be abated with costly adaptation infrastructure.

13.     Similarly, climate change causes more frequent and extreme weather events, extreme precipitation, riverine flooding, drought, extreme heat, increased fire risk, vector-borne

illnesses, and reduced air quality, which damage and strain public infrastructure and create cascading public health problems. Climate change is also threatening many of Hawaii's cultural resources and economically significant industries because of sea level rise, ocean warming, and ocean acidification. Climate change has impacted and will continue to impact Hawaii's public trust resources and Native Hawaiian traditional and customary practices.

14.     These consequences have and will continue to disproportionately impact Hawaii's frontline communities, as climate change exacerbates existing environmental and public health stressors associated with socioeconomic and racial disparities.

15.     Defendants' tortious and deceptive conduct was a substantial factor in bringing about these climate change impacts in Hawai'i.

16.     Fossil Fuel Defendants' individual and collective conduct—including, but not limited to, their introduction of fossil fuel products into the stream of commerce while knowing but failing to warn of the threats those products pose to the world's climate; their wrongful promotion of fossil fuel products, including the misrepresentation and concealment of known hazards associated with the intended use of those products; and Defendants' public deception campaigns designed to obscure the connection between fossil fuel products and climate change— was a direct and proximate cause of injuries to the State.

17.     Accordingly, Hawai'i brings this action against Defendants for negligence, public nuisance, private nuisance, trespass, harm to trust property and conspiracy to commit those torts, and unfair and deceptive acts or practices. Hawai'i also alleges strict liability for failure to warn against Fossil Fuel Defendants, and civil aiding and abetting against API. Hawai'i respectfully requests that this Court order Defendants to abate, directly or through an abatement fund, the harm caused by their conduct, and that this Court use its equitable powers to order Defendants to mitigate future harm to the environment and people of Hawai'i attributable to Defendants' unlawful actions, including, but not limited to, by granting preliminary and permanent equitable relief. Hawai'i also respectfully requests that this Court order Defendants to pay damages, treble damages, and civil penalties.

6

18. The State does *not* seek relief with respect to any federal property, land, or assets.

19. The State hereby disclaims injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes. The State seeks no recovery or relief attributable to these injuries.

20. The State does *not* seek to impose liability on Defendants for their direct emissions of GHGs and does *not* seek to restrain Defendants from engaging in their lawful business operations.

21. The State seeks relief for injuries in Hawai'i caused by Defendants' tortious, deceptive, and unlawful conduct within and outside of Hawai'i.

22. This suit shall not preempt, displace, or subsume the climate-deception suits brought by the City and County of Honolulu or the County of Maui ("Local Government Entities"), which are *City and County of Honolulu et al. v. Sunoco LP et al.*, No. 1CCV-20-0000380, and *County of Maui v. Sunoco LP et al.*, No. 2CCV-20-0000283, respectively. The geographic areas covered by those suits are excluded from, and not subsumed by, this action, except as to state-owned property and assets, and except as to harms or violations for which the State or State agencies (i) have exclusive authority to recover damages or obtain injunctive relief and/or (ii) have concurrent, supplementary, complementary, and/or overlapping authority to recover damages or obtain injunctive relief with the Local Government Entities if the Local Government Entities are unable to pursue claims for such harms or violations.

23. This case is fundamentally about shifting the costs of climate change-related harms back onto the entities whose failure to warn and deception caused and exacerbated them. Hawai'i seeks to ensure that the parties who have profited from deceiving consumers and the public about climate change bear the costs of that deceptive commercial activity.

## II.    JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction over this civil action pursuant to Hawai'i Revised Statutes ("HRS") § 603-21.5. No federal subject-matter jurisdiction is invoked herein.

25.     This Court has personal jurisdiction over Defendants because they either are domiciled in Hawaiʻi; were served with process in Hawaiʻi; are organized under the laws of Hawaiʻi; maintain their principal place of business in Hawaiʻi; transact business in Hawaiʻi; perform work in Hawaiʻi; contract to supply goods, manufactured products, or services in Hawaiʻi; caused tortious injury in Hawaiʻi; engage in persistent courses of conduct in Hawaiʻi; derive substantial revenue from manufactured goods, products, or services used or consumed in Hawaiʻi; and/or have interests in, use, or possess real property in Hawaiʻi. This Court has personal jurisdiction over Defendants pursuant to HRS § 634-35 because, among other things, the causes of action arise from and/or relate to Defendants' transaction of business within this State, commission of tortious acts within this State, and/or ownership, use, or possession of any real estate situated in this State. Each Defendant has had sufficient minimum contacts with the State and has purposefully directed activities toward this State and/or purposefully availed itself of the privileges and obligations of conducting business in this State such that this Court's exercise of jurisdiction over each Defendant is reasonable and consistent with the Constitution and laws of the United States. Among other relevant factors, Hawaiʻi has a paramount interest in having this dispute adjudicated in the courts of this State. Each Defendant caused injurious acts to be done, or caused the consequences of those acts to occur, within Hawaiʻi, as set forth in detail herein.

26.     Additionally, jurisdiction is proper over each non-resident Defendant for the following reasons:

a.     With respect to its subsidiaries, each non-resident Fossil Fuel Defendant controls and has controlled its direct and indirect subsidiaries' decisions about the quantity and extent of its fossil fuel production and sales; determines whether and to what extent to market, produce, and/or distribute its fossil fuel products; and controls and has controlled its direct and indirect subsidiaries' decisions related to its marketing and advertising, specifically communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment and humans. Each subsidiary Defendant is the agent of its parent Defendant. As agents, the subsidiaries of each non-resident Defendant conducted activities at the

8

direction and for the benefit of its parent company. Specifically, the subsidiaries furthered each parent company's campaign of deception and denial through misrepresentations, omissions, and/or affirmative promotion of the company's fossil fuel products as safe with knowledge of the climate change-related harms that would result from the intended use of those products, all of which resulted in climate change-related injuries in Hawaiʻi and increased sales to the parent company. The subsidiaries' jurisdictional activities are properly attributed to each parent company and serve as a basis to assert jurisdiction over each of the non-resident Defendant parent companies.

b.      Through their various agreements with dealers, franchises, or otherwise, the Fossil Fuel Defendants have directed and controlled the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuel products at their respective branded gas stations in Hawaiʻi, including point-of-sale advertising and marketing. The Fossil Fuel Defendants dictate which grades and formulations of their gasoline may be sold at their respective branded stations.

c.      Fossil Fuel Defendants, in coordination with trade organizations, including Defendant API, conspired to conceal and misrepresent the known dangers of burning fossil fuels, to knowingly withhold material information regarding the consequences of using fossil fuel products, to spread knowingly false and misleading information to the public regarding the weight of climate science research, and to promote consumer demand for fossil fuel products, which they knew were harmful. Through their own actions and through their membership and/or participation in climate denialist front groups, each Defendant was and is a member of that conspiracy. Defendants committed substantial acts to further the conspiracy in Hawaiʻi by making misrepresentations and misleading omissions to Hawaiʻi consumers about the existence, causes, and effects of global warming; by affirmatively promoting Fossil Fuel Defendants' fossil fuel products as safe, with knowledge of the disastrous impacts that would result from the intended use of those products; and by failing to warn Hawaiʻi consumers about the disastrous impacts of fossil fuel use. A substantial effect of the conspiracy has also occurred and will occur in Hawaiʻi, as the State has suffered and will suffer injuries from Defendants' wrongful conduct, including but

9

not limited to the following: sea level rise, coastal and riverine flooding, extreme heat and related illnesses, drought, fire risk, reduced air quality, vector-borne diseases, and other social and economic consequences of these environmental changes. Defendants knew or should have known, based on information provided to them from their internal research divisions, affiliates, trade associations, and industry groups, that their actions in Hawaiʻi and elsewhere would result in these injuries in and to the State of Hawaiʻi. Finally, the climate effects described herein are direct and foreseeable results of Defendants' conduct in furtherance of the conspiracy.

27.    Venue is proper in the First Circuit pursuant to HRS § 603-36(5) because some part of the tortious conduct and injuries at issue occurred in the First Circuit. The injuries to the State have occurred statewide, including on Oʻahu.

### III.    PARTIES

#### A.    Plaintiff

28.    Plaintiff State of Hawaiʻi is a sovereign state bringing this action by and through its Attorney General, which maintains its principal office at 425 Queen Street Honolulu, HI 96813. The State brings this action pursuant to the powers vested in the Attorney General by the common law and by the Hawaiʻi Constitution and Hawaiʻi statutes, including HRS §§ 28-1, 28-2, 480-3.1, 480-14, 661-10.

29.    The State brings this action in its capacity as sovereign on its own behalf, as trustee of the State's natural resources—which are held in trust for the benefit of Hawaii's people—as owner of State property or of substantial interests in property, in the public interest, and pursuant to its *parens patriae* capacity on behalf of its residents.

30.    The State's natural resources include without limitation aquatic animals, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, beaches, lava extensions, public lands the State holds in trust, and State-owned lands ("State natural resources").

31.    The State owns, leases, occupies, and manages extensive real property, some of which is held in trust, which may include but is not limited to: trails, roads, bridges and abutments,

10

culverts, dams, harbors, submerged lands, rivers and other bodies of water, beaches, dunes, lava extensions, boardwalks, piers, seawalls, parks, camping areas, picnic areas, historic sites, islands, lands, buildings and appurtenances, and other improvements and infrastructure thereto ("State property").

32.     The State also brings this action pursuant to the Attorney General's common law, constitutional, and statutory authority to protect the State's natural resources and property, including property held in trust, and the State's police powers. Those powers and authority include, but are not limited to, the power and authority to prevent and abate nuisance and to prevent and abate hazards to public health, safety, welfare, and the environment.

### B.     Defendants

33.     Defendants are among the largest oil and gas companies in the world and a national oil and gas industry trade association. The fossil fuel products produced by the Fossil Fuel Defendants (and promoted by all Defendants) are responsible for the emission of billions of tons of GHGs globally.

34.     When this Complaint references an act or omission of Defendants, unless otherwise stated, such references should be interpreted to mean that the officers, directors, agents, employees, or representatives of Defendants committed or authorized such an act or omission or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the course and scope of their employment or agency.

35.     **<u>BP entities:</u> BP p.l.c.; BP America Inc.; and BP Products North America Inc.**

a.     Defendant **BP p.l.c.** is a multinational, vertically integrated energy and petrochemical public limited company registered in England and Wales with its principal office in London, England. BP p.l.c. consists of three main operating segments: (1) exploration and production, (2) refining and marketing, and (3) "gas and low-carbon energy." BP p.l.c. is the ultimate parent company of numerous subsidiaries, referred to collectively as the "BP Group," which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as

11

gasoline; and market and sell oil, gasoline, other refined petroleum products, and natural gas worldwide. BP p.l.c. was formerly known as, did or does business as, and/or is the successor in liability to British Petroleum Company, British Petroleum Company p.l.c., BP Amoco p.l.c., Amoco Corporation, and Atlantic Richfield Company.

b.      BP p.l.c. controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. BP p.l.c. is the ultimate decision-maker on fundamental decisions about the BP Group's core business, i.e., the volume of group-wide fossil fuels to produce and market, including among BP p.l.c.'s subsidiaries. BP p.l.c.'s 2022 Annual Report summarizes the company's "Strategic progress," including on offshore and exploration projects and acquisitions and sales of various oil and gas operations that contributed to a 12% increase in the BP Group's overall fossil fuel product production. These projects were carried out by BP p.l.c.'s subsidiaries.

c.      BP p.l.c. controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, climate change, GHG emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. BP p.l.c makes and has made decisions on the production and use of fossil fuel reserves for the entire BP Group based on factors including climate change. BP p.l.c.'s Board of Directors is the company's highest decision-making body, with direct responsibility for the BP Group's policies concerning climate change. BP p.l.c.'s chief executive is responsible for maintaining the BP Group's system of internal control that governs the BP Group's business conduct. BP p.l.c.'s senior leadership directly oversees and has overseen a "carbon steering group," which manages climate change-related matters and consists of two committees—both overseen directly by the board—focused on climate change-related investments.

d.      BP p.l.c. does and has done business in Hawai'i through its wholly-owned subsidiaries, divisions, and/or affiliates, including BP America Inc., BP Products North America Inc., and BP Lubricants USA Inc. BP p.l.c. has formerly done business in Hawai'i through its

wholly-owned subsidiaries, divisions, and/or affiliates, including BP U.S.A., Inc., BP North America Petroleum, Inc., BP Exploration & Oil Company, BP Exploration & Oil Inc., BP Amoco Chemical Company, BP Oil, Amoco Oil Company, and The American Oil Company.

e.     Defendant **BP America Inc.** is a wholly owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. is a vertically integrated energy and petrochemical company incorporated in the state of Delaware with its headquarters and principal office at 501 Westlake Park Blvd., Houston, Texas 77079. BP America Inc. is registered to do business in Hawai'i, where it is and has been engaged in oil and gas business. BP America Inc. consists of numerous divisions and affiliates in all aspects of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP America Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

f.     **BP Products North America Inc.** is a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP Products North America Inc. is and has been engaged in fossil fuel exploration, production, refining, and marketing. BP Products North America Inc. is incorporated in Maryland and has its principal office in Chicago, Illinois. BP Products North America Inc. initially registered to do business in Hawai'i in 1959 and remains qualified to do business in Hawai'i today, where it is and has been engaged in oil and gas business in the State. In Hawai'i, BP Products North America Inc. was formerly known as, or did business as, The American Oil Company, Amoco Oil Company, and BP Oil. BP Products North America Inc. registered and operated various trademarks in Hawai'i, including "Amoco," "Permalube," and "you expect more from Amoco and you get it."

13

g.       Defendants BP p.l.c., BP America Inc., and BP Products North America Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

h.       The State's claims against BP arise out of and are related to the acts and omissions of BP in Hawai'i and elsewhere that caused or will cause injuries in Hawai'i.

i.       BP has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. BP's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and BP's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of BP's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of BP's fossil fuel products from the State and its residents such that use of BP's fossil fuel products in Hawai'i would not decline.

j.       Over the last several decades and continuing to the present day, BP has advertised on television, online, and social media in the Hawai'i market related to its fossil fuel products. BP has advertised in national and local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[8] BP has also advertised on national television programs that aired in Hawai'i. For example, in 2019 BP ran a series of advertisements on national television programs broadcast in Hawai'i that touted the carbon emissions benefits of

---

[8] *See, e.g.*, Honolulu Star-Bulletin (Apr. 21, 1977), https://perma.cc/9RZM-VVX2.

14

its biowaste to energy program.[9] In another television advertisement that aired on a program broadcast in Hawai'i, BP claimed, "[w]e all want more energy, but with less carbon footprint. That's why at BP we're working to make energy that's cleaner and better."[10] BP also promoted its investments in wind energy, while positioning natural gas as a necessary alternative in the event the "wind ever stops blowing."[11] Similarly, BP has published a variety of advertisements on social media platforms that reached Hawai'i consumers.[12] As further detailed herein, these advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of BP's fossil fuel products and climate change, and/or misrepresenting BP's products or BP itself as environmentally friendly.

k.    Significant quantities of BP's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which activities BP derives and has derived substantial revenue. For example, BP has sold crude oil to refinery customers in Hawai'i.

l.    BP, through its affiliates, subsidiaries, and/or predecessors, had multiple local dealers and stations in Hawai'i that it promoted and advertised to Hawai'i residents. For example, in 1977 there were 68 ARCO-branded stations selling gasoline to Hawai'i consumers.[13] ARCO-branded gas stations sold gasoline to Hawai'i consumers through the early 2000s.[14] Until 1978, BP's predecessors operated a petroleum terminal and warehouse on Kalaniana'ole Avenue in Hilo that was capable of processing or storing one million gallons of petroleum.[15] BP's current

---

[9] *See, e.g.*, CNN, *CNN Tonight with Don Lemon* (Oct. 3, 2019, 11:48 PM PDT), https://archive.org/details/CNNW_20191004_060000_CNN_Tonight_With_Don_Lemon/start/2892/end/2940; *see also* Honolulu Star-Advertiser (Oct. 3, 2019), https://perma.cc/7HXY-T3AK (confirming that *CNN Tonight with Don Lemon* aired in Hawai'i on Oct. 3, 2019 from 8:00 PM to 9:00 PM HST, or 11:00 PM to 12:00 AM PDT).

[10] *See, e.g.*, CNN, *The Situation Room* (Feb. 19, 2019, 2:55 PM PST), https://archive.org/details/CNNW_20190219_220000_Situation_Room_With_Wolf_Blitzer/start/3349/end/3405?q=That%27s+why+at+BP+we%27re+working+to+make+energy+that%27s+cleaner+and+better; *see also* Honolulu Star-Advertiser (Feb. 17, 2019), https://perma.cc/5UA6-FNT3 (confirming that *The Situation Room* aired in Hawai'i on Feb. 17, 2019 from 12:00 PM to 1:00 PM HST, or 2:00 PM to 3:00 PM PST).

[11] *See e.g.*, BP, *Fowler, Indiana*, aired on KITV (Jan. 29, 2019).

[12] *See, e.g.*, BP America, *From renewables to natural gas…*, Facebook Ad Libr., https://perma.cc/QQ6B-578Y; BP America, *Listen now to the Energy Trilemma podcast…*, Facebook Ad Libr., https://perma.cc/6DSC-9PRJ.

[13] Honolulu Star-Bulletin (Apr. 21, 1977), https://perma.cc/9RZM-VVX2.

[14] *See, e.g.*, Honolulu Star-Bulletin (June 23, 2000), https://perma.cc/HJV5-LTZZ.

[15] *See, e.g.*, Hawaii Tribune-Herald (Aug. 24, 1978), https://perma.cc/32XL-6DML.

operations in Hawai'i include "Air bp", a division of BP that supplies fuels and lubricants to the aviation industry.[16]

m.       BP also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Hawai'i consumers under its Castrol brand name. Castrol products are available at approximately 50 car service stations, distributors, and retail outlets across Hawai'i.[17] Castrol products are distributed and advertised throughout Hawai'i.[18]

36.       **Chevron entities: Chevron Corporation and Chevron U.S.A. Inc.**

a.       Defendant **Chevron Corporation** is a multinational, vertically integrated energy and chemicals company incorporated in Delaware, with its global headquarters and principal office in San Ramon, California. Chevron Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of California, Texaco Inc., and ChevronTexaco Corporation.

b.       Chevron Corporation operates through a web of United States and international subsidiaries at all levels of the fossil fuel supply chain. Chevron Corporation and its subsidiaries' operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

c.       Chevron Corporation controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. Chevron Corporation determines whether and to what extent its corporate holdings market, produce, and/or distribute fossil fuel products.

---

[16] BP, *Our US operations*, https://www.bp.com/en_us/united-states/home/where-we-operate.html (choose Enter Location; then search Air bp – Hawaii) (last visited Feb. 21, 2025).

[17] Castrol, *Where to Buy or Service*, Hawai'i, https://www.castrol.com/en_us/united-states/home/product-finder.html?page=wheretobuy (choose Show Filter; then Search Address) (last visited Feb. 21, 2025).

[18] *See, e.g.*, HI Now Staff, *Get top of the line Aloha Petroleum lubricants for your car at Lex Brodie's* (Sept. 23, 2022), https://perma.cc/HNK9-QDG3; Honolulu Star-Advertiser (July 13, 2017), https://perma.cc/R4HZ-AHXH.

d.      Chevron Corporation controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, climate change, GHG emissions from its fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Overall accountability for climate change within Chevron Corporation lies with Chevron Corporation's Board of Directors and Executive Committee.

e.      Chevron Corporation does business in Hawai'i through its wholly owned subsidiaries, divisions, and/or affiliates, including Chevron U.S.A. Inc., Chevron Shipping Company LLC, Chevron Phillips Chemical Company LP, Chevron Oronite Company LLC, Chevron Marine Products LLC, Chevron Intellectual Property LLC, and Chevron Environmental Management Company. Chevron Corporation has done business in Hawai'i through its wholly owned subsidiaries, divisions, affiliates, and/or predecessors including Chevron Chemical Company, Chevron Industries, Inc., Chevron Shipping Company, and Texaco Inc.

f.      Defendant **Chevron U.S.A. Inc.** is a wholly owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal office in San Ramon, California. Chevron U.S.A. Inc. is registered to do business in Hawai'i. Through its predecessors, Chevron U.S.A. Inc. has been registered to do business in Hawai'i since 1965. Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Chevron Energy Solutions Company, Chevron Products Company, Chevron U.S.A. Production Company, Chevron U.S.A. Products Company, ChevronTexaco Exploration & Production Company, ChevronTexaco Products Company, Gulf Oil Corp., and Warren Petroleum Company.

g.      Defendants Chevron Corporation and Chevron U.S.A. Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

h.      The State's claims against Chevron arise out of and are related to the acts and omissions of Chevron in Hawai'i and elsewhere that caused and will cause injuries in Hawai'i.

17

i.    Chevron has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. Chevron's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Chevron's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Chevron's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of Chevron's fossil fuel products from the State and its residents such that use of Chevron's fossil fuel products in Hawai'i would not decline.

j.    Chevron—both directly and through its subsidiaries and/or predecessors-in-interest—has supplied substantial quantities of fossil fuel products to Hawai'i.

k.    As early as 1948, Chevron had multiple local dealers and stations in Hawai'i that it promoted and advertised to Hawai'i residents.[19] By the mid-1950s, there were dozens of Chevron local dealers and stations on O'ahu alone.[20] By 1988, there were at least 75 local Chevron dealers or stations in Hawai'i.[21] Today, there are more than 30 Texaco stations, a Chevron-owned brand, in Hawai'i.[22]

l.    Over the last several decades and continuing to the present day, Chevron has advertised on television, online, social media, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1945, and continuing to the present day, Chevron has advertised in national and local print publications, including multiple Hawai'i

---

[19] *See, e.g.*, Honolulu Star-Advertiser (Sept. 30, 1948), https://perma.cc/YG4E-VVGT.
[20] *See, e.g.*, Honolulu Star-Advertiser (June 26, 1956), https://perma.cc/WL6U-NTH2.
[21] *See, e.g.*, Honolulu Star-Advertiser (Oct. 3, 1988), https://perma.cc/PH69-HN3D.
[22] Chevron, *Find a Station*, https://www.chevronwithtechron.com/en_us/home/gas-station-near-me.html (last visited Feb. 21, 2025).

18

newspapers, circulated widely to Hawaiʻi consumers.[23] For example, in 2006 Chevron ran a full-page advertisement in the Honolulu Star-Advertiser in which they touted that they "maintain some of the highest environmental standards on earth" and are "[d]eveloping energy today, protecting Hawaii for tomorrow."[24] Chevron has also extensively advertised its fossil fuel products in the Hawaiʻi market on social media accounts that have thousands of followers from Hawaiʻi.[25] For example, Chevron claimed in 2021, via its "Texaco in Hawaii" social media accounts that "[f]ueling your car at Texaco stations helps to reduce your carbon footprint" via a carbon offset project.[26] Chevron has extensively advertised this carbon offset project exclusively to Hawaiʻi consumers through not just social media, but also through television commercials, Hawaiʻi news stations, and at gas stations in Hawaiʻi.[27] In one such commercial, Chevron claimed that by choosing to fill up at Texaco stations, consumers help "power carbon offset programs and local eco initiatives."[28] Chevron has widely advertised on national television channels and their local affiliates that broadcast in Hawaiʻi. For example, in 2021 Chevron broadcast an ad in Hawaiʻi claiming it "believe[s] the future of energy is lower carbon," and touting how they are "taking action", such as "tying [its] executives' pay to lowering the carbon emissions intensity of [its] operations."[29] In another ad, Chevron explains how it has partnered with another company to

---

[23] *See, e.g.*, Honolulu Star-Bulletin (Oct. 31, 1945), https://perma.cc/W7FP-DNVV; Hawaii Tribune-Herald (July 3, 1946), https://perma.cc/Q5M4-R9CU; Hawaii Tribune-Herald (Sept. 17, 1970), https://perma.cc/99TW-LFYL; Honolulu Star-Advertiser (July 2, 2006), https://perma.cc/B55S-3HSJ; Honolulu Star-Advertiser (Dec. 22, 2012), https://perma.cc/2LZF-F5G6.

[24] Honolulu Star-Advertiser (July 2, 2006), https://perma.cc/B55S-3HSJ.

[25] *See, e.g.*, Facebook (Texaco in Hawaii), https://perma.cc/W8VJ-33D3; Instagram (@texacoinhawaii), https://perma.cc/HDS4-RZHY; TikTok (@ies_texacoinhawaii), https://perma.cc/FB69-K54Q.

[26] Facebook (Texaco in Hawaii) (Jan. 31, 2021), https://perma.cc/8SCV-HC9P.

[27] *See, e.g.*, Chevron, *Hoala Program*, aired on KHNL (Sept. 26, 2021); Brandon Kubo, Sponsored by Texaco in Hawaii, *Texaco helps the environment and community with free gas giveaway*, Hawaii News Now (Sept. 28, 2021), https://perma.cc/BQ9L-YGHJ; Texaco in Hawaii, *Rise Up and Make New*, Facebook Ad Libr., https://perma.cc/U6MQ-DP5C; Texaco in Hawaii, *Hoʻāla - Rise Up and Make New*, YouTube, https://perma.cc/SUX4-3X5L.

[28] Chevron, *Hoala Program*, aired on KGMB (Mar. 30, 2020).

[29] Chevron, *Steps Toward Better Tomorrow*, aired on KHON (June 5, 2021); *see also* CNN, *Anderson Cooper 360* (May 24, 2021 at 9:14 PM PDT), https://archive.org/details/CNNW_20210525_040000_Anderson_Cooper_360/start/891/end/951?q=to+make+progress+we+must+keep+taking+steps+forward; Honolulu Star-Advertiser (May 24, 2021), https://perma.cc/QPW8-E2LV (confirming that *Anderson Cooper 360* aired on CNN in Hawaiʻi on May 24, 2021 from 6:00 PM to 7:00 PM HST, or 9:00 PM to 10:00 PM PDT).

"transform farm waste into renewable natural gas . . . to provide an alternative source of power for a cleaner way forward."[30] As further detailed herein, these advertisements contained false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Chevron's fossil fuel products and climate change, and/or misrepresenting Chevron's products or Chevron itself as environmentally friendly.

m.    Chevron has owned and operated fossil fuel refinery and distribution facilities in Hawaiʻi. For example, until 2016 Chevron owned and operated a 58,000-barrel-per-day refinery on Oʻahu, a pipeline distribution system, and fossil fuel product distribution terminals on Oʻahu, Maui, Kauaʻi, and the Big Island.[31]

n.    Significant quantities of Chevron's fossil fuel products have been transported, traded, manufactured, distributed, promoted, marketed, sold, and consumed in Hawaiʻi, from which activities Chevron has derived substantial revenue. For example, in the late 1980s, Chevron's Hawaiʻi refinery generated roughly 14 percent of the company's profits in the United States.[32] Additionally, Chevron had more than 20 percent of the retail gasoline market share in Hawaiʻi from 1983 to 2001.[33] Chevron conducted and controlled, either directly or through franchise agreements, retail fossil fuel sales at Chevron and Texaco gas station locations throughout Hawaiʻi, at which locations it promoted, advertised, and sold its fossil fuel products under its various brand names, including Chevron and Texaco.

o.    Chevron offers proprietary credit cards, known as the "Chevron Techron Advantage Card" and "Texaco Techron Advantage Card," which allow consumers in Hawaiʻi to pay for gasoline and other products at Chevron- and/or Texaco-branded service stations, and which encourage consumers in Hawaiʻi to use Chevron- and/or Texaco-branded service. Chevron

---

[30] Chevron, *Transforming the Future*, aired on KITV (Feb. 16, 2020).

[31] Island Energy Services, *Island Energy Completes Acquisition of Chevron's Hawaiʻi Assets* (Nov. 2, 2016), https://perma.cc/G5SL-Q7LU.

[32] *See, e.g.*, Honolulu Star-Bulletin (Aug. 11, 1999), https://perma.cc/KGD4-EFJT.

[33] Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii*, 58 & Figure 4.1 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

maintains an interactive website and smartphone applications by which it directs prospective customers to Texaco-branded service stations in Hawai'i.

p.    Chevron also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Hawai'i consumers under its Delo and Techron brand names. These products are sold at stores across the State.[34]

37.    **Exxon entities:** **Exxon Mobil Corporation and ExxonMobil Oil Corporation**

a.    Defendant **Exxon Mobil Corporation** is a New Jersey corporation headquartered in Spring, Texas, that has been registered to do business in Hawai'i since 1972 and remains so today. Exxon Mobil Corporation is a multinational, vertically integrated energy and chemical company and one of the largest publicly traded international oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Standard Oil Company of New Jersey; and Mobil Corporation. In Hawai'i, Exxon Mobil Corporation does or has done business through its wholly-owned subsidiaries, divisions, affiliates, and/or trade names, including Exxon Mobil Alaska Production Inc., ExxonMobil Product Solutions Company, ExxonMobil Fuels & Lubricants Company, ExxonMobil Fuels Marketing, ExxonMobil Gas & Power Marketing Company, ExxonMobil Gas Marketing Company, ExxonMobil Lubricants & Petroleum Specialties, ExxonMobil Product Refining & Supply, Southwest Grease, and Southwest Grease Products.

b.    Defendant **ExxonMobil Oil Corporation** is a wholly owned subsidiary of Exxon Mobil Corporation, acts on Exxon Mobil Corporation's behalf, and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation is a New York corporation headquartered in Spring, Texas, has been registered to do business in Hawai'i since 1967, and remains registered to do business in Hawai'i for the purpose of producing, transporting, refining,

---

[34] Chevron Lubricants, *Find a Retailer*, https://perma.cc/4UUE-MUZM (search address: Hawai'i).

and marketing petroleum and natural gas. ExxonMobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of New York and Mobil Oil Corporation.

c.     Exxon Mobil Corporation controls and has controlled group-wide decisions about the quantity and rate of fossil fuel production and sales, including those of its subsidiaries. Exxon Mobil Corporation's 2022 Form 10-K filed with the SEC represents that its success, including its "ability to mitigate risk and provide attractive returns to shareholders, depends on [its] ability to successfully manage [its] overall portfolio." Exxon Mobil Corporation determines whether and to what extent its subsidiaries market, produce, and/or distribute fossil fuel products. For example, on October 11, 2023, Exxon Mobil Corporation announced its acquisition of Pioneer Natural Resources in a press release that referred to the corporate family generally as "ExxonMobil."

d.     Exxon Mobil Corporation controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Exxon Mobil Corporation's Board of Directors holds the highest level of direct responsibility for climate change policy. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management Committee have been actively engaged in discussions relating to GHG emissions and the risks of climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries, when seeking funding for capital investments, to provide estimates of project costs related to GHG emissions.

e.     Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Exxon."

22

f.      The State's claims against Exxon arise out of and are related to the acts and omissions of Exxon in Hawai'i and elsewhere that caused and will cause injuries in Hawai'i.

g.      Exxon consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

h.      Exxon has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. Exxon's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Exxon's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Exxon's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of Exxon's fossil fuel products from the State and its residents such that use of Exxon's fossil fuel products in Hawai'i would not decline.

i.      Over the past several decades and continuing to the present day, Exxon has advertised on television, online, and social media advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1948, and continuing to the present day, Exxon and its predecessors have advertised their fossil fuel products in national and local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[35] For example,

---

[35] *See, e.g.*, Hawaii Tribune-Herald (Aug. 9, 1948), https://perma.cc/8ZN6-43RU; Honolulu Star-Advertiser (Apr. 11, 1976), https://perma.cc/86W5-ZB82; Honolulu Star-Bulletin (Apr. 29, 1979), https://perma.cc/8U2Q-2XPZ.

23

in the 1970s and 1980s, Mobil ran dozens of advertorials in Hawai'i newspapers under its "Observations" column, which promoted its Mobil 1 gasoline,[36] touted its investments in solar energy,[37] and highlighted the negatives of wind energy.[38] Exxon has also advertised on national television programs that aired in Hawai'i. For example, in 2015, Exxon ran a series of television advertisements on programs that aired in Hawai'i touting that Exxon's "cleaner-burning natural gas" is "helping dramatically reduce America's emissions."[39] Likewise, in 2016, Exxon aired a commercial in Hawai'i describing itself as a "leader in carbon capture" and working to make the technology "better, more affordable, so we can reduce emissions around the world."[40] Exxon also repeatedly advertised its efforts to produce biofuel from algae in commercials broadcast in Hawai'i.[41] Similarly, Exxon's social media advertisements have reached consumers in Hawai'i.[42] As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions designed to hide the connection between the production and use of Exxon's fossil fuel products and climate change, and/or misrepresenting Exxon's products or Exxon itself as environmentally friendly.

　　j.　　Significant quantities of Exxon's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which activities Exxon has derived substantial revenue.

　　k.　　Exxon also—both directly and through its subsidiaries and/or predecessors-in-interest—has supplied substantial quantities of fossil fuel products to Hawai'i. For

---

[36] *See, e.g.*, Honolulu Star-Advertiser (Apr. 11, 1976), https://perma.cc/86W5-ZB82.

[37] *See, e.g.*, Honolulu Star-Advertiser (Feb. 8, 1976), https://perma.cc/B4Q9-Q9PF.

[38] *See, e.g.*, Honolulu Star-Advertiser (Apr. 27, 1980), https://perma.cc/P96V-YUBF.

[39] *See, e.g.*, CNN, *Amanpour* (Dec. 8, 2015, 11:15 PM PST), https://archive.org/details/CNNW_20151209_070000_Amanpour/start/942/end/1002?q=%22You+may+not+even+t hink+about+the+energy+that+lights+up+your+world%22; *see also* Honolulu Star-Advertiser (Dec. 6, 2015), https://perma.cc/4P76-7ZQZ (confirming that CNN's Amanpour aired in Hawai'i on Dec. 8, 2015 from 9:00 PM to 9:30 PM HST, or 11:00 PM to 11:30 PM PST).

[40] ExxonMobil, *Carbon Capture Technology*, aired on KITV (Dec. 10, 2016).

[41] *See e.g.*, ExxonMobil, *Energy Farmer*, aired on KITV (Apr. 30, 2017); ExxonMobil, *Not Small at All ("The Tiny Organism")*, aired on KHNL (Apr. 16, 2018).

[42] *See, e.g.*, ExxonMobil, *We support the goals set forth by the Paris Agreement…*, Facebook Ad Libr., https://perma.cc/5DWZ-YAWZ.

example, Exxon has supplied crude oil to Par Hawai'i Refining LLC to be refined on Hawai'i and distributed to consumers.

l.        Exxon also markets and sells petroleum products, including engine lubricants and motor oils sold under the "Mobil 1" brand name, to Hawai'i customers through local retailers. Exxon maintains an interactive website by which it directs prospective customers to local retailers that sell its engine lubricants and motor oils.[43] In the 1990s, Exxon was hiring lubricants sales representatives in Hawai'i.[44] Today, Exxon works with, and directs potential customers to, authorized distributors of its industrial lubricants in Hawai'i.[45]

38.        **Shell entities: Shell p.l.c.; Shell USA, Inc.; Equilon Enterprises LLC d/b/a Shell Oil Products US; and Shell Trading (US) Company**

a.        Defendant **Shell p.l.c.** (formerly Royal Dutch Shell P.L.C.) is a vertically integrated multinational energy and petrochemical company. Shell p.l.c. is incorporated in England and Wales, with its headquarters and principal office in London, England. Shell p.l.c. is the ultimate parent company of numerous divisions, subsidiaries, and affiliates, referred to collectively as the "Shell Group," that engage in all aspects of fossil fuel production, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

b.        Shell p.l.c. controls and has controlled group-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Shell p.l.c.'s Board of Directors determines whether and to what extent Shell subsidiary holdings around the globe produce Shell-branded fossil fuel products.

c.        Shell p.l.c. controls and has controlled group-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning

---

[43] Mobil, *Product Locator*, https://perma.cc/ES4V-G87J (search address: Hawai'i).
[44] *See, e.g.*, Honolulu Star-Bulletin (May 1, 1991), https://perma.cc/76VD-X9NC.
[45] Mobil, *Hawaiian Isles Petroleum, LLC*, https://www.mobil.com/en/lubricants/distributors/hawaiian-isles-petroleum-llc-hawaii-usa-101946 (last visited Feb. 25, 2025).

climate change and the link between fossil fuel use and climate change-related impacts on the environment and humans. Overall accountability for climate change within the Shell Group lies with Shell p.l.c.'s Chief Executive Officer and Executive Committee. For instance, at least as early as 1988, Shell p.l.c., through its predecessors and subsidiaries, was researching company-wide $CO_2$ emissions and concluded that the Shell Group accounted for 4% of the $CO_2$ emitted worldwide from combustion and that climatic changes could compel the Shell Group, as controlled by Shell p.l.c., to examine the possibilities of expanding and contracting its business accordingly.

d.      Shell p.l.c. does business in Hawai'i through wholly owned subsidiaries, divisions, and/or affiliates, including Shell USA, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Global Solutions (US) Inc., Shell MS Fuel Card, LLC, and Pennzoil-Quaker State Company.

e.      Defendant **Shell USA, Inc.** (formerly Shell Oil Company) is a wholly owned subsidiary of Shell p.l.c. that acts on Shell p.l.c.'s behalf and is subject to Shell p.l.c.'s control. Shell USA, Inc. is incorporated in Delaware, with its principal office in Houston, Texas. Shell USA, Inc. has been registered to do business in Hawai'i since 1949. Shell USA, Inc. was formerly known as, did or does business as, and/or is the successor in liability to Shell Oil Company; Shell Oil; Deer Park Refining LP; Shell Oil Products US; Shell Chemical LP; Shell Trading (US) Company; Shell Energy Resources Company; Shell Energy Services Company, L.L.C.; The Pennzoil Company; and Pennzoil-Quaker State Company.

f.      Defendant **Equilon Enterprises LLC d/b/a Shell Oil Products US ("Shell Oil Products US")** is a wholly owned subsidiary of Shell p.l.c. that acts on Shell p.l.c.'s behalf and is subject to Shell p.l.c.'s control. It is a Delaware limited liability corporation with its principal office in Houston, Texas. In 1998, Shell Oil Products US registered in Hawai'i to trade and supply transportation fuels and lubricants and to provide related services. It remains registered in Hawai'i today.

g.      **Shell Trading (US) Company** is a wholly owned subsidiary of Shell p.l.c., that acts on Shell p.l.c.'s behalf and is subject to Shell p.l.c.'s control. It is a Delaware corporation

26

with its principal office in Houston, Texas. In 1999, it registered in Hawai'i to engage in the trading of crude oil and petroleum products. It remains registered in Hawai'i today.

h.     Defendants Shell p.l.c., Shell USA, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US, and Shell Trading (US) Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Shell."

i.     The State's claims against Shell arise out of and are related to the acts and omissions of Shell in Hawai'i and elsewhere that caused and will cause injuries in Hawai'i.

j.     Shell has purposefully directed its tortious conduct toward Hawai'i by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawai'i, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawai'i, including without limitation injuries to the State's property, infrastructure, and natural resources. Shell's statements in Hawai'i and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Shell's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Shell's products. That conduct was purposefully directed to reach Hawai'i and obscure the dangers of Shell's fossil fuel products from the State and its residents such that use of Shell's fossil fuel products in Hawai'i would not decline.

k.     Over the last several decades and continuing to the present day, Shell has advertised on television, online, social media, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1928, and continuing to the present day, Shell has advertised its fossil fuel products in national and local print publications, including multiple

27

Hawai'i newspapers, circulated widely to Hawai'i consumers.[46] As early as 1970, Shell advertised to Hawai'i consumers that its fossil fuel products offered clean air benefits.[47] Shell has also advertised on television programs that aired in Hawai'i. For example, in 2016, Shell ran an ad in Hawai'i promoting its "Eco-Marathon" where students devised "ideas that could revolutionize the way we travel," including "reengineer[ing cars] to meet our growing energy challenges."[48] Similarly, in 2023, Shell advertised how its renewable race fuel was reducing emissions by 60% in Indy Car Racing, explaining that "[Shell] is moving forward with Indy Car because we're moving forward with everybody."[49] Shell also ran a series of television advertisements in 2024 on programs aired in Hawai'i which posited Shell as a leader in renewable energy.[50] Similarly, Shell's social media advertisements have reached consumers in Hawai'i.[51] As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Shell's fossil fuel products and climate change and/or misrepresenting Shell's products or Shell itself as environmentally friendly.

l.      Significant quantities of Shell's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which activities Shell has derived substantial revenue. Shell conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Hawai'i, at which locations it promotes, advertises, and sells its fossil fuel products under its Shell brand

---

[46] *See, e.g.*, Honolulu Star-Advertiser (May 10, 1928), https://perma.cc/256P-JJQB; Honolulu Star-Bulletin (Jan. 11, 1930), https://perma.cc/Y7DW-RT6J and https://perma.cc/346Z-F9Q7 (p. 2); Honolulu Star-Advertiser (Feb. 27, 1970), https://perma.cc/YUD6-FZ2B; Honolulu Star-Bulletin (June 4, 1970), https://perma.cc/S7ZC-TPQQ; Hawaii Tribune-Herald (May 14, 1989), https://perma.cc/N2RL-5FYW.

[47] Honolulu Star-Bulletin (June 4, 1970), https://perma.cc/S7ZC-TPQQ.

[48] Shell, *Eco-Marathon*, aired on KHNL (Jan. 29, 2016).

[49] Shell, *Moving Forward for Progress*, aired on KHNL (May 28, 2023).

[50] *See, e.g.*, FOX News, *Hannity* (Apr. 17, 2024, 11:25 PM PDT), https://archive.org/details/FOXNEWSW_20240418_060000_Hannity/start/1537/end/1597?q=%22Shell+Powering+Progress%22+; *see also* Honolulu Star-Advertiser (Apr. 17, 2024), https://perma.cc/ZW9N-REFG (confirming that FOX News's *Hannity* aired in Hawai'i on Apr. 17, 2024 from 8:00 PM to 9:00 PM HST, or 11:00 PM to 12:00 AM PDT).

[51] *See, e.g.*, Shell, *Shell's Climate Ambition*, Facebook Ad Libr., https://perma.cc/F2AC-QM3825; Shell USA, *Shell Renewable Race Fuel*, Facebook Ad Libr., https://perma.cc/Q4V5-XEPS.

name. There are more than 40 Shell-branded petroleum service stations in Hawaiʻi, and Shell maintains an interactive website by which it directs prospective customers to Shell-branded service stations in Hawaiʻi.[52] Shell-branded service stations in Hawaiʻi contain advertisements that direct consumers to Shell's website. Shell has sold a substantial percentage of all retail gasoline in Hawaiʻi.[53] Shell also has supplied jet fuel for aircrafts at Honolulu International Airport.[54] Shell also supplies, markets, and promotes its Pennzoil line of lubricants at retail and service stations throughout Hawaiʻi.[55] Shell owned five fuel distribution terminals and associated assets on Oʻahu, Maui, Kauaʻi, and the Big Island until the sale of those assets to Aloha Petroleum in 2010.[56]

m.     Shell historically directed its fossil fuel product advertising, marketing, and promotional campaigns to Hawaiʻi, including through maps that identified the locations of its service stations in Hawaiʻi. Shell offers a proprietary credit card known as the "Shell Fuel Rewards Card," which allows consumers in Hawaiʻi to pay for gasoline and other products at Shell-branded service stations and encourages consumers to use Shell-branded gas stations by offering various rewards, including discounts on gasoline purchases. Shell further maintains a smartphone application known as the "Shell App" that offers Hawaiʻi consumers a cashless payment method for gasoline and other products as well as rewards, including gasoline discounts at Shell-branded service stations.

39.     **Sunoco entities: Sunoco LP; Aloha Petroleum LLC; and Aloha Petroleum, Ltd.**

a.     Defendant **Sunoco LP** is a fossil fuel product distributor, marketer, and promoter. Sunoco LP is registered in Delaware and has its headquarters in Dallas, Texas. Sunoco LP was formerly known as, did or does business as, and/or is the successor in liability to Sunoco, Inc., Sun Company, Inc., Optima, Sun Oil Company, Aloha Petroleum LLC, and Aloha Petroleum

---

[52] Shell, *Shell Stations in Hawaii*, https://find.shell.com/us/fuel/locations/hawaii (last visited Feb. 25, 2025).

[53] *See, e.g.*, Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii*, 58 & Figure 4.1 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

[54] *See, e.g.*, Honolulu Star-Advertiser (Jan. 18, 1960), https://perma.cc/HZ95-QE34.

[55] Pennzoil, *Retail Locations & Oil Change Near Me*, https://www.pennzoil.com/en_us/oil-change-retail-locations.html (search location or facilities: Hawaiʻi) (last visited Feb. 25, 2025).

[56] Aloha Petroleum, *History*, https://perma.cc/6WPC-UQZR.

29

Ltd. Sunoco LP is one of the largest independent fuel distributors in the US. Sunoco LP consists of numerous divisions, subsidiaries, and affiliates engaged in all aspects of the fossil fuel industry, including exploration, development, extraction, and manufacturing; and energy production, transport, trading, marketing, distribution, and/or sales.

b.      Sunoco LP controls subsidiaries registered to do business in Hawai'i, including Sunoco LLC, Sunoco Retail LLC, Sunoco Global LLC, Aloha Petroleum LLC, and Aloha Petroleum, Ltd.

c.      Sunoco LP controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and related to communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Sunoco LP's managing partners determine whether and to what extent Sunoco subsidiary holdings around the globe—including in Hawai'i—market, produce, and/or distribute fossil fuel products.

d.      **Aloha Petroleum LLC** is a subsidiary of Sunoco LP. Aloha Petroleum LLC is registered in Delaware and has its principal place of business in Dallas, Texas. In 2015, Aloha Petroleum LLC registered in Hawai'i to engage in the marketing, terminaling, and distribution of gasoline, diesel, biodiesel, ethanol, lubricants, and other petroleum products in Hawai'i. It remains registered in Hawai'i today. Aloha Petroleum LLC has owned and operated retail stores that sell motor fuel in Hawai'i, and has operated terminal facilities in Hawai'i.

e.      **Aloha Petroleum, Ltd.** is a subsidiary of Sunoco LP. Aloha Petroleum, Ltd. is incorporated in Hawai'i with its principal place of business in Honolulu. Aloha Petroleum Ltd. was incorporated in Hawai'i in 1977 and remains registered in Hawai'i today to engage in the marketing, terminaling, and distribution of gasoline, diesel, biodiesel, ethanol, lubricants, and other petroleum products in Hawai'i. Aloha Petroleum, Ltd. was formerly known as Associated Oil, a division of Tidewater Oil. Associated Oil was a subsidiary of Phillips 66, a predecessor-in-interest to ConocoPhillips. In 2010, Aloha Petroleum, Ltd. acquired a variety of Shell Hawai'i

30

assets, including five fuel distribution terminals, 32 gas stations, and associated assets on Oʻahu, Maui, Kauaʻi, and the Big Island.[57] Aloha Petroleum, Ltd. is the authorized distributor and retailer of Shell gasoline in Hawaiʻi.[58] Aloha Petroleum, Ltd. operates in Hawaiʻi under a variety of trade names, including Aloha Gas and Aloha Petroleum.

       f.     Through its ownership of Aloha Petroleum LLC and Aloha Petroleum, Ltd., Sunoco LP supplies Sunoco-branded motor fuel wholesale to Sunoco-branded gas stations in Hawaiʻi. In press releases, Sunoco LP has described itself as operating convenience stores and/or fuel outlets in Hawaiʻi.[59]

       g.     Defendants Sunoco LP, Aloha Petroleum LLC, Aloha Petroleum, Ltd., and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, including but not limited to Sunoco LLC, Sunoco Retail LLC, Sunoco, Inc., Sun Company, Inc., and Sun Oil Company are collectively referred to herein as "Sunoco."

       h.     The State's claims against Sunoco arise out of and are related to the acts and omissions of Sunoco in Hawaiʻi and elsewhere that caused or will cause injuries in Hawaiʻi.

       i.     Sunoco has purposefully directed its tortious conduct toward Hawaiʻi by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawaiʻi, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawaiʻi, including without limitation injuries to the State's property, infrastructure, and natural resources. Sunoco's statements in Hawaiʻi and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Sunoco's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of Sunoco's products.

---

[57] *Id.*

[58] Aloha Petroleum, *Aloha & Shell Branded Dealer Opportunities*, https://perma.cc/FC5P-5NM4.

[59] *See, e.g.*, Sunoco LP, *Sunoco LP Announces 4Q and Full Year 2014 Financial and Operating Results* (Feb. 18, 2015), https://perma.cc/VE9E-2DPT.

That conduct was purposefully directed to reach Hawai'i and obscure the dangers of Sunoco's fossil fuel products from the State and its residents such that use of Sunoco's fossil fuel products in Hawai'i would not decline.

j.        Over the last several decades and continuing to the present day, Sunoco has advertised on online, social media, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. Since no later than 1922, and continuing to the present day, Sunoco has advertised its fossil fuel products in national and local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[60] Sunoco has also advertised its fossil fuel products on its social media platforms that have thousands of followers from Hawai'i. For example, in 2024 the "Aloha Gas" Facebook and Instagram accounts posted that they offer "eco-friendly gasoline that helps reduce emissions and protect our beautiful island environment."[61] As further detailed herein, Sunoco's advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Sunoco's fossil fuel products and climate change, and/or misrepresenting Sunoco's products or Sunoco itself as environmentally friendly.

k.        Significant quantities of Sunoco's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i,[62] from which activities Sunoco derives and has derived substantial revenue.

---

[60] *See, e.g.*, Honolulu Star-Advertiser (May 21, 1922), https://perma.cc/YF78-XF4M; Honolulu Star-Bulletin (Aug. 30, 1977), https://perma.cc/Q3BN-NE54; Honolulu Star-Advertiser (Dec. 3, 1980), https://perma.cc/2XYQ-SPYX; Hawaii Tribune-Herald (Dec. 5, 2005), https://perma.cc/88HP-38GT; Honolulu Star-Bulletin (Nov. 18, 2009), https://perma.cc/W4TX-MXKW.

[61] *See* Aloha Gas, *5 things to know about fueling up at Aloha*, Facebook (Mar. 25, 2024), https://perma.cc/FE2M-VK2B; Aloha Gas (@alohagasltd), *5 things to know about fueling up at Aloha*, Instagram (Mar. 25, 2024), https://perma.cc/F6CK-RAY5.

[62] *See, e.g.*, Hawaii Tribune-Herald (May 23, 1989), https://perma.cc/VQ3C-CXHZ.

l.      Sunoco currently owns and operates five active fuel terminals in Hawaiʻi with a combined storage capacity of more than 850,000 barrels of oil.[63] Sunoco also currently owns a fuel terminal in Hawaiʻi that is out of service.[64]

m.      Sunoco conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas stations throughout Hawaiʻi, at which it promotes, advertises, and sells its fossil fuel products. There are currently more than 50 gas stations throughout Hawaiʻi that are owned, operated, or branded by Sunoco or Aloha Petroleum, Inc.[65] In addition to its own Aloha-branded stations, Sunoco has licensed and operated Shell-branded gas stations across Hawaiʻi, and remains the authorized distributor and retailer of Shell gasoline in Hawaiʻi.[66]

n.      Sunoco has also marketed and sold other fossil fuel products, including engine lubricants and motor oils, to Hawaiʻi customers under its Sunoco brand name.[67]

o.      Sunoco, through Aloha Petroleum, Inc., markets and advertises its fossil fuel products in Hawaiʻi by maintaining an interactive website available to prospective Hawaiʻi customers that directs the State's residents to Sunoco's retail gas stations branded as Aloha Petroleum, Inc.[68] Sunoco also promotes its products in Hawaiʻi by regularly updating and actively promoting its Aloha-branded credit card known as the "Save-A-$ Club Card," which encourages customers to buy fuel at its Hawaiʻi stations in exchange for rewards.[69]

---

[63] *See* Sunoco, *Nawiliwili Terminal*, https://perma.cc/T3HN-R7G4; Sunoco, *Kahului, HI Terminal*, https://perma.cc/7WFC-7N56; Sunoco, *Honolulu, HI Terminal*, https://perma.cc/FWL5-PYLU; Sunoco, *Thomas F Malone (TFM) Terminal*, https://perma.cc/LWA6-JKRL; Sunoco, *Hilo West Terminal*, https://perma.cc/4BC6-C3QU.

[64] Sunoco, *Hilo East Terminal*, https://perma.cc/4H4S-3WPK.

[65] Aloha Petroleum, Inc., *Aloha Gas Locations*, https://perma.cc/U9BX-ZHRC.

[66] Aloha Petroleum, Inc., *Shell Hawaii*, https://perma.cc/Z7QQ-UAH6.

[67] *See, e.g.*, Honolulu Star-Advertiser (May 21, 1922), https://perma.cc/YF78-XF4M.

[68] Aloha Petroleum, *Aloha Gas Locations*, https://perma.cc/U9BX-ZHRC.

[69] *See, e.g.*, Aloha Petroleum, Inc., *Save-A-$ Club*, https://perma.cc/Z8K9-S8S4.

40.    **ConocoPhillips entities:** **ConocoPhillips**; **ConocoPhillips Company**; **Phillips 66**; **Phillips 66 Company**

a.    Defendant **ConocoPhillips** is a multinational energy company incorporated in the State of Delaware and with its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that carry out ConocoPhillips' fundamental decisions related to all aspects of the fossil fuel industry, including exploration, extraction, production, manufacture, transport, and marketing.

b.    ConocoPhillips controls and has controlled companywide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. ConocoPhillips' most recent annual report subsumes the operations of the entire ConocoPhillips group of subsidiaries under its name. Therein, ConocoPhillips represents that its value—for which ConocoPhillips maintains ultimate responsibility—is a function of its decisions to direct subsidiaries to explore for and produce fossil fuels: "Unless we successfully add to our existing proved reserves, our future crude oil, bitumen, natural gas and [natural gas liquids] production will decline, resulting in an adverse impact to our business." ConocoPhillips optimizes the ConocoPhillips group's oil and gas portfolio to fit ConocoPhillips' strategic plan. For example, in November 2016, ConocoPhillips announced a plan to generate $5 billion to $8 billion of proceeds over two years by optimizing its business portfolio, including its fossil fuel product business, to focus on low cost-of-supply fossil fuel production projects that strategically fit its development plans.

c.    In November 2024, ConocoPhillips acquired Marathon Oil Corporation.[70] This acquisition added more than 2 billion barrels of oil equivalent reserves to ConocoPhillips' portfolio. ConocoPhillips has done and does business in Hawai'i through its wholly owned subsidiary, Marathon Oil Company. Marathon Oil Company was registered to do business in Hawai'i in 2002 and remains registered in Hawai'i today to own and operate property and

---

[70] ConocoPhillips, *ConocoPhillips completes acquisition of Marathon Oil Corporation* (Nov. 22, 2024), https://perma.cc/3537-5SEQ.

equipment for the exploration, transportation, refining, and marketing of petroleum and petroleum products.

d.    ConocoPhillips controls and has controlled companywide decisions related to global warming and greenhouse gas emissions from its fossil fuel products, including those of its subsidiaries. For instance, ConocoPhillips' board has the highest level of direct responsibility for climate change policy within the company. ConocoPhillips has developed and implements a corporate Climate Change Action Plan to govern climate change decision-making across all entities in the ConocoPhillips group.

e.    Defendant **ConocoPhillips Company** is a wholly owned subsidiary of ConocoPhillips that acts on ConocoPhillips' behalf and subject to ConocoPhillips' control. ConocoPhillips Company is incorporated in Delaware and has its principal office in Bartlesville, Oklahoma. Through its predecessors, ConocoPhillips Company has been registered to do business in Hawai'i since 1960 and remains registered today. In Hawai'i, ConocoPhillips Company was formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company; Phillips 66 Company; Phillips Chemical Company; Phillips Oil Company; Conoco Inc.; ConocoPhillips ANS Marketing Company; Tosco Corporation; and Tosco Refining Company, Inc. ConocoPhillips Company has operated under various trade names in Hawai'i, including the trade name "Phillips 66 Company," which was registered to manufacture, refine, and market petroleum products and byproducts.

f.    Defendant **Phillips 66** is a multinational energy and petrochemical company incorporated in Delaware and with its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips.

g.    Defendant **Phillips 66 Company** is a wholly owned subsidiary of Phillips 66 that acts on Phillips 66's behalf and subject to Phillips 66's control. Phillips 66 Company is incorporated in Delaware and has its principal office in Houston, Texas. Phillips 66 Company is registered to do business in Hawai'i as an oil and gas distributor. Phillips 66 Company was

35

formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, Tosco Refining Co., and Associated Oil (a predecessor-in-interest of defendant Aloha Petroleum, Ltd.).

h.     Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "ConocoPhillips."

i.     The State's claims against ConocoPhillips arise out of and are related to the acts and omissions of ConocoPhillips in Hawaiʻi and elsewhere that caused or will cause injuries in Hawaiʻi.

j.     ConocoPhillips has purposefully directed its tortious conduct toward Hawaiʻi by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawaiʻi, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawaiʻi, including without limitation injuries to the State's property, infrastructure, and natural resources. ConocoPhillips' statements in Hawaiʻi and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and ConocoPhillips' affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of ConocoPhillips' products. That conduct was purposefully directed to reach Hawaiʻi and obscure the dangers of ConocoPhillips' fossil fuel products from the State and its residents such that use of ConocoPhillips' fossil fuel products in Hawaiʻi would not decline.

k.     Over the last several decades and continuing to the present day, ConocoPhillips has advertised on television, online, social media, and outdoor advertisements in the Hawaiʻi market related to its fossil fuel products. Since no later than 1966, and continuing to the present day, ConocoPhillips has advertised its fossil fuel products in national and local print

36

publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[71] ConocoPhillips has also advertised on its social media platforms that have thousands of followers and reach consumers in Hawai'i.[72] For example, in 2020 Phillips 66 ran an advertisement on Facebook and Instagram that reached Hawai'i consumers that touted their plans to support renewable fuels.[73] ConocoPhillips has also advertised on national television programs that aired in Hawai'i. For example, in 2011 ConocoPhillips ran a series of greenwashing television advertisements that aired in Hawai'i which promoted natural gas as clean, contributing to environmental protection, and creating fewer emissions.[74] ConocoPhillips has also advertised on local Hawai'i television networks. For example, in an ad from 2018 promoting its 76-branded gas stations, ConocoPhillips claimed that its fuel is "better for your car, [and] better for the environment."[75] As further detailed herein, ConocoPhillips' advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of ConocoPhillips' fossil fuel products and climate change, and/or misrepresenting ConocoPhillips' products or ConocoPhillips itself as environmentally friendly.

l.     A substantial portion of ConocoPhillips' fossil fuel products are or have been transported, traded, distributed, promoted, marketed, sold, and consumed in Hawai'i, from which ConocoPhillips derives and has derived substantial revenue. For example, through its subsidiaries, ConocoPhillips transports and delivers crude oil to purchasers, refiners, and/or distributors in Hawai'i. ConocoPhillips has owned and/or operated a bulk fossil fuel terminal near Honolulu, at which it received imported fossil fuels for distribution and sale throughout Hawai'i. ConocoPhillips has also owned and/or operated a bulk fossil fuel terminal near Kawaihae, Hawai'i.

---

[71] *See, e.g.*, Honolulu Star-Bulletin (Aug. 12, 1966), https://perma.cc/AZA6-VL82; Hawaii Tribune-Herald (Oct. 3, 1967), https://perma.cc/G6PK-K9L6; Hawaii Tribune-Herald (July 19, 1998), https://perma.cc/D6HV-ETMJ.

[72] *See, e.g.*, ConocoPhillips, *Mapping Migration to Enhance Conservation*, Facebook Ad Libr., https://perma.cc/2PAQ-VFLT; Phillips 66, *What are renewable fuels?*, https://perma.cc/7955-S29V.

[73] Phillips 66, *What are renewable fuels?*, https://perma.cc/7955-S29V.

[74] *See, e.g.*, CNN, *CNN Newsroom* (Oct. 30, 2011, 3:54 PM PDT), https://perma.cc/FF2Z-RDVE; *see also* Honolulu Star-Advertiser (Oct. 30, 2011), https://perma.cc/4JMX-LZA3 (confirming that *CNN Newsroom* aired on CNN in Hawai'i on Oct. 30, 2011 from 12:00 PM to 1:00 PM HST, or 3:00 PM to 4:00 PM PDT).

[75] ConocoPhillips, *76 Hawai'i Commercial*, aired on KHII (June 17, 2018).

37

m.    ConocoPhillips has marketed gasoline and other fossil fuel products to consumers in Hawaiʻi, including through ConocoPhillips, Phillips 66, and/or 76-branded petroleum service stations located in Hawaiʻi. Phillips 66-branded stations began selling gasoline in Hawaiʻi no later than 1966.[76] By 1971, there were more than 30 Phillips 66 dealers throughout Hawaiʻi.[77] By 2003, ConocoPhillips was considered one of the principal marketers of gasoline in Hawaiʻi and marketed under the 76 brand at more than 50 stations throughout Hawaiʻi.[78] At roughly the same time, ConocoPhillips posited itself in Hawaiʻi newspapers as "one of the world's oldest and proudest gasoline brands" that featured "[t]he 76 Brand Gasoline."[79] Today, there are almost 50 stations with the 76 brand throughout Hawaiʻi.[80] ConocoPhillips maintains multiple interactive websites by which it directs prospective customers to 76-branded gasoline stations in Hawaiʻi.[81]

n.    ConocoPhillips offers multiple proprietary credit cards, including the "Phillips 66 Credit Card," the "Conoco Credit Card", and the "76 Credit Card" which allow consumers and business customers in Hawaiʻi to pay for gasoline and other products at 76-branded service stations. Consumers who use ConocoPhillips' proprietary credit cards receive various rewards, including discounts on gasoline purchases. ConocoPhillips further maintains a smartphone application called the "Fuel Forward App" which offers Hawaiʻi consumers a cashless payment method for gasoline and other products at 76-branded service stations, as well as rewards and discounts on gasoline purchases.

41. **Woodside Energy Hawaii Inc. (f/k/a BHP Hawaii Inc.)**

a.    Defendant Woodside Energy Hawaii Inc. ("WEH") is incorporated in Hawaiʻi with its principal place of business in Houston, Texas. WEH was incorporated in Hawaiʻi

---

[76] *See, e.g.*, Honolulu Star-Bulletin (Aug. 12, 1966), https://perma.cc/AZA6-VL82.

[77] Honolulu Star-Bulletin (May 21, 1971), https://perma.cc/D76P-K5B7.

[78] Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii* 121 & Attachment B at p. 3 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

[79] Honolulu Star-Bulletin (Dec. 11, 2002), https://perma.cc/8EQD-U55H.

[80] Phillips 66 Company, *Find a Station (76)* (Search address: Hawaiʻi), https://www.76.com/station-finder/ (last visited Feb. 28, 2025); Phillips 66 Company, *Find a Station* (search address: Hawaiʻi), https://www.conoco.com/station-finder/ (last visited Feb. 28, 2025).

[81] ConocoPhillips 66 Company, *Find a Station (76)*, https://www.76.com/station-finder/ (last visited Feb. 28, 2025).

in 1970 and remains registered in Hawaiʻi today. From 1994 to 2022, WEH was known as BHP Hawaii Inc. WEH has also been known as Pacific Resources, Inc. and BHP Petroleum Americas (Hawaii) Inc. WEH has registered and operated a variety of trade names in Hawaiʻi, including "Hawaii's Energy Leader," "Hawaii's Energy People," "Pacific Resources," "PRI," "Isle Gasohol," "Enerco," "BHP," "BHP Petroleum," and "BHPPA (Hawaii)."

b.      WEH is a wholly-owned subsidiary of Woodside Energy Group Ltd., an Australian petroleum exploration and production company with its headquarters in Perth, Australia. Until 2022, WEH was a subsidiary of BHP Group Limited, an Australian entity with headquarters in Melbourne, Australia.

c.      WEH and its predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "WEH."

d.      The State's claims against WEH arise out of and are related to the acts and omissions of WEH in Hawaiʻi and elsewhere that caused or will cause injuries in Hawaiʻi.

e.      WEH has purposefully directed its tortious conduct toward Hawaiʻi by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Hawaiʻi, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Hawaiʻi, including without limitation injuries to the State's property, infrastructure, and natural resources. WEH's statements in Hawaiʻi and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and WEH's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the State and its residents, about the serious adverse consequences that would result from continued use of WEH's products. That conduct was purposefully directed to reach Hawaiʻi and obscure the dangers of WEH's fossil fuel products from the State and its residents such that use of WEH's fossil fuel products in Hawaiʻi would not decline.

39

f.    Over the last several decades, WEH has advertised on television, newspaper, online, and outdoor advertisements in the Hawai'i market related to its fossil fuel products. In the 1980s and 1990s, WEH advertised its fossil fuel products in local print publications, including multiple Hawai'i newspapers, circulated widely to Hawai'i consumers.[82] For example, in the 1990s WEH ran a series of advertorials in Hawai'i newspapers about its gas products, some of which claimed that gas energy is "friendly to Hawai'i's environment" and can "[help] preserve Hawai'i's clean air."[83] WEH also advertised on local television programs in Hawai'i, including commercials that highlighted the company's support for environmental nonprofits in Hawai'i.[84] Similarly, WEH produced print advertisements in Hawai'i that, for example, touted WEH's efforts to reduce air emission and posited WEH as "working hard to preserve Hawaii's environment."[85] As further detailed herein, WEH's advertisements contain false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of WEH's fossil fuel products and climate change, and/or misrepresenting WEH's products or WEH itself as environmentally friendly.

g.    In the 1980s and 1990s, WEH developed and distributed a wide variety of educational materials on the environment and conservation for Hawai'i students.[86] For example, WEH distributed approximately 25,000 booklets throughout Hawai'i on energy and resource conservation as part of its "Part of the Solution" campaign.[87]

---

[82] *See, e.g.*, Honolulu Star-Advertiser (Nov. 30, 1990), https://perma.cc/KQJ8-BRYK; Honolulu Star-Bulletin (Oct. 31, 1997), https://perma.cc/WJ8V-WL2H; Honolulu Star-Advertiser (Aug. 16, 1988), https://perma.cc/QYX7-Z7YW.

[83] Honolulu Star-Bulletin (Sep. 7, 1995), https://perma.cc/3N4Z-KLKG; *see also* Honolulu Star-Bulletin (June 13, 1996), https://perma.cc/D4HA-CBYR; Honolulu Star-Bulletin (June 12, 1997), https://perma.cc/2FSW-8DNM.

[84] *See, e.g.*, BHP Hawaii Inc., *TV Spots* (archived by web.archive on Jan. 28, 1998), https://web.archive.org/web/19980128154413/http://energypeople.com/bhp/energy/energy.html; *see also* BHP Hawaii Inc., *Todd* (archived by web.archive on Nov. 4, 1996), https://web.archive.org/web/19961104034128/http://www.energypeople.com/energy/todd.aiff.

[85] BHP Hawaii Inc., Print Ads, Ad 3 (archived by web.archive on Jan. 28, 1998), https://perma.cc/28UL-YP2Z.

[86] *See, e.g.*, Honolulu Star-Bulletin (Oct. 14, 1993), https://perma.cc/9TXX-QUL5; Honolulu Star-Advertiser (Oct. 16, 1993), https://perma.cc/M8GE-F82P.

[87] BHP Hawaii Inc., *Environment, Solve It!* (archived by web.archive on May 24, 1997), https://perma.cc/PS3Y-78SV.

h.      Significant quantities of WEH's fossil fuel products have been transported, traded, distributed, promoted, marketed, manufactured, sold, and consumed in Hawai'i, from which activities WEH has derived substantial revenue. Until approximately 1998, WEH owned and operated more than 30 gasoline stations throughout Hawai'i under the BHP Gas Express network.[88] At the time it sold its operations in 1998, WEH provided 40% of the gasoline consumed in Hawai'i, more than 60% of the diesel fuel consumed in Hawai'i, and 95% of the fuel used by ships in Hawai'i.[89] WEH had more than $1 billion in revenue in the 1997 fiscal year.

i.      WEH owned and operated Hawaii's largest crude oil refinery near Kapolei, O'ahu from approximately 1989 to 1998.[90] This refinery had a processing capacity of 95,000 barrels of crude oil per day, a storage capacity of 5.2 million barrels, and featured a 22-mile pipeline that delivered products to the Honolulu area.[91] On its website, WEH claimed that 85% of the products it manufactured in Hawai'i were distributed and consumed in Hawai'i, including "gasoline, jet fuel, diesel fuel, ship bunker fuels, residual fuel oil, butane, propane, naptha, synthetic natural gas, asphalt, and prilled sulphur."[92]

42.     BP, Chevron, Exxon, Shell, Sunoco, ConocoPhillips, and WEH are collectively referred to as the "Fossil Fuel Defendants."

43.     **American Petroleum Institute ("API")**

a.      API is a national trade association representing the oil and gas industry, created in 1919. It is a nonprofit corporation based in the District of Columbia. With more than 600 members, API is the country's largest petroleum trade association. Its purpose is to advance its members' collective business interests, which include increasing the sale and consumer consumption of fossil fuels in Hawai'i and elsewhere for the financial profit of API's members,

---

[88] Honolulu Star-Bulletin (May 29, 1998), https://perma.cc/QV39-VBGV.

[89] Honolulu Star-Bulletin (May 29, 1998), https://perma.cc/QV39-VBGV; *see also* BHP Hawaii Inc., *BHP Hawaii* (archived by web.archive on Nov. 4, 1996), https://perma.cc/F25S-JK3F?type=image.

[90] Stillwater Associates, *Study of Fuel Prices and Legislative Initiatives for the State of Hawaii*, 6–7 (Aug. 5, 2003), https://perma.cc/N2WJ-LLB4.

[91] BHP Hawaii Inc., *Refinery* (archived by web.archive on May 24, 1997), https://perma.cc/5G2B-Z9Y7.

[92] BHP Hawaii Inc., *BHP Hawaii* (archived by web.archive on Nov. 4, 1996), https://perma.cc/F25S-JK3F?type=image.

including Fossil Fuel Defendants and other fossil fuel companies. API coordinates members of the petroleum industry, gathers information of interest to the industry, and disseminates that information to its members. API acts and has acted as an advertising and marketing arm for its member companies' fossil fuel products, including Fossil Fuel Defendants, in Hawai'i and elsewhere.[93]

b.     The State's claims against API arise out of and are related to API's tortious and deceptive acts and omissions in Hawai'i and elsewhere that caused and will cause injuries in Hawai'i.

c.     API has targeted advertising campaigns at Hawai'i consumers in Hawai'i newspapers,[94] advertised on local television networks and on national television programs that were broadcast in Hawai'i,[95] and run social media advertisements that reached Hawai'i consumers. For example, in 2019 API ran an advertisement on Facebook that reached Hawai'i consumers that touted the emissions reduction achievements of natural gas and oil companies.[96] API also promoted the expansion of fossil fuel extraction and consumption in Hawai'i and to Hawai'i consumers, and engaged in other Hawai'i-based activities that promoted fossil fuel products for the financial benefit of API's members, including the Fossil Fuel Defendants, while misleading Hawai'i consumers about the environmental and climate impacts of those products.[97] As part of its "Power Past Impossible" campaign which began in 2017, API ran a series of misleading

---

[93] Through this Complaint, the State is not challenging API's lobbying efforts but rather is upholding and enforcing Hawai'i law against API for API's illegal acts and omissions in Hawai'i and elsewhere, which have caused injuries in Hawai'i. Any API lobbying effort that may incidentally be connected to API's illegal conduct merely exemplifies API's significant contacts with Hawai'i.

[94] *See, e.g.*, Honolulu Star-Bulletin (May 10, 1971), https://perma.cc/E87J-5FA2; Honolulu Star-Advertiser (June 19, 1972), https://perma.cc/R5ZG-5ST7.

[95] *See, e.g.*, Am. Petroleum Inst., *Power Past Impossible*, aired on KGMB (Aug. 21, 2017) ("Natural gas comes cleaner"); CNN, *The Lead With Jake Tapper* (Mar. 18, 2024, 11:36 PM PDT), https://perma.cc/MDC2-58Z9; *see also* Honolulu Star-Advertiser (Mar. 18, 2024), https://perma.cc/YL8U-BMR2 (confirming that *The Lead With Jake Tapper* aired in Hawai'i on CNN on Mar. 18, 2024 from 8:00 PM to 9:00 PM HST, or 11:00 PM to 12:00 AM PDT).

[96] Am. Petroleum Inst., *Did you know…*, Facebook Ad Libr., https://perma.cc/RE82-P8TT.

[97] *See, e.g.*, Am. Petroleum Inst., *Oil and Natural Gas Stimulate Hawaii Economic and Job Growth* (2015), https://perma.cc/3Z3Q-XC3K; Am. Petroleum Inst., *The people of Hawaii are part of the oil and natural gas industry* (2015), https://perma.cc/LLV6-SVSU; ICF, Prepared for Am. Petroleum Inst., *Benefits and Opportunities of Natural Gas Use, Transportation, and Production, Hawaii* (June 2017), https://perma.cc/KCJ7-SXCN.

advertisements that portrayed the oil and gas industry as a sustainable, healthy, and essential part of societal progress.[98] For example, one API advertisement which ran on television programs broadcast in Hawaiʻi claimed that "thanks to natural gas the air up here is cleaner than it's been in 25 years;"[99] This greenwashing statement was misleading because it gave the impression that natural gas is environmentally friendly when in fact the greenhouse gas emissions from natural gas combustion contribute to the catastrophic climate change impacts alleged in this Complaint.

d.    API's advertising campaigns that appeared in Hawaiʻi promoted, among other things, the expansion of fossil fuel product sale and consumption, expansion of commercial fossil fuel infrastructure, false claims that oil derricks save trees, misleading and repeated assertions that combusting natural gas is a climate change solution and that natural gas is "clean-burning" and good for the environment, and misleading advertisements about how API and the fossil fuel industry are protecting the environment by, among other things, working to get the "least pollution" from "every drop of oil."[100]

e.    Among other activities in Hawaiʻi during the 1970s, API ran advertisements on network television stations that aired in Hawaiʻi and ran multiple ads in Hawaiʻi newspapers under API's nationwide advertisement campaign themed, "a country that runs on oil can't afford to run short."[101] Those ads promoted the expanded use of and exploration for fossil fuel products, and were specifically targeted at Hawaiʻi residents by being published in Hawaiʻi newspapers read

---

[98] *See* Am. Petroleum Inst., *API Launches Power Past Impossible Campaign During Super Bowl Showing Natural Gas and Oil Benefit to Consumers in Everyday Life*, PR Newswire (Feb. 5, 2017, 6:32 PM ET), https://perma.cc/UE5Y-QFAQ.

[99] *See* Am. Petroleum Inst., *Thanks to Natural Gas*, aired on KGMB (Mar. 15, 2018); CNN, *CNN Newsroom* (Nov. 1, 2018, 12:50 PM PDT), https://perma.cc/UV67-QA3V; *see also* West Hawaii Today (Oct. 28, 2020), https://perma.cc/ZS6V-6LJQ (confirming that *CNN Newsroom* aired on CNN in Hawaiʻi on Nov. 1, 2018 from 9:00 AM to 10:00 AM HST, or 12:00 PM to 1:00 PM PDT).

[100] *See, e.g.*, Honolulu Star-Bulletin (May 3, 1971), https://perma.cc/66CS-R9DX; Honolulu Star-Bulletin (May 10, 1971), https://perma.cc/E87J-5FA2; Jack Gerard, Am. Petroleum Inst., National Opinion, *Obama shuns success in curbing climate change*, Honolulu Star Advertiser (Dec. 12, 2015), https://perma.cc/R5PU-9W4D; Lem Smith, Am. Petroleum Inst., Opinion, *Natural gas helps curb carbon dioxide emissions*, Honolulu Star-Advertiser (Mar. 16, 2020), https://perma.cc/WU6J-PE2J.

[101] *See, e.g.*, Honolulu Star-Bulletin (May 3, 1971), https://perma.cc/66CS-R9DX; Honolulu Star-Bulletin (May 10, 1971), https://perma.cc/E87J-5FA2; Honolulu Star-Bulletin (Oct. 18, 1971), https://perma.cc/AP7M-TG9C; Honolulu Star-Bulletin (Sept. 13, 1971), https://perma.cc/5HCY-A8LB; *see also* Philip H. Dougherty, *Advertising: Oil Prepares a Counterattack*, N.Y. Times (Apr. 23, 1971), https://perma.cc/P4BG-W93T.

by Hawai'i residents.[102] According to API's ad campaign manager, James C. Shelby, there was nothing political about the $4 million nation-wide API campaign, which featured full-page ads in at least 160 newspapers and commercials that ran across all major television networks.[103]

f. API directed misleading information at Hawai'i residents by stating in the *Honolulu Star-Advertiser* in 2016 that natural gas is "clean-burning" and has driven the US to become the world leader in reducing carbon emissions, and that fossil fuel is "cleaner and more efficient than ever."[104] In another statement made in the *Honolulu Star-Advertiser* in 2016, API claimed that "[g]iven the proven success of natural gas in reducing emissions, taking it out of the equation is unnecessary."[105] These greenwashing claims about fossil fuels deceptively portrayed fossil fuels as environmentally friendly and a long-term climate solution, and concealed the harmful climate impacts of continued oil and gas development.[106]

g. API targeted Hawai'i residents and tourists visiting Hawai'i by publishing an online blog in 2017 highlighting how petroleum-based products and fossil fuel energy help competitors reach the finish line of the Ironman World Championship in Kona, Hawai'i.[107]

h. All Fossil Fuel Defendants and/or their predecessors-in-interest or parent companies are or have been key API members. All Fossil Fuel Defendants except Sunoco and WEH are currently API members. Multiple Fossil Fuel Defendants held key API leadership roles, including BP, Shell, Exxon, Chevron, Sunoco, and ConocoPhillips.

i. Executives from Exxon, BP, Chevron, Shell, and Sunoco have served on the API Executive Committee and/or as API Chairman, essentially serving as corporate officers. For example, Exxon's CEO served on API's Executive Committee, including as President and

---

[102] *Id.*

[103] Philip H. Dougherty, *Advertising: Oil Prepares a Counterattack*, N.Y. Times (Apr. 23, 1971), https://perma.cc/P4BG-W93T.

[104] Jack Gerard, Am. Petroleum Inst., Insight, *Should U.S. still develop fossil fuels? Yes*, Honolulu Star Advertiser (Oct. 17, 2016), https://perma.cc/33UE-PHCC.

[105] Kyle Isakower, Am. Petroleum Inst., *Insight, Can 'clean' energy replace fossil fuels? No*, Honolulu Star-Advertiser (May 23, 2016), https://perma.cc/8Z79-RB4G.

[106] *See* International Institute for Sustainable Development, *Navigating Energy Transitions: Mapping the road to 1.5°C* (2022), https://perma.cc/WN9R-7AHG.

[107] Am. Petroleum Inst., *Energy is Hawaii, Iron Constitution!* (Oct. 2017), https://perma.cc/3G2R-9HA9.

44

Chairman, for 21 of the 29 years between 1991 and 2020. Multiple high-level executives from Exxon, such as Presidents, Vice Presidents, CEOs, COOs, and Chairmen, served on API's Board in each year between 1994 and 2002. BP's CEO served as API's Chairman in 1988, 1989, and 1998. Multiple high-level executives from BP served on API's Board of Directors between 1994 and 2002. The Chairman and CEO of BP's predecessor ARCO served as API Treasurer in 1998 and Chairman in 1999. Chevron's CEO served as API Chairman in 1994, 1995, 1997, 1998, 2003, and 2012. In 2002, Chevron's CEO served as API Treasurer. Chairman and CEO of Chevron's predecessor Texaco served as API Board Chairman in 2001, and as Treasurer in 1999. Multiple high-level executives from Chevron served on API's Board of Directors in each year between 1994 and 2002. Shell's President served as API Treasurer in 1997 and sat on the Board's Executive Committee from at least 2005 to 2006. Multiple high-level Shell executives served on API's Board of Directors between 1994 and 2002. Sunoco's President served as API Board Chairman between 1965 and 1967. ConocoPhillips' Chairman and CEO was API Chairman from 2016 to 2018. Phillips 66's Chairman and CEO served as API Board President from 2020 to 2022. Multiple high-level ConocoPhillips executives served on API's Board of Directors between 1994 and 2002.

j.      Member companies participate in API strategy, governance, and operation through their membership dues and by contributing company officers and other personnel to API boards, committees, and task forces. Fossil Fuel Defendants have collectively steered the policies and trade practices of API through membership, Executive Committee roles, and/or providing budgetary funding for API. Fossil Fuel Defendants have used their control over and involvement in API to develop and execute a long-term advertising and communications campaign centered on climate change denialism. The goal of the campaign was to influence consumer demand for Fossil Fuel Defendants' fossil fuel products. Fossil Fuel Defendants directly controlled, supervised, and participated in API's misleading messaging regarding climate change.[108] That conduct directly

---

[108] *See* H.R. Comm. on Oversight and Accountability Democrats & S. Comm. on the Budget, *Denial, Disinformation, and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change* (April 2024), Doc. No. SOC-HCOR-123718 (March 2018 email from Darren Woods to API Executive Committee, including representatives from Shell, Phillips 66, BP, and Chevron, noting that he was about to become API's Chair and that "it will be important to have a clear view of where *we* want to take API." (emphasis added)).

45

impacted Hawaiʻi, as Fossil Fuel Defendants worked with API to create and disseminate misleading advertisements that promote consumption of fossil fuel products throughout Hawaiʻi.

k.      Relevant information was shared among API and Fossil Fuel Defendants and Fossil Fuel Defendants' predecessors-in-interest through the following: (1) API's distribution of information to its members, and/or (2) participation of Fossil Fuel Defendants' officers and other personnel, and those of Fossil Fuel Defendants' predecessors-in-interest, on API boards, committees, and task forces. This includes representatives of Exxon, Chevron, BP, Shell, and Sunoco sitting on both API's Committee for Air and Water Conservation and a special advisory group to API's Committee for Public Affairs, which worked together to develop research reports on air emissions and other environmental topics. In addition, representatives from Chevron and Exxon chaired API's Engineering and Technical Research Committee, and representatives from BP and Exxon chaired API's Health and Biological Research Committee, also developing research documents. Different representatives of Exxon, Chevron, BP, Shell, and Sunoco rotated in and out of these positions throughout the time periods discussed in this Complaint.[109]

l.      API has acted on behalf of and under the supervision and control of Fossil Fuel Defendants. Under this control and supervision, API has, since no later than 1988, participated in and led several coalitions, front groups, and organizations that have promoted disinformation about the climate impacts of fossil fuel products to consumers—including, but not limited to, the Global Climate Coalition, Partnership for a Better Energy Future, Coalition for American Jobs, Alliance for Energy and Economic Growth, and Alliance for Climate Strategies. These front groups were formed to promote climate disinformation and advocacy from a purportedly objective source, when in fact these groups were financed and controlled by Fossil Fuel Defendants and other oil and gas companies. Defendants have benefited from the spread of this disinformation because, among other things, it has ensured a thriving consumer market for oil and gas, resulting in substantial profits for Fossil Fuel Defendants.

---

[109] Am. Petroleum Inst., Comm. for Air and Water Conservation & Comm. on Pub. Affs., *Environmental Research: A Status Report*, 135–46 (Jan. 1972) (listing members of relevant committees and their fossil fuel company affiliations), https://perma.cc/X4S8-TGR3.

m.      API admitted its role in promoting Fossil Fuel Defendants' fossil fuel products. For example, in 1964, API President Frank Ikard stated that "API also works hard to promote the use of petroleum products . . . . [W]e cannot, of course, engage directly in selling gasoline to customers. But if we can't sell the steak, we can sell the sizzle." Ikard continued, "[w]e can contribute to gasoline sales, for example, by telling as many motorists as possible about the wonderful places to go in this country and about some of the historic trails that connect them. This we are doing by means of a national campaign of localized newspaper ads carrying the theme: 'See America Best By Car.'"[110] Dozens of these "See America Best By Car" newspaper ads from Shell appeared in Hawai'i in 1964.[111]

## IV.      AGENTS AND CO-CONSPIRATORS

44.      As detailed below, each Fossil Fuel Defendant had actual knowledge, or should have known, that its fossil fuel products were hazardous in that the intended use of those products for combustion would substantially contribute to climate change and result in harms to Hawai'i. The Fossil Fuel Defendants obtained knowledge of the hazards of their products independently and through their membership and involvement in trade associations like Defendant API, and in other entities described herein.

45.      Fossil Fuel Defendants and/or API employed, financed, and participated in several industry-created front groups to serve their mission of flooding the markets with climate change disinformation and denialism. These organizations, acting under Fossil Fuel Defendants' and/or API's supervision and control, assisted the deception campaign by implementing public advertising and outreach campaigns to discredit climate science and by funding scientists to cast doubt upon climate science and upon the extent to which climate change is caused by human activity. In sum, Fossil Fuel Defendants and/or API, through front groups, engaged in a significant

---

[110] Address by Frank N. Ikard, President, American Petroleum Institute, at the Annual Meeting of the Interstate Oil Compact Commission, Broadwater Beach Hotel, Biloxi, Mississippi, Dec. 11, 1964 (Bernard Majewski Papers, Box 59, American Heritage Center, University of Wyoming).

[111] *See, e.g.*, Honolulu Star-Advertiser (Aug. 12, 1964), https://perma.cc/B6ZN-V4CL; Hawaii Tribune-Herald (July 21, 1964), https://perma.cc/M7KV-6T6M; Honolulu Star-Advertiser (Oct. 19, 1964), https://perma.cc/SQ3N-R4GG.

marketing campaign that misrepresented and concealed the dangers of fossil fuel products with the aim of protecting or enhancing sales of those products to consumers, including consumers in Hawaiʻi. Fossil Fuel Defendants and/or API actively supervised, facilitated, consented to, and/or directly participated in the misleading messaging of these front groups, from which Fossil Fuel Defendants profited significantly, including in the form of increased sales in Hawaiʻi.

46.    **The Information Council for the Environment ("ICE")** was formed by coal companies and their allies, including Western Fuels Association and the National Coal Association. Associated companies included Pittsburg and Midway Coal Mining (Chevron).

47.    **The Global Climate Coalition ("GCC")** was an industry group formed to preserve and expand consumer demand for fossil fuel products by publicly casting doubt on climate science and opposing GHG emission reduction initiatives. The GCC was founded in 1989 in reaction to the first meeting of the Intergovernmental Panel on Climate Change ("IPCC"), the United Nations body for assessing the science related to climate change, and to NASA scientist James Hansen's presentation to the Senate Committee on Energy and Natural Resources, in which Hansen emphasized that climate change was already happening and would lead to dire consequences if left unaddressed. The GCC disbanded in or around 2001. Founding members included API, Shell Oil Company (currently, Shell); Texaco, Inc. (currently, Chevron); Amoco (currently, BP); and ARCO (owned by BP at the time). GCC board membership during its existence included high-level executives from the founding members and Chevron, Exxon, and Mobil (Exxon).  Amoco (BP), ARCO (BP), API, Chevron, Exxon, Shell, Texaco (Chevron), and Phillips Petroleum (ConocoPhillips) were also corporate members of the GCC over the course of the GCC's existence. The GCC Board of Directors was comprised of high-level executives from the fossil fuel industry: in 1994, for instance, the GCC Board was comprised of executives from API, Exxon, Phillips Petroleum Company (ConocoPhillips), and Texaco (Chevron).[112] In 1995,

---

[112] Glob. Climate Coalition, *Background Information on the Global Climate Coalition*, 4 (Feb. 1, 1994), https://perma.cc/3W2B-G33X.

GCC's Board of Directors included high-level executives from Texaco (Chevron), API, and ARCO.[113]

## V.      FACTUAL BACKGROUND

### A.      Defendants Are Responsible for Causing and Accelerating Climate Change.

48.      The atmosphere and oceans are warming, sea levels are rising, snow and ice cover are diminishing, oceans are acidifying, and hydrogeologic systems have been altered, among other environmental changes.[114] These changes are directly harming people's health, lives, lifestyles, livelihoods, and property, including in Hawaiʻi. According to the IPCC, the evidence that humans are causing this warming of the Earth is unequivocal.[115]

49.      The mechanism by which human activity causes global warming and climate change is equally well-established: ocean and atmospheric warming is overwhelmingly caused by anthropogenic GHG emissions.[116] Over the past few decades, actual GHG emission rates have exceeded the rates previously predicted under "worst case" global emissions scenarios.

50.      When used as intended to produce energy and create petrochemical products, fossil fuels release GHGs, including $CO_2$ and methane, which trap atmospheric heat and increase global temperatures. $CO_2$ is by far the most important GHG because combustion of massive amounts of fossil fuels has released hundreds of billions of tons of $CO_2$ into the atmosphere.

---

[113] Glob. Climate Coalition, *IRS 1024 Attachment C: Global Climate Coalition Board of Directors* (1995), https://perma.cc/TE7R-4D3A.

[114] IPCC, *Global Carbon and Other Biogeochemical Cycles and Feedbacks, in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report* 676–79 (2021).

[115] IPCC, *Climate Change 2021: The Physical Science Basis*, v, 4, 41, 63, 150, 425, 506 (2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_FullReport_small.pdf.

[116] *Id.* at 41.

49

51.     Prior to World War II, most anthropogenic $CO_2$ emissions were caused by land-use practices, such as forestry and agriculture, which altered the capacity of the land and global biosphere to absorb and sequester $CO_2$ from the atmosphere. Those activities did not significantly alter atmospheric $CO_2$ concentrations, and their impacts on Earth's climate were relatively minor. Since that time, however, both the annual rate and total volume of anthropogenic $CO_2$ emissions have increased enormously following the dramatic rise in the combustion of oil, gas, and coal. Figure 1 below shows that while $CO_2$ emissions attributable to forestry and other land-use changes have remained relatively constant, total emissions attributable to fossil fuels have increased dramatically since the 1950s.[117]



**Figure 1: Total Annual Carbon Dioxide Emissions by Source, 1860-2022**

52.     This acceleration of fossil fuel emissions has led to a correspondingly sharp rise in atmospheric concentration of $CO_2$. Since 1960, the concentration of $CO_2$ in the atmosphere has spiked from under 320 parts per million (ppm) to approximately 427 ppm.[118] The concentration of

---

[117] Glob. Carbon Project, *Global Carbon Budget 2023*, 85 (Dec. 5, 2023), https://perma.cc/LE9K-AMBB.
[118] Nat'l Oceanic and Atmospheric Admin. ("NOAA"), *Trends in Atmospheric Carbon Dioxide ($CO_2$): Full Record*, Glob. Monitoring Lab'y, https://perma.cc/5AWZ-ZWXF.

atmospheric $CO_2$ has also been accelerating. From 1960 to 1970, atmospheric $CO_2$ increased by an average of approximately 0.9 ppm per year.[119]

53.    The graph below (Figure 2) indicates the tight nexus between the sharp increase in emissions from the combustion of fossil fuels and the steep rise of atmospheric concentrations of $CO_2$.



**Figure 2: Atmospheric $CO_2$ Concentration and Annual Emissions[120]**

54.    The increase in atmospheric $CO_2$ caused by fossil fuel combustion has been clearly documented and measured, and the ratio of different carbon isotopes in the atmosphere indicates that fossil fuel combustion is the overwhelming source of the increased concentration.[121]

55.    The burning of fossil fuel products has caused concentrations of GHGs in the atmosphere to rise to levels not seen in at least three million years.[122]

---

[119] NOAA, *Trends in Atmospheric Carbon Dioxide (Co2): Growth Rate*, Glob. Monitoring Lab'y, https://perma.cc/YBQ8-FGLR.

[120] Rebecca Lindsey, *Climate Change: Atmospheric Carbon Dioxide*, Climate.gov (Apr. 9, 2024), https://perma.cc/6MPK-6FE7.

[121] NOAA, *The Data: What Carbon-14 Tells Us*, Glob. Monitoring Lab'y, https://perma.cc/83JP-P9AG.

[122] Potsdam Inst. for Climate Impact Research, *More CO2 Than Ever Before in 3 Million Years, Shows Unprecedented Computer Simulation*, Sci. Daily (Apr. 3, 2019), https://perma.cc/4XZB-7BLD.

56.    As GHGs accumulate in the atmosphere, the Earth radiates less energy back to space. The result has been dramatic planetary warming. Ocean and land surface temperatures have increased at a rapid pace during the late 20th and early 21st centuries:

a.    2024 was the hottest year on record by globally averaged surface temperatures, exceeding the mid-20th century mean ocean and land surface temperatures by approximately 2.32°F.[123] Between June 2023 and July 2024 there were 14-straight months of record-breaking global temperatures.[124] The last ten years have been the hottest on record.[125]

b.    This trend appears certain to continue. January 2025 was the hottest January ever.[126] February 2025 was the third-hottest February on record.[127]

57.    2024 was the hottest year on record for global ocean temperatures.[128] Between April 2023 and June 2024, the ocean experienced 15-straight months of record-breaking temperatures.[129] Moreover, the average global ocean temperature of each month from January through April 2024 was at least 0.15°C (0.27°F) higher than the previous monthly records.[130] The increase in hotter temperatures and more frequent positive anomalies during the Great Acceleration are occurring both globally and locally, including in Hawai'i. The graph below (Figure 3) shows the increase in global land and ocean temperature anomalies since 1850, as measured against the 1901–2000 global average temperature.[131]

---

[123] NOAA Nat'l Ctr. for Env't Info., *Annual 2024 Global Climate Report* (Jan. 2025), https://perma.cc/L2HA-LLW2.

[124] *Id.*

[125] *Id.*

[126] Coepernicus, *Copernicus: January 2025 was the warmest on record globally, despite an emerging La Niña* (Feb. 6, 2025), https://perma.cc/246N-WWTJ.

[127] Coepernicus, *Surface air temperature for February 2025* (Mar. 2025), https://perma.cc/6V2R-4FLD.

[128] NOAA Nat'l Ctr. for Env't Info, *Assessing the Global Climate in 2024* (Jan. 10, 2025), https://perma.cc/RJ7V-T97Q.

[129] NOAA, *supra* note 123.

[130] *Id.*

[131] *See id.*



**Figure 3: Global Land and Ocean Temperature Anomalies, January – December**

58.     Increasing surface temperatures, both locally and globally, are disrupting the Earth's energy balance and leading to myriad environmental and physical consequences, including, but not limited to, the following:

a.     Increased frequency and intensity of heat waves;

b.     Sea level rise, due to the thermal expansion of warming ocean waters and runoff from melting glaciers and ice sheets;

c.     Changes to the global climate generally, bringing about longer droughts and dry periods interspersed with fewer and more severe periods of precipitation, and associated impacts to the quantity and quality of water resources available to both human and ecological systems;

d.     Increased frequency and intensity of extreme weather events due to increases in evaporation, evapotranspiration, and precipitation, a consequence of the warming atmosphere's increased ability to hold moisture;

e.     Adverse impacts on human health associated with extreme weather, extreme heat, wildfires, worsening air quality, and vector-borne illnesses;

f.     Flooding and inundation of land and infrastructure, increased erosion, higher wave run-up and tides, increased frequency and severity of storm surges, saltwater intrusion, and other impacts of higher sea levels;

g.     Ocean acidification, primarily due to the increased uptake of atmospheric carbon dioxide by the oceans; and

h.     Changes to terrestrial and marine ecosystems, and consequent impacts on the populations and ranges of flora and fauna.

**B.     Defendants Knew or Should Have Known the Dangers Associated with Fossil Fuel Products.**

59.     For decades, Fossil Fuel Defendants have known that their fossil fuel products posed and continue to pose risks of "severe" and even "catastrophic" impacts on the global climate through the work and warnings of their own scientists and/or through trade associations such as API. Defendants consistently researched or funded research into significant issues relevant to fossil fuels and were aware of significant scientific reports on climate change science and impacts at the time the reports were issued. Thus, Defendants developed a sophisticated understanding of climate change that far exceeded the knowledge of the public, ordinary consumers, and the State. Yet each Fossil Fuel Defendant decided to continue its conduct and commit itself to massive fossil fuel production. This was a deliberate and malicious decision to place company profits ahead of human safety and well-being and to foist onto the public the costs of abating and adapting to the harms of climate change.

60.     This industry knowledge was concealed at the time, only recently began to come to light outside of Defendants' spheres, and Defendants are still concealing their full knowledge.[132]

61.     In 1954, geochemist Harrison Brown and his colleagues at the California Institute of Technology wrote to API, informing the trade association that preliminary measurements of natural archives of carbon in tree rings indicated that fossil fuels had caused atmospheric carbon

---

[132] *See* discussion *infra* ¶¶ 255–269.

dioxide levels to increase by about 5% since 1840.[133] API provided those scientists funding for various research projects, and measurements of carbon dioxide continued for at least one year, if not longer, although the results were never published or otherwise made available to the public.[134] In 1957, H.R. Brannon of Humble Oil Company (predecessor-in-interest to Exxon) measured an increase in atmospheric carbon dioxide attributable to fossil fuels, similar to—and in agreement with—that measured by Harrison Brown.[135]

62.    In 1959, API organized a centennial celebration of the American oil industry at Columbia University in New York City.[136] High-level representatives of Defendants were in attendance. One of the keynote speakers was nuclear physicist Edward Teller. Teller warned the industry that "a temperature rise corresponding to a 10[%] increase in carbon dioxide will be sufficient to melt the icecap and submerge . . . [a]ll the coastal cities." Teller added that since "a considerable percentage of the human race lives in coastal regions, I think that this chemical contamination is more serious than most people tend to believe."[137] Following his speech, Teller was asked to "summarize briefly the danger from increased carbon dioxide content in the atmosphere in this century." He responded that "there is a possibility the icecaps will start melting and the level of the oceans will begin to rise."[138]

63.    By 1965, concern over the potential for fossil fuel products to cause disastrous global warming reached the highest levels of the United States' scientific community. In that year, President Lyndon B. Johnson's Science Advisory Committee's Environmental Pollution Panel reported that a 25% increase in carbon dioxide concentrations could occur by the year 2000, that such an increase could cause significant global warming, that melting of the Antarctic ice cap and

[133] *See* Benjamin Franta, *Early Oil Industry Knowledge of CO2 and Global Warming*, 8 Nature Climate Change 1024, 1024–25 (2018).
    [134] *Id.*
    [135] *Id.*; H.R. Brannon, Jr. et al., *Radiocarbon Evidence on the Dilution of Atmospheric and Oceanic Carbon by Carbon from Fossil Fuels*, 38 Am. Geophysical Union Transactions 643, 644–46 (1957).
    [136] *See* Allan Nevins & Robert G. Dunlop, *Energy and Man: A Symposium* (Appleton-Century-Crofts, Inc. 1960); *see also* Franta, *supra* note 133, at 1024–25.
    [137] Edward Teller, *Energy Patterns of the Future*, in *Energy and Man: A Symposium* 58 (Appleton-Century-Crofts, Inc. 1960).
    [138] *Id.* at 70.

rapid sea-level rise could result, and that fossil fuels were the clearest source of the carbon dioxide pollution.[139]

64.    Three days after President Johnson's Science Advisory Committee report was published, the president of API, Frank Ikard, addressed leaders of the petroleum industry in Chicago at the trade association's annual meeting. Ikard relayed the report to industry leaders, saying, "[o]ne of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts," and quoting the report's finding that "the pollution from internal combustion engines is so serious, and is growing so fast, that an alternative nonpolluting means of powering automobiles, buses, and trucks is likely to become a national necessity."[140] Mr. Ikard summarized the report by saying, "[t]he substance of the report is that there is still time to save the world's peoples from the catastrophic consequences of pollution, but time is running out."[141]

65.    Thus, by 1965, Defendants and/or their predecessors-in-interest were aware that the scientific community had found that the unrestrained use of fossil fuel products would cause global warming by the end of the century, and that such global warming would have wide-ranging and costly consequences.

66.    In 1968, API received a report from the Stanford Research Institute, which it had hired to assess the state of research on environmental pollutants, including carbon dioxide.[142] The assessment endorsed the findings of President Johnson's Scientific Advisory Council from three years prior, stating that carbon dioxide emissions were "almost certain" to produce "significant" temperature increases by 2000, and that these emissions were almost certainly attributable to fossil fuels. The report warned of major changes in the Earth's environment and a "rise in sea levels,"

---

[139] The White House, *Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel President's Science Advisory* Committee, 119–24 (Nov. 1965), https://perma.cc/998L-PNQV.

[140] Frank N. Ikard, *Meeting the Challenges of 1966*, in *Proceedings of the Am. Petroleum Inst.* 13 (1965), https://perma.cc/CHQ7-HXGA.

[141] *Id.*

[142] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants*, Stanford Rsch. Inst. (Feb. 1968), https://perma.cc/A58L-QVPK.

and concluded: "there seems to be no doubt that the potential damage to our environment could be severe." The scientists warned of "melting of the Antarctic ice cap" and informed API that "[p]ast and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere." What was missing, the scientists said, was work on "air pollution technology and . . . systems in which $CO_2$ emissions would be brought under control."[143]

67.     In 1969, the Stanford Research Institute delivered a supplemental report on air pollution to API, projecting with alarming particularity that atmospheric $CO_2$ concentrations would reach 370 parts per million (ppm) by 2000.[144] This projection turned out to almost exactly match the actual $CO_2$ concentrations measured in 2000 of 369.64 ppm.[145] The report explicitly connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere."

68.     By virtue of their membership and participation in API at that time, Fossil Fuel Defendants received or should have received the Stanford Research Institute reports and were on notice of their conclusions.

69.     In 1972, API members—including Fossil Fuel Defendants—received a status report on all environmental research projects funded by API. The report summarized the 1968 SRI report describing the impact of fossil fuel products—including Fossil Fuel Defendants'—on the environment, including global warming and its attendant consequences. Fossil Fuel Defendants and/or their predecessors-in-interest that received this report included but were not limited to: American Standard of Indiana (BP), Asiatic (Shell), Atlantic Richfield (BP), British Petroleum (BP), Chevron Standard of California (Chevron), Esso Research (Exxon), Ethyl (formerly affiliated with Esso, which was subsumed by Exxon), Getty (Exxon), Gulf (Chevron, among others), Humble Standard of New Jersey (Exxon, Chevron, BP), Mobil (Exxon), Pan American (BP), Shell, Standard of Ohio (BP), Sun (Sunoco), Texaco (Chevron), Union (Chevron), Skelly

---

[143] *Id.* at 108, 110, 112.

[144] Elmer Robinson & R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, Supplement*, Stanford Rsch. Inst., 3 (June 1969), https://perma.cc/J5YU-SNZ7.

[145] NASA Goddard Inst. for Space Stud., *Global Mean CO2 Mixing Ratios (ppm): Observations*, https://perma.cc/QE9P-PNYY.

(Exxon), Colonial Pipeline (ownership has included BP, ExxonMobil, and Chevron entities, among others), Continental (ConocoPhillips), DuPont (former owner of Conoco), Phillips (ConocoPhillips), and Caltex (Chevron).[146]

70.    Among other Defendants, "Shell was actively supporting research that clearly underscored the dangers posed by burning its fossil fuel products from the mid-1970s."[147]

71.    In 1977, James Black of Exxon gave a presentation to Exxon executives on the "greenhouse effect," which was summarized in an internal memo the following year. Black reported that "[t]here is general scientific agreement that the most likely manner in which mankind is influencing the global climate is through carbon dioxide release from the burning of fossil fuels." He noted that "current [scientific] opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel consumption," and relayed that doubling atmospheric carbon dioxide would, according to the best climate model available, "produce a mean temperature increase of about 2°C to 3°C [3.6°F to 5.4°F] over most of the earth," with two to three times as much warming at the poles.[148] Black also reported that "[p]resent thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might

---

[146] Am. Petroleum Inst., *supra* note 109.

[147] Matthew Green, *Lost Decade: How Shell Downplayed Early Warnings Over Climate Change*, Desmog (Mar. 31, 2023), https://perma.cc/VBU3-YYPT.

[148] Memorandum from J.F. Black, Exxon Rsch. and Eng'g Co., to F.G. Turpin, Exxon Rsch. & Eng'g Co., *The Greenhouse Effect*, 2, 14, 23, 26 (June 6, 1978), https://perma.cc/9KUU-XUPH.

become critical."[149] Figure 4 below, reproduced from Black's memo, illustrates Exxon's understanding of the timescale and magnitude of global warming that its products would cause.

**Figure 4: Future Global Warming Predicted Internally by Exxon in 1977**[150]



72.    Also in 1977, Henry Shaw of the Exxon Research and Engineering Technology Feasibility Center attended a meeting of scientists and governmental officials in Atlanta, Georgia, on developing research programs to study carbon dioxide and global warming. Shaw's internal memo to Exxon's John W. Harrison reported that "[t]he climatic effects of carbon dioxide release may be the primary limiting factor on energy production from fossil fuels[.]"[151]

73.    In 1979, an internal Exxon memorandum stated, "The most widely held theory [about the increase in $CO_2$ concentration in the atmosphere] is that: The increase is due to fossil fuel combustion; [i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface; [and t]he present trend of fossil fuel consumption will cause dramatic environmental effects before the

---

[149] *Id.* at 3.

[150] *Id.* at 26. The company predicted global warming of 1°C to 3°C (1.8°F to 5.4°F) by 2050, with 10°C (18°F) warming in polar regions. The difference between the lower dashed and solid curves prior to 1977 represents global warming that Exxon believed may already have been occurring. *Id.*

[151] Memorandum from Henry Shaw to John W. Harrison, *Environmental Effects of Carbon Dioxide*, Climate Investigations Ctr. (Oct. 31, 1977), https://perma.cc/7TZD-N5XP.

year 2050. . . . The potential problem is great and urgent." The memo added that, if limits were not placed on fossil fuel production,

> Noticeable temperature changes would occur around 2010 as the $[CO_2]$ concentration reaches 400 ppm. Significant climatic changes occur around 2035 when the concentration approaches 500 ppm. A doubling of the pre-industrial concentration [i.e., 580 ppm] occurs around 2050. The doubling would bring about dramatic changes in the world's environment[.][152]

Those projections proved remarkably accurate. Annual average atmospheric $CO_2$ concentrations surpassed 400 ppm in 2015 for the first time in millions of years.[153] And due to "committed warming"—the reality that future increases in global temperatures are caused by GHGs that have *already* been emitted—future warming is certain to occur even if all greenhouse gas emissions ceased today. Put differently, because GHGs can linger in the atmosphere for hundreds of years, there is a lag time between emissions on the one hand, and atmospheric GHG concentrations that lead to warming, on the other. Given this lag time, limiting the $CO_2$ concentration in the atmosphere to 440 ppm, or a 50% increase over preindustrial levels, which the Exxon memo said was "assumed to be a relatively safe level for the environment," would require fossil fuel emissions to peak in the 1990s and non-fossil energy systems to be rapidly deployed. Eighty percent of fossil fuel resources, the memo calculated, would have to be left in the ground to avoid doubling atmospheric carbon dioxide concentrations. Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[154]

74.     But instead of disclosing to consumers any aspects of these research findings, in November 1979, according to internal correspondence, Exxon urged "a very aggressive defensive program in . . . atmospheric science and climate" to "anticipate the strong intervention of

---

[152] Memorandum from W.L. Ferrall, Exxon Rsch. and Eng'g Co. to Dr. R.L. Hirsch, *Controlling Atmospheric CO₂*, 1–2, 5 (Oct. 16, 1979), https://perma.cc/B4F3-NYTH.

[153] Nicola Jones, *How the World Passed a Carbon Threshold and Why It Matters*, Yale Env't 360 (Jan. 26, 2017), https://perma.cc/5WWJ-ZF3F.

[154] Ferrall, *supra* note 152, at 3, 6–7.

environmental groups."[155] It urged an expanded research effort to "prepare[] for, and [get] ahead of the government in making the public aware of pollution problems."[156]

75.    In 1979, API and its members, including Fossil Fuel Defendants, convened a task force to monitor and share cutting edge climate research among the oil industry. The group was initially called the $CO_2$ and Climate Task Force, but changed its name to the Climate and Energy Task Force in 1980 (hereinafter referred to as "Task Force"). API kept and distributed meeting minutes to Task Force members. Membership included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company, including Exxon, Mobil (Exxon), Amoco (BP), Phillips (ConocoPhillips), Texaco (Chevron), Shell, Sunoco, Sohio (BP), as well as Standard Oil of California (Chevron) and Gulf Oil (Chevron, among others). The Task Force was charged with assessing the implications of emerging science on the petroleum and gas industries and identifying where reductions in GHG emissions from fossil fuel products could be made.[157]

76.    In 1979, a paper prepared by API for the Task Force asserted that $CO_2$ concentrations were rising, and predicted that, although global warming would occur, it would likely go undetected until approximately the year 2000 because its effects were being temporarily masked by a natural cooling trend.[158]

77.    In 1980, the Task Force invited Dr. J.A. Laurman, a "recognized expert in the field of $CO_2$ and climate," to make a presentation to its members.[159] The meeting lasted for seven hours and included a "complete technical discussion" of global warming caused by fossil fuels, including "the scientific basis and technical evidence of $CO_2$ buildup, impact on society, methods of modeling and their consequences, uncertainties, policy implications, and conclusions that can be drawn from present knowledge."[160] Attendees to the presentation included scientists and

---

[155] Memorandum from H. Shaw to H.N. Weinberg, *Research in Atmospheric Science*, 1–2 (Nov. 19, 1979), https://perma.cc/G7GX-QECB.

[156] *Id.*

[157] Am. Petroleum Inst., *AQ-9 Task Force Meeting Minutes* (Mar. 18, 1980), https://perma.cc/36C9-DM7P.

[158] Memorandum from R. J. Campion to J. T. Burgess, *Comments on The API's Background Paper on $CO_2$ Effects* (Sept. 6, 1979), https://perma.cc/R7JJ-MT2S.

[159] Letter from J. J. Nelson, Am. Petroleum Inst. to AQ-9 Task Force, *The $CO_2$ Problem; Addressing Research Agenda Development*, 1–2 (Mar. 18, 1980), https://perma.cc/2SV2-T7R6.

[160] *Id.*

executives from API, Texaco (a predecessor to Chevron), Exxon, and SOHIO (a predecessor to BP), and the minutes of the meeting were distributed to the entire Task Force. Dr. Laurman's written presentation informed the Task Force that there was a "Scientific Consensus on the Potential for Large Future Climatic Response to Increased $CO_2$ Levels." He further informed the Task Force in his presentation that, though the exact temperature increases were difficult to predict, the "physical facts agree on the probability of large effects 50 years away." He warned the Task Force of a 2.5ºC (4.5ºF) global temperature rise by 2038, which would likely have "MAJOR ECONOMIC CONSEQUENCES," and a 5ºC (9ºF) rise by 2067, which would likely produce "GLOBALLY CATASTROPHIC EFFECTS." He also suggested that, despite uncertainty in climate modeling, "THERE IS NO LEEWAY" in the time for acting.

78.    At this presentation, API minutes show that the Task Force discussed topics including "the technical implications of energy source changeover" and "ground rules for energy release of fuels and the cleanup of fuels as they relate to $CO_2$ creation." The Task Force also discussed a potential area for investigation: alternative energy sources as a means of mitigating $CO_2$ emissions from fossil fuel products. These efforts called for research and development to "Investigate the Market Penetration Requirements of Introducing a New Energy Source into World Wide Use," including the technical implications of energy source changeover.[161] The Task Force even asked the question "what is the 50 year future of fossil fuels?"[162]

79.    In 1980, a Canadian Esso (Exxon) company report sent to managers and staff at affiliated Esso and Exxon companies stated that there was "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere, and that "[t]echnology exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost of power generation."[163]

---

[161] *Id.*

[162] *Id.* at 3.

[163] Imperial Oil Ltd., *Review of Environmental Protection Activities for 1978–1979*, 2 (Aug. 6, 1980), https://perma.cc/AK7D-BEBL.

80.     In December 1980, an Exxon manager distributed a memorandum on the "$CO_2$ Greenhouse Effect" attributing future buildup of carbon dioxide to fossil fuel use, and explaining that internal calculations indicated that atmospheric carbon dioxide could double by around 2060, "most likely" resulting in global warming of approximately $3.0 \pm 1.5°C$ (2.7 to 8.1°F).[164] Calculations predicting a lower temperature increase, such as 0.25°C (0.45°F), were "not held in high regard by the scientific community[.]" The memo also reported that such global warming would cause "increased rainfall[] and increased evaporation," which would have a "dramatic impact on soil moisture, and in turn, on agriculture" and other "serious global problems[.]" The memo called for "society" to pay the bill, estimating that some adaptive measures would cost no more than "a few percent" of gross national product.[165] Shaw also reported that Exxon had studied various responses for avoiding or reducing a carbon dioxide build-up, including "stopping all fossil fuel combustion at the 1980 rate" and "investigat[ing] the market penetration of non-fossil fuel technologies." The memo estimated that such non-fossil energy technologies "would need about 50 years to penetrate and achieve roughly half of the total [energy] market."[166] The memo included Figure 5 below, which illustrates global warming anticipated by Exxon as well as the company's understanding that significant global warming would occur before exceeding the range of natural variability.

---

[164] Memorandum from Henry Shaw to T.K. Kett, *Exxon Research and Engineering Company's Technological Forecast: CO₂ Greenhouse Effect*, 3 (Dec. 18, 1980), https://perma.cc/22P8-W4V3.

[165] *Id.* at 3–5.

[166] *Id.* at 5–6.



**Figure 5: Future Global Warming Predicted Internally by Exxon in 1980**[167]

81.     In February 1981, Exxon's Contract Research Office prepared and distributed a "Scoping Study on $CO_2$" to the leadership of Exxon Research and Engineering Company.[168] The study reviewed Exxon's carbon dioxide research and considered whether to expand its research on carbon dioxide or global warming further. It recommended against expanding those research areas because Exxon's current research programs were sufficient for achieving the company's goals of closely monitoring federal research, building credibility and public relations value, and developing in-house expertise regarding $CO_2$ and global warming, and noted that Exxon employees were actively monitoring and keeping the company apprised of outside research developments, including those on climate modeling and "$CO_2$-induced effects." In discussing "options for reducing $CO_2$ build-up in the atmosphere," the study noted that although capturing $CO_2$ from flue gases (i.e., exhaust gas produced by combustion) was technologically possible, the cost was high,

---

[167] *Id.* at 13. The company anticipated a doubling of carbon dioxide by around 2060 and that the oceans would delay the warming effect by a few decades, leading to approximately 3°C (5.4°F) warming by the end of the century.

[168] Letter from G.H. Long, Exxon Rsch. & Eng'g Co., to P.J. Lucchesi et al., *Atmospheric $CO_2$ Scoping Study* (Feb. 5, 1981), https://perma.cc/Y79X-CWAL.

and "energy conservation or shifting to renewable energy sources[] represent the only options that might make sense."[169]

82.     Exxon scientist Roger Cohen warned his colleagues in a 1981 internal memorandum that "future developments in global data gathering and analysis, along with advances in climate modeling, may provide strong evidence for a delayed $CO_2$ effect of a truly substantial magnitude," and that under certain circumstances it would be "very likely that we will unambiguously recognize the threat by the year 2000."[170] Cohen had expressed concern that the memorandum understated the potential effects of reckless $CO_2$ emissions from fossil fuel products, saying, "it is distinctly possible" that $CO_2$ emissions "will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)."[171]

83.     Also in 1981, Exxon's Henry Shaw, the company's lead climate researcher at the time, prepared a summary of Exxon's current position on the greenhouse effect for Edward David Jr., president of Exxon Research and Engineering Company, stating in relevant part:

- "Atmospheric $CO_2$ will double in 100 years if fossil fuels grow at 1.4% [per year].
- $3°C$ global average temperature rise and $10°C$ at poles if $CO_2$ doubles.
  - Major shifts in rainfall/agriculture
  - Polar ice may melt"[172]

84.     Thus, by 1981, Exxon and other fossil fuel companies knew $CO_2$ accumulation in the atmosphere from fossil fuel consumption would lead to global warming, were actively monitoring all aspects of $CO_2$ and global warming research, and recognized that a shift away from fossil fuels and towards renewable energy sources would be necessary to avoid a large $CO_2$ buildup in the atmosphere and resultant global warming.

85.     In 1982, another API-commissioned report showed the average increase in global temperature from a doubling of atmospheric concentrations of $CO_2$ and projected, based upon

---

[169] *Id.* at 13.

[170] Memorandum from R.W. Cohen to W. Glass (Aug. 18, 1981), https://perma.cc/SR32-7UB6.

[171] *Id.*

[172] Memorandum from Henry Shaw to Dr. E. E. David, Jr., *CO₂ Position Statement* (May 15, 1981), https://perma.cc/U7A5-YTLG.

computer modeling, global warming of between 2ºC and 3.5ºC [3.6ºF to 6.3ºF]. The report projected potentially "serious consequences for man's comfort and survival," and noted that "the height of the sea level can increase considerably."[173] Exxon's own modeling research confirmed this.[174] In a 1982 internal memorandum, Exxon's Corporate Research and Science Laboratories acknowledged a "clear scientific consensus," based on computer modeling, that "a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$ºC [2.7ºF to 8.1ºF]."[175] The memo continued: "There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere."

86.    Also in 1982, Exxon's Environmental Affairs Manager distributed a primer on climate change to a "wide circulation [of] Exxon management . . . intended to familiarize Exxon personnel with the subject."[176] The primer also was "restricted to Exxon personnel and not to be distributed externally."[177] The primer compiled science on climate change available at the time, and confirmed fossil fuel combustion as a primary anthropogenic contributor to global warming. The primer included the original version of Figure 6 below, which estimated a $CO_2$ doubling around 2090 based on Exxon's long-range modeled outlook. The primer warned that the melting of the Antarctic ice sheet could result in global sea level rise of five feet which would "cause flooding on much of the U.S. East Coast, including the State of Florida and Washington, D.C."[178] Indeed, it warned that "there are some potentially catastrophic events that must be considered,"

---

[173] Am. Petroleum Inst., *Climate Models and CO₂ Warming: A Selective Review and Summary*, 3–5 (Mar. 1982), https://perma.cc/2ZDX-QMTX.

[174] *See* Memorandum from Roger W. Cohen, Exxon Rsch. & Eng'g Co., to A.M. Natkin, Off. of Sci. & Tech., Exxon Corp. (Sept. 2, 1982), https://perma.cc/5JSE-GBNS

[175] *Id.* at 1.

[176] Memorandum from M. B. Glaser to R.W. Cohen et al., *CO₂ "Greenhouse" Effect*, Exxon Rsch. & Eng'g Co. (Nov. 12, 1982), https://perma.cc/3FRQ-5WX9.

[177] *Id.*

[178] *Id.* at 13.

including sea level rise from melting polar ice sheets. It noted that some scientific groups were

concerned "that once the effects are measurable, they might not be reversible."[179]



**Figure 6: Exxon's Internal Prediction of Future $CO_2$ Increase
and Global Warming from 1982**[180]

---

[179] *Id.* at 2.

[180] G. Supran et al., *Assessing ExxonMobil's Global Warming Projections*, 379 SCI. 153 (Jan. 13, 2023),
https://perma.cc/ZB6B-8KVU. Exxon predicted a doubling of atmospheric carbon dioxide concentrations above

The primer recommended studying "soil erosion, salinization, or the collapse of irrigation systems" in order to understand how society might be affected and might respond to global warming, as well as "[h]ealth effects" and "stress associated with climate related famine or migration[.]"[181] The primer again estimated that undertaking "[s]ome adaptive measures" (not all of them) would cost "a few percent of the gross national product estimated in the middle of the next century" (gross national product was $27.820 trillion in 2023).[182] To avoid such impacts, the primer discussed a scientific analysis which studied energy alternatives and requirements for introducing them into widespread use, and which recommended that "vigorous development of non-fossil energy sources be initiated as soon as possible."[183] The primer also noted that the analysis indicated that other GHGs related to fossil fuel production, such as methane (which is a more powerful GHG than $CO_2$), "may significantly contribute to a global warming," and that concerns over $CO_2$ would be reduced if fossil fuel use were decreased due to "high price, scarcity, [or] unavailability."[184] "Mitigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion," the primer stated.[185] The primer was widely distributed to Exxon leadership.

87.    In September 1982, the Director of Exxon's Theoretical and Mathematical Sciences Laboratory, Roger Cohen, wrote Alvin Natkin of Exxon's Office of Science and Technology to summarize Exxon's internal research on climate modeling.[186] Cohen reported:

> [O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$. The consensus is that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of (3.0 ± 1.5)°C [(2.7 to 8.1)°F]. . . . The temperature rise is predicted to be distributed nonuniformly over the earth, with above-average temperature elevations in the polar regions and relatively small increases near the

---

preindustrial levels by around 2090 (left curve), with a temperature increase of more than 2°C (3.6°F) over the 1979 level (right curve). *Id.*

[181] Glaser, *supra* note 176, at 14.

[182] *Id.*; *see* Fed. Reserve Bank of St. Louis, *Gross National Product* (updated Mar. 30, 2023), https://perma.cc/A8VK-MED9.

[183] Glaser, *supra* note 176, at 18.

[184] *Id.* at 18, 29.

[185] *Id.* at 2.

[186] Cohen, *supra* note 174, at 1−2.

equator. There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations of the biosphere. The time required for doubling of atmospheric $CO_2$ depends on future world consumption of fossil fuels.

Cohen described Exxon's own climate modeling experiments, reporting that they produced "a global averaged temperature increase that falls well within the range of the scientific consensus," were "consistent with the published predictions of more complex climate models," and were "also in agreement with estimates of the global temperature distribution during a certain prehistoric period when the earth was much warmer than today." "In summary," Cohen wrote, "the results of our research are in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate."

88.    In October 1982, at the fourth biennial Maurice Ewing Symposium at the Lamont-Doherty Geophysical Observatory, Exxon Research and Engineering Company's President E.E. David, Jr. delivered a speech titled, "Inventing the Future: Energy and the $CO_2$ 'Greenhouse Effect.'"[187] His remarks included the following statement: "[i]t is ironic that the biggest uncertainties about the $CO_2$ buildup are not in predicting what the climate will do, but in predicting what people will do."[188]

89.    Throughout the early 1980s, at Exxon's direction, Exxon climate scientist Henry Shaw forecasted emissions of $CO_2$ from fossil fuel use. Those estimates were incorporated into Exxon's twenty-first century energy projections and were distributed among Exxon's various divisions. Shaw's conclusions included an expectation that atmospheric $CO_2$ concentrations would double in 2090 per the Exxon model, with an attendant 2.3°C to 5.6°C (4.1°F to 10.1°F) average global temperature increase.[189]

---

[187] Dr. E.E. David, Jr., President, Exxon Rsch. & Eng'g Co., Remarks at the Fourth Annual Ewing Symposium, Tenafly, NJ, ClimateFiles (Oct. 26, 1982), https://perma.cc/46A6-5524.

[188] *Id.* at 4.

[189] Neela Banerjee, *More Exxon Documents Show How Much It Knew About Climate 35 Years Ago*, Inside Climate News (Dec. 1, 2015), https://perma.cc/W25H-KNS8.

90.     During the 1980s, many Fossil Fuel Defendants formed their own research units focused on climate modeling. API, including the Task Force, provided a forum for Fossil Fuel Defendants to share their research efforts and corroborate their findings related to anthropogenic GHG emissions.[190]

91.     During this time, Fossil Fuel Defendants' statements expressed an understanding of their obligation to consider and mitigate the externalities of reckless promotion, marketing, and consumption of their fossil fuel products. For example, in 1988, Richard Tucker, the president of Mobil Oil, a predecessor of Exxon, presented at the American Institute of Chemical Engineers National Meeting, the premier educational forum for chemical engineers, where he stated:

> [H]umanity, which has created the industrial system that has transformed civilization, is also responsible for the environment, which sometimes is at risk because of unintended consequences of industrialization. . . . Maintaining the health of this life-support system is emerging as one of the highest priorities. . . . [W]e must all be environmentalists.
>
> The environmental covenant requires action on many fronts . . . the low-atmosphere ozone problem, the upper-atmosphere ozone problem and the greenhouse effect, to name a few. . . . Our strategy must be to reduce pollution before it is ever generated—to prevent problems at the source.
>
> Prevention means engineering a new generation of fuels, lubricants and chemical products. . . . Prevention means designing catalysts and processes that minimize or eliminate the production of unwanted byproducts. . . . Prevention on a global scale may even require a dramatic reduction in our dependence on fossil fuels—and a shift towards solar, hydrogen, and safe nuclear power. It may be possible that—just possible—that the energy industry will transform itself so completely that observers will declare it a new industry. . . . Brute force, low-tech responses and money alone won't meet the challenges we face in the energy industry.[191]

92.     In 1987, Shell published an internal "brief for companies of the Royal Dutch/Shell Group" titled "Air pollution: an oil industry perspective." In this report, the company described the greenhouse effect as occurring "largely as a result of burning fossil fuels and deforestation."[192]

---

[190] Neela Banerjee, *Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too*, Inside Climate News (Dec. 22, 2015), https://perma.cc/BZQ8-8KG7.

[191] Richard E. Tucker, *High Tech Frontiers in the Energy Industry: The Challenge Ahead*, AIChE National Meeting, 523 (Nov. 30, 1988), https://perma.cc/LA2Z-BH3V.

[192] Shell Briefing Serv., *Air pollution: An Oil Industry Perspective*, 1 SBS 4 (1987), https://perma.cc/W5AQ-SV8Q.

Shell further acknowledged the "concern that further increases in carbon dioxide levels could cause climatic changes, notably a rise in overall temperature, having major environmental, social and economic consequences."[193]

93.     In 1988, the Shell Greenhouse Effect Working Group issued a confidential internal report, "The Greenhouse Effect," which acknowledged global warming's anthropogenic nature: "Man-made carbon dioxide, released into and accumulated in the atmosphere, is believed to warm the earth through the so-called greenhouse effect." The authors also noted the burning of fossil fuels as a primary driver of $CO_2$ buildup and warned that warming could "create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather." They further pointed to the potential for "direct operational consequences" of sea level rise on "offshore installations, coastal facilities and operations (e.g., platforms, harbors, refineries, depots)."[194]

94.     Similar to early warnings by Exxon scientists, the 1988 Shell report noted that "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation."  The authors mentioned the need to consider policy changes on multiple occasions, noting that "the potential implications for the world are . . . so large that policy options need to be considered much earlier" and that research should be "directed more to the analysis of policy and energy options than to studies of what we will be facing exactly."[195]

95.     Fossil Fuel Defendants also meticulously examined plausible scenarios if they failed to act in the face of their internal knowledge. For instance, Shell evaluated in a 1989 internal confidential planning document the issue of "climate change – the greenhouse effect, global warming," which the document identified as "the most important issue for the energy industry."[196] The document compared a scenario in which society "addresses the potential problem" with one

---

[193] *Id.* at 5.
[194] Shell Internationale Petroleum, Greenhouse Effect Working Group, *The Greenhouse Effect*, 1, 27 (May 1988), https://perma.cc/Z2JR-9YT7.
[195] *Id.* at 1, 6.
[196] Shell, *Scenarios 1989–2010: Challenge and Response*, 33 (Oct. 1989), https://perma.cc/Y8WA-Y28C.

in which it does not. Acknowledging that "[c]hanging emission levels . . . and changing atmospheric $CO_2$ concentration has been likened to turning around a VLCC [very large crude carrier]," even "substantial efforts" by 2010 would have "hardly any impact on $CO_2$ concentration." In later years, however, the impacts are "strikingly different;" early efforts "will not prevent the problem arising, but … could mitigate the problem." The document described the consequences of failing to address the problem right away:

> These seem small changes but they mask more dramatic temperature changes which would take place at temperate latitudes. There would be more violent weather – more storms, more droughts, more deluges. Mean sea level would rise at least 30 cm. Agricultural patterns would be most dramatically changed. Something as simple as a moderate change in rainfall pattern disrupts eco-systems, and many species of trees, plants, animals and insects would not be able to move and adapt.
>
> The changes would, however, most impact on humans [sic]. In earlier times, man was able to respond with his feet. Today, there is no place to go because people already stand there. Perhaps those in industrial countries could cope with a rise in sea level (the Dutch examples) but for poor countries such defences are not possible. The potential refugee problem … could be unprecedented. Africans would push into Europe, Chinese into the Soviet Union, Latins into the United States, Indonesians into Australia. Boundaries would count for little – overwhelmed by the numbers. Conflicts would abound. Civilization could prove a fragile thing. The logic of [reducing emissions] is a society choosing to channel some investments into environmental maintenance against this contingency [197]

96.    In another 1989 confidential internal planning document, Shell anticipated that "public/media pressures" to "adopt[] environmental programmes" such as "much tighter targets for $CO_2$ emissions" could prompt "effective consumer responses" that "will lead to intense and unpredictable pressures on business."[198] The scenario envisioned that "[c]oncerns about global warming and depletion will depress production of fossil fuels, their market share declining as renewables are actively promoted," given that "[w]here there can be real consumer choice it will be a dominant force, especially where interest is heightened by obvious environmental impact."[199]

---

[197] *Id.* at 35–36.
[198] *See* Shell UK, *UK Scenarios 1989*, 31, 34 (Nov. 1989), https://perma.cc/6BZP-YEK7.
[199] *Id.* at 34.

97.    In yet another scenario published in a 1998 internal report, Shell paints an eerily prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the U.S. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry or the government. After all, two successive IPCC reports since 1993 have reinforced the human connection to climate change . . . Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[200]

98.    In a 1997 speech at Stanford University, John Browne, Group Executive for BP America, noted that "there is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature."[201]

99.    Climate change research conducted by Fossil Fuel Defendants and their industry associations frequently acknowledged uncertainties in their climate modeling. Those uncertainties, however, were largely with respect to the magnitude and timing of climate impacts resulting from fossil fuel consumption, not with respect to whether significant changes would eventually occur. Fossil Fuel Defendants' researchers and the researchers at their industry associations harbored little doubt that climate change was occurring and that fossil fuel products were, and are, the primary cause. As Ken Croasdale, a senior researcher for Exxon's subsidiary Imperial Oil, stated

---

[200] Royal Dutch/Shell Group, *The Group of the Future and the Group Scenarios 1998–2020 Report*, 115, 118 (1998), https://perma.cc/6C6L-EA7J.
[201] John Browne, *BP Climate Change Speech to Stanford*, ClimateFiles (May 19, 1997), https://perma.cc/6D53-KQT2.

73

to an audience of engineers in 1991, GHGs are rising "due to the burning of fossil fuels. Nobody disputes this fact."[202]

> **C.** **Despite Their Early Knowledge of Real and Severe Harm Posed by the Consumption of Fossil Fuel Products, Defendants Affirmatively Acted to Obscure Those Harms and Engaged in a Campaign to Deceptively Protect and Expand the Use of Fossil Fuel Defendants' Fossil Fuel Products.**

100.    Despite the overwhelming evidence about the threats to people and the planet posed by continued use of fossil fuel products amassed leading up to and throughout the 1980s, Defendants failed to act reasonably to mitigate or avoid those dire adverse impacts. Defendants instead dismissed and devalued the safety of the public and the planet, including the State and its residents, and continued their unfettered pursuit of profits from Fossil Fuel Defendants' fossil fuel products—including by intentionally misleading and deceiving the public regarding these threats.

101.    Exxon has all but admitted to these decisions. In a secretly recorded video from 2021, an Exxon executive stated:

> Did we aggressively fight against some of the science? Yes.
> Did we join some of these shadow groups to work against some of the early efforts? Yes, that's true. There's nothing illegal about that.
> We were looking out for our investments. We were looking out for our shareholders.[203]

102.    On notice that fossil fuel products were causing global climate change and dire effects on the planet, Defendants could and should have issued reasonable warnings to consumers and the public of the known dangers of consuming fossil fuel products. Instead, Defendants engaged in advertising and communications campaigns—through media including but not limited to radio, television, print, and online advertising—intended to promote consumer demand for Fossil Fuel Defendants' fossil fuel products by downplaying the harms and risks of climate change. Initially, the campaigns tried to show that global warming was not occurring. More recently, the campaigns have sought to minimize the risks and harms from climate change. The deception

---

[202] Sara Jerving et al., *Special Report: What Exxon Knew About the Earth's Melting Arctic*, L.A. Times (Oct. 9, 2015), https://perma.cc/7NNH-9QSY.

[203] Jeff Brady, *Exxon Lobbyist Caught on Video Talking About Undermining Biden's Climate Push*, NPR (July 1, 2021, 11:37 AM ET), https://perma.cc/MAZ7-TLG4.

campaigns have had the purpose and effect of inflating and sustaining the market for fossil fuels, which—in turn—drove up GHG emissions, accelerated global warming, delayed the energy economy's transition to a lower-carbon future, and brought about climate change harms to Hawaiʻi. These effects are ongoing and continue to worsen in the State due to Defendants' conduct.

103.    Defendants' conduct was and is an abdication and contravention of their responsibility to consumers and the public, including the State and its residents, to act on their unique knowledge of the reasonably foreseeable hazards of reckless production and promotion of fossil fuel products. Had Defendants acted responsibly to issue reasonable warnings instead of engaging in a disinformation campaign, consumers would have acted sooner and faster to reduce their fossil fuel consumption and stimulate demand for non-carbon energy alternatives whose use does not imperil the Earth. This process is now underway, but was wrongfully delayed and is still being slowed by Defendants' deception and continued downplaying of the reality and severity of climate change—and of fossil fuels' role in causing it.

104.    Several key events between 1988 and 1992 prompted Defendants to pivot from researching and discussing climate change internally to affirmatively deceiving consumers and the public about the climatic dangers of fossil fuels. As climate change—and the role of fossil fuels in causing it—became an increasingly prominent concern, Defendants realized that accurate consumer and public understanding of the dangers of fossil fuels would pose a paramount threat to Fossil Fuel Defendants' business models, their assets, and their profits. Key events that precipitated the shift from research to deception included the following:

    a.    In 1988, National Aeronautics and Space Administration ("NASA") scientists confirmed that human activities were contributing to global warming.[204] On June 23 of that year, NASA scientist James Hansen's presentation of this information to Congress engendered significant news coverage and publicity for the announcement, including coverage on the front page of *The New York Times*.

---

[204] *See* Peter C. Frumhoff et al., *The Climate Responsibilities of Industrial Carbon Producers*, 132 Climatic Change 157, 161 (2015), https://perma.cc/QKA6-VBXP.

b.      On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors introduced S. 2666, "The Global Environmental Protection Act," to regulate $CO_2$ and other GHGs. Three more bipartisan bills to significantly reduce $CO_2$ pollution were introduced over the following ten weeks, and in August, U.S. Presidential candidate George H.W. Bush pledged that his presidency would combat the greenhouse effect with "the White House effect."[205] Political will in the United States to reduce anthropogenic GHG emissions and mitigate the harms associated with Fossil Fuel Defendants' fossil fuel products was gaining momentum.

c.      In December 1988, the United Nations formed the IPCC, a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

d.      In 1990, the IPCC published its First Assessment Report on anthropogenic climate change,[206] which concluded that (1) "there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be," and (2) that

> emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapour, will increase in response to global warming and further enhance it.[207]

The IPCC reconfirmed those conclusions in a 1992 supplement to the First Assessment Report.[208]

e.      The United Nations held the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of 172 world governments, of which 116 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change ("UNFCCC"), an international, environmental treaty providing protocols for future negotiations

---

[205] N.Y. Times Editorial Board, *The White House and the Greenhouse*, N.Y. Times (May 9, 1989), https://perma.cc/4NSN-KS2D.

[206] *See* IPCC, *Reports*, ipcc.ch/reports (last visited Nov. 14, 2024).

[207] IPCC, *Policymaker Summary of Working Group I (Scientific Assessment of Climate Change), in Climate Change: The IPCC 1990 and 1992 Assessments*, 63 (1990), https://perma.cc/2LZV-MV7J.

[208] IPCC, *1992 IPCC Supplement, in Climate Change: The IPCC 1990 and 1992 Assessments* (1992), https://perma.cc/2LZV-MV7J.

aimed at "stabiliz[ing] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."[209]

105. To perpetuate and maximize dependence on fossil fuel products, Defendants embarked on a decades-long series of disinformation campaigns designed to stymie consumer and public understanding of climate change and the role of fossil fuel consumption in causing it.

106. Defendants' campaigns focused on concealing, discrediting, and/or misrepresenting information that tended to support decreasing consumption of fossil fuels, thereby preserving and inflating demand for Fossil Fuel Defendants' products and staving off the transition to a lower-carbon economy. The campaigns enabled Fossil Fuel Defendants to accelerate their business practice of exploiting fossil fuel reserves and to concurrently externalize the social and environmental costs of fossil fuel products. Those activities directly contradicted Defendants' internal recognition that the science of anthropogenic climate change was clear and that consumption of fossil fuels would result in dire consequences for the planet and states like Hawaiʻi.

107. In 1988, Joseph Carlson, an Exxon public affairs manager, stated in an internal memo that Exxon "is providing leadership through API in developing the petroleum industry position" on "the greenhouse effect."[210] He then went on to describe the "Exxon Position," which included two important messaging tenets among others: (1) "[e]mphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse Effect"; and (2) "[r]esist the overstatement and sensationalization [sic] of potential greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."[211]

108. Also in 1988 and a few months after NASA scientist James Hansen's presentation to Congress, Frank Sprow, Exxon's head of corporate research, sent a memo to Exxon colleagues warning that "[i]f a worldwide consensus emerges that action is needed to mitigate against Greenhouse gas effects, substantial negative impacts on Exxon could occur." Sprow continued,

---

[209] United Nations, *United Nations Framework Convention on Climate Change*, art. 2 (1992), https://perma.cc/59UX-HCZ3.

[210] Memorandum from Joseph M. Carlson, *The Greenhouse Effect*, 2, 7 (Aug. 3, 1988), https://perma.cc/GHC9-NM2E.

[211] *Id.* at 7–8.

"[a]ny additional R&D efforts within Corporate Research on Greenhouse should have two primary purposes: 1. Protect the value of our resources (oil, gas, coal). 2. Preserve Exxon's business options." According to *The Wall Street Journal*, Sprow stated in an interview that this memo was adopted by Exxon as policy.[212]

109.    Reflecting on his time as an Exxon consultant in the 1980s, Professor Martin Hoffert, a former New York University physicist who researched climate change, expressed regret over Exxon's "climate science denial program campaign" in his sworn testimony before Congress:

> [O]ur research [at Exxon] was consistent with findings of the United Nations Intergovernmental Panel on Climate Change on human impacts of fossil fuel burning, which is that they are increasingly having a perceptible influence on Earth's climate. . . . If anything, adverse climate change from elevated $CO_2$ is proceeding faster than the average of the prior IPCC mild projections and fully consistent with what we knew back in the early 1980's at Exxon. . . . I was greatly distressed by the climate science denial program campaign that Exxon's front office launched around the time I stopped working as a consultant—but not collaborator—for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[213]

110.    Likewise, Shell "shaped a series of influential industry-backed publications that downplayed or omitted key risks; emphasized scientific uncertainties; and pushed for more fossil fuels, particularly coal."[214] In 1992, for instance, Shell had released a publication for wide external distribution purporting to describe the "Basic Scientific Facts" of the "Potential Augmented Greenhouse Effect."[215] This document downplayed the scientific consensus (that Shell internally acknowledged) by referring to the "relatively few established scientific fundamentals" regarding the causes of climate change.[216] It also misleadingly suggested that a "particular cause" of climate

---

[212] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, The Wall Street J. (Sept. 14, 2023, 5:30 AM ET), https://perma.cc/9BQ4-UN3C.

[213] *Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change, Hearing Before the Subcomm. on Civil Rights and Civil Liberties of the Comm. on Oversight and Reform*, 116th Cong. 7–8 (Oct. 23, 2019) (statement of Martin Hoffert, Former Exxon Consultant, Professor Emeritus, Physics, New York University), https://perma.cc/6E4K-EERL.

[214] Green, *supra* note 147.

[215] Jan Kuyper, *Potential Augmented Greenhouse Effect, & Depletion of the Ozone Layer*, Shell Grp. 3 (Sept. 1992), https://perma.cc/SM9A-FDAD.

[216] *Id.* at 5.

change was "difficult" to identify, even though Shell had identified the use of its products as a significant contributor to the greenhouse effect in the previous decade.[217] For example, in 1985, a Shell UK environmental scientist published an article laying out the scientific fact that "[b]urning of fossil fuels which have taken millions of years to form has effectively upset the balance [of the Carbon Cycle] leading to an increase in $CO_2$ in the atmosphere."[218]

111.    A 1994 Shell report entitled "The Enhanced Greenhouse Effect: A Review of the Scientific Aspects" similarly emphasized scientific uncertainty, falsely stating, for example, that "the postulated link between any observed temperature rise and human activities has to be seen in relation to natural variability, which is still largely unpredictable."[219]

112.    In 1996, API published an extensive report that denied the human connection to climate change by falsely stating that "no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms." [220]

113.    In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." In the publication's preface, Exxon CEO Lee Raymond inaccurately stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." The publication described the greenhouse effect as "unquestionably real and definitely a good thing," while ignoring the severe consequences that would result from the influence of the increased $CO_2$ concentration on the Earth's climate. Instead, it falsely characterized the greenhouse effect as simply "what makes the earth's atmosphere livable." Directly contradicting Exxon's own internal knowledge and peer-reviewed science, the publication misleadingly ascribed the rise in temperature since the late nineteenth century to "natural fluctuations that occur over long periods

---

[217] *Id.*

[218] T.G. Wilkinson, *Why and How to Control Energy Pollution: Can Harmonisation Work?,* 8 Conservation & Recycling 7, 19 (1985), https://perma.cc/6ZCB-ACTP.

[219] P. Langcake, Shell Internationale Petroleum, *The Enhanced Greenhouse Effect: A Review of the Scientific Aspects*, 9 (Dec. 1994), https://perma.cc/FM7F-U8ZP.

[220] Sally Gentille et al., *Reinventing Energy: Making the Right Choices*, Am. Petroleum Inst., 63 (1996), https://perma.cc/J63S-RLSW.

of time" rather than to the anthropogenic emissions that Exxon itself and other scientists had confirmed were responsible. The publication also falsely challenged the computer models that projected the future impacts of fossil fuel product consumption, including those developed by Exxon's own employees, as having been "proved to be inaccurate." The publication contradicted the numerous reports prepared by and circulated among Exxon's staff, and by API, stating that "the indications are that a warmer world would be far more benign than many imagine . . . moderate warming would reduce mortality rates in the US, so a slightly warmer climate would be more healthful." Raymond concluded his preface by criticizing the basis for reducing consumption of his company's fossil fuel products as "drawing on bad science, faulty logic, or unrealistic assumptions"—despite the important role that Exxon's own scientists had played in compiling those same scientific underpinnings.[221]

114.    Imperial Oil (Exxon) CEO Robert Peterson falsely denied the established connection between Fossil Fuel Defendants' fossil fuel products and anthropogenic climate change in the Summer 1998 Imperial Oil Review, "A Cleaner Canada":

> [T]his issue [referring to climate change] has absolutely nothing to do with pollution and air quality. Carbon dioxide is not a pollutant but an essential ingredient of life on this planet. . . . [T]he question of whether or not the trapping of 'greenhouse' gases will result in the planet's getting warmer . . . has no connection whatsoever with our day-to-day weather.

> There is absolutely no agreement among climatologists on whether or not the planet is getting warmer, or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate. . . . I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[222]

115.    Exxon paid for a series of "advertorials," advertisements located in the editorial section of *The New York Times* and meant to look like editorials rather than paid ads. These ads discussed various aspects of the public discussion of climate change and sought to undermine the justifications for tackling GHG emissions as unsettled science. For example, the 1993 Mobil

---

[221] Exxon Corp., *Global Warming: Who's Right?* (1996), https://perma.cc/77FT-9AKV.
[222] Robert Peterson, *A Cleaner Canada*, Imperial Oil Rev. 29 (1998), https://perma.cc/29RV-PXJU.

advertorial below argued that "what's wrong with so much of the global warming rhetoric" is "[t]he lack of solid scientific data," and quoted a purportedly neutral scientific expert who insisted that "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."[223] It also quoted another purportedly neutral scientist who asserted that "the net impact [of a modest warming] may yet be beneficial."

---

[223] Mobil, *Apocalypse No*, N.Y. Times, A19 (Feb. 25, 1993), https://perma.cc/MGA5-W43N.

# Apocalypse no

For the first half of 1992, America was inundated by the media with dire predictions of global warming catastrophes, all of which seemed to be aimed at heating up the rhetoric from the Earth Summit in Rio de Janeiro last June.

Unfortunately, the media hype proclaiming that the sky was falling did not properly portray the consensus of the scientific community. After the Earth Summit, there was a noticeable lack of evidence of the sky actually falling and subsequent colder than normal temperatures across the country cooled the warming hysteria as well.

Everybody, of course, remembers the Earth Summit and the tons of paper used up in reporting on it—paper now buried in landfills around the world. But few people ever heard of a major document issued at the same time and called the "Heidelberg Appeal." The reason? It just didn't make "news."

Perhaps that is because the Appeal urged Summit attendees to avoid making important environmental decisions based on "pseudo-scientific arguments or false and non-relevant data."

The Heidelberg Appeal was issued initially by some 264 scientists from around the world, including 52 Nobel Prize winners. Today, the Appeal carries the signatures of more than 2,300 scientists—65 of them Nobel Prize winners—from 79 countries. If nothing else, its message is illustrative of what's wrong with so much of the global warming rhetoric. The lack of solid scientific data.

Scientists can agree on certain facts pertaining to global warming. First, the greenhouse effect is a natural phenomenon; it accounts for the moderate temperature that makes our planet habitable. Second, the concentration of greenhouse gases (mainly carbon dioxide) has increased and there has been a slight increase in global temperatures over the past century. Finally, if present trends continue, carbon dioxide levels will double over the next 50 to 100 years.

Controversy arises when trying to link past changes in temperatures to increased concentrations of greenhouse gases. And it arises again when climate prediction models are used to conclude Earth's temperature will climb drastically in the next century and—based on such models—to propose policy decisions that could drastically affect the economy.

According to Arizona State University climatologist Dr. Robert C. Balling in his book, *The Heated Debate* (San Francisco: Pacific Research Institute for Public Policy, 1992), until knowledge of the interplay between oceans and the atmosphere improves, "model predictions must be treated with considerable caution." Moreover, models don't simulate the complexity of clouds, nor do they deal adequately with sea ice, snow or changes in intensity of the sun's energy.

And they don't stand up to reality testing. Comparing actual temperatures over the last 100 years against model calculations, the models predicted temperature increases higher than those that actually occurred. Moreover, most of the earth's temperature increase over the last century occurred before 1940. Yet, the real build-up in man-made $CO_2$ didn't occur until after 1940. Temperatures actually fell between 1940 and 1970.

Sifting through such data, Dr. Balling has concluded, "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."

Other scientists have an even more interesting viewpoint. Notes atmospheric physicist S. Fred Singer, president of the Washington, D.C.-based Science & Environmental Policy Project, "the net impact [of a modest warming] may well be beneficial."

All of which would seem to suggest that the jury's still out on whether drastic steps to curb $CO_2$ emissions are needed. It would seem that the phenomenon—and its impact on the economy—are important enough to warrant considerably more research before proposing actions we may later regret.

Perhaps the sky isn't falling, after all.



**Mobil**

**<u>Figure 7: 1993 Mobil Advertorial</u>**

The first of those purportedly neutral scientific experts, Robert C. Balling, acknowledged five years after the advertorial ran that he had received $408,000 in research funding from the fossil fuel industry over the past decade, including from Exxon.[224] The second, S. Fred Singer, was not a climatologist, and had previously been funded by tobacco companies to spread doubt about the scientific claim that exposure to second-hand smoke causes cancer.[225]

116.    Many other Exxon advertorials falsely or misleadingly characterized the state of climate science research to the readership of *The New York Times*' op-ed page. A sample of these untruthful statements includes:

- "We don't know enough about the factors that affect global warming and the degree to which—if any—that man-made emissions (namely, carbon dioxide) contribute to increases in Earth's temperature."[226]

- "[G]reenhouse-gas emissions, which have a warming effect, are offset by another combustion product—particulates—which leads to cooling."[227]

- "Even after two decades of progress, climatologists are still uncertain how—or even if—the buildup of man-made greenhouse gases is linked to global warming. It could be at least a decade before climate models will be able to link greenhouse warming unambiguously to human actions. Important answers on the science lie ahead."[228]

- "[I]t is impossible for scientists to attribute the recent small surface temperature increases to human causes."[229]

- "Within a decade, science is likely to provide more answers on what factors affect global warming, thereby improving our decision-making. We just don't have this information today. Answers to questions about climate change will require more reliable measurements of temperature at many places on Earth, better understanding of clouds and ocean currents along with greater computer power."[230]

---

[224] DeSmog, *Robert C. Balling, Jr.*, https://perma.cc/T6YY-SFFY (last visited Nov. 18, 2024).

[225] Naomi Oreskes & Erik M. Conway, *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming*, 150–54 (Bloomsbury Press, 1st ed. 2011).

[226] Mobil, *Climate Change: A Prudent Approach*, N.Y. Times (Nov. 13, 1997), https://perma.cc/8D9V-H88D.

[227] Mobil, *Less Heat, More Light on Climate Change*, N.Y. Times (July 18, 1996), https://perma.cc/BQJ3-4G2S.

[228] Mobil, *Climate Change: Where We Come Out*, N.Y. Times (Nov. 20, 1997), https://perma.cc/YX2Q-EZ87.

[229] ExxonMobil, *Unsettled Science* (Mar. 23, 2000), reproduced in https://perma.cc/YNM7-QT9J.

[230] Mobil, *Science: What We Know and Don't Know* (1997), reproduced in https://perma.cc/YNM7-QT9J.

117.    A peer-reviewed quantitative analysis of Exxon's climate communications between 1989 and 2004 found that, while 83% of the company's peer-reviewed papers and 80% of its internal documents acknowledged the reality and human origins of climate change, 81% of its advertorials communicated doubt about those conclusions.[231] Put differently, Exxon demonstrated a clear tendency to contradict its own peer-reviewed research in statements meant for lay audiences, including the State and its residents. Based on this "statistically significant" discrepancy between internal and external communications, the authors concluded that "ExxonMobil misled the public."[232]

118.    Fossil Fuel Defendants also worked jointly through industry and front groups such as Defendant API and other groups like ICE and the GCC to fund, conceive, plan, and carry out sustained and widespread campaigns of denial and disinformation about the existence of climate change and fossil fuel products' contribution to it, despite their own knowledge and the growing national and international scientific consensus about the hazards of doing so. The campaigns included a long-term pattern of direct misrepresentations and material omissions to consumers, as well as a plan to influence consumers indirectly by affecting public opinion through the mass dissemination of misleading research. Although Fossil Fuel Defendants were competitors in the marketplace, they combined and collaborated with each other and with industry and front groups such as Defendant API, and others like ICE and the GCC, on these public campaigns to misdirect and stifle public knowledge in order to inflate consumer demand for fossil fuels. The efforts included promoting hazardous fossil fuel products through advertising campaigns that failed to warn of the existential risks associated with the use of those products, and that were designed to influence consumers to continue using Fossil Fuel Defendants' fossil fuel products irrespective of those products' damage to communities and the environment.

119.    One of the key organizations used by Defendants to coordinate the fossil fuel industry's response to the world's growing awareness of climate change was the International

---

[231] Geoffrey Supran & Naomi Oreskes, *Assessing ExxonMobil's Climate Change Communications (1977– 2014)*, 12 Envtl. Rsch. Letter 12 (2017), https://perma.cc/3W29-Z9NY.
[232] *Id.*

Petroleum Industry Environmental Conservation Association ("IPIECA"). In 1987, the IPIECA formed a "Working Group on Global Climate Change" chaired by Duane LeVine, Exxon's manager for science and strategy development. The Working Group also included Brian Flannery from Exxon, Leonard Bernstein from Mobil, Terry Yosie from API, and representatives from BP, Shell, and Texaco (Chevron). In 1990, the Working Group sent a strategy memo created by LeVine to hundreds of oil companies around the world, including Defendants. This memo explained that, to forestall a global shift away from burning fossil fuels for energy, the industry should emphasize uncertainties in climate science and the need for further research.[233]

120.    In 1991, the Information Council for the Environment, also known as ICE, whose members included affiliates, predecessors and/or subsidiaries of Defendants, launched a national climate change science denial campaign with full-page newspaper ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. Included among the campaign strategies was a plan to "reposition global warming as theory (not fact)." The target audience for its "consumer-based media awareness program" included demographics who were "not typically active information-seekers" and thought to be "predisposed to favor the ICE agenda, and likely to be even more supportive of that agenda following exposure to new information."[234]

121.    A goal of ICE's advertising campaign was to change public opinion and consumer perceptions of climate risk. A memo from Richard Lawson, president of the National Coal Association, a predecessor to the National Mining Association, warned, "[p]ublic opinion polls reveal that 60% of the American people already believe global warming is a serious environmental problem. Our industry cannot sit on the sidelines in this debate."[235]

---

[233] Benjamin A. Franta, *Big Carbon's Strategic Response to Global Warming, 1950-2020*, 140 (2022) (Ph. D. Dissertation, Stanford Univ.), https://perma.cc/GCN6-CBN2.

[234] Union of Concerned Scientists, *Deception Dossier #5: Coal's "Information Council on the Environment" Sham*, 9, 16, 26 (1991), https://perma.cc/BN2P-FKYS (last visited Nov. 18, 2024).

[235] Naomi Oreskes, *My Facts Are Better Than Your Facts: Spreading Good News About Global Warming* (2010), in Peter Howlett et al., *How Well Do Facts Travel?:* The Dissemination of Reliable Knowledge, 149–50 (Cambridge Univ. Press 2011).

122.    The following images are examples of ICE-funded print advertisements challenging the validity of climate science and intended to obscure the scientific consensus on anthropogenic climate change in order to inflate consumer demand for fossil fuels:[236]



**Figure 8: Information Council for the Environment Advertisements**

123.    The Global Climate Coalition, also known as GCC, on behalf of Defendants and other fossil fuel companies, spent millions of dollars on deceptive advertising campaigns and misleading material to discredit climate science and generate public uncertainty around the climate debate, and thereby inflate consumer demand for fossil fuels. The GCC operated between 1989 and 2001. Its founding members included Defendants Exxon, Shell, and API. Defendants BP and Chevron also participated as members of the GCC. William O'Keefe, former president of the GCC, was also a former executive of API.[237] GCC's position on climate change contradicted decades of its members' internal scientific reports by asserting that natural trends, not human combustion of fossil fuels, was responsible for rising global temperatures:

> The GCC believes that the preponderance of the evidence indicates that most, if not all, of the observed warming is part of a natural warming trend which began approximately 400 years ago. If there is an anthropogenic component to this observed warming, the GCC believes that it must be very small and must be superimposed on a much larger natural warming trend.[238]

---

[236] Union of Concerned Scientists, *supra* note 234, at 47–49.

[237] Jeff Nesmith, *Industry Promotes Skeptical View of Global Warming*, Cox News Service (May 29, 2003).

[238] Glob. Climate Coal., *Global Climate Coalition: An Overview*, 2 (Nov. 1996), https://perma.cc/2R82-SXZN.

124.    The GCC's promotion of overt climate change denialism also contravened its internal assessment confirming that climate change was real and supported by overwhelming scientific evidence. In December 1995, the GCC's Science and Technology Advisory Committee ("GCC-STAC"), whose members included employees of Mobil Oil Corporation (an Exxon predecessor) and API, drafted a primer on the science of global warming for GCC members. The primer concluded that the GCC's contrarian theories "do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change." However, the GCC excluded this section from the publicly released version of the report.[239] Nonetheless, for years afterward, the GCC and its members continued to tout their contrarian theories about global warming, even though the GCC had admitted internally these arguments were invalid. Between 1989 and 1998, the GCC spent $13 million on one ad campaign to obfuscate the public's understanding of climate science and undermine its trust in climate scientists.[240] For example, the GCC distributed a video to hundreds of journalists, which claimed that carbon dioxide emissions would increase crop production and feed the hungry people of the world.[241]

125.    In a 1994 public report, the GCC stated that "observations have not yet confirmed evidence of global warming that can be attributed to human activities," and that "[t]he claim that serious impacts from climate change have occurred or will occur in the future simply has not been proven."[242] In 1994, the GCC Board of Directors was composed of high-level executives from API, Exxon, and Texaco (Chevron). Representatives from Shell, Amoco (BP), and BP were also GCC members at that time.[243] In 1995, the GCC published a booklet called "Climate Change: Your Passport to the Facts," which stated, "While many warnings have reached the popular press about

[239] Memorandum from Gregory J. Dana, Assoc. of Int'l Auto. Mfrs., to AIAM Technical Committee, *Global Climate Coalition (GCC) - Primer on Climate Change Science - Final Draft*, 16 (Jan. 18, 1996), https://perma.cc/C9FV-C35P.

[240] Wendy E. Franz, Kennedy Sch. of Gov't, Harvard Univ., *Science, Skeptics and Non-State Actors in the Greenhouse*, ENRP Discussion Paper E-98-18, 1, 13 (Sept. 1998), https://perma.cc/E4GR-8DK4.

[241] The Center for Media and Democracy, *Global Climate Coalition*, Source Watch, https://perma.cc/7K47-G6CP.

[242] GCC, *Issues and Options: Potential Global Climate Change,* Climate Files (1994), https://perma.cc/5RNF-BNH6.

[243] GCC, *supra* note 112.

the consequences of a potential man-made warming of the Earth's atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous warming will occur."[244] In 1995, GCC's Board of Directors included high-level executives from Texaco (Chevron), API, ARCO, and Phillips Petroleum Company.[245]

126.    In 1997, William O'Keefe, chairman of the GCC and executive vice president of API, falsely wrote in a *Washington Post* op-ed, "[c]limate scientists don't say that burning oil, gas, and coal is steadily warming the earth."[246] This statement contradicted the established scientific consensus as well as Defendants' own knowledge. Yet Defendants did nothing to correct the public record, and instead continued to fund the GCC's anti-scientific climate skepticism.

127.    In addition to publicly spreading false and misleading information about the climate science consensus, the GCC also sought to undermine credible climate science from within the IPCC. After becoming a reviewer of IPCC's Second Assessment Report in 1996, the GCC used its position to accuse the convening author of a key chapter in the Report of modifying its conclusions. The GCC claimed that the author, climatologist Ben Santer, had engaged in "scientific cleansing" that "understate[d] uncertainties about climate change causes and effect . . . to increase the apparent scientific support for attribution of changes to climate to human activities."[247] The GCC also arranged to spread the accusation among reporters, editors of scientific journals, and even the op-ed page of the *Wall Street Journal*.[248] This effort "was widely perceived to be an attempt on the part of the GCC to undermine the credibility of the IPCC."[249]

128.    In the late 1990s, alarmed by significant legal judgments against Big Tobacco for decades of publicly denying the health risks of smoking cigarettes, Defendants shifted away from openly denying anthropogenic warming and toward peddling a subtler but still deceptive form of

---

[244] GCC, *Climate Change: Your Passport to the Facts*, Climate Files (1995), https://perma.cc/W3FL-UPDH (last visited Nov. 14, 2024).

[245] 1995 GCC IRS 1024 and Attachments, *supra* note 113.

[246] William O'Keefe, *A Climate Policy*, The Wash. Post (July 4, 1997, 8:00 PM EDT), https://perma.cc/3EG7-8GRG.

[247] Franz, *supra* note 240, at 14.

[248] Oreskes & Conway, supra note 225, at 205–13; *see also* S. Fred Singer, *Climate Change and Consensus*, 271 Sci. 581 (Feb. 2, 1996); Frederick Seitz, *A Major Deception on 'Global Warming'*, Wall Street J. (June 12, 1996).

[249] Franz, *supra* note 240, at 15.

climate change skepticism. A Shell employee explained that the company "didn't want to fall into the same trap as the tobacco companies who have become trapped in all their lies."[250] Several large fossil fuel companies, including BP and Shell, left the GCC (although all Fossil Fuel Defendants remained members of API),[251] and Defendants began claiming they had accepted climate science all along.[252]

129.    Despite the shift in public messaging, Defendants surreptitiously continued to organize and fund programs designed to deceive the public about the weight and veracity of the climate science consensus. In 1998, API convened a Global Climate Science Communications Team ("GCSCT") whose members included representatives from Exxon, Chevron, and API. There were no scientists on the "Global Climate Science Communications Team." Steve Milloy (a key player in the tobacco industry's deception campaigns) and his organization, The Advancement of Sound Science Coalition ("TASSC"), were also founding members of the GCSCT. TASSC was a fake grassroots citizen group created by the tobacco industry to sow uncertainty by discrediting the scientific link between exposure to second-hand cigarette smoke and increased rates of cancer and heart disease. Philip Morris launched TASSC on the advice of its public relations firm, which advised Philip Morris that the tobacco company itself would not be a credible voice on the issue of smoking and public health. TASSC, through API and with the approval of Defendants, also became a front group for the fossil fuel industry beyond its role in GCSCT, using the same tactics it had honed while operating on behalf of tobacco companies to spread doubt about climate science. Although TASSC posed as a grassroots group of concerned citizens, it received significant funding from Defendants. For example, between 2000 and 2004, Exxon donated $50,000 to Milloy's Advancement of Sound Science Center; and an additional $60,000 to the Free Enterprise Education Institute (a.k.a. the Free Enterprise Action Institute), both of which were registered to Milloy's home address.[253] The GCSCT, including TASSC, represented a continuation of

---

[250] Nathaniel Rich, *Losing Earth: A Recent History*, 186 (London: Picador 2020).
[251] *Id.* at 177.
[252] Franta (2022), *supra* note 233, at 170.
[253] Union of Concerned Scientists, *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, 20 (July 16, 2007), https://perma.cc/44CD-ARPN.

Defendants' concerted actions to sow doubt and confusion about climate change in order to inflate consumer demand for fossil fuels.

130.    The GCSCT's and Defendants' concerted efforts involved a multi-million-dollar, multi-year plan that, among other elements, sought to: (a) "[d]evelop and implement a national media relations program to inform the media about uncertainties in climate science to generate national, regional, and local media coverage on the scientific uncertainties"; (b) "[d]evelop a global climate science information kit for media including peer-reviewed papers that undercut the 'conventional wisdom' on climate science"; (c) "[p]roduce . . . a steady stream of op-ed columns"; and (d) "[d]evelop and implement a direct outreach program to inform and educate members of Congress . . . and school teachers/students about uncertainties in climate science"[254]—a blatant attempt to deceive consumers and the public, including in Hawai'i, in order to ensure a continued and unimpeded market for fossil fuel products.

131.    Exxon, Chevron, and API directed and contributed to the development of the plan, which set forth the criteria by which the contributors would know when their efforts to manufacture doubt had been successful. "Victory," they wrote, "will be achieved when . . . average citizens 'understand' (recognize) uncertainties in climate science" and "recognition of uncertainties becomes part of the 'conventional wisdom.'"[255] In other words, the plan was crafted to achieve Defendants' goal of using disinformation to plant doubt about the reality of climate change in an effort to prevent consumers from accessing vital information, inflate consumer demand for fossil fuel products, and increase Fossil Fuel Defendants' already large profits.

132.    In furtherance of the strategies described in these memoranda, Defendants made misleading statements to consumers, including in Hawai'i, about climate change, the relationship between climate change and fossil fuel products, and the urgency of the problem. Defendants made these statements in public fora and in advertisements published in newspapers and other media

---

[254] E-mail from Joe Walker to Global Climate Science Team, *Draft Global Climate Science Communications Plan*, 5–7 (Apr. 3, 1998), https://perma.cc/7Y5L-YYA6.
[255] *Id.* at 4.

with substantial circulation to Hawaiʻi, including national publications such as *The New York Times*, *The Wall Street Journal*, and *The Washington Post*.

133.    Another key strategy in Defendants' efforts to discredit scientific consensus on climate change and the IPCC was to bankroll unqualified or unscrupulous scientists to advance fringe conclusions about climate change. These scientists obtained part or all of their research budget from Fossil Fuel Defendants directly or through Fossil Fuel Defendant-funded organizations like Defendant API.[256] During the early- to mid-1990s, Exxon directed some of this funding to Dr. Fred Seitz, Dr. Fred Singer, and/or Seitz and Singer's Science and Environmental Policy Project ("SEPP") in order to launch repeated attacks on mainstream climate science and IPCC conclusions, even as Exxon scientists participated in the IPCC.[257] Seitz and Singer were not climate scientists. Rather, they and SEPP had previously been paid by the tobacco industry to create doubt in the public mind about the hazards of smoking.[258] Singer also acted as a paid consultant for Sun (Sunoco) and Shell.[259]

134.    Industry-funded scientists frequently failed to disclose their fossil fuel industry underwriters.[260] At least one, Dr. Wei-Hock Soon, contractually agreed to allow donors to review his research before publication, and his housing institution agreed not to disclose the funding arrangement without prior permission from his fossil fuel donors.[261] Between 2001 and 2012, various fossil fuel interests, including Exxon and API, paid Soon over $1.2 million.[262] "Dr. Soon, in correspondence with his corporate funders, described many of his scientific papers as 'deliverables' that he completed in exchange for their money."[263] His Defendant-funded research

---

[256] *E.g.*, Willie Soon & Sallie Baliunas, *Proxy Climatic and Environmental Changes of the Past 1000 Years*, 23 Climate Rsch. 89, 105 (Jan. 31, 2003), https://perma.cc/9V32-EY8H.

[257] Union of Concerned Scientists (2007), *supra* note 253.

[258] The Center for Media and Democracy, *S. Fred Singer*, Source Watch, https://perma.cc/X35L-DYUY; The Center for Media and Democracy, *Frederick Seitz*, https://perma.cc/TV67-ABUH.

[259] *Id.*

[260] *E.g.*, *Smithsonian Statement: Dr. Wei-Hock (Willie) Soon*, Smithsonian (Feb. 26, 2015), https://perma.cc/A4KY-W3NM.

[261] Union of Concerned Scientists, *The Climate Deception Dossier #1: Dr. Wei-Hock Soon's Smithsonian Contracts*, 6 (2015), https://perma.cc/JL2V-XYGL.

[262] Justin Gillis & John Schwartz, *Deeper Ties to Corporate Cash for Doubtful Climate Researcher*, N.Y. Times (Feb. 21, 2015), https://perma.cc/897V-7B22.

[263] *Id.*

includes articles in scientific journals accusing the IPCC of overstating the negative environmental effects of carbon dioxide emissions and arguing that the sun is responsible for recent climate trends. Soon was the lead author of a 2003 article that argued that the climate had not changed significantly. The article was widely promoted by other denial groups funded by Exxon, including via "Tech Central Station," a website supported by Exxon.[264] Soon published other bogus "research" in 2009, attributing global warming to solar activity, for which Exxon paid him $76,106.[265] This 2009 grant was made several years after Exxon had publicly committed not to fund climate change deniers.[266]

135.    Defendants have also funded dozens of think tanks, front groups, and dark money foundations pushing climate change denial. These include the Competitive Enterprise Institute, the Heartland Institute, Frontiers for Freedom, Committee for a Constructive Tomorrow, and Heritage Foundation. According to the Union of Concerned Scientists, from 1998 to 2017, Exxon spent over $36 million funding numerous organizations misrepresenting the scientific consensus[267] that fossil fuel products were causing climate change. Several Defendants have been connected to other groups that undermine the scientific basis linking fossil fuel products to climate change and sea level rise, including the Frontiers of Freedom Institute and the George C. Marshall Institute.

136.    Philip Cooney, an attorney at API from 1996 to 2001, testified at a 2007 Congressional hearing that it was "typical" for API to fund think tanks and advocacy groups that minimized fossil fuels' role in causing climate change.[268]

137.    Creating a false perception of disagreement in the scientific community (despite the consensus that its own scientists, experts, and managers had previously acknowledged) disrupted vital channels of communication between scientists and the public. A 2007 Yale University-Gallup poll found that only 48% of Americans believed that there was a consensus among the scientific

---

[264] Union of Concerned Scientists (2007), *supra* note 253, at 13–15.

[265] *Willie Soon FOIA Grants Chart* (Jan. 28, 2011), https://perma.cc/LJA5-BEQM.

[266] ExxonMobil, *2007 Corporate Citizenship Report*, 39 (2007), https://perma.cc/G4DK-TZGS.

[267] Union of Concerned Scientists, *ExxonMobil Foundation & Corporate Giving to Climate Change Denier & Obstructionist Organizations* (1998–2017), https://perma.cc/W3Q4-PCX2.

[268] Transcript of Deposition of Philip Cooney, U.S., House of Reps., Exec. Session Comm. on Oversight and Gov't, 32:3–5 (Mar. 12, 2007), https://perma.cc/M8YK-CWD4.

community that global warming was happening, and 40% believed there was a lot of disagreement among scientists over whether global warming was occurring.[269] Eight years later, a 2015 Yale-George Mason University poll found that "[o]nly about one in ten Americans understands that nearly all climate scientists (over 90%) are convinced that human-caused global warming is happening, and just half . . . believe a majority do."[270] Further, it found that 33% of Americans believe that climate change is mostly due to natural causes, compared to the 97% of peer-reviewed papers that acknowledge that global warming is real and at least partly human-caused.[271] The lack of progress, and even the regress, in the public understanding of climate science over this period—during which Defendants professed to accept the conclusions of mainstream climate science—demonstrates the success of Defendants' campaign to thwart dissemination of genuine scientific expertise and accurate information to the public regarding the effects fossil fuel consumption.

138.    As a result of Defendants' tortious, false, and misleading conduct, consumers of Fossil Fuel Defendants' fossil fuel products in Hawai'i and elsewhere have been deliberately and unnecessarily deceived about: the role of fossil fuel products in causing global warming, sea level rise, disruptions to the hydrologic cycle, and increased extreme precipitation, heat waves, and other consequences of the climate crisis; the acceleration of global warming since the mid-twentieth century and the continuation thereof; and the fact that the continued increase in fossil fuel consumption creates severe environmental threats and significant economic costs for coastal states, including Hawai'i. Consumers in Hawai'i and elsewhere have also been deceived about the depth and breadth of the state of the scientific evidence on anthropogenic climate change and, in particular, about the scientific consensus confirming the role of fossil fuels in causing both climate change and a wide range of potentially destructive impacts, including sea level rise, disruptions to the hydrologic cycle, extreme precipitation, heat waves, and associated consequences.

---

[269] *American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll*, Yale Program on Climate Change Commc'n (July 31, 2007), https://perma.cc/JU76-XV82.

[270] Anthony Leiserowitz et al., *Climate Change in the American Mind*, Yale Program on Climate Change Commc'n. & George Mason Univ., Ctr. for Climate Change Commc'n, 9 (Oct. 2015), https://perma.cc/4M77-25RM.

[271] *Id.* at 7.

**D.**    **In Contrast to Public Misrepresentations About the Risks of Climate Change, Fossil Fuel Defendants' Internal Actions Demonstrate Their Awareness of and Intent to Profit from Uses of Fossil Fuel Products They Knew Were Hazardous.**

139.    In contrast to their public-facing efforts challenging the validity of the scientific consensus about anthropogenic climate change, Fossil Fuel Defendants' acts and omissions evidence their internal acknowledgement of the reality of climate change and its likely consequences. Those actions include, but are not limited to, making multi-billion-dollar infrastructure investments to protect their own operations against anthropogenic climate change-related hazards such as: raising offshore oil platforms to protect against sea level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm severity; developing technology and infrastructure to extract, store, and transport fossil fuels in a warming arctic environment; and developing and patenting designs for equipment intended to extract crude oil and/or natural gas in areas previously unreachable because of the presence of polar ice sheets.[272]

140.    For example, oil and gas reserves in the Arctic that were not previously reachable due to sea ice are becoming increasingly reachable as sea ice thins and melts due to climate change.[273] In 1973, Exxon obtained a patent for a cargo ship capable of breaking through sea ice[274] and for an oil tanker[275] designed specifically for use in previously unreachable areas of the Arctic.

141.    In 1974, Chevron obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses,[276] allowing for drilling in areas with increased ice floe movement due to elevated temperature.

---

[272] Amy Lieberman & Susanne Rust, *Big Oil Braced for Global Warming While It Fought Regulations*, L.A. Times (Dec. 31, 2015), https://perma.cc/PWZ4-L9LC.

[273] James Henderson & Julia Loe, *The Prospects and Challenges for Arctic Oil Development,* Oxford Inst. for Energy Stud., 1 (Nov. 2014), https://perma.cc/VDJ3-U5FZ.

[274] Icebreaking Cargo Vessel, ExxonMobil Techn. & Rsch. Eng'g Co., U.S. Patent No. 3727571A (filed July 7, 1971) (issued Apr. 17, 1973), https://perma.cc/YF73-R6AG.

[275] Tanker Vessel, ExxonMobil Rsch. Eng'g Co., U.S. Patent No.3745960A (filed May 6, 1971) (issued July 17, 1973), https://perma.cc/WL9C-DQ99.

[276] Arctic Offshore Platform, Chevron Rsch. & Techn. Co., U.S. Patent No. 3831385A (filed June 26, 1972) (issued Aug. 27, 1974), https://perma.cc/MF5D-DSM9.

142.    That same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions,[277] allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.

143.    In 1984, Shell obtained a patent for an Arctic offshore platform adapted for conducting operations in the Beaufort Sea, an area that previously was largely unreachable because of ice but has become increasingly accessible as polar ice has melted.[278]

144.    As described below, in 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea level rise. Those design changes were ultimately carried out by Shell's contractors, adding substantial costs to the project.[279]

a.    The Troll natural gas and oil field, off the Norwegian coast in the North Sea, was proven to contain large natural oil and gas deposits in 1979, shortly after Norske Shell was approved by Norwegian oil and gas regulators to operate a portion of the field.

b.    In 1986, the Norwegian parliament granted Norske Shell authority to complete the first development phase of the Troll field gas deposits, and Norske Shell began designing the "Troll A" gas platform, with the intent to begin operation of the platform in approximately 1995. Based on the very large size of the gas deposits in the Troll field, the Troll A platform was projected to operate for approximately 70 years.

c.    The platform was originally designed to stand approximately 100 feet above sea level—the amount necessary to stay above waves in a once-in-a-century strength storm.

d.    In 1989, Shell engineers revised their plans to increase the above-water height of the platform by 3 to 6 feet, specifically to account for higher anticipated average sea

---

[277] Mobile, Arctic Drilling and Production Platform, Texaco Inc., U.S. Patent No. 3793840A (filed Oct. 18, 1971) (issued Jan. 24, 1974), https://perma.cc/2TB6-WBY9.

[278] Arctic Offshore Platform, Shell Oil Co., U.S Patent No. 4427320A (filed Feb. 19, 1982) (issued Jan. 24, 1984), https://perma.cc/YXH9-CS2B.

[279] *Greenhouse Effect: Shell Anticipates a Sea Change*, N.Y. Times (Dec. 20, 1989), https://perma.cc/PJV7-6H25.

levels and increased storm intensity due to global warming over the platform's 70-year operational life.[280]

     e.    Shell projected that the additional 3 to 6 feet of above-water construction would increase the cost of the Troll A platform by as much as $32 million.

145.    In 1989, Esso Resources Canada (Exxon) commissioned a report on the impacts of climate change on existing and proposed natural gas facilities in the Mackenzie River Valley and Delta, including extraction facilities on the Beaufort Sea and a pipeline crossing Canada's Northwest Territory.[281] It reported that "large zones of the Mackenzie Valley could be affected dramatically by climatic change" and that "the greatest concern in Norman Wells [oil town in North West Territories, Canada] should be the changes in permafrost that are likely to occur under conditions of climate warming."[282] The report concluded that, in light of climate models showing a "general tendency towards warmer and wetter climate," operation of those facilities would be compromised by increased precipitation, increase in air temperature, changes in permafrost conditions, and, significantly, sea level rise and erosion damage.[283] The authors recommended factoring those eventualities into future development planning and also warned that "a rise in sea level could cause increased flooding and erosion damage on Richards Island."

146.    In the mid-1990s, Exxon, Shell, and Imperial Oil (Exxon) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's Environmental Impact Statement declared, "The impact of a global warming sea level rise may be particularly significant in Nova Scotia. The long-term tide gauge records at a number of locations along the N.S. coast have shown sea level has been rising over the past century. . . . For the design of coastal and offshore structures,

---

[280] *Id.*; Lieberman & Rust, *supra* note 272.

[281] *See* Stephen Lonergan & Kathy Young, *An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic*, 7 Energy Exploration & Exploitation 359–81 (1989).

[282] *Id.* at 369, 376.

[283] *Id.* at 360, 377–78.

an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for the proposed project life (25 years)."[284]

E.    **Defendants Slowed the Development of Alternative Energy Sources and Knowingly Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis.**

147.    As GHG pollution accumulates in the atmosphere, some of which does not dissipate for potentially thousands of years (namely $CO_2$), climate changes and consequent adverse environmental changes compound, and their frequencies and magnitudes increase—a phenomenon about which Defendants were keenly aware for decades. As those adverse environmental changes compound and their frequencies and magnitudes increase, so too do the physical, environmental, economic, and social injuries that result from them.

148.    By sowing doubt about the future consequences of unrestricted fossil fuel consumption, Defendants' deception campaign successfully delayed the transition to alternative energy sources, which Defendants forecasted could penetrate half of a competitive energy market in 50 years if allowed to develop unimpeded. This delay caused the emission of huge amounts of avoidable GHGs and has increased the magnitude of and cost to address environmental harms, including in Hawaiʻi, that have already occurred or are unavoidable due to previous emissions.

149.    Knowledge of the full extent of the risks associated with the routine use of fossil fuel products is material to consumers' decisions to purchase and use those products. Had consumer demand to transition away from fossil fuels—and the market for affordable, reliable sources of clean energy—been allowed to develop earlier had Defendants provided warnings commensurate with the risks and absent Defendants' deception, the subsequent impacts of climate change could have been avoided or reduced.

150.    As with cigarettes, history demonstrates that when consumers are made aware of the extent of the harmful effects or qualities of the products they purchase, they often choose to stop purchasing them, to reduce their purchases, or to make different purchasing decisions. This

---

[284] ExxonMobil, *Sable Project: Development Plan, Vol. 3: Environmental Impact Statement*, 4–77 (Feb. 1996), https://web.archive.org/web/20151106083051/http://soep.com/about-the-project/development-plan-application.

phenomenon holds especially true when products have been shown to harm public health or the environment. For example, increased consumer awareness of the role of pesticides in harming human health, worker health, and the environment has spurred a growing market for food grown organically and without the use of harmful pesticides. With access to information about how their food is grown, consumers have demanded healthier choices, and the market has responded.

151.    A consumer who received accurate information about how fossil fuel use was a primary driver of climate change, and about the true extent of the resultant dangers and impacts to the environment and to public health, likely would have decreased their use of fossil fuel products and/or demanded lower-carbon transportation options. Indeed, recent studies and surveys have found that consumers with substantial awareness of climate change are largely willing "to change their consumption habits . . . to help reduce the impacts of climate change."[285] In addition, informed consumers often attempt to contribute toward solving environmental problems by supporting companies that they perceive to be developing "green" or more environmentally friendly products.[286] If consumers had been aware of what Defendants knew about climate change when Defendants knew it, many consumers likely would have opted to use less carbon-intense travel; avoid or combine car travel trips; carpool; switch to more fuel-efficient vehicles, hybrid vehicles, or electric vehicles; demand more charging infrastructure for electric vehicles; use a car-sharing service; seek transportation alternatives all or some of the time, if and when available (e.g., public transportation, biking, or walking); electrify houses and office buildings; or adopt any combination of these choices. Consumers, including in Hawai'i, were deprived of the knowledge to make these choices.

152.    Defendants have been aware for decades that clean energy presents a feasible alternative to fossil fuels. In 1980, Exxon forecasted that non-fossil fuel energy sources, if pursued,

---

[285] *Changes in Consumers' Habits Related to Climate Change May Require New Marketing and Business Models*, The Conf. Bd. (Oct. 26, 2022), https://perma.cc/2FFC-WYAY.

[286] *See, e.g.*, Anthony Leiserwitz et al., *Consumer Activism on Global Warming,* Yale Program on Climate Change Commc'n & George Mason Univ. Ctr. for Climate Change Commc'n, George Mason University, eds (Sept. 2021), https://perma.cc/5VXC-BN2H.

could penetrate half of a competitive energy market in approximately 50 years.[287] This internal estimate was based on extensive modeling within the academic community, including research conducted by the Massachusetts Institute of Technology's David Rose, which concluded that a transition to non-fossil energy could be achieved in around 50 years. Exxon circulated an internal memo approving of Rose's conclusions, stating they were "based on reasonable assumptions."[288] But instead of warning consumers about the dangers of burning fossil fuels, Defendants chose to deceive consumers and restrict the availability of truthful information in the market to preserve Fossil Fuel Defendants' profits and assets. As a result, much time has been lost during which consumers and market forces would have spurred a societal transition away from fossil fuels, which would have reduced or eliminated entirely the harmful effects of climate change in Hawai'i.

153.    The costs of inaction on anthropogenic climate change and its adverse environmental effects were understood by Defendants. In a 1997 speech by John Browne, Group Executive for BP America, at Stanford University, Browne described Defendants' knowledge of foreseeable climate change and the entire fossil fuel industry's responsibility and opportunities to reduce use of fossil fuel products, reduce global $CO_2$ emissions, and mitigate the harms associated with the use and consumption of such products, but misleadingly described BP's own actions:

> A new age demands a fresh perspective of the nature of society and responsibility. We need to go beyond analysis and to take action. It is a moment for change and for a rethinking of corporate responsibility. . . .

> [T]here is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature.

> The prediction of the IPCC is that over the next century temperatures might rise by a further 1 to 3.5 degrees centigrade [1.8º–6.3º F], and that sea levels might rise by between 15 and 95 centimetres [5.9 and 37.4 inches]. Some of that impact is probably unavoidable, because it results from current emissions. . . .

> [I]t would be unwise and potentially dangerous to ignore the mounting concern.

---

[287] Shaw, *supra* note 164, at 5.
[288] Exxon Research and Engineering Company, Coordination and Planning Division, *CO₂ Greenhouse Effect: A Technical Review*, at 17–18 (Apr. 1, 1982), https://perma.cc/83JJ-27CW.

. . .

We [the fossil fuel industry] have a responsibility to act, and I hope that through our actions we can contribute to the much wider process which is desirable and necessary.

BP accepts that responsibility and we're therefore taking some specific steps.

To control our own emissions.
To fund continuing scientific research.
To take initiatives for joint implementation.
To develop alternative fuels for the long term.[289]

154.    Defendants' own knowledge of foreseeable climate change harms and their acknowledged responsibility to act to abate climate change make it all the more egregious that Defendants chose to cast doubt upon the scientific consensus on climate change, and deceived consumers about the relationship between consumption of fossil fuels and climate change and the magnitude of the threat posed by fossil fuel use. Consumers equipped with complete and accurate knowledge about the climate and the public health effects of continued consumption of fossil fuels likely would have reduced fossil fuel consumption and formed a receptive customer base for clean energy alternatives decades before such demand in fact developed. Instead, Defendants' campaign of deception allowed them to exploit public uncertainty to reap substantial profits.

155.    The delayed emergence of a scalable market for non-fossil fuel energy is attributable in substantial part to Defendants' deception and their obfuscation of the reality and severity of the climatic consequences associated with normal use of fossil fuels. The societal transition to a low-carbon economy would have been far cheaper had Defendants issued reasonable warnings about the dangers of runaway consumption of fossil fuels of which they were aware.

156.    Despite Defendants' knowledge of the foreseeable, measurable, and significant harms associated with the unrestrained consumption and use of fossil fuel products, and despite Defendants' knowledge of technologies and practices that could have helped to reduce the foreseeable dangers associated with fossil fuel products, Defendants continued to misleadingly and

[289] Browne, *supra* note 201.

100

wrongfully market and promote heavy fossil fuel use and mounted a campaign to obscure the connection between fossil fuel products and the climate crisis, dramatically increasing the costs of abatement. This campaign was intended to and did reach and influence consumers and the public, including in Hawaiʻi.

157.   For example, in 2006, Exxon wrote a letter to the Royal Society recognizing that "the accumulation of greenhouse gases in the Earth's atmosphere poses risks that may prove significant for society and ecosystems." "Yet behind closed doors, Exxon took a very different tack: Its executives strategized over how to diminish concerns about warming temperatures, and they sought to muddle scientific findings that might hurt its oil-and-gas business."[290]

158.   Fossil Fuel Defendants were deeply familiar with opportunities to reduce the use of their fossil fuel products and associated global greenhouse emissions, mitigate the harms associated with the use and consumption of their products, and promote the development of alternative, clean energy sources. Examples of that recognition include, but are not limited to, the following:

a.   In 1963, Esso (Exxon) obtained multiple patents on technologies for fuel cells,[291] including on the design of a fuel cell and necessary electrodes,[292] and on a process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.[293]

b.   In 1970, Esso (Exxon) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines (the system also increased the efficiency of the

[290] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, The Wall Street J. (Sept. 14, 2023, 5:30 am ET), https://perma.cc/9BQ4-UN3C.

[291] Fuel cells use the chemical energy of hydrogen or other fuels to produce electricity. *See* U.S. Dep't of Energy, *Fuel Cells*, https://perma.cc/6W5L-EZGV.

[292] Fuel Cell and Fuel Cell Electrodes, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3116169A (filed Mar. 14, 1960) (issued Dec. 31, 1963), https://perma.cc/8NKJ-DEUL.

[293] Direct Production of Electrical Energy from Liquid Fuels, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3113049A (filed Jan. 3, 1961) (issued Dec. 3, 1963), https://perma.cc/CWW4-W4MF.

fossil fuel products used in such engines, thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology).[294]

        c.      In 1980, Imperial Oil wrote in its "Review of Environmental Protection Activities for 1978–79": "There is no doubt that increases in fossil fuel usage and decreases in forest cover are aggravating the potential problem of increased $CO_2$ in the atmosphere. Technology exists to remove $CO_2$ from stack gases but removal of only 50% of the $CO_2$ would double the cost of power generation."[295]

        d.      A 1987 company briefing Shell produced on "Synthetic Fuels and Renewable Energy" noted that while "immediate prospects" were "limited," "nevertheless it is by pursuing commercial opportunities now and in the near future that the valuable experience needed for further development will be gained." The brief also noted that "the task of replacing oil resources is likely to become increasingly difficult and expensive and there will be a growing need to develop lean, convenient alternatives. Initially these will supplement and eventually replace valuable oil products . . . Many potential energy options are as yet unknown or at very early stages of research and development. New energy sources take decades to make a major global contribution. Sustained commitment is therefore needed during the remainder of this century to ensure that new technologies and those currently at a relatively early stage of development are available to meet energy needs in the next century."[296]

        e.      A 1989 article in a publication from Exxon Corporate Research for company use only stated: "$CO_2$ emissions contribute about half the forcing leading to a potential enhancement of the Greenhouse Effect. Since energy generation from fossil fuels dominates modern $CO_2$ emissions, strategies to limit $CO_2$ growth focus near term on energy efficiency and long term on developing alternative energy sources. Practiced at a level to significantly reduce the growth of greenhouse gases, these actions would have substantial impact on society and our

---

[294] Low-polluting Engine and Drive System, ExxonMobil Rsch. Eng'g Co., U.S. Patent No. 3513929A (filed Aug. 25, 1967) (issued May 26, 1970), https://perma.cc/N4AF-2M67.

[295] Imperial Oil Ltd., *Review of Environmental Protection Activities for 1978–1979* 2 (Aug. 6, 1980), https://perma.cc/T68E-Q3JB.

[296] Shell Briefing Serv., *Synthetic Fuels and Renewable Energy*, 2 SBS (1987), https://perma.cc/CK92-YZC4.

industry—near-term from reduced demand for current products, long term from transition to entirely new energy systems."[297]

159.    Defendants could have taken practical, cost-effective steps to mitigate the risks posed by fossil fuel products. Those alternatives could have included, among other measures:

a.    Acknowledging scientific evidence of anthropogenic climate change and the damages it is causing and will cause people, communities, and the environment. Acceptance of that evidence, along with associated warnings and actions, would have allowed the public and the State to move beyond debating *whether* climate change was occurring to deciding *how* to combat it; avoided much of the public confusion that has ensued over more than 30 years, since no later than 1988; and contributed to an earlier and quicker transition to energy sources compatible with minimizing catastrophic climatic consequences.

b.    Forthrightly communicating with Fossil Fuel Defendants' shareholders, consumers, banks, insurers, the public, and the State and warning them about the climate hazards of Fossil Fuel Defendants' fossil fuel products that were known to Defendants, which would have enabled those groups to make material, informed decisions about whether and how to address climate change and sea level rise vis-à-vis Fossil Fuel Defendants' products—including whether and how much to invest in alternative clean energy sources compared to fossil fuels;

c.    Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort consumer awareness of the climatic dangers of fossil fuels, and to cause many consumers and business leaders to think the relevant science was far less certain that it actually was; and

d.    Sharing their internal scientific research with consumers and the public, and with other scientists and business leaders, to increase public understanding of the scientific underpinnings of climate change and its relation to Fossil Fuel Defendants' fossil fuel products.

---

[297] Brian Flannery, *Greenhouse Science*, Connections, Exxon Rsch. & Eng'g Co. (Fall 1989), https://perma.cc/A4MC-67LC.

**F.    Defendants Continue to Deceive Hawaiʻi Consumers Through Misleading Advertisements That Portray the Fossil Fuel Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change.**

160.    Defendants' coordinated campaign of disinformation and deception continues today, even as the scientific consensus about the causes and consequences of climate change has strengthened. Fossil Fuel Defendants have falsely claimed through advertising campaigns in Hawaiʻi and/or campaigns intended to reach Hawaiʻi that their businesses are substantially invested in lower-carbon technologies and renewable energy sources. In truth, however, each Fossil Fuel Defendant has invested minimally in renewable energy while continuing to expand its fossil fuel production. Reasonable consumers exposed to Fossil Fuel Defendants' advertisements would understand Fossil Fuel Defendants to be far more substantially invested in alternative energy sources than in fact is the case—this is deception. Defendants have also claimed that some of their fossil fuel products are "green" or "clean," and that using these products will sufficiently reduce or mitigate the dangers of climate change. None of Fossil Fuel Defendants' fossil fuel products are "green" or "clean" because they all continue to cause climate change and related impacts, and this marketing misleadingly minimizes these products' adverse environmental impacts and induces consumers to purchase these products under false impressions. Collectively, these more recent deceptive promotional statements and practices are referred to as "greenwashing."

161.    Fossil Fuel Defendants intentionally greenwash their own brands and their fossil fuel products to maximize profit from fossil fuel consumption. Greenwashing is designed to increase consumption by portraying positive but false representations of Fossil Fuel Defendants and their products. While greenwashing occurs in many different forms—e.g., false advertising about "green" or "clean" fossil fuel products, or social media campaigns about Fossil Fuel Defendants' commitments to the environment or to renewable energy—the common purpose of all greenwashing is to create a positive, but false, narrative about Fossil Fuel Defendants and their products. That false narrative drives brand loyalty and trust among consumers, alters consumer behavior, and thus increases consumption of fossil fuel products. Greenwashing is especially

104

misleading today because consumers increasingly prioritize environmental sustainability, even when that means paying more, and because consumers report positive associations with brands that portray themselves as "green" or as committed to renewable energy.[298] Because consumers may conflate greenhouse gas emissions and other air pollutants,[299] even advertising that does not explicitly mention greenhouse gases may create a misleading impression that a brand is climate-friendly.

162.    Fossil Fuel Defendants' misleading greenwashing campaigns are intended to and do reach and influence the public and consumers, including in Hawaiʻi. These campaigns are intended to capitalize on consumers' concerns about climate change and lead consumers to believe that Fossil Fuel Defendants are substantially diversified energy companies making meaningful investments in low-carbon energy compatible with minimizing catastrophic climate change. At bottom, these deceptive campaigns are intended "to induce false positive perceptions"[300] of the Fossil Fuel Defendants' commitment to the environment while downplaying or otherwise concealing the role their fossil fuel products play in bringing about catastrophic climate harms.

163.    Fossil Fuel Defendants' greenwashing extends to their professed support for the Paris Agreement. Publicly, multiple Fossil Fuel Defendants pledged to help meet the goals of the agreement. Privately, they viewed participation and support for the agreement as politically convenient, risk-free, and unburdened by the necessity of any meaningful corresponding action on their part.[301] The Paris Agreement proved to be an opportunity for Fossil Fuel Defendants to tout their environmental bona fides by overemphasizing their minimal investments in clean or renewable forms of energy while they knowingly pursued business strategies undermining the

---

[298] Ronald S. Friedman & Dylan S. Campbell, *An Experimental Study of the Impact of Greenwashing on Attitudes toward Fossil Fuel Corporations' Sustainability Initiatives*, 17 Env't Commc'n 486 (2023), https://perma.cc/4JNF-UTKZ; *see also* Ravi Dutta-Powell et al., *Two Interventions for Mitigating the Harms of Greenwashing on Consumer Perceptions*, BIT Working Paper No. 001 (2023), https://perma.cc/S59N-ECV2.

[299] *E.g.*, Charlotte Noël et al., *The Public's Perceptions of Air Pollution. What's in a Name?* Environ Health Insights (Sep. 21 2022), doi: 10.1177/11786302221123563; Ann Bostrom et al., *Causal Thinking and Support for Climate Change Policies: International Survey Findings*, 22 Global Environmental Change 210 (Feb. 2012), https://doi.org/10.1016/j.gloenvcha.2011.09.012.

[300] Noémi Nemes et al., *An Integrated Framework to Assess Greenwashing*, 14 Sustainability 4431 (2022), https://perma.cc/H4AF-9VA3.

[301] *Denial, Disinformation, and Doublespeak*, *supra* note 108, at 17–21.

agreement's goal of limiting global warming to 2 degrees Celsius.[302] For example, Exxon publicly announced its support for the Paris Agreement in 2015, and reiterated its support in 2021. However, in a 2019 memo circulated to high-level executives at the Oil and Gas Climate Initiative ("OGCI"), an Exxon official recommended that the group remove all references to its support for the agreement in any public-facing document so as to avoid "commit[ting] [OGCI] members to enhanced climate-related governance, strategy, risk management, and performance metrics and targets."[303] Meanwhile, in 2024 Exxon announced that it would increase oil and gas production by about 10% over the next four years.[304]

164.    Fossil Fuel Defendants also engaged in doublespeak regarding their commitments to emission reduction measures, professing their support for such things as federal methane emissions regulations on one hand while lobbying against them on the other.[305] Moreover, in a bid to "stave off future regulation," Fossil Fuel Defendants, through a program convened by API, voluntarily pledged to limit their methane emissions.[306] Beyond methane emissions, multiple Fossil Fuel Defendants have pledged to meet certain emission reduction targets.[307] These pledges, however, elide continued long-term commitments to oil and gas production and internal doubts about the ability of the Fossil Fuel Defendants to actually meet their emissions targets.[308]

165.    Likewise, multiple Fossil Fuel Defendants widely promoted their token investments in carbon capture and other emissions-reducing technologies like algae-based biofuels despite concerns about their scalability and cost. For example, in an advertisement Exxon described its investment and utilization of carbon capture technology as "one way ExxonMobil is

---

[302] *Id*. at 18.

[303] *Id*. at 18 (quoting Doc. No. EM-HCOR3-00064980).

[304] *Id*.

[305] *Id*. at 25.

[306] *Id*. at 24, 26 (quoting Doc. No. BPA_HCOR_00039279 ("You begin by doing things voluntarily and then that (and not much more) becomes the regulation.")).

[307] *Id*. at 11.

[308] *See e.g., id*. at 14 (citing Doc No. SOC-HCOR-045422 (email thread in which Shell employee writes that "any credible route to net-zero emission requires significant electrification of end use as well as biofuels, hydrogen and some degree of carbon capture and storage)), (citing Doc. No. SOC-HCOR-391063 (*New York Magazine* article quoting Shell's Chief Economist as saying "We're going to get as much out of [oil and gas] for as long as we can")).

helping industrial plants . . . be more like plants."[309] The goal of such advertising was to convince people that "ExxonMobil is actively working on effective ways to reduce the world's $CO_2$ levels."[310] However, Exxon itself admitted that to reach net zero by 2050, carbon capture technology would need to be deployed at 185 times its current rate of deployment.[311] Indeed, Fossil Fuel Defendants viewed one of the key benefits of carbon capture technology as "sustain[ing] gas demand growth for longer[.]"[312] Similarly, beginning in 2008, multiple Fossil Fuel Defendants heavily promoted their funding and development of algae-based biofuels as viable clean energy alternatives only for all such efforts to be terminated by 2023 amid internal doubts about the technology's practicability.[313]

166.  Contrary to their messaging about commitments to low-carbon energy and energy diversification, however, Fossil Fuel Defendants' spending on low-carbon energy is substantially and materially less than Fossil Fuel Defendants indicate to consumers. For example, according to a recent analysis, between 2010 and 2018, BP spent 2.3% of total capital spending on low-carbon energy sources, Shell spent 1.33%, Chevron spent 0.23%, Exxon spent 0.22%, and ConocoPhillips spent 0.03%, despite an array of greenwashing advertisements and promotion conveying these companies as committed to green, clean, or sustainable energy.[314]

167.  Ultimately, although Fossil Fuel Defendants currently claim to support reducing GHG emissions, their conduct belies these statements. Fossil Fuel Defendants have continued to ramp up fossil fuel production globally; to invest in new fossil fuel development, including in shale oil production and shale gas fracking—some of the most carbon-intensive extraction projects; and to plan for unabated oil and gas exploitation indefinitely into the future.

---

[309] *Id*. at 31 (citing Doc. Nos. EM-HCOR3-00524824, EM-HCOR3-00519383, EM-HCOR3-00519355).

[310] *Id*. (quoting Doc. No. EM-HCOR3-00298426).

[311] *Id*. at 32 (citing ExxonMobil, Emissions (online at https://corporate.exxonmobil.com/what-we-do/energy-supply/globaloutlook/emissions) (accessed Apr. 29, 2024)).

[312] *Id*. at 34 (quoting Doc. No. BPA_HCOR_00037840; BPA_HCOR_00049634).

[313] *Id*. at 34−35 ("Exxon spent nearly half as much on *advertising* algae as a climate solution as it did on actually *researching* it.").

[314] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX.

168.    For example, Exxon's 2023 Corporate Plan update states that the company expects its oil and gas production to rise from 3.8 million oil-equivalent barrels per day in 2024 to about 4.2 million oil-equivalent barrels per day by 2027.[315] Exxon anticipates capital expenditures of between $23 billion and $27 billion annually through 2027, and says that it will "pursu[e]" $20 billion of vaguely-defined "lower-emissions opportunities" through 2027.[316] In 2023 alone, Exxon spent almost three times as much money acquiring fossil fuel producer Pioneer Natural Resources ($59.5 billion) than it has stated that it will invest in "lower carbon initiatives" (largely carbon capture technology) through 2027.[317]

169.    Similarly, Chevron announced in late 2023 that it would spend between $18.5 billion and $19.5 billion on new oil and gas projects in 2024, representing an 11% increase from the year before.[318] By contrast, Chevron expected to spend only $2 billion in 2024 to "lower the carbon intensity of traditional operations and grow new energy business lines."[319] In late 2024, Chevron announced that it would spend only $1.5 billion in 2025 on emissions-reduction efforts and alternative energy initiatives, a 25% drop from 2024.[320] In 2023 alone, Chevron spent more than five times as much money acquiring fossil fuel producer Hess as it has stated it will spend on lower-carbon energy projects through 2028.[321]

170.    Likewise, Shell spent almost six times more money on oil and gas development than on renewable technology in 2022.[322] In June 2023, Shell withdrew its 2021 pledge to cut oil production each year for the rest of the decade, announcing instead that it would maintain its

[315] Press Release, ExxonMobil, *Corporate Plan Update* (Dec. 6, 2023), https://perma.cc/XAM4-F3WR.
[316] *Id.*
[317] Aryn Baker, *How Chevron and Exxon's Latest Fossil Fuel Deals Compare to Their Green Spending*, Time Magazine (Oct. 25, 2023, 2:31 PM EDT), https://perma.cc/8ZF6-JL5D.
[318] Sabrina Valle, *Chevron Increases Project Spending Budget by 11% for 2024*, Reuters (Dec. 6, 2023, 8:56 PM EST), https://perma.cc/JB7J-6UXN.
[319] Sam Ramon, *Chevron Announces $16 Billion 2024 Capex Budget*, Chevron (Dec. 6, 2023), https://perma.cc/H4X5-FH2M.
[320] Kevin Crowly, Chevron Is Cutting Low-Carbon Spending by 25% Amid Belt Tightening, Bloomberg (Dec. 6, 2024), https://perma.cc/N9QX-V6MT.
[321] Baker, *How Chevron and Exxon's Latest Fossil Fuel Deals Compare to Their Green Spending*, *supra* note 317.
[322] Ron Bousso, *Exclusive: Shell Pivots Back to Oil to Win Over Investors*, Reuters (June 9, 2023, 1:06 PM EDT), https://perma.cc/3MYK-T6TV.

current level of oil production until 2030 and would invest $40 billion in oil and gas production between 2023 and 2035.[323] And while Shell states that approximately 12% of its 2021 capital spending went to its "Renewables and Energy Solutions" division, its own financial reporting indicates it dedicated only approximately 1.5% of its capital expenditures to developing renewable energy sources such as wind and solar power production, with the large majority of other spending directed to projects related to natural gas.[324] Shell also announced that notwithstanding its record profits in 2022, it would not increase spending on Renewables and Energy Solutions and would instead focus new spending on fossil fuel production.[325]

171.    BP has also scaled back its recently stated decarbonization goals. In 2020, BP stated its intention to reduce the company's total upstream emissions 20% by the year 2025, and 35–40% by the year 2030. In February 2023, however, BP reduced those projections to a 10–15% reduction by 2025, and a 20–30% reduction by 2030.[326, 327] BP had also pledged in 2020 to reduce its total oil and gas production 40% from 2019 levels by 2030[328]—again in 2023, however, BP lowered its goal to a 25% reduction.[329] In 2025, BP essentially rolled back its entire 2020 pledge when it announced that it is aiming to boost its oil and gas production back up to 2.5 million barrels per day by 2030, roughly 1% below its 2019 production average of 2.6 million barrels per day.[330]

172.    Fossil Fuel Defendants' greenwashing campaigns deceptively minimize their own role in causing climate change, including by suggesting that small changes in consumer choice and

[323] Lottie Limb, *Shell Joins BP and Total In U-Turning on Climate Pledges 'to Reward Shareholders'*, euronews (June 15, 2023, 16:10 GMT), https://perma.cc/9QR8-JQLB.

[324] Oliver Milman, *Shell's Actual Spending on Renewables is Fraction of What It Claims, Group Alleges*, The Guardian (Feb. 1, 2023, 8:00 EST), https://perma.cc/3QRS-FZYL.

[325] Will Mathis, *Shell Hits the Brakes on Growing Renewables Unit After Record 2022 Profit*, Bloomberg (Feb. 2, 2023, 7:49 AM EST), https://perma.cc/VEX5-KCJD.

[326] Evan Halper and Aaron Gregg, *BP Dials Back Climate Pledge Amid Soaring Oil Profits*, The Wash. Post (Feb. 7, 2023, 11:41 AM EST), https://perma.cc/HL7J-YZCV.

[327] BP, *Getting to Net Zero*, https://perma.cc/3SGK-8JGU; BP, *BP Integrated Energy Company Strategy Update* (Feb. 7, 2023), https://perma.cc/PA3U-2EZ4.

[328] Shadia Nasralla and Ron Bousso, *BP to Cut Fossil Fuels Output By 40% By 2030*, Reuters, (Aug. 4, 2020, 3:34 AM EDT), https://perma.cc/5PNG-ENJT.

[329] Stanley Reed, *BP, in a Reversal, Says It Will Produce More Oil and Gas*, N.Y. Times (Feb. 7, 2023), https://perma.cc/TV4V-QK2X.

[330] Joe Wallace, *BP to Slash Green Spending, Pivot Back to Oil*, The Wall Street Journal (Feb. 26, 2025), https://perma.cc/K3EX-RCCL.

behavior can adequately address climate change. These campaigns misleadingly portray Fossil Fuel Defendants as part of the solution to climate change and deceptively distract from the fact that their fossil fuel products are the primary driver of global warming and climate change.

173.    Below are representative excerpts from Fossil Fuel Defendants' greenwashing campaigns, which present a false image of Fossil Fuel Defendants as clean energy innovators taking meaningful action to address climate change. Fossil Fuel Defendants' actions to further entrench fossil fuel production and consumption squarely contradict their public affirmations of corporate responsibility and support for reducing global GHG emissions. Functionally, Fossil Fuel Defendants have cut fossil fuels from their brand but not their business operations. Their greenwashing advertisements are deceptive to Hawai'i consumers.

### i.    Exxon's Misleading and Deceptive Greenwashing Campaigns

174.    Beginning in 2009, Exxon ran a series of advertisements in print editions and posts in the electronic edition of *The New York Times*, as well as on Exxon's YouTube channel, in which Exxon misleadingly promotes its efforts to develop energy from alternative sources such as algae and plant waste—efforts that are vanishingly small in relation to the investments Exxon continues to make in fossil fuel production.

175.    For example, an online advertisement in *The New York Times*, accessible to and marketed toward Hawai'i consumers, promotes the company's development of algae biofuels. The advertisement misleadingly tells consumers that Exxon is "working to decrease [its] overall carbon footprint," and that the company's "sustainable and environmentally friendly" biodiesel fuel could reduce "carbon emissions from transportation" by greater than 50%.[331]

176.    As recently as 2018, Exxon claimed it would be producing 10,000 barrels per day of algae biofuel by 2025 and that this fuel could reduce "carbon emissions from transportation" by more than fifty percent.[332] In 2019, Exxon continued to advertise that "[it] is growing algae for

---

[331] ExxonMobil Paid Post, *The Future of Energy? It May Come From Where You Least Expect*, N.Y. Times, https://perma.cc/VBU3-8KH4.
[332] *Id.*

biofuels that could one day power planes, propel ships, and fuel trucks, and cut their emissions in half."[333]

177. Exxon ultimately invested just $350 million of the $600 million it had promised to develop the technology before quietly pulling the plug on the project in December 2022.[334] But even $600 million likely would have fallen short; algae researchers believe several *billion* dollars would be necessary to truly commercialize biofuels, and that does not even account for the "fundamental biological limitations" associated with this technology.[335] In fact, statements from Exxon's spokesperson suggest that the money Exxon spent on advertising its algae biofuel was a substantial portion (more than a third) of what Exxon spent on actual development of algae biofuel.[336]

178. Exxon's advertisements promoting its investments in "sustainable and environmentally friendly" energy sources also fail to mention that the company's investment in alternative energy is miniscule compared to its ongoing "business as usual" escalation of global fossil fuel exploration, development, and production activities. As explained above, Exxon has consistently spent—and will continue to spend—the vast majority of its capital expenditures on maintaining and expanding fossil fuel production.

179. Supplementing this misleading campaign, Exxon has promoted dozens of multimedia advertisements on platforms such as Instagram, X (f/k/a Twitter), Facebook, and LinkedIn, where Exxon has millions of social media followers and its content has received hundreds of thousands of "likes" and "views." These advertisements emphasize its claimed leadership in research on lowering emissions, algae biofuel, climate change solutions, and clean energy research.[337] These advertisements were intended to and did reach the public and consumers

---

[333] Exxon Mobil, *Algae Potential*, iSpot TV (Oct. 19, 2019), https://perma.cc/N7KG-ELR4.

[334] Amy Westervelt, *Big Oil Firms Touted Algae as Climate Solution. Now All Have Pulled Funding*, The Guardian (Mar. 17, 2023), https://perma.cc/MF7Y-5AGS.

[335] *Id.*; *see also* Ben Elgin and Kevin Crowley, *Exxon Retreats From Major Climate Effort to Make Biofuels From Algae*, Bloomberg (Feb. 10, 2023), https://perma.cc/7LTQ-644J.

[336] *Id.*

[337] *See, e.g.*, ExxonMobil, *We support the goals set forth by the Paris Agreement…*, Facebook Ad Libr., https://perma.cc/5DWZ-YAWZ; ExxonMobil, *New renewable diesel*, Facebook Ad. Libr., https://perma.cc/6XLV-BD25.

in Hawaiʻi. An ordinary consumer viewing these advertisements would come away believing that Exxon is meaningfully invested in developing and deploying alternative energy technologies, whereas in truth nearly all the company's expenditures are directed toward present and future oil and gas development that hurtles Hawaiʻi and the world toward climate catastrophe. Exxon's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to increase fossil fuel production and sales in the future—renders these advertisements materially misleading.

180.    Exxon's "Lights Across America" television advertisement stated that Exxon's natural gas is "helping dramatically reduce America's emissions."[338] Exxon ran this advertisement on a series of television advertisements that aired in Hawaiʻi.[339] Natural gas is a fossil fuel that contributes to planetary warming, which harms coastal states and islands, including Hawaiʻi. Natural gas production and use competes with and its long term use disincentivizes the use of wind and solar power, which emit no GHGs. Exxon's statement that it is "helping dramatically reduce America's emissions" misleadingly portrays Exxon as a "green" company.

181.    In 2017, the Dutch Advertising Code Authority censured Shell and Exxon for advertising natural gas as the "cleanest fossil fuel." The Advertising Code Authority reasoned that the claim "suggested that fossil fuels can be clean in that they do not cause environmental damage. It is firm . . . that that suggestion is not correct."[340] Yet Exxon and Shell, along with other Defendants, continue to make the same representations in the United States, including in Hawaiʻi.

### ii.    Shell's Misleading and Deceptive Greenwashing Campaigns

182.    Like Exxon, Shell has misleadingly promoted, and continues to promote, itself to Hawaiʻi consumers as environmentally conscientious through advertisements in publications such

---

[338] Exxon Mobil TV Spot, *Lights Across America*, iSpot TV (Nov. 26, 2015), https://perma.cc/TJ8G-CBV5 (at 0:43).

[339] *See, e.g.*, CNN, *Amanpour* (Dec. 8, 2015 at 11:15 PM PST), https://archive.org/details/CNNW_20151209_070000_Amanpour/start/942/end/1002?q=%22You+may+not+even+think+about+the+energy+that+lights+up+your+world%22; *see also* Honolulu Star-Advertiser (Dec. 6, 2015), https://perma.cc/4P76-7ZQZ (confirming that CNN's Amanpour aired in Hawaiʻi on Dec. 8, 2015 from 9:00 PM to 9:30 PM HST, or 11:00 PM to 11:30 PM PST).

[340] Arthur Neslen, *Shell and Exxon Face Censure over Claim Gas was 'Cleanest Fossil Fuel'*, The Guardian (Aug. 14, 2017, 12:14 PM EDT), https://perma.cc/VR3R-TEPN.

as *The New York Times*. The advertisements are targeted at and read by Hawaiʻi consumers and intended to influence consumer demand for Shell's products.

183.    As part of Shell's "Make the Future" campaign, the company has published numerous advertisements currently viewable on *The New York Times* website,[341] in which the company touts its investment in new energy sources, including liquified natural gas ("LNG") and biofuel, which Shell refers to as "cleaner sources."

184.    One Shell advertisement in *The Washington Post*, "The Making of Sustainable Mobility," refers to LNG as "a critical component of a sustainable energy mix" and a "lower-carbon fuel" that could "help decrease" $CO_2$ emissions.[342] The advertisement emphasizes Shell's leadership in "setting the course" for a "lower-carbon mobility future." Similarly, another Shell advertisement in *The Washington Post*, "The Mobility Quandary," emphasizes Shell's role in working to counteract climate change through investments in alternative energy, stating: "Shell is a bigger player than you might expect in this budding movement to realize a cleaner and more efficient transportation future."[343]

185.    Shell's statements emphasizing its involvement in these many areas of energy-related research, development, and deployment are misleading because the company's investments and activities are substantially smaller than its advertisements lead consumers to believe. As explained above, only 1.33% of Shell's capital spending from 2010 to 2018 was in low-carbon energy sources, and that number continues to be heavily outweighed by Shell's continued expansion of its fossil fuel business.[344]

---

[341] *See, e.g.*, Shell Paid Post, *Moving Forward: A Path To Net-Zero Emissions By 2070*, N.Y. Times, https://perma.cc/5J84-2MDW.

[342] *See, e.g.*, Content from Shell, *The Making of Sustainable Mobility*, Wash. Post, https://www.washingtonpost.com/brand-studio/shell/the-making-of-sustainable-mobility (last visited Nov. 13, 2024).

[343] Content from Shell, *The Mobility Quandary*, Wash. Post., https://www.washingtonpost.com/brand-studio/shell/the-mobility-quandary ("Another critical component of a sustainable energy mix in transportation is further investment in natural gas, a cleaner-burning fossil fuel . . . .").

[344] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX.

186.    Shell's "Make the Future" advertisements also misled consumers about the extent to which Shell has invested in clean energy technology. For example, "The Mobility Quandary" touts Shell's investments in hydrogen fuel cell technology, promoting hydrogen as "sustainable in the long-term" and "[o]ne of the cleaner sources" that power electric vehicles, stating that "[h]ydrogen fuel cell vehicles . . . emit nothing from their tailpipes but water vapor."[345] Shell's "In for the Long Haul" advertisement in *The New York Times* similarly promotes its investment in hydrogen fuel cells, as well as biofuels, as meaningful attempts to mitigate climate change.[346]

187.    One of Shell's public relations firms described the intent of Shell's "Make The Future" campaign, stating: "As part of their efforts to make consumers, particularly millennials, aware of their commitment to cleaner energy, Shell launched the #makethefuture campaign. The company tasked Edelman with the job of giving millennials a reason to connect emotionally with Shell's commitment to a sustainable future. We needed them to forget their prejudices about 'big oil' and think differently about Shell."[347]

188.    Shell's 2016 "#makethefuture" advertising campaign targets young people and misleadingly portrays the company as heavily engaged in developing and selling clean energy sources.[348]

189.    Shell's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to ramp up fossil fuel production and sales in the future—renders its advertisements materially misleading.

190.    In 2017, Shell's CEO promoted massive fossil fuel use by stating that the fossil fuel industry could play a "crucial role" in lifting people out of poverty.[349] Similarly, a 2017 Shell

---

[345] Shell, *The Mobility Quandary*, *supra* note 343.
[346] Shell, *Moving Forward, supra* note 341.
[347] *Shell: South Pole Energy Challenge*, Edelman, https://perma.cc/FUM8-PE7K.
[348] *See* Graham Readfearn, *Hey Millennials, Don't Fall for Shell's Pop Star PR*, The Guardian (April 25, 2018, 1:28 EDT), https://perma.cc/T5YD-YWGJ.
[349] Shell Speech by Ben van Beurden, CEO of Shell, *Deliver Today, Prepare for Tomorrow* (Mar. 9, 2017), https://perma.cc/NBQ4-LJT4.

website promotion stated: "We are helping to meet the world's growing energy demand while limiting $CO_2$ emissions, by delivering more cleaner-burning natural gas."[350]

191.    In 2023, the United Kingdom's Advertising Standards Authority banned Shell's marketing campaign in which Shell advertised itself as providing renewable energy, installing electric vehicle chargers, and catalyzing the energy transition.[351] The Authority found that the advertisements "gave the overall impression that a significant proportion of Shell's business comprised lower-carbon energy products," but that the campaign was misleading because the "vast majority" of Shell's business was oil and gas investments and extraction.[352] Shell, along with other Defendants, continues to make similar representations in the United States, including in Hawai'i. For example, Shell posited itself as a leader in renewable energy in multiple television advertisements in 2023 and 2024.[353] Shell ran these advertisements on a series of television shows that aired in Hawai'i.[354]

### iii.    BP's Misleading and Deceptive Greenwashing Campaigns

192.    BP also has misleadingly portrayed itself as diversifying its energy portfolio and reducing its reliance on fossil fuel sales, whereas its alternative energy portfolio is negligible compared to the company's ever-expanding fossil fuel portfolio. To this end, BP has employed a series of misleading greenwashing advertisements, which are intended to influence consumer demand for its products, including consumers in Hawai'i.

---

[350] Shell United States, *Transforming Natural Gas*, https://perma.cc/T9WV-SXRA.

[351] Ed Davey, *Shell's Clean Energy Advertising Campaign is Misleading, UK Watchdog Says*, Assoc. Press (June 7, 2023, 11:50 AM EST), https://perma.cc/9G3D-9P8K; *see also* Advert. Standards Authority, *ASA Ruling on Shell UK Ltd t/a Shell* (June 7, 2023), https://perma.cc/7QVU-MGYD.

[352] *Id.*

[353] *See, e.g.*, Shell TV Spot, *Progress at 225 MPH: Renewable Race Fuel*, iSpot TV (May 29, 2023), https://www.ispot.tv/ad/1zWK/shell-progress-at-225-mph-renewable-race-fuel; Shell TV Spot, *Renewable Electricity Plan: Houston Dash*, iSpot TV (June 20, 2023), https://www.ispot.tv/ad/1XFt/shell-renewable-electricity-plan-houston-dash.

[354] *See, e.g.*, FOX News, *Hannity* (Apr. 17, 2024 at 11:25 PM PDT), https://archive.org/details/FOXNEWSW_20240418_060000_Hannity/start/1537/end/1597?q=%22Shell+Powering+Progress%22+; *see also* Honolulu Star-Advertiser (Apr. 17, 2024), https://perma.cc/ZW9N-REFG (confirming that FOX News' *Hannity* aired in Hawai'i on Apr. 17, 2024 from 8:00 PM to 8:30 PM HST, or 11:00 PM to 11:30 PM PDT).

115

193.    BP ran its extensive "Beyond Petroleum" advertising and rebranding campaign from 2000 to 2008 and even changed its logo to a sunburst, evoking the renewable resource of the sun. The "Beyond Petroleum" advertising campaign falsely portrayed the company as heavily engaged in low-carbon energy sources and no longer investing in but rather moving "beyond" petroleum and other fossil fuels. In truth, BP invested a small percentage of its total capital expenditure during this period on alternative energy research. The vast majority of its capital expenditure was focused on fossil fuel exploration, production, refining, and marketing.[355] BP ultimately abandoned what had been, until then, its solar and wind assets in 2011 and 2013, respectively, and even the "Beyond Petroleum" moniker in 2013.[356]

194.    In 2019, BP launched an advertising campaign called "Possibilities Everywhere." These advertisements were misleading both in their portrayal of BP as heavily involved in non-fossil energy systems, including wind, solar, and electric vehicles, as well as in their portrayal of natural gas as environmentally friendly.

195.    One "Possibilities Everywhere" advertisement, called "Better fuels to power your busy life," stated:

> We [] want—and need—[] energy to be kinder to the planet. At BP, we're working to make our energy cleaner and better. . . . At BP, we're leaving no stone unturned to provide [the] extra energy the world needs while finding new ways to produce and deliver it with fewer emissions. . . . We're bringing solar and wind energy to homes from the US to India. We're boosting supplies of cleaner-burning natural gas. . . . More energy with fewer emissions? We see possibilities everywhere to help the world keep advancing.[357]

The accompanying video showed a busy household while a voiceover said, "We all want more energy, but with less carbon footprint. That's why at BP we're working to make energy that's

---

[355] *See* BP, *Annual Reports and Accounts 2008*, https://perma.cc/9CLF-JTS4.

[356] Javier E. David, *'Beyond Petroleum' No More? BP Goes Back to Basics*, CNBC (Apr. 20, 2013 12:00 AM EDT), https://perma.cc/U5UW-MYNK.

[357] *See* BP, *Better Fuels to Power Your Busy Life*, https://perma.cc/H42Q-LNSB.

cleaner and better."[358] This video was also extensively advertised on television, including on programs that aired in Hawai'i.[359]

196.    But BP's claim that non-fossil energy systems constitute a substantial portion of BP's business was materially false and misleading. At the time of the advertisement, BP owned only approximately 1.7 gigawatts ("GW") of wind capacity, which was dwarfed by other companies including GE, Siemens, and Vestas (with about 39 GW, 26 GW, and 23 GW capacities, respectively).[360] Overall, installed wind capacity in the United States was approximately 100 GW, meaning BP's installed capacity comprised a mere 1% of the market.[361] Yet, "Blade runners," another advertisement in BP's "Possibilities Everywhere" campaign, described the company as "one of the major wind energy businesses in the US."[362] In short, BP's proportionately small wind power portfolio was materially smaller than that conveyed in the company's advertisements.

197.    The same is true for BP's activities in solar energy, which consist predominantly of its purchase of the solar company Lightsource (rebranded Lightsource BP).[363] The total purchase price ($454 million) represents only a miniscule percentage of BP's annual capital spending ($16 billion in 2023), nearly all of which is spent on fossil fuel production.[364] This is a far cry from BP's claim that it was "leaving no stone unturned" to find "new" ways to produce lower-emissions energy and playing a "leading role" in "advancing a low carbon future." These claims convey the misleading impression to ordinary consumers that BP is substantially invested in developing and deploying clean energy technology, whereas in truth nearly all the company's

---

[358] *Id.*

[359] *See, e.g.*, CNN, *The Situation Room* (Feb. 19, 2019 at 2:55 PM PST), https://archive.org/details/CNNW_20190219_220000_Situation_Room_With_Wolf_Blitzer/start/3349/end/3405?q= That%27s+why+at+BP+we%27re+working+to+make+energy+that%27s+cleaner+and+better.; *See also* Honolulu Star-Advertiser (Feb. 17, 2019), https://perma.cc/5UA6-FNT3 (confirming that *The Situation Room* aired in Hawai'i on Feb. 19 from 12:00 PM to 1:00 PM HST, or 2:00 PM to 3:00 PM PST).

[360] For BP's wind capacity, see Press Release, *BP Advances Offshore Wind Growth Strategy* (Feb. 8, 2021), https://perma.cc/V33G-U6LU. For wind capacity of GE, Siemens, and Vestas, see Abby McClain, *The 10 Largest Wind Power Companies in the World* (Apr. 18, 2023), https://perma.cc/UB4P-WMXW.

[361] *See* Elizabeth Ingram, *U.S. Wind Capacity Grew 8% in 2019, AWEA says*, Renewable Energy World (Apr. 10, 2019), https://perma.cc/4U9D-7S33.

[362] *See* BP, *Blade Runners*, https://perma.cc/V7ZW-F58W.

[363] BP, *Annual Report and Form 20-F 42* (2017), https://perma.cc/PD35-ZML6; *see also* Ron Bousso, *BP to Buy Remaining 50% In Solar JV Lightsource BP*, Reuters (Nov. 30, 2023), https://perma.cc/4M4M-NT26.

[364] *See* BP, *4Q 2023 Quarterly Results*, https://perma.cc/3FZA-Q3LP.

present and future expenditures are directed toward oil and gas development that hurtles the world toward climate catastrophe. BP's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to ramp up fossil fuel production and sales in the future—renders these advertisements materially misleading.

198.    In BP's web advertisement "Rise and shine," the company nevertheless specifically touted its Lightsource partnership. "Our economics gurus believe [solar power] could account for 10% of the world's power by 2040," the advertisement stated, and "to help make that a reality, we've teamed up with Europe's largest solar company, [Lightsource BP]."[365] The advertisement highlighted Lightsource BP's 6.3-megawatt ("MW") floating solar power station near London and Lightsource BP's deal with Budweiser to supply renewable energy to its U.K. breweries. "Projects like these are advancing the possibilities of solar," BP claimed, "and even the rainy days can't dampen the excitement for this fast-growing energy source. That's because, whatever the weather, our cleaner-burning natural gas can play a supporting role to still keep your kettle ready for action."[366]

199.    This portrayal of solar power as BP's strong interest, with natural gas used only as a backup, is also false. BP's investments in natural gas outstrip its solar investments by a factor of approximately 100 or more, and only a small fraction of its natural gas products, an estimated 5% or less, are used to backup renewables. Thus, the overall impression given by the advertisements— that BP is substantially invested in solar energy, with its natural gas used only for backup—is materially misleading to consumers.

200.    BP misleadingly touts natural gas on its website as "a vital lower carbon energy source" and as playing a "crucial role" in a transition to a lower carbon future.[367] BP promotes continued massive fossil fuel use as enabling two billion people to be lifted out of poverty.[368]

---

[365] BP, *Rise and Shine*, https://perma.cc/MM6Q-M6D7.
[366] *Id*.
[367] BP, *Sustainability Report 2016*, https://perma.cc/2A7F-4YVZ; BP, *Shifting Towards Gas*, https://perma.cc/7W8P-NU37.
[368] BP, *Energy Outlook 2024* (July 10, 2024), https://perma.cc/YK6K-BTW3.

118

### iv.    Chevron's Misleading and Deceptive Greenwashing Campaigns

201.    Chevron also engaged in greenwashing campaigns designed to deceive consumers about Chevron's products and its commitment to addressing climate change, including consumers in Hawaiʻi.

202.    In 1996, Chevron claimed in a print advertisement that appeared in *The Atlantic* that the endangered Hawaiian Stilt was beginning to thrive for the first time in generations thanks to Chevron's refinery on Oʻahu, Hawaiʻi.

203.    In 2001, Chevron developed and shared a sophisticated information management system to gather GHG emissions data from its explorations and production to help regulate and set reduction goals.[369] Beyond this technological breakthrough, Chevron touted "profitable renewable energy" as part of its business plan for several years and launched a 2010 advertising campaign promoting the company's move towards renewable energy. Despite this rhetoric—and Chevron renewable power group's $27 million profit in 2013—Chevron sold its renewable energy unit in 2014.[370]

204.    In 2006, Chevron ran a full-page advertisement in the *Honolulu Star-Advertiser* misleadingly stating that they "maintain some of the highest environmental standards on earth," and are "[d]eveloping energy today, protecting Hawaii for tomorrow":

---

[369] Press Release, *Chevron Introduces New System to Manage Energy Use*, Chevron (Sept. 25, 2001), https://perma.cc/LY9M-XW4Y.

[370] Ben Elgin, *Chevron Dims the Lights on Green Power*, Bloomberg (May 29, 2014), https://perma.cc/RZT7-WY9C.



**Figure 9: "Developing energy today, protecting Hawai'i for tomorrow"
Chevron Advertisement[371]**

[371] Honolulu Star-Advertiser (July 2, 2006), https://perma.cc/B55S-3HSJ.

120

205.    Chevron's 2007 "Will You Join Us?" campaign and its 2008 "I Will" campaign both misleadingly portrayed the company as a leader in renewable energy. The campaigns' advertisements portrayed minor changes in consumer choices (e.g., changing light bulbs) as sufficient to address environmental problems such as climate change.[372]

206.    The overall thrust of the campaigns was to shift the perception of fault and responsibility for climate change to consumers and make Chevron's role, and that of the broader fossil fuel industry, appear small. The misleading solution promoted to consumers was not to transition away from fossil fuels, but instead to implement small changes in consumer behavior with continued reliance on fossil fuel products. By portraying GHG emissions as deriving from numerous sources in addition to fossil fuels, Chevron's advertisements obfuscated the fact that fossil fuels are the primary cause of increased GHG emissions and the primary driver of climate change.

207.    Misleading messages were emblazoned over images of everyday Americans, as in the example highlighted below:

---

[372] *See* Mark Robert Wills, *Chevron*, https://perma.cc/TW6G-W4BV; *see also* Jean Halliday, *Chevron: We're Not Big Bad Oil*, AdAge (Sept. 28, 2007), https://perma.cc/8T8Q-G9QY.



**Figure 10: "Will You Join Us?" Chevron Advertisement[373]**

208.    In 2010, Chevron launched an advertising campaign titled "We Agree." The print, internet, and television ad campaign expanded across the United States and internationally. For example, the advertisement below highlighted Chevron's supposed commitment to the development of renewable energy, stating in large letters next to a photo of a young girl, "It's time oil companies get behind the development of renewable energy. We agree." The advertisement emphasized: "We're not just behind renewables. We're tackling the challenge of making them affordable and reliable on a large scale."[374]

---

[373] Chevron, *I will leave the car at home more* (archived on web.archive.org on Sep. 30, 2009), https://perma.cc/M2HN-EKZZ.

[374] *See* Mark Robert Wills, *Chevron*, https://perma.cc/TW6G-W4BV.



**Figure 11: "We Agree" Chevron Advertisement**

209.     Chevron's portrayal of itself as a renewable energy leader was false and misleading. In reality, only 0.23% of Chevron's capital spending from 2010 to 2018 was in low-carbon energy sources, and 99.77% was in continued fossil fuel exploration and development—a stark contrast to the message communicated to consumers through the company's advertisements.[375]

---

[375] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX; Anjli Raval & Leslie Hook, *Oil and Gas Advertising Spree Signals Industry's Dilemma*, Fin. Times (Mar. 6, 2019), https://perma.cc/5JPC-V56J.

210.    By 2013, Chevron's "We Agree" campaign featured 1,700 print advertisements, 141 online projects, 55 web pages, and a local community advertising kit of more than 100 advertisements.[376] Chevron's "We Agree" campaign also featured misleading television advertisements. In one focused on renewable energy, a teacher says, "Ok, listen. Somebody has got to get serious. We need renewable energy." To which a Chevron environmental operations employee responds, "At Chevron we're investing millions in solar and biofuel technologies to make it work." In reality, Chevron has continued to overwhelmingly focus on fossil fuel extraction and development, and its investment of "millions" in renewables is miniscule in comparison to its investment of billions in fossil fuels. An ordinary consumer watching the "We Agree" advertisements would be misled into believing Chevron has meaningfully invested in developing and deploying clean technologies, whereas nearly all the company's spending is directed toward oil and gas development. Chevron's failure to inform ordinary consumers that its touted clean energy investments comprise only a miniscule percentage of its expenditures—and that it intends to ramp up fossil fuel production and sales in the future—renders these advertisements materially misleading.

211.    Today, Chevron's website implores that they "believe the future of energy is lower carbon" while continuing to promote widespread use of fossil fuels, touting that a mix of oil and gas will be required to meet future energy demands and that Chevron is investing in its oil and gas operations to meet those demands.[377] A prior Chevron advertisement still available on the web promotes Chevron fossil fuels on a massive scale by stating that "our lives demand oil."[378]

212.    Recently, Chevron has also engaged in greenwashing advertisements targeted exclusively to Hawai'i consumers. For example, Chevron has extensively advertised a carbon offset program exclusively to Hawai'i consumers via social media, Hawai'i news stations, and at

---

[376] *See* Wills, *supra* note 372, *Chevron "We Agree" Case Study* Vimeo at 03:28.

[377] Chevron, *Explore a Lower Carbon Future For All*, https://perma.cc/5MBN-K93D; Chevron, *Sustainability Climate*, https://perma.cc/EA3T-MB2Z.

[378] Driving Sales Beyond, *Chevron Human Energy*, YouTube, at 0:59 (Feb. 26, 2009), https://perma.cc/WG28-WM7G.

124

gas stations in Hawai'i.[379] As part of this misleading campaign, Chevron has made claims such as: "Fueling your car at Texaco stations helps to reduce your carbon footprint";[380] "fill up your tank while helping the environment";[381] "It's a simple way for you as a driver to lower your carbon footprint";[382] and "Earth Day may be over, but we protect our island every day [through our offset program]."[383]

### v.    Sunoco's Misleading and Deceptive Greenwashing Campaigns

213.    Sunoco also engaged in greenwashing campaigns designed to deceive consumers about Sunoco's products and its commitment to addressing climate change, including consumers in Hawai'i.

214.    In 2019, Sunoco launched a nationwide advertising campaign, "Fuel Your Best," to promote its fuel. This campaign "drove two of Sunoco's record-highest sales quarters, ever."[384] Sunoco explains on its website that Sunoco Ultratech "help[s] your engine run cleaner" and that other fuels can have "[u]p to 200 percent more carbon monoxide and a 30 percent increase in hydrocarbon emissions."[385] Sunoco also ran multiple advertisements, through its own accounts and through social media influencers, stating that "[n]ot all fuels are created equal" and that Sunoco Ultratech is a fuel "that helps your engine run cleaner, longer, and more efficient."[386]

215.    Sunoco's website says that the company "takes great pride and commitment in working to protect the public and environment."[387]

---

[379] *See, e.g.*, Brandon Kubo, Sponsored by Texaco in Hawaii, *Texaco helps the environment and community with free gas giveaway*, Hawaii News Now (Sept. 28, 2021), https://perma.cc/BQ9L-YGHJ; Texaco in Hawaii, *Rise Up and Make New*, Facebook Ad Libr., https://perma.cc/U6MQ-DP5C; Texaco in Hawaii, *Ho'āla - Rise Up and Make New*, YouTube, https://perma.cc/SUX4-3X5L.

[380] Facebook, *Texaco in Hawaii* (Jan. 31, 2021), https://perma.cc/8SCV-HC9P.

[381] Brandon Kubo, Sponsored by Texaco in Hawaii, *Texaco helps the environment and community with free gas giveaway*, Hawaii News Now (Sept. 28, 2021), https://perma.cc/BQ9L-YGHJ.

[382] *Id*.

[383] Texaco in Hawaii, Facebook (Apr. 29, 2021), https://perma.cc/8SCV-HC9P.

[384] Effie, *Sunoco, Fuel Your Best* (2021), https://perma.cc/9W74-PBKP.

[385] News Staff, *Passion Meets Performance*, *5 Reasons to Always Use Top Tier Fuel*, Sunoco (Jan. 26, 2021), https://perma.cc/9VN9-L5PD.

[386] GoSunoco, *Fill Up With Sunoco UltraTech, Facebook* (Sep. 16, 2020), https://perma.cc/F6P5-52U3; TikTok, @milesabovetech (Mar. 3, 2023), https://perma.cc/4D2F-X6H5.

[387] Sunoco, *Discover Sunoco's History*, https://perma.cc/9BF3-XP4D.

125

216.    Sunoco created advertisements in the form of "license plate" posters that appeared above pump stations. According to the consultant who worked on the campaign, Sunoco "proudly *owned* the campaign" which ran for years. The Sunoco campaign "tap[ped] the tension between high performance and clean – two contrary brand attributes," and the campaign was "constantly refreshed with new *mean* and *green* brand messages." Overall, the campaign featured a new headline every week for a year and an auto show car with over 150 license plate advertisements on it. Sunoco messages featured on the license plates and the auto show car include "Proud sponsor of breathing" and "Do something good for the environment. Drive."



**Figure 12: Sunoco License Plate Advertisements[388]**

217.    Sunoco has also engaged in greenwashing advertisements targeted exclusively to consumers in Hawai'i. For example, in 2024 the "Aloha Gas" Facebook and Instagram accounts posted that they offer "eco-friendly gasoline that helps reduce emissions and protect our beautiful island environment."[389]

### vi.    ConocoPhillips' Misleading and Deceptive Greenwashing Campaigns

218.    ConocoPhillips has used misleading Facebook advertisements that reached Hawai'i consumers to position itself as supporting the transition to renewable energy and achievement of

---

[388] Marc Stoiber, *Case Study: Sunoco* (Oct. 22, 2024), https://perma.cc/VHD5-WJ52.

[389] *See* Aloha Gas, Facebook post (Mar. 25, 2024), https://perma.cc/FE2M-VK2B; @alohagasltd, Instagram post (Mar. 25, 2024), https://perma.cc/F6CK-RAY5.

state climate targets, despite the negligible fraction of its business invested in renewable energy compared to fossil fuels. For example, in 2020 ConocoPhillips ran an advertisement on Facebook and Instagram targeted at Hawai'i consumers that highlighted its "plans to support demand for renewable fuels." [390]

219.    ConocoPhillips has also directed greenwashing campaigns at consumers in Hawai'i through publications with significant circulation in Hawai'i. For example, in 2008, ConocoPhillips ran a series of advertisements in publications such as *The Atlantic* under the headline "Tomorrow begins today." The advertisements typically contained a picture of an older person and a child, and the text began with the phrase "[w]e're defined by what we pass on to the next generation," followed by statements such as: "That's why, as one of North America's leading producers of natural gas, ConocoPhillips is providing clean-burning fuel to homes"; "That's why ConocoPhillips is working to provide clean, efficient technology to turn coal into clean-burning fuel"; or "That's why ConocoPhillips is funding college and university programs, like biofuels research at Iowa State University, to develop new energy sources." The ads continued with statements such as: "And we're stepping up our own research to create new, cleaner fuels and improve environmental performance."; or "And, because we believe we're responsible for finding long-term solutions for future generations, ConocoPhillips is exploring new sources of secure, stable energy."[391]

220.    In 2011, ConocoPhillips directed a series of greenwashing television advertisements at consumers in Hawai'i and elsewhere which promoted natural gas as clean and environmentally friendly. For example, one television advertisement contained the statements: "We need to protect the environment"; "What about our planet?"; and "At ConocoPhillips, we're helping power America's economy with cleaner, affordable natural gas. More jobs, less emissions.

---

[390] Phillips 66, *What are renewable fuels?*, https://perma.cc/7955-S29V.

[391] *See, e.g.*, ConocoPhillips, *Tomorrow begins today* (archived Apr. 20, 2009), https://perma.cc/4VDM-VHXZ; ConocoPhillips, *Tomorrow begins today* (archived Apr. 18, 2009), https://perma.cc/6C4R-GGCB; ConocoPhillips, *Tomorrow begins today* (archived Nov. 16, 2008), https://perma.cc/H4YE-H964.

127

A good answer for everyone." This advertisement ran on programs that aired in Hawaiʻi.[392] The advertisements directed consumers to a ConocoPhillips website which contained additional misleading statements, including "Natural Gas is best for the environment," "Natural Gas is Clean," and "Natural gas for power production avoids some of the challenges facing wind, solar, biofuels and nuclear power generation technologies, such as visual impact, competing land uses, bird strikes and waste disposal."[393] ConocoPhillips also produced a series of print advertisements around this time with similar misleading statements (see Figure 13).

---

[392] *See, e.g.*, CNN, *CNN Newsroom* (Oct. 30, 2011 at 3:54 PM PDT), https://perma.cc/FF2Z-RDVE; *see also* Honolulu Star-Advertiser (Oct. 30, 2011), https://perma.cc/4JMX-LZA3 (confirming that *CNN Newsroom* aired on CNN in Hawaiʻi on Oct. 30, 2011 from 12:00 PM to 1:00 PM HST, or 3:00 PM to 4:00 PM PDT).

[393] *See* ConocoPhillips Company, *There's Power in Cooperation* (archived by web.archive on Oct. 17, 2011), https://perma.cc/F5F2-V5Q8; *see also* ConocoPhillips Company, *Clean* (archived by web.archive on Oct. 8, 2011), https://perma.cc/24KQ-EJCD.



**Figure 13: ConocoPhillips' Print Advertisement[394]**

221.    ConocoPhillips' 2012 Sustainable Development report declared developing renewable energy a priority in keeping with their position on sustainable development and climate change.[395] However, the company's 10-K filing from the same year told a different story: "As an independent E&P company, we are solely focused on our core business of exploring for, developing and producing crude oil and natural gas globally."[396] This is also reflected in ConocoPhillips' capital spending. From 2010 to 2018, only 0.03% of ConocoPhillips' capital

---

[394] ConocoPhillips Company, *There's Power in Cooperation*, *Class* (archived by web.archive on Mar. 16, 2012), https://perma.cc/WEM6-YSSC.

[395] ConocoPhillips, *Sustainable Development* (2012), https://perma.cc/8ETD-PT2J.

[396] ConocoPhillips, Form 10-K: Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 23 (Dec. 31, 2012), https://perma.cc/JP5G-MYQN.

spending was in low-carbon energy sources—a stark contrast to the message communicated to consumers through the company's advertisements.[397]

222.    ConocoPhillips made these misleading statements and omissions despite the fact that fossil fuels are the primary cause of increased greenhouse gas emissions and the primary driver of climate change, and that ConocoPhillips has continued to overwhelmingly focus on fossil fuel extraction and development. Further, describing natural gas as "clean-burning," "clean," and good for the environment is misleading because natural gas is a fossil fuel, the burning of which is the leading cause of climate change; and the focus on consumer use obscures the significant methane and other greenhouse gas emissions resulting from the extraction, production, and long-term use of natural gas.

### vii.    WEH's Misleading and Deceptive Greenwashing Campaigns

223.    Like other Fossil Fuel Defendants, WEH engaged in greenwashing advertisements designed to deceive Hawai'i consumers about WEH's products and its commitment to addressing climate change.

224.    WEH produced and directed print advertisements to Hawai'i consumers that, for example, touted WEH's efforts to reduce air emission and posited WEH as "working hard to preserve Hawaii's environment."[398]

---

[397] Fletcher et al., *Beyond the Cycle*, at 38, Figure 69 ("Disclosed low-carbon investment as a proportion of total CAPEX (2010-Q3 2018)") (Nov. 2018), https://perma.cc/3SY2-PNSX.
[398] BHP Hawaii Inc., *Print Ads, Ad 3* (archived by web.archive on Jan. 28, 1998), https://perma.cc/28UL-YP2Z.



**<u>Figure 14: WEH's Print Advertisement[399]</u>**

225.    WEH also produced and directed greenwashing television advertisements to Hawaiʻi consumers, including one advertisement that highlighted the company's support for environmental nonprofits in Hawaiʻi.[400]

226.    WEH ran a series of advertorials in Hawaiʻi newspapers in the 1990s which misleadingly promoted natural gas as a clean and environmentally friendly fossil fuel for Hawaiʻi consumers to cook with. For example, WEH misleadingly described natural gas as "helping to preserve Hawaii's clean air" and claimed that it is "friendly to Hawaii's environment because it is clean burning."[401]

---

[399] BHP Hawaii Inc., *Print Ads, Ad 3* (archived by web.archive on Jan. 28, 1998), https://perma.cc/28UL-YP2Z.
[400] *See, e.g.*, BHP Hawaii Inc., *TV Spots* (archived by web.archive on Jan. 28, 1998), https://perma.cc/9K4Y-4VB9; *see also* BHP Hawaii Inc., *Todd* (archived by web.archive on Nov. 4, 1996), https://web.archive.org/web/19961104034128/http://www.energypeople.com/energy/todd.aiff.
[401] Honolulu Star-Bulletin (June 13, 1996), https://perma.cc/D4HA-CBYR; Honolulu Star-Bulletin (Sep. 7, 1995), https://perma.cc/3N4Z-KLKG.

227.    WEH's advertisements in Hawai'i newspapers directed consumers in Hawai'i to their website, where WEH made misleading statements specifically targeted at consumers in Hawai'i.[402] The statements made on WEH's website promoted the continued use of WEH's petroleum products, gave the misleading impression that WEH's natural gas was clean and environmentally friendly, and posited WEH as a leader in environmental conservation and supporter of renewable energy. Statements made by WEH on its website include: "BHP Gas Company produces clean, efficient synthetic natural gas"; "[BHP's] plant uses a clean, no-polluting process that is environmentally compatible";[403] "Cleaning The Environment One Vehicle At A Time"; and "LP-Gas is a clean burning fuel with minimal emissions."[404] Additionally, although WEH claimed to "support[] development of alternative energy," they stated that "for now the solution to Hawaii's growing energy demands is oil."[405]

228.    WEH made these misleading statements and omissions despite the fact that fossil fuels are the primary cause of increased greenhouse gas emissions and the primary driver of climate change. Further, describing natural gas as "clean-burning," "clean," and good for the environment is misleading because natural gas is a fossil fuel, the burning of which is the leading cause of climate change; and the focus on consumer use obscures the significant methane and other greenhouse gas emissions resulting from the extraction, production, and long-term use of natural gas.

### viii.    API's Misleading and Deceptive Greenwashing Campaigns

229.    The Fossil Fuel Defendants also collectively promote their fossil fuel products through Defendant API, which makes public statements and claims about oil and natural gas. These public statements include advertisements and promotional campaign websites that have been directed at and/or reached Hawai'i, and which reasonable consumers would understand to

---

[402] *See, e.g.*, Honolulu Star-Bulletin (June 13, 1996), https://perma.cc/D4HA-CBYR; Honolulu Star-Bulletin (Oct. 31, 1997), https://perma.cc/WJ8V-WL2H.

[403] BHP Hawaii Inc., *BHP Gas Company* (archived by web.archive on Nov. 4, 1996), https://perma.cc/3GAH-37NK.

[404] BHP Hawaii Inc., *Clean Air* (archived by web.archive on June 12, 1997), https://perma.cc/DEH7-ZS88.

[405] BHP Hawaii Inc., Hana (archived by web.archive on Nov. 4, 1996), https://perma.cc/GRB6-WL8G.

mean that the Fossil Fuel Defendants' fossil fuel products are beneficial or benign and not harmful to the environment. In particular, API's marketing material falsely promotes the narrative that natural gas is an environmentally friendly fuel. For example, a Facebook advertisement by API that reached Hawai'i states, "Cleaner burning natural gas reduces CO2 emissions at home and bolsters energy security abroad."[406]

230.    In several advertisements in *The Washington Post*—e.g., "Why natural gas will thrive in the age of renewables," "Real climate solutions won't happen without natural gas and oil," and "Low- and no-carbon future starts with natural gas"—API has misleadingly touted natural gas as "part of the solution" to climate change. API falsely claims natural gas is "clean."[407] API also promotes natural gas's purported benefits through a campaign titled "Energy for a Cleaner Environment."

231.    API further claims, falsely, that, "[n]atural gas is an economical, environmentally friendly complement to renewable energy. The sooner green activists realize that, the more effective they'll be at continuing to slash emissions."[408]

232.    API markets itself as being an environmental steward, committed to helping reduce GHG emissions. API's 2021 Climate Action Framework portrays the organization as a partner in moving towards a climate solution, stating: "Our industry is essential to supplying energy that makes life modern, healthier and better while doing so in ways that tackle the climate challenge: lowering emissions, increasing efficiency, advancing technological innovation, building modern infrastructure and more."[409] As part of this campaign, API has offered on its website, in social media posts, and in other advertisements that have reached residents of Hawai'i, the image below, of lush greenery and a message that "88% of Americans favor energy companies helping meet

---

[406] Am. Petroleum Inst., *LNG is Pro-Environment and Pro-Energy Security*, Facebook Ad Libr., https://perma.cc/8X7Y-VAB7.

[407] Am. Petroleum Inst., *Why Natural Gas will Thrive in the Age of Renewables*, Wash. Post Creative Grp., https://perma.cc/U48M-VA8R; Mike Sommers, *Real Climate Solutions Won't Happen Without Natural Gas and Oil*, Wash. Post (Dec. 14, 2020), https://perma.cc/6RPX-R2SX.

[408] WP BrandStudio, *Low- And No-Carbon Future Starts with Natural Gas*, Wash. Post Creative Grp. (Content from API) (Feb. 15, 2019), https://perma.cc/ZRA7-7FDY.

[409] *Climate Action Framework*, Am. Petroleum Inst., 5 (2021), https://perma.cc/2DQN-2P52.

environmental challenges." API elaborates within the advertisement that "natural gas and oil []
powers and supports modern living . . . with lower emissions."



**Figure 15: API, We Are America's Generation Energy**[410]

233.     In 2017, API launched an advertising campaign called "Power Past Impossible,"
which portrayed the oil and gas industry as a sustainable, healthy, and essential part of societal
progress.[411] API President and CEO Jack Gerrard misleadingly stated that "greenhouse gas
emissions . . . are near 25 year lows," when GHG emissions globally were in fact increasing, and
total GHG emissions in the U.S. (including methane, not just carbon dioxide) had not been shown
to decline as claimed.[412] The campaign's opening advertisement, which aired nationally during the

---

[410] *We Are America's Generation Energy*, Am. Petroleum Inst. (2019), https://perma.cc/G9H3-62RP.
[411] *See* Am. Petroleum Inst., *API Launches Power Past Impossible Campaign During Super Bowl Showing
Natural Gas and Oil Benefit to Consumers in Everyday Life*, PR Newswire (Feb. 5, 2017, 18:32 ET),
https://perma.cc/UE5Y-QFAQ.
[412] *Id.*

Superbowl, stated: "Oil pumps life. Oil runs cleaner." The advertisement ignored the climate and public health harms caused by oil.[413] In 2018, API ran another advertisement under the same campaign which claimed, "thanks to natural gas the air up here is cleaner than it's been in 25 years." This advertisement ran on television programs broadcast in Hawaiʻi.[414] And as of July 21, 2020, the Power Past Impossible website described oil as "Energy for a Cleaner Environment." In touting the environmental benefits of oil, the website also made the following false or misleading assertions: "This is Energy for a Cleaner Environment," "99% Fewer Vehicle Emissions," and "Cleanest Air in More Than a Decade."[415] In 2020, API launched a nationwide advertising campaign called "Energy for Progress," which portrays the oil and gas industry as a leader in reducing GHG emissions.[416] The opening advertisement for the campaign states that "natural gas and oil companies have . . . reduced carbon emission levels to the lowest in a generation."[417] Similarly, in a September 2023 Twitter post, API stated "American natural gas & oil is committed to creating climate solutions."[418]

234.    The Energy for Progress website also contains advertisements such as "Five Ways We're Helping to Cut Greenhouse Gas Emissions," which misleadingly portrays the oil and gas industry as an environmental leader by focusing on marginal improvements in operational emissions while ignoring the much greater emissions from the industry's products.[419]

---

[413] Am. Petroleum Inst. (@powerpastimpossible), *Oil: Power Past Impossible*, YouTube (Feb. 4, 2017), https://perma.cc/67CK-3AE9.

[414] *See, e.g.*, CNN, *CNN Newsroom* (Nov. 1, 2018 at 12:50 PM PDT), https://perma.cc/UV67-QA3V; *see also* West Hawaii Today (Oct. 28, 2020), https://perma.cc/ZS6V-6LJQ (confirming that *CNN Newsroom* aired on CNN in Hawaiʻi on Nov. 1, 2018 from 9:00 AM to 10:00 AM HST, or 12:00 PM to 1:00 PM PDT).

[415] *See* Am. Petroleum Inst., *Energy for a Cleaner Environment*, Power Past Impossible, https://perma.cc/FAS7-NNXB.

[416] *See API Launches New National Campaign 'Energy for Progress', Highlights U.S. Energy Leadership in Annual State of American Energy Event*, Am. Petroleum Inst. (Jan. 7, 2010), https://perma.cc/53NP-SCJZ.

[417] *See* Am. Petroleum Inst., *Solving Big Challenges Requires Energy*, YouTube (Jan. 7, 2020), https://perma.cc/32NW-ESFE.

[418] Am. Petroleum Inst. (@APIenergy), X (Sept. 5, 2023, 12:25 PM), https://perma.cc/4QJG-WTZB.

[419] *See* Am. Petroleum Inst., *Five Ways We're Helping to Cut Greenhouse Gas Emissions*, Am. Natural Gas & Oil Energy for Progress (Apr. 17, 2020), https://perma.cc/Q3KN-RHUC.

135



**Figure 16: API advertisement from its Energy for Progress campaign,
used as the campaign's Facebook banner.**[420]

235. Tellingly, however, API's strategy does not advocate for or even mention a reduction in fossil fuel production as a strategy to protect the climate. Rather, it focuses on potential technological advances and shifting to heavier reliance on natural gas as a "clean fuel." And an internal API email shows that its Climate Action Framework was in fact organized around the purpose of "the continued promotion of natural gas in a carbon constrained economy."[421] As discussed above, natural gas is far from a "clean" fuel, as API misleadingly claims, because natural gas production and transmission contribute substantially to climate change by the release of methane, an extremely potent GHG, and combustion, which releases $CO_2$.

236. API's misinformation campaign has and continues to reach Hawai'i residents. API has and continues to finance advertisements targeting Hawai'i consumers, including a recent advertisement stating "I am Pro-Natural Gas. It's Who I Am."[422] Another API advertisement stated

---

[420] Am. Natural Gas & Oil Energy for Progress, *LET'S CREATE CLIMATE SOLUTIONS TOGETHER* (photograph), Facebook, https://perma.cc/GK7X-W9KT.

[421] *See* Memorandum from Chairwoman Carolyn B. Maloney & Chairman Ro Khanna to Members of the U.S., House of Rep., Comm. on Oversight & Reform, *Investigation of Fossil Fuel Industry Disinformation* (Dec. 9, 2022), https://perma.cc/JSX6-JNLK.

[422] Energy Citizens, *I AM PRO-NATURAL GAS. ITS WHO I AM*, Am. Petroleum Inst., Facebook Ad Libr. (Oct. 2, 2024), https://perma.cc/87XN-VYKC.

that "[i]ndustry investment in carbon capture technology has kept America at the forefront of decreasing emissions."[423]

### G. Fossil Fuel Defendants and API Also Made Misleading Claims About Specific "Green" or "Greener" Fossil Fuel Products.

237.     Fossil Fuel Defendants and API have also engaged in extensive and highly misleading marketing efforts aimed at promoting some fossil fuel products as "green" and environmentally beneficial. For example, as early as the 1970 advertorial below (Figure 17)—at which time Chevron already knew of the environmental risks posed by its fossil fuel products—Chevron marketed a gasoline additive in Hawai'i as one that "helps towards cleaner air" by reducing "unburned hydrocarbon and carbon monoxide exhaust emissions dramatically."[424] The Chevron advertorial further claimed that "Clearly, this [additive] is a major step towards solving one of today's most urgent problems." Similarly, a Shell advertorial from 1970 that ran in Hawai'i and targeted Hawai'i consumers claimed that "[w]hen it comes to cleaner air, you can count on Shell to do its part."[425]

---

[423] Am. Petroleum Inst., *CARBON CAPTURE*, Facebook Ad Libr. (Jan. 22, 2020 - Feb. 3, 2020), https://perma.cc/7227-YDVK.
[424] Hawaii Tribune-Herald (Feb. 13, 1970), https://perma.cc/SJB8-5D4E.
[425] Honolulu Star-Bulletin (June 4, 1970), https://perma.cc/S7ZC-TPQQ.



**Figure 17: 1970 Chevron Advertorial in the *Hawaii Tribune-Herald*[426]**

238.    Fossil Fuel Defendants' advertising and promotional materials fail to disclose the extreme safety risk associated with the use of fossil fuel products, which are causing "catastrophic" climate change, as understood by Defendants for decades.[427] Fossil Fuel Defendants continue to omit that important information to this day, consistent with their goal of maintaining consumer demand for fossil fuel products despite the risks those products pose for the planet and its people.

239.    Defendants misleadingly represent that consumer use of certain fossil fuel products actually helps customers reduce emissions. But emphasizing relative climate and "green" benefits while concealing the dangerous effects of continued high rates of fossil fuel use creates an overall

---

[426] Hawaii Tribune-Herald (Feb. 13, 1970), https://perma.cc/SJB8-5D4E.
[427] *See, e.g.*, ¶¶ 59–99, *supra*.

138

misleading picture that hides the dire climate impacts resulting from normal consumer use of Fossil Fuel Defendants' fossil fuel products. Contrary to Fossil Fuel Defendants' "green" claims, the development, production, refining, and consumer use of Fossil Fuel Defendants' fossil fuel products (even products that may yield relatively more efficient engine performance) *increase* GHG emissions to the detriment of public health and consumer welfare. No matter what chemicals are added to the fuel mixture, burning gasoline always emits GHGs, thereby contributing to climate change and its associated impacts. Fossil Fuel Defendants' additive marketing cloaks their gasoline products in an environmentally friendly veneer while misleadingly concealing the hazardous climatic effects of burning fossil fuels.

240. In addition, at the same time Fossil Fuel Defendants have been actively promoting their "greener" gasoline products at Hawai'i gas stations and on their company websites, Fossil Fuel Defendants have also been massively expanding fossil fuel production and increasing emissions. If consumers understood the full degree to which Fossil Fuel Defendants' fossil fuel products contributed to climate change and realized that Fossil Fuel Defendants had not in fact materially invested in alternative energy sources or were otherwise environmentally cautious, they likely would have acted differently, e.g., by not purchasing Fossil Fuel Defendants' products or purchasing less of them.

241. In the promotion of these and other fossil fuel products, including at their branded gas stations in Hawai'i, Fossil Fuel Defendants fail to disclose the fact that fossil fuels are the leading cause of climate change and that current levels of fossil fuel use—even purportedly "cleaner" or more efficient products—represent a direct threat to Hawai'i and the environment. Fossil Fuel Defendants' omissions in this regard are consistent with their goal of influencing consumer demand for fossil fuel products through greenwashing. Fossil Fuel Defendants also fail to require their vendors and third-party retail outlets to disclose facts pertaining to the impact the consumption of fossil fuels and their "cleaner" alternatives have on climate change when selling Fossil Fuel Defendants' fossil fuel products.

242.    Fossil Fuel Defendants' marketing of these fossil fuel products to Hawai'i consumers as "safe," "clean," "emissions-reducing," and impliedly beneficial to the climate—when production and use of such products is the leading cause of climate change—is reminiscent of the tobacco industry's effort to promote "low-tar" and "light" cigarettes as an alternative to quitting smoking after the public became aware of the life-threatening health harms associated with smoking.[428]

243.    As with tobacco companies' misleading use of scientific and engineering terms in advertising to enhance the credibility of their representations, Fossil Fuel Defendants' promotional materials for their fossil fuel products also misleadingly invoke similar terminology to falsely convey to Hawai'i consumers that the use of these products benefits the environment.

244.    For example, Exxon advertises that its Synergy Diesel Efficient fuel will permit vehicles to "[r]educe emissions."[429] Exxon also publishes online content under the banner "Energy Factor," wherein Exxon claims that it "offers a range of products—including lightweight materials and advanced lubricants and fuels—that improve performance, durability, and efficiency to drive down emissions." With this "portfolio of solutions," Exxon claims, it is pursuing "[t]he vital task of reducing greenhouse gas emissions across the transportation sector."[430] Exxon consistently promotes Synergy fuels as "clean" or "cleaner," and the company's climate strategy mentions its Synergy fuel, claiming it can help reduce GHG emissions. Exxon also cites Synergy's alleged reduction of $CO_2$ emissions in Exxon's advertisement of the company's improved environmental performance. An advertisement on Exxon's website, which is reproduced on the following page, includes an image featuring a bright sunrise in a clear sky over hills of green grass, green trees, and little to no industrial or urban development.

---

[428] *See* Am. Cancer Soc'y Cancer Action Network, *23 Year History of the Racketeering Lawsuit Against the Tobacco Industry: Guilty of Deceiving the American Public*, at 1, 4 (History of DOJ Rico Lawsuit Fact Sheet) (Nov. 8, 2024), https://perma.cc/LG9J-T927; *see also* Tobacco Control Legal Consortium, *The Verdict Is In: Findings from United States v. Philip Morris, Section on Light Cigarettes*, at 1–9 (2006), https://perma.cc/9VGN-67NX.

[429] Exxon, *Synergy Diesel Efficient Fuels For Fleets, Light-Duty Trucks, and Passenger Vehicles*, https://perma.cc/Y78T-SVB5.

[430] Exxon, *Transforming Transportation*, https://perma.cc/P9AY-ZKFA.



**Figure 18: ExxonMobil Fuels "Environmental Performance" website**[431]

245.    From 2016 through at least 2022, Exxon promoted Mobil 1™ ESP x2 on the website Energy Factor—effectively a corporate blog for Exxon, in which Exxon claims to discuss

---

[431] ExxonMobil, *Environmental Performance*, https://perma.cc/4GUF-7YVS.

141

developing safe and reliable energy sources for the future—in a post titled, "Green motor oil? ExxonMobil scientists deliver an unexpected solution."[432] According to its advertisement for Mobil 1™ ESP x2, Exxon specially formulated the green oil to "contribute to [] carbon-emission reduction efforts." Exxon's advertising suggests to the consumer that purchase and use of this motor oil convey an environmental benefit, when in fact the opposite is true.

246.     Around 1990, Exxon unveiled its "Exxon Supreme, Reduced Emissions Unleaded" marketing campaign promoting "New Exxon 93 Supreme" gasoline that "has been reformulated to reduce emissions." In September 1996, Exxon discontinued the 93 Supreme gasoline marketing campaign after the Federal Trade Commission accused Exxon of false and misleading advertising. According to studies, high-octane premium gas, such as Exxon's 93 Supreme, not only consumes more energy to produce than a gallon of regular gas,[433] but also increases emissions.[434]

247.     Similarly, Shell advertises that using its gasoline "produce[s] fewer emissions."[435]

248.     BP markets its Invigorate gasoline as a "proprietary detergent additive" that "help[s] cars become clean, mean, driving machines," and its bp Diesel as fuel that "can reduce emissions with powerful, reliable, and energy efficient fuel made with low sulfur and additives."[436] BP's website also advertises its fuel selection as "including a growing number of lower-carbon and carbon-neutral products."[437]

249.     Chevron advertises its Techron fuel with claims that emphasize its supposed positive environmental qualities, such as: "less is more," "minimizing emissions," and "up to 50% cleaner."[438] In a Q&A on Chevron's website, one question says, "I care for the environment. Does

---

[432] Energy Factor, *Green Motor Oil? Exxonmobil Scientists Deliver an Unexpected Solution*, ExxonMobil (July 19, 2016), https://perma.cc/EW2H-57S6.

[433] Elizabeth Martin-Malikian, *High Octane: Eco-Adaptive Architecture*, 2012 ACSA Fall Conference 123 ("Making a gallon of premium gas thus consumes more energy than making a gallon of regular."), https://perma.cc/84GU-66VX.

[434] Cenk Sayin et al., *An Experimental Study of the Effect of Octane Number Higher than Engine Requirement on the Engine Performance and Emissions*, 25 Applied Thermal Eng'g 1315, 1317 (2005) ("The results demonstrated that as the octane number was increased from 91 to 93, CO emissions boosted nearly 5%.").

[435] *See, e.g.*, Shell, *Shell Gasolines*, https://perma.cc/R2SZ-7YNS.

[436] *See, e.g.*, BP, *Our Fuels*, https://perma.cc/Q439-PV9S.

[437] BP, *Advanced Fuels and Lubricants*, https://perma.cc/JC3F-9JLG.

[438] *See, e.g.*, Chevron, *Techron* (archived by web.archive on Feb. 21, 2022), https://web.archive.org/web/20220221084120/https://www.techron.com/.

142

Techron impact my car's emissions?" Chevron answers that "[g]asolines with Techron" clean up carburetors, fuel injectors, and intake valves, "giving you reduced emissions."[439] Chevron has made similar claims in advertisements in Hawaiʻi newspapers targeted to Hawaiʻi consumers.[440] As discussed above, Chevron has also extensively advertised its carbon offset program in Hawaiʻi and to Hawaiʻi consumers, including misleading claims such as, "[f]ueling your car at Texaco stations helps to reduce your carbon footprint."[441]

250.    Similarly, Sunoco has advertised its gasoline to consumers in Hawaiʻi as "eco-friendly gasoline that helps reduce emissions and protect our beautiful island environment."[442]

251.    These misrepresentations, which were intended to and did in fact reach and influence consumers, including consumers in Hawaiʻi, were misleading because they emphasize the fuels' supposed environmental benefits without disclosing the key role fossil fuels play in causing climate change.

252.    Additionally, Defendants often represent hydrogen fuel as "clean," "renewable," or "zero / low carbon." These representations omit that the vast majority of hydrogen fuel is produced from fossil gas.[443] For example, ExxonMobil issued an advertisement on Twitter stating, "Hydrogen is the most abundant element on earth. And because hydrogen fuel is versatile - and produces no emissions at point-of-use, #hydrogen can play a big role helping society meet its net-zero goals."[444] In another example, Shell has posted on Twitter, "A car that only emits water and heat? Learn more about #hydrogen, a fuel for the future that can help clean up transport today #makethefuture."[445]

---

[439] *Techron Technology*, Chevron, https://perma.cc/W4JH-LQPG.

[440] *See, e.g.*, Hawaii Tribune-Herald (July 11, 2006), https://perma.cc/A3VJ-R2C9.

[441] *See* Texaco in Hawaii, Facebook (Jan. 31, 2021), https://perma.cc/8SCV-HC9P.

[442] *See* Aloha Gas, *5 Things to Know About Fueling Up at Aloha*, Facebook (Mar. 25, 2024), https://perma.cc/FE2M-VK2B; @alohagasltd, Instagram (Mar. 25, 2024), https://perma.cc/F6CK-RAY5.

[443] *See* U.S. Dep't of Energy, *Hydrogen Production: Natural Gas Reforming*, Office of Energy Efficiency & Renewable Energy, https://perma.cc/E4Y5-3ATZ.

[444] ExxonMobil (@ExxonMobil), X (Aug. 3, 2023, 10:00 AM), https://perma.cc/WWP7-MK5L (The advertisement also includes a video where an Exxon employee touts hydrogen as "decarbonizing." The advertisement later shows a diagram (but nothing spoken) showing that hydrogen comes from natural gas.).

[445] Shell USA (@Shell USA), X (Dec. 20, 2017, 12:45 AM), https://perma.cc/X3EV-YP6B.

253.    Defendants also misrepresent the characteristics of biofuels. These misrepresentations fail to disclose that biofuels created from bioethanol and blended into gasoline are typically composed mostly of fossil fuel, and Fossil Fuel Defendants' production of biofuels is insignificant compared to fossil fuel production and fuel demand. For example, in addition to not disclosing the very small scope of these efforts, Exxon's advertisements do not acknowledge that Exxon's biodiesel fuel is generally a blend that uses only 5% to 20% biofuel, with the remainder composed of fossil fuel.[446] Thus, Exxon's greenwashing advertisements misleadingly overstate both the "sustainable" or "environmentally friendly" nature of its biodiesel investment as well as its scope. Chevron has a Renewable Energy Group that produces "EnDura Fuels," which it advertises as "A Simple Lower Carbon Solution Now."[447] The front page of Chevron's website, as of September 8, 2023, featured "renewable diesel,"[448] and another page on its website touts biofuels used on ships[449] and an advertising campaign linking to that page.[450] The page says, "Biofuels can quickly change transportation sectors for the better. When used as a marine fuel, biofuels can reduce greenhouse gas (GHG) emissions on a lifecycle analysis." Similarly, BP claims in advertisements that "We're making motor oil that's 25% sugarcane based" to "make energy cleaner and better."[451]

254.    As with the tobacco companies' use of scientific terms to promote "light" cigarettes, Fossil Fuel Defendants' claim that their purportedly high-tech new fossil fuel products help consumers reduce emissions renders their promotional materials misleading because they seek to convey—with the imprimatur of scientific credibility—an overall message that is false and

---

[446] *See* ExxonMobil, *Mobility Reimagined: On the Road to Lower GHG Emissions*, at 8, https://perma.cc/HGN3-K5VD.

[447] *Endura Fuels: A Simple Lower Carbon Solution Now*, Chevron Renewable Energy Grp., https://perma.cc/2WX9-RAPH.

[448] Chevron.com (archived by web.archive on Sep. 8, 2023), https://web.archive.org/web/20230908134310/https://www.chevron.com/; *see also* Chevron, *Energy Everywhere: Renewable Diesel – Episode 2*, YouTube, https://perma.cc/G8FQ-BHQJ (video embedded on front page).

[449] *Biofuels Steer into Maritime Sector*, Chevron (July 5, 2023), https://perma.cc/ZP9Y-22GW.

[450] Chevron, *Biofuels Steer into Maritime Sector*, Facebook Ad Libr. (Aug. 18-24, 2023), https://perma.cc/NK3K-J65G.

[451] BP America, *Possibilities Everywhere,* Facebook Ad Libr. (July 23–28, 2019), https://perma.cc/6XRE-N68Q.

contradicted by Defendants' own decades-old internal knowledge regarding the dangers of fossil fuel use.

## H. Defendants' Deceit Only Recently Began Coming to Light, and Their Misconduct Is Ongoing and Yet to be Fully Uncovered.

255. Defendants' long campaign of deception has just started to be uncovered, with confidential documents beginning to enter certain public spheres. One of the early sources of this information was a niche non-profit news organization focused on covering environmental topics. Journalists at the organization uncovered archives and conducted interviews of former employees of one Defendant—Exxon—demonstrating that Exxon had sophisticated knowledge of the causes and consequences of climate change and the role its products played in causing climate change as far back as the 1970s.[452]

256. Additional journalists then began to expose some information pertaining to Exxon's knowledge, and other select members of the fossil fuel industry related to the consequences of climate change and the role their products played in causing climate change going back to the 1970s.[453]

257. As information about Defendants' tortious and deceptive conduct and knowledge of their fossil fuel products slowly trickled to light, the Center for International Environmental Law—another environmental non-profit organization—issued a report summarizing the evidence that had been uncovered up to that point.[454]

258. Since then, public reporting on Defendants' deceptive conduct has become more widespread. In 2023, for example, the *Wall Street Journal* reported that Exxon worked "behind closed doors" to sow public doubt about climate change. The article was based on "documents reviewed by the Journal, which haven't been previously reported."[455] The fact that new, non-public

---

[452] Neela Banerjee et al., *Exxon: The Road Not Taken*, Inside Climate News (Sept. 16, 2015), https://perma.cc/U9L4-U99E.

[453] *See* Katie Jennings et al., *How Exxon Went from Leader to Skeptic on Climate Change Research*, L.A. Times (Oct. 23, 2015), https://perma.cc/5CEU-SUNP; Jerving et al., *supra* note 202; Lieberman & Rust, *supra* note 272.

[454] Caroll Muffett & Steven Feit, *Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis*, Ctr. for Int'l Envtl. Law 10 (Nov. 2017), https://perma.cc/TE6L-DSUL.

[455] Matthews & Eaton, *supra* note 290.

145

and potentially confidential documents are still being discovered demonstrates not just Defendants' efforts to conceal their knowledge of the role their products play in climate change, but also highlights the lengths Defendants' went—and continue to go—to conceal their role in obfuscating that science, their knowledge, and their role in bringing about catastrophic climate harms to consumers in Hawai'i and elsewhere. These recent investigations and reports are but a fraction of Defendants' knowledge and misconduct. The full extent of Defendants' deception and concealed knowledge remain unknown to Hawai'i.

259. The fact that Defendants and their proxies knowingly provided incomplete and misleading information to the public, including Hawai'i consumers, only recently became discoverable due to, among other things:

a. Defendants' above-described deception campaign, which continues to this day;

b. Defendants' concealment and misrepresentations regarding the fact that fossil fuel products cause catastrophic harms; and

c. The fact that Fossil Fuel Defendants used front groups such as API, GCC, and ICE to obscure their involvement in these actions, which put the public off the trail of inquiry.

260. Moreover, Defendants' tortious misconduct—in the form of misrepresentations, omissions, and deceit—began decades ago and continues to this day. Now, rather than engaging in outright denials of the existence of climate change, Defendants deflect attention from their role in causing climate change by falsely portraying fossil fuel products as environmentally friendly, climate-friendly, or otherwise less environmentally damaging than those products really are, and by overstating Defendants' investments in renewable or alternative energy.

261. Defendants have continued to mislead the public about the impact of fossil fuel products on climate change through "greenwashing." Through recent advertising campaigns and public statements in Hawai'i and/or intended to reach Hawai'i, including but not limited to online advertisements and social media posts, Defendants falsely and misleadingly portray these products as "green," and Fossil Fuel Defendants portray themselves as climate-friendly energy companies

that are deeply engaged in finding solutions to climate change. In reality, Defendants continue to primarily, and overwhelmingly, invest in, develop, promote, and profit from fossil fuel products and heavily market those products to consumers, with full knowledge that those products will continue to exacerbate climate change harms.

262.    Defendants' greenwashing exploits consumers' concerns about climate change and their desire to purchase "green" products and spend their consumer dollars on products and businesses that are taking substantial and effective measures to combat climate change. Defendants' false advertisements are likely to mislead the public, including Hawai'i consumers, by giving the impression that in purchasing Fossil Fuel Defendants' fossil fuel products, consumers are supporting genuine, substantial, and effective measures to mitigate climate change through these companies' alleged investments in clean energy. Defendants' greenwashing ultimately attempts to persuade consumers to continue purchasing Fossil Fuel Defendants' fossil fuel products.

263.    As described above, Fossil Fuel Defendants, directly and/or through membership in other organizations, continue to misrepresent their own activities, the fact that their products cause climate change, and the danger presented by climate change. Exemplars of continuing misrepresentations, omissions, and deceit follow below.

264.    As recently as June 2018, a post on the official Shell blog stated: "the potential extent of change in the climate itself could now be limited. In other words, the prospect of runaway climate change might have passed."[456] However, this statement is not supported by valid scientific research and was, and is, contradicted by various studies.[457]

265.    In March 2018, Chevron issued a report entitled "Climate Change Resilience: A Framework for Decision Making," which misleadingly stated that "[t]he IPCC Fifth Assessment

---

[456] David Hone, *Has Climate Change Run Its Course??*, Shell Climate Change Blog (June 14, 2018), https://perma.cc/C939-ZAEJ.
[457] *See, e.g.*, Fiona Harvey, *Carbon Emissions from Warming Soils Could Trigger Disastrous Feedback Loop*, The Guardian (Oct. 5, 2017), https://perma.cc/6LWD-KRX2; Jonathan Watts, *Domino-Effect of Climate Events Could Move Earth into a 'Hothouse' State*, The Guardian (Aug. 7, 2018), https://perma.cc/73FU-6RKE; Fiona Harvey, *'Tipping Points' Could Exacerbate Climate Crisis, Scientists Fear*, The Guardian (Oct. 9, 2018), https://perma.cc/2FBD-Q594.

147

Report concludes that there is warming of the climate system and that warming is due in part to human activity."[458] In reality, the Fifth Assessment report concluded that "[i]t is *extremely likely* [defined as 95–100% probability] that human influence has been the *dominant cause* of the observed warming since the mid-20th century."[459]

266.    Despite this fact, in April 2017, Chevron CEO and Chairman of the Board John Watson said on a podcast, "There's no question there's been some warming; you can look at the temperatures data and see that. The question and debate is around how much, and how much is caused by humans."[460]

267.    On May 27, 2015, at Exxon's annual shareholder meeting, then-CEO Rex Tillerson misleadingly downplayed global warming's risks by stating that climate models used to predict future impacts were unreliable: "What if everything we do, it turns out our models are lousy, and we don't get the effects we predict? Mankind has this enormous capacity to deal with adversity, and those solutions will present themselves as those challenges become clear."[461] But as noted above, in 1982, Exxon's scientific staff stated, based upon the climate models, that there was a "clear scientific consensus" with respect to the level of projected future global warming and starting shortly thereafter Exxon relied upon the projections of climate models, including its own climate models, in order to protect its own business assets. Tillerson's statement reached consumers because it was reported in the press, as is common when fossil fuel company CEOs make statements regarding climate change and as Exxon had reason to know would occur.

268.    Until approximately early 2017, Exxon's website continued to emphasize the "uncertainty" of global warming science and impacts: "current scientific understanding provides limited guidance on the likelihood, magnitude, or time frame" of events like temperature extremes

---

[458] Chevron, *Climate Change Resilience: A Framework for Decision Making*, at 20 (Mar. 2018), https://perma.cc/P6EQ-P47Q.

[459] IPCC, S*ummary for Policymakers: Working Group I Contribution to the Fifth Assessment Report*, at 17 (2013), https://perma.cc/DRD2-VFGR.

[460] Columbia Energy Exchange Podcast, *Guest John Watson, CEO, Chevron*, Ctr. on Glob. Energy Pol'y at Columbia (Apr. 10, 2017) (at 15:00), https://perma.cc/HVD6-3FD6.

[461] *Exxon CEO: Let's Wait for Science to Improve Before Solving Problem of Climate Change*, Dallas Morning News (May 27, 2015), https://perma.cc/666G-Y8MS.

and sea level rise.[462] Exxon's insistence on crystal-ball certainty was clear misdirection, since Exxon knew that the fundamentals of climate science were well-settled and showed global warming to be an unambiguous danger.[463]

269.    Until approximately early 2016, API's website referred to global warming as "possible man-made warming" and claimed that the human contribution is "uncertain." API removed this statement from its website in 2016 when journalistic investigations called attention to API's misleading statements on global warming and its participation in the $CO_2$ and Climate Task Force during the late 1970s and early 1980s.

**I.    Hawai'i Has Suffered, Is Suffering, and Will Suffer Injuries from Defendants' Conduct.**

270.    Defendants' individual and collective conduct brought about or helped bring about climate change and consequent harms to Hawai'i. That conduct includes, but is not limited to, Fossil Fuel Defendants' failures to warn of the known threats fossil fuel products pose to the world's climate; Defendants' wrongful promotion of fossil fuel products and concealment of known hazards associated with the use of those products; and their public deception campaigns designed to mislead consumers to believe that fossil fuel products are climate-friendly, and to obscure the connection between fossil fuel products and the environmental, physical, social, and economic consequences of climate change.

271.    Hawai'i is experiencing global warming acutely. Over the last 60 years, atmospheric concentrations of carbon dioxide, as measured at NOAA's Mauna Loa Observatory, have increased by more than 100 parts per million, and this trend is accelerating.[464] Since 1950, temperatures in Hawai'i have risen by about 2 degrees Fahrenheit, and the annual number of hot

---

[462] *Meeting Global Needs – Managing Climate Change Business Risks*, ExxonMobil, https://perma.cc/9UW5-8PY5.

[463] *See* IPCC, *Climate Change 2014, Impacts, Adaptation, and Vulnerability, Summary for Policymakers* (2014), https://perma.cc/K2WB-XMMX.

[464] J.J. Marra et al., *Pacific Islands Climate Change Monitor: 2021*, Kenodo, at 6 (2021), https://perma.cc/M2LU-BW3P.

days and very warm nights has risen sharply.[465] By 2100, NOAA projects an increase of near-surface average annual temperature in Hawai'i of between 6-10 degrees Fahrenheit above 1950 levels in a high-emissions scenario, or an increase of 2-6 degrees Fahrenheit in a lower-emissions scenario.[466] As emissions continue and temperatures rise, the impacts of climate change will worsen.

272.     The exceptional rate of warming globally and in Hawai'i has caused manifold harms, including sea level rise, storm surge, extreme high tides and attendant flooding; warming and acidification of Hawai'i waters and concomitant damages to Hawai'i fishing and aquaculture; increased frequency and intensity of precipitation events and associated flooding; increased drought and fire risk; more dangerously hot days and heat-related illnesses; increased transmission of vector-borne diseases; reduced air quality; and the cascading social, cultural, economic, health, and other consequences of these environmental changes.

273.     While these harms are suffered by all Hawai'i residents, they particularly affect, and will continue to disproportionately impact, Hawaii's frontline communities.[467] Sea level rise, extreme precipitation, wildfires, extreme heat, vector-borne diseases, and other climate harms have unequal impacts on Hawai'i residents depending on social vulnerability factors including demographic characteristics, social and economic characteristics, community social capital, and public infrastructure and resources.[468] The lowest-lying areas of Hawai'i are most at risk from sea level rise, storm surge, extreme high tides, and attendant flooding. Many Hawai'i communities and State assets are also vulnerable to flooding from extreme precipitation events. And Hawai'i

---

[465] L.E. Stevens et al., *Hawai'i State Climate Summary 2022, NOAA Technical Report NESDIS 150-HI*, at 1 (2022), https://perma.cc/M7FK-MXMF.

[466] *Id*.

[467] S. Nazrul Islam & John Winkel, *Climate Change and Social Inequality*, UN Department of Economic & Social Affairs Working Paper No. 152, at 24 (October 2017), https://perma.cc/VG96-A56U. ("[I]nequality exerts the disproportionate effects through three channels, namely (i) increased exposure of disadvantaged groups to climate hazards, (ii) increased susceptibility to damage caused by climate hazards, and (iii) decreased ability to cope with and recover from the damage."); Makena Coffman, Suwan Shen & Maja Schjervheim, *Social Vulnerability to Climate Change in Hawai'i: Data, Indicators, and "Gap" Assessment*, A Report to The State of Hawai'i Climate Change Mitigation and Adaptation Commission (May 4, 2022), https://perma.cc/NXW4-UEGS.

[468] Coffman, *supra* note 467, at 9.

residents employed in the agriculture, fishing, aquaculture, and tourism industries are at particular risk of employment disruptions.

274. Climate change has caused and will continue to cause significant harm to Native Hawaiians and Native Hawaiian traditional and customary practices. For Native Hawaiians, the land is an integral component of social, cultural, and spiritual life, and the principle of mālama ʻāina (to take care of the land) is therefore directly linked to conserving and protecting not only the land and its resources but also humankind and the spiritual world as well.[469] Because Native Hawaiian culture is inextricably bound to Hawaiʻi's natural environment, climate impacts threaten Native Hawaiian culture, identity, and social welfare.[470] Climate change has already impacted and will continue to harm Native Hawaiian traditional and customary practices including upland forest practices, traditional agriculture, and coastal and nearshore marine practices.[471]

275. The State has suffered and will continue to suffer severe climate change harms because of Defendants' deceptive promotion of fossil fuel consumption as described in this Complaint. These include, but are not limited to, injury, obstruction, invasion, or destruction of State property, natural resources, and infrastructure, as well as other assets that are essential to community health, safety, and well-being; increased planning and implementation costs for confronting sea level rise, erosion, landslides, extreme precipitation, wildfires, extreme heat events, vector-borne diseases, and poor air quality; increased costs for emergency preparedness and response measures; and increased costs for public education and awareness, and for extensive community adaptation and resilience efforts.

276. The Hawaiʻi legislature has recognized that "an existential climate emergency threatens humanity and the natural world" and has committed to "statewide action that is rooted in equity, self-determination, culture, tradition, and the belief that people locally and around the world have the right to clean, healthy, and adequate air, water, land, food, education, and

---

[469] Melody Kapilialoha et al., *Environmental Justice for Indigenous Hawaiians: Reclaiming Land and Resources*, 21 Nat. Resources & Env't 37 (2007).

[470] D. Kapuaʻala Sproat, *An Indigenous People's Right to Environmental Self-Determination: Native Hawaiians and the Struggle Against Climate Change Devastation*, 35 Stan. Envtl. L.J. 157, 171 (2016).

[471] *Id.* at 172–81.

shelter."[472] In 2014, the legislature created an interagency climate adaptation committee, which in 2017 was renamed the Climate Change Mitigation and Adaptation Commission.[473] The Climate Change Mitigation and Adaptation Commission is charged with assessing climate change vulnerabilities; identifying people, communities, industries, and ecosystems vulnerable to climate impacts; establishing climate change mitigation and adaptation strategies; and providing policy direction and coordination among relevant stakeholders, among other responsibilities.[474]

277.    To prepare for and mitigate climate impacts in Hawaiʻi, State agencies have engaged and will continue to engage in planning and implementing adaptation and resiliency measures. For example, the Department of Land and Natural Resources has issued sea level rise vulnerability and adaptation reports, and DLNR's Commission on Water Resource Management and Hawaiʻi Drought Council have worked to predict drought seasons, develop guidelines on water conservation, monitor water quality, and manage risk for areas most likely to be impacted by water shortages.[475] The Department of Transportation has developed its Highway's Climate Adaptation Action Plan and Climate Insights for Infrastructure Platform.[476] DOT is also implementing resiliency into its construction projects, with over 280 active resiliency projects in calendar year 2025 collectively exceeding $1 billion in total project costs.[477] The Office of Planning and Sustainable Development has worked to identify vulnerable State facilities, and other offices within the Department of Business, Economic Development, and Tourism have implemented initiatives to promote renewable energy and protect against climate change impacts.[478] The Department of Hawaiian Homelands has engaged in resiliency planning for climate impacts to

---

[472] Senate Concurrent Resolution 44, S.D. 1, H.D. 1, 31st Leg., Reg. Sess. (2021).

[473] 2014 Haw. Sess. Laws Act 83; 2017 Haw. Sess. Laws Act 32.

[474] HRS § 225P-3.

[475] Climate Change Mitigation and Adaptation Commission, *2023 Annual Report*, https://perma.cc/A2HW-72W5.

[476] Hawaiʻi Dep't of Transp., *HDOT Climate Insights for Infrastructure*, https://perma.cc/Q2BT-CJJR.

[477] Hawaiʻi Dep't of Transp., *Improve Resiliency*, https://perma.cc/WA32-XH86.

[478] *E.g.*, Climate Change Mitigation and Adaptation Commission, *supra* note 475, Climate Change Mitigation and Adaptation Commission, *2024 Annual Report*, https://files.hawaii.gov/dlnr/reports-to-the-legislature/2025/CC25-Hawaii-Climate-Change-Report-FY24.pdf.

Hawaiian homesteads, including on Molokaʻi.[479] The Department of Health has undertaken a Climate Change and Health Vulnerability Assessment and implemented a multi-stakeholder Hawaiʻi Climate Change and Health Working Group.[480] Other State departments have also engaged in climate mitigation, adaptation, and resiliency efforts,[481] and the need for these initiatives will only increase as climate impacts in Hawaiʻi become more severe.

278.    As a result of Defendants' wrongful conduct, Hawaiʻi has expended and will continue to expend resources to abate the existing and projected adverse harms of climate change on the State, including, but not limited to, efforts to abate the harms described below.

### i.    Sea Level Rise in Hawaiʻi

279.    Global warming has caused and continues to cause accelerated sea level rise in the Pacific Ocean with severe, and potentially catastrophic, consequences for the State. As the only U.S. state comprised entirely of islands, Hawaiʻi is uniquely vulnerable to sea level rise, and is projected to experience sea level rise that is 16 to 20 percent higher than the global average.[482] Furthermore, much of Hawaii's economic, cultural, and social life revolves around coastal resources and habitats. Therefore, the disruption and damage caused by sea level rise will have widespread and long-lasting impacts within the State beyond just the physical damage caused by flooding.

280.    Hawaiʻi is already feeling the impacts of sea level rise. As of 2021, 66 State-owned facilities have reported flooding from sea level rise and precipitation. These facilities include public housing complexes in Kāneʻohe, the Huliheʻe Palace historic site, and the Kauaʻi and Oʻahu

---

[479] Plan. Consultants Hawaiʻi, LLC & Coastal Planners, LLC, *South Molokaʻi Shoreline Erosion Management Plan*, prepared for State of Hawaiʻi Dep't of Hawaiian Home Lands (Dec. 2022), https://dhhl.hawaii.gov/wp-content/uploads/2024/01/Dec-2022_Final-SM-SEMP_for-web.pdf.

[480] Climate Change & Health in Hawaiʻi Comprehensive Vulnerability Assessment, https://www.storydoc.com/9024b4f3c6dc04a5870b66b700a6fc19/c8741689-04ae-4347-97f7-a1261797b198/65c6dea641e4a2000b44585d; Hawaiʻi Climate Change and Health Working Group, https://climatehealthhawaii.org/.

[481] *E.g.*, Climate Change Mitigation and Adaptation Commission, *supra* note 475; Climate Change Mitigation and Adaptation Commission, *supra* note 478.

[482] Honolulu Climate Change Commission, *Sea Level Rise II – Guidance Document*, at 2 (July 29, 2022), https://perma.cc/8YHQ-WY75.

Community Correctional Centers.[483] Additionally, at least 43 miles of roads, 105 bridges, and 9 culverts are threatened by sea level rise hazards including flooding and coastal erosion.[484] Moreover, 70 percent of the State's beaches have already experienced erosion, and 13 miles of beach have been lost across the islands.[485] These impacts will continue to worsen as the sea level rises further. By 2050, NOAA predicts that more than 90 percent of the State's beaches will be receding.[486]

281.    The State has already undertaken efforts to fight erosion, including dune and beach restoration projects intended to prevent further shoreline loss. In response to coastal erosion that has impacted State highways, the Hawaiʻi Department of Transportation is proposing revetments in at least two locations along the Kamehameha Highway on Oʻahu to protect the threatened roadway.[487] For example, Punaluʻu Beach Park and the adjacent portions of Kamehameha Highway are threatened by erosion and inundation from sea level rise, and a feasibility study prepared for the Department of Land and Natural Resources found that interventions to protect the beach and highway could exceed $14 million or $30 million.[488] Some roads may need to be relocated entirely.[489] On Maui, plans are being made to relocate entire portions of the Honoapiʻilani Highway inland.[490] And far more extensive adaptation efforts will become necessary to mitigate the impacts of climate change in the future.

282.    The State's Climate Change Mitigation and Adaptation Commission has evaluated the extent of damage that would be caused by 3.2 feet of sea level rise above 2000 levels by 2100. This scenario, previously considered one of the more extreme outcomes, is now considered a mid-

---

[483] Hawaiʻi Off. of Plan. and Sustainable Dev.*, 2021 Annual Report for Act 178: Relating to Sea Level Rise Adaptation*, at 12 (December 2021), https://perma.cc/V8WF-EK9Y.

[484] Hawaiʻi Dep't of Transp., *Hawaii Highways Climate Adaptation Action Plan: Exposure Assessments*, at 44 (April 2021), https://perma.cc/P3UT-NEPF.

[485] Stevens, *supra* note 465, at 5.

[486] *Id*.

[487] Hawaiʻi State Climate Commission*, Hawaiʻi Sea Level Rise Vulnerability and Adaptation Report 2022 Update*, at 6 (2022) ("2022 SLR Report"), https://perma.cc/C5E2-UTMQ.

[488] Sea Engineering, Inc., *Punaluʻu Beach Restoration Feasibility Study*, prepared for Hawaiʻi Dep't of Land and Nat. Resources (April 2024), https://perma.cc/GV2R-92PY.

[489] Hawaiʻi Dep't of Transp., *supra* note 484, at 46.

[490] Hawaiʻi State Climate Commission, *supra* note 487, at 6.

154

range outcome.[491] Under this scenario, Hawaiʻi will lose over 25,000 acres of land due to chronic flooding. That land will either be eroded into the ocean, submerged under inches or feet of standing water, or subject to seasonal flooding from high surf. Of those 25,000 acres, 34% are designated for urban use; 25% for agriculture, and 40% are designated for conservation.[492] Additionally, under a 3.2-foot sea level rise scenario, over 6,500 structures located near the shoreline will be lost or impacted, including hotels, shopping malls, small businesses, churches, schools, community centers, and apartment buildings. These homes, businesses, and community assets will need to be closed, relocated and rebuilt, displacing an estimated 20,000 residents. The total value of the impacted structures will amount to over $19 billion (in 2017 dollars), but this sum cannot account for the disruption and loss felt by those who will be forced to move.[493]

283.    This figure also does not account for the damages to the State's roads, utilities, and other important infrastructure, like airports and harbor facilities. Under the scenario of 3.2 feet of sea level rise by 2100, over 38 miles of roads in the State will be flooded, including sections of highways such as Kūhiō Highway on Kauaʻi, Kamehameha Highway on Oʻahu, and Honoapiʻilani Highway on Maui. Utility lines running parallel and beneath these roadways will also be damaged. In addition to the monetary damages, which will likely be an order of magnitude greater than the $19 billion in estimated losses from flooding to land and structures, this loss of infrastructure will impact commerce, access to emergency services, and traffic flow across the State.[494]

284.    Furthermore, 275 State-owned facilities are currently located in areas that will be impacted by sea level rise of 3.2 feet. This includes 28 airports, 17 harbors, 22 state parks, and 107 Department of Education facilities. Even under a much more conservative projection of 0.5 feet of

---

[491] *Id.* at ii. The Commission used the 3.2 feet benchmark in 2017 to assess the likely impacts of sea level rise by the end of the century. Based on recent emissions projections, the Commission recommended in its update to that 2017 report that going forwards the State use sea level rise of 4 feet as the revised planning and policy benchmark and apply a 6-foot benchmark for all future public infrastructure projects with low risk-tolerances. *Id.* at iv.

[492] Hawaiʻi Climate Change Mitigation and Adaptation Commission, *Hawaiʻi Sea Level Rise Vulnerability and Adaptation Report*, at ix (2017) ("2017 SLR Report"), https://perma.cc/Y8MP-CDLE; U.S. Glob. Change Rsch. Program, *Chapter 30: Hawaiʻi and US-Affiliated Pacific Islands*, at 25 (2023) ("Fifth National Climate Assessment"), https://perma.cc/PQ47-YDNS.

[493] *Id.*

[494] 2017 SLR Report, *supra* note 492, at ix.

sea level rise, 99 State-owned facilities will be impacted, with that number growing to 187 with 2 feet of sea level rise. If sea level rise reaches 6 feet, 431 State-owned facilities will be impacted.[495]

285.    Additionally, 3.2 feet of sea level rise would lead to the loss of invaluable natural and cultural resources across the State, resources which cannot be relocated or rebuilt. World-famous beaches like Sunset Beach  will be eroded if not lost altogether.[496] For example, on the Island of Hawaiʻi alone, approximately 692 acres of public beaches and parks, like Hōnaunau County Park and Puʻuohonua o Hōnaunau National Historical Park, fall within the threatened areas. [497]  3.2 feet of sea level rise will cause inundation of approximately 29% of current Hawaiian waterbird nesting habitat, and would likely result in the decline of currently endangered waterbird populations.[498]

286.    Sea level rise will lead to wastewater overflow caused by flooding to on-site sewage disposal systems, which could diminish water quality and harm marine ecosystems, and greater amounts of ocean water combining with freshwater will impact shoreline habitats.[499] Harms to coastal ecosystems and species will impact Native Hawaiian cultural traditions dependent on the natural environment, as well as fishing and aquaculture industries. Additionally, under a scenario of 3.2 feet sea level rise, almost 550 cultural sites will be flooded, as will many Hawaiian Home Lands communities.[500]

287.    Alongside sea level rise will come more frequent coastal flooding from high tide and storm surges, with severe effects to shoreline infrastructure, communities and ecosystems.[501] Rising sea levels, in tandem with natural variations in high tides, will lead to rapid increases in tidal flooding beginning in the mid-2030s. By the early 2040s, the City of Honolulu may

---

[495] Hawaiʻi Off. of Plan. and Sustainable Dev., *2021 Annual Report for Act 178: Relating to Sea Level Rise Adaptation*, at 6–8 (December 2021), https://perma.cc/V8WF-EK9Y.

[496] 2017 SLR Report, *supra* note 492, at xi.

[497] *Id*. at 84.

[498] Kristen C. Harmon et al., *The Role of Indigenous Practices in Expanding Waterbird Habitat in the Face of Rising Seas*, 34 Anthropocene, at 4, 6 (June 2021), https://perma.cc/7B7X-8YDS.

[499] 2017 SLR Report, *supra* note 492, at 84.

[500] *Id*. at xi.

[501] 2022 SLR Report, *supra* note 487, at 2.

experience as many as 6–14 flood days per month when rising sea levels combine with king tides.[502]

288.    Sea level rise and coastal flooding will be exacerbated by heavy rainfall overwhelming existing drainage systems. As the water table rises, drainage systems that rely on stormwater flowing from higher elevation to lower elevation waterways will be disrupted. Increasing sea levels and more frequent extreme precipitation events will and has already altered this balance, such that drainage systems become inundated even absent any rainfall. This has been commonly observed in Mapunapuna and Waikīkī.[503] The elevated water table caused by sea level rise will eventually rise to the point of breaking through the ground surface thereby creating new wetlands. The structural integrity of overlying infrastructure will be affected where this occurs, as will existing ecosystems unaccustomed to saturated soil and free-standing water bodies.[504]

289.    Hawaiʻi is already experiencing, and working to abate, current harms caused by sea level rise. But while harms to the State have commenced, additional and far more severe injuries will occur in the future if prompt action is not taken now. Indeed, the sea level rise harms inflicted on Hawaiʻi by climate change are insidious partly because they are projected to continue, and to worsen, far into the future. Beyond 2100, the IPCC projects with high confidence that sea levels will continue to rise for centuries due to continuing deep-ocean heat uptake and mass loss of the Greenland and Antarctic ice sheets, and will remain elevated for thousands of years.[505] The State must plan for future harms from sea level rise now to ensure that adaptation to protect human well-being and public and private property is done most efficiently and effectively.

---

[502] *Id*. at 4.

[503] *Id*. at 5.

[504] Charles H. Fletcher III, *Sea Level Rise in Hawaiʻi*, *in* WAIWAI: WATER AND THE FUTURE OF HAWAIʻI, 121, 130 (Kamanamaikalani Beamer ed., 2025).

[505] IPCC, Sixth Assessment Report, Chapter 9: Ocean, Cryosphere and Sea Level Change, at 1217 (2021), https://perma.cc/MC4R-FL3D.

### ii.     Changing Precipitation Patterns and Increased Fire Risk in Hawaiʻi

290.     Total annual rainfall in Hawaiʻi is declining, with the State experiencing longer dry periods, diminished freshwater availability, and heightened wildfire risk. These changes are occurring in Hawaiʻi and will continue to become more severe as a result of climate change.

291.     Annual rainfall has decreased in the State, particularly during recent years in the wet season, and is projected to decline further.[506] Historically, La Niña years were wetter than El Niño years. However, since the 1980s, Hawaiʻi has experienced less rainfall during the wet season of La Niña years. Furthermore, El Niño years have become more common. The combined effect has been drier conditions and longer periods of drought.[507] The State has also begun to experience more consecutive dry days. For example, in 2010 more than 40% of the State experienced "severe, extreme, or exceptional dry drought conditions," leading to less freshwater and increased wildfire risk.[508] The Island of Hawaiʻi has been most impacted by these drier conditions, with the largest long-term declines in annual and dry-season rainfall.[509]

292.     Climate impacts threaten Hawaiʻi water resources. As rainfall levels decline, Hawaiʻi will have decreasing access to freshwater.[510] Moreover, rising temperatures, changing frequency and intensity of extreme precipitation events, and sea level rise will impair access to freshwater. [511] As rainfall becomes more concentrated over shorter periods, less of it will reach and replenish underground aquifers as it instead is channeled into the ocean as runoff.[512] Pollution

---

[506] Mandeep Adhikari et al., *Climate change impacts shifting landscape of the dairy industry in Hawaiʻi*, Translational Animal Sci., at 1 (May 16, 2022), https://perma.cc/3EQL-Z3GF.

[507] Stevens, *supra* note 465, at 2.

[508] *Id*. at 2–3.

[509] *Id*. at 2.

[510] Fifth National Climate Assessment, *supra* note 492, at 17; Water Research Foundation, Impacts of Climate Change on Honolulu Water Supplies and Planning Strategies for Mitigation, Project No. 4637 (2019), https://perma.cc/5VFN-X8Q2; Richard Wallsgrove & David Penn, *Water Resources and Climate Change Adaptation in Hawaiʻi: Adaptive Tools in the Current Law and Policy Framework* (2012)*,* https://perma.cc/NP8F-HGKD.

[511] *Id*.

[512] Li Cohen, *Hawaii is "on the verge of a greater catastrophe," locals says, as water crisis continues¸* CBS News (Apr. 11, 2024), https://perma.cc/5U34-54L8.

of freshwater resources from flooding and saltwater intrusion will also affect the State's supply.[513] Coastal erosion, marine inundation, and groundwater inundation caused by climate change could also damage water delivery infrastructure.[514] Across the Hawaiian islands, freshwater availability is projected to decline as demand rises.[515] By 2030, the State may suffer from a freshwater shortfall of 100 million gallons per day.[516]

293. The frequency of extreme precipitation events has also been altered, with certain areas in Hawai'i experiencing more extreme precipitation.[517] More frequent tropical cyclones are also attributed to climate change. These storms cause widespread damage to infrastructure, and, nationally, are the most expensive type of natural disaster. Since 1980, they have cost the U.S. $1.3 trillion, averaging to $22.8 billion per event.[518] In Hawai'i, approximately 74 miles of roads, 120 bridges, and 9 culverts are located in areas vulnerable to damage from storm surges equivalent to those from a Category 4 hurricane.[519]

294. Climate change increases the threat of wildfires for Hawai'i.[520] The 2023 Maui wildfires were the deadliest in modern U.S. history and the worst natural disaster in the history of the State. More than 100 lives were lost, and more than 2,200 structures were destroyed, causing

---

[513] Fifth National Climate Assessment, *supra* note 492, at 17.

[514] Water Research Foundation, *supra* note 510.

[515] Center for Climate Integrity, *Hawai'i Climate Impacts and Costs*, at 2 (2024), https://perma.cc/K9WK-QRJU.

[516] Thomas W. Giambelluca, *Climate Change and Water in Hawai'i, in* WAIWAI: WATER AND THE FUTURE OF HAWAI'I 107, 115 (Kamanamaikalani Beamer ed., 2025).

[517] Stevens, *supra* note 465, at 3.

[518] Center for Climate Integrity, *supra* note 515, at 4.

[519] Hawai'i Dep't of Transp., *supra* note 484, at 2.

[520] Stevens, *supra* note 465, at 4; Fifth National Climate Assessment, *supra* note 492, at 44; Pacific Fire Exchange, *Changing Climate and Wildfire in Hawai'i: Current Observations and Future Projections* (Sep. 2022), https://perma.cc/U6LM-BCYN; Pacific Fire Exchange, *Changing Climate and Wildfire: a Crisis Brewing in the Pacific* (Apr. 2021), https://perma.cc/A5HK-CXD7; Clay Trauernicht, *Vegetation—Rainfall interactions reveal how climate variability and climate change alter spatial patterns of wildland fire probability on Big Island, Hawai'i*, Science of the Total Environment 650, 459–469 (2019), https://doi.org/10.1016/j.scitotenv.2018.08.347; *see also* Christopher Flavelle & Manuela Andreoni, *How Climate Change Turned Lush Hawaii Into a Tinderbox*, N.Y. Times (Aug. 10, 2023), https://perma.cc/GNZ8-7ZW4 (describing all three reasons behind the State's long-term decline in rainfall as likely related to climate change); Elliot Parsons & Christy Martin, *The Tragedy in Lahaina: How invasive grasses and shrubs are fueling the wildfire crisis in Hawai'i*, North Am. Invasive Species Mgmt. Ass'n (Oct. 10, 2023), https://perma.cc/T7CF-PTBP.

$5.5 billion of damage.[521] In 2021, 40,000 acres of ranchland and brush were burned across Maui and the Big Island.[522] Wildfires have caused incalculable loss to Hawai'i communities.

295.    The number of wildfires in Hawai'i in recent decades has increased four-fold,[523] and nearly 0.5% of all land in Hawai'i is now burned by wildfire annually.[524] By late century the probability of wildfire in Hawai'i will rise by as much as 375 percent under a high emissions scenario.[525] Across the State, 139 miles of roads and 97 bridges are located in areas vulnerable to wildfire.[526] State lands such as the Pu'u Wa'awa'a Forest Reserve are threatened by increased wildfire risk due to climate change.[527]

### iii.    Warming Oceans Around Hawai'i

296.    As the atmosphere grows warmer, so too does the ocean. These oceanic temperature changes vary across regions, but from 1901 to 2015, the global temperature of the sea surface rose an average of 0.13 degrees Fahrenheit per decade, with higher rates of warming occurring more recently.[528] Oceans are becoming more acidic too. This altered chemistry occurs as the oceans absorb larger amounts of carbon dioxide, which reacts with sea water to produce carbonic acid. This affects the pH levels of the ocean, rendering it more acidic.[529]

297.    Rising ocean temperatures and increasing acidity, along with more frequent marine heatwaves and falling oxygen concentrations, will have grave effects on the makeup of marine ecosystems. Over the course of the remainder of the century, between 10 to 40 percent of the marine biomass across the Pacific Ocean is projected to disappear.[530] Additionally, scientists

---

[521] U.S. Fire Admin., FEMA, *Preliminary After-Action Report: 2023 Maui Wildfire* (Feb. 8, 2024), https://perma.cc/GWH5-VQC6.

[522] Thomas Fuller, *Maui Town is Devasted by Deadliest Wildfire to Strike Hawaii*, N.Y. Times (Aug. 9, 2023), https://perma.cc/S6V7-GEMY.

[523] Hawai'i Dep't of Transp., *supra* note 484, at 61.

[524] Parsons & Martin, *supra* note 520.

[525] Hawai'i Dep't of Transp., *supra* note 484, at 61.

[526] *Id*. at 2.

[527] Pacific Islands Climate Adaptation Science Center et al., *Fire History and Risk at Pu'u Wa'awa'a* (June 2021), https://perma.cc/AXV7-NK6Q; Christopher A. Wada et al., *Estimating Cost-Effectiveness of Hawaiian Dry Forest Restoration Using Spatial Changes in Water Yield and Landscape Flammability Under Climate Change,* Pacific Science 71(4), 401–424 (2017), https://perma.cc/A92E-5ULB.

[528] 2017 SLR Report, *supra* note 492, at 19.

[529] U.S. EPA, *Climate Change Connections: Hawai'i (Coral Reefs)*, https://perma.cc/4TDA-BWSZ.

[530] Fifth National Climate Assessment, *supra* note 492, at 30.

expect that the historic range of many marine species will change, disrupting existing access to fisheries.[531] These harms will be felt not only by marine life, but also by the people who depend on them, including many Hawaiʻi residents who rely on the ocean to provide income and food, and whose social and cultural practices are closely interwoven with its health.

298.    Coral reefs are hit particularly hard by these impacts. Rising ocean temperatures and more frequent marine heatwaves will cause more coral bleaching events, leading to higher rates of coral mortality. Moreover, severe storms and greater acidity will impair the ability of coral reefs to grow and regenerate quick enough to keep pace with the rate at which they are dying.[532] Runoff containing sediment and pollutants, itself the byproduct of changing precipitation patterns, further compromises the health of nearshore coral reefs and fisheries.[533]

299.    Much of the coral reefs surrounding Hawaiʻi have been designated by NOAA as "highly-vulnerable" to the impacts of climate change. 25 percent of the coral reefs surrounding the Island of Hawaiʻi are classified in this manner, as are 24 percent of those around Oʻahu, and 20 percent of those around Kauaʻi.[534] According to the EPA, if the global emissions trajectory remains unchanged, environmental conditions will degrade further such that that the oceans will be unable to support the world's remaining reefs by 2050.[535]

300.    Hawaii's coral reefs are ecologically, culturally, and economically significant. Coral reefs provide critical habitat for marine species, including many which are unique to the Hawaiian Islands.[536] Additionally, many Native Hawaiians feel strong connections to the reefs, imbuing them with spiritual significance.[537] The health and continued existence of these reefs is integral to the viability of subsistence fishing and the Hawaiʻi fishing industry, which is valued at

---

[531] *Id.*

[532] NOAA Fisheries, *Ecosystem Status Report for Hawaiʻi*, at 52, 53 (2022), https://perma.cc/KG3R-DFFH.

[533] Fifth National Climate Assessment, *supra* note 492, at 18.

[534] NOAA Fisheries, *supra* note 532, at 56.

[535] U.S. EPA, *supra* note 529.

[536] *Id.*

[537] Gregg, T. M., et. al, *Puka Mai He Koʻa: The significance of corals in Hawaiian culture*, *in* Ethnobiology of Corals and Coral Reefs, 103 (N. Narchi & L. L. Price eds. 2015), https://doi.org/10.1007/978-3-319-23763-3_7.

$110 million.[538] Coral-reef fisheries provide Pacific Island communities between 50 to 90 percent of their dietary protein.[539] Coral reefs also generate revenue through tourism.[540]

301.    Additionally, coral reefs provide shoreline protection against strong waves. Annually, reefs in Hawai'i provide flood protection benefits to more than 6,800 people and $836 million in averted damages to property and economic activity.[541] Without such buffers, the State will suffer greater damage from sea level rise, flooding, and extreme weather events than it otherwise would have.[542] With a one meter loss in reef height, the 100-year floodplain would increase across Hawai'i by 12 square miles, imperiling 9,200 more people and $1.3 billion in property and economic activity.[543]

302.    Hawai'i suffers from and continues to suffer injuries caused by rising ocean temperatures, acidification, marine heatwaves, and deoxygenation, and must now adapt to protect its people, property, facilities, and equipment from impacts caused by climate change.

### iv.    Harms to Ecological Resources and Native Hawaiian Traditional and Customary Practices

303.    Climate change imperils Hawaii's ecological resources and the Native Hawaiian traditional and customary practices that are deeply interwoven with those ecological resources. Worsening climate change impacts will continue to threaten and even destroy regional ecosystems and biodiversity throughout this century and beyond.[544] Because Native Hawaiian culture is inextricably bound to Hawai'i's natural environment, climate impacts threaten Native Hawaiian culture, identity, and social welfare.[545] Climate change has already impacted and will continue to

---

[538] Rachel Hagen, *Underwater and Underrated: Coral Reefs and Climate Change*, American Security Project, 2 (Dec. 1, 2018), https://perma.cc/JR7Z-PGCH.

[539] Honolulu Climate Change Commission, *Climate Change Brief 2023*, at 25 (2023), fhttps://perma.cc/8KT5-F4S6.

[540] Hawai'i Dep't of Land and Nat. Resources, Division of Aquatic Resources, *Hawai'i Coral Reef Strategy 2030*, https://perma.cc/U9TW-2QUV; Hagen, *supra* note 538, at 1–2.

[541] USGS, *The value of US coral reefs for risk reduction - Hawai'i*, https://perma.cc/6R4Y-BNBW.

[542] U.S. EPA, *supra* note 529.

[543] USGS, *supra* note 541.

[544] Fifth National Climate Assessment*, supra* note 492, at 43.

[545] Sproat, *supra* note 470, at 171.

harm Native Hawaiian traditional and customary practices including upland forest practices, traditional agriculture, and coastal and nearshore marine practices.[546]

304.    The forests of Hawaiʻi, which contain more than 175 native species of trees almost all found nowhere else on Earth, are threatened by climate change.[547] Nearly all of Hawaii's dryland forests have already disappeared in the last century, and some wet native ecosystems at higher elevations may cease to exist by 2100.[548] Hawaii's forests inform and sustain many practices of Native Hawaiian culture. Due to their significance as the source of physical and spiritual nourishment, the misty uplands are called wao akua, or the realm of the gods, sacred to Kū, the god of war and governance.[549] Many of the plants and animals inhabiting the wao akua are considered kinolau (the physical embodiment of spirits).[550] Alongside their spiritual significance, Hawaii's forests provide timber for woodworking and plants for traditional healing.[551] The dance form of hula relies on the availability of forest plants including the kauila plant, which is used to the craft the kālaʻau, a rhythm stick used during the dance. However, kauila is vulnerable to climate change, and is becoming more difficult to gather as it becomes increasingly rare.[552]

305.    As climate change affects habitat, Hawaii's wildlife is suffering from the impacts of climate change. For example, climactic shifts are known to affect nā manu nahele (Native Hawaiian forest birds), causing range loss and substantial declines in populations.[553] Nā manu nahele not only play important roles as pollinators, seed dispersers, and insect managers, but are interwoven into Native Hawaiian culture. According to custom, these birds act as ʻaumakua (family deities) and messengers between akua (gods) and kānaka (people), and are celebrated through songs, stories, and proverbs, and in the creation of traditional feather adornments.[554] The high-

---

[546] *Id*. at 172–81.
[547] *Id*. at 173–74.
[548] *Id*.
[549] *Id*. at 174–75.
[550] *Id*.
[551] *Id*.
[552] *Id*. at 173, 175; U.S. F.W.S., *5-Year Review of Colubrina Oppositifolia (kauila)*, at 2 (2019), https://perma.cc/3AHD-643G (concluding kauila is vulnerable to climate change).
[553] Fifth National Climate Assessment, *supra* note 492, at 44.
[554] *Makahiki o Nā Manu Nahele*, Hawaiʻi Dep't of Land and Nat. Resources (2024), https://perma.cc/N9KS-ZCG2.

elevation habitats of the nā manu nahele are becoming more vulnerable to rising temperatures and the associated spread of vector-borne diseases like avian malaria. Over time, the range losses of these emblematic species are projected to be severe, including complete range collapses for ʻAkekeʻe, ʻAkikiki and Puaiohi.[555] Out of the once 50 species of honeycreeper birds in Hawaiʻi, only 17 remain, with 11 of them endangered. In 2023, only five ʻAkikiki were found on Kauaʻi.[556]

306.     Traditional forms of agriculture in Hawaiʻi are threatened by declining rainfall, reduced streamflow and groundwater, increasing temperatures and greater saltwater intrusion.[557] Water is the lifeblood of Native Hawaiian culture and the physical manifestation of Kāne, one of the four major gods of the Hawaiian pantheon.[558] The importance of water in Hawaiʻi is embodied in the phrase ola i ka wai (water is life).[559] Kalo (taro) cultivation requires a consistent supply of fresh water, and kalo cultivation is an important Native Hawaiian cultural practice.[560] Kalo fields are threatened by diminishing access to freshwater, and the remaining freshwater may become more saline as rising temperatures increase evaporation rates.[561] Additionally, sea level rise and attendant salt water inundation of the State's coastal plains will further harm the crop's viability.[562]

307.     Hawaii's nearshore and coastal habitats support myriad traditional practices, such as gathering marine life and maintaining fishponds, cultivating sea salt, and burying ancestral bones.[563] Climate change has impacted and will continue to impact these habitats and fundamentally disturb these practices.[564] For example, changes in marine species distribution and damage to coral reef will devastate subsistence fisheries.[565] Climate change also threatens ancient

---

[555] L.B. Fortini et al., *Large-Scale Range Collapse of Hawaiian Forest Birds under Climate Change and the Need 21st Century Conservation Options*, PLoS ONE (Oct. 28, 2015), at 1, 11, 13, https://perma.cc/QP3A-YJB2.

[556] *Nā Manu Nahele: Hawaiʻi's Forest Birds*, The Nature Conservancy (Sept. 25, 2024), https://perma.cc/XN92-Z4E5.

[557] Sproat, *supra* note 470, at 173, 176.

[558] D. Kapuaʻala Sproat, *From Wai to Kānāwai: Water Law in Hawaiʻi*, *in* Native Hawaiian Law: A Treatise 522, 526 (Melody Kapilialoha MacKenzie, Susan K. Serrano & D. Kapuaʻala Sproat eds., 2015).

[559] *Id*.

[560] Sproat, *supra* note 470, at 200–01.

[561] Jessica Terrell, *Climate Change is a Big Problem for Farmers in Hawaii*, Honolulu Civ. Beat (Sept. 26, 2021), https://perma.cc/B46X-99B8.

[562] Sproat, *supra* note 470, at 201.

[563] *Id*. at 178.

[564] *Id*. at 179.

[565] *Id*. at 178–80.

Hawaiian fishponds, which depend on a delicate balance between saltwater and freshwater.[566] And changes in climate and rising seas have disrupted the traditional practice of cultivating pa'akai (sea salt), with practitioners unable to cultivate pa'akai at all in some years.[567] Additionally, coastal erosion and sea level rise threatens the cultural practice of burying 'iwi kupuna (ancestral remains) along Hawai'i's shores.[568]

308.     Hawaii's coral reefs are also culturally important, in addition to being ecologically and economically critical. For example, the reefs forming the Papahānaumokuākea Marine National Monument are where Native Hawaiians believe life first began, and where the spirts of their ancestors return to after death. The name of the Monument is derived from the two figures of Papahānaumoku and Wākea and the roles they played in the creation story of the Hawaiian Islands.[569] Therefore, the loss of these reefs and others will have grave cultural impacts, alongside the economic and ecological losses that will occur.[570]

309.     Sea level rise will also directly impact Native Hawaiian communities and cultural resources. Sea level rise will submerge lands that are part of the Hawaiian Home Lands Program. On Moloka'i, homestead lots including in Kalama'ula, Kapa'akea, and Kamiloloa-One Ali'i are vulnerable to sea level rise.[571] On Maui, 3 out of the 11 homesteads are vulnerable to the increasing threat of sea level rise. Along with the land, many cultural and economic resources near the shoreline are threatened by sea level rise, including traditional burial grounds, home sites, fish ponds, and other places of cultural significance. Nearly 33 cultural sites in Maui alone are threatened by only 1.1 feet of sea level rise—that number rises to 48 with 3.2 feet of sea level

---

[566] *Id.*

[567] *Id.* at 213–215.

[568] *Id.* at 179.

[569] Papahānaumokuākea: A Sacred Name, A Sacred Place, Papahānaumokuākea Marine National Monument, https://perma.cc/KEK7-ZJ2A.

[570] Tony Weir et. al, *Social and cultural issues raised by climate change in Pacific Island countries: an overview*, 17 Reg'l Envtl. Change (Apr. 2017), at 8, https://perma.cc/L2WA-E59S.

[571] Plan. Consultants Hawai'i, LLC & Coastal Planners, LLC, *supra* note 479.

rise.[572] Across all the islands, almost 550 cultural sites will be flooded by 3.2 feet of sea level rise.[573]

### v.     Harmful Health Outcomes in Hawaiʻi

310.     Climate change is already harming human health and well-being in Hawaiʻi, and is projected to have significant health impacts in the future.[574] Climate change affects the physical environment as well as all aspects of both natural and human systems—including social and economic conditions and the functioning of health systems. "It is therefore a threat multiplier, undermining and potentially reversing decades of health progress."[575]

311.     Climate change has, and will continue to have, constant, widespread, and severe impacts to the physical health of Hawaiʻi residents. Rising temperatures and intense heat waves, extreme weather events, related disruptions to health and emergency services, and increased proliferation of vector-borne disease and pathogens will and has already taken its toll. And these impacts will fall hardest on those who are most vulnerable, including the socioeconomically disadvantaged, the elderly, children, and those with disabilities.[576]

312.     Rising temperatures and more frequent and intense heatwaves pose serious, even fatal, threats to the health of Hawaiʻi residents, including by causing heat exhaustion and heat stroke. Heat also exacerbates many preexisting conditions, like certain respiratory, cerebral, and cardiovascular diseases. Rising temperatures along with high humidity are a particularly dangerous combination, as humidity impairs the ability of the body to cool itself off through sweating.[577] As climate change worsens, more Hawaiʻi residents will be hospitalized and die from heat-related illnesses. For example, recent data shows that between 400 and 600 people annually on Oʻahu seek emergency care for heat-related illnesses,[578] and that 82 percent of heat-related deaths in Honolulu

---

[572] 2017 SLR Report, *supra* note 492, at 105.

[573] *Id*. at xi.

[574] Fifth National Climate Assessment, *supra* note 492, at 21.

[575] World Health Org., *Climate Change* (Oct. 12, 2023), https://perma.cc/CU6R-WFY4.

[576] Fifth National Climate Assessment, *supra* note 492, at 21.

[577] Cnty. of Hawaiʻi, *Integrated Climate Action Plan for the Island of Hawaiʻi*, at 46 (June 2023), https://perma.cc/NM9M-F4L2.

[578] Savannah Harriman-Pote, *Extreme heat is setting records across the US. Could the same happen in Hawaiʻi?*, Hawaiʻi Pub. Radio (July 19, 2024), https://perma.cc/3VP7-MSSU.

can already be attributed to climate change.[579] Young children, older adults, outdoor workers, socioeconomically disadvantaged people, military personnel who are required to wear heavy gear and engage in vigorous activity, and non-acclimated visitors are all especially vulnerable to heat-related illness and death.[580]

313. Vector-borne diseases, fueled by a hotter climate and periods of intense rainfall, will and have proliferated throughout Hawaiʻi, impacting the health of humans and wildlife. These include diseases like dengue, chikungunya, Zika, and others that may emerge in the future. Increases in the frequency, duration, and extent of these diseases across the Pacific Islands region are linked to climate variability and are expected to increase further.[581]

314. More frequent extreme weather events will also impact human health. Stronger and more frequent tropical cyclones will pose serious risks to human health and wellbeing directly and will disrupt emergency services and critical infrastructure needed to respond to such events, amplifying their direct impacts. Other extreme weather events like droughts and floods will also have health impacts that extend beyond the initial disaster, including increases in food- and waterborne-pathogens, loss of access to emergency and medical services, loss of electricity, and damages to transportation infrastructure. These impacts will disproportionately fall on the State's more vulnerable populations.[582]

315. Beyond the immediate serious harm wildfire can cause to humans, wildlife, and structures, smoke from wildfire can also create air quality hazards that lead to further death and illness. Human exposure to smoke is linked with mortality, asthma, and other respiratory problems, in addition to worse outcomes for birth and COVID-19 infection.[583] In a recent study of 679 Lāhainā residents, most of whom lived in Lāhainā during the 2023 wildfire, 74 percent were found

---

[579] Fifth National Climate Assessment, *supra* note 492, at 23.

[580] *Id.*

[581] *Id.*

[582] *Id.* at 21.

[583] U.S. CDC, *Regional Health Effects - Hawaii and U.S. Affiliated Pacific Islands* (June 3, 2024), https://perma.cc/69CD-G6CT.

to have elevated blood pressure levels and a heightened risk of cardiovascular disease, and 60 percent suffered from poor respiratory health.[584]

316.     The emotional wellbeing of those who experience wildfire is also harmed. Extreme weather events like wildfire can impact the mental health and wellbeing of those who suffer through them, including causing posttraumatic stress disorder (PTSD) and major depressive disorder, with symptoms persisting for years.[585] The loss of cultural sites caused by wildfire can also have mental health consequences.[586] Local climate impacts such as floods, droughts, and sea level rise are linked to negative mental health outcomes.[587]

317.     The mental and physical health of Hawai'i residents will continue to be harmed by the worsening impacts of climate change. These harms will impose substantial and growing costs on both the State and its people.

### vi.     Hawaii's Economic Vulnerability from Climate Change

318.     Climate change harms Hawaii's economy by threatening industries that rely on marine ecosystems, tourism, and Hawaii's world-famous climate and ecology.

319.     Hawaii's agricultural industry will and has suffered from climate change-related impacts, such as more frequent and prolonged drought and rising temperatures. For example, between 2008 and 2016, the State lost $53.5 million in revenue from cattle production due to a severe drought.[588] Furthermore, rising temperatures could lead to severe heat stress and less foraging area for livestock. In particular, increased nighttime warming threatens the health of domesticated animals like beef, cattle, swine, and poultry, since these animals often rely on cooler nights to find relief from daytime heat stress. As temperatures continue to rise, animal productivity

---

[584] Brianna Sacks, *Months after Maui fires, residents report troubling health problems*, Wash. Post (May 15, 2024), https://perma.cc/W8YJ-CAPR.

[585] Velez German, M.D., & Adam Balkozar, M.D., *Maui's Wildfires Carry Immeasurable MH Toll*, 58 Psychiatric News No. 10, 15 (Sept. 26, 2023), https://perma.cc/RU3U-D9X7.

[586] Ryan Holliday et al., *The Health and Social Impacts of the Maui Wildfires: Post-Disaster Care from a Sociocultural Lens*, 83 Haw. J Health Soc. Welfare No. 3, 85, 86 (Mar. 2024), https://perma.cc/BH4Q-NVQQ.

[587] Fifth National Climate Assessment, *supra* note 492, at 23.

[588] *Id*. at 28.

and reproductivity will decline while mortality rises, causing economic harm to the State and to its livestock growers. [589]

320.    Hotter temperatures also interfere with crop production. For example, hotter, drier conditions cause plants like sweet corn to struggle to retain enough moisture to catch pollen, leading to declining rates of pollination. The heat also makes it more difficult for certain plants to absorb moisture from the soil, stunting their ability to grow.[590]

321.    Climate change has impeded the production of culturally and economically important crops like kalo, macadamia nuts, and coffee beans. Excess heat is increasing the salt content of kalo fields, which can severely damage the crop over time. Meanwhile, higher nighttime temperatures have led to problems with macadamia nut trees flowering, leading to lower overall yields. Heavy rains have also led to increases in pests and root-borne pathogens which have caused declines in macadamia nut trees on the Island of Hawai'i.[591] Coffee growers in Hawai'i have also been impacted by climate change. Rising temperatures accelerate the maturation process of coffee cherries, lowering the quality of the crop, and making the crop more vulnerable to heat stress, reducing overall yields and compromising the health of the plant. Changes in precipitation patterns, more frequent extreme weather events, and warmer conditions more favorable to pests and disease all take their toll as well.[592]

322.    The Hawai'i fishing industry will also suffer from climate change, as rising ocean temperatures, more frequent marine heatwaves, and increasing acidification harm the health and viability of the coral reefs in the waters surrounding the State and alter the historic ranges of many marine species. Over the course of the century, the total biomass of marine species in the Pacific Ocean is projected to decline by between 10 to 40 percent, and many species are projected to shift beyond their historic ranges by as early as 2030.[593]

---

[589] Adhikari, *supra* note 506, at 7–9.
[590] Terrell, *supra* note 561.
[591] *Id*.
[592] *The Influence of Climate Change on Kona Coffee Production*, Kona Coffee, https://perma.cc/WQ4T-JGTY.
[593] Fifth National Climate Assessment, *supra* note 492, at 30.

323.   Since the 1950s, the global capacity of coral reefs to nurture fish has declined by 50 percent.[594] The Hawai'i fishing industry, which is valued at $110 million, is reliant on coral reefs to protect and nurture marine species.[595] Therefore, as global oceanic conditions become unsuitable for coral reefs, potentially as soon as 2050, the State's fishing industry will suffer gravely.[596] Additionally, warming oceans, extreme weather events, continued acidification, and sea level rise may also negatively affect aquaculture, species richness, and access to nearshore and open-ocean fish species for the Hawai'i fishing industry.[597]

324.   Tourism also constitutes a significant portion of Hawaii's economy. Prior to COVID-19, tourism accounted for about a quarter of total GDP in Hawai'i when considering direct, indirect, and induced impacts.[598] Tourism in Hawai'i will be affected by climate change. Structural and ecological damages from climate change, especially damages to beaches and recreation areas, as well as the deterioration of natural assets—like the ongoing disappearance of coral—and the growing frequency of vector-borne diseases may deter non-residents from visiting the State, leading to fewer jobs and less revenue derived from tourism.[599] The loss of coral reefs will particularly devastate the tourism industry in Hawai'i, as 60 percent of the State's tourism revenue comes from reef visitors, worth an estimated $304 million annually.[600]

325.   Sea level rise and erosion will impact Hawaii's world famous beaches, such as North Shore Oahu's "Seven Mile Miracle," the beaches of Kauai's North Shore, and West Maui beaches.[601] These beaches are treasured both by local residents and global tourists. Already 70 percent of Hawaii's beaches have eroded, with over 13 miles of beach lost as a result.[602] Sea level

---

[594] *Id*. at 18.

[595] Hagen, *supra* note 538, at 2.

[596] U.S. EPA, *supra* note 529.

[597] Fifth National Climate Assessment, *supra* note 492, at 18.

[598] DBEDT Research Division, Tourism and Hawai'i Economy (Oct. 2023), https://perma.cc/3TPQ-KGEA.

[599] Fifth National Climate Assessment, *supra* note 492, at 28.

[600] *Shallow Coral Reef Habitat*, NOAA, https://perma.cc/LH6R-87X8.

[601] 2017 SLR Report, *supra* note 492, at 66.

[602] Stevens, *supra* note 465, at 5.

170

rise and threats to coral will also impact Hawaii's surf breaks, threatening a beloved and culturally and economically significant activity in Hawai'i.[603]

***

326.    Because of Defendants' failure to warn and affirmative campaign to deceive the public about climate change and Defendants' products, Hawai'i has suffered and will continue to suffer substantial injuries. Defendants' conduct as described herein is an actual, substantial, and proximate cause of Hawaii's climate change-related injuries.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

327.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

328.    Defendants are responsible for causing and accelerating climate change. *See e.g.*, Section V.A, ¶¶ 48–58, *supra*. Fossil fuel products release GHGs into the atmosphere, causing the harms in Hawai'i alleged in Section V.I, ¶¶ 270–326, *supra*—including but not limited to climate destabilization, global warming, more frequent and extreme precipitation and flooding, more frequent and extreme drought, more frequent and severe heat waves and extreme temperature days, greater fire risk, vector-borne illnesses, worsening air quality, more frequent and extreme weather events and storms, sea level rise, storm surge, and ocean acidification. The consequences and injuries associated with climate change include without limitation injuries to natural resources, cultural resources, human health and safety, property, infrastructure, and the economy in the State ("Climate-Related Harms").

329.    For years, Defendants possessed knowledge that fossil fuels are the primary cause of climate change and that, if unabated, climate change would cause Climate-Related Harms. *See, e.g.*, Section V.B., ¶¶ 59–99, *supra*.

---

[603] Claire Caulfield, *How Will Climate Change Affect Surfing In Hawaii?*, Honolulu Civil Beat (Nov. 18, 2019), https://perma.cc/MV95-ACZN.

171

330.    Given the scientific evidence available to and/or conducted by Defendants, as referenced herein, such injury was reasonably foreseeable to Defendants.

331.    Defendants had a duty to the State and its residents to exercise due care in the marketing, sale, and/or labeling of fossil fuel products and to act reasonably for the protection of the State and its residents and to avoid inflicting the injuries described herein.

332.    Defendants also had a duty to the State and its residents to honestly communicate their knowledge about the hazards of fossil fuel products, and a duty not to make false and misleading statements about the hazards of fossil fuel products.

333.    Defendants had superior knowledge of the risks posed by fossil fuel products.

334.    Defendants breached their duty of care when they advertised, promoted, and/or sold fossil fuel products, while failing to include warnings of the risk of harm associated with fossil fuel products, in a manner that they knew or should have known would result in injury to human health and safety, damage to property, infrastructure, and natural resources, loss of use of State services, and other damages to the State and its residents.

335.    Defendants further breached their duty of care by waging a years-long deceptive marketing and public relations campaign to discredit climate science.

336.    Any warnings provided by Defendants were rendered ineffective by Defendants' decades-long tortious campaign of deception described herein, and by their promulgating pseudo-scientific theories and false and misleading statements which cast doubt on the consensus of climate scientists—including Fossil Fuel Defendants' own scientists.

337.    Defendants individually and in concert failed to warn about the foreseeable dangers of fossil fuel products, widely disseminated misleading marketing materials, refuted the scientific knowledge generally accepted at the time—including by Fossil Fuel Defendants' own scientists—advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that directly and proximately prevented reasonable consumers from recognizing or discovering the latent risks posed by Fossil Fuel Defendants' fossil fuel products and their contributions to grave climate changes. This conduct directly and proximately inflated fossil fuel

172

consumption, which in turn delayed the emergence of clean-energy alternatives, delayed the transition to a lower-carbon economy, caused the emission of huge amounts of avoidable GHGs into the atmosphere, accelerated climate change, and exacerbated Climate-Related Harms in Hawai'i, causing loss to the State and its residents.

338.    A reasonably careful company would not engage in the decades-long tortious campaign of deception described herein, would not advertise, market, manufacture, or distribute fossil fuel products without proper warning, would warn of these products' hazardous properties, and/or would take steps to enhance the safety and/or reduce the risk of the products.

339.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the State suffered monetary and non-monetary losses and damages in amounts to be proven at trial. Defendants' conduct was a substantial factor in causing monetary and non-monetary injury to the lives and health of the State's residents, and to the State's property and natural resources, including by causing Climate-Related Harms.

340.    Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of negligence and civil conspiracy to commit negligence.

341.    Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

**SECOND CAUSE OF ACTION**
**PUBLIC NUISANCE**
**(Against All Defendants)**

342.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

343.    Defendants, individually and in concert with each other, through their decades-long campaign of deception; their failure to include warnings of the risk of harm associated with fossil fuel products; and their affirmative promotion, advertisement, sale, and/or distribution of fossil fuel products, including in the State, have created, caused, contributed to, and assisted in creating a public nuisance of Climate-Related Harms that unreasonably endangers and injures public rights and the property, health, safety, peace, comfort, and welfare of Hawaii's residents.

344.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products, and their advertisement, marketing, promotion, sale, and/or distribution of fossil fuel products would injure public rights by causing long-lasting Climate-Related Harms when those products were used as intended or in a reasonably foreseeable manner. Defendants intentionally proceeded with their conduct despite their substantial certainty about the foreseeable harms to the State and its residents.

345.    Defendants individually and collectively created, caused, contributed to, and assisted in the creation of Climate-Related Harms in the State by, *inter alia*, affirmatively advertising, marketing, and promoting the sale and use of fossil fuel products within and outside the State, which Defendants knew would cause or exacerbate Climate-Related Harms in the State, while simultaneously engaging in the decades-long tortious campaign of deception described herein and failing to include warnings of the risk of harm associated with fossil fuel products.

346.    Each Defendant individually and collectively has created, caused, contributed to, and assisted in creating a public nuisance by substantially and unreasonably interfering with, obstructing, and/or threatening Hawaiʻi residents' health, safety, peace, comfort, and convenience—including, among other things, (i) Hawaiʻi residents' common public rights to enjoy

174

the State's natural resources and property free from unacceptable health risk, pollution, and contamination, (ii) Hawaiʻi residents' public rights with respect to State property held in trust for the public benefit, and (iii) the State's *parens patriae* and public trust abilities and responsibilities to protect, conserve, and manage the State's natural resources. These interferences include Climate-Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326, *supra*.

347.    The public nuisance created by Defendants' conduct affects the public at large and has occurred and will continue to occur on and in public places within the State such that members of the public are likely to come within the range of its influence.

348.    The State has not consented to Defendants' tortious conduct in creating the substantial and unreasonable public nuisance or the associated harms of that conduct.

349.    These Climate-Related Harms are injurious to health; indecent and offensive to the senses; interfere with the comfortable enjoyment of life, property, and natural resources; and constitute a substantial and unreasonable interference with rights enjoyed by the State and its residents. An ordinary person would be reasonably disturbed by these Climate-Related Harms.

350.    Defendants' conduct caused harm and will continue to cause worsening harm to the State and its residents many years into the future if the nuisance is not abated. Abatement will prevent the public nuisance from becoming as severe as it would become absent abatement.

351.    As a direct and proximate result of Defendants' acts and omissions, the State will be required to expend significant public resources to adapt to the impacts of Climate-Related Harms throughout the State to abate the nuisance. The public nuisance caused, contributed to, maintained, and/or participated in by Defendants has caused and imminently threatens to cause special injury to the State. Defendants' actions were a substantial contributing factor to the unreasonable violation of public rights in Hawaiʻi.

352.    The Climate-Related Harms are severe, exceed what the State and its residents should bear without compensation, and outweigh any utility of Defendants' tortious conduct.

353. Defendants are liable and subject to injunctive relief to abate the nuisance and prohibit the creation and continuance of this public nuisance, and the State is entitled to all direct and consequential damages from that nuisance, among other relief.

354. Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of public nuisance and civil conspiracy to commit public nuisance.

355. Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

## THIRD CAUSE OF ACTION
## PRIVATE NUISANCE
### (Against All Defendants)

356. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

357. Defendants, individually and in concert with each other, through their decades-long campaign of deception, their failure to include warnings of the risk of harm associated with fossil fuel products, and their affirmative promotion, advertisement, sale, and/or distribution of fossil fuel products, including in the State, have created, caused, contributed to, and assisted in creating a private nuisance of Climate-Related Harms that substantially and unreasonably endangers and impairs the use, enjoyment, and value of State property.

176

358.    The State owns, leases, occupies, and manages extensive State property, some of which is held in trust. *See* Compl. ¶ 31, *supra*.

359.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products; and their advertising, marketing, promotion, sale, and/or distribution of fossil fuel products would cause Climate-Related Harms to occur in the State when those products were used as intended or in a reasonably foreseeable manner. Defendants proceeded with their conduct despite their substantial certainty about the foreseeable harms to the State. Defendants thus acted with the intent of interfering with the use and enjoyment of State property.

360.    Defendants individually and collectively created, caused, contributed to, and assisted in the creation of Climate-Related Harms in the State by, among other things, affirmatively advertising, marketing, and promoting the sale and use of fossil fuel products within and outside the State, which Defendants knew would cause or exacerbate Climate-Related Harms in the State and elsewhere, while simultaneously engaging in the decades-long tortious campaign of deception described herein and failing to include warnings of the risk of harm associated with fossil fuel products.

361.    State property has been and will be impaired by private nuisances from Climate-Related Harms caused by Defendants' tortious conduct, thereby impeding use and enjoyment of State property by the State and its residents for the public benefit and welfare. Defendants, by their individual and collective acts and omissions, have caused, created, and contributed to conditions on State property, and permitted those conditions to persist, which substantially and unreasonably interfere with the use and enjoyment of such property for the public benefit and welfare, and which materially diminishes the values of such property to the State and the public.

362.    The State has not consented to Defendants' conduct in creating the substantial and unreasonable conditions on its real property or to the associated harms of that conduct.

363. These substantial and unreasonable conditions affect State property and reduce its value and its benefit to the State and its residents. These conditions include Climate Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326, *supra*.

364. An ordinary person would be reasonably annoyed or disturbed by Defendants' conduct and resulting Climate-Related Harms.

365. Defendants' conduct has caused and will continue to cause worsening harm to the State's property many years into the future if not abated. Abatement will prevent the private nuisance from becoming as severe as it would become absent abatement.

366. As a direct and proximate result of Defendants' acts and omissions, the State will be required to expend significant public resources to adapt to the impacts of Climate-Related Harms to its properties throughout the State to abate the nuisance. Defendants' actions were a substantial contributing factor to the creation of a private nuisance and the injuries to the State.

367. The Climate-Related Harms are severe, greater than the State and its residents should bear without compensation, and outweigh any utility of Defendants' tortious conduct.

368. Defendants are liable and subject to injunctive relief to abate the nuisance and prohibit the creation and continuance of this private nuisance, and the State is entitled to all direct and consequential damages from that nuisance, among other relief.

369. Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of private nuisance and civil conspiracy to commit private nuisance.

370. Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice

178

toward the State and its residents may also be implied. Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

**FOURTH CAUSE OF ACTION**
**TRESPASS**
**(Against All Defendants)**

371.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

372.    Defendants, individually and in concert with each other, through their decades-long campaign of deception, their failure to include warnings of the risk of harm associated with fossil fuel products; and their affirmative advertisement, marketing, promotion, advertisement, sale, and/or distribution of fossil fuel products within and outside the State, acted intentionally and in a manner that created, caused, contributed to, and assisted in creating Climate-Related Harms that have entered and invaded, and will enter and invade, State property.

373.    The State owns, leases, occupies, and manages extensive real property, some of which is held in trust, and which was previously defined as "State property," Compl. ¶ 31, *supra*, that is already being invaded by multiple Climate-Related Harms.

374.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products; and their advertisement, marketing, promotion, sale, and/or distribution of fossil fuel products would cause Climate-Related Harms—including but not limited to rising sea levels, extreme precipitation, and flood waters—to intrude and enter State property, when those fossil fuel products were used as intended or in a reasonably foreseeable manner. Defendants proceeded with their tortious and deceptive conduct despite their substantial certainty about the foreseeable intrusion of State property. Defendants thus acted with the intent of causing Climate-Related Harms to invade and enter State property.

375.    Defendants had considerable scientific knowledge—including from Fossil Fuel Defendants' own scientists—affording them substantial certainty that GHG emissions from

combusting fossil fuel products cause, and will cause, sea level rise, extreme precipitation, flood events, and other extreme weather that cause seawater, river water, and extreme storm runoff to invade State property.

376. Defendants actually did foresee—including through Fossil Fuel Defendants' own studies—that their intentional conduct would cause such an invasion of State property.

377. By engaging in intentional conduct that Defendants were substantially certain would result in Climate-Related Harms in the State that enter and intrude upon State property, Defendants have intentionally intruded upon State property without permission or privilege.

378. These undeniably severe, substantial, and unreasonable conditions affecting and threatening State property include Climate-Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326.

379. The State has not consented to, and does not consent to, the intrusion of Climate-Related Harms on its property. Defendants knew or reasonably should have known that the State would not consent to this trespass.

380. The State is, and will continue to be, injured by the entry of Climate-Related Harms onto its properties caused by Defendants' intentional misconduct.

381. Defendants' tortious and deceptive conduct has caused and will continue to cause worsening harm to State property many years into the future if not abated. Abatement will prevent the trespass caused by Climate-Related Harms from becoming as severe as it would become absent abatement.

382. As a direct and proximate result of the Defendants' tortious acts and omissions, the State will be required to expend significant resources to adapt to the impacts of Climate-Related Harms to its properties throughout the State to abate those trespasses. Defendants' actions were a substantial contributing factor to the trespass upon State property and the injuries to the State.

383. The Climate-Related Harms are severe and greater than the State and the public should bear without compensation and outweigh any utility of the Defendants' tortious conduct.

384.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the State has suffered monetary and non-monetary losses and damages in amounts to be proven at trial.

385.    Each Defendant, individually and collectively, engaged in the tortious conduct alleged in this Count, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of the tort of trespass and civil conspiracy to commit trespass.

386.    Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

**FIFTH CAUSE OF ACTION**
**<u>HARM TO PUBLIC TRUST RESOURCES</u>**
**<u>(Against All Defendants)</u>**

387.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

388.    The public trust doctrine is enshrined in the Hawaiʻi Constitution, which provides that "[a]ll public natural resources are held in trust by the State for the benefit of the people." Haw. Const. art. XI, § 1. As the trustee of the State's public natural resources, the State has a constitutional obligation to protect those resources, including water resources. Haw. Const. art. XI, §§ 1, 7. The State also has an obligation to protect "all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who

181

are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778." Haw. Const. art. XII, § 7. Additionally, "[t]he lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as 'available lands' by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, shall be held by the State as a public trust for native Hawaiians and the general public." Haw. Const. art XII, § 4. Public trust resources in the State include but are not limited to navigable waters and the soils under them, shoreline lands below the high water mark, lava extensions, all water resources, conservation district lands owned by the State, and other public resources held in trust by the State.

389.    Defendants, individually and in concert with each other, through their decades-long campaign of deception, their failure to include warnings of the risk of harm associated with fossil fuel products, and their affirmative promotion, advertisement, sale, and/or distribution of fossil fuel products, including in the State, have harmed and threatened the State's public trust resources and unreasonably interfered with the public's use and enjoyment of public trust resources.

390.    Defendants were fully aware and substantially certain that their decades-long campaign of deception, failure to include warnings of the risk of harm associated with fossil fuel products; and their advertising, marketing, promotion, sale, and/or distribution of fossil fuel products would cause Climate-Related Harms to occur in the State when those products were used as intended or in a reasonably foreseeable manner. Defendants proceeded with their conduct despite their substantial certainty about the foreseeable harms to the State. Defendants thus acted with the intent of interfering with the public's ability to use and enjoy public trust resources.

391.    Defendants' individually and collectively created, caused, contributed to, and assisted in the creation of Climate-Related Harms in the State by, among other things, affirmatively advertising, marketing, and promoting the sale and use of fossil fuel products within and outside the State, which Defendants knew would cause or exacerbate Climate-Related Harms in the State and elsewhere, while simultaneously engaging in the decades-long tortious campaign of deception

described herein and failing to include warnings of the risk of harm associated with fossil fuel products.

392.    The State has not consented to Defendants' conduct in creating the harm to the State's public trust resources.

393.    The harms and threats to the State's public trust resources include Climate Related Harms, *see* Compl. ¶ 328 & Section V.I, ¶¶ 270–326, *supra*.

394.    As a direct and proximate result of Defendants' acts and omissions, the State's public trust resources have been and will be threatened, harmed, and degraded. The State will be required to expend significant public resources to adapt to the impacts of Climate-Related Harms. Defendants' actions were a substantial contributing factor to injuries and threats to public trust resources.

395.    The Climate-Related Harms are severe, greater than the State and its residents should bear without compensation, and outweigh any utility of Defendants' tortious conduct.

396.    Defendants are liable for harming the State's public trust resources, including natural resource damages, damages for harm to ecosystem services, and equitable relief to abate the harm, among other relief.

397.    Each Defendant, individually and collectively, engaged in the tortious conduct alleged herein, conspired to do so, and is thereby vicariously liable for the conduct of the other Defendants, individually and collectively, for the commission of private nuisance and civil conspiracy to harm public trust resources.

398.    Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Defendants' want of care raises the

183

presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

**SIXTH CAUSE OF ACTION**
**CIVIL AIDING AND ABETTING**
**(Against API)**

399.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

400.    The Fossil Fuel Defendants committed and are liable for negligence, public nuisance, private nuisance, trespass, and harm to public trust resources as alleged in Counts 1–5, each of which harmed the State and its residents as alleged therein and in Section V.I, ¶¶ 270–326, *supra*.

401.    API has long had actual knowledge Fossil Fuel Defendants were committing the torts alleged in Counts 1–5 because Fossil Fuel Defendants committed those torts collectively through API, and individually as members of API, which was and is the primary industry forum in which Fossil Fuel Defendants strategize about and execute the decades-long deception campaign at the core of the tortious conduct alleged in this lawsuit. Fossil Fuel Defendants have long worked through, and in full cooperation with, API to advance their decades-long deception campaign. Defendants' tortious conduct impacting Hawaiʻi, and API's assistance and encouragement of that conduct, remains ongoing today. For example, API assisted Fossil Fuel Defendants' commission of tortious activities by making public statements, including advertisements and promotional campaign websites that have been directed at and/or reached Hawaiʻi, giving the impression that Fossil Fuel Defendants' operations and fossil fuel products are beneficial or benign to the environment. For example, API promoted natural gas, one of Fossil Fuel Defendants' fossil fuel products, as a clean fuel that reduces carbon dioxide emissions, an "environmentally friendly complement to renewable energy," and as "part of the solution" to climate change. API also promoted the oil and gas industry, including Fossil Fuel Defendants, as leaders in tackling climate change while ignoring the emissions from the industry's products. API had, and continues to have, actual knowledge of Fossil Fuel Defendants' alleged tortious conduct

184

at the center of this lawsuit—all of which remains ongoing. *See, e.g.*, *id.* ¶¶ 43, 44–45, 47, 59–69, 75–78, 90, 112, 118–136, 148–151, 230–236, 269, *supra.*

402.    API had actual knowledge that it was aiding and abetting the torts alleged in Counts 1–5 because API acted on behalf of, as an agent for, and at the direction of Fossil Fuel Defendants to execute the decades-long deception campaign at the center of this lawsuit through marketing, advertising, and other means while simultaneously promoting Fossil Fuel Defendants' fossil fuel products with full knowledge that the foreseeable use of those products would cause Climate-Related Harms in the State and elsewhere. *See, e.g.*, *id.* ¶¶ 26(c), 43, 44–45, 47, 112, *supra.*

403.    API had actual knowledge that it was—at the direction of Fossil Fuel Defendants—conceiving, planning, funding, and carrying out the sustained and widespread campaign of denial and disinformation about the existence of climate change and about the role of Fossil Fuel Defendants' fossil fuel products in causing Climate-Related Harms. API had actual knowledge that it took those actions in order to misdirect and stifle public knowledge about climate change, and to promote consumer demand for fossil fuels. API's actual knowledge of its own role in the deception campaign is ongoing, with API's 2021 Climate Action Framework organized around the purpose of "the continued promotion of natural gas in a carbon constrained economy." *See, e.g.*, *id.* ¶¶ 118–119, 123–136, 230–236, 259–263, 269, *supra.*

404.    API gave substantial assistance and encouragement to the Fossil Fuel Defendants in committing the torts alleged in Counts 1–5, who likewise encouraged and accepted API's assistance, over decades and in close coordination during repeated API meetings and initiatives and through ongoing communication. API did so, and continues to do so, by actively marketing fossil fuel products and fossil fuel operations in a knowingly and intentionally misleading manner for Fossil Fuel Defendants' benefit and in breach of due care; assisting Fossil Fuel Defendants' campaign to conceal and obscure from the State and its residents data and information demonstrating that fossil fuel products were causing, and would increasingly cause, grave Climate-Related Harms in the State and elsewhere; widely disseminating materials refuting the scientific knowledge generally accepted at the time; promoting and amplifying pseudo-scientific theories;

185

and developing commercial public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products and operations were causing, and would increasingly cause, grave Climate-Related Harms in the State and elsewhere. Additionally, by acting as a front group on behalf of Fossil Fuel Defendants and providing the primary industry forum through which Fossil Fuel Defendants organized, conspired, strategized about, and executed their decades-long deception campaign, API was present at the time of the tortious conduct alleged in this lawsuit. *See, e.g.*, *id.* ¶¶ 43, 44–45, 47, 59–69, 75–78, 90, 112, 118–136, 148–151, 230–236, 269, *supra.*

405.    As a direct and proximate result of Fossil Fuel Defendants' acts and omissions, aided and abetted by API, the State will be required to expend significant public resources to adapt to Climate-Related Harms throughout the State, which are so severe as to exceed what the State and its residents should bear without compensation.

406.    Fossil Fuel Defendants' decades-long campaign of intentional deception was, and is, maliciously aided and abetted by API and wantonly designed by Fossil Fuel Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources; or to the State's residents' health, safety, and wellbeing—all of which Defendants and Fossil Fuel Defendants' scientists long foresaw. Fossil Fuel Defendants and API acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and their conduct was so outrageous that malice toward the State and its residents may also be implied. Fossil Fuel Defendants and API's want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter API.

## SEVENTH CAUSE OF ACTION
## HAWAIʻI UNFAIR OR DECEPTIVE ACTS OR PRACTICES STATUTE
### (Against All Defendants)

407.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

408.    The Hawaiʻi unfair or deceptive acts or practices (UDAP) statute provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." HRS § 480-2(a).

409.    The Fossil Fuel Defendants' tortious actions, as alleged herein, have been undertaken in the conduct of trade or commerce. Fossil Fuel Defendants systematically and continually conducted trade or commerce throughout the State of Hawaiʻi by marketing, advertising, offering for sale, distributing, and selling the fossil fuel products directly and indirectly affecting the people of Hawaiʻi, and which are the subject of this lawsuit.

410.    API's tortious conduct, as alleged herein, has been undertaken in the conduct of trade or commerce, by engaging in the marketing, advertising, and promotion of fossil fuel products directly and indirectly affecting the people of Hawaiʻi. That marketing, advertising, and promotion is the subject of this lawsuit.

411.    In the course of trade or commerce, including the marketing, advertising, promotion, and (in the case of the Fossil Fuel Defendants) selling of fossil fuels to consumers in Hawaiʻi, Defendants made misrepresentations regarding the safety of and contributions to climate change made by fossil fuel products which Defendants intended would induce consumers to continue to use Fossil Fuel Defendants' fossil fuel products.

412.    The misrepresentations made by API and Fossil Fuel Defendants, both together and separately, or through front groups, regarding the safety of fossil fuels, the environmentally friendly nature of fossil fuels, and the production by Fossil Fuel Defendants of clean energy alternatives were false, omitted critical information, and therefore had a capacity or tendency to deceive.

413.    Defendants misled the State and its residents through a range of advertisements and promotional materials that contained false or misleading statements, misrepresentations, and significant omissions. These deceptive and/or unfair practices obscured the critical connection between the production and use of fossil fuel products and their adverse effects on climate change, thereby undermining the informed choices of consumers.

187

414.    The misrepresentations by Defendants were not only pervasive but also sophisticated, as they were supported by industry-funded research and extensive media campaigns designed to cast doubt on well-established climate science. As a result, reasonable consumers faced considerable difficulty in discerning Defendants' deceptive and/or unfair claims from legitimate scientific consensus, further perpetuating a harmful reliance on fossil fuel products.

415.    Defendants' misrepresentations and omissions as described herein are material to a consumer's decision to purchase and use fossil fuels and are likely to mislead consumers acting reasonably under the circumstances.

416.    Defendants' conduct offended public policy, was immoral, unethical, oppressive, or unscrupulous, and caused substantial harm to Hawai'i consumers and the State.

417.    Defendants' conduct described herein was deceptive and/or unfair in violation of HRS § 480-2.

418.    Defendants' conduct in violation of HRS § 480-2 was intentional.

419.    Defendants' conduct in violation of HRS § 480-2 has caused and will continue to cause Climate-Related Harms to the State and its residents.

420.    Each day that Defendants violated HRS § 480-2 constitutes a separate violation. HRS § 480-3.1. Each act in violation of HRS § 480-2 may constitute a separate violation.

**EIGHTH CAUSE OF ACTION**
**STRICT LIABILITY FOR FAILURE TO WARN**
**(Against Fossil Fuel Defendants)**

421.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

422.    Fossil Fuel Defendants and their affiliates and subsidiaries were engaged in the business of advertising, manufacturing, promoting, and/or selling fossil fuel products. The Fossil Fuel Defendants placed these fossil fuel products into the stream of commerce knowing they would reach Hawai'i.

423.    Fossil Fuel Defendants' fossil fuel products were used, distributed, and sold in a manner in which they were reasonably foreseeably intended to be used, distributed, and sold,

including but not limited to being combusted for energy, combusted to power automobiles, refined into petrochemicals, and refined and/or incorporated into petrochemical products including, but not limited to, fuels and plastics.

424.    As manufacturers, marketers, distributors, promoters, and/or sellers of fossil fuel products, Fossil Fuel Defendants had a duty to warn the State and its residents (both of whom are users and consumers) of the risks posed by fossil fuel products.

425.    Fossil Fuel Defendants knew that fossil fuel products would be purchased, transported, stored, handled, used, and disposed of, including within Hawaiʻi, without notice of the hazards that fossil fuel products pose to State natural resources and property and to the State's residents.

426.    Fossil Fuel Defendants' failure to warn of these hazards made their fossil fuel products unreasonably dangerous.

427.    Fossil Fuel Defendants knew that by failing to warn the State and its residents of the risks posed by fossil fuels, their fossil fuel products would be purchased, transported, stored, handled, used, and disposed of without the State and its residents being aware of the hazards fossil fuels pose to human health and the environment.

428.    At the time of manufacture, merchandising, advertising, promotion, or sale, Fossil Fuel Defendants could have provided warnings or instructions regarding the full and complete risks fossil fuel products posed, including the risks of climate destabilization, Climate-Related Harms, and other dangers, because they knew and/or should have known of the unreasonable risks of harm associated with the use of these products, as described herein.

429.    Despite the Fossil Fuel Defendants' superior and unequal knowledge of the risks posed by fossil fuel products, the Fossil Fuel Defendants failed to adequately warn consumers and the State and its residents of the known and foreseeable risks of climate destabilization, Climate-Related Harms, and other dangers that would inevitably follow from the intended or reasonably foreseeable use of these products.

189

430. Not only did Fossil Fuel Defendants fail to adequately warn, but the Fossil Fuel Defendants, through their decades-long tortious campaign of deception described herein, also represented, asserted, claimed, and warranted that their fossil fuel products were safe for their intended and foreseeable uses.

431. Any warnings the Fossil Fuel Defendants may have issued as to the risks of their fossil fuel products were rendered ineffective and inadequate by Fossil Fuel Defendants' false and misleading public relations campaigns and statements about fossil fuel products, and their years-long efforts to conceal and misrepresent the dangers that follow from the intended or reasonably foreseeable use of such products.

432. Fossil Fuel Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time—including by their own research divisions—advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable users and consumers, including the State and its residents, from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products would cause grave climate changes, undermining and rendering ineffective any warnings that Fossil Fuel Defendants may have disseminated.

433. Accordingly, the ordinary user and consumer, including the State and its residents, would not have recognized and did not recognize that the use of fossil fuel products causes global and localized changes in climate, and would result in injuries to the State and its residents, communities, property, and resources, as described herein, or would not have recognized and did not recognize the extent of the harm that would be caused by fossil fuels.

434. Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from trade associations and entities, and/or from the international scientific community, that the Climate-Related Harms described herein rendered their fossil fuel products dangerous, or likely to be dangerous, when used in the manner reasonably foreseeably intended.

435.    The fossil fuel products that Fossil Fuel Defendants refined, formulated, designed, manufactured, merchandised, advertised, promoted, and/or sold—whether used as intended or used in a reasonably foreseeable manner—were not reasonably safe at the time they left Fossil Fuel Defendants' control because they lacked adequate warnings and instructions.

436.    Fossil Fuel Defendants expected that their fossil fuel products would reach consumers and/or users without a substantial change in those products' conditions; and their fossil fuel products did reach consumers and/or users without a substantial change in those products' conditions.

437.    Fossil Fuel Defendants have had actual and/or constructive knowledge about Climate-Related Harms, based on information known to their internal research divisions and affiliates, from their non-party trade associations and entities, and/or from the international scientific community, which rendered the fossil fuel products hazardous to State natural resources and property.

438.    The foregoing facts relating to the hazards that fossil fuel products pose to State natural resources and property are not the sort of facts that the State and its residents could ordinarily observe or protect themselves against.

439.    Fossil Fuel Defendants breached their duty to warn by unreasonably failing to provide the State and its residents with warnings regarding the potential and/or actual threat to human health and the environment caused by pollution released from the manufacturing and consumption of fossil fuels, despite Fossil Fuel Defendants' vast amounts of knowledge and research demonstrating the threats Fossil Fuel Defendants' fossil fuel products presented to the State and its residents.

440.    Given the grave dangers presented by the climate effects that inevitably flow from the normal and foreseeable use of fossil fuel products, a reasonable extractor, manufacturer, formulator, seller, or other participant responsible for introducing fossil fuel products into the stream of commerce, would have warned of those known, inevitable climate effects.

191

441. Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, their fossil fuel products would not have earned widespread acceptance in the marketplace, fossil fuel alternatives could have been developed faster, investment in fossil fuel alternatives would be greater, and/or fossil fuel alternatives would be used in greater amounts.

442. Moreover, had the Fossil Fuel Defendants provided adequate warnings about the adverse impacts to public health and the environment, and to the State and its residents in particular, that result from the intended and reasonably foreseeable use of fossil fuel products, the State and its residents would have taken measures to decrease fossil fuel dependency in order to avoid or lessen the Climate-Related Harms and property damage that would inevitably follow.

443. As a result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products, Fossil Fuel Defendants are strictly liable to the State.

444. The Fossil Fuel Defendants consciously disregarded the health, safety, property, and rights of others in engaging in the decades-long tortious campaign of deception described herein.

445. As a direct and proximate result of Fossil Fuel Defendants' acts and omissions, the State has sustained and will sustain substantial expenses and damages, including damages for loss of use and enjoyment.

446. As a direct and proximate result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products, the State has incurred and will continue to incur costs and damages related to physical damage to State property, State infrastructure, human health, and natural resources.

447. As a direct and proximate result of Fossil Fuel Defendants' acts and omissions as alleged herein, the State and its residents have suffered monetary and non-monetary losses and damages in amounts to be proven at trial. Fossil Fuel Defendants' conduct was a substantial factor in bringing about the harms suffered by Plaintiffs as alleged herein.

448.    Fossil Fuel Defendants' decades-long campaign of intentional deception was, and is, wantonly designed by Fossil Fuel Defendants to enrich themselves without regard to or remorse for the known and increasingly catastrophic injuries to the State and its property, infrastructure, and natural resources, or to the health, safety, and wellbeing of the State's residents—all of which Fossil Fuel Defendants' scientists long foresaw. Fossil Fuel Defendants acted intentionally, willfully, wantonly, oppressively, or with gross negligence, and Fossil Fuel Defendants' conduct was so outrageous that malice toward the State and its residents may also be implied. Fossil fuel Defendants' want of care raises the presumption of a conscious indifference to the consequences of their conduct. Punitive damages are warranted to punish and deter Defendants.

## PRAYER FOR RELIEF

WHEREFORE, the State of Hawai'i seeks judgment in its favor and against Defendants for:

A.    Compensatory damages in an amount according to proof;

B.    Punitive damages as permitted by law;

C.    Natural resource damages;

D.    Any other damages as permitted by law;

E.    Disgorgement of profits;

F.    Equitable relief, including abatement in Hawai'i of the nuisances complained of herein, for example by means of an equitable fund to pay for adaptation, mitigation, and resilience measures in the State;

G.    Civil penalties pursuant to HRS § 480-3.1;

H.    Damages pursuant to HRS § 480-13;

I.    Treble damages pursuant to HRS § 480-14;

J.    An order enjoining Defendants from engaging in the unfair or deceptive acts or practices described herein;

K.    A finding that Defendants are liable under each cause of action asserted herein;

L.    An order holding Defendants jointly and severally liable for all past damages the State has incurred, and future damages the State will incur as a result of Defendants'

193

conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, natural resource damages, any other compensatory and exemplary damages available under Hawaiʻi law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the State will face;

M.      Reasonable attorney fees, court costs, and other expenses of litigation as permitted by law;

N.      Pre-judgment and post-judgment interest; and

O.      Any other and further relief as the Court deems appropriate and just.

DATED: May 1, 2025         **ANNE E. LOPEZ**
Honolulu, Hawaiʻi         **ATTORNEY GENERAL**


By:    */s/ Wade H. Hargrove III*

MELISSA J. KOLONIE
Supervising Deputy Attorney General
WADE H. HARGROVE III
LYLE T. LEONARD
Deputy Attorneys General
Department of the Attorney General
State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Telephone:    (808) 587-3050
Facsimile:    (808) 587-3077
Email:         wade.h.hargrove@hawaii.gov

VICTOR M. SHER (*pro hac vice* forthcoming)
MATTHEW K. EDLING (*pro hac vice* forthcoming)
STEPHANIE D. BIEHL (*pro hac vice* forthcoming)
WILLIAM LIANG    #11790
**SHER EDLING LLP**
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Telephone:    (628) 231-2500
Facsimile:    (628) 231-2929
Email: vic@sheredling.com

194

matt@sheredling.com
stephanie@sheredlig.com
william@sheredling.com

*Attorneys for Plaintiff State of Hawai'i*

## REQUEST FOR JURY TRIAL

The State of Hawai'i hereby demands a jury trial on all issues so triable.

**ANNE E. LOPEZ**
**ATTORNEY GENERAL**

DATED: May 1, 2025
Honolulu, Hawai'i              By:    _/s/ Wade H. Hargrove III_

MELISSA J. KOLONIE
Supervising Deputy Attorney General
WADE H. HARGROVE III
LYLE T. LEONARD
Deputy Attorneys General
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Telephone:    (808) 587-3050
Facsimile:    (808) 587-3077
Email:        wade.h.hargrove@hawaii.gov

VICTOR M. SHER (*pro hac vice* forthcoming)
MATTHEW K. EDLING (*pro hac vice* forthcoming)
STEPHANIE D. BIEHL (*pro hac vice* forthcoming)
WILLIAM LIANG (#11790)
**SHER EDLING LLP**
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Telephone:    (628) 231-2500
Facsimile:    (628) 231-2929
Email:        vic@sheredling.com
              matt@sheredling.com
              stephanie@sheredling.com
              william@sheredling.com

*Attorneys for Plaintiff State of Hawai'i*

196

| **STATE OF HAWAIʻI** CIRCUIT COURT OF THE FIRST CIRCUIT | **SUMMONS** TO ANSWER CIVIL COMPLAINT / |  |
|---|---|---|
| **CASE NUMBER** | | |

**PLAINTIFF'S NAME & ADDRESS, TEL. NO.**

THE STATE OF HAWAIʻI, ex. rel., ANNE E. LOPEZ, ATTORNEY GENERAL

425 Queen Street

Honolulu, Hawaiʻi 96813

Telephone: (808) 587-3050

Facsimile: (808) 587-3077

| **PLAINTIFF** VS. | **DEFENDANT(S)** |
|---|---|
| THE STATE OF HAWAIʻI, ex. rel., ANNE E. LOPEZ, ATTORNEY GENERAL | BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORP.; CHEVRON USA INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; SHELL P.L.C.; SHELL USA, INC.; EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US;  SHELL TRADING (US) COMPANY; SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; WOODSIDE ENERGY HAWAII INC. f/k/a BHP HAWAII INC.; AMERICAN PETROLEUM INSTITUTE; AND DOES 1 through 100, inclusive. |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to filed with the court and serve upon:

The State of Hawaiʻi, ex. rel., Anne E. Lopez, Attorney General
Wade H. Hargrove, III, Department of the Attorney General, 465 South King Street, Room 200, Honolulu, Hawaiʻi 96813

_____,

plaintiff, as indicated above/whose address is stated above, an Answer to the Complaint /
_____, which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRYOF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http:/www.courts.state.hi.us | **Effective Date of 1-DEC-2021** **Signed by: /s/ Patsy Nakamoto** **Clerk, 1st Circuit, State of Hawaiʻi** |  |
|---|---|---|

 If you need an accommodation for a disability when participating in a court program, service, or activity, please contact the ADA Coordinator of the XX Circuit as soon as possible to allow the court time to provide an accommodation. Phone No. 808-539-4400, TTY 808-539-4853, FAX 808-539-4402 or Send an e-mail to:  adarequest@courts.hawaii.gov. The court will try to provide, but cannot guarantee, your requested auxiliary aid, service or accommodation.

Form 1C-P-787 (12/21)  1CCT
Summons to Complaint